No. 26-5235

## IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

HERITAGE FOUNDATION AND MIKE HOWELL,

*Plaintiffs-Appellees*,

—v.—

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellee,*

*and*

JOSEPH R. BIDEN, JR.,

*Defendant-Intervenor-Appellant*.

## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL BY JOSEPH R. BIDEN, JR.

AMY JEFFRESS, BAR NO. 44740
  *Counsel of Record*
KAITLIN KONKEL, BAR NO. 64682
TAISA M. GOODNATURE
H. ATTICUS BALLESTEROS
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

*Counsel for Defendant-Intervenor-Appellant Joseph R. Biden, Jr.*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    I.     The Private Conversations at Issue and the Special Counsel's
         Investigation ...............................................................................3

    II.    Developments in this Litigation and the Department's
         About-Face ..................................................................................4

LEGAL STANDARD..............................................................................................6

ARGUMENT ..........................................................................................................7

    I.     President Biden Is Likely to Succeed on the Merits ............................7

         A.     Disclosure to the Heritage Plaintiffs Would Violate the
              Privacy Act..................................................................................7

         B.     Separately, the Department's Disclosure Decision Is
              Arbitrary, Capricious, and an Abuse of Discretion ..................16

    II.    President Biden Will Suffer Imminent, Irreparable Harm..................21

    III.   The Remaining Factors Strongly Favor an Injunction.......................22

CONCLUSION.......................................................................................................23

**TABLE OF AUTHORITIES**

**CASES**

*AFL-CIO v. DOL*,
No. 25 Civ. 339, 2025 WL 1783899 (D.D.C. June 27, 2025)......................22

*Bartel v. FAA*,
725 F.2d 1403 (D.C. Cir. 1984)............................................................... 11, 13

*Bowen v. Massachusetts*,
487 U.S. 879 (1988).....................................................................................8

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)...................................................................................18

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
746 F.3d 1082 (D.C. Cir. 2014).................................................................16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)...................................................................................17

*CNA Fin. Corp. v. Donovan*,
830 F.2d 1132 (D.C. Cir. 1987).................................................................17

*Ctr. for Taxpayer Rts. v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025)...............................................................22

*Data-Prompt, Inc. v. Cisneros*,
52 F.3d 1122 (D.C. Cir. 1995)...................................................................19

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020).......................................................................................20

*DOD v. FLRA*,
510 U.S. 497 (1994)............................................................................. 11, 16

*Doe v. Chao*,
540 U.S. 614 (2004).....................................................................................8

*Doe v. Hill*,
141 F.4th 291 (D.C. Cir. 2025)......................................................................10

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988)........................................................................8

*DOJ v. Reps. Comm. for Freedom of the Press*,
489 U.S. 749 (1989).................................................................... 14, 22

*FAA v. Cooper*,
566 U.S. 284 (2012)........................................................................................8

*Fitzgibbon v. CIA*,
911 F.2d 755 (D.C. Cir. 1990)......................................................................14

*Hosp. Staffing Sols., LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010)..............................................................21

*John Doe Agency v. John Doe Corp.*,
488 U.S. 1306 (1989)................................................................... 21, 23

*John Doe Co. v. CFPB*,
235 F. Supp. 3d 194 (D.D.C. 2017)..............................................................21

*Jurewicz v. USDA*,
891 F. Supp. 2d 147 (D.D.C. 2012)..............................................................18

*Jurewicz v. USDA*,
741 F.3d 1326 (D.C. Cir. 2014)............................................................ 17, 18

*Kowal v. DOJ*,
107 F.4th 1018 (D.C. Cir. 2024)...................................................................15

*League of Women Voters v. DHS*,
No. 25 Civ. 3501, 2026 WL 1784297 (D.D.C. June 22, 2026)......................8

*Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*,
No. 23-5096, 2023 WL 7294839 (D.C. Cir. May 25, 2023)..........................6

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)................................................................10

*Maness v. Meyers*,
    419 U.S. 449 (1975)................................................................22

*Martin v. DOJ*,
    488 F.3d 446 (D.C. Cir. 2007)............................................. 14, 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.Co.*,
    463 U.S. 29 (1983)................................................................20

*N.Y. Times Co. v. NASA*,
    920 F.2d 1002 (D.C. Cir. 1990).................................................15

*News-Press v. DHS*,
    489 F.3d 1173 (11th Cir. 2007) ................................................13

*People for the Am. Way Found. v. U.S. Dep't of Educ.*,
    518 F. Supp. 2d 174 (D.D.C. 2007)............................................21

*RNC v. Pelosi*,
    2022 No. 22-5123 (D.C. Cir. 2022)...........................................21

*In re Search Warrant*,
    No. 00-138M-01, 2000 WL 1196327 (D.D.C. July 24, 2000).....................23

*Seven County Infrastructure v. Eagle County*,
    605 U.S. 168 (2025) ......................................................... 10, 11

*United States v. Philip Morris, Inc.*,
    314 F.3d 612 (D.C. Cir. 2003)..................................................22

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977)............................................. 6, 7, 23

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018)................................................................17

iv

**STATUTES**

5 U.S.C. § 552 ................................................................. 13, 14, 19, 26

5 U.S.C. § 552a .................................................................... *passim*

5 U.S.C. § 701 ............................................................................17

5 U.S.C. § 702 ............................................................................19

5 U.S.C. § 704 ..............................................................................8

5 U.S.C. § 706 ..............................................................................9

**INTRODUCTION**

President Biden seeks an injunction pending appeal to prevent an irreversible change in the status quo.  This appeal seeks review of an order denying President Biden's motion to preliminarily enjoin the U.S. Department of Justice (the "Department") from disclosing sensitive law enforcement records—recordings and transcripts of personal conversations that took place at his home in 2016 and 2017—to the Heritage Foundation and Mike Howell (the "Heritage Plaintiffs").  As the district court recognized in granting a temporary injunction last week, "the legal issues before the Court are complex and considerable, the need for records disclosure is not immediate, [and] the harms to the objecting party are irreparable."  App-030.  The temporary injunction expires on **July 10, 2026**, at 5:00 p.m.[1]

An injunction pending appeal is needed to avoid the very harm this litigation seeks to prevent.  The private conversations at issue were never intended to be shared with a wider audience, and the Department has them only because it collected the recordings as part of a criminal investigation that resulted in no charges.  As the Department forcefully argued before it changed course in this case, publicly disseminating such conversations through FOIA "would be exceedingly harmful"—akin to "releasing the pages of an unindicted suspect's diary entries, or

---

[1] Counsel for President Biden informed the other parties of this motion by email on June 23, 2026.  *See* Cir. R. 8(a)(2).

the private text messages exchanged on the suspect's phone." App-048, 072.

President Biden satisfies all the factors for an injunction pending appeal. If the temporary injunction expires and the Department discloses his private conversations, that action will moot this case and extinguish his right to appellate review. By contrast, as the district court recognized, there is no immediate need for the Heritage Plaintiffs to access the materials. This FOIA action has been pending for nearly two and a half years, and there is no meaningful public interest—let alone one that must be satisfied in the immediate days or weeks—in the disclosure of decade-old conversations of a former President who is now a private citizen, and who neither holds nor is seeking public office.

In addition, President Biden is likely to prevail on the merits of his claims under the Administrative Procedure Act ("APA"), both because the disclosure is "not in accordance with" the Privacy Act and because the Department's disclosure decision is neither reasonable nor reasonably explained. In deciding these complex issues in an emergency posture, the district court committed dispositive errors invited by the Department, and this Court should grant an injunction pending appeal to review and correct these errors. An injunction is also warranted because this appeal presents "difficult and weighty" merits questions, as the district court recognized. App-029.

2

# BACKGROUND

## I.     The Private Conversations at Issue and the Special Counsel's Investigation

In 2016 and 2017, President Biden met with his writing partner, Mark Zwonitzer, to discuss what would become his 2017 memoir.  App-066.  Their discussions, which Zwonitzer recorded in President Biden's home, were candid and personal, covering sensitive topics such as family health issues, President Biden's relationships with public and private figures, and President Biden's decision whether to run for President in 2016.  App-066-067, 071.  The conversations were never intended for public disclosure.  App-071.

Years later, in 2023, Attorney General Merrick Garland appointed Special Counsel Robert Hur to investigate then-President Biden's handling of classified documents.  App-064.  The Department obtained the recordings under an agreement restricting access and use to advancing the Special Counsel's investigation.  App-274-75; *see* App-235, 344.

President Biden was never charged with a crime.  In his final report, Hur relied on limited excerpts from President Biden's conversations with Zwonitzer, all relating to his service as Vice President.  App-350-58.  Relevant materials now available to the public include Hur's 345-page final report; Hur's congressional testimony; partially redacted transcripts and audio recordings of Hur's interview of

President Biden; and a partially redacted transcript of Hur's interviews of Zwonitzer. App-038-039, 072-073.

## II.    Developments in this Litigation and the Department's About-Face

The relevant FOIA request sought certain "[r]ecords [r]elied [u]pon by Special Counsel Robert K. Hur." ECF No. 6-3, No. 24 Civ. 645 (D.D.C. Mar. 13, 2024). In October 2024, the Department provided the Heritage Plaintiffs with redacted transcripts from the Zwonitzer recordings, App-064, 083-199, following a careful process of reviewing the relevant materials and assessing the relevant privacy interests and public interests, as set forth in Associate Deputy Attorney General Bradley Weinsheimer's declaration, App-063-076. The Department left unredacted the portions quoted in Hur's report, and it explained that redaction of the remainder was necessary, among other reasons, because "the information withheld from the transcripts reflects the content of sensitive, private recordings, which are only in the government's possession because they were gathered pursuant to a law enforcement investigation that yielded no charges." App-075. The Department further explained that a private, uncharged individual is "entitled to the utmost privacy protection" and concluded that "disclosure of any of the withheld information would result in an unwarranted invasion of personal privacy." *Id*.

In November and December 2024, the parties briefed cross-motions for summary judgment on the validity of the Department's FOIA withholdings. App-

4

593.   The Department argued forcefully that disclosure of the materials "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  App-038.

In February 2026, the Department reversed course, informing President Biden through counsel that it intended to produce the audio recordings and transcripts with only limited redactions.  App-236-37.  Counsel for President Biden engaged with the Department in an effort to resolve this matter without litigation.  Midway through that process, the Department announced its intent to disclose the materials to Congress pursuant to a request from the House Judiciary Committee—a request the Committee had not yet issued and the Department had not yet received.  *See* App-237-38, 279-80.

On May 5, the Department informed President Biden that it had made a final decision to release the materials to the Heritage Plaintiffs and Congress on June 15, with certain redactions, absent a court order blocking release.  App-238-39.

On May 21, the district court granted President Biden leave to intervene, App-281-93, and he moved for a preliminary injunction on May 29, App-294-342.[2]  On June 19, the district court denied President Biden's preliminary injunction motion,

---

[2] President Biden filed a separate lawsuit challenging the proposed disclosure to Congress.  *Biden v. U.S. Dep't of Just.*, No. 26-cv-1818-TSC (D.D.C.).

App-001, and granted in part his emergency motion for an injunction pending appeal, App-028-031. The court prohibited disclosure "for a period of three weeks"—until July 10, 2026—"to permit the Court of Appeals for the D.C. Circuit an orderly period to consider whether to grant an injunction pending appeal." App-031. The court explained that, "[w]here, as here, the legal issues before the Court are complex and considerable, the need for records disclosure is not immediate, the harms to the objecting party are irreparable, and the Court's decision is likely unreviewable, a temporary status-quo-preserving injunction is proper." App-030.

## LEGAL STANDARD

In considering whether to grant an injunction pending appeal, the Court must balance four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) whether an injunction will substantially harm other interested parties; and (4) the public interest. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *see also Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 WL 7294839, at *5 (D.C. Cir. May 25, 2023) (per curiam). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public[,] and when denial of the order would inflict irreparable injury on the movant." *Holiday Tours*, 559 F.2d at 844.

## ARGUMENT

President Biden satisfies all the factors for an injunction pending appeal: he is likely to prevail on the merits; he will suffer irreparable harm absent an injunction; no other interested party will suffer substantial harm if an injunction is granted; and the public interest weighs strongly in his favor. *See Holiday Tours*, 559 F.2d at 844.

### I.    President Biden Is Likely to Succeed on the Merits

President Biden is likely to prevail on each of his APA theories. As the district court recognized, President Biden has raised serious legal questions as to the merits, and the Court should grant an injunction to preserve the status quo while it considers these "difficult and weighty" questions. App-029.

### A.    Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act

President Biden is likely to succeed on his APA claim that the Department's proposed disclosure is barred by the Privacy Act and thus is contrary to law. At the threshold, the district court correctly held that President Biden "can challenge the agency's disclosure decision through a 'reverse-FOIA' suit under the APA." App-005. Moreover, nearly all the elements of unlawful disclosure under the Privacy Act are undisputed. *See* App-010, 531. The Department's sole merits argument is that the proposed release falls within the Privacy Act's exception for disclosures "required under [FOIA]." 5 U.S.C. § 552a(b)(2); *see* App-439-41. But disclosure is not "required" because Exemptions 6 and 7(C) apply, and the district court erred

in deferring to the agency's contrary position rather than conducting the required independent review.

### 1. President Biden May Pursue Declaratory and Injunctive Relief Under the APA

The district court correctly held that President Biden may seek equitable relief under the APA because "there is no other adequate remedy" for the Department's proposed Privacy Act violation.  *See* App-005-008; 5 U.S.C. § 704.  The court's analysis was consistent with the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988); its dicta in *FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012), and *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004); this Court's decision in *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988); and recent persuasive authority from this district, *see* App-007-008 (discussing cases); *see also League of Women Voters v. DHS*, No. 25 Civ. 3501, 2026 WL 1784297, at \*21-23 (D.D.C. June 22, 2026); App-330-31, 531-36.  President Biden therefore is likely to succeed on this aspect of his claims.

### 2. The District Court Was Obligated to Independently Assess Whether Disclosure of the Materials Is "Required" Under FOIA

The Privacy Act prohibits agencies from disclosing "any record which is contained in a system of records … except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless a statutory exception applies.  5 U.S.C. § 552a(b).  Here, the analysis hinges on the

8

Privacy Act's exception for disclosures "required under [FOIA]," 5 U.S.C. § 552a(b)(2), which turns on whether any FOIA exemptions apply, *see* App-331, 536. If any exemptions apply here—and they do—disclosure is not "required under [FOIA]" and is therefore contrary to the Privacy Act. 5 U.S.C. § 552a(b); *see* 5 U.S.C. § 706(2)(A).

The district court erroneously deferred to the agency's new legal position that disclosure is required under FOIA. But President Biden expressly pleaded Count IV as a contrary-to-law claim, distinct from the arbitrary-and-capricious and abuse-of-discretion theories of Counts I and II. *Compare* App-267-69 (¶¶ 89-97) (alleging that the proposed disclosure would violate the Privacy Act), *with* App-265-66 (¶¶ 77-84). Although President Biden emphasized and preserved this distinction in briefing and at argument,[3] the district court merged these inquiries and conducted a single, "highly deferential abuse-of-discretion review under the APA." App-024; *see* App-010 (asserting that "the legality of disclosure under the Privacy Act here turns on whether the Department abused its discretion in determining that the FOIA exemptions did not apply"). This error infected the district court's analysis and conclusions, leading it to defer to the agency on legal questions it should have

---

[3] *See, e.g.*, App-330-31, 336 (addressing contrary-to-law theory); *compare* App-330-36 (Count IV contrary-to-law claim) *with* App-323-30 (Counts I and II); App-545-46 (explaining that Privacy Act claim is "separate" from other APA claims and that "without the Privacy Act challenge," the abuse-of-discretion standard would apply).

analyzed independently. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law ….").

The district court applied a highly deferential standard drawn from *Seven County Infrastructure v. Eagle County*, 605 U.S. 168 (2025). App-014-015 (reasoning that the Department's FOIA analysis warranted "substantial deference" within a "broad zone of reasonableness"). But *Seven County* did not involve the Privacy Act or a contrary-to-law analysis. Rather, the case's reasoning is confined to environmental assessments under the National Environmental Policy Act—a "purely procedural statute"—which "invariably" involve "fact-dependent, context-specific, and policy-laden choices." 605 U.S. at 172, 183. While the "broad zone of reasonableness" test applied in that context, *id.* at 179-80, it does not apply to judicial assessments of whether a statute "require[s] any particular substantive outcome," *id.* at 180. The former scenario implicates the "arbitrary-and-capricious standard," whereas the latter raises questions of statutory authority that courts must decide "*de novo*." *Id.* at 179-80 (citation omitted).

As President Biden argued in the district court, the text of § 552a(b)(2)'s exception provides that disclosure must be "required"—not just permitted—by FOIA. App-331. And disclosure is not "required" when a FOIA exemption applies, as this Court generally has recognized. *See, e.g., Doe v. Hill*, 141 F.4th 291, 297

10

(D.C. Cir. 2025), *cited in* App-331 (explaining that § 552a(b)(2) "prohibit[s] agencies from disclosing information about private citizens when a FOIA exemption applies"); *Bartel v. FAA*, 725 F.2d 1403, 1412 (D.C. Cir. 1984) ("Only when the agency is faced with a FOIA request for information that is not within a FOIA exemption, and therefore has no discretion but to disclose the information, does the FOIA exception to the Privacy Act come into play."). The question, then, is a legal one—not a "policy-laden" analysis to which courts may defer. *Seven County*, 605 U.S. at 183.

Supreme Court precedent also requires this independent review. In *DOD v. FLRA*, the Court decided the same statutory question: whether disclosure of records about an individual "would be 'required under section 552'" for purposes of the § 552a(b)(2) Privacy Act exception. 510 U.S. 487, 491 (1994) (quoting 5 U.S.C. § 552a(b)(2)). To answer that question, the Supreme Court independently analyzed whether Exemption 6 applied, balancing the public and private interests. *Id.* at 495-502. The Court ultimately concluded—relying on its own assessment and not the agency's—that the exemption applied and that disclosure therefore was not "required" under FOIA. *Id.* at 502; *see also id.* at 495 (referring to evaluation of FOIA exemptions by "a court").

Deciding these complex matters in an emergency posture, the district court applied a "highly deferential abuse-of-discretion" standard where it should have

11

conducted an independent review.  App-024; *see* App-557-58, 561-62 (invitation to error by the Department).  If such deference were the law, it would severely undermine the Privacy Act's constraints on agency disclosures from law-enforcement files.  The Department could release much of the sensitive information it maintains, provided it follows a simple playbook: (i) collect evidence from individuals based on its broad investigatory powers; (ii) solicit a FOIA request from a friendly organization; (iii) decide that FOIA Exemptions 6 and 7(C) do not apply; and (iv) if challenged in court for violating the Privacy Act, argue that the court must defer to the agency's determination that the exemptions do not apply and disclosure therefore is "required under [FOIA]."  5 U.S.C. § 552a(b)(2).

The Department insists that this case is unique and that the district court's decision will not authorize federal officials to abuse their sweeping control over private information contained in law enforcement files.  App-562; *see also* App-023-025.  But no such limiting principle is embedded in the order on review.  Just the opposite: by deferring to the "Department's assessment" of potential defects in Hur's exercise of prosecutorial discretion, including the Department's unsupported assertion that Hur may have "pulled his punches," App-020, the ruling carves out a pathway for the Department to offer up investigative files any time a FOIA requestor seeks information about a declination decision.  Deferring to the Department on the legality of its own disclosure would gut critical Privacy Act protections against the

12

release of private information collected in criminal investigations—including personal text messages, diary entries, photographs, and other private material.

The Privacy Act does not permit that result. *Cf. Bartel*, 725 F.2d at 1408-11 (rejecting application of the Privacy Act that would allow agencies to "circumvent" the Act's core protections). To the contrary, as the Eleventh Circuit has explained, "where the FOIA requires disclosure, the Privacy Act will not stand in its way, but where the FOIA would permit withholding under an exemption, the Privacy Act makes such withholding mandatory upon the agency." *News-Press v. DHS*, 489 F.3d 1173, 1189 (11th Cir. 2007).

### 3. Because Exemptions 6 and 7(C) Apply, Disclosure Is Not "Required" Under FOIA

President Biden is likely to prevail on his position that disclosure is not "required under [FOIA]" because FOIA Exemptions 6 and 7(C) apply. 5 U.S.C. § 552a(b)(2). Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) covers "records or information compiled for law enforcement purposes" where production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C); *see also* App-014 (because Exemption 7(C) applies more broadly than Exemption 6, courts need only address the former where law enforcement records are involved).

<center>13</center>

To determine whether an invasion of personal privacy "could reasonably be expected to be unwarranted," 5 U.S.C. § 552(b)(7)(C), "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect," *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989). As this Court has explained, "rarely does a public interest outweigh an individual's privacy interest when law enforcement information pertaining to an individual is sought." *Martin v. DOJ*, 488 F.3d 446, 457 (D.C. Cir. 2007) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990)).

President Biden has substantial privacy interests in the recorded conversations. Because the district court deferred to the Department rather than conducting an independent review, however, it severely undervalued these interests. For example, the court gave dispositive weight to the Department's redaction of direct references to President Biden's family members, family health issues, and certain third parties, App-017, but it did not address President Biden's position—the same position formerly advanced by the Department—that the conversations as a whole were private and that Exemption 7(C)'s protections are not limited to the most sensitive portions, App-522. The court also acknowledged key points in favor of non-disclosure that could change the ultimate outcome on *de novo* review: The conversations took place in President Biden's home and were not intended for public disclosure, App-025; the recordings involve "frank words" and discussion of topics

14

that "could be considered sensitive," App-018, 025; and President Biden did not lose his privacy rights by serving as a public official, App-017.

The Department's analysis also disregards binding precedent, and the district court's deferential review incorporated these errors into its own analysis. Critically, the court failed to consider the case law relating to law-enforcement records, which makes clear that uncharged individuals' privacy interests extend well beyond the Department's narrow view of appropriate redactions in this case. *See* App-527-28. Moreover, the district court recognized that President Biden has a separate privacy interest in his voice, App-018 (citing *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1009 (D.C. Cir. 1990) (en banc)), but it dismissed this interest as overridden by the Hur Report's references to President Biden's "tone," *id*. That analysis ignores the case law establishing that a "summary" of a conversation "is not the same as the conversation itself." *Kowal v. DOJ*, 107 F.4th 1018, 1030 (D.C. Cir. 2024). Similarly, in reasoning that President Biden's privacy interests were "diminished by the [Hur] Report's descriptions and the publication of his memoir" even though "the same detail or exact language" is not present, App-018, the district court disregarded case law providing that an exact match is required, App-527.

On the other side of the balance, any light that disclosure might shed on the Special Counsel's investigation is *de minimis*. "The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information

15

sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Citizens for Resp. & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014) (alterations adopted) (quoting *DOD*, 510 U.S. at 497). "That is, the relevant public interest is *not* to find out what [President Biden] himself was 'up to.'" *Id.*; *contra* App-571-73. The transcripts and recordings of President Biden's decade-old conversations have minimal bearing on this question, particularly in light of the materials that are already in the public domain. *See* App-320-21, 521-31.

The district court recognized that President Biden has raised serious legal questions. App-029; *see also* App-559 (acknowledging a public interest in references to classified information, but stating that "[i]t's hard to see the public interest in the other nearly two hours of uncensored audio"). An injunction pending appeal is warranted to preserve the status quo while the Court considers these important issues.

### B. Separately, the Department's Disclosure Decision Is Arbitrary, Capricious, and an Abuse of Discretion

President Biden also is likely to succeed on the merits of Counts I and II, which seek relief under the arbitrary-and-capricious and abuse-of-discretion provisions of the APA.

To start, the district court erred in concluding that the Department's decision that FOIA requires disclosure is unreviewable because it is "committed to agency

discretion by law." App-008 (quoting 5 U.S.C. § 701(a)(2)). This is not one of "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," such that § 701(a)(2) would bar review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citation modified); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (describing the "strong presumption favoring judicial review" (citation omitted)). Rather, the relevant FOIA exemptions and decades of precedent interpreting them supply ample "law to apply" in reviewing an agency's decision that FOIA requires disclosure. *Volpe*, 401 U.S. at 410 (citation omitted); *see Jurewicz v. USDA*, 741 F.3d 1326, 1332-34 (D.C. Cir. 2014).

Although the Department contends that the standards underlying Exemptions 6 and 7(C) are "inherently discretionary," *see, e.g.*, App-409, it has consistently maintained that the disclosure here is required under FOIA—not that the Department has decided to make a voluntary release as an exercise of discretion despite the availability of FOIA exemptions, *see, e.g.*, App-407, 439-40. That is, the Department based its disclosure decision not on any "belief that release is justified in the exercise of its discretion," but rather on its legal conclusion "that none of the FOIA exemptions applies, and thus that disclosure is mandatory." *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1133 n.1 (D.C. Cir. 1987). Accordingly, the Court

17

need not decide the availability or scope of APA review when an agency concludes that FOIA does not require release but nevertheless makes a voluntary disclosure.

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), on which the district court relied, is therefore inapposite. *See* App-008-010. In *Chrysler*, "the gravamen of [the plaintiff's] complaint" was a "voluntary disclosure … over and above that mandated by the FOIA." 441 U.S. at 287.

Moreover, as the district court acknowledged, its decision cannot be reconciled with *Jurewicz*, in which this Court reviewed an agency's decision that the agency was required to release information in response to a FOIA request under the APA's familiar arbitrary-and-capricious standard, even after concluding that no independent statute barred release. App-009-010; *see Jurewicz*, 741 F.3d at 1330-34. The district court sought to distinguish *Jurewicz* in a footnote, reasoning that the government had not argued in that case that the agency's decision was unreviewable. App-009 n.1. But in the decision under review in *Jurewicz*, the district court correctly explained that "because the [agency's] decision … rested purely on its determination that no exemption applied, the possibility of discretion play[ed] no role in judicial review." *Jurewicz v. USDA*, 891 F. Supp. 2d 147, 153 (D.D.C. 2012), *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014). Put simply, where—as here—an agency contends that its challenged decision is legally required, that decision cannot

possibly be committed to agency discretion by law.[4]  The district court's reliance on the premise that a precedential decision of this Court was wrongly decided also counsels strongly in favor of an injunction pending appeal.

On the merits, President Biden is likely to succeed on his claims that the Department's disclosure decision is arbitrary and capricious and an abuse of discretion.  As the Department previously argued at summary judgment, FOIA Exemptions 6 and 7(C) squarely apply to the materials because disclosure would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  App-038.

The Department's insistence that it can "reasonably" change its mind despite no relevant change in the private or public interests at issue, *see* App-409, cannot rescue its decision.  Exemption 7(C) shields law-enforcement materials whenever disclosure "*could reasonably be expected* to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C) (emphasis added).  That statutory language compels the conclusion that, where reasonable minds could differ, the tie

---

[4] In a non-precedential decision, this Court reversed a district court's decision that it lacked jurisdiction over a reverse-FOIA claim, explaining that, "[i]n the reverse-FOIA context, district courts have jurisdiction to hear complaints brought by parties claiming that an agency decision to release a document adversely affects them." *Data-Prompt, Inc. v. Cisneros*, 52 F.3d 1122 (D.C. Cir. 1995) (mem.) (per curiam) (citing, *inter alia*, 5 U.S.C. § 702).

goes to privacy. And as the Department itself has conceded, its prior position was reasonable. *See* App-409 ("[I]t should surprise no one that reasonable people in different administrations might weigh the relevant factors in different ways."). It thus reflects a "clear error of judgment," and a fundamental misunderstanding of the exemption, for the Department to claim that disclosure is required because the exemption does *not* apply. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *see* App-323-30, 518-29.

It is a bedrock principle of administrative law that "[a]n agency must defend its actions based on the reasons it gave when it acted." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). To the extent a Department employee addressed these matters in contemporaneous email correspondence, *see* App-325-28, his explanation was so flawed that the Department effectively abandoned it in litigation, *see* App-518. Those communications underscore the deficiencies in the Department's reasoning, and the district court erred in reading them to adequately explain the Department's unreasonable decision—an argument that even the Department did not make—and in considering the employee's post hoc declaration. *See* App-013, 020-022, 324-30, 519-21.

## II.    President Biden Will Suffer Imminent, Irreparable Harm

The district court correctly determined that President Biden will face "irreparable" and "imminent" harm absent an injunction.  *See* App-025, 030. "Courts routinely issue injunctions to stay the status quo when the trial court's order would otherwise allow the prevailing party to engage in actions that would moot the losing party's right to appeal." *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 205-07 (D.D.C. 2017); *e.g.*, Order, *RNC v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022), ECF No. 15 (per curiam); *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, J., in chambers).  Here, an injunction is "necessary to avoid irreparable injury" from the "release [of] documents prior to having the opportunity to seek meaningful appellate review." *People for the Am. Way Found. v. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007).

An injunction is also necessary to prevent "irreparable harm to [President] Biden's privacy interests."  App-029; *see* App-319-20 (describing privacy interests at issue).  As the district court recognized, disclosure of "the frank words of [President Biden] in his home," obtained solely to further a law enforcement investigation, "risks irreparable harm to [President] Biden's privacy interests and his reputation."  App-025 (citing *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010)).  Both the "type of information" at issue and the "breadth of disclosure"—unrestricted disclosure to a national advocacy organization that

21

intends to disseminate the materials, *see* ECF No. 50 at 5—weigh strongly in favor of finding actual and great harm to President Biden's privacy interests. *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 60-61 (D.D.C. 2025) (quoting *AFL-CIO v. DOL*, No. 25 Civ. 339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025)).

The fact that other materials are already in the public domain "does not diminish the harm that would result from releasing additional … information." *United States v. Philip Morris, Inc.*, 314 F.3d 612, 622 (D.C. Cir. 2003) (granting stay pending appeal). Nor does the potential availability of *partial* retrospective damages weigh against injunctive relief. *Contra* App-026. As the Supreme Court has recognized, disclosure of sensitive information "cause[s] irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released." *Maness v. Meyers*, 419 U.S. 449, 460 (1975).

Disclosure will extinguish President Biden's right of review and destroy his privacy interests in materials of "utmost" sensitivity. App-075. Such severe, irreparable harms weigh heavily in favor of an injunction pending appeal.

## III.    The Remaining Factors Strongly Favor an Injunction

The remaining factors also weigh in President Biden's favor. The public has a "strong" and longstanding interest in protecting private citizens from "the disclosure of records containing [their] personal details." *Reps. Comm.*, 489 U.S. at 766. The public also has a compelling interest in maintaining the integrity of law

enforcement files, *see In re Search Warrant*, No. 00-138M-01, 2000 WL 1196327, at *2 (D.D.C. July 24, 2000) (collecting cases), and in ensuring meaningful appellate review for those whose privacy is threatened, *see John Doe Agency*, 488 U.S. at 1309 (Marshall, J., in chambers).

On the other side of the scale, as the district court recognized, there is no "immediate need for the materials," App-029-030, and "there is little indication," if any, that an injunction "pending appeal will result in substantial harm to either appellee" or to the public, *Holiday Tours*, 559 F.2d at 843. Even if there were any cognizable public interest, the opposing parties have not explained why that interest requires *immediate* disruption of the status quo, extinguishment of President Biden's appellate rights, and irrevocable intrusion on his substantial privacy interests.

## CONCLUSION

For the foregoing reasons, the Court should grant President Biden's motion for injunction pending appeal before the district court's temporary injunction expires on Friday, July 10, 2026.

DATED: June 24, 2026                    Respectfully submitted,

                                        /s/ Amy Jeffress
                                        Amy Jeffress, Bar No. 44740
                                        Kaitlin Konkel, Bar No. 64682
                                        Taisa M. Goodnature
                                        H. Atticus Ballesteros
                                        HECKER FINK LLP
                                        1050 K Street NW, 10th Floor
                                        Washington, DC 20001
                                        (212) 763-0883
                                        ajeffress@heckerfink.com

                                        *Counsel for Defendant-Intervenor-*
                                        *Appellant Joseph R. Biden, Jr.*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,179/5,200 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced serif typeface.

DATED: June 24, 2026

/s/ Amy Jeffress
Amy Jeffress

*Counsel for Defendant-Intervenor-Appellant Joseph R. Biden, Jr.*

25

## CERTIFICATE AS TO PARTIES AND AMICI CURIAE

Pursuant to D.C. Circuit Rule 8(a)(4), counsel for Joseph R. Biden, Jr., certifies as follows:

Defendant-Intervenor-Appellant Joseph R. Biden, Jr., was the forty-seventh Vice President of the United States and the forty-sixth President of the United States. He is currently a private citizen.

Defendant-Appellee U.S. Department of Justice is a department of the executive branch of the United States government and an "agency" within the meaning of 5 U.S.C. § 552(f)(1) and 5 U.S.C. § 552a(a)(1).

Plaintiff-Appellee Heritage Foundation, upon information and belief, is a nonprofit organization established under the laws of the District of Columbia with its principal place of business in the District of Columbia.

Plaintiff-Appellee Mike Howell, upon information and belief, is or was an employee of Heritage Foundation.

No amici curiae participated before the district court.

DATED: June 24, 2026

/s/ Amy Jeffress
Amy Jeffress

*Counsel for Defendant-Intervenor-Appellant Joseph R. Biden, Jr.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2026, I caused this motion and appendix to be served as follows, pursuant to Federal Rule of Appellate Procedure 25(c)(2): (1) on all registered CM/ECF users by filing the document with the Clerk of Court for the U.S. Court of Appeals for the District of Columbia Circuit via the appellate CM/ECF system; (2) by email, with written consent, on the following persons identified as counsel for Plaintiffs-Appellees in this matter: Samuel Everett Dewey (samueledewey@sedchambers.com), Jeffrey Bossert Clark (jeff@itsyourgov.org), Dan D. Mauler (dan.mauler@heritage.org), Kyle Brosnan (kyle@itsyourgov.org), Eric Neal Cornett (neal@itsyourgov.org), and Anthony Licata (anthony@itsyourgov.org); and (3) by email, with written consent, on the following persons identified as counsel for Defendant-Appellee the U.S. Department of Justice in this matter: Sean R. Janda (sean.r.janda@usdoj.gov) and Daniel Tenny (daniel.tenny@usdoj.gov).

DATED: June 24, 2026

/s/ Amy Jeffress
Amy Jeffress

*Counsel for Defendant-Intervenor-Appellant Joseph R. Biden, Jr.*

27

No. 26-5235

## IN THE

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

HERITAGE FOUNDATION AND MIKE HOWELL,

*Plaintiffs-Appellees*,

—v.—

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellee*,

*and*

JOSEPH R. BIDEN, JR.,

*Defendant-Intervenor-Appellant*.

## APPENDIX TO EMERGENCY MOTION
## FOR INJUNCTION PENDING APPEAL BY JOSEPH R. BIDEN, JR.

AMY JEFFRESS, BAR NO. 44740
  *Counsel of Record*
KAITLIN KONKEL, BAR NO. 64682
TAISA M. GOODNATURE
H. ATTICUS BALLESTEROS
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

*Counsel for Defendant-Intervenor-Appellant Joseph R. Biden, Jr.*

## TABLE OF CONTENTS

| Name and Date Filed on D.D.C. Docket | ECF No. | Page |
|---|---|---|
| Order Denying Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction (June 19, 2026) | 77 | App-001 |
| Memorandum Opinion Denying Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction (June 19, 2026) | 78 | App-002 |
| Memorandum Opinion Granting in Part Joseph R. Biden, Jr.'s Emergency Motion for an Injunction Pending Appeal (June 19, 2026) | 83 | App-028 |
| Defendant U.S. Department of Justice's Memorandum of Law in Support of Motion for Summary Judgment (November 13, 2024) | 33-1 | App-032 |
| Declaration of Bradley Weinsheimer in Support of Defendant U.S. Department of Justice's Motion for Summary Judgment (November 13, 2024) | 33-2 | App-063 |
| Motion to Intervene by Joseph R. Biden, Jr. (May 12, 2026) | 51 | App-200 |
| Memorandum of Law in Support of Motion to Intervene by Joseph R. Biden, Jr. (May 12, 2026) | 51-1 | App-203 |
| Declaration of Amy Jeffress in Support of Motion to Intervene by Joseph R. Biden, Jr. (May 12, 2026) | 51-2 | App-233 |
| Answer to Amended Complaint and Cross-Claims of Joseph R. Biden, Jr. (May 12, 2026) | 51-3 | App-241 |
| Exhibit A to Answer & Cross-Claims: Agreement Between Special Counsel Robert K. Hur and the White House Counsel's Office, Executed on April 26, 2023 | 51-4 | App-273 |

| Name and Date Filed on D.D.C. Docket | ECF No. | Page |
|---|---|---|
| Exhibit B to Answer & Cross-Claims: Emails Between Richard Sauber of the White House Counsel's Office and "MHK" of the Special Counsel's Office, Dated May 12, 2023 | 51-5 | App-276 |
| Exhibit C to Answer & Cross-Claims: Letter from Rep. Jim Jordan, Chairman of the H. Committee on the Judiciary, to Pamela J. Bondi, U.S. Attorney General, Dated March 23, 2026 | 51-6 | App-278 |
| Memorandum Opinion Granting in Part Joseph R. Biden, Jr.'s Motion to Intervene (May 21, 2026) | 63 | App-281 |
| Motion for a Preliminary Injunction by Joseph R. Biden, Jr. (May 29, 2026) | 65 | App-294 |
| Memorandum of Law in Support of Motion for a Preliminary Injunction by Joseph R. Biden, Jr. (May 29, 2026) | 65-1 | App-296 |
| Supplemental Declaration of Amy Jeffress in Support of Motion for a Preliminary Injunction by Joseph R. Biden, Jr. (May 29, 2026) | 65-2 | App-343 |
| Exhibit 1 to Supplemental Jeffress Declaration: Excerpts from the February 2024 Report of Special Counsel Robert K. Hur | 65-3 | App-347 |
| Exhibit 2 to Supplemental Jeffress Declaration: Email Correspondence Between Amy Jeffress, Counsel to Joseph R. Biden, Jr., and Peter A. Winn, Acting Chief Privacy & Civil Liberties Officer at the U.S. Department of Justice, Between March 31, 2026, and April 16, 2026 | 65-4 | App-359 |
| Exhibit 3 to Supplemental Jeffress Declaration: White House "Fact Sheet: President Donald J. Trump Directs Review of Certain Presidential Actions" | 65-5 | App-366 |

| Name and Date Filed on D.D.C. Docket | ECF No. | Page |
|---|---|---|
| Exhibit 4 to Supplemental Jeffress Declaration: March 6, 2025, Post on X by Plaintiff-Appellee Mike Howell | 65-6 | App-371 |
| Exhibit 5 to Supplemental Jeffress Declaration: August 21, 2026, Post on X by Plaintiff-Appellee Mike Howell | 65-7 | App-373 |
| Exhibit 6 to Supplemental Jeffress Declaration: October 27, 2025, Report Published by the Oversight Project | 65-8 | App-375 |
| Exhibit 7 to Supplemental Jeffress Declaration: December 15, 2025, Post on X by Plaintiff-Appellee Mike Howell | 65-9 | App-388 |
| Exhibit 8 to Supplemental Jeffress Declaration: May 10, 2026, Post on X by Plaintiffs-Appellees' Counsel Jeff Clark | 65-10 | App-392 |
| Exhibit 9 to Supplemental Jeffress Declaration: May 26, 2026, Post on Truth Social by Donald J. Trump | 65-11 | App-394 |
| Memorandum of Law of the Department of Justice in Opposition to Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction (June 5, 2026) | 68 | App-397 |
| Declaration of Peter A. Winn in Support of the Department of Justice's Opposition to Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction (June 5, 2026) | 68-1 | App-446 |
| Plaintiffs' Opposition to Intervenor's Motion for Preliminary Injunction (June 5, 2026) | 69 | App-457 |
| Reply in Support of Motion for a Preliminary Injunction by Joseph R. Biden, Jr. | 73 | App-508 |
| Transcript of June 11, 2026, Motion Hearing Before the Honorable Dabney L. Friedrich | -- | App-541 |
| Docket in *Heritage Foundation, et al. v. U.S. Department of Justice, et al.*, No. 24-cv-645-DLF (D.D.C.) (as of June 23, 2026) | -- | App-586 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF JUSTICE,<br><br>*Defendant*,<br><br>JOSEPH R. BIDEN, JR.,<br><br>*Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is

**ORDERED** that the defendant-intervenor Joseph R. Biden, Jr.'s Motion for a Preliminary

Injunction, Dkt. 65, is **DENIED**.

**SO ORDERED.**

_____
DABNEY L. FRIEDRICH
United States District Judge

June 19, 2026

App-001

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION, *et al.*,

      *Plaintiffs*,

    v.

DEPARTMENT OF JUSTICE,

      *Defendant*,

JOSEPH R. BIDEN, JR.,

      *Defendant-Intervenor*.

No. 24-cv-645 (DLF)

**<u>MEMORANDUM OPINION</u>**

    The Heritage Foundation and Mike Howell (plaintiffs) bring this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *et seq.*, for certain records from Special Counsel Robert K. Hur's investigation of former President Joseph R. Biden, Jr.  The Department of Justice (Department) initially withheld requested transcripts and audio recordings under several FOIA exemptions.  *See* Dkt. 33.  Recently, the Department reversed course and represented that it intends to disclose those materials, with redactions, to the plaintiffs and the House Judiciary Committee on June 15, 2026.[1]  Dkt. 50.  Biden intervened to defend the withholdings.  *See* Dkts. 51, 63.  Before the Court is Biden's Motion for a Preliminary Injunction, which asks the Court to preliminarily enjoin the Department from disclosing the materials to the plaintiffs.  Dkt. 65.  For the reasons that follow, the Court will deny the motion.

---

[1] The Department initially informed the parties that it intended to disclose these materials to the plaintiffs on June 15, 2026.  Dkt. 50.  It later agreed to delay release of these materials to the plaintiffs until June 19, 2026, at 5:00 p.m.  *See* June 11, 2026 Hr'g Tr. 43:19–23.

## I.    BACKGROUND

In January 2023, Attorney General Merrick Garland appointed Robert K. Hur as a Special Counsel to investigate and prosecute federal crimes arising from the "possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private residence of President Joseph R. Biden, Jr."  Appointment of Robert K. Hur as Special Counsel, Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023).  Hur issued his findings, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph. R. Biden, Jr.* (Report), in February 2024.  *See* Hur Report, Dkt. 6-1.  Among other things, the Report mentioned Biden's "diminished faculties and faulty memory," as exhibited in his interview with the Special Counsel's Office and his 2016 and 2017 recorded interviews with Mark Zwonitzer, a biographer who assisted with Biden's since published book, *Promise Me, Dad*.  *Id.* at 248; *see id.* at 3–5, 244–48.  Hur ultimately declined to prosecute Biden "for his retention of" certain classified documents because, among other things, "the evidence [was] not sufficient to convict" and because "[i]t would be difficult to convince a jury that they should convict [Biden]— by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness."  *Id.* at 6.

In March 2024, the Heritage Foundation and its employee, Mike Howell, filed this FOIA action against the Department seeking "all records relied upon by Special Counsel Hur to write particular passages of the Report."  Compl. ¶ 1, Dkt. 1; *see* Am. Compl. ¶ 1 (same), Dkt. 6.  As relevant here, those passages included lines in which the Report referred to Biden's recorded conversations with Zwonitzer as "painfully slow, with Mr. Biden struggling to remember events

2

and straining at times to read and relay his own notebook entries."  Am. Compl. ¶ 9 (Passage 4).

After narrowing the issues, Dkt. 28, and processing relevant materials, Dkt. 32, the Department

withheld the Zwonitzer audio tapes and the majority of the written transcripts, invoking FOIA

Exemptions 1, 3, 5, 6, and 7(C), Decl. of Bradley Weinsheimer ¶ 4, Dkt. 33-2.  In November 2024,

the Department moved for summary judgment, Def.'s Mot. Summ. J., Dkt. 33, and the plaintiffs

cross-moved for summary judgment, Pls.' Mot. Summ. J., Dkt. 34.  The Court stayed proceedings

in September 2025 to allow the parties to engage in additional discussions or to settle or narrow

the case, *see* September 27, 2025 Minute Order, after the Department represented that it would

review its withholdings, Dkt. 42.

The Department no longer seeks to withhold the Zwonitzer materials.  In a May 8, 2026

filing, the Department reported that it "intends to disclose the written transcript and audio

recordings at issue in this matter, with redactions, to Congress, pursuant to a request from the Chair

of the House Judiciary Committee, as well as to Plaintiffs."  Joint Status Report 1, Dkt. 50.  The

Department further stated that, if Biden intervened by May 12, 2026, it would hold off disclosing

the material until June 15, 2026.  *Id.*  Biden timely moved to intervene.  Intervenor Mot., Dkt. 51.

The Court granted in part and denied in part the motion, allowing Biden to assert his privacy

interests as to the plaintiffs' FOIA request for disclosure of the written transcripts and audio

recordings.  Intervention Mem. Op. 11, Dkt. 63.

On May 29, 2026, Biden moved for a preliminary injunction barring the Department from

"disclosing or causing to be disclosed the written transcript and audio recordings at issue in this

matter, or any portion thereof, to" the plaintiffs.  Mot., Dkt. 65.  He argues that the Department's

decision to disclose the Zwonitzer materials violates the Administrative Procedure Act (APA), 5

App-004

U.S.C. § 551, *et seq.*, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Mem. Mot. 2, Dkt. 65-1.

## II.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)).  To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation modified).  The movant "bear[s] the burdens of production and persuasion."  *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits

Biden is unlikely to show that the Department's decision to disclose the Zwonitzer materials, as currently redacted, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

#### 1.    *APA Reviewability as to the Privacy Act*

As a threshold matter, Biden can challenge the agency's disclosure decision through a "reverse-FOIA" suit under the APA.  *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1134 n.1 (D.C. Cir. 1987) ("'Reverse-FOIA' actions are now a common species of FOIA litigation."); *Taylor Energy Co. LLC v. U.S. Dep't of the Interior*, 734 F. Supp. 2d 112, 118–19 (D.D.C. 2010).  "Section 10(a) of the APA provides that 'a person suffering legal wrong because of agency action,

or adversely affected or aggrieved by agency action . . . , is entitled to judicial review thereof.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 (1979) (modifications in original) (quoting 5 U.S.C. § 702). Release of the Zwonitzer materials would leave Biden "adversely affected or aggrieved" by the Department's decision. *See* Intervention Mem. Op. 6. Accordingly, "review of [the Department's] decision to disclose [Biden's personal records] is available under the APA." *Chrysler*, 441 U.S. at 317.

The Department's decision is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *contra* DOJ Opp'n 12, Dkt. 68. The Privacy Act provides a "meaningful standard against which to judge the agency's exercise of discretion" in reaching its voluntary disclosure decision. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The Act commands that "[n]o agency shall disclose any [covered] record . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless an enumerated exception applies. 5 U.S.C. § 552a(b).

The Privacy Act is enforceable through the APA in this voluntary disclosure context because there is no other adequate remedy. The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Supreme Court has explained that "[a] restrictive interpretation of § 704 would unquestionably . . . 'run counter to § 10 and § 12 of the Administrative Procedure Act. Their purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes.'" *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). Accordingly, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967). In *Bowen v. Massachusetts*, 487 U.S. 879 (1988), for example, the

5

Supreme Court concluded that the Tucker Act's channeling of certain monetary claims to the Claims Court did not preclude injunctive relief under the APA. *Id.* at 904, 908. Among other things, the Court was "not willing to assume, categorically, that a naked money judgment against the United States," which was the only form of relief that the Claims Court could offer, "will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Id.* at 905; *see Cohen v. United States*, 650 F.3d 717, 734 (D.C. Cir. 2011) (en banc) (similar).

Here, the Privacy Act's remedies provision speaks only of monetary damages for intentional and willful disclosures, 5 U.S.C. § 552a(g)(4)(A), and injunctive relief for the amendment and disclosure of personal records improperly withheld, *id.* § 552a(g)(2)–(3). Those provisions do not offer the declaratory and injunctive relief against the disclosure of records that Biden seeks here, nor do they explicitly forbid such relief. The Court thus concludes that the Act's enumerated remedies are "not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." *Bowen*, 487 U.S. at 904. The Act's silence as to other remedies does not furnish the sort of "clear and convincing evidence of a contrary legislative intent" necessary to overcome the general presumption of judicial review under the APA. *Abbott Lab'ys*, 387 U.S. at 141. Nor does "[t]he structure of this Act indicate[] that Congress intended only . . . [the enumerated remedies] to ensure that the statutory objectives would be realized." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984).

That said, "[t]his Court is mindful that the availability of injunctive relief under the APA in circumstances similar to those presented here is an unsettled question with which other courts are actively wrestling." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 111 (D.D.C. 2026); *see Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175–76 (4th

Cir. 2025) (reserving on the issue and noting that "it appears that no court of appeals has opined directly on the question").  The Supreme Court's three-paragraph opinion staying a Privacy Act–based preliminary injunction, *see SSA v. Am. Fed'n of State, Cnty., & Mun. Employees*, 145 S. Ct. 1626 (2025), offers no meaningful guidance on the § 704 issue given the many potential grounds for issuing such a stay, particularly in light of the Supreme Court's dicta suggesting that the Privacy Act may be enforceable under the APA, *see FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012); *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).  As such, the Court agrees with the persuasive opinions of other judges of this Court in concluding that the APA authorizes judicial review of agency decisions to disclose records protected by the Privacy Act.  *See AFL-CIO v. Dep't of Labor*, 25-cv-339, 2026 WL 879518, at *19–20 (D.D.C. Mar. 31, 2026); *League of United Latin Am. Citizens*, 818 F. Supp. 3d at 112.

### 2.    *APA Reviewability as to FOIA Alone*

Unlike the Privacy Act, FOIA contains no meaningful standard against which to assess an agency's decision to disclose certain sensitive materials.  The Department's decision whether to invoke a particular FOIA exemption is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *see* DOJ Opp'n 12–13; *Sunoco Pipeline, L.P. v. U.S. Dep't of Transp.*, 21-cv-1760, 2023 WL 11195824, at *2 (D.D.C. Sept. 29, 2023) ("[I]n order to state a claim that an agency acted unlawfully in disclosing information, a plaintiff must demonstrate that some other law, not FOIA, required the agency to withhold the information." (citation modified)); *contra* Mem. Mot. 19 (arguing that the Department's decision to disclose the Zwonitzer materials "is arbitrary and capricious and an abuse of discretion" under FOIA alone).

The plain text of FOIA does not require the government to invoke every applicable exemption; it merely clarifies that an agency's obligation to "make available to the public

7

information" within FOIA's ambit, 5 U.S.C. § 552(a), "does not apply to matters that are" subject to one of the nine enumerated exemptions, *id.* § 552(b).  As the Supreme Court noted in *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 (1979), which blessed "reverse-FOIA" cases, "Congress did not limit an agency's discretion to disclose information when it enacted the FOIA," and, as such, FOIA did "not afford [the party opposing release] any right to enjoin agency disclosure" because an exemption might apply.  *Id.* at 294.  The Court explained that "Congress did not design the FOIA exemptions to be mandatory bars to disclosure," *id.* at 293, and rejected the challenger's argument that "the exemptions impose affirmative duties on an agency to withhold information sought" as "not supported by the language, logic, or history of the Act.," *id.* at 291.  The *Chrysler* challenger thus had to rely on the external constraints on disclosure under the Trade Secrets Act, 18 U.S.C. § 1905.  *See id.* at 318.

*Chrysler*'s logic holds.  Because the Department is under no "affirmative dut[y] . . . to withhold information sought" under FOIA's exemptions, *id.* at 291, its determination that they do not apply here would be "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), absent the Privacy Act's (or another statute's) external constraints on disclosure.[2]  This point is ultimately

---

[2] Two "reverse-FOIA" decisions—one from this Court and another from the D.C. Circuit—have engaged in APA review of agencies' decision to forgo withholdings under applicable exemptions. *See AFL-CIO v. FEC*, 177 F. Supp. 2d 48, 63 (D.D.C. 2001), *aff'd on other grounds*, 333 F.3d 168 (D.C. Cir. 2003); *Jurewicz v. United States, Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014). But those decisions assumed that the agency's decisions were subject to APA review.  Neither decision discusses *Chrysler*, *Heckler*, or § 701(a)(2). Nor does it appear that the government pressed a committed-to-discretion argument against review in *Jurewicz v. United States*.  *See* Br. of Appellee, *Jurewicz v. United States, Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (Nos. 10-1683 & 11-707).  The briefing in *AFL-CIO v. FEC*, which is not docketed on CM/ECF due to age, was not available at the time of this decision.

"That the court has taken jurisdiction in the past does not affect the analysis because jurisdictional issues that were assumed but never expressly decided in prior opinions do not thereby become precedents." *Am. Portland Cement All. v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996); *Claybrook v.*

academic because, as discussed below, the legality of disclosure under the Privacy Act here turns on whether the Department abused its discretion in determining that the FOIA exemptions did not apply.

### 3. *Privacy Act Exceptions*

Because Biden can press his Privacy Act claim through the APA, the question is whether the Department's decision to disclose the Zwonitzer materials is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The parties do not dispute that the Privacy Act applies to the Zwonitzer materials, which are "information about an individual that is maintained by an agency." *Id.* § 552a(a)(4); *see* Mem. Mot. 29–32; *see generally* DOJ Opp'n; Heritage Opp'n, Dkt. 68. Accordingly, the Privacy Act prohibits disclosure of the Zwonitzer materials "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless an enumerated exception applies. 5 U.S.C. § 552a(b). The relevant exception here applies when "disclosure of the record would be . . . required under section 552 of this title." *Id.* § 552a(b)(2). Section 552 is FOIA, which "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material." *Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011).

The legality of the Department's decision thus turns on whether FOIA "require[s]" disclosure of the Zwonitzer materials. 5 U.S.C. § 552a(b)(2). The Department's initial answer to that question was no because "[t]he withheld audio recordings and portions of the transcripts are

---

*Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) ("[T]he courts lack jurisdiction to review agency decisions 'committed to agency discretion by law.'" (quoting 5 U.S.C. § 701(a)(2)); *see United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("[T]his Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*."); *see also Waters v. Churchill*, 511 U.S. 661, 678 (1994) (past decisions "cannot be read as foreclosing an argument that they never dealt with").

App-010

protected by FOIA's Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  Def.'s Mem. Mot. Summ. J. 1, Dkt. 33-1.[3]  But, after receiving a request from the House Judiciary Committee and redacting additional portions of the materials, the Department decided that "the redacted Zwonitizer [*sic*] Materials are required to be provided to the FOIA requesters."  Decl. of Peter A. Winn (Winn Decl.) ¶ 17, Dkt. 68-1.  The Department found that "Biden's reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials."  *Id.*.

Biden argues that the agency's new position is "arbitrary and capricious and an abuse of discretion, in violation of the APA," Mem. Mot. 12, (1) because the Department's decision was explained only by *post hoc* rationalizations, Reply 4–5, Dkt. 73; (2) because Exemptions 6 and 7(C) mean that disclosure is not required under FOIA and is thus barred by the Privacy Act, Mem. Mot. 27; and (3) because the Department's decision was politically motivated, Mem. Mot. 9; Reply 10.

First, the Department's decision-making process is supported by more than *post hoc* rationalizations.  *Contra* Reply 3–6.  "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation modified).  But "[t]he significance of agency affidavits in a FOIA case cannot be underestimated."  *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987).  In its only "reverse-FOIA" case to deal with the issue, the

---

[3] The Department also asserted that "the written transcripts are also subject to Exemption 5, as disclosure of the redacted material would reveal attorney work product."  Def.'s Mem. Mot. Summ. J. 2.  Biden does not appear to contest the Department's recent decision to waive its work-product privilege.

App-011

D.C. Circuit held that an agency's disclosure decision could not be supported by a litigation affidavit alone. *See AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987). In that case, the agency had informed the challenger that it would release its sensitive business data in a letter that "contained no explanation or reason." *Id.* at 1235. The D.C. Circuit reasoned that the agency's affidavit could not supplement the record because the agency had "provided no rationalization at the agency level for its refusal to withhold the [sensitive] data and [was] therefore precluded from initially offering one on judicial review." *Id.* at 1236.

Here, the Department offers the declaration of Peter Winn, which describes the redaction negotiations and decision-making process leading up to the Department's final decision to disclose the Zwonitzer materials. *See* Winn Decl. ¶¶ 11–14. That affidavit alone does not an administrative record make. *See AT&T*, 810 F.3d at 1236. But Winn also explained the Department's grounds for disclosure in an April 15, 2026 email to Biden's lawyers leading up to its final May 5, 2026 decision. *See* Suppl. Decl. of Amy Jeffress, Ex. 2 (Winn-Jeffress Emails), at 2–4, Dkt. 65-4. Winn's email explained that Hur's "public[]" and "explicit[]" reliance on the Zwonitzer materials "increases the public interest in and need to access that item of information—essentially, without such access, the public would lack access to the complete record of the basis of the decision by the Special Counsel." *Id.* at 3; *see id.* ("Hur's express reliance on the audio recordings and transcripts as the basis of his decision that [*sic*] dramatically increases the public interest in them. In other words, in the face of a potential conflict of interest, public access to these materials becomes necessary to show whether in the face of a conflict of interest, Special Counsel Hur 'pulled his punches' or acted without impropriety."). Winn also elaborated that the Department had considered that the "privacy interests of individuals do not disappear, whether they happen to be the President or other public figures," but nevertheless the Department determined that it was

11

required to produce segregable audio after making redactions. *Id.* at 3–4. He stated that the Department's redactions "reflect [its] analysis, after consideration of [Biden's] input, of the privacy interests of the President and other third parties that override the cognizable public interest in the audio and transcript" and then explains why the Department declined to redact certain information about "third-party public figures" as opposed to "non-public figures." *Id.* at 4.

The Court considers Winn's April 15, 2026 email to be a contemporaneous explanation of the Department's rationale for its disclosure decision. Winn's declaration is consistent with the justification advanced in that email, and the Department may thus "supplement the administrative record to provide such additional explanations of the reasons for the agency decision as may prove necessary." *AT&T*, 810 F.3d at 1236 (citation modified); *see id.* ("[T]he record may be supplemented to provide, for example, background information or evidence of whether all relevant factors were examined by an agency, [but] we have made clear that the new material should be merely explanatory of the original record and should contain no new rationalizations." (citation modified)). Although Winn's declaration contains more detail about, for example, congressional inquiries than his contemporaneous email, "there is nothing improper in receiving declarations that merely illuminate reasons obscured but implicit in the administrative record." *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (citation modified). Accordingly, the Court will consider Winn's declaration and his April 15, 2026 email as part of the administrative record.[4]

---

[4] The Court notes that Winn's April 15, 2026 email appears to be one in a series of back-and-forth written communications and meetings with Biden's lawyer about the disclosure decision and additional redactions. *See* Winn-Jeffress Emails 4 (March 31, 2026 email from Biden's counsel thanking Department lawyers for "taking the time to meet with us regarding the Heritage Foundation's pending request for the audio recordings and transcripts of President Biden's private conversations with Mark Zwonitzer"). Should this challenge proceed to summary judgment, it seems likely that the record of the Department's decision-making process will expand.

12

App-013

Second, on the record before this Court, the Department's disclosure decision does not appear to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Department determined that "reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials" such that Exemptions 6 and 7(C) do not apply.  Winn Decl. ¶ 17.  Exemption 7(C) protects "records or information compiled for law enforcement purposes," the production of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7).  "Courts have construed this exemption to cover documents in which the privacy interest at stake outweighs the public's interest in disclosure."  *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996).  Exemption 6 similarly protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), but there is "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)."  *Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

The Department exercised discretion in weighing the factors that underlie Exemptions 6 and 7(C).  "[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential abuse of discretion standard.  Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179–80 (2025).  When an agency makes "fact-dependent, context-specific, and policy-laden choices," such as weighing the incommensurable value of personal privacy against the public's interest, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of

13

reasonableness." *Id.* at 182–83. "Agencies are [also] free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* (citation modified). "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* at 222 (citation modified).

As an initial matter, the change in position here was obvious: the Department once withheld these documents from the plaintiffs under FOIA; now it seeks to release them. "Once a change in agency position is identified, the doctrine poses a second question: Did the agency display awareness that it *is* changing position and offer good reasons for the new policy?" *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 570 (2025) (modification in original). The answer to this question is yes. The Department acknowledged that "[i]n or about February 2026, the Department reassessed its prior decision," "provided notice to President Biden's counsel of its preliminary view that the Zwonitzer Materials should be disclosed," and engaged in "extensive consultation" before reaching its final decision. Winn Decl. ¶ 11; *see* Winn-Jeffress Emails 4; Decl. of Amy Jeffress ¶ 13, Dkt. 51-2 ("Perkins informed me that the Department had reversed its position on withholding and intended to release 117 pages of transcript and the corresponding audio recordings."). The Department also identified reasons for its new position: Biden's privacy interests had waned after extensive redactions and were "outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials." Winn Decl. ¶ 17. The rationality

14

App-015

of the Department's decision, then, turns on traditional APA review of the agency's weighing of those values.[5]

The Department's disclosure decision was reasonable under the deferential APA standard. Start with Biden's privacy interests. In negotiations with Biden's lawyer, the Department made redactions where it determined that "the privacy interests of the President and other third parties . . . over[o]de the cognizable public interest in the audio and transcript." Winn-Jeffress Emails 4. Winn explained that "[a]s important public figures, the privacy interests of President Biden and certain other third-party public figures were evaluated differently given their status." *Id.* "Accordingly, as in the case of the Hur Report itself, redactions were not made where [the Department] found no serious harm to their interests in the release of the otherwise private information about them in Biden's discussions with his ghostwriter." *Id.* The Department "also did not redact content if the information was already public, be it cited in the Hur report, discussed in Congressional testimony, or published in President Biden's memoir." *Id.* The result is that "[i]nformation concerning President Biden's family and any family health issues has been fully redacted. Information concerning third parties who are not public figures has been redacted. National security information has been redacted as well as related information covered by the presidential communications privilege." Winn Decl. ¶ 6.

Bidens says that his "privacy interests are tremendous" because, among other things, "portions of the audio recordings remaining at issue took place in the context of broader

---

[5] Another facet of the change-in-position doctrine is that "an agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars*, 579 U.S. at 221–22 (citation modified). But Biden does not argue that the agency's earlier position to withhold the Zwonitzer materials engendered serious reliance interests. *See generally* Mem. Mot.

15

conversations between President Biden and his writing assistant that involved highly personal topics, including the illness and death of [his] son." Mem. Mot. 15 (citation modified). He also emphasizes the Department's earlier stance that "[h]ow Mr. Biden's voice sounded throughout those conversations . . . implicates substantial privacy rights." *Id.* (citation modified). The Court agrees that "government officials do not surrender all rights to personal privacy when they accept a public appointment." *Bast v. DOJ*, 665 F.2d 1251, 1254–55 (D.C. Cir. 1981); *see* Winn-Jeffress Emails 3 (acknowledging the same). But having reviewed the Zwonitzer materials *in camera*, the Court finds that Biden's privacy arguments largely overlook the Department's recent redactions and reasoning.

After the latest round of redactions, the Zwonitzer materials contain no mention of highly sensitive topics like illness or death, nor do they mention any non-public persons, including members of Biden's family. *Accord* Winn Decl. ¶ 6. The Court's *in camera* review of the materials—including a copy without the redactions applied—shows that the Department made substantial redactions to the audio and transcripts since its earlier stance in opposition to release. The remaining materials largely contain Biden's discussion of foreign policy—including his references to what may have been classified material in his possession—and his decision not to run for President in 2016.

Biden insists that, even if the Department "teased apart" his "personal and political lives," "the fact that these conversations included intimate discussion of [his] family life illustrates their private nature." Reply 8. But, as noted, Biden and Zwonitzer covered a number of topics, not all of which were personal in nature. *See* Winn-Jeffress Emails 3–4 (Winn citing the agency's segregability obligation under 5 U.S.C. § 552(b)); *Rudometkin v. United States*, 140 F.4th 480, 495 (D.C. Cir. 2025) ("Even if an exemption covers an entire agency record, the agency still must

App-017

release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." (citation modified)).  And while Biden's discussion of certain topics and other public figures could be considered sensitive, the Department reasoned that Biden's privacy interests are diminished by the Report's descriptions and the publication of his memoir, which contains some similar material, *see* Winn Decl. ¶ 15(c)–(d); Winn-Jeffress Emails 4—albeit without the same detail or exact language. Moreover, although Biden's privacy interest in the sound of his own voice is legitimate, *see N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1009 (D.C. Cir. 1990) (en banc), the Department explained that his privacy was already diminished by Hur's references to the "tone" and "sound" of certain of his statements in the tapes, *see* Winn Decl. ¶ 15(e); Winn-Jeffress Emails 2 (noting Hur's finding that "Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries"); *id.* at 4 (explaining that the Department "did not redact content if the information was already public," such as being "cited in the Hur report").  In all, the Department offered a rational explanation for its conclusion that Biden's "privacy interests in the Zwonitzer Materials were greatly reduced."  Winn Decl. ¶ 15.

Turning next to the Department's articulation of "the significant public interest in the disclosure of the redacted Zwonitzer Materials," *id.* ¶ 16, the Department explained that Congress and the public have an interest in Hur's investigation and declination decision, *see* Winn-Jeffress Emails 3; *id.* (noting congressional inquiry); *id.* ("Hur's express reliance on the audio recordings and transcripts as the basis of his decision . . . dramatically increases the public interest in them."); Winn Decl. ¶ 16(d)–(g).  The curated set of Zwonitzer materials "constituted both the primary evidence of the 2017 wrongful disclosures, as well as the primary basis for his decision to decline

App-018

prosecution of President Biden with respect to these wrongful disclosures." Winn-Jeffress Emails 3. The Department explained that "the integrity of a Special Counsel's investigation constitutes a matter of paramount public interest" and that Attorney General Merrick Garland's decision to release the Report turned on his determination "that the Hur Report addressed 'evidence that would warrant the belief by a reasonable person that government impropriety might have occurred.'" Winn-Jeffress Emails 3. Moreover, the Department elaborated that Biden had heightened the public's interest by "challeng[ing] the fairness, scope and propriety of the Hur Report and Mr. Hur's handling of Zwonitzer Materials." Winn Decl. ¶ 16(b).

As to the public interest in the audio—rather than the transcripts alone—the Department explained that Hur "relied on matters of 'tone' that could only be evaluated by reviewing the audio." *Id.* ¶ 16(c); *see also* Winn-Jeffress Emails 2 (noting Hur's finding that "Biden's memory appeared to have significant limitations at the time he spoke to Zwonitzer in 2017" because "Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow" and concluding that "[t]he audio and transcripts thus constitute not only the principal evidence on which Hur relied to reach his conclusion that the evidence would not support a finding of willfulness beyond a reasonable doubt but, as to the 2017 wrongful disclosures, what Hur *explicitly relied on in his public report* to justify his decision to decline prosecution for lack of willfulness" (emphasis in original)).

Biden's arguments about the public's interest are unavailing. He says that "any light that might be shed on the Special Counsel's investigation by the public disclosure of these materials is *de minimis*," Mem. Mot. 16, particularly in light of the Department's release of specific portions of the transcripts of the Zwonitzer interviews that Hur quoted in his report, *id.* at 17, and the Department's release of audio recordings of Biden's interview with Hur, *id.* at 6. But the D.C.

18

Circuit has "repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy." *CREW v. DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014); *see id.* (collecting cases). That public interest extends to records that would "likely reveal much about . . . the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches," *id.* (citation modified), which aligns with the Department's assessment of the public's interest in the Special Counsel's investigation and decision not to prosecute Biden, *see* Winn-Jeffress Emails 3 ("[I]n the face of a potential conflict of interest, public access to these materials becomes necessary to show whether in the face of a conflict of interest, Special Counsel Hur 'pulled his punches' or acted without impropriety."); Winn Decl. ¶ 16(a) ("Information about the Hur investigation into the alleged mishandling of classified material by a high-ranking public official sheds light on how the Department of Justice and its Special Counsel have performed their statutory duties.").

Biden also quibbles with the Department's reading of two cases in an email exchange with his lawyer leading up to the release decision. *See* Mem. Mot. 21–23. He says that the Department's "legal . . . errors . . . further evidence that the Department's position is arbitrary, capricious, and an abuse of discretion." *Id.* at 21. Biden is correct that "citation to a clearly distinguishable precedent is not enough" to support an agency's decision. *Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972, 976 (D.C. Cir. 1998). But the Department's reading of these cases is neither "clearly" wrong nor pivotal to its weighing of the factors that Congress intended it to consider under FOIA Exemptions 6 and 7(C).

First, Biden takes issue with Winn's citation to *National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004), in explaining the public's heightened interest in the Special Counsel's Office as opposed to the Supreme Court's analysis of the public interest in

death scene photographs that the Office of the Independent Counsel had collected in its investigation into former President William J. Clinton.  The Supreme Court in that case concluded that the descendant's family's privacy interest in preventing photographs of their family member's apparent suicide outweighed the public interest because "where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure."  *Id.* at 174.  But contrary to Biden's description that Winn "suggest[ed] that *Favish* demands disclosure," Mem. Mot. 21, Winn's email simply cites *Favish* in explaining that there is a heightened public interest in the functions of the Special Counsel, *see* Winn-Jeffress Emails 3 ("Hur reported directly to the Attorney General who in turn reported to the subject of his investigation.  The potential conflict of interest inherent in this arrangement requires a greater corresponding level of transparency as reflected in the Special Counsel Regulations. . . . It is for this reason that the integrity of a Special Counsel's investigation constitutes a matter of paramount public interest.").  Winn's subsequent "*see*" citation to *Favish* does not suggest that this finding of public interest required him to conclude falsely that *Favish* mandated disclosure here.

To the extent that Biden contests whether *Favish*'s "evidentiary requirements" regarding allegations of government impropriety are met here, *see* Mem. Mot. 22, he ignores the D.C. Circuit's more recent and binding pronouncement that the public interest in law enforcement records under Exemption 7(C) extends to public records that "would likely reveal much about . . . the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches," *CREW*, 746 F.3d at 1093, which Winn echoed in his email, *see* Winn-Jeffress Emails 3 ("[P]ublic access to these materials becomes necessary to

App-021

show whether in the face of a conflict of interest, Special Counsel Hur 'pulled his punches' or acted without impropriety.").

Next, Biden objects to Winn's "*compare*" citation to *Brennan Center for Justice v. U.S. Department of Justice*, 697 F.3d 184 (2d Cir. 2012).  *See* Mem. Mot. 23.  But Winn's explanation does not hinge on the details of that case—he merely analogizes the prior public release of the Hur Report to public domain waiver doctrine.  *See* Winn-Jeffress Email 3.

In sum, the Department's reading of the caselaw in its email to Biden's counsel does not render its bottom-line balancing of Biden's privacy and the public's interest arbitrary and capricious.

Finally, Biden's general allegations of political motivation do not vitiate the Department's reasonable weighing of personal privacy and the public interest.  Biden argues that "a change in administration does not give the Department of Justice license to make decisions motivated by the sitting President's well-documented animosity toward his predecessor."  Reply 10.  He also says that a "striking alignment between Administration officials and the Heritage Plaintiffs in their targeting of President Biden . . . bears directly on the purposes of the proposed disclosure under the Privacy Act and the Department's reasons for its new position under the APA."  Mem. Mot. 9; *see id.* at 9–10 (collecting statements by Trump, the Trump White House, Heritage, Heritage's lawyer, and Howell about Biden).

But "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."  *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019).  "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'"  *Id.* (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).  The Supreme Court has "recognized a narrow exception to the

App-022

general rule against inquiring into the mental processes of administrative decisionmakers.  On a strong showing of bad faith or improper behavior, such an inquiry may be warranted and may justify extra-record discovery."  *Id.* at 781 (citation modified).  Biden notes this doctrine in a footnote, *see* Mem. Mot. 31 n.7, but he neither offers any specific argument for looking beyond the agency's stated justification here nor advances the "strong showing of bad faith" necessary to do so, a standard that has "proven virtually impossible for plaintiffs to meet," *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 516 F. Supp. 2d 43, 54 n.4 (D.D.C. 2007).

In all, Biden is not likely to succeed on the merits of his cross-claims against the Department because he has not made a clear showing that the Department abused its discretion in "determin[ing] that President Biden's reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials" and concluding that "FOIA Exemptions 6 and 7(C) do not apply[] and the redacted Zwonitizer [*sic*] Materials are required to be provided to the FOIA requesters."  Winn Decl. ¶ 17.  Because the Department's determination that it was required to produce the Zwonitzer materials under FOIA was not "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A), its decision is "in accordance with," *id.*, the Privacy Act's exception for "disclosure of the record[s] . . . required under [FOIA]," *id.* § 552a(b)(2).

*        *        *

The Court emphasizes that its evaluation of Biden's likelihood of success on the merits in this case is unique in several ways.

First, this case involves an unusually strong public interest in the release of law enforcement materials to outweigh the privacy interests protected by FOIA's exemptions.  In

App-023

particular, (1) while serving in the position of Special Counsel, (2) Hur prepared a report detailing

evidence that the then-sitting President had, among other things, disclosed classified information

to his biographer, and (3) Hur report explicitly relied on the Zwonitzer materials in deciding not

to prosecute Biden because of his mental state.  Attorney General Garland, in turn, (4) released

Hur's report to the public, leading to (5) immense lay and congressional interest in the Special

Counsel's Office, Hur's findings about Biden's mental state, and Hur's ultimate decision not to

prosecute the sitting President.

These unparalleled circumstances account for the high degree of public interest in materials

that were gathered during the course of a law enforcement investigation that resulted in no criminal

charges.  As the Department itself acknowledged, "not all evidence acquired in connection with a

special counsel investigation thereby becomes publicly disclosable" because of public interest in

the Special Counsel.  Winn-Jeffress Emails 3.  Indeed, the Department described this case as "a

very singular circumstance" involving "a very discrete set of materials" that have "been redacted"

and "generally referenced and quoted and referred to in public fora" and concern "a former sitting

[P]resident of the United States."  June 11, 2026 Hr'g Tr. 22:7–13.  In short, this case presents a

confluence of significant public disclosures of prosecutorial decision-making, explicit reliance on

particular records, and the statements of a high-profile public figure to support the Department's

decision—all considered under the Court's highly deferential abuse-of-discretion review under the

APA.

Second, the privacy interests in this case—though substantial—are mitigated by the

Department's extensive redactions, as reviewed by the Court *in camera*.  As now redacted, the

Zwonitzer materials contain no information about Biden's family or other private persons.  And

while public figures maintain certain privacy rights, the Department did not abuse its discretion in

App-024

finding that nothing in the remaining Zwonitzer materials is sensitive enough to outweigh the public's unusually strong interest.

Finally, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation modified) (emphasis in original). On this preliminary record, Biden simply has not carried that burden as to his likelihood of success on the merits.

### B.    Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and not theoretical. . . . Second, the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation modified). There is no question of imminent injury to Biden here given the Department's looming disclosure deadline. Biden says that "the harm caused by the disclosure of [his] private conversations will be irreparable" because "[n]o judicial remedy could un-ring the bell or fairly compensate President Biden for the perpetual intrusion on his and his family's privacy." Mem. Mot. 34. The Court agrees that—on these facts involving the frank words of a public figure in his home—disclosure of the Zwonitzer materials risks irreparable harm to Biden's privacy interests and his reputation. *See Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature.").

App-025

The severity of Biden's irreparable injury is less clear.  *See Holland v. Florida*, 560 U.S. 631, 649–50 (2010) ("We have said that courts of equity must be governed by rules and precedents no less than the courts of law.  But we have also made clear that often the exercise of a court's equity powers . . . must be made on a case-by-case basis." (citation modified)).  Biden offers little in the way of specific details about the types of harm he foresees, especially in light of related information already in the public domain like the Hur Report and Biden's deposition with the Special Counsel.  And courts are generally reluctant to find general harms to personal reputations to be irreparable.  *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 103 (D.D.C. 2014) (If "any harm to his personal reputation . . . constituted irreparable harm, not compensable through monetary damages, defamation plaintiffs would regularly obtain preliminary injunctions against their defamers rather than seek monetary damages."); *Sampson v. Murray,* 415 U.S. 61, 91–92 (1974) ("Assuming . . . that respondent had . . . supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case.").  Moreover, not all of Biden's potential harm here is irreparable because the Privacy Act provides a private right of action for "actual damages" and attorney fees against the United States in the case of a violation.  *See* 5 U.S.C. § 552a(g)(1); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citation modified)).

Accordingly, the Court finds that—absent a preliminary injunction—Biden is likely to suffer irreparable injuries from the Department's disclosure of the Zwonitzer materials to the plaintiffs.  But, to the extent that the D.C. Circuit's "sliding scale approach remains good law

25

after . . . *Winter v. Natural Resources Defense Council, Inc.*," *Clevinger*, 134 F.4th at 1235, his showing of such harms is not so "strong" that it "could make up for a weaker showing" on the likelihood-of-success prong, *Sherley*, 644 F.3d at 392.

### C.      Balance of the Equities & Public Interest

Finally, the Court "must carefully balance the equities by weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024).  Biden has not identified any public harm that would arise absent an injunction in this case.  And, as with the Department's FOIA balancing discussed above, the harm to Biden's diminished privacy interest is outweighed by the public's interest in the Zwonitzer materials and FOIA's "policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society."  *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (citation modified).

### CONCLUSION

For the foregoing reasons, the defendant-intervenor Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction, Dkt. 65, is denied.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

June 19, 2026

26

App-027

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF JUSTICE, <br><br> *Defendant*, <br><br> JOSEPH R. BIDEN, JR., <br><br> *Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

**<u>MEMORANDUM OPINION</u>**

On June 19, 2026, the Court denied defendant-intervenor Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction, Dkt. 65, which asked the Court to enjoin preliminarily the Department of Justice from disclosing to the plaintiffs certain records from Special Counsel Robert K. Hur's investigation of Biden (the Zwonitzer materials), *see* Dkts. 77, 78.  Biden subsequently filed an Emergency Motion for an Injunction Pending Appeal, Dkt. 79, which the Court granted in part, *see* June 19, 2026 Minute Order, for the following reasons.

Federal Rule of Civil Procedure 62(d) provides that, "[w]hile an appeal is pending from an interlocutory order . . . that . . . refuses . . . an injunction, the court may . . . grant an injunction on . . . terms that secure the opposing party's rights."  Fed. R. Civ. P. 62(d).  A party seeking a Rule 62(d) injunction must show that (1) "they are likely to succeed on the merits"; (2) "they are likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in

their favor"; and (4) "an injunction is in the public interest." *Coal. for Humane Immigrant Rts. v. DHS*, 795 F. Supp. 3d 7, 12 (D.D.C. 2025) (citation modified).

The "plain language" of Rule 62(d) "contemplates the possibility that the district court may grant an injunction" after entering an interlocutory order denying a preliminary injunction. *Id.* (citation modified). Accordingly, the standard for a Rule 62(d) injunction "is, at least at times, more flexible than a rigid application of the traditional four-part [preliminary injunction] standard." *MediNatura, Inc. v. FDA*, No. 20-cv-2066, 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021); *see CREW v. Off. of Admin.*, 565 F. Supp. 2d 23, 25 n.1 (D.D.C. 2008) (noting that, although "[t]he test for a[n] . . . injunction pending appeal is essentially the same as the test for a preliminary injunction, . . . courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms favors a stay" (citation modified)); *cf. Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911–12 (D.C. Cir. 2008) (Tatel, J., concurring) ("To show a likelihood of success on the merits sufficient to obtain a stay pending appeal, an appellant who will suffer serious irreparable injury need only raise questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." (citation modified)). Thus, a Rule 62(d) injunction "may be appropriate, even if the Court believe[s] its analysis in denying preliminary injunctive relief is correct." *MediNatura*, 2021 WL 1025835, at *6 (citation modified).

The Court finds that a brief injunction is warranted in this case to allow the Court of Appeals for the D.C. Circuit to consider whether to grant an injunction pending appeal. The merits issues before the Court are difficult and weighty, and disclosure of the Zwonitzer materials risks irreparable harm to Biden's privacy interests and reputation. Furthermore, the plaintiffs have not

identified any immediate need for the materials, the release of which at this juncture would likely moot Biden's right to appeal this Court's preliminary injunction order. *Cf. People for the Am. Way Found. v. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) ("Particularly in the FOIA context, courts have routinely issued stays where the release of documents would moot a defendant's right to appeal."); *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1308–09 (1989) (Marshall, J., in chambers) (stay pending Supreme Court's disposition of petition for a writ of certiorari appropriate in FOIA case where, among other things, (1) disclosure of documents "posed a substantial risk of jeopardizing an important ongoing grand jury investigation"; (2) disclosure would moot aspects of litigation; and (3) "the Corporation's interest in receiving th[e] information immediately, while significant if the Corporation's interpretation of the FOIA [wa]s correct, pose[d] no threat of irreparable harm"); *Shapiro v. DOJ*, No. 13-cv-555, 2016 WL 3023980, at *7–8 (D.D.C. May 25, 2016) (similar); *Charles v. Off. of the Armed Forces Med. Exam'r*, No. 09-cv-199, 2013 WL 12332949, at *1–2 (D.D.C. May 9, 2013) (similar); *Judicial Watch, Inc. v. U.S. Secret Serv.*, No. 09-cv-2312, 2011 WL 13377578, at *1–2 (D.D.C. Nov. 14, 2011) (similar).

Where, as here, the legal issues before the Court are complex and considerable, the need for records disclosure is not immediate, the harms to the objecting party are irreparable, and the Court's decision is likely unreviewable, a temporary status-quo-preserving injunction is proper. *See Christian Sci. Reading Room Jointly Maintained v. City & Cnty. of San Francisco*, 784 F.2d 1010, 1017 (9th Cir. 1986) ("[Rule 62(d)] codifies the inherent power of a court to preserve the status quo where, in its sound discretion, the court deems the circumstances so justify." (citation modified)); *cf. John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 205–07 (D.D.C. 2017) (granting injunction pending appeal where the plaintiff "raise[d] a novel legal question" and publication of

App-030

documents related to a civil investigative demand would moot "aspects of [the plaintiff's] sought-after remedy").

For the foregoing reasons, the Court has enjoined the Department of Justice from disclosing the Zwonitzer materials to the plaintiffs for a period of three weeks to permit the Court of Appeals for the D.C. Circuit an orderly period to consider whether to grant an injunction pending appeal.

DABNEY L. FRIEDRICH
United States District Judge

June 19, 2026

4

App-031

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**HERITAGE FOUNDATION**,

**MIKE HOWELL**,

*Plaintiffs,*

v.

**U.S. DEPARTMENT OF JUSTICE**,

*Defendant*.

Case No. 1:24-cv-00645-DLF

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

App-032

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.      The Hur Investigation ........................................................................................ 2

II.     Plaintiffs' FOIA Request and Procedural Background....................................... 4

STANDARD OF REVIEW ............................................................................................ 5

ARGUMENT .................................................................................................................. 6

I.      The Transcripts Were Properly Withheld In Part and the Audio Was Properly
        Withheld In Full Under Exemptions 6 and 7(C) Because Disclosure Would
        Cause An Unwarranted Invasion of Privacy...................................................... 6

        A.      Release of the Redacted Portions of the Transcripts Would Result In
                An Unwarranted Invasion of Privacy ...................................................... 8

        B.      Release of the Audio Recordings Would Result In An Unwarranted
                Invasion of Privacy ............................................................................... 16

II.     The Transcripts Were Properly Withheld In Part Under Exemption 5 Because
        They Are Attorney Work Product Not "Routinely" Available in Civil Litigation........... 20

III.    Disclosure of the Audio Recordings or of the Redacted Portions of the Transcripts
        Would Foreseeably Harm Interests Protected by FOIA Exemptions ............................. 23

IV.     There Is No Reasonably Segregable, Non-Exempt Information ..................................... 24

CONCLUSION.............................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Oversight v. U.S. Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) .................................................................................. 21

*Associated Press v. U.S. Dep't of Def.*,
554 F.3d 274 (2d Cir. 2009) .................................................................................. 13

*August v. FBI*,
328 F.3d 697 (D.C. Cir. 2003) ................................................................................. 5

*Bast v. U.S. Dep't of Just.*,
665 F.2d 1251 (D.C. Cir. 1981) ............................................................................. 10

*Boyd v. Crim. Div. of U.S. Dep't of Just.*,
475 F.3d 381 (D.C. Cir. 2007) ......................................................................... 12, 13

*Brayton v. Off. of the U.S. Trade Rep.*,
641 F.3d 521 (D.C. Cir. 2011) ................................................................................. 5

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) ................................................................................. 5

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,*
746 F.3d 1082 (D.C. Cir. 2014) ................................................................... 7, 12, 19

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,*
854 F.3d 675 (D.C. Cir. 2017) ............................................................................... 10

*Cook v. Nat'l Archives & Recs. Admin.*,
758 F.3d 168 (2d Cir. 2014) ............................................................................ 11, 12

*Dep't of Air Force v. Rose*,
425 U.S. 352 (1976) ................................................................................................. 6

*Detroit Free Press Inc. v. U.S. Dep't of Just.*,
829 F.3d 478 (6th Cir. 2016) ................................................................................. 18

*Dunkelberger v. U.S. Dep't of Just.*,
906 F.2d 779 (D.C. Cir. 1990) ......................................................................... 15, 19

*Ecological Rts. Found. v. EPA*,
541 F. Supp. 3d 34 (D.D.C. 2021) ......................................................................... 24

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
18 F.4th 712 (D.C. Cir. 2021) .......................................................................... *passim*

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ................................................................................................. 5

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
524 F.3d 1021 (9th Cir. 2008) ............................................................................... 13

ii

*FTC v. Grolier Inc.*,
    462 U.S. 19 (1983) ......................................................................................... 20

*Fund for Const. Gov't v. Nat'l Archives & Recs. Admin.*,
    656 F.2d 856 (D.C. Cir. 1981) ................................................................. *passim*

*Gilliam v. U.S. Dep't of Just.*,
    128 F. Supp. 3d 134 (D.D.C. 2015) ............................................................... 5

*In re Sealed Case*,
    146 F.3d 881 (D.C. Cir. 1998) ..................................................................... 21

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ....................................................................................... 5

*Jud. Watch, Inc. v. U.S. Dep't of Def.*,
    715 F.3d 937 (D.C. Cir. 2013) ....................................................................... 6

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
    926 F. Supp. 2d 121 (D.D.C. 2013) ............................................................. 20

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
    391 F. Supp. 3d 43 (D.D.C. 2019) ............................................................... 22

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
    432 F.3d 366 (D.C. Cir. 2005) ..................................................................... 24

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
    806 F. App'x 5 (D.C. Cir. 2020) ................................................................... 22

*Jud. Watch, Inc. v.  Nat'l Archives & Recs. Admin.*,
    876 F.3d 346 (D.C. Cir. 2017) ................................................................. *passim*

*Leopold v. U.S. Dep't of Just.*,
    487 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 22

*Light v. U.S. Dep't of Just.*,
    968 F. Supp. 2d 11 (D.D.C. 2013) ................................................................. 5

*Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*,
    819 F.2d 1181 (D.C. Cir. 1987) ......................................................... 20, 21, 22

*Mil. Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ....................................................................... 6

*Nat'l Archives & Recs. Admin. v. Favish*,
    541 U.S. 157 (2004) ............................................................................. 7, 9, 12

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) ..................................................................... 19

*N.Y. Times Co. v. NASA*,
    782 F. Supp. 628 (D.D.C. 1991) ............................................................. 17, 18

iii

*N.Y. Times Co. v. NASA*,
  920 F.2d 1002 (D.C. Cir. 1990) ................................................................. 17

*Nova Oculus Partners, LLC v. SEC*,
  486 F. Supp. 3d 280 (D.D.C. 2020) ............................................................. 7

*Off. of the Cap. Collateral Couns. v. U.S. Dep't of Just.*,
  331 F.3d 799 (11th Cir. 2003) ................................................................... 13

*Pike v. U.S. Dep't of Just.*,
  306 F. Supp. 3d. 400 (D.D.C. 2016) .......................................................... 17

*Pike v. U.S. Dep't of Just.*,
  No. 16-5303, 2017 WL 2859559 (D.C. Cir. June 23, 2017) ....................... 18

*Prison Legal News v. Samuels*,
  787 F.3d 1142 (D.C. Cir. 2015) ................................................................. 10

*Project on Gov't Oversight, Inc. v. U.S. Off. of Special Couns.*,
  No. 22-cv-3381, 2024 WL 1213324 (D.D.C. Mar. 19, 2024) ..................... 15

*Reps. Comm. for Freedom of the Press v. FBI*,
  3 F.4th 350 (D.C. Cir. 2021) ..................................................................... 23

*Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*,
  567 F. Supp. 3d 97 (D.D.C. 2021) ............................................................. 23

*Schoenman v. FBI*,
  575 F. Supp. 2d 166 (D.D.C. 2008) ............................................................. 7

*Tax Analysts v. IRS*,
  117 F.3d 607 (D.C. Cir. 1997) ................................................................... 20

*U.S. Dep't of Def. v. FLRA*,
  510 U.S. 487 (1994) ............................................................................. 7, 12

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
  489 U.S. 749 (1989) ........................................................................... *passim*

*N.Y. Times, Co. v. U.S. Dep't of Just.*,
  138 F. Supp. 3d 462 (S.D.N.Y. 2015) ........................................................ 21

*Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Just.*,
  844 F.3d 246 (D.C. Cir. 2016) ................................................................... 24

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991) ............................................................................. 13, 14

*U.S. Dep't of State v. Wash. Post Co.*,
  456 U.S. 595 (1982) ............................................................................... 6, 7

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
  592 U.S. 261 (2021) ................................................................................. 23

iv

*United States v. Clemens*,
    793 F. Supp. 2d 236 (D.D.C. 2011) ........................................................................ 22

*United States v. Deloitte LLP*,
    610 F.3d 129 (D.C. Cir. 2010) ............................................................................... 21

*Williams & Connolly v. SEC*,
    662 F.3d 1240 (D.C. Cir. 2011) ....................................................................... 20, 21

**Statutes**

5 U.S.C. § 552(a)(3) ................................................................................................... 5

5 U.S.C. § 552(a)(4)(B) .............................................................................................. 5

5 U.S.C. § 552(a)(8)(A) ............................................................................................ 23

5 U.S.C. § 552(b) ...................................................................................................... 24

5 U.S.C. § 552(b)(5) ................................................................................................. 20

5 U.S.C. § 552(b)(6) ............................................................................................. 6, 10

5 U.S.C. § 552(b)(7)(C) ........................................................................................ 7, 10

44 U.S.C. § 2201(3)(A) ............................................................................................ 12

**Rules**

Federal Rule of Civil Procedure 56 ............................................................................ 5

Federal Rule of Civil Procedure 26(b)(3)(A) ....................................................... 20, 21

**Regulations**

28 C.F.R. § 600.8(c) ................................................................................................... 3

**Other Authorities**

Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the H. Comm. on the
    Judiciary, 118th Cong. (2024), available at https://www.congress.gov/event/118th-con-
    gress/house-event/116942/text ........................................................................... 14

Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal,
    Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn
    Biden Center & the Delaware Private Residence of President Joseph R. Biden, Jr.*
    (Feb. 5, 2024) .............................................................................................. *passim*

**INTRODUCTION**

In this Freedom of Information Act ("FOIA") case, Plaintiffs seek written transcripts and audio recordings of private conversations between President Biden and Mark Zwonitzer, the President's writing assistant. These conversations took place in President Biden's homes in 2016 and 2017, as part of the writing process for a memoir about a painful period of President Biden's life: a span of fourteen months, from November 2014 to January 2016, during which Mr. Biden dealt with the illness and death of his son Beau—and the challenge of serving as vice-president and deciding whether to run for the presidency amid immense grief. These discussions—recorded by Mr. Zwonitzer for reference in drafting Mr. Biden's memoir—were analogous to entries in a personal diary. The only reason that these recordings became government records is because they were collected by the Special Counsel's Office ("SCO"), as part of an investigation that yielded no charges.

The Department of Justice has disclosed redacted versions of partial transcripts of these recordings, but any additional disclosure of either the transcripts or the audio recordings is unwarranted. The withheld audio recordings and portions of the transcripts are protected by FOIA's Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest. Privacy interests implicated by disclosure of law enforcement records are at their zenith when the disclosure involves nonpublic information about an uncharged individual. These privacy harms are acute in this context, where the nonpublic information involves sensitive and personal home recordings. Under FOIA, only a substantial public interest in disclosure could overcome such significant privacy concerns—and there is no such interest here. The Department has already released ample information that explains the basis for the Special Counsel's conclusions, including his assessment

1

of the Biden-Zwonitzer recordings.  As a result, any marginal increase in the public's

understanding of how Special Counsel Hur carried out his investigation (the only public interest

cognizable under FOIA) is insufficient to overcome the significant privacy interests at stake.

Moreover, the written transcripts are also subject to Exemption 5, as disclosure of the

redacted material would reveal attorney work product.  The transcripts were created by a court-

reporter service at the SCO's direction, in order to capture the specific sections of dozens of hours

of recorded conversations between President Biden and Mr. Zwonitzer that the SCO team deemed

most significant.  The transcripts were accordingly created because of the prospect of criminal

litigation.  This work product reveals the impressions of the SCO attorneys, and it is subject to

withholding without any balancing of interests.

Since the Department properly asserted FOIA Exemptions 5, 6, and 7(C), it is entitled to

summary judgment.

**BACKGROUND**

**I.    The Hur Investigation**

On January 12, 2023, Attorney General Merrick Garland appointed Robert Hur as Special

Counsel.  Decl. of Bradley Weinsheimer ("Weinsheimer Decl.") ¶ 5.  The SCO was authorized to

investigate the possible unauthorized removal and retention of classified documents at various

locations associated with President Biden.  *See id.*  During the investigation, agents from the

Federal Bureau of Investigation ("FBI") contacted Mr. Zwonitzer regarding his work on memoirs

that President Biden had published.  *See* Robert K. Hur, *Report of the Special Counsel on the*

*Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents*

*Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of*

*President Joseph R. Biden, Jr.* at 335 (Feb. 5, 2024) ("Hur Report"), available at

2

https://www.justice.gov/sco-hur. Mr. Zwonitzer provided investigators with the electronic devices he had used to create dozens of hours of recorded conversations with Mr. Biden in advance of the publication of Mr. Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose. Id.* at 106, 335. The conversations took place between the spring of 2016 and the summer of 2017, at Mr. Biden's residences. *Id.* at 100. They covered "a vast array of topics" related to the memoir, which "recounts a 14-month period of Mr. Biden's vice presidency from Thanksgiving to January 2016, during which he dealt with the illness and eventual death of his elder son, Beau, who died in May 2015." *Id.* at 97, 207. "The book discusses the toll that loss took on Mr. Biden, the foreign policy issues in Ukraine, Central America, and Iraq he addressed during that time, and the role his son's death played in Mr. Biden's decision not to run for president in 2016." *Id.* at 97-98.

In a voluntary interview with the SCO, Mr. Zwonitzer relayed that he had deleted the audio recordings of these conversations with Mr. Biden. *Id.* at 335. Investigators recovered the deleted files from the external hard drive that Mr. Zwonitzer provided, using a digital forensic process known as "file carving," in which a storage device is comprehensively scanned. *Id.* at 335 & n.1350. The SCO listened to the recovered recordings as part of its investigation. Weinsheimer Decl. ¶ 14. A small subset of these recordings were of particular investigative interest, and the SCO accordingly engaged a court-reporter service to transcribe those portions of the recordings designated as such by the SCO. *Id.* ¶ 15.

At the conclusion of the investigation, Mr. Hur submitted a confidential report to Attorney General Garland pursuant to Department regulations. *See* 28 C.F.R. § 600.8(c). The Report stated that Mr. Hur "conclude[d] that no criminal charges are warranted," Hur Report at 1, and provided extensive discussion of the investigation and the decisions he reached, *see generally* Hur Report.

3

The Department later produced a copy of the Hur Report to Congress without any additional redactions or modifications and published it on the Department's public-facing website. Weinsheimer Decl. ¶ 8. The Department also produced redacted copies of the transcripts of interviews that the SCO had conducted with President Biden and Mr. Zwonitzer as part of its investigation. *Id.* ¶ 25. In addition, the Department facilitated Mr. Hur's testimony before Congress concerning his investigation and his decision to decline prosecution. *Id.*

## II.    Plaintiffs' FOIA Requests and Procedural Background

On February 9, 2024, Plaintiffs submitted a FOIA request to the Department seeking "the records relied upon by Special Counsel Hur in drafting [certain] passages in the Report relating to President Joseph R. Biden's memory and mental faculties." Am. Compl. ¶ 8, ECF No. 6. Plaintiffs filed a Complaint on March 6, 2024 and an Amended Complaint on March 13, 2024. *See* ECF Nos. 1, 6.

Plaintiffs do not challenge the adequacy of the Department's search. Joint Status Report at 2 (Aug. 28, 2024), ECF No. 28. By agreement of the parties, Plaintiffs only seek (1) the portions of audio recordings from 2016-17 of conversations between President Biden and his writing assistant, Mark Zwonitzer ("the Biden-Zwonitzer recordings") that are quoted directly in the Hur Report, and (2) the transcripts of a portion of the Biden-Zwonitzer recordings that SCO created via a court-reporter service. The Department withheld the audio in full on the basis of Exemptions 6 and 7(C). The Department withheld the transcripts in part on the basis of Exemptions 1, 3, 5, 6, and 7(C). Plaintiffs informed the Department that they do not challenge the Department's withholdings on the basis of Exemptions 1 and 3, but Plaintiffs otherwise challenge all withholdings made regarding the audio and transcripts on the basis of Exemptions 5, 6, and 7(C). The Department now seeks summary judgment.

4

## STANDARD OF REVIEW

Under FOIA, federal agencies must make agency records available to the public upon request unless the records fall within one or more statutory exemptions. 5 U.S.C. § 552(a)(3), (b)(1)-(9). The statute reflects a "balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential," *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 925 (D.C. Cir. 2003), given the "'legitimate governmental and private interests' that might be 'harmed by release of certain types of information,'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (cleaned up). The Department bears the burden of justifying its withholdings of materials responsive to a FOIA request, and this Court reviews the Department's response to that request *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. U.S. Dep't of Just.*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The defendant in a FOIA case must show . . . that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. U.S. Dep't of Just.*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

5

A court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (citations omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (cleaned up).

## ARGUMENT

### I.    The Transcripts Were Properly Withheld In Part and the Audio Was Properly Withheld In Full Under Exemptions 6 and 7(C) Because Disclosure Would Cause An Unwarranted Invasion of Privacy

The release of the unredacted transcripts or the audio recordings would harm substantial privacy interests that are not outweighed by any cognizable public interest. The Department thus properly withheld the transcripts in part and the audio recordings in full under Exemptions 6 and 7(C).

Exemption 6 exempts from disclosure information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For the exemption to apply, the information at issue must be maintained in a government file and apply to a particular individual. *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). Once that threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).

6

Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). And for Exemption 7(C) to apply, the records at issue must have been compiled for law enforcement purposes. *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008). If that threshold requirement is met, Exemption 7(C)—like Exemption 6—requires individual privacy rights to be balanced against the public interest in disclosure. *See, e.g.*, *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989). In the balancing process, however, Exemption 7(C) "is more protective of privacy than Exemption 6." *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 165-66 (2004). Accordingly, "[w]hen an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'" *Nova Oculus Partners, LLC v. SEC*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) ("CREW")).

The recordings and transcripts satisfy the threshold requirements of both Exemption 6 and Exemption 7(C). They qualify as "similar files" under Exemption 6 because the protected information applies to a particular individual and is contained in government records. *Wash. Post*, 456 U.S. at 602. And they were "compiled for law enforcement purposes" under Exemption 7(C) since the underlying audio was collected from Mr. Zwonitzer's hard-drive using forensic techniques as part of evidence-gathering efforts in a law enforcement investigation, and then partially transcribed at the SCO's direction. Weinsheimer Decl. ¶¶ 11, 14-15, 17. Because the

7

privacy interests at stake in the transcripts and audio far outweigh the potential public interest in disclosure, the Department's assertions of Exemptions 6 and 7(C) should be upheld.

**A. Release of the Redacted Portions of the Transcripts Would Result In An Unwarranted Invasion of Privacy**

Controlling precedent strongly supports the Department's determination that the transcripts should be withheld in part under Exemptions 6 and 7(C). That precedent demonstrates that uncharged individuals—including high-ranking public officials—have a strong privacy interest in the contents of a law enforcement file. This point applies in spades to the unredacted transcripts, as they reflect the contents of private, sensitive home recordings gathered by the government as part of a law enforcement investigation. In order to overcome this strong privacy interest, Plaintiffs have to identify a public interest in the transcripts that is direct and substantial—and one that concerns the *agency* behind the investigation, not the target. But there is no such interest here. The public already has access to a wide array of information about the SCO's investigation. The Department has released the Hur Report, which describes the basis of Mr. Hur's conclusions in detail, including his assessment of Mr. Biden's conversations with Mr. Zwonitzer. The Department has also produced a transcript of Special Counsel Hur's interview of President Biden, with limited redactions, and a redacted version of the Special Counsel's interview of Mr. Zwonitzer. And Mr. Hur provided more than five hours of congressional testimony regarding his investigation. With a breadth of information already available, there is minimal public interest in the transcripts, as Plaintiffs cannot show that they would directly and substantially shed additional light on the SCO's conclusions. The privacy interest clearly outweighs any marginal public interest here.

8

### 1.  The Privacy Interests in the Transcripts are Substantial

Privacy interests are at their apex for individuals when prosecutors have decided not to charge them.  As the D.C. Circuit has emphasized, "'where individuals have been investigated but not charged with a crime,' disclosure of material properly exempt under Exemption 7(C) 'represents a severe intrusion on the privacy interests of the individual[] in question.'"  *Jud. Watch v. Nat'l Archives and Records Administration*, 876 F.3d 346, 349 (D.C. Cir. 2017) (quoting *Fund for Const. Gov't v. NARA*, 656 F.2d 856, 866 (D.C. Cir. 1981)); *see also Fund for Const. Gov't*, 656 F.2d at 861 (highlighting the privacy interest in "information which would reflect investigations of allegations of possible wrongdoing by individuals who were neither indicted nor prosecuted").  This principle extends to high profile cases involving public figures.  *See, e.g.*, *Jud. Watch*, 876 F.3d at 350 (holding that former Secretary of State Hillary Clinton's "significant privacy interest in the contents of the Independent Counsel's investigative files 'should yield only where exceptional interests militate in favor of disclosure'" (quoting *Fund for Const. Gov't*, 656 F.2d at 866)).

This heightened privacy interest remains even if it is known that a particular individual has been subject to an investigation.  "'[T]he *fact* that [an individual] was under investigation' is distinct from the privacy interest in the *contents* of the investigative files," which entails "avoiding disclosure of the details of the investigation."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 719 (D.C. Cir. 2021) ("*EPIC*") (citations and internal quotation marks omitted); *see also Jud. Watch*, 876 F.3d at 349 (finding a "distinct" privacy interest in contents of the Independent Counsel's investigation files even though the existence of the investigation and the investigation's subject were both public knowledge); *Favish*, 541 U.S. at 171 (holding that "the fact that other

9

pictures had been made public [does not] detract[] from the weighty privacy interests" in remaining pictures).

These holdings are grounded in the fundamental policy choice Congress made in Exemption 7(C): the recognition that the release of information about individuals contained in *law enforcement files* raises particularly acute threats to personal privacy.  The relationship between Exemption 6 and Exemption 7(C) reflects those heightened privacy concerns, in that FOIA sets a "lower bar" for the government to withhold information contained in law enforcement files under Exemption 7(C).  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (citation omitted).  While Exemption 6 protects information contained in non-law enforcement files only when disclosure "would constitute a *clearly* unwarranted invasion of personal privacy," Exemption 7(C) protects information in law enforcement files when disclosure "could reasonably be expected" to result in "an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6), (7)(C) (emphasis added).  Exemption 7(C) thus "affords broader privacy rights to suspects, witnesses, and investigators."  *Bast v. U.S. Dep't of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981). That protection "makes sense because disclosure of [the contents of the investigative files] could reveal new information about a person's conduct, going beyond the facts in the public record," which "could expose the individual to the very reputational and stigmatizing harms against which we have found Exemption 7(C) protects."  *EPIC*, 18 F.4th at 719 (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675, 682 (D.C. Cir. 2017)).

The unredacted transcripts would include an array of new information about individuals who were never indicted.  And this information reflects intimate details that are in the heartland of what Exemption 7(C) protects from disclosure—including the impact of Beau Biden's death on President Biden's assessment of whether to run for President, foreign policy issues occurring

10

App-047

during the period preceding and following Beau's death, the well-being of family and others, and President Biden's candid reflections on his relationships with leaders in the United States and abroad and his decision on whether to enter the 2016 election. *See* Weinsheimer Decl. ¶ 16. The transcripts reflect home recordings that are analogous to diary entries and that only happen to be in the government's possession because they were swept up as evidence in an investigation yielding no charges. *See id.* ¶ 22. Releasing the unredacted version of the transcripts would be like releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone—despite no charges having ever been brought, let alone charges relating to that private content. The privacy interests here are undoubtedly enormous.[1]

That privacy interest does not somehow lessen because the recordings were made with a book in mind. The conversations reflect source material; the book that resulted from that source material was only released to the public after subsequent drafting and editing. *See* Hur Report at 100. More generally, there is a substantial difference between private brainstorming and what a person might decide to communicate later in a more public setting. The very foundation of privacy is the choice of what aspects of a brainstorming session become public and what stays in the room. *See Reps. Comm.*, 489 U.S. at 763 (defining privacy as "the individual's control of information concerning his or her person").

That foundational tenet applies to former presidents and vice presidents, who have "compelling" privacy interests in "what they were thinking, considering, and planning as they transitioned back to private life after their years of service to the country." *Cook v. Nat'l Archives*

---

[1] In addition to President Biden and Mr. Zwonitzer, the unredacted transcripts reflect private conversations involving other individuals. *See* Weinsheimer Decl. ¶ 16. Mr. Zwonitzer and these other individuals have their own privacy interests implicated by the disclosure of these transcripts, as unindicted individuals referenced in material included in a law enforcement file.

*& Records Admin.*, 758 F.3d 168, 176 (2d Cir. 2014).  These "former officials have a significant interest in developing their ideas privately, free from unwanted public scrutiny."  *Id.*  Indeed, Congress has specifically sought to protect the privacy of presidential and vice-presidential diaries, deliberately excluding materials that serve as the "functional equivalent of a diary or journal" from the Presidential Records Act's preservation and disclosure requirements.  *See* 44 U.S.C. § 2201(3)(A).

### 2. Any Cognizable Public Interest in the Transcripts is Exceedingly Limited and Outweighed by the Privacy Interest

On the other side of the balance, to overcome a privacy interest under Exemption 7(C), "a FOIA requester must (1) 'show that the public interest sought to be advanced [by disclosure] is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'"  *Boyd v. Crim. Div. of U.S. Dep't of Justice*, 475 F.3d 381, 387 (D.C. Cir. 2007) (quoting *Favish*, 541 U.S. at 172).  Where there is a "significant privacy interest in the contents of the . . . investigative files," disclosure is warranted "only where exceptional interests militate in favor of disclosure."  *Judicial Watch*, 876 F.3d at 350 (quoting *Fund for Const. Gov't*, 656 F.2d at 866).

Critically, only certain public interests are cognizable here: "the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'"  *CREW*, 746 F.3d at 1093 (cleaned up) (quoting *FLRA*, 510 U.S. at 497).  D.C. Circuit precedent thereby requires that any public interest in disclosure be grounded in an explanation of how release of the audio recordings and transcripts would inform the public about the activities of *Special Counsel Hur*, not about the conduct or characteristics of President Biden or Mr. Zwonitzer.  *See id.* ("[T]he relevant public interest is *not* to find out what [House

12

App-049

Majority Leader] DeLay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct."); *EPIC*, 18 F.4th at 720-21 (noting that this principle "follow[s] decades of United States Supreme Court precedent," and applying it to a FOIA case involving the report of Special Counsel Robert Mueller).

And because a plaintiff must show that disclosure "is likely to advance" a cognizable public interest, *see Boyd*, 475 F.3d at 387, an important consideration in the Exemption 7(C) analysis is whether the public already has access to substantial information about the topic. If substantial information is already available, then there is little public interest in further disclosure that only marginally increases public understanding. For example, in *Judicial Watch*, the D.C. Circuit held that the public interest in a draft indictment of former Secretary of State Clinton was "greatly reduced" given "the voluminous information already in the public domain about the Independent Counsel's investigation," including a final report by the Independent Counsel, a staff summary of the evidence, and information released by congressional committees. 876 F.3d at 350. "In these circumstances," disclosure was inappropriate because "the incremental public interest in learning how the Independent Counsel carried out his investigation . . . by disclosure of a draft indictment appears slight."[2] *Id.*; *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 178 (1991) (allowing

---

[2] Courts outside of this Circuit apply a similar analysis. *See, e.g.*, *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1028 (9th Cir. 2008) ("As a result of the substantial information already in the public domain, we must conclude that the release of the identities of the employees who participated in the Forest Service's response to the Cramer Fire would not appreciably further the public's important interest in monitoring the agency's performance[.]"); *Off. of the Cap. Collateral Couns. v. U.S. Dep't of Justice*, 331 F.3d 799, 804 (11th Cir. 2003) (finding that substantial public information was available about an attorney's misconduct and that any "public interest in knowing how DOJ responded to [the attorney's] misconduct can be satisfied by this other public information"); *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 293 (2d Cir. 2009) ("We conclude that the public interest in evaluating whether DOD properly followed-up on the detainees' claims of mistaken identity have been adequately served by the disclosure of the redacted information[.]").

withholding of unredacted summaries of agency interviews because the public interest had been "adequately served" by earlier release of redacted summaries of the interviews).

Here, any public interest in the unredacted transcripts would be exceedingly minimal. The public already has access to voluminous information about the SCO investigation, beginning with the Hur Report itself. The Hur Report specifically and meticulously lays out the basis for the SCO's conclusions, in a comprehensive account that spans 345 pages of main text, more than 1,300 footnotes, and three appendices. It includes substantial discussion of the legal framework governing the handling of classified information, the investigatory steps undertaken, the evidence uncovered, and the reasons why SCO concluded that charges against President Biden and Mr. Zwonitzer were not warranted. As part of this analysis, the Hur Report includes a detailed examination of the Biden-Zwonitzer recordings and how they were relevant to Mr. Hur's decision not to seek charges. *See, e.g.*, Hur Report at 3-14. In addition, Special Counsel Hur publicly testified before Congress for more than five hours concerning his investigation and his decision to decline to recommend charges. *See* Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the H. Comm. on the Judiciary, 118th Cong. (2024), available at https://www.congress.gov/event/118th-congress/house-event/116942/text. And the Department has already produced a written transcript of Special Counsel Hur's interview with President Biden himself and has produced redacted transcripts of the SCO's interviews with Mr. Zwonitzer.[3] So any public interest in the transcripts "is greatly reduced . . . because . . . the voluminous information already in the public domain about the [Special] Counsel's investigation" already lets "the public

---

[3] The Department applied a small number of redactions to the Biden interview transcript to withhold specific information that is exempt under FOIA.

14

at large" "readily assess" SCO's conduct. *Jud. Watch*, 876 F.3d at 350, 351; *see also Ray*, 502 U.S. at 178.

To the extent that Plaintiffs may argue that the transcripts shed additional light regarding the Special Counsel's conclusions about the President's memory, such an argument is sheer speculation. The Hur Report already explains the Special Counsel's assessment of the President's memory and the ways in which it influenced the SCO's decision-making. *See, e.g.*, Hur Report at 5-6. The Hur Report also discusses the role that the Biden-Zwonitzer recordings played in that assessment. *See, e.g., id.* at 207 ("Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."). It is unclear how the unredacted transcripts would shed additional light on this conclusion, which is already spelled out. Speculation about what may be included in the unredacted transcripts does not amount to a substantial public interest. *See Dunkelberger v. U.S. Dep't of Just.*, 906 F.2d 779, 781 (D.C. Cir. 1990) (noting that public interest "must be defined with sufficient specificity" to enable balancing).

All told, given the extensive amount of evidence collected and analyzed by Special Counsel Hur and the substantial amount of other information about Special Counsel Hur's declination decision already available to the public, release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions. *Jud. Watch*, 876 F.3d at 350; *see also Project on Gov't Oversight, Inc. v. U.S. Off. of Special Couns.*, No. 22-cv-3381, 2024 WL 1213324, at *4 (D.D.C. Mar. 19, 2024) (upholding Exemption 7(C) assertion after noting that

15

"'general public curiosity' about the conduct of government employees who have been cleared of wrongdoing cannot outrun those employees' 'legitimate and substantial privacy interests,' even when those employees are 'high level government . . . officials'" (quoting *Fund for Const. Gov't*, 656 F.2d at 866, 864)).

When the privacy interests are high and the public interests are minimal given public information, the balance decisively tips in favor of exemption.  That is the case here.  The privacy interest in transcripts of sensitive home recordings is exceedingly significant.  Any potential cognizable public interest in the transcripts is minimal, as the public already has access to a wealth of material that explains how the recordings were evaluated in the SCO investigation. The Department properly withheld the redacted material under Exemptions 6 and 7(C).

**B.  Release of the Audio Recordings Would Result In An Unwarranted Invasion of Privacy**

The principles supporting the Department's decision to redact the transcripts similarly support the withholding of the audio recordings under Exemptions 6 and 7(C).  Controlling precedent makes clear that individuals have a distinct privacy interest in an audio recording of their voice, even where a transcript is available of the words they have spoken.  That distinct privacy interest is notable here, given that the audio is of sensitive home recordings that are solely in the government's possession because of a criminal investigation that yielded no charges.  No substantial public interest counterbalances those privacy concerns.

**1.      The Audio Implicates Distinct Privacy Interests**

The medium of audio recordings creates additional and distinct privacy concerns.   The audio recordings of a private conversation reflect the individual's oral responses, including any pauses, hesitations, mannerisms, and intonations.  For that reason, the *en banc* D.C. Circuit has recognized that audio recordings "can contain personal information" distinct from the information

16

App-053

contained in a written transcript. *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990) ("*NASA I*"). In *NASA I*, the government refused to release through FOIA the audio recording of astronauts aboard the *Challenger* shortly before the space shuttle exploded. *See id.* at 1003. The Court held that "[t]he information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves." *Id.* at 1006. Because "voice inflections can contain personal information," the audio recording at issue in *NASA I* could be withheld *even though the transcript had already been released. Id.* at 1005; *see also id.* at 1005–07. Indeed, on remand the district court found that the government properly withheld the audio recording on privacy grounds because the sound of a person's voice constituted "intimate details" over which a person possesses a "substantial" privacy interest. *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 631-32 (D.D.C. 1991) ("*NASA II*").

Underlying these holdings is the common-sense understanding that "information is not conveyed by words alone." *NASA I*, 920 F.2d at 1007. The sound of a person's voice is far more intimate, expressive, and revealing than words captured on a page. That is why the release of a private recording is a far greater intrusion into someone's privacy than the release of only their words.

That precedent and principle squarely applies to the audio recordings here. The "information recorded" in the audio recording of the Biden-Zwonitzer conversations is "distinct and in addition to the information contained" in a transcript of those conversations. *Id.* at 1006; *see also Pike v. U.S. Dep't of Just.*, 306 F. Supp. 3d. 400, 412 (D.D.C. 2016) (Brown Jackson, J.) ("Under binding precedent, written transcripts of recordings do not contain information that is identical to the audio recorded version." (citing *NASA I*, 920 F.2d at 1006) (emphasis removed)), *aff'd*, No. 16-5303, 2017 WL 2859559 (D.C. Cir. June 23, 2017) (per curiam). As noted above,

17

this new information would come from a law enforcement file regarding individuals who were never charged—a context in which the D.C. Circuit has recognized a heightened privacy interest. *EPIC*, 18 F.4th at 719; *see also Fund for Const. Gov't*, 656 F.2d at 861. And while the content of the specific audio recordings at issue does not involve particularly sensitive subjects—dealing instead with document retention and foreign policy issues[4]—the context in which the conversations were recorded was undoubtedly sensitive. The recordings were made for a book about how Mr. Biden coped with the loss of his son, and how he managed his responsibilities in that year while struggling with enormous personal grief. They were recorded in private and were not meant for wider distribution. *See* Weinsheimer Decl. ¶ 22. The sound of a person's voice conveys "intimate details" in such a context. *NASA II*, 782 F. Supp. at 631.

If released to the public, these private conversations—and all the "intimate details" they contain—would likely be broadcast to the world and become universally available on the Internet. *See* Weinsheimer Decl. ¶ 23. This would be akin to the global dissemination of someone's private audio diaries, which only happened to be in the government's possession because those diaries had been swept up in an investigation that yielded no charges. *See id.* ¶ 22. Such a disclosure implicates obvious and significant privacy interests. *See, e.g., Judicial Watch*, 876 F.3d at 349; *Detroit Free Press Inc. v. U.S. Dep't of Just.*, 829 F.3d 478, 482 (6th Cir. 2016) ("[M]odern technology only heightens the consequences of disclosure . . . .").

---

[4] The audio corresponds to quoted material featured in the Hur Report on pages 64-65, 75-77, 106, 110, 225, and 236-37. *See* Weinsheimer Decl. ¶ 19 (providing the quoted material). The Department also identified two partial quotations on page 173 of the Hur Report for which no corresponding audio was located. *See id.* These quotations involve brief reflections from President Biden regarding relationships with world leaders, and the Department understands that these quotes are attributed to documents collected during the SCO's investigation. *See id.*

18

### 2.    Any Cognizable Public Interest in the Audio is Clearly Outweighed By the Privacy Interest

On the other side of the balance, disclosure of the recordings would do little to advance the public's understanding of the Special Counsel's investigation.  The sound of Mr. Biden and Mr. Zwonitzer's voices sheds little light on "how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct."  *CREW*, 746 F.3d at 1093.  As indicated above, voluminous information is available that lets the public know how the SCO reached its conclusions, including a nearly 400-page report.  That report spells out how the recordings affected the Special Counsel's determination regarding the President's memory.  And the Special Counsel's decision not to recommend charges was based on a huge collection of evidence, including additional portions of the Biden-Zwonitzer recordings and interviews with President Biden, Mr. Zwonitzer, and dozens of other individuals. *See, e.g.*, Hur Report at 29.  In such a context, it is exceedingly speculative to envision how these recordings would shed any light on SCO's role.  *See Dunkelberger*, 906 F.2d at 781 (noting that the public interest "must be defined with sufficient specificity").  Such a release "would tell us nothing directly about the character of the [SCO's] behavior." *Reps. Comm.*, 489 U.S. at 774; *see also Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) (holding that there is no public interest "unless the public would learn something directly about the workings of the *Government*" via disclosure).  It certainly does not justify divulging the audio of what amounts to the conversational equivalent of Mr. Biden's diary entries.

Under these facts, the Department has satisfied its burden to show that the audio recordings—like the redacted portions of the transcripts—"logically" and "plausibly" fall within the protection of Exemptions 6 and 7(C).

19

App-056

**II.    The Transcripts Were Properly Withheld In Part Under Exemption 5 Because They Are Attorney Work Product Not "Routinely" Available in Civil Litigation**

Exemption 5 exempts documents that are privileged in civil discovery.  *See Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1185-87 (D.C. Cir. 1987).  This includes any material that cannot ordinarily be obtained through civil discovery.  *See id.*  Accordingly, information that is subject to a "qualified" privilege remains unqualifiedly exempt under FOIA even if the privilege could be overcome in specific civil litigation.  *See FTC v. Grolier Inc.*, 462 U.S. 19, 27 (1983).  For instance, "[a]lthough work product protection may be overcome for cause in civil cases, any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA."  *Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011) (citation omitted).  So unlike in the civil litigation context, the Court does not engage in any balancing here; qualified privileges are categorical under Exemption 5.  *See, e.g.*, *id.*

The transcripts at issue here are quintessential attorney work product.  They were created by SCO during and in furtherance of a law enforcement investigation, and they reveal the impressions of what SCO deemed to be important parts of the Biden-Zwonitzer recordings for investigative and prosecutorial purposes.  The redacted portions of the transcripts are thereby protected by Exemption 5.

"The work-product doctrine protects materials 'prepared in anticipation of litigation or for trial by or for another party or its representative.'"  *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  The doctrine covers "the mental impressions, conclusions, opinions, or legal theories of an attorney," often called opinion work product, and "factual materials prepared in anticipation of litigation," often called fact work product.  *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997).  Importantly, and as the Second Circuit has explained, Federal Rule of Civil Procedure 26(b)(3)(A) "sweeps

20

broadly," and "effectively . . . rejects the conclusion reached by some district courts that witness statements—particularly verbatim statements—are work product only to the extent 'they reveal an attorney's strategic impressions and mental processes,' not when they merely record the witnesses' factual observations." *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 590 & n.13 (2d Cir. 2022) (quoting *N.Y. Times, Co. v. U.S. Dep't of Just.*, 138 F. Supp. 3d 462, 471-72 (S.D.N.Y. 2015)). "[B]oth are work product." *Id.* at 590 n.13. In civil litigation, fact work product is more easily discoverable upon a showing of good cause. But under FOIA, "any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA." *Williams & Connolly*, 662 F.3d at 1243.

The D.C. Circuit "appl[ies] a 'because of' test" to determine whether a record is work product, "asking 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)). This "because of" test governs "regardless of [a document's] status as 'factual' or 'deliberative'" material. *Martin*, 819 F.2d at 1187. So even factual documents memorializing verbatim witness testimony, such as "eleven signed witness statements," constitute work product if they were prepared because of litigation. *See id.* at 1183, 1187; *see also Am. Oversight*, 45 F.4th at 590 n.13.

Applying this test here, the transcripts are plainly work product, as they were prepared because of the prospect of litigation. The Special Counsel was authorized to investigate potential federal crimes and to bring prosecutions arising from his investigation. As part of this investigation, the SCO examined "dozens of hours of recorded conversations" between Biden and Zwonitzer in 2016 and 2017, which covered "a vast array of topics." Hur Report at 207. The SCO

21

determined that a small subset of these recordings were of particular investigative interest, and it had these portions of the recordings transcribed by a court-reporter service, to facilitate SCO's consideration of evidence that would be considered in determining whether to pursue any charges. *See* Weinsheimer Decl. ¶ 15.

Since the transcripts were culled from a wider array of material, they constitute opinion work product, which garners the highest level of protection in civil discovery. The act of paring down key items of evidence from a much larger pool of material "necessarily reflect[s] a focus chosen by the lawyer." *United States v. Clemens*, 793 F. Supp. 2d 236, 252 (D.D.C. 2011) (citation omitted). Here, the transcripts reveal the assessment of what the SCO deemed to be the most significant material for prosecutorial purposes among the dozens of hours of the Biden-Zwonitzer recordings.

And even if the SCO had undertaken no winnowing at all, it would make no difference, since factual material prepared because of litigation is also protected by the work product doctrine. *Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 11-12 (D.D.C. 2020); *see also Jud. Watch, Inc. v. U.S. Dep't of Just.*, 391 F. Supp. 3d 43, 50 (D.D.C. 2019) ("Exemption 5 extends the same protections to both kinds of work product [*i.e.*, fact and opinion work product]."), *aff'd*, 806 F. App'x 5 (D.C. Cir. 2020). By engaging a court-reporter service to create transcripts of conversations containing relevant evidence, to assist the SCO in determining whether the evidence warranted a recommendation of criminal charges, the SCO was creating material because of the prospect of litigation. That material's status as work product does not hinge on whether it was a full transcript or a partial one, or whether it featured verbatim statements or summaries of them. *See Martin*, 819 F.2d at 1183, 1187 (finding that "eleven signed witness statements"—which necessarily contained the verbatim testimony of those witnesses—were work product). The

22

redacted portions of the transcripts are accordingly exempt under Exemption 5. *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

### III. Disclosure of the Audio Recordings or of the Redacted Portions of the Transcripts Would Foreseeably Harm Interests Protected by FOIA Exemptions

In order to justify the withholding of a responsive record, the FOIA Improvement Act of 2016 requires the government to show that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) [of FOIA]," or that "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); *see also Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021). To satisfy the foreseeable harm requirement, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reps. Comm.*, 3 F.4th at 369 (quoting H.R. Rep. No. 391, 114th Cong., 2d Sess. 9 (2016)).[5]

Disclosure of the audio recordings or the redacted portions of the transcripts would foreseeably harm interests protected by each of the FOIA exemptions asserted here. Disclosure of either the audio recordings or the redacted transcript portions would harm interests protected by Exemptions 6 and 7(C) because releasing the records would result in unwarranted harm to privacy interests that an individual maintains in preventing the dissemination of a private recordings that were collected in the course of an investigation that yielded no criminal charges. *See* Weinsheimer Decl. ¶ 34; *see also Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 65 (D.D.C. 2021) ("[W]hen

---

[5] This burden is more stringent when an agency asserts the deliberative process privilege, which is the specific privilege that Congress sought to address by adding the foreseeable harm standard. *See Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021). By contrast, "an agency's burden under the foreseeable harm requirement may be more easily met when invoking other privileges and exemptions for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated." *Id.*

23

invoking Exemption 7(C), an agency need not establish much more than the fact of disclosure to establish foreseeable harm."). Further, disclosure would harm the interests protected by Exemption 5 (via work product): release of the recordings or transcripts would impermissibly reveal federal prosecutors' interview strategies and factual material gathered in anticipation of litigation. *See* Weinsheimer Decl. ¶ 34. Disclosure would also eliminate the Department's ability to assert a viable discovery privilege over the transcripts in future potential civil litigation. *See id*.

## IV.    There Is No Reasonably Segregable, Non-Exempt Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Here, the Department has properly withheld the audio recordings in full and the written transcripts in part under multiple exemptions. Because their release would unjustifiably infringe privacy interests related to the law enforcement interview of an uncharged individual, the entirety of the audio recordings and the redacted portions of the transcripts are properly withheld under Exemptions 6 and 7(C), and no portions are further segregable. *See* Weinsheimer Decl. ¶ 35. Further, because the transcripts were created in anticipation of litigation, the redacted portions of the transcripts are work product subject to Exemption 5—an exemption that is not subject to segregability requirements. *See, e.g., Jud. Watch, Inc. v. U.S. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005). Accordingly, all information has been appropriately withheld, and no further segregation is possible. *See, e.g.*, *Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Just.*, 844 F.3d 246, 256 (D.C. Cir. 2016) (noting that when an exemption applies to an entire record, "there are no non-exempt portions left to segregate").

24

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendant's motion for summary

judgment.


Dated:  November 13, 2024          Respectfully submitted,


                                   BRIAN M. BOYNTON
                                   Principal Deputy Assistant Attorney General

                                   MARCIA BERMAN
                                   Assistant Branch Director

                                   */s/ Cameron Silverberg*
                                   CAMERON SILVERBERG (D.C. Bar No. 1780628)
                                   JOSHUA C. ABBUHL (D.C. Bar No. 1044782)
                                   Trial Attorneys
                                   United States Department of Justice
                                   Civil Division, Federal Programs Branch
                                   1100 L Street NW
                                   Washington, DC 20005
                                   Tel.:    (202) 353-9265
                                   Fax:    (202) 616-8470
                                   Email:  Cameron.D.Silverberg@usdoj.gov

                                   *Counsel for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HERITAGE FOUNDATION,** *et al.,* | |
| *Plaintiffs,* | |
| v. | Case No. 1:24-cv-00645-DLF |
| **U.S. DEPARTMENT OF JUSTICE,** | |
| *Defendant.* | |

## DECLARATION OF BRADLEY WEINSHEIMER

I, Bradley Weinsheimer, declare the following to be true and correct:

1.    I am an Associate Deputy Attorney General for the Department of Justice ("the Department"). I serve as the highest-ranking career official in the Department. I have held this position since July 2018. Prior to that time, I served in the Department's National Security Division, from March 2016 to July 2018, serving as Acting Chief of Staff to the Assistant Attorney General from May 2016 until approximately February 2018. I have worked at the Department since 1991, including twenty years as an Assistant United States Attorney ("AUSA") in Washington, D.C. As an AUSA, I handled a wide variety of narcotics, violent crime, and public corruption cases, and held numerous supervisory positions, including Chief of the Superior Court Division and Chief of the Grand Jury Section.

2.    The statements made in this declaration are based on my personal knowledge as well as information obtained and reviewed in the course of my official duties, including conversations I had with Special Counsel Robert K. Hur (the "Special Counsel") and members of his staff, as well as other individuals in the Department.

3.    I understand that the plaintiffs in this case submitted Freedom of Information Act ("FOIA") requests to the Department seeking "the records relied upon by Special Counsel Hur in

App-063

drafting [certain] passages in the Report relating to President Joseph R. Biden's memory and mental faculties." Amended Compl. ¶ 8. The "Report" referenced in Plaintiffs' FOIA request is a report that the Special Counsel furnished to the Attorney General at the conclusion of his investigation, in accordance with 28 C.F.R. § 600.9(a)(3) ("Hur Report").

4.    I further understand that, by agreement of the parties, the records remaining at issue are: (1) portions of audio recordings from 2016-2017 of conversations between Mr. Biden and his writing assistant, Mark Zwonitzer ("the Biden-Zwonitzer recordings"); and (2) 117 pages of transcripts of some of the Biden-Zwonitzer recordings that had been created by the Special Counsel's Office ("SCO") with the assistance of a court-reporter service. *See* ECF Nos. 20, 26, 28. The portions of the audio recordings at issue correspond to quotations from the Hur Report. The Department withheld the portions of the audio recordings in full on the basis of Exemptions 6 and 7(C). *See* Interim Response (July 26, 2024), attached as Exhibit A. The Department withheld the transcripts in part on the basis of Exemptions 1, 3, 5, 6, and 7(C). *See* Final Response (Oct. 16, 2024), attached as Exhibit B. Plaintiffs informed the Department that they do not challenge the withholdings to the transcripts that were made on the basis of Exemptions 1 and 3, so those withholdings are no longer at issue. I submit this declaration to provide detail and context concerning the Department's invocation of Exemptions 5, 6, and 7(C) over the records remaining at issue.

**The Hur Investigation and the Conversations Between Mr. Biden and Mr. Zwonitzer**

5.    On January 12, 2023, Attorney General Merrick Garland appointed Robert K. Hur as Special Counsel. *See* Order No. 5588-2023, *Appointment of Robert K. Hur as Special Counsel,* available at https://www.justice.gov/sco-hur. Mr. Hur was "authorized to conduct the investigation of matters that are the subject of the initial investigation . . . led by United States Attorney John R. Lausch, Jr., including possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private residence of President Joseph R. Biden, Jr., as well as any matters that arose from the initial investigation or may arise directly from the Special

2

Counsel's investigation or that are within the scope of 28 C.F.R. § 600.4(a)." *Id.* ("SCO Investigation").

6. Mr. Hur resigned from his position of Special Counsel and left the Department in March 2024. I did not directly work on or oversee the SCO Investigation. I do, however, work on issues relating to disclosure of SCO Investigation documents both to Congress and pursuant to FOIA requests.

7. On February 5, 2024, Special Counsel Hur informed the Attorney General that SCO had concluded its investigation, and Special Counsel Hur provided the Attorney General with the Hur Report, in accordance with 28 C.F.R. § 600.9(a)(3). As reflected in his report, Special Counsel Hur, "conclude[d] that no criminal charges are warranted[.]" Hur Report at 1.

8. I also participated in the review of the Hur Report to make recommendations as to what material, if any, should be redacted prior to congressional or public release by the Attorney General. President Biden did not assert executive privilege over any portion of the Hur Report or its appendices. *See* February 8, 2024 Ltr. of Attorney General Merrick Garland, at 2 ("Feb. 8 Letter"), available at https://www.justice.gov/sco-hur. Attorney General Garland released to Congress and the public the Hur Report as it was provided to him by Special Counsel Hur without any further additions, redactions, or other modifications. *Id.* The Department has placed a copy of the Hur Report on its public-facing website. *See* Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr. (Feb. 2024), available at https://www.justice.gov/sco-hur.

9. Over the course of the investigation, the SCO conducted "173 interviews of 147 witnesses," and "collected over seven million documents, including e-mails, text messages, photographs, videos, toll records, and other materials from both classified and unclassified sources." Hur Report at 29.

10. During the SCO investigation, agents from the Federal Bureau of Investigation ("FBI") contacted Mr. Zwonitzer to seek records relating to his work on two of Mr. Biden's

memoirs. Hur Report at 335. Mr. Zwonitzer had interviewed Mr. Biden for dozens of hours while researching and writing Mr. Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose*. *Id.* at 100. Mr. Zwonitzer audio-recorded the interviews for use in writing *Promise Me, Dad*. *Id.* The conversations between Mr. Biden and Mr. Zwonitzer took place beginning in the spring of 2016 and continued through the summer of 2017, at Mr. Biden's residences. *Id.*

11.     At some point, Mr. Zwonitzer deleted digital audio recordings of his conversations with Mr. Biden during the writing of *Promise Me, Dad*. Hur Report at 334-35. Mr. Zwonitzer provided investigators with the electronic devices he had used to create the recordings and consented to investigators searching the devices. *Id.* As a result, investigators were able to recover deleted recordings using a digital forensic process known as "file carving," in which a storage device is comprehensively scanned. *Id.* at 335 & n.1350.

12.     *Promise Me, Dad* contains highly personal reflections of Mr. Biden. It "recounts a 14-month period of Mr. Biden's vice presidency from Thanksgiving 2014 to January 2016, during which he dealt with the illness and eventual death of his elder son, Beau, who died in May 2015." Hur Report at 97. It "discusses the toll that loss took on Mr. Biden," as well as "the role his son's death played in Mr. Biden's decision not to run for president in 2016," among other topics. *Id.* at 97-98. The book focuses "on a 'small window in time' during which Mr. Biden balanced his responsibilities as vice president with his family responsibilities during and in the wake of his son's illness and death." *Id.* at 99.

13.     Mr. Zwonitzer's interviews of Mr. Biden contain highly personal discussions about those and other topics: "[d]uring the interviews, Mr. Biden recounted the events of 2015, including the challenges of dealing with profound personal tragedy while fulfilling his duties as vice president." *Id.* at 100. During interviews, Mr. Biden "referred to and read" from certain of his notebooks, and one of those notebooks contained notes relating to "Mr. Biden's private lunches with President Obama and meetings with advisors to discuss whether to run for president in 2016"; other entries were "highly personal—most notably, entries reflecting on his son's illness and death." *Id.* 100-01. During "many of the interviews" with Mr. Zwonitzer, "Mr. Biden read from

4

his notebooks nearly verbatim, sometimes for an hour or more." *Id.* at 102. The recorded conversations reflect source material; the book that resulted from that source material was only released to the public after subsequent drafting and editing. *See* Hur Report at 100.

14. During SCO's investigation, while they were considering whether to recommend criminal charges against Mr. Biden, SCO attorneys listened to the audio recordings. SCO determined that the audio "recordings had significant evidentiary value." Hur Report at 334.

15. To assist their work in determining whether the evidence warranted recommending criminal charges, SCO engaged a court-reporter service to make transcripts of selected portions of the audio recordings from six interviews. SCO selected these portions for transcription because they contained information that was potentially relevant to SCO's evaluation of whether to recommend criminal charges.

16. The substance of the conversations reflected in the transcripts involves a wide range of subjects. These subjects include the impact of Beau Biden's death on President Biden's assessment of whether to run for President; foreign policy issues around the time of Beau Biden's death and the President's decision on running for President; and President Biden's candid reflections on his relationships with leaders in the United States and abroad, his decision on whether to enter the 2016 election, and his own political strengths and weaknesses. Portions of the transcripts also include conversations with other individuals. One portion appears to include conversation between Mr. Zwonitzer and an unidentified individual regarding Beau Biden's illness.

17. Because the audio recordings were collected pursuant to a law enforcement investigation, the audio recordings constitute "records or information compiled for law enforcement purposes." *See* 5 U.S.C. 552(b)(7)(C). Likewise, because SCO created the transcripts of some of those audio recordings to assist in their law enforcement investigation and decision of whether to recommend charges, the transcripts are also "records or information compiled for law enforcement purposes." *See id.*

18.     Since SCO recovered the audio recordings from Mr. Zwonitzer's electronic devices, other than providing them to the court-reporter service for the purposes of creating limited transcripts, the audio recordings have been kept in the custody and control of the Executive Branch. Likewise, since SCO created the transcripts of some of the audio recordings, the Department has not shared those transcripts with anyone outside the Executive Branch, except that the Department released portions of the transcripts in response to Plaintiffs' FOIA request, as described below.

19.     As indicated above, the audio recordings at issue correspond to portions of the Biden-Zwonitzer recordings that are quoted in the Hur Report. The relevant passages of the Hur Report with these quotations are included below:

- Pages 64-65:

    Referring to his 'Foreign Policy' notebook, Mr. Biden added, "[t]hey didn't even know I have this."

    Mr. Biden: There was a lot of stuff going on at the same time in foreign policy. You said-they said, you didn't wanna go into . . . but I have extensive notes over this period of time.

    Zwonitzer: Oh, you actually have those here?

    Mr. Biden: Yeah, now there's a lot of other notes too. But, I mean, this is my . . . They didn't even know I have this. Some of this stuff I'm not, you know, going . . . I have stuff all the way up to 5-19. May 19. And then it skips in my notes to . . . 6-16 is the next entry.

- Pages 75-77

    Zwonitzer: Can we spend some time on that lunch?

    Mr. Biden: I had all those presidential notes.

    Zwonitzer: I know you gave me this much from the diaries.

    Mr. Biden: But I actually, I wonder where those . . .

    Zwonitzer: Do you have separate notebooks of the presidential [lunches]?

6

App-068

Mr. Biden: Yeah. What I would do is after every lunch I would dictate to, um, I would call in [the Executive Assistant] and I would dictate to her what the lunch was about. I had all those at the house in a safe. I don't know what they made me do with them. But what I would do is I would make up a card, one of those little cards of mine. Before I'd have lunch, I'd meet with Steve [Ricchetti] and anything anybody thought I should be bringing up [I'd put] on our agenda. And when I came back, I'd dictate notes to [the Executive Assistant] as to what actually transpired at the lunch.

- Pages 75-77 & 236-37:

  Mr. Biden: I'm told by [a personal aide], I guess he checked with you, in order for me to get my, uh, get all those presidential notes I had for lunch, the luncheon meetings, I have to go to McGrail?

  Assistant: Yes, McGrail has them. We were supposed to turn it in and that is the last person who had them.

  Mr. Biden: OK Uh. See if you can get me McGrail on the line while I have you now. OK? And stay on okay?

  Assistant: Got it sir. Hold on.

  Zwonitzer: This is probably something that goes to the presidential papers.

  Mr. Biden: I don't think so. It was in between. I didn't want to turn them in.

  Zwonitzer: Right, so, it's the gray area.

- Pages 104 & 245:

  Mr. Biden appeared to tell Zwonitzer this notebook entry related to "a long meeting on the Security Council on - it probably was classified."

- Pages 106 & 225:

App-069

While reading these notes, Mr. Biden struggled to read his handwriting, and he showed part of the handwritten passage to Zwonitzer. The two then had the following exchange:

Mr. Biden: Do you have any idea what the hell I'm saying there? Less on the number of what? Isn't that awful?

Zwonitzer: Something. Number, something - quality. I can't.

Mr. Biden: Some of this may be classified, so be careful.

Zwonitzer: Okay.

Mr. Biden: I'm not sure. It isn't marked classified, but.

- Pages 110-11:

So this was - I, early on, in '09-I just found all the classified stuff downstairs-I wrote the President a handwritten 40-pagememorandum arguing against deploying additional troops to Iraq-I mean, to Afghanistan-on the grounds that it wouldn't matter, that the day we left would be like the day before we arrived. And I made the same argument . . . I wrote that piece 11 or 12 years ago.

20.    The Department also identified the following passage from the Hur Report as containing a reference to quoted material from the Biden-Zwonitzer recordings:

During a recorded interview with Zwonitzer, Mr. Biden explained that during these international trips, he learned the importance of foreign policy experience and that "[i]t matters what kind of personal relationships and rapport you can establish with foreign leaders." Biden said that when he later considered a presidential run, he "was never worried . . . whether I could sit across [from] [Soviet President Leonid] Brezhnev or sit across from [British Prime Minister Margaret] Thatcher . . . or [that I would] sit there and be intimidated."

Hur Report at 173. No corresponding audio was located for these partial quotes. The Hur Report provides the following citations for these partial quotes: "1978-race.doc at 18," "Zwonitzer-

8

00009492," "1988.doc at 10," and "Zwonitzer-00009499." *Id.* at 173 n.717. The Department understands these citations to be references to documents collected during the SCO investigation that contained information relating to the partial quotes given above.

### Privacy Concerns and Public Interest in Disclosure

21.    The potential release of evidence regarding private conduct that was gathered in a law enforcement investigation raises substantial privacy concerns. Those privacy concerns are at their apex when the evidence discusses the private conduct of individuals who were investigated but never charged with a crime, as is the case for both President Biden and Mr. Zwonitzer. It is a bedrock principle of the U.S. justice system that individuals are entitled to a presumption of innocence. Release of law enforcement records that reveal non-public private conduct poses substantial threats to that core tenet of American justice. Accordingly, the Department regularly seeks to protect citizens from any unwarranted intrusions of privacy that would occur due to the release of sensitive law enforcement records—particularly for individuals who were never charged with a crime.

22.    The records at issue here implicate substantial privacy interests of President Biden and Mr. Zwonitzer, as well as other individuals mentioned or included in the unredacted transcripts. The audio recordings at issue here were not originally created by the government; rather, they were created by individuals acting in a private capacity, and they reflect private conversations. Moreover, the conversations at issue are unusually sensitive. They were created for the purpose of helping create a memoir that focused on a highly emotional period in President Biden's life, as discussed above. More generally, conversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary. To the government's knowledge, neither the withheld portions of the transcripts nor the audio recordings at issue have ever been made public, and the only reason the government possesses the records (making them potentially subject to a FOIA request) is because they were gathered from private individuals as part of a law enforcement investigation.

9

App-071

23.    The audio recordings that have been withheld also raise privacy concerns. While these portions correspond to quoted statements in the Hur Report, releasing the audio would reveal new information: specifically, the sound of the voices of individuals heard on the recording, namely President Biden and Mr. Zwonitzer. The sound of an individual's voice, particularly during sensitive conversations, implicates that person's privacy rights. The portions of the audio recordings remaining at issue took place in the context of broader conversations between President Biden and his writing assistant that involved highly personal topics, including the illness and death of President Biden's son. How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights. If the audio recording is released, it could be played on national television or made universally available on the internet, amplifying the harm to privacy.

24.    In light of the above, the release of the non-public information contained in the transcripts as well as the withheld portions of the audio recordings raises privacy concerns, particularly given that SCO investigated the conduct of President Biden and Mr. Zwonitzer but neither was charged with a crime. In a criminal prosecution, a trial will be public, and evidence developed in the investigation will become public. Defendants are afforded procedural protections to ensure not only due process but to safeguard important privacy and reputational interests. When no charges are filed, however, evidence gathered from private individuals that reveals their private conduct can be expected to be kept confidential, especially when that information may be highly personal. For that reason, the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties. Given these privacy concerns (as well as other concerns relevant to law enforcement), publicly disseminating through FOIA the transcripts or audio recordings of conversations between private individuals (particularly when those conversations reflect sensitive personal issues, as is the case here) would be exceedingly harmful.

25.    The Department has made substantial information concerning the Special Counsel's investigation available to the public. Department regulations require that "[a]t the conclusion of [a] Special Counsel's work, he or she shall provide the Attorney General with a

10

confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8(c). At the conclusion of the SCO investigation, Special Counsel Hur submitted the Hur Report to Attorney General Garland pursuant to that regulation. The Hur Report contains a detailed accounting of the SCO investigation and the reasons why Special Counsel Hur concluded that criminal charges were unwarranted. As mentioned above, the Department has placed a copy of the Hur Report on the Department's public-facing website. In addition, the Department has produced (both to Congress and pursuant to FOIA) the transcripts of the Special Counsel's interview of President Biden, with limited redactions, and has also produced a redacted version of the Special Counsel's interview of Mr. Zwonitzer. These public disclosures were discretionary; the Department did not make all withholdings or apply all redactions available under FOIA. In addition, the Department and Special Counsel Hur agreed that Mr. Hur would testify before Congress about his investigation, and Mr. Hur appeared and answered questions for more than five hours during a public hearing about his investigation and his charging decisions. These disclosures ensured appropriate transparency without compromising the substantial privacy interests of those who were witnesses, subjects, or targets of the investigation.

26. The Hur Report discusses various portions of the Biden-Zwonitzer recordings that SCO deemed legally relevant, analyzed the evidentiary implications of those recordings, and discussed their effect on SCO's decisionmaking with respect to whether SCO would recommend criminal charges. *See, e.g.*, Hur Report at 3-14.

27. I understand that FOIA Exemption 6 authorizes the withholding of information about individuals in "personnel and medical files and similar files" when disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). I also understand that Exemption 7(C) authorizes the withholding of "records or information compiled for law enforcement purposes" to the extent that production of such records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Given the clear harm to privacy interests that would result from release of the transcripts and audio recordings, and given that release of the recording would do very little (if anything) to

11

advance the public's understanding of Special Counsel Hur's activities due to the substantial amount of information already in the public record, I have concluded that release of these records clearly would result in an unwarranted invasion of personal privacy.

## Attorney Work Product

28.     The potential release of the unredacted transcripts also raises the concern of divulging material protected by the work-product doctrine.

29.     The transcripts were created at SCO's direction, for the purpose of assisting SCO in reviewing evidence it deemed significant in its evaluation of whether to recommend charges. The transcripts therefore were created in anticipation of litigation.

30.     The transcripts at issue reflect only a small portion of the dozens of hours of conversations between President Biden and Mr. Zwonitzer. SCO engaged a court-reporter service to transcribe only these selected portions of the conversations because they reflected the portions of the interviews that SCO deemed to be of particular investigative interest. Accordingly, release of the transcripts would reveal the prosecutors' views and impressions of the case, insofar as it would reveal material SCO's determination of what material was particularly relevant to their investigation.

31.     Additionally, the transcripts constitute factual material gathered by SCO in connection with SCO's assessment as to whether to bring criminal charges. Release of the transcripts would reveal this factual material.

32.     I understand that the work-product doctrine protects both factual materials and an attorney's mental impressions, opinions, or legal theories when they are prepared by an attorney or group of attorneys, or their agents, in anticipation of litigation. Accordingly, and based on the above, I have concluded that the transcripts constitute attorney work product created in anticipation of litigation. The release of the transcripts would reveal prosecutors' impression of the case and factual material collected by SCO in anticipation of possible litigation.

12

## Foreseeable Harm

33.    I also understand that FOIA generally directs agencies to withhold records only where "the agency reasonably foresees that disclosure would harm an interest protected by" one or more of FOIA's exemptions.

34.    I have concluded that release would result in foreseeable harm to the interests underlying the claimed FOIA exemptions for all the reasons I have described above. The foreseeable harm to interests protected by Exemptions 6 and 7(C) is apparent, as release of the materials would reveal previously undisclosed material relating to private individuals that was gathered in a law enforcement investigation into individuals who were never charged with a crime—individuals who are thus entitled to the utmost privacy protection. There also would be foreseeable harm to interests protected by Exemption 5, since release of the unredacted transcripts would impermissibly reveal federal prosecutors' thoughts and impressions about a case and factual material gathered in anticipation of litigation. Disclosure of the unredacted transcripts would also destroy the government's ability to assert a viable litigation privilege over the record in potential future litigation.

35.    Since the audio recordings have been withheld in full because disclosure of any portion of those recordings would implicate the privacy interests of individuals by revealing the sound of their voice, no further segregation of the audio recordings is possible. With respect to the transcripts, those transcripts were prepared in anticipation of litigation and thus are entirely protected by the work product doctrine, except for the portions that were released by the Department because they correspond to quoted portions of the Hur Report. In addition, the information withheld from the transcripts reflects the content of sensitive, private recordings, which are only in the government's possession because they were gathered pursuant to a law enforcement investigation that yielded no charges. Accordingly, disclosure of any of the withheld information would result in an unwarranted invasion of personal privacy. Further segregation of any of the records therefore is not possible.

\*\*\*

13

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this __13th__ day of November, 2024.

Bradley Weinsheimer

App-076

# Exhibit A



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC  20530-0001*

---

*Telephone: (202) 514-3642*

July 26, 2024

Mike Howell
The Heritage Foundation / The Daily Signal
214 Massachusetts Avenue, NE                Re:    FOIA-2024-01098
Washington, DC  20002                              24-cv-645 (D.D.C.)
oversightproject@heritage.org                      VRB:JMB:JMS

Dear Mike Howell:

   This is an interim response to your Freedom of Information Act (FOIA) request dated and received in this Office on February 9, 2024, seeking "[a]ll [r]ecords relied upon in making the following statements highlighted in screenshots from Special Counsel Robert K. Hur's *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private resident (sic) of President Joseph[] R. Biden Jr.* (Feb. 2024) ("Hur Report")."

   As previously advised, a search has been conducted for records responsive to your request, which located audio recordings of conversations between Mark Zwonitzer and President Biden from 2016-2017.  Pursuant to discussions through counsel, the parties agreed that we would process only those portions of the audio recordings that are directly quoted in the Hur Report, collectively approximately 6 minutes and 25 seconds.  At this time, I have determined that this material should be withheld in full pursuant to Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(6) and (b)(7)(C).  Exemption 6 pertains to information the release of which would constitute a clearly unwarranted invasion of personal privacy.  Exemption 7(C) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to constitute an unwarranted invasion of personal privacy.  Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.

   For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  *See* 5 U.S.C. § 552(c) (2018).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

-2-

If you have any questions regarding this response, please contact Cameron Silverberg at the Department's Civil Division, Federal Programs Branch at (202) 353-9265.

Sincerely,

*Jonathan Breyan*

Jonathan Breyan
Senior Supervisory Attorney
<u>for</u>
Vanessa R. Brinkmann
Senior Counsel

# Exhibit B

**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC  20530-0001*

---

*Telephone: (202) 514-3642*

October 16, 2024

Mike Howell
The Heritage Foundation / The Daily Signal
214 Massachusetts Avenue, NE                    Re:     FOIA-2024-01098
Washington, DC  20002                                    24-cv-645 (D.D.C.)
oversightproject@heritage.org                            VRB:JMB:JMS

Dear Mike Howell:

This is the final response to your Freedom of Information Act (FOIA) request dated and received in this Office on February 9, 2024, seeking "[a]ll [r]ecords relied upon in making the following statements highlighted in screenshots from Special Counsel Robert K. Hur's *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private resident (sic) of President Joseph[] R. Biden Jr.* (Feb. 2024) ("Hur Report")."

As previously advised, a search has been conducted for records responsive to your request, which located transcripts of selected audio recordings of conversations between Mark Zwonitzer and President Biden from 2016-2017.  At this time, I have determined that this material, totaling 117 pages, is appropriate for release with certain information withheld pursuant to Exemptions 1, 3, 5, 6, and 7(C) of the FOIA, 5 U.S.C. § 552(b)(1), (b)(3), (b)(5), (b)(6) and (b)(7)(C).  Exemption 1 pertains to information that is properly classified in the interest of national security pursuant to Executive Order 13526.  Exemption 3 pertains to information exempted from release by statute, in this instance, Section 6 of the Central Intelligence Agency Act of 1949, 50 U.S.C. § 3507, as amended, noted as "(b)(3) CIAAct," and/or Section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024(i)(1), as amended, noted as "(b)(3) NatSecAct."  Exemption 5 pertains to certain inter- and intra-agency communications protected by civil discovery privileges.  Exemption 6 pertains to information the release of which would constitute a clearly unwarranted invasion of personal privacy.  Exemption 7(C) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to constitute an unwarranted invasion of personal privacy.  Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.

-2-

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. *See* 5 U.S.C. § 552(c) (2018). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

If you have any questions regarding this response, please contact Cameron Silverberg at the Department's Civil Division, Federal Programs Branch at (202) 353-9265.

Sincerely,

Jonathan Breyan

Jonathan Breyan
Senior Supervisory Attorney
<u>for</u>
Vanessa R. Brinkmann
Senior Counsel

`

Enclosures

RECORDED INTERVIEW BETWEEN

MARK ZWONITZER

PRESIDENT JOSEPH BIDEN

File: _carved_000246

Date of Interview:  October 10, 2016

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

R E C O R D I N G

PRESIDENT BIDEN:

(b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 23 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 122 of 635

3

[0:02:23.8]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

there was a lot of stuff going on at the same time in foreign policy. You said -- they said you didn't want --

4

[0:03:59.0]

PRESIDENT BIDEN: -- to, you didn't want to go into it, but I have extensive notes --

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: -- over this period of time.

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C) oh, you actually have those here.

PRESIDENT BIDEN: Yeah. Now, there's a lot of other notes too.

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: But I mean --

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C) -- this is my -- they didn't even know I had this.

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: Some of this stuff, I'm not, you know, going to -- (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C) (indiscernible 0:04:41.3) --

PRESIDENT BIDEN: I have stuff on all the way up to 5/19.

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: May '19.

App-086

5

[0:04:58.3]

MR. ZWONITZER:  (Indiscernible 0:04:58.4).

PRESIDENT BIDEN:  And then it skips in my notes to -- (b) (5), (b) (6), (b) (7)(C)  6/16 is the next entry.

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

(End of recording.)

App-087

6

## C E R T I F I C A T E

I, (b) (6), (b) (7)(C) certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the RECORDED INTERVIEW provided to me by the Special Counsel's Office.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

(b) (6), (b) (7)(C)

January 11, 2024
Date

Within this transcript of proceedings, some of the names and/or technical terms are spelled phonetically, inasmuch as exhibits, files and supporting documentation were not made available to us for reference.

RECORDED INTERVIEW BETWEEN

MARK ZWONITZER

PRESIDENT JOSEPH BIDEN

File: _carved_000248

Date of Interview:    November 3, 2016

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

2

R E C O R D I N G

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

3

[0:01:08.4]

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

4

[0:02:41.9]

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

5

[0:04:01.8]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)



FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 32 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 131 of 635

6

[0:05:32.5]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

7

[0:06:31.5]

MR. ZWONITZER:

PRESIDENT BIDEN:

MR. ZWONITZER:

PRESIDENT BIDEN:

MR. ZWONITZER:

PRESIDENT BIDEN:

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-095

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 34 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 133 of 635

8

[0:07:54.2]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 35 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 134 of 635

9

[0:09:03.6]

MR. ZWONITZER: ███

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

███

████

████

████

████

████

███

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

████

███

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

████

████

████

████

███

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C) ██

████

███

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-097

10

[0:10:42.2]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

11

[0:12:54.3]

MR. ZWONITZER:

PRESIDENT BIDEN:

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

12

[0:14:40.0]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

13

[0:16:07.3]

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b)(5),(b)(6),(b)(7)(C)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:     (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b)(5),(b)(6),(b)(7)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b)(5),(b)(6),(b)(7)(C)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

14

[0:17:45.2]

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

15



[0:19:48.6]

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)(C) ████

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)(C) ████

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)(C) ████

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 42 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 141 of 635

16

[0:23:22.2]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

[0:25:01.4]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7

MR. ZWONITZER: (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

[0:26:56.0]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

19

[0:30:09.2]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

20

[0:32:16.1]

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

21

[0:33:34.3]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

22

[0:35:48.6]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

23

[0:37:36.1]

PRESIDENT BIDEN:

MR. ZWONITZER:

PRESIDENT BIDEN:

MR. ZWONITZER:

PRESIDENT BIDEN:

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-111

24

[0:39:57.4]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (5)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (5), (b) (7)

MS. BIDEN: (b) (5), (b) (6)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

25

[0:41:11.1]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

(End of recording.)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

26

# C E R T I F I C A T E

I, **(b) (6), (b) (7)(C)** certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the RECORDED INTERVIEW provided to me by the Special Counsel's Office.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was taken, and further that I am not financially nor otherwise interested in the outcome of the action.



January 11, 2024
Date

Transcriber

Within this transcript of proceedings, some of the names and/or technical terms are spelled phonetically, inasmuch as exhibits, files and supporting documentation were not made available to us for reference.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-114

RECORDED INTERVIEW BETWEEN

MARK ZWONITZER

PRESIDENT JOSEPH BIDEN

VALERIE BIDEN OWENS

File: _carved_000556

Date of Interview:   February 16, 2017

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

2

R E C O R D I N G

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN OWENS:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN OWENS:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

App-116

3

[0:01:45.6]

PRESIDENT BIDEN: ▓▓▓▓ (b) (5), (b) (6), (b) (7)(C) ▓▓▓▓

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-117

4

[0:03:32.0]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN OWENS: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN OWENS: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: -- was a long meeting on the Security Council on -- (b) (5), (b) (6), (b) (7)(C)

5

[0:06:26.1]

PRESIDENT BIDEN: (b)(1), (b)(5), (b)(6), (b)(7)(C)

So this was -- I, early on, in '09 -- I just found all the classified stuff downstairs. I wrote the President a handwritten 40-page memorandum arguing against deploying additional troops to Iraq -- I mean, to Afghanistan on the grounds that it wouldn't matter, that the day we left would be like the day before we arrived.

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 58 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 157 of 635

6

[0:08:45.5]

PRESIDENT BIDEN:

MR. ZWONITZER:

PRESIDENT BIDEN:  And I made the same argument

(b) (5), (b) (6), (b) (7)(C)

I wrote that piece now 11 years ago, 12 years

ago.  (b) (5), (b) (6), (b) (7)(C)

(b)(1), (b)(3) NatSecAct, (b)(5), (b)(6), (b)(7)(C)

(b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

7

[0:10:53.5]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

App-121

8

[0:13:20.4]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

[0:15:14.0]

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 62 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 161 of 635

10

[0:17:17.3]

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

11

[0:19:52.2]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)



FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-125

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 64 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 163 of 635

12

[0:22:30.0]

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

13

[0:24:56.7]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN OWENS:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

MS. BIDEN OWENS:    (b) (5), (b) (6), (b) (7)

(Audio skip 0:26:06.2)

UNIDENTIFIED MALE SPEAKER:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 66 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 165 of 635

14

[0:26:28.0]

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5),(b)(6),(b)(7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5),(b)(6),(b)(7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b)(5),(b)(6),(b)(7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5),(b)(6),(b)(7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5),(b)(6),(b)(7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

15

[0:26:49.6]

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 68 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 167 of 635

16

[0:27:23.6]

UNIDENTIFIED MALE SPEAKER: ████

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C) ████

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

████

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

████████████

████████████

████

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

████

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C) ███

████████████

████

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

████████████

████████████

(End of recording.)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

████

App-130

17

# C E R T I F I C A T E

I, (b) (6), (b) (7)(C) certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the RECORDED INTERVIEW provided to me by the Special Counsel's Office.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

January 11, 2024
Date

(b) (6), (b) (7)(C)

Transcriber

Within this transcript of proceedings, some of the names and/or technical terms are spelled phonetically, inasmuch as exhibits, files and supporting documentation were not made available to us for reference.

RECORDED INTERVIEW BETWEEN

MARK ZWONITZER

PRESIDENT JOSEPH BIDEN

File: _carved_000571

Date of Interview:   April 10, 2017

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

2

R E C O R D I N G

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b)(1), (b)(5), (b)(6), (b)(7)(C)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

App-133

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 72 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 171 of 635

3

[0:03:31.0]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 73 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 172 of 635

4

[0:06:07.6]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

(b)(1), (b)(3) NatSecAct, (b)(5), (b)(6), (b)(7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 74 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 173 of 635

5

[0:08:16.4]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)



FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

6

[0:09:24.1]

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

7

[0:10:50.1]

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(End of recording.)

8

# C E R T I F I C A T E

I, (b) (6), (b) (7)(C), certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the RECORDED INTERVIEW provided to me by the Special Counsel's Office.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was taken, and further that I am not financially nor otherwise interested in the outcome of the action.



January 26, 2024
Date

Transcriber

Within this transcript of proceedings, some of the names and/or technical terms are spelled phonetically, inasmuch as exhibits, files and supporting documentation were not made available to us for reference.

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

App-139

RECORDED INTERVIEW BETWEEN

MARK ZWONITZER

PRESIDENT JOSEPH BIDEN

(b) (6), (b) (7)(C)    (Telephonically)

File: _carved_000599

Date of Interview:    April 26, 2017

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

2

R E C O R D I N G

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

3

[0:01:50.1]

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C) I'm told by (b) (6), (b) (7)(C) -- I guess he checked with you.  In order for me to get my -- get all those presidential notes I had from lunch -- the luncheon meetings --

(b) (6), (b) (7)(C)    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-142

4

[0:03:03.1]

PRESIDENT BIDEN:  I'd have to McGrail?

███████████  Yes.  McGrail has them.  We were supposed to turn it in, and that is the last person who had them.

PRESIDENT BIDEN:  Okay.  See if you can get me McGrail on line while I have you now, okay?  And stay on, okay?

███████████ ████████Got it, sir.  Hold on ████████ ███████

MR. ZWONITZER:  This is probably something that goes to the presidential papers.

PRESIDENT BIDEN:  I don't think so.  It was in between.  But I didn't want to turn them in.

MR. ZWONITZER: ██████████████right.  So ██████████

-- it's the gray area.

(Audio skip 0:03:41.5)

UNIDENTIFIED MALE:  █████████████████████

████████████████████████████████

MR. ZWONITZER:  ████████

UNIDENTIFIED MALE:  █████████████████████

█████████████████████████████

████  █████████████████████

█████████████████████████████

█████████████████████████████

5

[0:04:01.6]

UNIDENTIFIED MALE: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

UNIDENTIFIED MALE: (b) (5), (b) (6), (b) (7)(C)

(End of recording.)

6

# C E R T I F I C A T E

I, (b) (6), (b) (7)(C) certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the RECORDED INTERVIEW provided to me by the Special Counsel's Office.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

**(b) (6), (b) (7)(C)**

January 11, 2024
Date

Transcriber

Within this transcript of proceedings, some of the names and/or technical terms are spelled phonetically, inasmuch as exhibits, files and supporting documentation were not made available to us for reference.

RECORDED INTERVIEW BETWEEN

MARK ZWONITZNER

PRESIDENT JOSEPH BIDEN


File: 170424_0091


Date of Interview:   April 24, 2017


FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

R E C O R D I N G

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(0:00:57.7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

4

(0:02:48.6)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

5

(0:05:05.3)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

6

(0:06:27.2)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

App-151

7

(0:08:17.6)

(b)(1), (b)(5), (b)(6), (b)(7)(C)



MR. ZWONITZER:

PRESIDENT BIDEN:        (b) (5), (b) (6), (b) (7)(C)

8

(0:10:25.6)

PRESIDENT BIDEN:           (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:           (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:           (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:           (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:           (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:           (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:           (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:           (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:           (b) (5), (b) (6), (b) (7)(C)

9

(0:12:03.9)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

(b)(1), (b)(3) CIAAct, (b)(3) NatSecAct, (b)(5), (b)(6), (b)(7)(C)



MR. ZWONITZER: (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

10

(0:13:45.8)

MR. ZWONITZER: [REDACTED (b)(5), (b)(6), (b)(7)]

PRESIDENT BIDEN: [REDACTED (b) (5), (b) (6), (b) (7)(C)]

[REDACTED]

[REDACTED]

MR. ZWONITZER: [REDACTED (b) (5), (b) (6), (b) (7)(C)]

[REDACTED]

[REDACTED]

PRESIDENT BIDEN: [REDACTED (b) (5), (b) (6), (b) (7)(C)]

MR. ZWONITZER: [REDACTED (b)(5), (b)(6), (b)(7)]

PRESIDENT BIDEN: [REDACTED (b) (5), (b) (6), (b) (7)(C)]

[REDACTED]

MR. ZWONITZER: [REDACTED (b)(5), (b)(6), (b)(7)]

PRESIDENT BIDEN: [REDACTED (b)(1), (b)(3) NatSecAct, (b)(5), (b)(6), (b)(7)(C)]

[REDACTED (b)(1), (b)(3) NatSecAct, (b)(5), (b)(6), (b)(7)(C)]

MR. ZWONITZER: [REDACTED (b)(5), (b)(6), (b)(7)]

(0:15:10.1)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (5), (b) (7)

PRESIDENT BIDEN: (b)(1), (b)(5), (b)(6), (b)(7)(C)

12

(0:17:18.5)

PRESIDENT BIDEN: ▮▮▮ (b) (5), (b) (6), (b) (7)(C) ▮▮▮

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C) ▮▮▮

▮▮▮

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: ▮▮▮ (b) (5), (b) (6), (b) (7)(C) ▮▮▮

▮▮▮

PRESIDENT BIDEN: ▮▮▮ (b) (5), (b) (6), (b) (7)(C) ▮▮▮

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: ▮▮▮ (b) (5), (b) (6), (b) (7)(C) ▮▮▮

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

App-157

13

(0:18:58.1)

PRESIDENT BIDEN:

PRESIDENT BIDEN:

PRESIDENT BIDEN:

PRESIDENT BIDEN:

do you have any idea what the hell I'm saying there.  Less on the number of what?  Isn't that awful?

MR. ZWONITZER:  Something -- number something quality.

PRESIDENT BIDEN:

MR. ZWONITZER:  I can't.

App-158

14

(0:20:09.7)

PRESIDENT BIDEN:  Some of this may be classified, so be careful --

MR. ZWONITZER:  Okay.

PRESIDENT BIDEN:  -- [(b) (5), (b) (6), (b) (7)(C)] I'm not sure.  It's not marked classified, but --

MR. ZWONITZER:  [(b) (5), (b) (6), (b) (7)]

PRESIDENT BIDEN:  [(b) (5), (b) (6), (b) (7)(C)]

MR. ZWONITZER:  [(b) (5), (b) (6), (b) (7)(C)]

PRESIDENT BIDEN:  [(b) (5), (b) (6), (b) (7)(C)]

MR. ZWONITZER:  [(b) (5), (b) (6), (b) (7)(C)]

(0:21:24.0)

PRESIDENT BIDEN: ███

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)(C) ████

████ ████

████

PRESIDENT BIDEN: ███

MR. ZWONITZER: ███

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

MR. ZWONITZER: ██ (b) (5), (b) (6), (b) (7)(C) ██ ████

████

████

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

████ ████

████ ████

████ ████

████

████ ████

MR. ZWONITZER: ███

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

████

MR. ZWONITZER: ██ (b) (5), (b) (6), (b) (7)(C) ██

PRESIDENT BIDEN: █ (b) (5), (b) (6), (b) (7)(C) █

MR. ZWONITZER: ██ (b) (5), (b) (6), (b) (7)(C) ██

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██ ███

████

16

(0:22:18.6)

MR. ZWONITZER: ▮

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: ▮

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C) ▮

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C) ▮

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

(0:23:16.6)

PRESIDENT BIDEN:    ███ (b) (5), (b) (6), (b) (7)(C) ███

MR. ZWONITZER:    ███

PRESIDENT BIDEN:    ███ (b) (5), (b) (6), (b) (7)(C) ███

███

███    ███

███    ███

███

███

███

MR. ZWONITZER:    ███

PRESIDENT BIDEN:    ███ (b) (5), (b) (6), (b) (7)(C) ███

███

MR. ZWONITZER:    ███

PRESIDENT BIDEN:    ███ (b) (5), (b) (6), (b) (7)(C) ███    ███    ███

███

███

███

MR. ZWONITZER:    ███

PRESIDENT BIDEN:    ███ (b) (5), (b) (6), (b) (7)(C) ███

███

███    ███

███

MR. ZWONITZER:    ███

PRESIDENT BIDEN:    ███ (b) (5), (b) (6), (b) (7)(C) ███

18

(0:24:33.3)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

19

(0:25:31.2)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902

App-164

20

(0:27:04.9)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (c)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b)(5),(b)(6),(b)(7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

21

(0:28:24.8)

MR. ZWONITZER: ████ (b) (5). (b) (6). (b) (7)(C)

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

████████████████ ████████████████

████████████ ████████████████

████████████████ ████████

████████████ ████████████ █

████████████████

████████

████████████████████

████████████████

████████ ████████████

████████ ████████████

████████████████████

████████████████████

████████ ████████████

████████████████

████████

████████

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

████████████████

████████████████████

████████████████████

████████████████

████

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

22

(0:32:03.0)

MR. ZWONITZER: ██████

PRESIDENT BIDEN: ██████ (b) (5), (b) (6), (b) (7)(C) ██████

████████████████████

████████████████████

█████████████

MR. ZWONITZER: ██████

PRESIDENT BIDEN: ██████ (b) (5), (b) (6), (b) (7)(C)

████████████████████

MR. ZWONITZER: ██████ (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: ██████ ████████████

████████████████████

████ ████████ ████████

████ ████████████████

████████████████████

█████████ ██████████

███████████████████

████████████ ████████

████████████████████

████ ████████████ ██

████████

██████████████████

████████████████

████████

MR. ZWONITZER: ██████

(0:34:00.7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

24

(0:35:02.3)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 108 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 207 of 635

25

(0:37:06.8)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

(0:38:56.6)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 110 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 209 of 635

27

(0:40:39.0)

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██

██

MR. ZWONITZER: ██ (b) (5), (b) (6), (b) (7) ██

PRESIDENT BIDEN: ██ (b) (5), (b) (6), (b) (7)(C) ██ ██



FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

28

(0:43:09.6)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

can we spend some time on that, that lunch.

PRESIDENT BIDEN: (Indiscernible 0:44:43.8) (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

App-173

(0:44:45.7)

PRESIDENT BIDEN:  I had all those presidential notes.

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C) I know you gave me this much from the diaries (indiscernible 0:45:01.0) --

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C) but I actually --

MR. ZWONITZER:  -- separate from presidential --

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  Do you have separate notebooks of the --

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  -- of the presidential (indiscernible 0:45:16.4)?

PRESIDENT BIDEN:  What I would do, (b) (5), (b) (6), (b) (7)(C) -- after every lunch, I would dictate to, (b) (5), (b) (6), (b) (7)(C) -- I'd call in (b) (6), (b) (7)(C) and I'd dictate to her what the lunch was about, (b) (5), (b) (6), (b) (7)(C) I had all those at the house in a safe.  I don't know what (b) (5), (b) (6), (b) -- they made me do with them.

But what I'd do, I'd make up a card, one of those little cards of mine, before I'd have lunch.  I'd meet with Steve and anything anybody thought I should be bringing up on our agenda.  And then -- (b) (5), (b) (6), (b) ('d come back and I'd dictate notes to (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-174

30

(0:46:23.3)

PRESIDENT BIDEN:  -- as to what actually transpired at the lunch.  ████████ (b)(5), (b)(6), (b)(7)(C) ████████

████

MR. ZWONITZER:  ████████ (b)(5), (b)(6), (b)(7)(C) ████████

████████████████████████████████████████

████████

PRESIDENT BIDEN:  ████ (b)(5), (b)(6), (b)(7)(C) ████

████████████████████████████████████████

████████████████████████████

MR. ZWONITZER:  ████ (b)(5), (b)(6), (b)(7)(C) ████

PRESIDENT BIDEN:  ████ (b)(5), (b)(6), (b)(7)(C) ████

MR. ZWONITZER:  ████ (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN:  ████ (b)(5), (b)(6), (b)(7)(C) ████

████████████  ████████  ████████████████████

████████████████████████████████████████

████████████████████████████████████  ██

████████████████████████████████████████

████████████████  ████████████████████  ██

████████████████████  ████████████████████

████████████████████████████████████████

████████████████████

MR. ZWONITZER:  ████ (b)(5), (b)(6), (b)(7)(C) ████

PRESIDENT BIDEN:  ████ (b)(5), (b)(6), (b)(7)(C) ████

████████████████████████

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 114 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 213 of 635

31

(0:48:55.0)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

32

(0:50:11.5)

PRESIDENT BIDEN:    ▮▮▮ (b) (5), (b) (6), (b) (7)(C) ▮▮▮

▮▮▮▮▮▮

MR. ZWONITZER:    ▮▮ (b)(5),(b)(6),(b)(7)(C)

PRESIDENT BIDEN:    ▮▮▮ (b) (5), (b) (6), (b) (7)(C) ▮▮▮

MR. ZWONITZER:    ▮▮ (b)(5),(b)(6),(b)(7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C) ▮▮▮

33

(0:52:06.4)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C).

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 117 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 216 of 635

34

(0:53:21.2)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 118 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 217 of 635

35

(0:54:10.7)

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███

MR. ZWONITZER: ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███

███

███

MR. ZWONITZER: ███

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C) ███

███

MR. ZWONITZER: ███

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C) ███

███

███

███

███

███

███

███

███

███

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: ███ (b) (5), (b) (6), (b) (7)(C) ███

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C) ███

███

36

(0:55:07.4)

MR. ZWONITZER: ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███

███

███

MR. ZWONITZNER: ███ (b) (5), (b) (6), (b) (7)(C) ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███ ███

███ ███

███

███ ███

███ ███

███ ███

███ ███

███

MR. ZWONITZER: ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███

███

MR. ZWONITZER: ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███

MR. ZWONITZER: ███ (b) (5), (b) (6), (b) (7)(C) ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███ ███

███

███

MR. ZWONITZER: ███

PRESIDENT BIDEN: ███ (b) (5), (b) (6), (b) (7)(C) ███

Case 1:24-cv-00645-DLF   Document 33-2   Filed 11/13/24   Page 120 of 137
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 219 of 635

37

(0:56:58.3)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:   (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:   (b) (5), (b) (6), (b) (7)(C)

38

(0:57:34.0)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

39

(0:58:33.4)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7).

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-184

40

(0:59:15.1)

MR. ZWONITZNER:

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

UNIDENTIFIED MALE SPEAKER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

41

(1:00:21.1)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

42

(1:01:12.6)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

43

(1:01:55.5)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

44

(1:02:58.0)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

Case 1:24-cv-00645-DLF    Document 33-2    Filed 11/13/24    Page 128 of 137
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 227 of 635

45

(1:03:45.7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

46

(1:04:52.9)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

47

(1:06:07.2)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (5), (b) (7

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:  (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:  (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

48

(1:06:57.4)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:     (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:     (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:     (b) (5), (b) (6), (b) (7)(C)

49

(1:08:38.6)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: (b)(5), (b)(6), (b)(7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN: (b)(5), (b)(6), (b)(7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: (b)(5), (b)(6), (b)(7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: (b)(5), (b)(6), (b)(7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: (b)(5), (b)(6), (b)(7)(C)

MR. ZWONITZER: (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN: (b)(5), (b)(6), (b)(7)(C)

50

(1:09:28.6)

MR. ZWONITZER: ████

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER: (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: (b) (5), (b) (6), (b) (7)(C)

51

(1:11:01.6)

PRESIDENT BIDEN:            (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5),(b)(6),(b)(7)(C)

PRESIDENT BIDEN:            (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:            (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:            (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5),(b)(6),(b)(7)

PRESIDENT BIDEN:            (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

52

(1:11:45.1)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b)(5), (b)(6), (b)(7)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

MR. ZWONITZER:    (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN:    (b) (5), (b) (6), (b) (7)(C)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-197

53

(1:12:33.6)

MR. ZWONITZER: ████████ (b) (5), (b) (6), (b) (7)(C) ████

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)(C)

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

████████████████████████████████████

████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)

PRESIDENT BIDEN: ████ (b) (5), (b) (6), (b) (7)(C) ████

████████████████████████████████████

████

MR. ZWONITZER: ████ (b) (5), (b) (6), (b) (7)

(End of recording.)

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

App-198

54

## C E R T I F I C A T E

I, ▓▓▓▓▓▓▓▓, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the RECORDED INTERVIEW provided to me by the Special Counsel's Office.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this recording was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

January 17, 2024
Date

(b) (6), (b) (7)(C)

Transcriber

Within this transcript of proceedings, some of the names and/or technical terms are spelled phonetically, inasmuch as exhibits, files and supporting documentation were not made available to us for reference.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION,<br><br>MIKE HOWELL,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>      *Defendant*,<br><br>    and<br><br>JOSEPH R. BIDEN, JR.,<br><br>      *Proposed Defendant-<br>Intervenor*. | No. 24-cv-645 (DLF) |

**MOTION TO INTERVENE BY JOSEPH R. BIDEN, JR.**

Joseph R. Biden, Jr., respectfully moves the Court for leave to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure and Local Civil Rule 7(j) of the U.S. District Court for the District of Columbia. President Biden seeks intervention as of right pursuant to Rule 24(a)(2), or, in the alternative, permissive intervention pursuant to Rule 24(b)(1)(B), to participate fully in this action, defend against Plaintiffs' FOIA claims, and assert cross-claims against the U.S. Department of Justice (the "Department"), as set forth in the attached pleading.

With respect to Plaintiffs' FOIA claims, President Biden is prepared to participate in

App-200

renewed summary judgment briefing on an expedited basis.  With respect to the proposed cross-claims, President Biden intends to seek emergency relief against the Department to prevent disclosures to Plaintiffs and Congress that the Department has announced it will make on June 15, 2026, absent a court order.  *See* ECF No. 50 at 1 (setting forth Defendant's position in May 8, 2026, joint status report).

President Biden respectfully proposes that, as part of any order granting intervention, the Court direct the parties to meet and confer and, within three days of that order, submit a joint status report setting forth their joint or competing proposals on further proceedings in this matter.

As explained in the supporting memorandum, it would serve judicial economy and the parties' interests to permit President Biden to assert his cross-claims in this action.  In the event the Court disagrees, however, President Biden seeks intervention for the limited purpose of defending against Plaintiffs' FOIA claims, and he is prepared to assert his cross-claims in a separate action.

In support of this motion, President Biden is submitting the attached memorandum of law, declaration of Amy Jeffress, answer with cross-claims and exhibits, and a proposed order granting leave to intervene.

Pursuant to Local Rule 7(m), counsel for President Biden have conferred with counsel for the parties. The Department does not oppose this motion. Counsel for Plaintiffs stated their intention to oppose this motion.

Dated: May 12, 2026

Respectfully submitted:

*/s/  Amy Jeffress*
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883
ajeffress@heckerfink.com
kkonkel@heckerfink.com
tgoodnature@heckerfink.com
jhirschfield@heckerfink.com

*Counsel for Proposed Defendant-Intervenor*
*Joseph R. Biden, Jr.*

*Application for *pro hac vice* admission
forthcoming

3

App-202

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION,

MIKE HOWELL,

　　　　　*Plaintiffs*,

　　v.

U.S. DEPARTMENT OF JUSTICE,

　　　　　*Defendant*,

　　and

JOSEPH R. BIDEN, JR.,

　　　　　*Proposed Defendant-*
　　　　　*Intervenor*.

No. 24-cv-645 (DLF)

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO INTERVENE BY JOSEPH R. BIDEN, JR.**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ........................................................................................................................... 4

LEGAL STANDARD..................................................................................................................... 8

ARGUMENT ................................................................................................................................. 9

    I.       President Biden Has a Right to Intervene Pursuant to Rule 24(a)(2) ............................... 9

        A.       President Biden's Motion to Intervene Is Timely ............................................ 10

        B.       President Biden Has a Legally Protected Interest in This Action ...................... 16

        C.       This Action Threatens to Impair President Biden's Legally Protected
                Interest ......................................................................................................... 17

        D.       The Existing Parties Will Not Adequately Protect President Biden's
                Legally Protected Interest............................................................................... 19

    II.      In the Alternative, President Biden Should Be Permitted to Intervene Pursuant to
        Rule 24(b)(1)(B) ........................................................................................................ 19

    III.    President Biden Has Article III Standing ........................................................................ 21

    IV.    At a Minimum, the Court Should Permit President Biden to Intervene for the
        Limited Purpose of Defending Against the Heritage Plaintiffs' FOIA Claims............... 22

CONCLUSION............................................................................................................................. 24

## TABLE OF AUTHORITIES

**CASES**

\* *100Reporters LLC v. U.S. Dep't of Just.*,
    307 F.R.D. 269 (D.D.C. 2014)................................................................. 9, 17, 20, 21, 22

*Appleton v. FDA*,
    310 F. Supp. 2d 194 (D.D.C. 2004) ........................................................................ 9, 17

*In re Brewer*,
    863 F.3d 861 (D.C. Cir. 2017) ...................................................................................... 12

\* *Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022)............................................................................... 11, 12, 13, 15

*Convertino v. U.S. Dep't of Just.*,
    674 F. Supp. 2d 97 (D.D.C. 2009) ............................................................................... 12

*Davis v. FEC*,
    554 U.S. 724 (2008)...................................................................................................... 22

*Defs. of Wildlife v. Perciasepe*,
    714 F.3d 1317 (D.C. Cir. 2013) .................................................................................... 10

*Dunn v. Austin*,
    No. 25 Civ. 1844, 2026 WL 865836 (D.D.C. Mar. 30, 2026)......................................... 10

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*,
    146 F.3d 1042 (D.C. Cir. 1998) .................................................................................... 20

*Fund for Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ................................................................................ 19, 21

*Gov't Accountability Project v. FDA*,
    181 F. Supp. 3d 94 (D.D.C. 2015) ................................................................................ 14

*Hardin v. Jackson*,
    600 F. Supp. 2d 13 (D.D.C. 2009) ................................................................................ 14

*Hodgson v. United Mine Workers of Am.*,
    473 F.2d 118 (D.C. Cir. 1972) ........................................................................................ 9

*Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*,
    No. 16 Civ. 720, 2021 WL 4739036 (D.D.C. Oct. 12, 2021)..................................... 8, 9

App-205

*Institutional S'holder Servs., Inc. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025) .................................................................. 10, 19

*Jones v. Prince George's County*,
348 F.3d 1014 (D.C. Cir. 2003) ........................................................................ 21

*Jud. Watch v. U.S. Dep't of Just.*,
No. 24 Civ. 700 (D.D.C. 2025) ........................................................................... 7

*Karsner v. Lothian*,
532 F.3d 876 (D.C. Cir. 2008) ......................................................................... 10

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*,
No. 23 Civ. 3570, 2024 WL 4239936 (D.D.C. Sept. 19, 2024) ...................... 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ......................................................................................... 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ......................................................................................... 21

*Malvitz v. Fincantieri Marine Grp., LLC*,
No. 24 Civ. 238, 2025 WL 1663077 (D.D.C. June 12, 2025) ......................... 16

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*,
66 F.4th 282 (D.C. Cir. 2023) ......................................................................... 19

*Nat. Res. Def. Council v. Costle*,
561 F.2d 904 (D.C. Cir. 1977) .................................................................. 14, 17

*Nat'l Fair Hous. All. v. Carson*,
330 F. Supp. 3d 14 (D.D.C. 2018) ................................................................... 19

*Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*,
205 F.R.D. 1 (D.D.C. 2000) ............................................................................. 12

*Pescatore v. Palmera Pineda*,
No. 08 Civ. 2245, 2019 WL 2173835 (D.D.C. May 20, 2019) ....................... 11

*Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*,
316 F. Supp. 3d 1 (D.D.C. 2018) ....................................................................... 9

* *Roane v. Leonhart*,
741 F.3d 147 (D.C. Cir. 2014) ................................................... 10, 12, 13, 14

*Roeder v. Islamic Republic of Iran*,
333 F.3d 228 (D.C. Cir. 2003) ......................................................................... 21

*SEC v. Prudential Sec. Inc.*,
    136 F.3d 153 (D.C. Cir. 1998)................................................................ 10

*Shapiro v. U.S. Dep't of Just.*,
    No. 16 Civ. 1959 (D.D.C. 2018)............................................................. 14

*Smoke v. Norton*,
    252 F.3d 468 (D.C. Cir. 2001)........................................................... 10, 12

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017)................................................................................ 10

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)................................................................................ 22

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)................................................................................ 19

*United Airlines, Inc. v. McDonald*,
    432 U.S. 385 (1977)................................................................................ 11

*United Mexican States v. Lion Mexico Consol. L.P.*,
    172 F.4th 1 (D.C. Cir. 2026)................................................................... 20

*United States v. Am. Tel. & Tel. Co.*,
    642 F.2d 1285 (D.C. Cir. 1980)............................................................... 19

*Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. U.S. Dep't of the Interior*,
    No. 18 Civ. 547, 2020 WL 1465886 (D.D.C. Feb. 5, 2020)................... 10

*Wildearth Guardians v. Salazar*,
    272 F.R.D. 4 (D.D.C. 2010)............................................................... 21, 23

*Yocha Dehe v. U.S. Dep't of the Interior*,
    3 F.4th 427 (D.C. Cir. 2021)................................................................... 10

## FEDERAL STATUTES

5 U.S.C. § 706.............................................................................................. 23

28 U.S.C. § 1331.......................................................................................... 20

## FEDERAL RULES

Fed. R. Civ. P. 24................................................................................. *passim*

## OTHER AUTHORITIES

FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y,
    https://www.justice.gov/oip/available-documents-oip ........................................................ 7

*Authorities upon which we chiefly rely are marked with asterisks.*

**INTRODUCTION**

Every American, including a sitting or former Vice President, has a right to privacy in the personal conversations he has within his own home. And when the U.S. Department of Justice (the "Department") obtains that private information through a criminal investigation, the Department bears a particular responsibility to protect it from disclosure. The Department previously defended those fundamental principles in this lawsuit, describing the materials sought in this action as "analogous to entries in a personal diary" and withholding them from disclosure under Freedom of Information Act ("FOIA") Exemptions 5, 6, and 7(C). Under President Trump, however, the Department has reversed that position, and it now plans to release audio recordings and transcripts of President Biden's private, sensitive conversations from 2016 and 2017 both to Heritage Foundation and Mike Howell (collectively, "Plaintiffs" or the "Heritage Plaintiffs") and to Congress. As a result, President Biden is forced to seek intervention to protect his privacy interests and to advocate for the faithful application of the law, given that the Department has abandoned its duty to do so in this matter.

The Heritage Plaintiffs sued the Department in 2024, seeking recordings and transcripts of President Biden's private conversations with his writing partner, Mark Zwonitzer, that took place in President Biden's home in 2016 and 2017. The conversations were part of the writing process for President Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose*, in which he recounted the politically consequential and personally painful year of his life that began on Thanksgiving in 2014. That year, President Biden navigated a range of foreign and domestic policy challenges as Vice President. He also weighed a run for the Presidency in 2016. All the while, President Biden's eldest son, Beau, fought brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six. The public and private dimensions of President Biden's life have always been intertwined, but perhaps never more so than during that difficult year.

President Biden and Zwonitzer recorded their conversations for use in writing *Promise Me, Dad*, and they both understood that they were speaking privately.

The Department obtained these recordings in 2023 in connection with the investigation of Special Counsel Robert K. Hur into President Biden's handling of classified records. President Biden cooperated fully in that investigation. Ultimately, the Special Counsel concluded that criminal charges were unwarranted, and no charges were brought against President Biden or anyone else.

The Heritage Plaintiffs have no legal right to the recordings or transcripts of President Biden and Zwonitzer's private conversations, which the Department obtained in the context of law enforcement proceedings. The Department itself has explained as much, in no uncertain terms. In the Department's own words, release of President Biden's sensitive, private conversations "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." ECF No. 33-1 ("Def.'s Mem.") at 1. Such release would also inhibit law enforcement in the future, thereby threatening public safety. The Department's highest-ranking career official explained that "the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties," ECF No. 33-2 ("Weinsheimer Decl.") ¶ 28, and that "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to [a] core tenet of American justice," *id.* ¶ 21.

The Department is now abandoning the core tenets of American justice and forsaking its duty to protect law enforcement files. The law has not changed, but nonetheless, the Department has reversed course. It plans to release the recordings and transcripts at issue to Plaintiffs and to Congress on June 15, 2026, absent a court order barring release. ECF No. 50 ("JSR (May 8,

<div align="center">2</div>

<div align="center">App-210</div>

2026)") at 1.  The Department has yet to offer any formal explanation for its decision.  That may well be because the decision is nakedly political, lacking any basis in the law.  Indeed, faced with the striking weaknesses of its new legal position in this action, the Department took a new tack and secured a pretextual "request" for the records at issue from the House Committee on the Judiciary (the "Committee").  The Department informed President Biden of this supposed request on March 19, but the written document is dated four days later—March 23, 2026.

President Biden now is forced to seek intervention to defend his interests against the Heritage Plaintiffs' meritless legal claims.  The Department does not oppose intervention, and President Biden meets all of the requirements for intervention as of right.  *See* Fed. R. Civ. P. 24(a)(2).  This motion—filed one week after the Department made a final decision to reverse its prior position—is timely.  President Biden has a legally protected interest in preventing the Heritage Plaintiffs from obtaining private conversations recorded in his own home for purely personal use, and this interest would be irrevocably harmed if Plaintiffs prevailed in this action.  It is clear that the existing parties will not adequately protect President Biden's privacy interests or the Department's own institutional and law enforcement interests; indeed, the Department has stated in a court filing that it will disclose the materials at issue on June 15, 2026, unless a court prohibits the Department from doing so.  In the alternative, the Court should grant permissive intervention.  *See* Fed. R. Civ. P. 24(b)(1).  The Court has subject matter jurisdiction over the Heritage Plaintiffs' FOIA claims and over President Biden's proposed cross-claims; President Biden has filed a timely motion; and President Biden's defense and cross-claims share common questions of law or fact with the underlying action.  Permitting President Biden to intervene will not unduly delay or prejudice the adjudication of Plaintiffs' or the Department's rights.  For

3

App-211

substantially the same reasons that President Biden has a legally protected interest sufficient to support intervention as of right, he also has Article III standing.

## BACKGROUND

Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise Me, Dad*. ¶ 7.[1] In these private conversations—which took place in President Biden's home—President Biden recounted one of the most politically consequential and personally painful years of his life, beginning on Thanksgiving in 2014. ¶¶ 7-10. That year, President Biden served the final year of his term as Vice President and considered a run for the Presidency in 2016. ¶ 9. Meanwhile, President Biden's eldest son, Beau, battled brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six. *Id.* Pressing decisions that President Biden faced about his political future were inextricably intertwined with Beau. ¶ 38. Candidly reflecting on this difficult and consequential time in his life, President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family; the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; and the many other voices and events that factored into that difficult, highly personal decision. ¶ 10.

Zwonitzer recorded these conversations for his personal use in working with President Biden on *Promise Me, Dad*. ¶ 8. Both men understood that they were speaking privately, and the recordings were never intended to be released to the public. *Id.*

---

[1] Unless otherwise indicated, citations to "¶ __" are to paragraphs of Proposed Defendant-Intervenor's cross-claims. *See* Proposed Def.-Intervenor's Answer to Am. Compl. & Cross-Claims ("Answer & Cross-Claims") at 13-31.

4

Years later, in 2020, President Biden ran for and was elected President. ¶ 11. In 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden. ¶ 13. President Biden cooperated fully with the Special Counsel's investigation, and Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted and that "the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt." ¶ 19.

In the course of Special Counsel Hur's investigation, the Department obtained materials related to Zwonitzer's conversations with President Biden in 2016 and 2017. ¶ 14. In a 345-page report to Attorney General Garland, which the Department later published on its website, Special Counsel Hur cited limited excerpts of President Biden's conversations with Zwonitzer, all of which focused on President Biden's notes and other records related to official business as Vice President. ¶¶ 21-22.[2] The Department obtained these materials subject to an agreement between the White House Counsel's Office and Special Counsel Hur, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office." ¶ 15; Decl. of Amy Jeffress in Supp. of Mot. to Intervene by Joseph R. Biden, Jr. ("Jeffress Decl.") ¶ 8; Answer & Cross-Claims Ex. A ("Agreement") ¶ 1. The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in

---

[2] *See* Robert K. Hur, Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center & the Delaware Private Residence of President Joseph R. Biden, Jr. 65, 75-77, 106, 110-11, 236-37 (Feb. 5, 2024).

5

App-213

response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." ¶ 16; Jeffress Decl. ¶ 9; Agreement ¶ 5.

On February 9, 2024, Plaintiff Mike Howell submitted a FOIA request to the Department for certain "[r]ecords [r]elied [u]pon by Special Counsel Robert K. Hur." ECF No. 6-3 (the "FOIA Request"). On March 6, 2024, the Heritage Plaintiffs filed this action against the Department, alleging violations of FOIA. ECF No. 1. On October 16, 2024, the Department issued a final response to the FOIA Request and released 117 redacted pages of transcripts of conversations between President Biden and Zwonitzer that occurred between October 10, 2016, and April 26, 2017. ¶ 27; Weinsheimer Decl. Ex. B. In November 2024, the parties filed cross-motions for summary judgment on the validity of the Department's withholdings pursuant to FOIA. ECF Nos. 33-34. Those motions have been fully briefed since December 23, 2024. *See* ECF No. 38.

In the Department's motion for summary judgment on its withholdings, the Department correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content." Def.'s Mem. at 11. Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions." *Id.* at 15. Unsurprisingly, the Department concluded that disclosure of the audio recordings and transcripts

would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." *Id.* at 1.

On May 19, 2025, the Department released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur. *See* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip. On September 23, 2025, the Court entered a minute order stating: "In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24-cv-700, the parties shall file, on or before September 26, 2025, a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records." Min. Order (Sept. 23, 2025). In the joint status report that followed, the parties explained that the Department had not made additional releases of records and was reviewing its withholdings. ECF No. 42.

On September 27, 2025, the Court stayed this action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues." Min. Order (Sept. 27, 2025). This action remains stayed, and the only substantive activity in the case since September 27, 2025, has been the filing of joint status reports and minute orders extending the stay to allow the parties to continue their discussions. ECF Nos. 42-50.

On February 25, 2026, pursuant to the Agreement, the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce the audio recordings and transcripts at issue in this action to the Heritage Plaintiffs with

7

App-215

only very limited redactions. Jeffress Decl. ¶¶ 11, 14. Since then, counsel for President Biden engaged continually with the Department, in an effort to resolve this matter without litigation. *See id.* ¶¶ 13-29. Meanwhile, on March 19, 2026, the Department reported to counsel for President Biden that it intended to comply with a request from Congress for the very same materials the Department intended to produce to Plaintiffs. *Id.* ¶ 20. Counsel for President Biden asked for a copy of the written request. *Id.* ¶ 21. On March 23, 2026, the Department shared the congressional request that it had purportedly described the previous week, stating that it was "received from House Judiciary today." *Id.* ¶ 22. The request was dated March 23, 2026, four days after the Department described it to President Biden's counsel and three days after counsel requested the written document. *Id.* ¶ 23.

On May 5, 2026, the Department informed President Biden it had made a final decision to release the recordings and transcripts at issue—with only minimal redactions that are wholly inadequate to protect the privacy interests of President Biden and of third parties—on June 15, 2026, unless President Biden obtains a court order blocking release by that date. *Id.* ¶¶ 25-29. President Biden now seeks intervention to protect his interests, including his fundamental privacy interests in the recordings and transcripts of his private conversations from 2016 and 2017.

## LEGAL STANDARD

Federal Rule of Civil Procedure 24(a)(2) provides for intervention of right when, among other things, a person claims an interest relating to the property or transaction at issue and the existing parties do not adequately represent that interest. Fed. R. Civ. P. 24(a)(2). Alternatively, the Court may grant permissive intervention where the person "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "[C]ourts routinely grant motions to intervene for the purpose of preventing disclosure of information under FOIA." *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, No. 16 Civ. 720, 2021 WL 4739036, at

8

*4 (D.D.C. Oct. 12, 2021); *see, e.g.*, *Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*, 316 F. Supp. 3d 1, 3 (D.D.C. 2018); *100Reporters LLC v. U.S. Dep't of Just.*, 307 F.R.D. 269, 274 (D.D.C. 2014); *Appleton v. FDA*, 310 F. Supp. 2d 194, 195-198 (D.D.C. 2004). Indeed, such requests are "commonplace and straightforward." *Humane Soc'y Int'l*, 2021 WL 4739036, at *4.

## ARGUMENT

The Court should grant President Biden's motion to intervene to protect the "undoubtedly enormous" privacy interests that this matter implicates. Def.'s Mem. at 11. President Biden is entitled to intervene as of right because his motion is timely, he has a legally protected interest in the action, the Department's proposed release threatens to impair his interest, and neither of the existing parties adequately represents that interest. In the alternative, the Court should grant permissive intervention because the claims and defense at issue involve common questions of law and fact.

## I.   President Biden Has a Right to Intervene Pursuant to Rule 24(a)(2)

Because the Department recently abandoned its longstanding litigation position and is no longer protecting President Biden's interests, President Biden is entitled to intervene under Rule 24(a)(2). Rule 24(a)(2) provides that, "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). This Rule "implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130

9

App-217

(D.C. Cir. 1972).  Indeed, the Department does not oppose President Biden's intervention.  ECF No. 50 ("JSR (May 8, 2026)") at 1.

President Biden meets all of the requirements to intervene under Rule 24(a)(2).  The D.C. Circuit "ha[s] identified four prerequisites to intervene as of right: '(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests.'"  *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)).  Additionally, in this Circuit, "to intervene under Rule 24(a), the movant must demonstrate that [he] has standing under Article III of the U.S. Constitution," at least when the movant seeks relief that is distinct from that sought by an existing party.  *Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 430 (D.C. Cir. 2021); *see also Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (citing *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020)).[3]

A.    **President Biden's Motion to Intervene Is Timely**

This motion, filed just one week after the Department informed President Biden of its final decision to disclose the private conversations at issue, is timely.  "The timeliness of a motion to intervene is 'to be judged in consideration of all the circumstances.'"  *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) (quoting *Smoke v. Norton,* 252 F.3d 468, 471 (D.C. Cir. 2001)).  Where, as here, "the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request for intervention as untimely."  *Ute Indian Tribe of Uintah &*

---

[3] It is "an open question in this [C]ircuit whether Article III standing is required for permissive intervention." *Dunn v. Austin*, No. 25 Civ. 1844, 2026 WL 865836, at *5 (D.D.C. Mar. 30, 2026) (quoting *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013)).  Because President Biden has standing, *see infra* Section III, the Court need not reach that question here.

10

App-218

*Ouray Indian Rsrv. v. U.S. Dep't of the Interior*, No. 18 Civ. 547, 2020 WL 1465886, at *1 (D.D.C. Feb. 5, 2020) (citing 7C Charles Alan Wright & Arthur R. Miller, et al., *Federal Practice and Procedure* § 1916 (3d ed. 2019)); *accord Pescatore v. Palmera Pineda*, No. 08 Civ. 2245, 2019 WL 2173835, at *2 (D.D.C. May 20, 2019); *see infra* Sections I.B-C, III (addressing harm to President Biden absent intervention).

The timeliness of an intervention motion is assessed not in relation to the filing of an action, but rather "in relation to th[e] point in time" when "'it became clear' that the [movant's] interests 'would no longer be protected' by the parties in the case." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022) (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)). Here, as explained, President Biden is seeking intervention just one week after it became clear that the Department would no longer protect his privacy interests. The Heritage Plaintiffs filed this action in March 2024; the Department vigorously defended President Biden's interests in summary judgment briefing; the Court stayed the case in September 2025; and the parties filed a series of joint status reports between September 2025 and April 2026. Until the most recent joint status report, filed on May 8, 2026, nothing in these filings revised or rescinded the Department's litigation position that the requested materials were "analogous to entries in a personal diary," that "any additional disclosure of either the transcripts or the audio recordings is unwarranted," and that the withheld audio recordings and transcript portions are protected by FOIA Exemptions 5, 6, and 7(C). Def.'s Mem. at 1-2. Indeed, the Department did not notify President Biden of any planned disclosure—which it was required by the Agreement to do—until February 25, 2026. Jeffress Decl. ¶¶ 9, 11. Immediately upon receiving this notice, counsel for President Biden engaged with the Department in an effort to protect his interests and avoid the need for intervention, including by seeking to negotiate agreed-upon redactions and conditions for

11

any disclosure to Congress, such as making the recordings and transcripts available to the Committee's members and staff in a closed reading room. *Id.* ¶¶ 13-29.[4]  These discussions continued until May 5, when the Department informed President Biden of its final decision and announced that it would disclose the recordings to Plaintiffs and the Committee unless President Biden intervened by May 12. *Id.* ¶ 29.

Considering "all the circumstances," *Roane*, 741 F.3d at 151 (quoting *Smoke*, 252 F.3d at 471), President Biden's motion is timely.  After learning of the Department's final decision on May 5, President Biden promptly prepared his intervention papers and an answer with cross-claims, and he is filing those papers by the Department's requested deadline of May 12. *See* JSR (May 8, 2026) at 1.  By any reading of the case law, this motion—filed just seven calendar days and five business days after it "became clear" that the Department would no longer protect his interests—is timely. *Cameron*, 595 U.S. at 280; *see In re Brewer*, 863 F.3d 861, 872 (D.C. Cir. 2017) ("A nonparty must timely move for intervention once it becomes clear that failure to intervene would jeopardize her interest in the action.").  Courts have granted intervention after far longer periods elapsed. *See, e.g.*, *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 109 (D.D.C. 2009) (granting intervention motion filed several months after movant learned of his interest in the lawsuit); *Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*, 205 F.R.D. 1, 6 (D.D.C. 2000) (granting in part intervention motion filed four months after movant learned of the lawsuit).

---

[4] For avoidance of doubt, President Biden's position (which is consistent with the Department's litigation position until its recent reversal) is that all of the materials withheld in the Department's final response to Plaintiff Mike Howell's FOIA request, *see* ECF No. 33-2, are exempt from disclosure pursuant to FOIA.  Nevertheless, after learning of the Department's change in position, President Biden engaged with the Department in an effort to resolve this matter without litigation, including by attempting to negotiate mutually acceptable redactions and discussing possible conditions for any disclosure to Congress. Jeffress Decl. ¶¶ 13-29.  The Department refused to implement redactions or conditions necessary to protect the fundamental privacy rights of President Biden and of third parties. *Id.* ¶¶ 25-29.

12

App-220

The Heritage Plaintiffs contend in the May 8, 2026 joint status report that President Biden's motion is untimely, *see* JSR (May 8, 2026) at 2, 4, but their reasoning is at odds with controlling Supreme Court precedent.  Rather than considering timeliness "in relation to th[e] point in time" when "'it became clear' that the [movant's] interests 'would no longer be protected' by the parties in the case," *Cameron*, 595 U.S. at 280, Plaintiffs suggest that the clock for intervention began to run at the moment that President Trump was inaugurated.  *See* JSR (May 8, 2026) at 4 ("President Biden was well aware of both this action and the potential for divergence in interests with the Department on January 20, 2025 at 12:01 p.m.  Yet he waited well over a year to seek to intervene despite open filings in the public docket of this case indicating that negotiations between Plaintiffs and the Department have been ongoing.").  As explained, however, the Department was bound by an agreement to inform President Biden if it intended to disclose the recordings, and it did not do so until February 25, 2026.  Jeffress Decl. ¶¶ 9, 11.  In the weeks that followed, between February 25 and May 5, President Biden was actively discussing the matter with the Department and had reason to believe that a negotiated resolution might be possible.  *Id.* ¶¶ 13-29.  In any case, Plaintiffs offer no explanation for why the events of January 20, 2025, would affect the *legal* analysis, as none of the relevant FOIA exemptions have changed, and the facts militating against disclosure are even stronger now that President Biden has returned to life as a private citizen.

Importantly, President Biden's motion will not unfairly prejudice any existing party or unduly disturb the litigation—and, indeed, the Department does not oppose the motion.  Courts "do not require timeliness for its own sake"; rather, "the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Roane*, 741 F.3d at 151.  Here, the action has been stayed since September 27, 2025, and the existing parties remained in this posture for more than seven months,

13

App-221

filing periodic joint status reports explaining that the Department was reviewing its withholdings and the parties were conferring. *See* ECF Nos. 42-45, 47-48. Neither side sought to lift the stay or filed any request for relief with the Court. *See id.* In light of these facts, it would have made no difference to the course of the litigation if President Biden had moved for intervention earlier. Pursuant to the Court's September 27, 2025 minute order, the Department still would have needed to review its withholdings, and the Department and Plaintiffs still would have needed to confer as directed by the Court.

It is also significant, if not dispositive, that the Court has not yet ruled on the merits of the Heritage Plaintiffs' claims. As this Court has explained, "[a] Rule 24(a)(2) motion is timely when it occurs before a court has ruled on the merits of the case." Mem. Op. & Order at 2, *Shapiro v. U.S. Dep't of Just.*, No. 16 Civ. 1959 (D.D.C. Aug. 10, 2018), ECF No. 28 (concluding intervention motion was timely but denying without prejudice on other grounds); *see also, e.g.*, *Gov't Accountability Project v. FDA*, 181 F. Supp. 3d 94, 95 (D.D.C. 2015) (granting intervention motion where the Court had not yet issued any decisions on the merits of the plaintiff's claims); *Hardin v. Jackson*, 600 F. Supp. 2d 13, 16 (D.D.C. 2009) (same). That is because any "risk of prejudice to existing parties" is "minimal" where, as here, "the putative intervenor d[oes] not seek to upset prior decisions in the case." *Roane*, 741 F.3d at 152 (citing *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 907-08 (D.C. Cir. 1977)).

The Heritage Plaintiffs complain vociferously about the situation, *see* JSR (May 8, 2026), but contrary to their characterizations in the May 8 joint status report, these circumstances are not of President Biden's making. Indeed, Plaintiffs' position statement reflects serious misunderstandings and makes repeated misstatements regarding the timeline of events and other key facts. *Compare id.* at 2-5 *with* Jeffress Decl. ¶¶ 11-29. For example, it is the Department, not

14

App-222

President Biden, that recently "changed position," and it is the Department that has set a unilateral deadline of June 15, 2026 for the release, thereby "necessitat[ing] emergency litigation." *Cf.* JSR (May 8, 2026) at 2. These late-breaking decisions by the Department, in turn, created a sudden need for President Biden to protect his interests through litigation.

There are several paths forward, and intervention in this litigation—both to defend against Plaintiffs' claims and to assert cross-claims against the Department—is the least disruptive and most efficient of those paths. If President Biden were to file a separate action, for example, it would merely fragment the procedural questions across two actions, and Plaintiffs' own representations make clear that it would not eliminate the need for briefing on intervention, consolidation, and related issues. *See id.* at 4 (representing that Plaintiffs will seek consolidation if President Biden files a separate action).

In short, Plaintiffs' claimed prejudice has no connection to the timeliness of President Biden's intervention motion. While the Heritage Plaintiffs may have "hoped" that the Department would reverse its longstanding litigation position and release the material without objection from President Biden, Plaintiffs "had no legally cognizable expectation" in that outcome, and "[t]he loss of this sort of claimed expectation does not amount to unfair prejudice in the sense relevant here." *Cameron*, 595 U.S. at 282. President Biden now seeks to do "what the [Department] would have done" in the ordinary course (and was doing until very recently)—namely, to defend against Plaintiffs' meritless claims against the Department—and so his intervention will "d[o] nothing to delay the suit's normal progress." *Id.* at 292 (Kagan, J., concurring in the judgment). To the extent this matter may have unfolded differently if the Department had notified President Biden of the possibility of release before February 25, 2026, or provided its final decision before May 5, or

15

taken any number of other steps to advance the timeline and avoid emergency litigation, Plaintiffs' quarrel is with the Department, not with President Biden.

Far from delaying these proceedings, granting President Biden's motion will expedite and streamline the necessary litigation by allowing the parties to litigate these issues in a single action and to proceed immediately to further briefing once the Court has decided intervention. President Biden is prepared to move forward with all due speed. With respect to the Heritage Plaintiffs' existing FOIA claims, President Biden is prepared to participate in renewed summary judgment briefing on an expedited basis. With respect to the proposed cross-claims, President Biden intends to seek emergency relief against the Department to prevent the planned disclosures on June 15 and is prepared to brief the relevant issues on an expedited schedule. *See infra* Section IV. President Biden respectfully proposes that, as part of any order granting intervention, the Court direct the parties to meet and confer and, within three days of that order, submit a joint status report setting forth their joint or competing proposals on further proceedings in this matter.

**B.    President Biden Has a Legally Protected Interest in This Action**

President Biden has a legally protected interest in this action in light of the severe and imminent risk of harm to his privacy that will result if the Heritage Plaintiffs obtain his personal, sensitive conversations. Plaintiffs seek—and the Department now intends to immediately release, absent President Biden's intervention, *see* JSR (May 8, 2026) at 1—audio recordings and transcripts of private conversations between President Biden and his writing partner that took place in President Biden's home and were never intended for public dissemination. These conversations include President Biden's intimate reflections on sensitive topics, including the passing of his eldest son, Beau, and his decision whether to run for the Presidency in 2016.

There is no serious question that the Department's public disclosure of these records would severely harm President Biden's legally protected interest in his privacy. *See Malvitz v.*

16

App-224

*Fincantieri Marine Grp., LLC*, No. 24 Civ. 238, 2025 WL 1663077, at *9 (D.D.C. June 12, 2025) (recognizing "privacy" as a "legally protected interest"); *Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, No. 23 Civ. 3570, 2024 WL 4239936, at *11 (D.D.C. Sept. 19, 2024) (same). Indeed, "preventing the disclosure of . . . confidential information is a well-established interest sufficient to justify intervention under Rule 24(a)." *100Reporters*, 307 F.R.D. at 275.

### C.      This Action Threatens to Impair President Biden's Legally Protected Interest

The Department's disclosure of the materials at issue in this action, which reflect President Biden's private conversations and were obtained by the Department as part of a criminal investigation, would impair President Biden's legally protected interest in his personal privacy. In assessing impairment, the Court must consider the "practical consequences" that President Biden may suffer if intervention is denied. *Costle*, 561 F.2d at 909. If the Heritage Plaintiffs prevailed in their FOIA claims in this action, the Department would be required to release President Biden's private conversations. Such disclosure would irreparably harm President Biden's privacy interests. *See 100Reporters LLC*, 307 F.R.D. at 279 ("[I]mpairment appears especially obvious in FOIA litigation because if the plaintiff succeeds, the public release of the requested materials is both imminent and irreversible."); *Appleton*, 310 F. Supp. 2d at 197 ("[D]isclosures resulting from the disposition of this action could impair [the intervenor's] ability to protect [its] . . .confidential information.").

The Court need not take President Biden's word for it. As the Department has explained in this litigation, including in sworn declarations:

- "These discussions—recorded by Mr. Zwonitzer for reference in drafting Mr. Biden's memoir—were analogous to entries in a personal diary." Def.'s Mem. at 1; *see also id.* at 11 ("Releasing the unredacted version of the transcripts would be like releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone—despite no charges having ever been brought, let alone charges relating to that private content."); *id.* at 19 (describing "the audio of what amounts to the conversational equivalent of Mr. Biden's diary entries"); Weinsheimer Decl. ¶ 22

17

App-225

("[C]onversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary."); ECF No. 37 ("Def.'s Reply") at 5-6 ("Private conversations that inform the drafting process of a memoir are no more public than diary entries that inform that process."); *id.* at 12-13 ("[I]f law enforcement were to release select portions of an uncharged individual's private diary, that would clearly implicate the individual's privacy interests, regardless of the particular subjects covered in the entries.").

- "The privacy interests here are undoubtedly enormous."  Def.'s Mem. at 11.

- "The recordings were made for a book about how Mr. Biden coped with the loss of his son, and how he managed his responsibilities in that year while struggling with enormous personal grief.  They were recorded in private and were not meant for wider distribution."  *Id.* at 18 (citing Weinsheimer Decl. ¶ 22).

- "[I]t is exceedingly speculative to envision how these recordings would shed any light on SCO's role."  *Id.* at 19.

- "The release of the unredacted transcripts or the audio recordings would harm substantial privacy interests that are not outweighed by any cognizable public interest."  *Id.* at 6.

- "It is a bedrock principle of the U.S. justice system that individuals are entitled to a presumption of innocence.  Release of law enforcement records that reveal non-public private conduct poses substantial threats to that core tenet of American justice."  Weinsheimer Decl. ¶ 21.

- "[T]he Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties."  *Id.* ¶ 24.

- "How Mr. Biden's voice sounded throughout [his] conversations [with Zwonitzer] implicates substantial privacy rights.  If the audio recording is released, it could be played on national television or made universally available on the internet, amplifying the harm to privacy."  *Id.* ¶ 23.

- "The unredacted transcripts and the audio recordings are protected by Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  Def.'s Reply at 1.

- "[B]inding precedent . . . makes clear that President Biden and Mr. Zwonitzer have a distinct privacy interest in recordings of their voices, even where the corresponding text has already been released."  *Id.*

- "[Plaintiffs'] assertion . . . would eviscerate the well-established principle that the privacy rights of uncharged individuals are among the most protected under FOIA."  *Id.* at 14 (citation omitted).

18

- "To the extent that there is an interest in determining how President Biden spoke over seven years ago, in the 2016-17 timeframe, the public already has access to an array of his interviews, speeches, and public appearances from that period." *Id.* at 15.

These statements remain true today, and the Court should credit them in concluding that disclosure would impair President Biden's legally protected interest.

### D.    The Existing Parties Will Not Adequately Protect President Biden's Legally Protected Interest

It is also beyond dispute that the existing parties will not adequately protect President Biden's legally protected interest in preventing the release of intimate, private conversations. "The movant's burden of showing inadequate representation is 'minimal.'" *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 66 F.4th 282, 285 (D.C. Cir. 2023) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Thus, a putative intervenor "ordinarily should be allowed to intervene unless it is clear that [a] party will provide adequate representation for the absentee." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980)), *called into question on other grounds by Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025). Here, the opposite is clear: While the Department once faithfully adhered to the law and defended against Plaintiffs' baseless FOIA claims, it has now reversed course and will no longer defend President Biden's interests. Nor, to state the obvious, are the Heritage Plaintiffs adequate representatives of President Biden. *See* JSR (May 8, 2026) at 2-5.

## II.    In the Alternative, President Biden Should Be Permitted to Intervene Pursuant to Rule 24(b)(1)(B)

"If a movant does not meet the requirements to intervene as a matter of right, intervention may nonetheless be allowed, pursuant to Rule 24(b)." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 64 (D.D.C. 2018). "A court 'may' allow intervention under Rule 24(b)(1) if the would-be intervenor presents '(1) an independent ground for subject matter jurisdiction; (2) a

19

App-227

timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action.'" *United Mexican States v. Lion Mexico Consol. L.P.*, 172 F.4th 1, 11 (D.C. Cir. 2026) (quoting *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)). The Court also "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). "[P]ermissive intervention is an inherently discretionary enterprise," and district courts are afforded "wide latitude" in determining whether a third party should be permitted to intervene. *Nat'l Children's Ctr.*, 146 F.3d at 1046.

President Biden satisfies all three requirements for permissive intervention. *First*, the Court has subject matter jurisdiction over Heritage's FOIA claims and over President Biden's proposed cross-claims pursuant to 28 U.S.C. § 1331. *See also infra* Section III (addressing President Biden's Article III standing). *Second*, President Biden has filed a timely motion, just one week after learning that the Department made a final decision to release material in which President Biden has compelling privacy interests. *See supra* Section I.A. *Third*, President Biden's defense and cross-claims share common questions of law or fact with the underlying action between the Heritage Plaintiffs and the Department. With respect to Plaintiffs' FOIA claims, President Biden stands in the shoes of the Department before its change in position: he will argue that the recordings and transcripts that Plaintiffs seek in this action, which were obtained through a criminal investigation, are exempt from disclosure pursuant to FOIA. *See* Def.'s Mem. at 1-2; *100Reporters LLC*, 307 F.R.D. at 286 (finding that "similarities between the issues presented" by the intervenors and the Department of Justice showed a common question of law or fact). With respect to President Biden's cross-claims, the claims are brought against the same party (the Department), involve the proposed disclosure of the same materials, and involve overlapping questions related to the Department's motivations and legal basis for disclosure.

20

App-228

Further, permitting President Biden to intervene in this case will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). President Biden's motion is timely, and his intervention will not prejudice any existing party. *See supra* Section I.A.

In sum, in the event the Court denies intervention as of right pursuant to Rule 24(a)(2), the Court should grant President Biden permissive intervention pursuant to Rule 24(b)(1)(B).

## III.    President Biden Has Article III Standing

A proposed intervenor seeking to intervene under Rule 24(a) generally must establish Article III standing. *See Jones v. Prince George's County*, 348 F.3d 1014, 1017 (D.C. Cir. 2003); *Fund for Animals*, 322 F.3d at 731-32. To establish Article III standing, an intervenor must show: (1) injury-in-fact, (2) causation, and (3) redressability. *See Fund for Animals*, 322 F.3d at 732-33 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Whether an intervenor has standing is "equivalent" to the question of whether "the intervenor has a 'legally protected' interest under Rule 24(a)." *100Reporters LLC*, 307 F.R.D. at 276; *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement."); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 13, n.5 (D.D.C. 2010) ("[G]enerally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa*."); *Fund for Animals*, 322 F.3d at 735 (explaining that the inquiries are coextensive).

President Biden has Article III standing for substantially the same reason he has a legally protected interest in this action: because the materials that Plaintiffs seek—namely, recordings and transcripts of private conversations between President Biden and his writing partner in President Biden's home, in the context of writing a highly personal memoir focused substantially on the death of President Biden's son—squarely implicate President Biden's privacy interests. *See supra*

App-229

Section I.B.  Invasion of personal privacy is a paradigmatic injury for purposes of Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (recognizing privacy harms as traditional, "concrete" harms); *Davis v. FEC*, 554 U.S. 724, 733 (2008) (recognizing disclosure of individual's private information as sufficient to grant individual standing).  "When, as here, it is clear that the FOIA requestor seeks the release of documents that are likely to contain the intervenor's [private] information, the intervenor's injury is both particularized and sufficiently imminent" to establish standing.  *100Reporters LLC*, 307 F.R.D. at 283; *see also id.* at 2884 ("[The] imminent and concrete risk of a proposed intervenor's [private] materials being released through a successful FOIA action is obvious.").  This injury is directly traceable to the Department's decision to disclose these records.  And the injury would be redressed by the relief President Biden seeks in his defense and cross-claims, namely, a decision that the materials at issue are exempt from release pursuant to FOIA and an injunction preventing the Department from publicly releasing them.  *See* Answer & Cross-Claims (answering Plaintiffs' FOIA claims, bringing cross-claims against the Department, and seeking a permanent injunction barring disclosure to Plaintiffs and to the Committee).

**IV.    At a Minimum, the Court Should Permit President Biden to Intervene for the Limited Purpose of Defending Against the Heritage Plaintiffs' FOIA Claims**

For the reasons explained above, at a minimum, President Biden satisfies the requirements for intervention to defend against the Heritage Plaintiffs' FOIA claims in this action.  Because the Department will no longer do so, intervention is necessary to protect President Biden's private, sensitive conversations from disclosure.

As noted, the Department has informed President Biden that it will disclose the conversations to Plaintiffs and to Congress on June 15, 2026, absent a court order barring release.  Accordingly, President Biden also seeks intervention to bring cross-claims against the Department

to enjoin release of the materials at issue on the grounds that the Department's final decision to release them to Plaintiffs and the Committee is arbitrary and capricious, an abuse of discretion, and contrary to law.  5 U.S.C. § 706(2)(A); *see* Answer & Cross-Claims at 13-31.  In light of the substantial factual and legal commonalities between Plaintiffs' claims and President Biden's proposed cross-claims, it would serve judicial economy to decide President Biden's cross-claims in the context of this action.  For similar reasons, it is in the existing parties' interest for the Court to adjudicate these claims and defenses together.  Indeed, Plaintiffs have represented that they will seek consolidation if President Biden files a separate action regarding the materials at issue here.  *See* JSR (May 8, 2026) at 4.  As explained above, President Biden is prepared to participate in expedited summary judgment briefing on Plaintiffs' FOIA claims.  In light of the Department's planned disclosure on June 15, President Biden also intends to seek emergency relief with respect to his proposed cross-claims and to brief the relevant issues on an expedited schedule.  *See supra* Section I.A.

In the event the Court disagrees, however, President Biden alternatively seeks intervention for the limited purpose of defending against the Heritage Plaintiffs' claims, and he is prepared to assert his cross-claims in a separate action.  *See, e.g.*, Fed. R. Civ. P. 24(a) advisory committee's note to 1966 amendment ("An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."); *Wildearth Guardians*, 272 F.R.D. at 20 ("[D]istrict courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action.").

* * *

23

App-231

For the foregoing reasons, President Biden has a right to intervene in this action pursuant to Rule 24(a)(2). In the alternative, the Court should grant President Biden permissive intervention pursuant to Rule 24(b)(1)(B). In the interest of judicial economy, the Court should grant President Biden leave to intervene for purposes of defending against Plaintiffs' FOIA claims and asserting cross-claims against the Department, in light of the significant factual and legal overlap among the parties' claims and defenses. In the alternative, the Court should grant intervention for the limited purpose of defending against Plaintiffs' FOIA claims, leaving President Biden to assert his affirmative claims in a separate action.

**CONCLUSION**

For the foregoing reasons, President Biden respectfully requests that the Court grant the motion to intervene and order the parties to file a joint status report within three days of any such order, setting forth their joint or competing proposals for further proceedings.

Dated: May 12, 2026

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883s
ajeffress@heckerfink.com
kkonkel@heckerfink.com
tgoodnature@heckerfink.com
jhirschfield@heckerfink.com

*Counsel for Proposed Defendant-Intervenor Joseph R. Biden, Jr.*

*Application for *pro hac vice* admission forthcoming

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION,

MIKE HOWELL,

       *Plaintiffs*,

    v.

U.S. DEPARTMENT OF JUSTICE,          No. 24-cv-645 (DLF)

       *Defendant*,

    and

JOSEPH R. BIDEN, JR.,

       *Proposed Defendant-
Intervenor*.

**DECLARATION OF AMY JEFFRESS IN SUPPORT OF
MOTION TO INTERVENE BY JOSEPH R. BIDEN, JR.**

I, Amy Jeffress, hereby declare:

1.    I am a partner at Hecker Fink LLP.  I represent Proposed Defendant-Intervenor Joseph R. Biden, Jr.  This declaration is based on my personal knowledge and on information that has become available to me in the course of this representation.

2.    Plaintiffs Heritage Foundation and Mike Howell (collectively, "Plaintiffs" or the "Heritage Plaintiffs") brought this FOIA action in March 2024, seeking audio recordings and transcripts of private conversations that President Biden had with his writing partner, Mark Zwonitzer, at his home in 2016 and 2017.

App-233

3.      For the past two years, the U.S. Department of Justice (the "Department") has opposed disclosure and withheld the requested materials under FOIA Exemptions 5, 6, and 7(C). In court filings, the Department described the conversations between President Biden and his writing partner as "analogous to entries in a personal diary" and explained that the requested disclosures "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." ECF No. 33-1 at 1.

4.      The Department recently changed its position. Attorneys for the Department stated in a May 8 filing that the Department "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions," to both Plaintiffs and the House Committee on the Judiciary (the "Committee") on June 15, 2026. ECF No. 50 at 1. The Department's proposed redactions are insufficient to protect the privacy interests of President Biden and third parties.

5.      The Department notified President Biden of its final decision on May 5, 2026. President Biden now seeks to intervene in this action to prevent the Department from disclosing the referenced audio recordings and transcripts to Plaintiffs and the Committee.

## The Materials at Issue

6.      The materials at issue are audio recordings and transcripts of President Biden's conversations with his writing partner in 2016 and 2017. Those conversations covered a range of private and sensitive topics, including family health issues.

7.      The Department obtained the materials in connection with Special Counsel Robert K. Hur's investigation of the possible unauthorized removal and retention of classified documents. The investigation resulted in no criminal charges—against President Biden, members of his staff, or anyone else.

2

App-234

8.    I understand that the audio recordings and transcripts were obtained from Zwonitzer's electronic devices that were produced to the Special Counsel's Office ("SCO") pursuant to an agreement between Special Counsel Hur and the White House Counsel's Office, executed on April 26, 2023.  *See* Answer & Cross-Claims Ex. A ("Agreement").  The Agreement provides that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office."  Although the materials consist of recordings of President Biden's conversations with Zwonitzer, President Biden does not have copies of or access to these recordings.

9.    The Agreement provides further that "the Special Counsel's Office will not share any of the information, in any form, outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public without providing the President with advance notice and a sufficient opportunity to challenge such a disclosure."

10.    By email on May 12, 2023, attorneys in the White House Counsel's Office and the Special Counsel's Office memorialized their agreement that the production of materials from Zwonitzer to the Special Counsel's office was subject to the Agreement.  *See* Answer & Cross-Claims Ex. B.

**The Department's Proposed Disclosure of the Materials**

11.    On February 25, 2026, Associate Deputy Attorney General Paul Perkins contacted President Biden through counsel, informing President Biden's counsel that the Department "plan[ned] to produce, in response to [the] FOIA request" at issue in this action "transcripts and

3

App-235

audio recordings between President Biden and Mark Zwonitzer referenced in the Hur Report" by March 6, 2026. Perkins noted that the materials "appear to be covered by an agreement between the former President's attorneys and Special Counsel Hur," which "provides that the Department will give the former President advance notice and the opportunity to object prior to the production of certain materials."

12.    The following day, on February 26, 2026, I was notified of the Department's plan to produce the materials to Plaintiffs.

13.    On March 3, 2026, I discussed the Department's plan to produce the materials with Perkins by phone. Perkins informed me that the Department had reversed its position on withholding and intended to release 117 pages of transcript and the corresponding audio recordings by March 6, the deadline for the next joint status report in this case.

14.    On March 5, 2026, I visited the Department of Justice to review the audio recordings and transcripts the Department planned to produce. The Department of Justice maintained the recordings and transcripts, and I was only allowed to review them at the Department of Justice. The recordings and transcripts that I reviewed on March 5 contained limited redactions, including redactions that appeared to be directed toward national security concerns. The redactions were insufficient to protect President Biden's privacy interests.

15.    Over the next two months, in the hope of resolving this matter without resort to litigation, I engaged with the Department's attorneys to seek redactions necessary to prevent the invasion of President Biden's and others' privacy.

16.    On March 6, 2026, Perkins informed me that the Department would delay production of the materials for one week, until March 13. That same day, the Department filed a joint status report stating that it "ha[d] nearly completed its review of the withholdings from the

written transcript and audio record and hope[d] to complete that process by March 13, 2026." ECF No. 47.

17. On March 9, 2026, I reviewed the materials again, at the Department of Justice, along with members of President Biden's staff.

18. Over the course of the following week, I consulted with President Biden and his team regarding his position on the proposed release.

19. On March 17, 2026, I exchanged messages with and spoke by phone to Perkins, and we agreed to meet again on March 20, 2026, to discuss the matter again in person.

20. On March 19, 2026, Perkins represented to me that the Department intended to produce the materials in response to a request from Congress.

21. On March 20, 2026, I met with Perkins and with Peter Winn, Acting Chief Privacy and Civil Liberties Officer at the Department. We discussed the transcripts at issue, and I proposed redactions to protect the privacy interests of President Biden and of third parties. Perkins and Winn said that they would conduct another review of the materials in light of the considerations I had raised. I also asked Perkins to share the congressional request that he had mentioned the previous day.

22. On March 23, 2026, Perkins emailed me a document, describing it as a request that the Department "received from House Judiciary today." The request, issued by the Chair of the House Committee on the Judiciary, Representative Jim Jordan, seeks "[a]ll audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*." Its stated purpose is to "advance [the Committee's] oversight of the politicization of the Biden-Garland Department of Justice."

5

23.     The request is dated March 23, 2026—four days after March 19, the date on which the Department informed me of the request.

24.     Between March 31, 2026, and April 16, 2026, I exchanged emails with Perkins and Winn to follow up on the discussion at our March 20 meeting.

25.     On April 15, 2026, Winn informed me that the Department had made some but not the majority of the redactions that we had proposed, and planned to release the materials on April 21, 2026.  Perkins subsequently stated that it likely would not take more than "5-10 minutes" to review the newly proposed redactions.

26.     I informed Perkins and Winn that I would be representing another client in a criminal trial beginning on April 17, 2026, and asked to review the materials that the Department proposed to release after the conclusion of my trial.  Perkins refused to accommodate this request.

27.     On April 20, 2026, while I was in court for the unrelated trial, a member of my team and a representative of President Biden visited the Department to review the newly proposed redactions.

28.     On April 30, 2026, I informed Perkins and Winn that President Biden was inclined to intervene to seek to prevent the disclosure of his private conversations to Plaintiffs.  I also informed the Department that President Biden may not seek to block disclosure to the Committee if the Department made the recordings and transcripts available to the Committee's members and staff in a closed reading room at the Department, similar to how the materials had been made available for my review, but not provided to Congress in a form that could be published on the Internet.

29.     On May 5, 2026, the Department notified me of its final decision.  Perkins and Winn stated by phone that the Department would not make the requested materials available to

6

Congress in a closed reading room. They further informed me that, if President Biden wished to prevent disclosure, he must file a motion to intervene by May 12, 2026; that the Department would produce the materials to Plaintiffs and to Congress on June 15, 2026, absent a court order barring release; and that the Department's decision constitutes final agency action for the purposes of the APA.

30.     The Department memorialized its final decision in a joint status report filed on May 8, 2026, stating: "Defendant intends to disclose the written transcript and audio recordings at issue in this matter, with redactions, to Congress, pursuant to a request from the Chair of the House Judiciary Committee, as well as to Plaintiffs. President Biden, through counsel, has advised the Department that he intends to seek to intervene to prevent any such disclosures. The Department does not oppose intervention. If President Biden does not seek to intervene on or before May 12, the Department will disclose the material shortly thereafter. Otherwise, the Department will disclose the material on June 15." ECF No. 50 at 1.

**Discussions with the Parties Regarding President Biden's Proposed Filing**

31.     Prior to filing the accompanying motion to intervene and answer with cross-claims, my team and I conferred with counsel for the Department and the Heritage Plaintiffs regarding the proposed filing.

32.     As noted, the Department informed me of its final decision regarding disclosure of the materials on Tuesday, May 5, 2026. Attorneys for the Department also confirmed that the Department does not oppose President Biden's motion to intervene.

33.     On Wednesday, May 6, counsel for Plaintiffs called my law firm and left a message with the front desk. I was not in the office due to health reasons, so my colleague returned the call on Wednesday and had a further call with Plaintiffs' counsel on Thursday, May 7.

7

34.     In addition, I corresponded with Plaintiffs' counsel by email on Thursday, May 7, and Friday, May 8.

35.     I offered to discuss President Biden's proposed filing in a call on Monday or Tuesday, when I hoped to be back in the office.  Plaintiffs' counsel originally insisted that the call take place prior to the May 8 deadline for the parties (*i.e.*, Plaintiffs and the Department) to file a joint status report.  I explained that the substance of the joint status report was for Plaintiffs and the Department to decide but offered to have additional conversations regarding President Biden's anticipated submission prior to filing.  Plaintiffs' counsel agreed to a Monday call and provided windows of availability, which we accommodated.

36.     The "Plaintiffs' Position" section of the May 8 joint status report contains a number of inaccurate statements.  Both before and after the filing of the joint status report, I informed Plaintiffs' counsel that they appeared to have misunderstood key facts.

37.     I spoke with Plaintiffs' counsel on Monday, May 11, and informed them that President Biden planned to file a motion to intervene as a defendant and a proposed answer including cross-claims against the Department, seeking to enjoin disclosure of the materials to Plaintiffs or to Congress.

38.     Following these discussions, I understand that the Department does not oppose, and the Heritage Plaintiffs do oppose, President Biden's motion to intervene.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 12, 2026                    */s/ Amy Jeffress*
Washington, D.C.                             Amy Jeffress (D.C. Bar No. 449258)

                                            *Counsel for Proposed Defendant-Intervenor*
                                            *Joseph R. Biden, Jr.*

8

App-240

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HERITAGE FOUNDATION,<br><br>MIKE HOWELL,<br><br>       *Plaintiffs*,<br><br>     v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>       *Defendant*,<br><br>   and<br><br>JOSEPH R. BIDEN, JR.,<br><br>       *Proposed Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

## <u>PROPOSED DEFENDANT-INTERVENOR'S<br>ANSWER TO AMENDED COMPLAINT & CROSS-CLAIMS</u>

Proposed Defendant-Intervenor Joseph R. Biden, Jr., by and through his undersigned counsel, hereby answers the numbered paragraphs of the Amended Complaint of the Heritage Foundation and Mike Howell (collectively, "Plaintiffs"), ECF No. 6, as follows:

1.      The first sentence of this paragraph consists of Plaintiffs' characterization of this lawsuit to which no response is required. To the extent a response is required, Defendant-Intervenor admits that Plaintiffs brought the referenced FOIA action. With respect to the second, third, tenth, twelfth, and fifteenth sentences of this paragraph, Defendant-Intervenor respectfully refers the Court to the cited sources, and he denies any allegation inconsistent with those sources. With respect to the ninth, eleventh, thirteenth, and fourteenth sentences of this paragraph,

App-241

Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations, except he admits that Special Counsel Hur testified about the Report before Congress on March 12, 2024 and that on that same day, the Department provided to Congress a transcript of President Biden's interview with Special Counsel Hur. Defendant-Intervenor denies the remaining allegations contained in this paragraph.

2.       Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

3.       Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

4.       Admitted that the Department is a federal agency within the meaning of 5 U.S.C. § 552(f)(1) and that the Department's mission statement "is to uphold the rule of law, to keep our country safe, and to protect civil rights."

5.       This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor admits the allegations.

6.       This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor admits the allegations.

7.       Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

8.       Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

9.       Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

App-242

10.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

11.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

12.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

13.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

14.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

15.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

16.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

17.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

18.    This paragraph consists of Plaintiffs' argument and legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the cited sources, and he denies any allegation inconsistent with those sources.

19.    Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

3

App-243

20.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the cited sources, and he denies any allegation inconsistent with those sources.

21.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the cited source, and he denies any allegation inconsistent with that source.

22.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the cited sources, and he denies any allegation inconsistent with those sources.

23.     Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

24.     Admitted.

25.     Defendant-Intervenor admits that the docket for this case, No. 24-cv-645, identifies the filing date for Plaintiffs' original complaint as March 6, 2024.  Defendant-Intervenor respectfully refers the Court to the docket, and he denies any allegations inconsistent with that source.

26.     Admitted.

27.     Defendant-Intervenor reasserts his response to the foregoing paragraphs as if fully stated herein.

28.     The first sentence of this paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.  The second sentence of this paragraph purports to quote a memorandum dated

4

App-244

March 15, 2022. Defendant-Intervenor respectfully refers the Court to that memorandum for a complete and accurate statement of its contents, and he denies any allegation inconsistent with that source.

29. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

30. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor admits that Defendant DOJ is subject to FOIA, respectfully refers the Court to the FOIA statute and applicable case law, and denies any allegation inconsistent with those sources.

31. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

32. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute, the cited DOJ regulations, and applicable case law, and he denies any allegation inconsistent with those sources.

33. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

34. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

5

35.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor denies the allegations.

36.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

37.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

38.    Defendant-Intervenor reasserts his response to the foregoing paragraphs as if fully stated herein.

39.    The first sentence of this paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.  The second sentence of this paragraph purports to quote a memorandum dated March 15, 2022.  Defendant-Intervenor respectfully refers the Court to that memorandum for a complete and accurate statement of its contents, and he denies any allegation inconsistent with that source.

40.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

41.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor admits that Defendant DOJ is subject to

6

FOIA, respectfully refers the Court to the FOIA statute and applicable case law, and denies any allegation inconsistent with those sources.

42. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

43. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

44. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute, the cited DOJ regulations, and applicable case law, and he denies any allegation inconsistent with those sources.

45. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

46. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

47. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor denies the allegations.

48. This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

App-247

49.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

50.     Defendant-Intervenor reasserts his response to the foregoing paragraphs as if fully stated herein.

51.     The first sentence of this paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.  The second sentence of this paragraph purports to quote a memorandum dated March 15, 2022.  Defendant-Intervenor respectfully refers the Court to that memorandum for a complete and accurate statement of its contents, and he denies any allegation inconsistent with that source.

52.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

53.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

54.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

App-248

55.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

56.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor denies the allegations.

57.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

58.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

59.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

60.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in the second sentence of this paragraph, and he denies the remaining allegations.

61.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

9

App-249

62.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

63.     Defendant-Intervenor reasserts his response to the foregoing paragraphs as if fully stated herein.

64.     The first sentence of this paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.  The second sentence of this paragraph purports to quote a memorandum dated March 15, 2022.  Defendant-Intervenor respectfully refers the Court to that memorandum for a complete and accurate statement of its contents, and he denies any allegation inconsistent with that source.

65.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

66.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

67.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

68.     This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor denies the allegations.

App-250

69.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

70.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

71.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor denies the allegations.

72.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

73.    Defendant-Intervenor reasserts his response to the foregoing paragraphs as if fully stated herein.

74.    The first sentence of this paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.  The second sentence of this paragraph purports to quote a memorandum dated March 15, 2022.  Defendant-Intervenor respectfully refers the Court to that memorandum for a complete and accurate statement of its contents, and he denies any allegation inconsistent with that source.

75.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

76.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

77.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

78.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor respectfully refers the Court to the FOIA statute and applicable case law, and he denies any allegation inconsistent with those sources.

79.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor denies the allegations.

80.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

81.    This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenor lacks knowledge or information sufficient to form a belief about the truth of the allegations.

The remainder of the Amended Complaint sets forth Plaintiffs' requested relief, to which no response is required.  To the extent a response is required, Defendant-Intervenor denies that Plaintiffs are entitled to the relief that they seek or to any other relief in this action.

Defendant-Intervenor further denies all allegations in the Amended Complaint not expressly admitted or denied.

## DEFENSE

Plaintiffs are not entitled to the requested information because it is exempt from disclosure under FOIA. *See* 5 U.S.C. § 552(b).

## RESERVATION OF RIGHTS

Proposed Defendant-Intervenor Joseph R. Biden, Jr., respectfully requests and reserves the right to amend, alter, and supplement the defense contained in this Answer as the facts and circumstances giving rise to the Amended Complaint become known to him through the course of the litigation.

## CROSS-CLAIMS

Proposed Defendant-Intervenor Joseph R. Biden, Jr., hereby alleges the following cross-claims against Defendant U.S. Department of Justice:

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the cross-claims arise under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the United States Constitution.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (e)(1).

## PARTIES

3. Upon information and belief, Plaintiff Heritage Foundation is a nonprofit organization established under the laws of the District of Columbia with its principal place of business in Washington, D.C.

4. Upon information and belief, Plaintiff Mike Howell is an employee of Plaintiff Heritage Foundation.

13

App-253

5.      Defendant  U.S. Department of Justice (the "Department") is a department of the executive branch of the United States government and an "agency" within the meaning of 5 U.S.C. § 552(f)(1) and 5 U.S.C. § 552a(a)(1).  The Department has possession of and control over the records at issue.

6.      Proposed Defendant-Intervenor Joseph R. Biden, Jr. was the forty-seventh Vice President of the United States and the forty-sixth President of the United States.

## FACTUAL ALLEGATIONS

**The Records at Issue, the Special Counsel's Investigation, and the Operative Agreement**

7.      Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose*.  These were private conversations, often involving sensitive subject matter, that took place in President Biden's home.

8.      Zwonitzer recorded the conversations for his personal use in assisting President Biden with writing his memoir.  President Biden and Zwonitzer both understood that the recordings would be used only for that purpose and would not be disseminated to the public.

9.      In President Biden's conversations with Zwonitzer and, ultimately, in his memoir, he recounted the year of his life that began during the Thanksgiving holiday in 2014.  That year was among the most consequential of President Biden's political life and the most painful of his personal life.  Then-Vice President Biden served the final year of his term in that office and considered a run for the Presidency in 2016.  All the while, President Biden's eldest son, Beau, fought brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.

10.     In reflecting on these events, President Biden and Zwonitzer discussed a range of sensitive topics, including the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; the many other voices and events that factored into

14

App-254

that difficult, highly personal decision; and the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family.

11.    Years later, in 2020, President Biden ran for and was elected President.

12.    On November 2, 2022, President Biden's personal counsel discovered classified documents within boxes of materials from his Vice Presidency, which were stored at the Penn Biden Center for Diplomacy and Global Engagement in Washington, D.C.  Through counsel, President Biden immediately reported the discovery.  He cooperated fully with the resulting investigation.

13.    On January 12, 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden.  As Attorney General Garland explained, "[t]his appointment underscore[d] for the public the Department's commitment to both independence and accountability in particularly sensitive matters, and to making decisions indisputably guided only by the facts and the law."

14.    In the course of the investigation, the Special Counsel's Office ("SCO") obtained from Zwonitzer materials related to his conversations with President Biden.

15.    The Department obtained these materials subject to an agreement between the White House Counsel's Office and Special Counsel Hur, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office."  Ex. A ¶ 1 (the "Agreement").

15

16.    The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." *Id.* ¶ 5.

17.    The SCO used forensic tools to recover deleted audio recordings of Zwonitzer's conversations with President Biden from the external hard drive that Zwonitzer produced.

18.    Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted.

19.    Special Counsel Hur explained his decision in a 345-page report to the Attorney General, in which Hur "conclude[d] that the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt."

20.    Special Counsel Hur also explained that there were "several material distinctions" between the facts that Special Counsel Hur had found with respect to President Biden and the allegations in the indictment charging President Trump with mishandling classified documents. For example, President Trump "not only refused to return [classified] documents for many months" after being given the opportunity to do so to avoid prosecution, "but he also obstructed justice by enlisting others to destroy evidence and then to lie about it." "In contrast," President Biden "turned in classified documents to the National Archives and the Department of Justice, consented to the search of multiple locations including his homes, sat for a voluntary interview, and in other ways cooperated with the investigation."

21.    Special Counsel Hur's report cited limited excerpts of President Biden's conversations with Zwonitzer. All of these excerpts focused on President Biden's notes and other records related to official business as Vice President.

16

App-256

22.     On February 8, 2024, the Department published Special Counsel Hur's report on its website.

23.     In addition to releasing Special Counsel Hur's report to the public, the Department helped facilitate Special Counsel Hur's public testimony before Congress on March 12, 2024, concerning his investigation and decision to decline prosecution.  The day of Special Counsel Hur's congressional testimony, the Department also provided to Congress a transcript of President Biden's five-hour interview with Special Counsel Hur.

**Plaintiffs' FOIA Request and This Litigation**

24.     On February 9, 2024, Plaintiff Mike Howell submitted a FOIA request to the Department, seeking all "records relied upon by Special Counsel Hur in drafting [six particular] passages in the [Hur] Report relating to President Joseph R. Biden's memory and mental faculties." ECF No. 6 ("Am. Compl.") ¶¶ 8-9; ECF No. 6-3 (the "FOIA Request").

25.     Plaintiffs filed this action against the Department, alleging violations of FOIA, on March 6, 2024.  Plaintiffs filed an amended complaint on March 13, 2024.

26.     After Plaintiffs and the Department (collectively, the "Parties") completed partial summary judgment briefing on the adequacy of the Department's search for responsive records, ECF Nos. 21-22, 24-25, Plaintiffs withdrew their challenge to the search's adequacy, ECF No. 28 at 2.

27.     On October 16, 2024, the Department issued a final response to the FOIA Request and released 117 pages of transcripts of conversations between President Biden and Zwonitzer. ECF No. 33-2 ("Weinsheimer Decl.").  These conversations took place on six occasions between October 10, 2016, and April 26, 2017.  The transcripts were heavily redacted pursuant to FOIA Exemptions 5, 6, and 7(C).  5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C).  They were created from audio

recordings that the SCO obtained from Zwonitzer pursuant to the Agreement and were prepared by a court reporting service at the direction of the SCO, to facilitate the SCO's review of evidence.

28.    In November 2024, the Parties filed cross-motions for summary judgment on the Department's withholdings.    ECF Nos. 33-34.    The Parties completed briefing on their cross-motions in December 2024.  ECF Nos. 37-38.

29.    In the Department's motion for summary judgment on its withholdings, the Department correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content."  ECF No. 33-1 ("Def.'s Mem.") at 18.

30.    Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions." *Id.* at 14-15.

31.    The Department concluded that disclosure of the audio recordings and transcripts would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." *Id.* at 1.

32.    The summary judgment briefing involved the Department's withholdings of: (1) transcripts of President Biden and Zwonitzer's conversations that the SCO directed a court reporting service to prepare and (2) the corresponding audio recordings.  By agreement of the Parties, Plaintiffs sought the transcripts in their entirety but sought only the portions of audio

recordings of President Biden and Zwonitzer's conversations that were quoted directly in the Hur Report.  ECF No. 33-3 ¶ 28.

33.    On September 23, 2025, the Court entered a minute order stating: "In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24-cv-700, the parties shall file, on or before September 26, 2025, a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records."  Min. Order (Sept. 23, 2025).

34.    On September 26, 2025, the Parties filed a joint status report explaining that the Department had not made additional releases of records and was reviewing its withholdings.  ECF No. 42 at 1, 3.

35.    On September 27, 2025, the Court stayed this action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues."  Min. Order (Sept. 27, 2025).

36.    For nearly eight months, the Parties have conferred and filed periodic joint status reports.  Neither party has sought to lift the stay or requested any other relief from the Court.

**President Biden's Privacy Interests and the Department's Prior Position**

37.    Every American, including a sitting or former Vice President, has a right to privacy in the personal conversations he has within his own home.  That is particularly true when the Department obtains that information through a criminal investigation.

38.    For President Biden, his son Beau's battle with cancer played a role in the major decisions that President Biden faced during the consequential year that he recounted to Zwonitzer, including the decision whether to run for President in 2016.  As President Biden wrote in *Promise Me, Dad*, "[r]unning for the Democratic nomination was all tied up with Beau. . . . The thought of

19

App-259

doing it without him was painful.  But as the days passed, the idea of not running started to feel like letting him down, like letting everybody down."

39.    The Department obtained Zwonitzer's recordings of his private conversations with President Biden as part of the Special Counsel's investigation.  That investigation resulted in no charges against President Biden.

40.    Bradley Weinsheimer, then an Associate Deputy Attorney General for the Department, provided a declaration setting forth the basis for the Department's withholdings in this action.  *See* Weinsheimer Decl.  Weinsheimer served for over twenty years as an Assistant United States Attorney in Washington, D.C.  He also served in the Department's National Security Division and Office of Professional Responsibility.  In 2018, Attorney General Jeff Sessions appointed Weinsheimer to serve as Associate Deputy Attorney General, the highest-ranking career position in the Department.

41.    Weinsheimer's conclusions were based in part on direct conversations with Special Counsel Hur and members of his staff.  *Id.* ¶ 2.

42.    As Weinsheimer explained, "[w]hen no charges are filed, . . . evidence gathered from private individuals that reveals their private conduct can be expected to be kept confidential, especially when that information may be highly personal."  *Id.* ¶ 24.  "For that reason, the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties."  *Id.*  These statements were, and continue to be, accurate.

43.    Weinsheimer also recognized that, in general, "conversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary."  *Id.* ¶ 22.  "Moreover, the conversations at issue are unusually sensitive," because "[t]hey were created

20

App-260

for the purpose of helping create a memoir that focused on a highly emotional period in President

Biden's life." *Id.* These statements were, and continue to be, accurate.

44. The Department stated in its summary judgment brief that "[t]he privacy interests

here are undoubtedly enormous." Def.'s Mem. at 11. This statement was, and continues to be,

accurate.

45. On the other side of the balance, Weinsheimer explained that "release of the

recording would do very little (if anything) to advance the public's understanding of Special

Counsel Hur's activities due to the substantial amount of information already in the public record."

Weinsheimer Decl. ¶ 27; *see, e.g.*, *supra* ¶¶ 22-23. These statements were, and continue to be,

accurate.

46. Accordingly, the Department represented to the Court that disclosure of the

materials "would constitute a severe invasion of privacy with little to no meaningful or cognizable

counterbalancing public interest." Def.'s Mem. 1. This statement was, and continues to be,

accurate.

47. Put simply, the Department's career attorneys did not view the issues presented in

this action as remotely close.

**The Department's About-Face and Present Intent to Disclose the Materials**

48. The FOIA statute has not changed since the Department set forth its position on

withholding in late 2024.

49. The case law interpreting the relevant FOIA exemptions has not materially changed

since the Department set forth its position on withholding in late 2024.

50. President Trump was inaugurated on January 20, 2025. At no point in the following

year did the Department withdraw its summary judgment filings or notify the Court of any change

in its position in this case.  The case was largely dormant until September 2025, when the Court entered a minute order directing the parties to submit a joint filing regarding the case status.

51.    Since briefing on the Parties' summary judgment motions concluded, the balance of interests has only tipped more sharply against disclosure.

52.    President Biden is a private citizen who does not hold, and is not seeking, any government office.

53.    Additionally, more information about Special Counsel Hur's investigation has entered the public record.  For example, on May 19, 2025, the Department released the full audio recording of President Biden's interview with Special Counsel Hur.

54.    On February 25, 2026—after defending the privacy interests underlying Exemptions 6 and 7(C) for approximately two years—the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce certain audio recordings and transcripts, with limited redactions, to Plaintiffs.

55.    The Agreement required the Department to provide such notice to President Biden.

56.    The Department provided no official explanation that reflected the consummation of the Department's decisionmaking for reversing its position in this action.

57.    By phone, an attorney in the Department's Office of the Deputy Attorney General informed counsel for President Biden that the Department had reversed its position on withholding and intended to release 117 pages of transcript and the corresponding audio recordings.

58.    President Biden's counsel and other representatives of the President promptly reviewed the materials at the Department.  In the weeks that followed, President Biden's counsel engaged with the Department's attorneys, with the goal of resolving this matter without resort to litigation.

59.    On the evening of March 19, 2026, an attorney in the Department's Office of the Deputy Attorney General called President Biden's counsel and stated that the Department had received a request from Congress and intended to produce the materials to Congress regardless of the outcome of this FOIA action.

60.    The next day, President Biden's counsel asked the Department attorneys to provide the congressional request of which they had notified President Biden's counsel the previous evening.

61.    On March 23, 2026, the Department sent to President Biden's counsel a request from the Chair of the House Committee on the Judiciary, Representative Jim Jordan, for "[a]ll audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*." Ex. B at 1.  The stated purpose of the request is "to advance [the Committee's] oversight of the politicization of the Biden-Garland Department of Justice." *Id.*

62.    The request was dated **March 23, 2026**.  March 23 is four days after March 19, the date on which the Department informed President Biden's counsel of its supposed existence.

63.    The Department ultimately refused to make most of the redactions to the materials that President Biden requested.  These redactions were necessary to adequately protect the privacy interests of President Biden and third parties.

64.    On May 5, 2026, the Office of the Deputy Attorney General informed President Biden, through counsel, that the Department had made a final decision to release the materials, with limited redactions, to Plaintiffs and to Congress on June 15.  The Department represented that its decision constitutes final agency action for the purposes of the APA.

23

65.     On May 8, the Department stated in a joint status report that it "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions" (the "Materials"), to both Plaintiffs and Congress on June 15, 2026.  *See* ECF No. 50 at 1.

66.     To date, President Biden has not received an official explanation that reflects the consummation of the Department's decisionmaking regarding the basis for the Department's reversal of position .  *See supra* ¶ 56.

67.     While President Biden's counsel have exchanged emails with Department attorneys regarding the issues in this action in the course of attempting to negotiate a resolution, those emails do not reflect the consummation of the Department's decisionmaking.  Moreover, their substance cannot be squared with binding Supreme Court and D.C. Circuit precedent.

**The Proposed Disclosure and the Requirements of the Privacy Act**

68.     The Privacy Act prohibits federal agencies from disclosing certain information about an individual to any person, or to another agency, without the individual's written consent, unless specified conditions are met.  5 U.S.C. § 552a.

69.     The Department has stated that it intends to disclose the Materials to Plaintiffs and Congress on June 15.

70.     The Materials constitute a "record" or "record[s]" contained in one or more "system[s] of records" maintained by the Department of Justice, as defined in the Privacy Act, 5 U.S.C. § 552a(a)(4)-(5).  For example, FOIA processing records are maintained in DOJ-004: Freedom of Information Act, Privacy Act, and Mandatory Declassification Review.

71.     The Department may also have maintained the Materials in the following systems of records, among others: DOJ-003: Correspondence Management Systems for the Department of Justice; DOJ-006: Personnel Investigation and Security Clearance Records for the Department of

Justice; FBI-002: FBI Central Records System; and CRM-001: Central Criminal Division Index File and Associated Records.

72.    On information and belief, at all relevant times, the Department maintained the Materials in one or more systems of records.

73.    On information and belief, Department of Justice officials retrieved the Materials from a system or systems of records using one or more personal identifiers.  President Biden's name is one such personal identifier.

74.    In addition, on information and belief, Department of Justice officials generally used personal identifiers to retrieve information about individuals from the relevant systems of records during the period in question.

75.    President Biden has not consented to disclosure of the Materials to Plaintiffs or Congress.

76.    Disclosure of the materials would cause harm to President Biden, including in the form of costs to respond to the disclosure and other financial losses.

<div align="center">

**COUNT I**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**Disclosure to Plaintiffs**

</div>

77.    Proposed Defendant-Intervenor Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 76, as if fully restated herein.

78.    The Materials constitute "similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," within the meaning of FOIA Exemption 6, 5 U.S.C. § 552(b)(6), and "records or information compiled for law enforcement purposes" the "production" of which "could reasonably be expected to constitute an unwarranted invasion of

<div align="center">25</div>

<div align="center">App-265</div>

personal privacy," within the meaning of FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), and are therefore exempt from disclosure.

79.     The Department failed to rationally explain the basis for the reversal of its unequivocal position that the Materials are exempt from disclosure under Exemptions 6 and 7(C).

80.     The Department's decision to release the Materials to Plaintiffs is thus arbitrary and capricious.  5 U.S.C. § 706(2)(A).

<div align="center">

**COUNT II**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Abuse of Discretion**
**Disclosure to Plaintiffs**

</div>

81.     Proposed Defendant-Intervenor Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 76, as if fully restated herein.

82.     The Materials constitute "similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," within the meaning of FOIA Exemption 6, 5 U.S.C. § 552(b)(6), and "records or information compiled for law enforcement purposes" the "production" of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy, within the meaning of FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), and are therefore exempt from disclosure.

83.     The Department's reversal of its unequivocal position that the Materials are exempt from disclosure under Exemptions 6 and 7(C) has no rational basis.

84.     The Department's decision to release the Materials to Plaintiffs is thus an abuse of discretion.  5 U.S.C. § 706(2)(A).

<div align="center">

App-266

</div>

## COUNT III
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)
### Contrary to Law Under FOIA
### Disclosure to Plaintiffs

85.    Proposed Defendant-Intervenor Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 76, as if fully restated herein.

86.    The Materials constitute "similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," within the meaning of FOIA Exemption 6, 5 U.S.C. § 552(b)(6), and "records or information compiled for law enforcement purposes" the "production" of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy, within the meaning of FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), and are therefore exempt from disclosure.

87.    Because Exemptions 6 and 7(C) operate to protect the privacy rights of individuals implicated in requested records, those exemptions generally bar the Department from disclosing records that would result in an unwarranted invasion of individuals' personal privacy without the individuals' consent.

88.    The Department's decision to release the Materials to Plaintiffs violates FOIA, 5 U.S.C. § 552(b)(6), (7)(C), and is thus contrary to law.  *See* 5 U.S.C. § 706(2)(A).

## COUNT IV
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)
### Contrary to Law Under the Privacy Act, 5 U.S.C. § 552a
### Disclosure to Plaintiffs

89.    Proposed Defendant-Intervenor Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 76, as if fully restated herein.

App-267

Case 1:24-cv-00645-DLF  Document 51-3  Filed 05/12/26  Page 28 of 32

USCA Case #26-5235  Document #2180382  Filed: 06/24/2026  Page 305 of 635

90. The Department is an "agency" within the meaning of the Privacy Act and maintains one of more relevant "system[s] of records" as defined in the Privacy Act, 5 U.S.C. § 552a(a)(1), (5).

91. At all relevant times, those "system[s] of records" contained "record[s]," as defined in 5 U.S.C. § 552a(a)(4), that pertain to and are about Proposed Defendant-Intervenor Joseph R. Biden, Jr., including audio recordings and transcripts associated with the investigation of Special Counsel Rob Hur.

92. The Privacy Act states: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. § 552a(b). The Act provides a private cause of action "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D).

93. The Department has stated that it "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions," to both Plaintiffs and Congress on June 15, 2026. Such disclosures would be willful and intentional.

94. The proposed disclosure to Plaintiffs described in Paragraph 64 is not covered by any statutory exception or exemption. In particular, while the statute permits disclosures "required under section 552 of this title," 5 U.S.C. § 552a(b)(2), FOIA does not require disclosure of the Materials. Nor is there any Privacy Act provision permitting an agency to disclose records to a FOIA litigant or the public on the basis that the agency has already provided, or plans to provide, the same records to Congress.

28

App-268

95.    The proposed disclosure to Plaintiffs is not compatible with the purpose for which the records were collected and is not otherwise a permissible "routine use" of the records under the Privacy Act.  5 U.S.C. § 552a(b)(3).  For instance, while the records were collected for law enforcement purposes, the Department now proposes disclosing them for political purposes.

96.    The proposed disclosure to Plaintiffs would constitute an unwarranted invasion of President Biden's privacy.  President Biden's privacy interest is not outweighed by any public interest in the messages' release.

97.    The Department's willful and intentional disclosure of records pertaining to and about President Biden would adversely affect him, including in the form of costs to respond to the disclosure and other financial losses.

## COUNT IV
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious
### Disclosure to Congress

98.    Proposed Defendant-Intervenor Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 76, as if fully restated herein.

99.    The content, timing, and context of the Committee's request for the Materials suggest that the Department solicited the request from the Committee to circumvent FOIA's protection of law enforcement materials implicating personal privacy interests and to make an end-run around this pending FOIA litigation.

100.    The Committee's request is a pretextual attempt to disclose records reflecting President Biden's private conversations to the public for the sake of exposure, among other improper purposes.

101.    The Materials long predate the Special Counsel investigation over which the Committee purports to be conducting oversight and could not possibly shed light on the

29

App-269

"politicization of the Biden-Garland Department of Justice"—the stated purpose of the Committee's request. The Committee's request therefore lacks a legitimate legislative purpose, exceeds the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable.

102.    The Department failed to rationally explain the basis for its decision to voluntarily produce the Materials to the Committee pursuant to an invalid and unenforceable congressional request.

103.    The Department's decision to release the Materials to the Committee is thus arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## COUNT V
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)
### Abuse of Discretion
### Disclosure to Congress

104.    Proposed Defendant-Intervenor Joseph R. Biden, Jr., incorporates by reference paragraphs 1 through 76, as if fully restated herein.

105.    The content, timing, and context of the Committee's request for the Materials suggest that the Department solicited the request from the Committee to circumvent FOIA's protection of materials implicating personal privacy interests and to make an end-run around this pending FOIA litigation.

106.    The Committee's request is a pretextual attempt to disclose records reflecting President Biden's private conversations to the public for the sake of exposure, among other improper purposes.

107.    The Materials long predate the Special Counsel investigation over which the Committee purports to be conducting oversight and could not possibly shed light on the "politicization of the Biden-Garland Department of Justice"—the stated purpose of the

30

Committee's request.  The Committee's request therefore lacks a legitimate legislative purpose, exceeds the scope of the Committee's investigative powers under Article I of the Constitution, and is invalid and unenforceable.

108.    The Department's decision to voluntarily produce the Materials to the Committee pursuant to an invalid and unenforceable congressional request has no rational basis.

109.    The Department's decision to release the Materials to the Committee is thus an abuse of discretion.  5 U.S.C. § 706(2)(A).

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, on the basis of the foregoing, Joseph R. Biden, Jr., respectfully requests that the Court:

a)    Declare, pursuant to 28 U.S.C. §§ 2201-2202, that the Materials are exempt from disclosure pursuant to FOIA Exemptions 6 and 7(C);

b)    Declare, pursuant to 28 U.S.C. §§ 2201-2202, that the Committee's request exceeds the bounds of Congress's investigative authority pursuant to Article I of the United States Constitution;

c)    Set aside the Department's decision to disclose the Materials to Plaintiffs as arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A);

d)    Set aside the Department's decision to disclose the Materials to the Committee as arbitrary and capricious and an abuse of discretion, in violation of the APA, 5 U.S.C. § 706(2)(A);

e)    Permanently enjoin the Department and its officers, agents, and employees from disclosing the Materials; and

f)    Grant such other and further relief as may be deemed just and proper.

<div align="center">

App-271

</div>

<center>*   *   *</center>

Dated: May 12, 2026                     Respectfully submitted:


                                         /s/ Amy Jeffress
                                         Amy Jeffress (D.C. Bar No. 449258)
                                         Kaitlin Konkel (D.C. Bar No. 1021109)
                                         Taisa M. Goodnature (D.C. Bar No. 90044537)*
                                         Jared M. Hirschfield (N.Y. Bar No. 6296933)*
                                         HECKER FINK LLP
                                         1050 K Street NW, 10th Floor
                                         Washington, D.C. 20001
                                         Tel: (212) 763-0883
                                         ajeffress@heckerfink.com
                                         kkonkel@heckerfink.com
                                         tgoodnature@heckerfink.com
                                         jhirschfield@heckerfink.com

                                         *Counsel for Proposed Defendant-Intervenor
                                         Joseph R. Biden, Jr.*

                                         *Application for *pro hac vice* admission
                                         forthcoming

<center>32</center>

<center>**App-272**</center>

# EXHIBIT A

No. 24-cv-645 (DLF)



U.S. Department of Justice

*Special Counsel's Office*

April 26, 2023

Stuart Delery
White House Counsel

Dear Mr. Delery:

I write to memorialize the following agreement.  Please sign and return a signed copy to me.

Consistent with President Biden's commitment to full and complete cooperation with the investigation being conducted by the Special Counsel's Office, and to allow for the Special Counsel to access information without compromising or waiving any claims of privilege or protection in such information, the President and the Special Counsel's Office agree to the following. This agreement applies to: (a) President Biden's handwritten materials taken from the President's residences and other locations, as defined by the Special Counsel's Office's letter and attachment of April 21, 2023, and as amended including any future amendments; (b) information provided in interviews by current and former Executive Branch employees;[1] and (c) documents produced by the Executive Branch (collectively, "information").[2]

1. The information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office.

2. By providing the information to the Special Counsel's Office, the President does not waive any privilege, right, or confidentiality interest that might otherwise be asserted, including but not limited to executive privilege and its components.

---

[1] "Current and former Executive Branch employees" refers to any employees who worked in the Executive Branch during any Administration and whose interviews solicit information about their service in the Executive Branch.

[2] For clarity, "documents produced by the Executive Branch" includes documents produced by any component of the White House or of the Executive Branch.

Stuart Delery
April 26, 2023
Page 2

3. The Special Counsel's Office may not use the information in the grand jury or in court applications without first providing the President with advance notice and a sufficient opportunity to challenge that use in court.

4. The Special Counsel's Office may show a document produced by the Executive Branch to any witness who there is cause to believe has previously seen or been made aware of that document. The Special Counsel's Office will not give the witness copies of the document to retain and will instruct the witness to keep the information confidential. Likewise, when the Special Counsel's Office receives information provided in interviews, the Special Counsel's Office may use that information in any subsequent interview. The Special Counsel's Office will instruct each witness to keep the substance of the interview confidential.

5. Other than as specified above, the Special Counsel's Office will not share any of the information, in any form, outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public without providing the President with advance notice and a sufficient opportunity to challenge such a disclosure.

6. The President and the White House Counsel's Office will make requested witnesses available to the Special Counsel's Office for interviews promptly.

7. The President and the White House Counsel's Office will instruct White House and Executive Branch components to produce documents to the Special Counsel's Office promptly.

8. This agreement is effective as of the date of signing and does not apply retroactively.

Sincerely,

Robert K. Hur
Special Counsel

Agreed to by:

Stuart Delery
White House Counsel

# EXHIBIT B

No. 24-cv-645 (DLF)

[EXTERNAL] RE: Materials produced by Mark Zwonitzer

Case 1:24-cv-00645-DLF    Document 51-5    Filed 05/12/26    Page 2 of 2
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 314 of 635

SR    Sauber, Richard A. EOP/WHO <Richard.A.Sauber@who.eop.gov>
To ○ MLK (JHPT)
Cc ○ Cotton, Rachel F. EOP/WHO; ○ Bob Bauer; ○ RKHSC (JHPT); ○ Jennifer Grace Miller

↩ Reply    ↩ Reply All    → Forward        ⋯

Fri 5/12/2023 11:58 AM

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Yes this formulation is fine, thanks.

**Richard Sauber**
**Special Counsel to the President**
**Office of the White House Counsel**
Richard.A.Sauber@who.eop.gov
**202-881-7806**
**Privileged and Confidential**

**From:** MLK (JHPT)
**Sent:** Friday, May 12, 2023 11:05 AM
**To:** Sauber, Richard A. EOP/WHO
**Cc:** Cotton, Rachel F. EOP/WHO ; Bob Bauer ; RKHSC (JHPT) ; Jennifer Grace Miller
**Subject:** RE: Materials produced by Mark Zwonitzer

Thanks Dick. This works for us with one addition.

We agree that any materials produced by Mark Zwonitzer in response to the pending subpoena will be covered by the April 26, 2023, agreement on executive privilege, with the understanding that neither the President's personal counsel nor the White House Counsel will assert any claims of executive privilege or any other claims to prevent or delay the production of materials from Zwonitzer to the Special Counsel. Though we agree to be bound by the April 26 agreement, we take no position at this time about whether the materials produced are subject to a claim of executive privilege.

If this is agreeable, then we can proceed. Thank you.

Marc

**From:** Sauber, Richard A. EOP/WHO <Richard.A.Sauber@who.eop.gov>
**Sent:** Friday, May 12, 2023 10:35 AM
**To:** MLK (JHPT) <MLK@usdoj.gov>
**Cc:** Cotton, Rachel F. EOP/WHO <Rachel.F.Cotton@who.eop.gov>; Sauber, Richard A. EOP/WHO <Richard.A.Sauber@who.eop.gov>; Bob Bauer <bauer@bobbauer.org>; RKHSC (JHPT) <RKHSC@usdoj.gov>; Jennifer Grace Miller <jmiller@hembar.com>
**Subject:** [EXTERNAL] Materials produced by Mark Zwonitzer

Marc- This is to confirm that neither the President's personal counsel nor the White House Counsel will assert any claims of executive privilege to prevent the production of materials from Mark Zwonitzer to the Special Counsel so long as all those produced materials are subject to the Global Executive Privilege Agreement entered between us on April 26, 2023.

Let me know if you have a different understanding.

**Richard Sauber**
**Special Counsel to the President**
**Office of the White House Counsel**
Richard.A.Sauber@who.eop.gov
**202-881-7806**
**Privileged and Confidential**

App-277

# EXHIBIT C

No. 24-cv-645 (DLF)

JIM JORDAN, Ohio
CHAIRMAN

JAMIE RASKIN, Maryland
RANKING MEMBER

ONE HUNDRED NINETEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

March 23, 2026

The Honorable Pamela J. Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Bondi:

During the 118th Congress, the Committee conducted oversight of Special Counsel Robert K. Hur's investigation of President Joe Biden's willful mishandling of classified information. As part of that effort, we requested that Mark Zwonitzer, the ghostwriter for President Biden's memoirs, produce the audio recordings of his conversations with President Biden relating to his ghostwriting work on President Biden's memoirs.[1] Unfortunately, Zwonitzer declined to comply with our request.

We appreciate the increased level of cooperation and responsiveness demonstrated by the Department under your leadership. Your commitment to transparency has resulted in the production of materials that were not previously made available to the Committee, including the audio recordings of Special Counsel Hur's interviews with President Biden and Zwonitzer. Contrary to your transparency, the House of Representatives was forced to hold then-Attorney General Merrick Garland in contempt for defying duly issued subpoenas from two congressional committees for those recordings.[2]

Accordingly, to advance our oversight of the politicization of the Biden-Garland Department of Justice, please produce the following documents and information:

1. All audio recordings of any interviews or conversations between Mark Zwonitzer and President Biden relating to Zwonitzer's ghostwriting work on President Biden's memoirs, *Promise Me, Dad* and *Promises to Keep*.

---

[1] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark Zwonitzer (Feb. 14, 2024); Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark Zwonitzer (Mar. 22, 2024) (issuing a subpoena for the audio recordings, among other materials).

[2] Carrie Johnson & Deirdre Walsh, *House votes to hold Attorney General Garland in contempt*, NAT'L PUB. RADIO (June 12, 2024).

App-279

The Honorable Pamela J. Bondi
March 23, 2026
Page 2

Pursuant to Rule X of the House of Representatives, the Committee has jurisdiction over the Department of Justice.[3] If you have any questions about this matter, please contact Committee staff at (202) 225-6906.

Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

cc:    The Honorable Jamie Raskin, Ranking Member

---

[3] Rules of the House of Representatives, R. X, 119th Cong. (2026).

App-280

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF JUSTICE, <br><br> *Defendant*. | No. 24-cv-645 (DLF) |

**MEMORANDUM OPINION**

The Heritage Foundation and Mike Howell (plaintiffs) bring this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *et seq*., for certain records from Special Counsel Robert K. Hur's investigation of now-former President Joseph R. Biden, Jr.  After the Department of Justice (Department) withheld certain transcripts and audio recordings, the parties filed cross-motions for summary judgment.  *See* Dkts. 33, 34.  The Department recently represented that it intends to disclose those materials, with redactions, to the plaintiffs and the House Judiciary Committee.  Dkt. 50.  Before the Court is Biden's motion to intervene.  Dkt. 51.  For the reasons that follow, the Court will grant in part and deny in part the motion.

**I.    BACKGROUND**

In January 2023, Attorney General Merrick Garland appointed Robert K. Hur as a Special Counsel to investigate and prosecute federal crimes arising from the "possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private residence of President Joseph R. Biden, Jr."  Appointment of Robert K. Hur as Special Counsel, Att'y Gen.

App-281

Order No. 5588-2023 (Jan. 12, 2023).  Hur issued his findings, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph. R. Biden, Jr.* (Report), in February 2024.  *See* Hur Report, Dkt. 6-1.  Among other things, the Report mentioned Biden's "diminished faculties and faulty memory," as exhibited in his interview with the Special Counsel's Office and recorded interviews from 2016 and 2017 with Mark Zwonitzer, a biographer who was working on Biden's since-published book, *Promise Me, Dad*.  *Id.* at 248; *see id.* at 3, 244–48.  Hur ultimately declined to prosecute Biden "for his retention of" certain classified documents because, among other things, "the evidence [was] not sufficient to convict" and because "[i]t would be difficult to convince a jury that they should convict [Biden]—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness."  *Id.* at 6.

In March 2024, the Heritage Foundation and its employee, Mike Howell, filed this FOIA action against the Department seeking "all records relied upon by Special Counsel Hur to write particular passages of the Report."  Compl. ¶ 1, Dkt. 1; *see* Am. Compl. ¶ 1 (same), Dkt. 6.  As relevant here, those passages included lines in which the Report referred to Biden's recorded conversations with Zwonitzer as "painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."  Am. Compl. ¶ 9 (Passage 4).  After narrowing the issues, Dkt. 28, and processing relevant materials, Dkt. 32, the Department withheld the Zwonitzer audio tapes and the majority of the written transcripts.  In November 2024, the Department moved for summary judgment, Def.'s Mot. Summ. J., Dkt. 33, and the plaintiffs cross-moved for summary judgment, Pls.' Mot. Summ. J., Dkt. 34.  The Court stayed proceedings in September 2025 to allow the parties to engage in additional discussions or to settle or narrow

2

the case, *see* September 27, 2025 Minute Order, after the Department represented that it would re-review its withholdings, Dkt. 42.

The Department no longer seeks to withhold the Zwonitzer materials. In a May 8, 2026 filing, the Department reported that it "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions, to Congress, pursuant to a request from the Chair of the House Judiciary Committee, as well as to Plaintiffs." Joint Status Report 1, Dkt. 50. The Department further stated that, if Biden intervened before May 12, 2026, it would hold off disclosing the material until June 15, 2026. *Id.*

Biden moved to intervene on May 12, 2026. Intervenor Mot., Dkt. 51. He argues that he has a right to intervene because he "has a legally protected interest in preventing the Heritage Plaintiffs from obtaining private conversations recorded in his own home for purely personal use, and this interest would be irrevocably harmed if Plaintiffs prevailed." Mem. Intervenor Mot. 3, Dkt. 51-1. Biden's proposed answer to the plaintiffs' amended complaint also asserts cross-claims regarding the Department's production of the Zwonitzer materials to the House Judiciary Committee. *See* Proposed Answer ¶¶ 98–109, Dkt. 51-3. The plaintiffs oppose Biden's intervention, *see* Pls.' Opp'n, Dkt. 59; the Department does not, *see* Joint Status Report 1.

## II.    LEGAL STANDARDS

Rule 24 of the Federal Rules of Civil Procedure "outlines two different avenues by which a court can allow an outsider to intervene—intervention of right, and permissive intervention." *EEOC v. Nat'l Child.'s Ctr., Inc.*, 146 F.3d 1042, 1044 (D.C. Cir. 1998). Rule 24(a) provides for intervention of right when a movant can demonstrate four requirements: "1) timeliness of the application to intervene; 2) a legally protected interest; 3) that the action, as a practical matter, impairs or impedes that interest; and 4) that no party to the action can adequately represent the

potential intervenor's interest." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 320 (D.C. Cir. 2015).  Rule 24(b) provides for permissive intervention by a third party who either "is given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1).

"In addition to satisfying the four elements of Rule 24—timeliness, interest, impairment of interest, and adequacy of representation—prospective intervenors in this circuit must possess standing under Article III of the Constitution."  *Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003)  "To establish standing, a party must demonstrate: (1) an injury in fact that is concrete and particularized as well as actual or imminent; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision."  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 76 (D.C. Cir. 2020) (citation modified).  Because a putative intervenor's Article III standing "presents a question going to this [C]ourt's jurisdiction," the Court must address it before evaluating intervention under Rule 24.  *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003); *see Conf. Grp., LLC v. FCC*, 720 F.3d 957, 962 (D.C. Cir. 2013).

Rule 13 provides that a "pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action."  Fed. R. Civ. P. 13(g).  "Federal Rule of Civil Procedure 13 does not distinguish between intervenors and other parties with respect to their ability to assert counterclaims or cross-claims."  *City of Jersey City v. Consol. Rail Corp.*, 968 F. Supp. 2d 302, 305 (D.D.C. 2013), *aff'd*, No. 13-7175, 2014 WL 1378306 (D.C. Cir. Feb. 19, 2014).

App-284

III.   ANALYSIS

The Court will grant Biden's motion to intervene as to the Department's production of the Zwonitzer materials to the plaintiffs because Biden has a right to protect his privacy interests that no party can adequately represent now that the Department has reversed its position.  But the Court will deny Biden's motion to intervene insofar as he asserts cross-claims relating to the Department's production of the Zwonitzer materials to the House Judiciary Committee because an intervenor may not press issues that have not been presented to the Court by another party.

A.   Standing

Biden has constitutional standing.   His proposed answer asserts that the Zwonitzer materials, which were recorded in his home in 2016 and 2017, contain discussion of "a range of sensitive topics," Proposed Answer ¶ 10, including details relating to his son's illness and death and his decision to run for President in 2016, *id.* ¶¶ 10, 38.  Non-consensual disclosure of these materials, he says, will violate his rights under the Privacy Act of 1974, 5 U.S.C. § 552a, *id.* ¶¶ 68–76, and "would adversely affect him, including in the form of costs to respond to the disclosure and other financial losses," *id.* ¶ 97.

Of course, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).  To be "concrete," an injury must be "real, and not abstract." *Id.* at 340 (citation modified).  "As a general matter, the [Supreme] Court has explained that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation modified).  "[W]ith respect to the concrete-harm requirement in particular, . . . courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm

5

App-285

traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* (citation modified).

Here, Biden has shown that the production of the Zwonitzer materials will cause concrete harm to his privacy similar to those injuries addressed by the common-law tort of intrusion upon seclusion. *See id.* at 425 ("[I]njuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts . . . include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion."); *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102–03 (D.D.C. 2025) (analogizing Privacy Act violations to tort of intrusion upon seclusion). "At common law, the essential features of intrusion upon seclusion are that the defendant intentionally intruded 'upon the solitude or seclusion of another or his private affairs or concerns' and that such intrusion 'would be highly offensive to a reasonable person.'" *All. for Retired Ams.*, 770 F. Supp. 3d at 102 (quoting Restatement (Second) of Torts § 652B). As the Department's motion for summary judgment argued, Biden's "discussions—recorded by Mr. Zwonitzer for reference in drafting Mr. Biden's memoir—were analogous to entries in a personal diary." Mem. Def.'s Mot. Summ. J. 1, Dkt. 33-1. Such an intrusion into a person's private affairs, including personal thoughts regarding the death of a family member, "would be highly offensive to a reasonable person." *All. for Retired Ams.*, 770 F. Supp. 3d at 102 (quoting Restatement (Second) of Torts § 652B). Moreover, Biden's injury is imminent given that the Department will produce the materials on June 15, 2026, *see* Joint Status Report 1; Proposed Answer ¶ 69, which is less than a month from today.

Having found a harm that is both concrete and imminent, the Court considers whether there exists "a causal connection between the injury and the challenged conduct" and "a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision." *Nat. Res.*

*Def. Council*, 955 F.3d at 76 (citation modified). The answer to both inquiries is yes. First, Biden's injury (the invasion of his personal privacy) flows directly from the conduct he challenges (the disclosure of the Zwonitzer materials to the plaintiffs). Second, if Biden successfully obtains the relief he seeks—an injunction barring the Department from disclosing the Zwonitzer materials to the plaintiffs—there is no question that the imminent injury posed by the invasion of his privacy will be redressed.

In short, Biden "possesses [the] standing under Article III of the Constitution" that is necessary for his motion to intervene. *Jones*, 348 F.3d at 1017.

**B.    Rule 24(a)**

Biden has the right to intervene to assert his privacy interests in preventing the Department's production of the Zwonitzer materials to the plaintiffs. *See* Fed. R. Civ. P. 24(a)(2).

First, Biden has a legally protected interest in his privacy. "[T]o determine if a legally protected interest will be 'impaired,' courts 'look to the "practical consequences" of denying intervention.'" *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 7 (D.D.C. 2018) (citation modified) (quoting *Fund for Animals*, 322 F.3d at 735). In the commercial context, "preventing the disclosure of commercially-sensitive and confidential information is a well-established interest sufficient to justify intervention under Rule 24(a)." *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 275 (D.D.C. 2014).

The same logic applies to the personal information contained in the Zwonitzer materials, for which FOIA enumerates at least two relevant exemptions. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and Exemption 7(C) protects "records or information compiled for law enforcement purposes," the production of which "could reasonably

7

App-287

be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7).  Biden possesses privacy interests under these exemptions even though he was the subject of a criminal investigation and is a public figure.  *Jud. Watch v. Nat'l Archives & Records Admin.*, 876 F.3d 346, 349–50 (D.C. Cir. 2017); *id.* at 349 ("Where individuals have been investigated but not charged with a crime, disclosure of material properly exempt under Exemption 7(C) represents a severe intrusion on the privacy interests of the individual in question." (citation modified)).

Second, the Department's production of the Zwonitzer materials would impair Biden's legal interests in this action.  The sensitive nature of the Zwonitzer materials means that Biden's privacy interests are likely substantial.  Because the audio tapes and transcripts, if disseminated, "would result in a substantial change in the status quo with respect to those [privacy] interests, such that the task of reestablishing the status quo" would be impossible, *Waterkeeper All., Inc.*, 330 F.R.D. at 7 (citation modified), Biden's legally protected interests will be impaired if the Court were to deny intervention here.

Third, it is clear that "no party to the action can adequately represent the potential intervenor's interest." *Crossroads Grassroots*, 788 F.3d at 320.  This requirement "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972).  Here, the Department has abandoned its earlier position that "releasing the records would result in unwarranted harm to privacy interests that an individual maintains in preventing the dissemination of . . . private recordings that were collected in the course of an investigation that yielded no criminal charges," Mem. Def.'s Summ. J. 23, and now intends to comply with the plaintiffs' request within a month, Joint Status Report 1.  In light of that apparent alignment among the plaintiffs and the Department, it is obvious that none of the parties is

8

adequately representing Biden's legal interests.  *See 100Reporters LLC*, 307 F.R.D. at 279–80 ("The divergence of interests, moreover, is especially evident in FOIA litigation, where this Court has recognized that the plaintiff's interest lies in disclosure, the government entity's interest lies in responding appropriately to the plaintiff's request, and the intervenor's interest lies in protecting its . . . confidential information." (citation modified)).

Finally, Biden's motion to intervene is timely.  "[T]imeliness is to be determined from all the circumstances, and the point to which a suit has progressed is not solely dispositive." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279 (2022) (citation modified); *see Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) (same).  The plaintiffs are correct that more than two years have passed since the filing of this suit.  Pls.' Opp'n 1.  But "[h]ere, the most important circumstance relating to timeliness is that [Biden] sought to intervene as soon as it became clear that [his] interests would no longer be protected by the [Department]." *Cameron*, 595 U.S. at 279–80 (citation modified).  According to the declaration submitted by Biden's attorney, the Department first notified Biden of its planned disclosure on February 25, 2026, and was engaged in negotiations about redactions and limited dissemination until the Department's May 5, 2026 final decision to disclose the recordings and transcripts, with redactions, to the Committee and the plaintiffs.  *See* Jeffress Decl. ¶¶ 11–30, Dkt. 51-2.  The motion to intervene, along with supporting exhibits, was filed one week later.  In consideration of these circumstances, Biden's motion to intervene is not dilatory.

The plaintiffs' arguments in opposition are unavailing.  They press that "Biden's lawyers sat on their hands for at least two-plus months knowing their ultra-thin privacy claims to cloak disclosure of for-profit book disclosure were in danger and could be affected by the outcome of this FOIA litigation."  Pls.' Opp'n 8 (errors in original).  In the plaintiffs' view, Biden should have

intervened (1) the minute that President Donald J. Trump returned to office on January 20, 2026; (2) when the Department released other Special Counsel materials[1] in other cases; (3) when the Department indicated that it was "reviewing [its] withholdings" in September 2025; (4) when the Department informed Biden's counsel of its plan to release the Zwonitzer materials in February 2026; or, at the latest, (5) when the Department informed Biden's counsel of its new position in March 2026. *Id.* 8–13. These arguments ignore the Supreme Court's instruction that intervenor timeliness be evaluated from the point at which it was "clear that [the movant's] interests would no longer be protected by the parties." *Cameron*, 595 U.S. at 280 (citation modified). Leading up to the Department's February 25, 2026 notification to Biden's attorney, nothing in the Department's status reports made clear that it would abandon its position that "disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest," as reflected in its still-pending motion for summary judgment. *See* Mem. Def.'s Mot. Summ. J. 1.

Any delay between the Department's February 25, 2026 notification and Biden's motion is attributable to negotiations that, if fruitful, could have obviated the need for intervention. *See* Jeffress Decl. ¶ 15 ("Over the next two months, in the hope of resolving this matter without resort to litigation, I engaged with the Department's attorneys to seek redactions necessary to prevent the invasion of President Biden's and others' privacy."). The plaintiffs counter that, "[b]y operation of the English language, if one is in negotiations to resolve a matter without litigation, then it ineluctably follows that one has already reached a state of divergent interests, even if the

---

[1] The Court will deny the plaintiffs' request for an evidentiary hearing as to when Biden may have learned of the Department's disclosure of other materials from the Hur investigation, *see* Pls.' Opp'n 15; Dkt. 61, because, as explained *infra*, those disclosures—regardless of Biden's notice—did not make clear that the Department would abandon the legal position reflected in its still-pending motion for summary judgment.

App-290

divergence of interest has not yet been finalized by adverse action." Pls.' Opp'n 12 (emphases omitted). But the plaintiffs ignore the fact that—until the Department's May 5, 2026 final decision—Biden was engaged in productive discussions that yielded some of the privacy-based redactions that he sought. *See, e.g.*, Jeffress Decl. ¶ 25. In short, it was not "clear" that the Department would wholly abandon Biden's privacy interests until negotiations gave way to a final decision.

Finally, "even where a would-be intervenor could have intervened sooner, in assessing timeliness a court must weigh whether any delay in seeking intervention unfairly disadvantaged the original parties." *Roane*, 741 F.3d at 151 (citation modified). The plaintiffs insist that their settlement efforts "will be for naught if intervention is permitted" and that they "and the Government will be prejudiced because production will—yet again—be delayed." Pls.' Opp'n 14. But Biden's intervention does not vitiate the plaintiffs' potential settlement with the Department because that settlement can be entered as soon as the Court resolves Biden's asserted privacy interests. Nor will Biden's intervention necessarily lead to a considerable delay in resolving this case: "Biden is prepared to participate in renewed summary judgment briefing on an expedited basis." Mem. Intervenor Mot. 16. And the Department, which the plaintiffs claim will also be prejudiced, does not oppose intervention. *See* Joint Status Report 1. In all, a short delay for Biden's expedited briefing would not "unfairly disadvantage the original parties" in this case, *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 908 (D.C. Cir. 1977), in light of the parties' sudden alignment after years of disagreement.

Accordingly, the Court will permit Biden to intervene in this case as to the plaintiffs' FOIA claims.

## C.      Cross-Claims

Although Biden has the right to intervene to oppose production of the Zwonitzer materials

to the plaintiffs, he may not bring cross-claims regarding the Department's production of such

materials to the House Judiciary Committee because "it is well settled in this circuit that 'an

intervening party may join issue only on a matter that has been brought before the court by another

party.'"  *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1, 7 (D.D.C. 2001) (citation

modified) (quoting *Ill. Bell Tel. Co. v. FCC,* 911 F.2d 776, 786 (D.C. Cir. 1990)).

This case turns on the Department's withholding of certain materials from the plaintiffs

under FOIA Exemptions 5, 6, and 7(C).  *See* Def.'s Mem. Mot. Summ. J.; Pls.' Mem. Mot. Summ.

J, Dkt. 34-1.  Counts IV and V of Biden's proposed answer, by contrast, assert that disclosure to

Congress would violate the Privacy Act and the APA, *see* Proposed Answer ¶¶ 98–109, and he

seeks additional equitable relief on the ground that "the Committee's request exceeds the bounds

of Congress's investigative authority pursuant to Article I of the United States Constitution," *id.*

at 31.  Such "[c]ongressional [requests] for the President's personal information implicate weighty

concerns regarding the separation of powers," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 869

(2020), the adjudication of which requires careful analysis of Congress's and a former President's

interests, *see Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*,

45 F.4th 324, 333–40 (D.C. Cir. 2022) (applying tests from *Mazars* and *Nixon v. GSA*, 433 U.S.

425, 443 (1977), to congressional request for former President's personal records).  Neither the

plaintiffs nor the Department has brought those issues before this Court.

Because "an intervenor is admitted to the proceeding as it stands, . . . but is not permitted

to enlarge those issues or compel an alteration of the nature of the proceeding," *Vinson v. Wash.*

*Gas Light Co.*, 321 U.S. 489, 498 (1944), Biden cannot inject his APA claims into the plaintiffs'

12

App-292

FOIA action through intervention.  Accordingly, the Court will deny Biden's motion to intervene as to the cross-claims asserted in Counts IV and V of his proposed answer.

<div align="center">**CONCLUSION**</div>

For the foregoing reasons, Joseph R. Biden, Jr.'s motion to intervene, Dkt. 51, is granted as to the plaintiffs' FOIA claims and denied as to the cross-claims asserted in Counts IV and V of his proposed answer.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

May 21, 2026

<div align="center">13</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, <br><br> MIKE HOWELL, <br><br>    *Plaintiffs*, <br><br>   v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br>    *Defendant*, <br><br>   and <br><br> JOSEPH R. BIDEN, JR., <br><br>    *Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

**<u>MOTION FOR PRELIMINARY INJUNCTION BY JOSEPH R. BIDEN, JR.</u>**

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65.1(c), Defendant-Intervenor Joseph R. Biden, Jr., through counsel, respectfully requests that the Court issue a preliminary injunction before June 15, 2026, enjoining Defendant U.S. Department of Justice (the "Department") from disclosing or causing to be disclosed the written transcript and audio recordings at issue in this matter, or any portion thereof, to Plaintiff Heritage Foundation or to Plaintiff Mike Howell (collectively, the "Heritage Plaintiffs"). The grounds for this motion are set forth in the attached memorandum of law, supporting declaration, and exhibits. A proposed order is attached.

Pursuant to Local Rule 7(m), counsel for President Biden have conferred with counsel for the Department and the Heritage Plaintiffs regarding this motion. Following those discussions,

App-294

President Biden understands that both the Department and the Heritage Plaintiffs oppose this motion.  President Biden takes no position as to whether the Court should schedule a hearing.

Dated: May 29, 2026

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
H. Atticus Ballesteros (D.C. Bar No. 90043198)**
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883
ajeffress@heckerfink.com
kkonkel@heckerfink.com
tgoodnature@heckerfink.com
aballesteros@heckerfink.com
jhirschfield@heckerfink.com

*Counsel for Defendant-Intervenor*
*Joseph R. Biden, Jr.*

*Admitted pro hac vice

**Application for *pro hac vice* admission forthcoming

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION,<br><br>MIKE HOWELL,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>    *Defendant*,<br><br>    and<br><br>JOSEPH R. BIDEN, JR.,<br><br>    *Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

**<u>MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION BY JOSEPH R. BIDEN, JR.</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

   I.   The Records at Issue and the Special Counsel's Investigation ........................................... 3

   II.   Developments in This Litigation and the Department's About-Face ............................... 5

   III.   The Purposes of the Disclosure ........................................................................................ 9

LEGAL STANDARD ......................................................................................................... 11

ARGUMENT ..................................................................................................................... 11

   I.   President Biden Is Likely to Succeed on the Merits of His Cross-Claims Challenging the Department's Proposed Disclosure of His Private Information to the Heritage Plaintiffs ................................................................................................................. 12

       A.   The Department's Decision Is a Final Agency Action Subject to Immediate Review ................................................................................................................. 12

       B.   President Biden's Private Conversations Are Exempt From Disclosure and Properly Withheld Pursuant to FOIA Exemptions 6 and 7(C) ............................. 13

       C.   The Department's Contrary Determination Is Arbitrary, Capricious, and an Abuse of Discretion ........................................................................................... 19

       D.   Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act .................. 26

   II.   President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction ............. 32

   III.   The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief ........................................................................................... 34

   IV.   The Bond Requirement Should Be Waived or Set to a Nominal Amount ....................... 36

CONCLUSION ................................................................................................................. 37

## TABLE OF AUTHORITIES

**CASES**

*AAR Airlift Grp., Inc. v. U.S. Transp. Command*,
161 F. Supp. 3d 37 (D.D.C. 2015) ................................................................. 25

*\*AFL-CIO v. Dep't of Lab.*,
No. 25 Civ. 339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) ........................... 26

*AFL-CIO v. Dep't of Lab.*,
No. 25 Civ. 339, 2025 WL 1783899 (D.D.C. June 27, 2025) ................................... 33, 34

*AFL-CIO v. FEC*,
177 F. Supp. 2d 48 (D.D.C. 2001) ................................................................. 18

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
663 F.3d 476 (D.C. Cir. 2011) ...................................................................... 31

*All. for Retired Ams. v. Bessent*,
770 F. Supp. 3d 79 (D.D.C. 2025) ......................................................... 8, 33, 34

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .................................................................... 21

*Ames v. U.S. Dep't of Homeland Sec.*,
861 F.3d 238 (D.C. Cir. 2017) .................................................................. 27, 29

*Armstrong v. Geithner*,
608 F.3d 854 (D.C. Cir. 2010) ...................................................................... 32

*Bartko v. U.S. Dep't of Just.*,
898 F.3d 51 (D.C. Cir. 2018) ........................................................................ 14

*Bast v. U.S. Dep't of Just.*,
665 F.2d 1251 (D.C. Cir. 1981) ..................................................................... 16

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................... 12

*Brennan Ctr. for Just. v. U.S. Dep't of Just.*,
697 F.3d 184 (2d Cir. 2012) .......................................................................... 23

*Brunotte v. Johnson*,
892 F. Supp. 2d 199 (D.D.C. 2012) ............................................................... 27

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) .................................................................................... 20

*Canadian Com. Corp. v. Dep't of the Air Force*,
    514 F.3d 37 (D.C. Cir. 2008) ...................................................................... 19

*Canning v. U.S. Dep't of Just.*,
    919 F. Supp. 451 (D.D.C. 1994) ................................................................. 17

*CASA, Inc. v. Trump*,
    793 F. Supp. 3d 687 (D. Md. 2025) ............................................................ 37

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .................................................................... 32

*Chichakli v. Tillerson*,
    882 F.3d 229 (D.C. Cir. 2018) .............................................................. 27, 29

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) .................................................................................... 11

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
    746 F.3d 1082 (D.C. Cir. 2014) .................................................................. 16

*CNA Fin. Corp. v. Donovan*,
    830 F.2d 1132 (D.C. Cir. 1987) .................................................................. 19

*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
    No. 26 Civ. 317, 2026 WL 569034 (D.D.C. Mar. 1, 2026) ........................... 20

*Council on Am.-Islamic Rels. v. Gaubatz*,
    667 F. Supp. 2d 67 (D.D.C. 2009) .......................................................... 34, 37

*Creed v. Nat'l Transp. Safety Bd.*,
    758 F. Supp. 2d 1 (D.D.C. 2010) ........................................................... 12, 13

*Ctr. for Taxpayer Rts. v. IRS*,
    815 F. Supp. 3d 1 (D.D.C. 2025) ....................................................... 33, 34, 35

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .................................................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ........................................................................................ 25

*Doe v. Hill*,
    141 F.4th 291 (D.C. Cir. 2025) ................................................................... 27

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ...................................................................................... 37

*Eagle Broad. Grp., Ltd. v. FCC*,
563 F.3d 543 (D.C. Cir. 2009) .................................................................................... 19

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
15 F. Supp. 3d 32 (D.D.C. 2014) ................................................................................ 36

*ERG Transit Sys. (USA), Inc. v. Wash. Metro. Area Transit Auth.*,
593 F. Supp. 2d 249 (D.D.C. 2009) ............................................................................ 19

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
811 F. Supp. 3d 1 (D.D.C. 2025) ................................................................................ 37

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................ 20, 21, 24, 25

*Fitzgibbon v. CIA*,
911 F.2d 755 (D.C. Cir. 1990) .................................................................................... 15

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020) ............................................................................ 24

*Groenendal v. Exec. Off. for U.S. Att'ys*,
No. 20 Civ. 1030, 2024 WL 1299333 (D.D.C. Mar. 27, 2024) .................................... 16

*Hand v. U.S. Dep't of Just.*,
No. 20 Civ. 3690, 2023 WL 2707878 (D.D.C. Mar. 29, 2023) .................................... 18

*Harrison v. Fed. Bureau of Prisons*,
611 F. Supp. 2d 54 (D.D.C. 2009) .............................................................................. 18

*Henke v. U.S. Dep't of Com.*,
83 F.3d 1453 (D.C. Cir. 1996) .................................................................................... 31

*Heritage Found. v. EPA*,
No. 23 Civ. 748, 2023 WL 2954418 (D.D.C. Apr. 14, 2023) ...................................... 36

*Hill v. U.S. Dep't of the Interior*,
151 F.4th 420 (D.C. Cir. 2025) ................................................................................... 12

*Hosp. Staffing Sols., LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010) ............................................................................ 34

*Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.,*
    394 F. Supp. 3d 67 (D.D.C. 2019) ................................................................. 18

*\*Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.,*
    876 F.3d 346 (D.C. Cir. 2017) ......................................................... 25, 32, 36

*Jud. Watch, Inc. v. U.S. Dep't of Just.,*
    No. 23 Civ. 1485, 2024 WL 4039924 (D.D.C. Sept. 4, 2024) ........................ 22

*Jurewicz v. U.S. Dep't of Agric.,*
    891 F. Supp. 2d 147 (D.D.C. 2012) ............................................................. 25

*\*League of United Latin Am. Citizens v. Exec. Off. of the President,*
    818 F. Supp. 3d 34 (D.D.C. 2026) ............................................................... 26

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................................... 11, 35

*Lepelletier v. FDIC,*
    164 F.3d 37 (D.C. Cir. 1999) ..................................................................... 14

*Londrigan v. FBI,*
    670 F.2d 1164 (D.C. Cir. 1981) ................................................................. 26

*Martin v. Dep't of Just.,*
    488 F.3d 446 (D.C. Cir. 2007) ................................................................... 15

*Maydak v. United States,*
    630 F.3d 166 (D.C. Cir. 2010) ............................................................. 30, 31

*McCready v. Nicholson,*
    465 F.3d 1 (D.C. Cir. 2006) ....................................................................... 30

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.,*
    778 F. Supp. 3d 1 (D.D.C. 2025) ............................................................... 11

*Milton v. U.S. Dep't of Just.,*
    596 F. Supp. 2d 63 (D.D.C. 2009) ............................................................. 18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................... 20

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,*
    783 F. Supp. 3d 290 (D.D.C. 2025) ............................................................ 37

*\*Nat'l Archives & Recs. Admin. v. Favish,*
    541 U.S. 157 (2004) ............................................................ 14, 18, 21, 22, 23

*Nat'l Bus. Aviation Ass'n, Inc. v. FAA*,
  686 F. Supp. 2d 80 (D.D.C. 2010) ...................................................................... 11

*Nat'l Tel. Coop. Ass'n v. FCC*,
  563 F.3d 536 (D.C. Cir. 2009) .......................................................................... 20

*Niskanen Ctr. v. FERC*,
  20 F.4th 787 (D.C. Cir. 2021) ........................................................................... 27

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................... 11, 34

*Northern Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................... 35

*Northrop Grumman Sys. Corp. v. NASA*,
  346 F. Supp. 3d 109 (D.D.C. 2018) ................................................................... 13

*NTEU v. Trump*,
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .............................. 36

*Occidental Petroleum Corp. v. SEC*,
  873 F.2d 325 (D.C. Cir. 1989) ..................................................................... 11, 19

*Paige v. DEA*,
  665 F.3d 1355 (D.C. Cir. 2012) ........................................................................ 30

*Prill v. NLRB*,
  755 F.2d 941 (D.C. Cir. 1985) .......................................................................... 24

*Pub. Emps. for Env't Resp. v. EPA*,
  No. 24 Civ. 445, 2026 WL 571217 (D.D.C. Mar. 2, 2026) ............................... 19

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) .......................................................................... 11

*Roth v. U.S. Dep't of Just.*,
  642 F.3d 1161 (D.C. Cir. 2011) ........................................................................ 14

*SafeCard Servs. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) ........................................................................ 17

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ........................................................................................... 20

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ................................................................................ 20, 21, 25

*Simms v. District of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) ................................................................... 37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   249 F. Supp. 3d 516 (D.D.C. 2017) ................................................................. 11

*Tobey v. NLRB*,
   40 F.3d 469 (D.C. Cir. 1994) ........................................................................... 30

*Truong v. U.S. Citizenship & Immigr. Servs.*,
   No. 21 Civ. 316, 2022 WL 17356865 (D.D.C. Dec. 1, 2022) .......................... 31

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) .................................................................................. 14, 15

*U.S. Dep't of State v. Wash. Post Co.*,
   456 U.S. 595 (1982) ........................................................................................ 14

*Waterkeeper All., Inc. v. Wheeler*,
   330 F.R.D. 1 (D.D.C. 2018) .......................................................................... 8, 32

*Wheeler v. U.S. Dep't of Just.*,
   403 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................... 18

*Whitmore v. U.S. Dep't of Just.*,
   132 F. Supp. 3d 69 (D.D.C. 2015) ................................................................... 17

**STATUTES**

5 U.S.C. § 552 ............................................................................................. 1, 13, 14, 25

5 U.S.C. § 552a ......................................................................................................... *passim*

5 U.S.C. § 704 ..................................................................................................... 12

5 U.S.C. § 706 ................................................................................................ 2, 11, 19, 26

28 U.S.C. § 591 .................................................................................................... 22

**FEDERAL RULES**

Fed. R. Civ. P. 65 ............................................................................................. 36, 37

**LEGISLATIVE MATERIALS**

S. Rep. No. 1183, 93rd Cong., 2d Sess. (1974) ............................................................. 26

**OTHER AUTHORITIES**

FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y,
    https://www.justice.gov/oip/available-documents-oip ................................................. 6, 25

Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review—Review of District
    Court Decisions and Agency Actions* (2007) ...................................................... 19

Press Release, Office of the Attorney General, Appointment of a Special Counsel (Jan.
    12, 2023), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-1 ....... 23

## INTRODUCTION

President Biden seeks a preliminary injunction to stop the U.S. Department of Justice (the "Department") from disclosing sensitive law enforcement records—recordings and transcripts of personal conversations that took place at his home in 2016 and 2017—to Heritage Foundation and its staffers.  These conversations were never intended to be shared with a wider audience, and the Department has them only because it collected the recordings as part of a criminal investigation that resulted in no charges.  Under ordinary circumstances, the Department would vigorously defend the privacy and law enforcement interests at stake in such records, including by applying long-settled principles to withhold them from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Indeed, in litigating this case for almost two years, the Department did exactly that.  The Department's decision to defend these long-settled principles was unremarkable—it was the kind of straightforward application of the law that is the daily work of any independent Justice Department.  Government lawyers reviewed the case, determined that the FOIA exemptions applied, produced material that was not exempt, and explained their reasoning in detailed declarations filed with the Court.

But these are not ordinary circumstances, and the Department is not operating through normal channels.  It is not ordinary for the Department to abandon its duty to protect law enforcement records containing sensitive personal information, instead offering them up to political operatives.  It is not routine for the statements of top Department officials to be indistinguishable from the made-for-TV attacks of those political operatives.  And it is not normal—nor should it be—for the President of the United States to issue a string of late-night social media posts about litigation to which he is not a party, branding a fellow former President "A Crooked Politician!!!" because the former President has filed a lawsuit so that an impartial

App-305

federal court can protect rights that the Department of Justice, operating under President Trump's banner, is failing to defend.

The Department's unexplained deviations from regular practice matter for purposes of the Administrative Procedure Act ("APA"), the statute under which President Biden has challenged the Department's proposed disclosure of his private conversations to the Heritage Foundation and Mike Howell (the "Heritage Plaintiffs"). That statute provides a mechanism for courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). That is, the APA requires agency action to be both rational and rationally explained. The relevant laws have not changed since Department attorneys reached their prior determination in late 2024, but nonetheless, the Department has reversed course. It plans to release the recordings and transcripts at issue to the Heritage Plaintiffs on June 15, 2026, absent a court order barring release. ECF No. 50 at 1. The Department has yet to offer any formal explanation for its decision. That may well be because the decision is nakedly political, lacking any basis in the law.

The Heritage Plaintiffs have no legal right to the recordings or transcripts of President Biden's private conversations, which the Department obtained in the context of law enforcement proceedings. The Department itself has explained as much, in no uncertain terms. In the Department's own words, release of President Biden's sensitive, private conversations "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." Def.'s Mem., ECF No. 33-1 at 1. Such release would also inhibit law enforcement in the future, thereby threatening public safety. The Department's highest-ranking career official, who served across administrations for more than 30 years, explained in a declaration that "the Department takes great care to protect its law enforcement files, consistent

2

App-306

with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties," Declaration of Bradley Weinsheimer ("Weinsheimer Decl.") ¶ 24, ECF No. 33-2.  As Weinsheimer explained: the "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to [a] core tenet of American justice."  *Id.* ¶ 21.  That statement remains true today.

President Biden has now intervened in this litigation to protect his privacy interests and to advocate for the faithful application of the law, given that the Department has abandoned its duty to do so in this matter.  All of the preliminary injunction factors weigh in his favor: (1) he is likely to succeed on the merits of his cross-claims; (2) he will suffer irreparable harm in the absence of preliminary relief; and (3) the balance of equities and the public interest support a preliminary injunction.  For the reasons explained below, the Court should set aside the Department's decision and enjoin its disclosure of the recordings and transcripts at issue.

## BACKGROUND

**I.      The Records at Issue and the Special Counsel's Investigation**

Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise Me, Dad*.  Weinsheimer Decl. ¶ 10.  In these private conversations—which took place in President Biden's home in 2016 and 2017—President Biden recounted one of the most politically consequential and personally painful years of his life, beginning on Thanksgiving in 2014.  *Id.* ¶¶ 10, 12-13.  Then-Vice President Biden served the final year of his term in that office and considered a run for the Presidency in 2016.  *Id.* ¶¶ 12-13.  All the while, President Biden's eldest son, Beau, battled brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.  Pressing decisions that President Biden faced about his political future were inextricably intertwined with Beau.  Weinsheimer Decl. ¶ 12.  Candidly reflecting on this difficult and

3

App-307

consequential time in his life, President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family; the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; and the many other voices and events that factored into that difficult, highly personal decision. *Id.* ¶¶ 13, 16.

Zwonitzer recorded these conversations for his personal use in working with President Biden on *Promise Me, Dad*. *Id.* ¶¶ 10, 13. Both men understood that they were speaking privately, and the recordings were never intended to be released to the public in verbatim form. *See id.* ¶ 13 ("The recorded conversations reflect source material; the book that resulted from that source material was only released to the public after subsequent drafting and editing.").

Years later, in 2020, President Biden ran for and was elected President. In 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden. Weinsheimer Decl. ¶ 5. As the Special Counsel's final report reflects, President Biden cooperated with the investigation—including by sitting for a voluntary interview while he was serving as President—and Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted and that "the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt." Supplemental Declaration of Amy Jeffress in Support of Motion for Preliminary Injunction by Joseph R. Biden, Jr. ("Suppl. Jeffress Decl.") ¶ 8 & Ex. 1 ("Hur Report") at 1, 11.[1]

---

[1] As used in this memorandum, "Supplemental Jeffress Declaration" and "Suppl. Jeffress Decl." refer to the supporting declaration that accompanies the instant motion for a preliminary injunction. "Jeffress Declaration" and "Jeffress Decl." refer to the declaration filed on May 12, 2026, in support of President Biden's motion to intervene, ECF No. 51-2, which is adopted and incorporated into the Supplemental Jeffress Declaration, Suppl. Jeffress Decl. ¶ 3.

In the course of Special Counsel Hur's investigation, the Department obtained materials related to Zwonitzer's conversations with President Biden in 2016 and 2017. Weinsheimer Decl. ¶ 11. The Special Counsel's 345-page final report to Attorney General Garland, which the Department later published on its website, cited limited excerpts of President Biden's conversations with Zwonitzer, all of which focused on President Biden's notes and other records related to official business as Vice President. Hur Report at 65, 75-77, 106, 110-11, 236-37. The Department obtained these materials subject to an agreement between the White House Counsel's Office and the Special Counsel's Office, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office." Answer & Cross-Claims Ex. A ("Agreement") ¶ 1, ECF No. 51-4; *see* Suppl. Jeffress Decl. ¶ 5; Jeffress Decl. ¶ 8. The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." Agreement ¶ 5; *see* Suppl. Jeffress Decl. ¶ 5; Jeffress Decl. ¶ 9. The Agreement applies to the materials at issue here. Answer & Cross-Claims Ex. B, ECF No. 51-5; *see* Suppl. Jeffress Decl. ¶ 6; Jeffress Decl. ¶ 10.

## II.    Developments in This Litigation and the Department's About-Face

On February 9, 2024, Plaintiff Mike Howell submitted a FOIA request to the Department for certain "[r]ecords [r]elied [u]pon by Special Counsel Robert K. Hur." Am. Compl. Ex. 2 (the "FOIA Request"), ECF No. 6-3. On March 6, 2024, the Heritage Plaintiffs filed this action against the Department, alleging violations of FOIA. ECF No. 1. On October 16, 2024, the Department

5

issued a final response to the FOIA Request and released 117 redacted pages of transcripts of conversations between President Biden and Zwonitzer that occurred between October 10, 2016, and April 26, 2017.  Weinsheimer Decl. ¶ 4, Ex. B.  In November 2024, the parties filed cross-motions for summary judgment on the validity of the Department's withholdings pursuant to FOIA.  ECF Nos. 33-34.  Those motions have been fully briefed since December 23, 2024.  *See* ECF No. 38.

In the Department's motion for summary judgment on its withholdings, the Department correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content."  Def.'s Mem. at 11.  Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions."  *Id.* at 14-15.  Unsurprisingly, the Department concluded that disclosure of the audio recordings and transcripts would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  *Id.* at 1.

On May 19, 2025, the Department released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur.  *See* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA

Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip.  On September 23, 2025, the Court entered a minute order stating: "In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24-cv-700, the parties shall file, on or before September 26, 2025, a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records."  Min. Order (Sept. 23, 2025).  In the joint status report that followed, the parties explained that the Department had not made additional releases of records and was reviewing its withholdings.  ECF No. 42.

On September 27, 2025, the Court stayed this action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues."  Min. Order (Sept. 27, 2025).  This action remains stayed, and the only substantive activity in the case since September 27, 2025, has been the filing of joint status reports and minute orders extending the stay to allow the parties to continue their discussions.  ECF Nos. 43-50.

On February 25, 2026, pursuant to the Agreement, the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce the audio recordings and transcripts at issue in this action to the Heritage Plaintiffs with only very limited redactions.  Jeffress Decl. ¶¶ 11, 14.  Counsel for President Biden subsequently engaged with the Department in an effort to resolve this matter without litigation.  *See id.* ¶¶ 13-29.  Meanwhile, on March 19, 2026, the Department reported to counsel for President Biden that it intended to comply with a request from Congress for the very same materials the Department intended to produce to the Heritage Plaintiffs.  *Id.* ¶ 20.

App-311

On May 5, 2026, the Department informed President Biden it had made a final decision to release the recordings and transcripts at issue—with redactions that are wholly inadequate to protect the privacy interests of President Biden and of third parties—on June 15, 2026, unless President Biden obtains a court order blocking release by that date. *Id.* ¶¶ 25-29.

On May 12, President Biden moved to intervene in this litigation, seeking to enjoin the Department from producing the recordings and transcripts to the Heritage Plaintiffs or to the House Judiciary Committee. ECF No. 51. Recognizing President Biden's "right to protect his privacy interests," the Court granted his intervention motion "as to the Department's production of the Zwonitzer materials to the [Heritage Plaintiffs]." Intervention Order, ECF No. 63 at 5. The Court reasoned that "[t]he sensitive nature of the Zwonitzer materials means that Biden's privacy interests are likely substantial" and that "the audio tapes and transcripts, if disseminated, 'would result in a substantial change in the status quo with respect to those [privacy] interests, such that the task of reestablishing the status quo' would be impossible." *Id.* at 8 (quoting *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 7 (D.D.C. 2018)). The Court also explained that disclosure of these materials would cause "concrete harm to [President Biden's] privacy similar to those injuries addressed by the common-law tort of intrusion upon seclusion" given that the Department's proposed "intrusion into [President Biden's] private affairs, including personal thoughts regarding the death of a family member, 'would be highly offensive to a reasonable person.'" *Id.* at 6 (quoting *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025)). The Court denied intervention as to President Biden's "cross-claims regarding the Department's production of such materials to the House Judiciary Committee," explaining that permitting those claims would expand the action beyond its original scope. *Id.* at 12-13. President Biden has filed a separate action to pursue those claims. *See Biden v. U.S. Dep't of Just.*, No. 26 Civ. 1818 (D.D.C.).

App-312

## III.    The Purposes of the Disclosure

The public record reflects striking alignment between Administration officials and the Heritage Plaintiffs in their targeting of President Biden, including on matters related to Special Counsel Hur's investigation and President Biden's mental state.  The alignment between these disparate actors—including parties that purportedly are opponents in this litigation—bears directly on the purposes of the proposed disclosure under the Privacy Act and the Department's reasons for its new position under the APA.

Relevant statements include the following:

- On June 4, 2025, the Trump White House issued a memorandum directing the review of certain presidential actions under the Biden Administration, including "who ran the United States while President Biden was in office."  The memorandum directed investigation on topics related to "Biden's mental state" and "mandate[d] an investigation into the circumstances surrounding Biden's purported execution of the numerous executive actions during his final years in office, examining policy documents signed with an autopen, who authorized its use, and the validity of the resulting Presidential policy decisions."  The memorandum stated that "[t]he combined nature of Biden's documented cognitive decline and the repeated use of an autopen raises serious concerns about the legitimacy of his actions."  Suppl. Jeffress Decl. ¶ 10 & Ex. 3.

- In the same memorandum dated June 4, 2025, the Trump White House expressly linked its claims about President Biden's mental state to Special Counsel Hur's investigation and non-prosecution decision, falsely stating: "Reports indicate that, for years, Biden suffered from serious cognitive decline.  For example, although the Department of Justice found that Biden had violated the law by willfully retaining and disclosing classified materials, it ultimately concluded that Biden was unfit to stand trial given his incompetent mental state." *Id.*

- The same June 4, 2025, memorandum quotes President Trump as saying: "And you know what, they ought to find out who was using that autopen.  Because whoever that person was, he or she was like the President of the United States . . . I think a President should sign it, not use an autopen." *Id.* (alteration in original).

- In a March 6, 2025, post on X, Plaintiff Mike Howell wrote: "There is a constitutional process to deal with an incapacitated POTUS and it doesn't contemplate giving someone else his autopen and authority.  It's called the 25th Amendment and the conspiracy not to invoke it in order to keep whatever they were doing going is a big problem."  Suppl. Jeffress Decl. ¶ 11 & Ex. 4.

9

App-313

- In an August 21, 2025, post on X, Plaintiff Mike Howell wrote: "theres now a generation of dem WH staffers who were planning to rely on titles that showed a proximity to a president that now cant do that they should have to update their linkedins to things like Special Assistant to the Autopen." Suppl. Jeffress Decl. ¶ 12 & Ex. 5.

- On September 26, 2025, the Heritage Plaintiffs asserted in a joint status report in this litigation: "This case is still of great relevance to on-going national discourse regarding President Joseph R. Biden's use of the autopen and whether President Biden—or a 'politburo' of unelected officials *actually* ran the Country." ECF No. 42 at 1.

- On October 27, 2025, the Oversight Project of Plaintiff Heritage Foundation issued a report titled "The Autopen Presidency Part IV: Comprehensive Summary of Autopen Use." Suppl. Jeffress Decl. ¶ 13 & Ex. 6.

- In a December 15, 2025, post on X, Plaintiff Mike Howell explained that, in the summer of 2024, he and his team searched for ways to "accelerate" President Biden's "exit," and that one such way was "intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur." Suppl. Jeffress Decl. ¶ 14 & Ex. 7.

- In the same post, Plaintiff Mike Howell stated that "Joe Biden wasn't the President, an autopen was." He further stated: "President Trump has brought up the autopen perhaps more than any other topic. He has called it the scandal of the century." He then called for the Department of Justice to treat "all autopenned documents" signed by President Biden as "null" and "void." *Id.*

- In a May 10, 2026, post on X, Jeff Clark, counsel of record for the Heritage Plaintiffs in this matter, referred to this action as "our case against DOJ that started in Biden autopen administration." Suppl. Jeffress Decl. ¶ 15 & Ex. 8.

- On May 16, 2026, the Heritage Plaintiffs asserted in their opposition to President Biden's motion to intervene in this case: "President Biden clearly was in cognitive decline over his Term and in particular in 2024. . . . President Trump has deemed this issue 'one of the most dangerous and concerning scandals in American history.' Indeed, President Biden's many own senior staff testified to a complete lack of such documentation and authorization for use of the autopen on official documents cloaked by a game of three-card monte." ECF No. 59 at 4-5 (citation omitted).

- In a May 26, 2026, post on Truth Social, President Trump responded to an article about President Biden's filing of a lawsuit involving the records at issue here with the statement: "A Crooked Politician!!!" Suppl. Jeffress Decl. ¶ 16 & Ex. 9.

10

App-314

## LEGAL STANDARD

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). "Where a federal agency is the defendant, the last two factors merge." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 7 (D.D.C. 2025); *accord Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

"Third parties have the right to protect documents with their information from improper disclosure by the government." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 522 (D.D.C. 2017). So-called "[r]everse FOIA cases" challenging agencies' decisions to disclose protected information "seek review of informal agency adjudications, and thus are reviewable under Section 706 of the Administrative Procedure Act ('APA'), 5 U.S.C. § 706." *Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F. Supp. 2d 80, 84 (D.D.C. 2010) (citing *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989)). Accordingly, the reviewing court must determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979).

## ARGUMENT

President Biden satisfies all of the preliminary injunction factors: (1) he is likely to succeed on the merits of his cross-claims; (2) he will suffer irreparable harm in the absence of preliminary relief; and (3) the balance of the equities and the public interest weigh strongly in his favor. *See League of Women Voters*, 838 F.3d at 6.

11

App-315

I.      **President Biden Is Likely to Succeed on the Merits of His Cross-Claims Challenging the Department's Proposed Disclosure of His Private Information to the Heritage Plaintiffs**

President Biden is likely to prevail on his cross-claims. *See* ECF No. 51-3 ("Cross-Claims") ¶¶ 77-97 (Counts I-IV). The Department's decision to abandon longstanding FOIA principles and disclose President Biden's private information to the Heritage Plaintiffs is a final agency action that is arbitrary and capricious and an abuse of discretion, in violation of the APA. In addition, the Privacy Act prohibits the Department's proposed disclosure to the Heritage Plaintiffs, and the APA authorizes the Court to enjoin disclosure on that basis alone. The "likelihood of success" factor thus counsels in favor of a preliminary injunction.

A.      **The Department's Decision Is a Final Agency Action Subject to Immediate Review**

The Department's decision to produce the materials to the Heritage Plaintiffs on June 15, 2026, absent a court order barring release, constitutes "final agency action . . . subject to judicial review" under the APA. 5 U.S.C. § 704. The decision satisfies the two requirements of final agency action: It "'marks the consummation of the agency's decisionmaking process' and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hill v. U.S. Dep't of the Interior*, 151 F.4th 420, 428 (D.C. Cir. 2025) (citation modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The Department's decision—communicated by phone to President Biden's counsel on May 5, 2026, Jeffress Decl. ¶ 29, and memorialized in a joint status report filed in this action on May 8, ECF No. 50 at 1—is conclusive, "not tentative, advisory, or interlocutory." *Creed v. Nat'l Transp. Safety Bd.*, 758 F. Supp. 2d 1, 7 (D.D.C. 2010). And, as the Court has recognized, the Department's decision to release President Biden's sensitive information threatens his "legally protected interest in his privacy." ECF No. 63 at 7; *see also id.* at 6 (concluding that, for purposes

12

of the motion to intervene, "production of the Zwonitzer materials will cause concrete harm to [President Biden's] privacy").

Indeed, the Department expressly represented to President Biden's counsel that its decision is final agency action.  Jeffress Decl. ¶ 29; *see Northrop Grumman Sys. Corp. v. NASA*, 346 F. Supp. 3d 109, 115, 118-21 (D.D.C. 2018) (reviewing agency decision to disclose confidential materials where agency "informed [third party] that its decision constituted final agency action with respect to the matter" (citation modified)); *Creed*, 758 F. Supp. 2d at 7 (explaining that agency's communication to third party of its intent to disclose materials publicly was a "conclusive determination[]" and thus "final order[]").

## B.    President Biden's Private Conversations Are Exempt From Disclosure and Properly Withheld Pursuant to FOIA Exemptions 6 and 7(C)

The transcripts and audio recordings that the Heritage Plaintiffs seek are exempt from disclosure under FOIA Exemptions 6 and 7(C).  Indeed, before the Department abandoned its position in this action, it argued forcefully and correctly—relying on sworn statements from a top career official—that these exemptions apply.  *See* ECF Nos. 33, 37.[2]

Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  Because the latter exemption is "broader" than the former,

---

[2] Beyond the arguments set forth in this memorandum regarding the applicability of Exemptions 6 and 7(C), President Biden adopts and incorporates by reference the Department's prior arguments and briefing in this matter.  *See, e.g.*, Def.'s Mem.  In addition, President Biden is prepared to participate in renewed summary judgment briefing on an expedited basis.

13

App-317

where law-enforcement records are at issue, there is "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011); *see also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 165-66 (2004) (noting that "[t]he adverb 'clearly,' found in Exemption 6, is not used in Exemption 7(C)" and that "whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion" (citation omitted)).

The transcripts and audio recordings at issue satisfy the threshold requirements for both exemptions. They constitute "similar files" to "personnel and medical files," 5 U.S.C. § 552(b)(6), because they include "information that applies to a particular individual," *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (citing *U.S. Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 602 (1982)). And they were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7)(C), because they "relate to anything that can fairly be characterized as an enforcement proceeding"— namely, Special Counsel Hur's investigation of President Biden, *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018) (citation omitted). Accordingly, the materials are exempt from disclosure if their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* (quoting 5 U.S.C. § 552(b)(7)(C)).

To determine whether an invasion of personal privacy could reasonably be expected to be "unwarranted," "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989). The privacy protections enshrined in Exemption 7(C) are robust. As the D.C. Circuit has explained, "rarely does a public interest outweigh an individual's privacy

14

interest when law enforcement information pertaining to an individual is sought." *Martin v. Dep't of Just.*, 488 F.3d 446, 457 (D.C. Cir. 2007) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990)). "[W]hen [a FOIA] requester seeks a private citizen's criminal history information within the government's control," the "privacy interest protected by Exemption 7(C) is . . . at its apex while the FOIA-based public interest in disclosure is at its nadir." *Id.* (quoting *Reps. Comm.*, 489 U.S. at 780).

Applying these standards here, President Biden's privacy interests are tremendous, as the record in this action reflects. For example, Bradley Weinsheimer, who served as the Department's highest-ranking career official, provided a declaration setting forth the basis for the Department's withholdings in this action. *See* Weinsheimer Decl., ECF No. 33-2. As Weinsheimer explained, "[t]he audio recordings at issue here were not originally created by the government; rather, they were created by individuals acting in a private capacity, and they reflect private conversations." *Id.* ¶ 22. Indeed, "conversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary." *Id.* Further, "the conversations at issue are unusually sensitive," as "[t]hey were created for the purpose of helping create a memoir that focused on a highly emotional period in President Biden's life." *Id.* "The portions of the audio recordings remaining at issue took place in the context of broader conversations between President Biden and his writing assistant that involved highly personal topics, including the illness and death of President Biden's son." *Id.* ¶ 23. "How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights." *Id.* Moreover, the materials at issue also "implicate substantial privacy interests of . . . Mr. Zwonitzer [and of] other individuals mentioned or included in the unredacted transcripts." *Id.* ¶ 22. Weinsheimer's testimony regarding the

subject matter of the conversations at issue and the privacy interests those conversations implicate remains as true today as it was when he filed his declaration in this action.

Although President Biden was a sitting and then a former Vice President at the time of the conversations at issue, his government service does not transform his private conversations into unrestricted public records, particularly where the Department obtained the material reflecting those conversations through his cooperation with a criminal investigation.  This Court has recognized that "[g]overnment officials do not surrender all rights to personal privacy when they accept a public appointment." *Groenendal v. Exec. Off. for U.S. Att'ys*, No. 20 Civ. 1030, 2024 WL 1299333, at *9 (D.D.C. Mar. 27, 2024) (quoting *Bast v. U.S. Dep't of Just.*, 665 F.2d 1251, 1255 (D.C. Cir. 1981)), *aff'd*, No. 24-5086, 2024 WL 4455868 (D.C. Cir. Oct. 8, 2024).  This is particularly true where, as here, the recordings and transcripts are of conversations in which President Biden participated in his personal capacity, not in his capacity as Vice President or President.  Moreover, while Special Counsel Hur's final report has become public, President Biden retains a "distinct privacy interest in the *contents* of the investigative files." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1092 (D.C. Cir. 2014).

On the other side of the balance, any light that might be shed on the Special Counsel's investigation by the public disclosure of these materials is *de minimis*.  "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Id.* at 1093 (citation omitted).  "That is, the relevant public interest is *not* to find out what [President Biden] himself was 'up to' but rather how the [Special Counsel's Office] carried out [its] statutory duties to investigate and prosecute [alleged] criminal conduct." *Id.* (citation omitted).

16

App-320

The Department already has released the portions of the transcripts of President Biden and Zwonitzer's conversations that Special Counsel Hur cited in his report, which formed part of the basis for the Special Counsel's conclusion that criminal charges against President Biden were unwarranted. *See* Weinsheimer Decl. Ex. B. The remaining materials that the Department proposes to disclose constitute portions of President Biden's conversations with Zwonitzer that Special Counsel Hur may have reviewed but chose *not* to cite in his 345-page report, as well as audio recordings of portions of the conversations that have already been made public in written form. Any nexus between these materials and the public interest in understanding how Special Counsel Hur conducted his investigation of President Biden is tenuous at best, and it is insufficient to overcome President Biden's significant privacy interests in the personal information that appears in these law-enforcement files. Accordingly, the Department correctly concluded that "[t]he release of the unredacted transcripts or the audio recordings would harm substantial privacy interests that are not outweighed by any cognizable public interest." Def.'s Mem. at 6.

The Court need not address whether the Department would have had discretion to release the materials even if it had adhered to its position that they were exempt from disclosure under FOIA, since the Department has not taken that position and cannot adopt it now. *See infra* Argument Section I.C. In any event, such discretion would be significantly limited—at a minimum—by President Biden's unwaived privacy interests in the materials. The D.C. Circuit "has made clear that" individuals involved in law enforcement proceedings "have cognizable privacy interests that may be protected by Exemption 7(C)." *Canning v. U.S. Dep't of Just.*, 919 F. Supp. 451, 455 (D.D.C. 1994) (citing *SafeCard Servs. v. SEC,* 926 F.2d 1197, 1205 (D.C. Cir. 1991)). Significantly, "[t]he privacy interest at stake belongs to the individual, not the government agency." *Whitmore v. U.S. Dep't of Just.*, 132 F. Supp. 3d 69, 78 (D.D.C. 2015). Accordingly,

17

"Exemption 7(C) . . . requires courts 'to protect, in the proper degree, the personal privacy of citizens against the uncontrolled release of information compiled through the power of the State.'" *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, 394 F. Supp. 3d 67, 76 (D.D.C. 2019) (quoting *Favish*, 541 U.S. at 172); *cf. AFL-CIO v. FEC*, 177 F. Supp. 2d 48, 63 (D.D.C. 2001) ("[T]he FEC's refusal to apply Exemption 7(C) to bar release of the names and other identifying information of third-party individuals referred to in its investigative files is arbitrary, capricious and contrary to law."), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003).

Here, President Biden has not waived his privacy interests in the audio recordings or transcripts of his conversations with Zwonitzer. *Cf. Harrison v. Fed. Bureau of Prisons*, 611 F. Supp. 2d 54, 66 (D.D.C. 2009) ("[P]ersonal privacy exemptions may be overcome by a waiver signed by the third person whose privacy interest would be affected by the disclosure." (citing *Milton v. U.S. Dep't of Just.*, 596 F. Supp. 2d 63, 65 (D.D.C. 2009))); *Wheeler v. U.S. Dep't of Just.*, 403 F. Supp. 2d 1, 14 (D.D.C. 2005) ("Without those privacy waivers, information concerning third parties who are not requesters is properly withheld under Exemption 7(C) as an unwarranted invasion of that person's privacy."); *Hand v. U.S. Dep't of Just.*, No. 20 Civ. 3690, 2023 WL 2707878, at *5 (D.D.C. Mar. 29, 2023) (similar), *aff'd*, No. 23-5080, 2023 WL 9008705 (D.C. Cir. Dec. 28, 2023). As a result, the Department does not have unfettered discretion to release the materials at issue.[3]

---

[3] Any discretion to release these materials notwithstanding the clear application of Exemptions 6 and 7(C) is further limited by the Agreement governing the production of the materials to the Special Counsel's Office. *See* Agreement ¶ 1 (providing that the materials would "be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office"); Suppl. Jeffress Decl. ¶ 5; Jeffress Decl. ¶ 9; *see also* ECF No. 51-5.

18

## C.    The Department's Contrary Determination Is Arbitrary, Capricious, and an Abuse of Discretion

President Biden is likely to succeed on Counts I and II of his Cross-Claims because the Department's recent decision to release his private conversations to the Heritage Plaintiffs—a striking about-face from its prior position on withholding—is arbitrary and capricious and an abuse of discretion. *See* Cross-Claims ¶¶ 77-84. "A person whose information is about to be disclosed pursuant to a FOIA request may file a 'reverse-FOIA action' and seek to enjoin the Government from disclosing it." *Canadian Com. Corp. v. Dep't of the Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008). "Reverse FOIA cases seek review of informal agency adjudications, and thus are reviewable under Section 706 of the Administrative Procedure Act." *Pub. Emps. for Env't Resp. v. EPA*, No. 24 Civ. 445, 2026 WL 571217, at *2 (D.D.C. Mar. 2, 2026) (citation omitted); *see Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989). "Accordingly, the [reviewing] [c]ourt must decide whether [the agency's] FOIA determination was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"[4] *ERG Transit Sys. (USA), Inc. v. Wash. Metro. Area Transit Auth.*, 593 F. Supp. 2d 249, 252 (D.D.C. 2009) (quoting 5 U.S.C. § 706(2)(A); and citing *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154-55 (D.C. Cir. 1987)).

That standard is met when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

---

[4] "[C]ourts rarely draw any meaningful distinctions between acts that are arbitrary, capricious, or an abuse of discretion." *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review—Review of District Court Decisions and Agency Actions* 167 (2007)). Accordingly, "'[a]rbitrary, capricious, [or] an abuse of discretion' review under § 706(2)(A) is now routinely applied by the courts as one standard under the heading of 'arbitrary and capricious' review." *Id.* (quoting Edwards & Elliott, *supra*, at 167).

19

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Put simply, the "standard requires that agency [actions] be reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). When an agency fails to meet this standard, "[t]he reviewing court should not attempt itself to make up for such deficiencies" and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947) ("*Chenery II*")). It is therefore black-letter law that, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962) and citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("*Chenery I*")). And when an agency reverses its prior position, "the familiar 'requirement that an agency provide reasoned explanation for its action' obliges the agency to 'show that there are good reasons for the new [decision]' and to provide 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior [decision].'" *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26 Civ. 317, 2026 WL 569034, at *1 (D.D.C. Mar. 1, 2026) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

Here, the Department has not provided any formal explanation of the basis for its sudden abandonment of longstanding FOIA principles. When the Department notified President Biden, through counsel, of its decision to release the materials at issue, it offered no justification for its about-face. Associate Deputy Attorney General Paul Perkins stated only that "[t]he Department of Justice [wa]s planning to produce, in response to a FOIA request that is now in litigation (Heritage v. DOJ; 24-cv-645 (D.D.C.)), certain materials that appear to be covered by an

20

App-324

agreement between the former President's attorneys and Special Counsel Hur" and that "[t]he materials at issue are transcripts and audio recordings between President Biden and Mark Zwonitzer referenced in the Hur Report." Suppl. Jeffress Decl. ¶ 4. Perkins permitted President Biden's counsel to review the materials that the Department planned to release, but he offered no substantive justification for the Department's disclosure decision. Moreover, Perkins did not offer the requisite "good reasons" for reversing the Department's prior, well-reasoned position on withholding, *Fox*, 556 U.S. at 515; *see generally* Def.'s Mem., or for "disregarding facts and circumstances that underlay or were engendered by the prior [decision]," *Fox*, 556 U.S. at 516. The Department thereby failed to satisfy the "fundamental requirement of administrative law . . . that an agency set forth its reasons for decision," and this "failure . . . constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted).

In subsequent communications, Department employees have likewise failed to provide any reasoned justification for the Department's new position. To the contrary, their communications have been riddled with legal and factual errors—further evidence that the Department's position is arbitrary, capricious, and an abuse of discretion.

For example, Acting Chief Privacy and Civil Liberties Officer Peter Winn explained that the Department had analyzed the materials at issue under the standard set forth by the Supreme Court in *Favish*, 541 U.S. 157. *See* Suppl. Jeffress Decl. ¶ 9 & Ex. 2. Taking the Department's explanation on its own terms, as the Court must do, *see Chenery II*, 332 U.S. at 196, Winn's suggestion that *Favish* demands disclosure here contravenes *Favish* on its face. In *Favish*, the Supreme Court explained that "courts must insist on a meaningful evidentiary showing" that "responsible officials acted negligently or otherwise improperly in the performance of their duties"

21

App-325

to overcome an individual's privacy interests in the contents of his law-enforcement investigative files. 541 U.S. at 173-75. But the Department has not identified any evidence that Special Counsel Hur acted negligently or otherwise improperly in investigating President Biden. Instead, Winn claimed that there is a "potential conflict of interest inherent" in a Special Counsel investigation of a President that either satisfies or obviates the *Favish* standard. *See* Suppl. Jeffress Decl. ¶ 9 & Ex. 2.

Such an "explanation" is flatly wrong. *Favish* itself involved an Independent Counsel investigation. *See* 541 U.S. at 161, 164. Thus, the mere fact of a Special Counsel investigation cannot possibly obviate *Favish*'s evidentiary requirements. When confronted with this fact, Winn adopted the puzzling position that the lapsed independent counsel statute "eliminat[ed] the potential conflict of interest, but thereby eliminat[ed] the need for heightened public scrutiny." *See* Suppl. Jeffress Decl. ¶ 9 & Ex. 2 (citing 28 U.S.C. §§ 591-599). Yet nothing in *Favish* turned on the structure of the independent counsel statute. Moreover, courts in this district have continued to apply *Favish*'s requirement that FOIA requestors "produce evidence that would warrant a belief by a reasonable person that [an] alleged Government impropriety might have occurred" to "obtain private information under FOIA" in the precise context of a Special Counsel's investigation of a sitting President. *Jud. Watch, Inc. v. U.S. Dep't of Just.*, No. 23 Civ. 1485, 2024 WL 4039924, at *6 (D.D.C. Sept. 4, 2024) (alteration in original) (citation omitted), *appeal dismissed as moot*, No. 24-5255, 2026 WL 303055 (D.C. Cir. Feb. 4, 2026). Such analysis cannot be squared with Winn's assertion that a Special Counsel investigation, as distinct from an Independent Counsel investigation, presents a "potential" "inherent" "conflict of interest" that obviates the evidentiary showing required to overcome an individual's privacy interests. Suppl. Jeffress Decl. ¶ 9 & Ex. 2.

22

App-326

Winn also has contended that "Attorney General Garland's . . . decision to make the Hur Report public" reflected a "determin[ation] that the Hur Report addressed 'evidence that would warrant the belief by a reasonable person that government impropriety might have occurred.'" Suppl. Jeffress Decl. ¶ 9 & Ex. 2 (quoting *Favish*, 541 U.S. at 174).  But Winn has cited no evidence or authority for the remarkable assertion that public disclosure of an investigative report is evidence of government malfeasance, and Attorney General Garland's own public statements confirm that there is a far simpler explanation: the Department appointed the Special Counsel, and ultimately published the final report, to promote independence and accountability in a matter involving the sitting President.  *See, e.g.*, Press Release, Office of the Attorney General, Appointment      of      a      Special      Counsel      (Jan.      12,      2023), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-1      ("This      appointment underscores for the public the Department's commitment to both independence and accountability in particularly sensitive matters, and to making decisions indisputably guided only by the facts and the law.").

Winn also relied on *Brennan Center for Justice v. U.S. Department of Justice*, 697 F.3d 184 (2d Cir. 2012), to suggest that the entirety of the transcripts and audio recordings at issue have "become[] disclosable" because Special Counsel Hur considered them during his investigation and cited limited portions of them.  Suppl. Jeffress Decl. ¶ 9 & Ex. 2.  These assertions are equally flawed.  For starters, that doctrine involves privilege waiver by the government.  Here, however, President Biden and third parties have distinct privacy interests in the materials at issue that the government cannot waive unilaterally.  *See supra* at 17-18.  In any event, the Department's analysis does not grapple with the fact that the transcripts of President Biden and Zwonitzer's conversations

23

that were cited in the Hur Report have already been released to the Heritage Plaintiffs. *See* Weinsheimer Decl. Ex. B.

In sum, Winn's communications regarding the Department's decision to abandon its previously held position reflect that the decision is infected by serious legal and factual errors and is therefore arbitrary, capricious, and an abuse of discretion. *See, e.g.*, *Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) ("Agency action that 'stands on a faulty legal premise and [lacks] adequate rationale' is arbitrary and capricious." (alteration in original) (quoting *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985))).

More importantly, and as previously explained, the Department does not write on a blank slate in this action. The Department's new position reflects a dramatic break with its prior, reasoned position on withholding, but the underlying facts and circumstances either have not changed or have evolved to more strongly support withholding. *See Fox*, 556 U.S. at 515. Like Perkins's initial notification, Winn's communications—which are divorced from the personal, private, and sensitive contents of the particular materials at issue—failed to grapple with the "facts and circumstances that underlay" the Department's previous determination that the materials at issue are exempt from disclosure. *Id.* at 516.

Furthermore, since the Department determined that the materials at issue are exempt, the balance has shifted even more sharply in favor of withholding. When this action was filed, President Biden was the sitting President and was running for a second term. Today, he is a private citizen. And in the meantime, the Department has released additional materials related to the Special Counsel's investigation, including more than five hours of audio recordings of President Biden's interview with Special Counsel Hur, further reducing any "incremental public interest in learning how the [Special] Counsel carried out his investigation" that may be served by disclosure

24

App-328

of the transcripts and audio recordings of President Biden's 2016 and 2017 conversations with Zwonitzer. *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017); *see* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip.  Thus, not only has the Department failed to explain the departure from its prior decision on its own terms, but it has overlooked intervening events that have strengthened and reinforced its earlier position.  *See Fox*, 556 U.S. at 515-16.

"It is a 'simple but fundamental rule of administrative law' that 'a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency.'" *AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 43 (D.D.C. 2015) (first alteration in original) (quoting *Chenery II*, 332 U.S. at 196).  Here, "[t]he Court cannot . . . affirm [the Department's] disclosure determination based on a rationale that was not in fact considered or relied upon by the agency." *Id.* at 45.  For instance, because the Department's new decision was predicated on the view that it was bound under FOIA to disclose the materials at issue to the Heritage Plaintiffs and that no exemption applied, *see* Suppl. Jeffress Decl. ¶ 9 & Ex. 2 (citing, *inter alia*, 5 U.S.C. § 552(b)), "the possibility of discretion plays no role in judicial review," *Jurewicz v. U.S. Dep't of Agric.*, 891 F. Supp. 2d 147, 153 (D.D.C. 2012), *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014).  Nor can the Court "be expected to chisel that which must be precise from what the agency has left vague and indecisive." *AAR Airlift Grp.*, 161 F. Supp. 3d at 45 (quoting *Chenery II*, 332 U.S. at 197).  Because the Department did not satisfy the APA's requirement to "engage in 'reasoned decisionmaking,'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), its decision to disclose the transcripts and audio

recordings of President Biden's private conversations to the Heritage Plaintiffs must be "set aside," 5 U.S.C. § 706(2).

### D.   Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act

President Biden is also likely to succeed on his APA claim that the Department's proposed disclosure to the Heritage Plaintiffs is barred by the Privacy Act and thus is contrary to law. *See* Cross-Claims ¶¶ 89-97 (Count IV). The non-disclosure provision of the Privacy Act bars agencies from disclosing certain government records about individuals, unless the individual has consented or one of the enumerated exceptions applies. *See* 5 U.S.C. § 552a(b). This provision, working in tandem with other parts of the statute, "promote[s] observance of valued principles of fairness and privacy." *Londrigan v. FBI*, 670 F.2d 1164, 1169 n.28 (D.C. Cir. 1981) (quoting S. Rep. No. 1183, 93rd Cong., 2d Sess., 2 (1974)).

As an initial matter, President Biden may challenge the Department's planned Privacy Act violation in the form of an APA claim seeking declaratory and injunctive relief. To be sure, the Privacy Act does not directly provide for injunctive relief in the context of an unlawful-disclosure claim; rather, it authorizes claims for monetary damages once the disclosure has occurred. *See* 5 U.S.C. § 552a(g)(1)(D), (g)(4). As multiple courts have now recognized, however, plaintiffs may sue under the APA to enjoin proposed disclosures that are barred by the Privacy Act, on the theory that the agency action is contrary to law. *See AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2026 WL 879518, at *19-20 (D.D.C. Mar. 31, 2026) (holding that "the APA could step into the breach and supply plaintiffs with a cause of action for injunctive and declaratory relief" and that the "Privacy Act does not preclude plaintiffs' APA claim that the [agency action is] contrary to law"); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 113 (D.D.C. 2026) ("Plaintiffs may pursue injunctive relief under the APA for alleged violations of the Privacy

Act."). These recent decisions acknowledge—and are consistent with—the fact that the Privacy Act does not provide its own mechanism for such relief.

The remaining question, then, is whether the proposed disclosure to the Heritage Plaintiffs is prohibited by the Privacy Act and thus would be contrary to law under the APA. For the reasons explained below, President Biden is likely to prevail on the merits of this claim.

"An agency violates the [Privacy] Act when it 'discloses' information in the form of a 'record' from a 'system of records' and the disclosure is not pursuant to a valid exception under the Act." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (quoting 5 U.S.C. § 552a(b)). The enumerated exceptions include disclosures required under FOIA, *id.* § 552a(b)(2), and disclosures for a "routine use" as defined in the statute, *id.* § 552a(b)(3).

Because the records here are exempt under FOIA, *see supra* Argument Section I.B, the (b)(2) exception for required disclosures does not apply. That exception covers disclosures that are "required," not just permitted, "under section 552 of this title." *Id.* § 552a(b)(2). When a record is exempt, FOIA does not, of course, require its disclosure. *See, e.g.*, *Niskanen Ctr. v. FERC*, 20 F.4th 787, 793 (D.C. Cir. 2021); *see also Doe v. Hill*, 141 F.4th 291, 297 (D.C. Cir. 2025) (explaining that § 552a(b)(2) "prohibit[s] agencies from disclosing information about private citizens when a FOIA exemption applies").

Nor would any of the other exceptions to the disclosure bar set forth in § 552a(b)(1)-(13) authorize the Department's proposed disclosure to the Heritage Plaintiffs. For example, while the Privacy Act contains a "routine use" exception, 5 U.S.C. § 552a(b)(3), the disclosure "must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency," *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7), (e)(4)(D)); *see Brunotte*

27

App-331

*v. Johnson*, 892 F. Supp. 2d 199, 207 (D.D.C. 2012) ("The agency must demonstrate both compatibility and publication in order to invoke the routine use exception."). Here, regardless of the specific routine use notice at issue,[5] the Department cannot satisfy the compatibility requirement because the purposes of the disclosure are at odds with, and indeed would gravely undermine, the purpose for which the records were collected.

Even at this preliminary stage, ample evidence supports the conclusion that the purpose for which the records were collected is incompatible with the purposes of the disclosure. Regarding the purpose of collection, the parties and the Court do not have to guess. This purpose is set forth in the Agreement governing the production of the materials to the Special Counsel's Office, which provides that "[t]he information produced will be accessed, reviewed, and used . . . only for purposes of advancing the investigation." ECF No. 51-4. By contrast, the evidence shows that the Department's reversal is motivated by a desire to further *non-investigative* goals of the Department and the Trump Administration. These goals overlap substantially with the stated objectives of the Heritage Plaintiffs, which may explain why the Department and Heritage Plaintiffs—though ostensibly opponents—are poised to reach a mutually agreeable resolution regarding President Biden's private information.

As noted, both the Trump White House and the Heritage Plaintiffs have expressly tied their attacks on President Biden to materials from Special Counsel Hur's investigation. *See, e.g.*, Suppl. Jeffress Decl. ¶ 10 & Ex. 3 (June 2025 White House fact sheet describing a White House

---

[5] Agencies that wish to rely on a "routine use" for a specific "system of records" must provide notice to the public in the form of a System of Records Notice published in the Federal Register. 5 U.S.C. § 552a(e)(4)(D). Because routine uses are specific to particular "system[s] of records," President Biden may have additional arguments that a "routine use" does not apply, depending on the Department's position on which repositories are at issue.

28

memorandum referencing the Special Counsel's report, "Biden's mental state," and an investigation into the use of autopen); *id.* ¶ 14 & Ex. 7 (December 2025 X post by Plaintiff Mike Howell, stating that pursuing "intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur" was part of an effort to "accelerate" President Biden's "exit" in mid-2024); *id.* ¶ 15 & Ex. 8 (May 2026 post by counsel of record in this case, describing it as "our case against DOJ that started in Biden autopen administration"). In any case, President Biden need not prove the specific motive at issue. To establish that the "routine use" exception is unavailable, it is enough to show that the purpose of disclosure is different from the purpose for which the records were collected. 5 U.S.C. § 552a(a)(7), (e)(4)(D); *Ames*, 861 F.3d at 240. Here, President Biden can easily demonstrate that the Department is pursuing a purpose *other* than "advancing the investigation" of Special Counsel Hur, which concluded in 2024. ECF No. 51-4.

President Biden also is likely to succeed in establishing the other elements of an unlawful disclosure under the Privacy Act. *See* 5 U.S.C. § 552a(b). As noted, the Privacy Act provides that, unless a statutory exception applies, "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." *Id.*; *see Chichakli*, 882 F.3d at 233 (citing 5 U.S.C. § 552a(b)). Thus, in deciding President Biden's claim on the merits, the Court will need to consider whether: (1) the materials are "record[s]" that "pertain[] to" and are "about" President Biden; (2) the materials are "contained in a system of records"; and (3) the Department's proposed action involves a "disclos[ure]" to "any person" without President Biden's "written consent." 5 U.S.C. § 552a(a)(4), (b). President Biden is likely to prevail on each of these points.

First, the materials meet the definition of "record[s]" under the Privacy Act, and those records pertain to and are about President Biden. The Privacy Act defines the term "record" to mean "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." 5 U.S.C. § 552a(a)(4). "[T]o be a 'record,' an item must contain 'information that actually describes the person in some way.'" *McCready v. Nicholson*, 465 F.3d 1, 9 (D.C. Cir. 2006) (quoting *Tobey v. NLRB*, 40 F.3d 469, 472 (D.C. Cir. 1994)). The audio recordings and transcripts of President Biden's private conversations certainly pertain to and are about President Biden, as he discusses in those conversations intimate details about himself and his life. The transcripts contain his name, and the Department previously recognized that the audio recordings—which capture President Biden's distinct and widely recognized voice—contain an identifying particular of President Biden. *See* Weinsheimer Decl. ¶ 23 ("How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights.").

Second, President Biden likely will be able to establish that the records are contained in a "system of records." Under the Privacy Act, a "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). In general, a "system of records exists only if the information contained within the body of material is both *retrievable* by personal identifier and actually *retrieved* by personal identifier." *Paige v. DEA*, 665 F.3d 1355, 1359 (D.C. Cir. 2012) (quoting *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010)). Here, President Biden has alleged that the recordings and transcripts are "record[s]" contained in one or more "system[s] of records." *See*

30

App-334

Cross-Claims ¶ 70. His cross-claims identify relevant systems of records; allege on information and belief that Department officials retrieved the materials from a system or systems of records using one or more personal identifiers, such as President Biden's name; and allege on information and belief that Department officials generally used personal identifiers to retrieve information about individuals from the relevant systems of records during the period in question. *See id.* ¶¶ 71-76. Because this is a FOIA action, and because the Weinsheimer Declaration and other filings in this case describe the Department's review and withholding of the materials in response to a FOIA request, President Biden is especially likely to prevail in establishing that the materials were contained in, retrievable from, and retrieved from the system of records for "FOIA processing records" (DOJ-004: Freedom of Information Act, Privacy Act, and Mandatory Declassification Review). *Id.* ¶ 70.[6]

In any case, it is highly probable that the materials at issue were retrieved from at least one Department system of records. *See Maydak*, 630 F.3d at 172-73 ("[W]here an agency compiles information about individuals for investigatory purposes, 'Privacy Act concerns are at their zenith, and if there is evidence of even a few retrievals of information keyed to [personal identifiers], it may well be the case that the agency is maintaining a system of records.'" (quoting *Henke v. U.S. Dep't of Com.*, 83 F.3d 1453, 1461 (D.C. Cir. 1996))). Here, while certain details are within the Department's exclusive control, there is sufficient evidence for the Court to find in President Biden's favor on the "likelihood of success" factor.[7] Notably, "[t]he source of any particular bit

---

[6] President Biden alleged that the Department may also have maintained the materials in the following systems of records, among others: DOJ-003: Correspondence Management Systems for the Department of Justice; DOJ-006: Personnel Investigation and Security Clearance Records for the Department of Justice; FBI-002: FBI Central Records System; and CRM-001: Central Criminal Division Index File and Associated Records. Cross-Claims ¶ 71.

[7] Although discovery is typically unavailable in APA cases, *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011), courts and parties may look beyond the agency-

31

App-335

of information is a question of fact" that will/should be resolved at a future stage of the litigation. *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010).

Third, it is undisputed that the Department's proposed action involves a "disclos[ure]" to "any person" without President Biden's "written consent." The Department's own statements in this action establish that it plans to disclose the materials to the Heritage Plaintiffs. *See* ECF No. 50 at 1. Moreover, the Department is well aware that President Biden has not consented to the disclosure, and it has not obtained his written consent. *See* Jeffress Decl. ¶¶ 11-30 (describing negotiations between President Biden's counsel and the Department).

Because the proposed disclosure to the Heritage Plaintiffs would violate the Privacy Act, *see* 5 U.S.C. § 552a(b), the Department's actions are contrary to law under the APA.

## II.    President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction

The harms that President Biden asserts strongly support the issuance of a preliminary injunction. To establish irreparable harm, a movant must assert an actual, great, and imminent injury that is beyond remediation. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006). President Biden has done so here.

First, the conversations that the Department plans to disclose to the Heritage Plaintiffs are deeply sensitive and personal in nature, and their disclosure would cause the kind of real and apparent injury that courts have characterized as "severe," "substantial," and "impossible" to redress. Intervention Order at 8 (first quoting *Jud. Watch*, 876 F.3d at 349-50; and then quoting *Waterkeeper All., Inc.*, 330 F.R.D. at 7). The disclosure would encompass hours of recordings and

---

compiled record where there is evidence of bad faith or when the record is so sparse on a particular issue as to frustrate the court's review, *see Truong v. U.S. Citizenship & Immigr. Servs.*, No. 21 Civ. 316, 2022 WL 17356865, at *5-6 (D.D.C. Dec. 1, 2022).

over 100 transcript pages covering President Biden's intimate reflections on his decision-making both as a public servant and as a husband, father, and grandfather, including his descriptions of conversations with multiple third parties on these subjects. These conversations, which took place in President Biden's home, were never intended to be disclosed in verbatim form. In fact, the Department previously recognized that the materials are "analogous to entries in a personal diary." Intervention Order at 6 (quoting Def.'s Mem. at 1). It would of course "be highly offensive to a reasonable person" to have his personal diary disclosed to someone else. *Id.* (quoting *All. for Retired Ams.*, 770 F. Supp. 3d at 102). And the intrusion is even greater where, as here, the recipient has engaged in repeated public attacks focused on the diary-writer's mental competency. *See supra* Background Section III. Thus, both the "type of information"—a private citizen's sensitive and personal reflections made in the privacy of his own home—and the "breadth of disclosure"—unrestricted disclosure to a national advocacy organization that has expressed an intention to further disseminate the materials, ECF No. 5 at 5—weigh strongly in favor of finding an actual and great harm to President Biden's privacy interests. *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 60-61 (D.D.C. 2025) (quoting *AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025)).

Second, there is no dispute that harm is imminent. As the Court wrote in the Intervention Order, President "Biden's injury is imminent given that the Department will produce the materials on June 15, 2026." Intervention Order at 6. Although this deadline does not appear to be tied to any time-sensitive need for the information, the Department so far has not extended it, and the Court has treated it as the operative date. *See* Min. Order (May 28, 2026) (ordering the parties to submit a proposed briefing schedule "[i]n light of the Department's June 15, 2026 disclosure

33

App-337

date").  As a result, President Biden will face an "imminent" intrusion on his privacy absent a preliminary injunction.  Intervention Order at 6.

-Third, the harm caused by the disclosure of President Biden's private conversations will be irreparable.  No judicial remedy could un-ring the bell or fairly compensate President Biden for the perpetual intrusion on his and his family's privacy.  For this very reason, courts in this District routinely find that "disclosure necessitates a preliminary injunction when there is an imminent risk that information privately disclosed . . . will either be impermissibly used or publicly disclosed." *AFL-CIO*, 2025 WL 1783899, at \*12; *see, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (concluding that "disclosure of proprietary information" to "competitors in the market" would constitute irreparable harm); *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009) (concluding that public disclosure of confidential information, including "personal information" about a party's employees, would cause irreparable harm).  As in those cases, "public dissemination of [President Biden's] sensitive, private information is an irreparable harm." *All. for Retired Ams.*, 770 F. Supp. 3d at 108.

## III.  The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief

Finally, the balance of equities and the public interest also weigh in favor of a preliminary injunction. *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 68 (explaining that the balance of equities and public interest factors merge where the government is the opposing party (citing *Nken*, 556 U.S. at 435)).  President Biden risks severe and irreparable harm to his privacy interests if the materials are disclosed.  By contrast, the Department faces no injury and the public interest is served if the Department is enjoined from disclosing the materials consistent with its obligations under the law.  Nor is there any private or public interest the Heritage Plaintiffs could assert that would outweigh the severity of the injury to President Biden's privacy if the materials were

34

released.  The balance of equities and public interest weigh decidedly in favor of a preliminary injunction.

With respect to the Department, it is well established in this Circuit that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12.  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation modified); *accord Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 68.  In the context of the APA in particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).  As explained above, disclosure of President Biden's sensitive, private conversations to the Heritage Plaintiffs would violate federal law, *see supra* Argument Sections I.C, I.D, and the public interest does not support lawless governmental disclosures of private citizens' private conversations.

To the extent the Heritage Plaintiffs contend that they or the public will be harmed by a preliminary injunction prohibiting disclosure of the materials pending a final decision on the merits, they have identified no time-sensitive need for President Biden's private conversations from 2016 and 2017.  As an initial matter, releasing the materials would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest," as the Department explained back in 2024.  Def.'s Mem. at 1.  Since then, the balance has tipped even more sharply in favor of withholding.  Today, President Biden is a private citizen rather than the sitting President or a candidate for public office.  And in the meantime, the Department has released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur, further reducing any "incremental public interest in learning how the [Special]

35

App-339

Counsel carried out his investigation." *Jud. Watch, Inc.*, 876 F.3d at 350; *see* Status Report at 1,

*Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66.

Even if the Heritage Plaintiffs had a valid interest in the materials, that interest does not

outweigh the severity of the irreparable harm disclosure will cause President Biden.  In the context

of a FOIA case, "a movant's general interest in being able to engage in an ongoing public debate

using information that it has requested under FOIA is not sufficient to establish that irreparable

harm will occur unless the movant receives immediate access to that information."  *Elec. Priv.*

*Info. Ctr. v. Dep't of Just.*, 15 F. Supp. 3d 32, 46-47 (D.D.C. 2014); *see also, e.g.*, *Heritage Found.*

*v. EPA*, No. 23 Civ. 748, 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (collecting cases).  The

Heritage Plaintiffs have not attempted to argue that the records they seek will lose significant

evidentiary value after a particular date, nor could they: President Biden is not a candidate for any

public office.  This litigation has been pending with only sporadic activity since early 2024, and

maintaining the status quo by continuing to withhold President Biden's private conversations from

a decade ago will not cause immediate, severe, or irreparable harm to any interest the Heritage

Plaintiffs may assert.

In short, any hypothetical public or private interest in the release of President Biden's

private conversations is far exceeded by the irreparable harm that President Biden will face from

their release.  The balance of the equities and the public interest therefore weigh strongly in favor

of granting preliminary injunctive relief.

## IV.    The Bond Requirement Should Be Waived or Set to a Nominal Amount

Finally, the Court should waive Rule 65(c)'s bond requirement or set bond at a nominal

amount.   Under Rule 65(c), "injunction bonds are generally required," *NTEU v. Trump*,

No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), but district courts have

<div align="center">36</div>

<div align="center">App-340</div>

"'broad discretion . . . to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (first quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); and then citing *Council on Am.-Islamic Rels.*, 667 F. Supp. 2d at 80). The Department will not suffer meaningful damages or costs if it is temporarily ordered not to disclose the materials to the Heritage Plaintiffs pending a final determination on the merits. *See* Fed. R. Civ. P. 65(c). Accordingly, President Biden respectfully requests that the Court waive the bond requirement or set bond at a nominal amount. *Cf. N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (waiving bond requirement); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64-65 (D.D.C. 2025) (setting nominal bond of $1 and collecting cases imposing the same where "the risk of harm to the government is non-existent or remote" (quoting *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025))).

## CONCLUSION

For the foregoing reasons, President Biden respectfully requests that the Court grant the motion for a preliminary injunction and waive a security bond under Federal Rule of Civil Procedure 65(c).

Dated: May 29, 2026

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
H. Atticus Ballesteros (D.C. Bar No. 90043198)**
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883
ajeffress@heckerfink.com
kkonkel@heckerfink.com

37

tgoodnature@heckerfink.com
aballesteros@heckerfink.com
jhirschfield@heckerfink.com

*Counsel for Defendant-Intervenor*
*Joseph R. Biden, Jr.*

\*Admitted *pro hac vice*

\*\*Application for *pro hac vice* admission forthcoming

38

App-342

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HERITAGE FOUNDATION,

MIKE HOWELL,

       *Plaintiffs*,

    v.

U.S. DEPARTMENT OF JUSTICE,          No. 24-cv-645 (DLF)

       *Defendant*,

    and

JOSEPH R. BIDEN, JR.,

       *Defendant-Intervenor*.

## SUPPLEMENTAL DECLARATION OF AMY JEFFRESS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION BY JOSEPH R. BIDEN, JR.

I, Amy Jeffress, hereby declare:

1.    I am a partner at Hecker Fink LLP.  I represent Defendant-Intervenor Joseph R. Biden, Jr., in this action.  This declaration is based on my personal knowledge and on information that has become available to me in the course of this representation.

2.    I submit this declaration in support of President Biden's motion for preliminary injunction in connection with Counts I-IV of his cross-claims.  *See* Cross-Claims ¶¶ 77-97, ECF No. 51-3.

3.    I previously submitted a declaration in support of President Biden's motion to intervene, which I adopt and incorporate here.  *See* ECF No. 51-2.

App-343

4.    On February 25, 2026, Associate Deputy Attorney General Paul Perkins sent an email message to a representative of President Biden, which was later forwarded to me.  This message read in relevant part:

> The Department of Justice is planning to produce, in response to a FOIA request that is now in litigation (Heritage v. DOJ; 24-cv-645 (D.D.C.)), certain materials that appear to be covered by an agreement between the former President's attorneys and Special Counsel Hur. The agreement provides that the Department will give the former President advance notice and the opportunity to object prior to the production of certain materials. The materials at issue are transcripts and audio recordings between President Biden and Mark Zwonitzer referenced in the Hur Report. We expect to produce the material by March 6.

> Let me know if you would like to review the material at Main Justice.

5.    **Exhibit A** to President Biden's Answer & Cross-Claims, previously filed at ECF No. 51, is a true and correct copy of an agreement between the Office of Special Counsel Robert K. Hur and the White House Counsel's Office, dated April 26, 2023.  **ECF No. 51-4**.

6.    **Exhibit B** to President Biden's Answer & Cross-Claims is a true and correct copy of an email exchange between Richard Sauber of the White House Counsel's Office and "MHK" of the Special Counsel's Office, with others copied, dated May 12, 2023.  **ECF No. 51-5**.

7.    **Exhibit C** to President Biden's Answer & Cross-Claims is a true and correct copy of a document provided to me by a Department of Justice official on March 23, 2026, after I had requested a copy of a congressional request for records that he had referenced on March 19, 2026. **ECF No. 51-6.**  The document is dated March 23, 2026, and signed by Representative Jim Jordan.

8.    Attached as **Exhibit 1** are true and correct copies of excerpts from the February 2024 report of Special Counsel Robert K. Hur titled "Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President

2

App-344

Joseph R. Biden, Jr.," retrieved from the Department of Justice website at https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.

9. Attached as **Exhibit 2** is a true and correct copy of an email exchange I had with Peter A. Winn, Acting Chief Privacy & Civil Liberties Officer at the U.S. Department of Justice, between March 31, 2026, and April 16, 2026.

10. Attached as **Exhibit 3** is a true and correct copy of a June 4, 2025, "Fact Sheet" published by the White House, titled "Fact Sheet: President Donald J. Trump Directs Review of Certain Presidential Actions," retrieved from the White House website at https://www.whitehouse.gov/fact-sheets/2025/06/fact-sheet-president-donald-j-trump-directs-review-of-certain-presidential-actions.

11. Attached as **Exhibit 4** is a true and correct copy of a March 6, 2025, post on X by Mike Howell (@MHowellTweets), retrieved from the X website at https://x.com/MHowellTweets/status/1897797427622821982.

12. Attached as **Exhibit 5** is a true and correct copy of an August 21, 2025, post on X by Mike Howell (@MHowellTweets), retrieved from the X website at https://x.com/MHowellTweets/status/1958646895452254366.

13. Attached as **Exhibit 6** is a true and correct copy of an October 27, 2025, report published by the Oversight Project, titled "The Autopen Presidency Part IV: Comprehensive Summary of Autopen Use," retrieved from the Oversight Project website at https://itsyourgov.org/investigation/the-autopen-presidency-part-iv-comprehensive-summary-of-autopen-use.

14.    Attached as **Exhibit 7** is a true and correct copy of a December 15, 2025, post on X by Mike Howell (@MHowellTweets), retrieved from the X website at https://x.com/MHowellTweets/status/2000748090555297827.

15.    Attached as **Exhibit 8** is a true and correct copy of a May 10, 2026, post on X by Jeff Clark (@JeffClarkUS), retrieved from the X website at https://x.com/JeffClarkUS/status/2053516203209953655.

16.    Attached as **Exhibit 9** is a true and correct copy of a May 26, 2026, post on Truth Social by President Donald J. Trump (@realDonaldTrump), retrieved from the Truth Social website at https://truthsocial.com/@realDonaldTrump/posts/116644198848350274.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 29, 2026              /s/ Amy Jeffress
Washington, D.C.                      Amy Jeffress (D.C. Bar No. 449258)

                                      *Counsel for Defendant-Intervenor*
                                      *Joseph R. Biden, Jr.*

4

App-346

# EXHIBIT 1

## EXECUTIVE SUMMARY

We conclude that no criminal charges are warranted in this matter.[1] We would reach the same conclusion even if Department of Justice policy did not foreclose criminal charges against a sitting president.[2]

Our investigation uncovered evidence that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen. These materials included (1) marked classified documents about military and foreign policy in Afghanistan, and (2) notebooks containing Mr. Biden's handwritten entries about issues of national security and foreign policy implicating sensitive intelligence sources and methods. FBI agents recovered these materials from the garage, offices, and basement den in Mr. Biden's Wilmington, Delaware home.

However, for the reasons summarized below, we conclude that the evidence does not establish Mr. Biden's guilt beyond a reasonable doubt. Prosecution of Mr. Biden is also unwarranted based on our consideration of the aggravating and mitigating factors set forth in the Department of Justice's Principles of Federal Prosecution. For these reasons, we decline prosecution of Mr. Biden.

\* \* \*

The classified documents and other materials recovered in this case spanned Mr. Biden's career in national public life. During that career, Mr. Biden has long seen

---

[1] We submit this report to the Attorney General pursuant to 28 C.F.R. § 600.8(c), which states that, "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General a confidential report explaining the prosecution or declination decisions reached by the Special Counsel."

[2] *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 260 (2000).

1

own administration. The exception is former President Trump. It is not our role to assess the criminal charges pending against Mr. Trump, but several material distinctions between Mr. Trump's case and Mr. Biden's are clear. Unlike the evidence involving Mr. Biden, the allegations set forth in the indictment of Mr. Trump, if proven, would present serious aggravating facts.

Most notably, after being given multiple chances to return classified documents and avoid prosecution, Mr. Trump allegedly did the opposite. According to the indictment, he not only refused to return the documents for many months, but he also obstructed justice by enlisting others to destroy evidence and then to lie about it. In contrast, Mr. Biden turned in classified documents to the National Archives and the Department of Justice, consented to the search of multiple locations including his homes, sat for a voluntary interview, and in other ways cooperated with the investigation.

In reaching our decision, we did not consider every circumstance in which criminal charges against a former president or vice president for mishandling classified information may be warranted. But on the facts of this case, "the fundamental interests of society" do not "require" criminal charges against Mr. Biden.[4] For this additional reason, applying the Principles of Federal Prosecution set forth in the Justice Manual, we decline prosecution.

The practices of retaining classified material in unsecured locations and reading classified material to one's ghostwriter present serious risks to national

---

[4] U.S. Dep't of Just., Just. Manual §§ 9-27.001, 9-27.220 (2023).

11

> Mr. Biden:   There was a lot of stuff going on at the same time in foreign policy. You said—they said, you didn't wanna go into . . . but I have extensive notes over this period of time.
>
> Zwonitzer:   Oh, you actually have those here?
>
> Mr. Biden:   Yeah, now there's a lot of other notes too. But, I mean, this is my . . . **They didn't even know I have this**. Some of this stuff I'm not, you know, going . . . I have stuff all the way up to 5-19. May 19. And then it skips in my notes to . . . 6-16 is the next entry.[236]

In this exchange, Mr. Biden seemed to distinguish between his notecards, which his staff were in the process of implementing protocols to safeguard, and his notebooks, which, "[t]hey didn't even know I have." As explained below, although the notecards and notebooks both contained classified information, most of the notecards were handled differently than the notebooks after the vice presidency.

### G.   The investigation did not determine what, if anything, staff told Mr. Biden about the proper storage of classified information in his notecards

After staff raised concerns about the possibility that Mr. Biden's notecards may contain classified material, his staff discussed how to properly handle and store the notecards. There is some indication that Mr. Biden's staff may have advised him that his notecards contained classified information and needed to be held in a secured location. But the investigation did not determine what, if anything, Mr. Biden's staffers actually told him on this subject.

---

[236] Zwonitzer recording Carved_000246 (emphasis added); Carved_000246 Tr. at 3-5; FBI Serials 315, 335; Notebook entries 1B58-50-51, 56-60.

office that he had no memory of giving the Archives employee the binders of notecards, or that they contained classified information, but the Archives employee recalled McGrail telling him that the materials contained classified information.[287] Accordingly, the Archives stored the materials inside a SCIF.[288]

## I.    After he left the vice presidency, Mr. Biden twice visited the National Archives to review copies of his notecards in a SCIF

Soon after he left office in 2017 and while researching his book, Mr. Biden visited the National Archives twice to consult the copies of his notecards that were being held in a SCIF.[289]

During a recorded interview on April 24, 2017, Mr. Biden told his ghostwriter, Zwonitzer, that he took separate notes regarding his private lunches with President Obama.[290] Mr. Biden said that before each lunch, he and his chief of staff prepared and wrote an agenda on "one of those little cards of mine"—an apparent reference to the long narrow notecards that Biden carried in his jacket pocket.[291] After each lunch, Mr. Biden dictated notes about the lunch to his executive assistant.[292] Mr. Biden explained that he previously "had all those [notes] at the house in a safe" but that "I don't know what they made me do with them."[293]

Zwonitzer:    Can we spend some time on that lunch?

---

[287] McGrail 1/22/24 Tr. at 121-22; NARA Archivist 1 Tr. at 56, 62.

[288] NARA Archivist 1 Tr. at 56, 62.

[289] 5/11/17 and 7/11/17, National Archives Visitor Logs, NARA-H-700002505; NARA Archivist 2 6/1/23 Tr. at 14; McGrail 5/2/23 Tr. at 169-80.

[290] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80.

[291] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80.

[292] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80; Executive Assistant 9/28/23 Tr. at 47.

[293] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80.

75

Mr. Biden:    I had all those presidential notes.

Zwonitzer:    I know you gave me this much from the diaries.

Mr. Biden:    But I actually, I wonder where those . . .

Zwonitzer:    Do you have separate notebooks of the presidential [lunches]?

Mr. Biden:    Yeah. What I would do is after every lunch I would dictate to, um, I would call in [the Executive Assistant] and I would dictate to her what the lunch was about. **I had all those at the house in a safe. I don't know what they made me do with them.** But what I would do is I would make up a card, one of those little cards of mine. Before I'd have lunch, I'd meet with Steve [Ricchetti] and anything anybody thought I should be bringing up [I'd put] on our agenda. And when I came back, I'd dictate notes to [the Executive Assistant] as to what actually transpired at the lunch.[294]

Two days later, in another recorded interview, Mr. Biden said he had learned that his notecards had been "turned in" to the National Archives and that Mr. Biden would have to go through his former counsel, McGrail, to get them.[295] Mr. Biden also told Zwonitzer that he had not wanted to turn the notecards in:

Mr. Biden:    I'm told by [a personal aide], I guess he checked with you, in order for me to get my, uh, get all those presidential notes I had for lunch, the luncheon meetings, I have to go to McGrail?

Assistant:    Yes, McGrail has them. We were supposed to turn it in and that is the last person who had them.

---

[294] Zwonitzer recording 170424_0091 (emphasis added); 170424_0091 Tr. at 28-30; Evidence item 1B80.

[295] Zwonitzer recording Carved_000599; Carved_000599 Tr. at 3-4; FBI Serials 315, 335.

76

Mr. Biden:   OK. Uh. See if you can get me McGrail on the line while I have you now. OK? And stay on okay?

Assistant:   Got it sir. Hold on.

Zwonitzer:   **This is probably something that goes to the presidential papers.**

Mr. Biden:   **I don't think so. It was in between. I didn't want to turn them in.**

Zwonitzer:   **Right, so, it's the gray area.**[296]

The next day, Zwonitzer sent an e-mail to the assistant and personal aide, explaining that Mr. Biden "may try to review some of his notes from lunches with the President and asked [Zwonitzer] to give him a list of the dates of the lunches that would be important."[297] Zwonitzer included a list of the dates of several such lunches in his e-mail. Zwonitzer forwarded the list to Mr. Biden's personal e-mail account on May 11, 2017.[298]

On that day and again two months later, Mr. Biden visited the National Archives to review copies of his notecards, which were held in a SCIF.[299] McGrail accompanied him.[300] During both visits, Archives staff made clear to Mr. Biden that, by viewing the notecards in the Archives SCIF, he was accessing classified

---

[296] Zwonitzer recording Carved_000599 (emphasis added); Carved_000599 Tr. at 3-4; FBI Serials 315, 335.

[297] 4/27/17 e-mail from Zwonitzer to Executive Assistant and Personal Aide 3, Zwonitzer-00001464.

[298] *Id.*

[299] 5/11/17 and 7/11/17 National Archives Visitor Logs, NARA-H-700002505; NARA Archivist 2 6/1/23 Tr. at 14; McGrail 5/2/23 Tr. at 169-80.

[300] McGrail recalled only the first visit to the Archives, but visitor logs show he accompanied Mr. Biden on both visits. 5/11/17 and 7/11/17 National Archives Visitor Logs, NARA-H-700002505; NARA Archivist 2 6/1/23 Tr. at 14; McGrail 5/2/23 Tr. at 169-80.

77

intelligence community, including the Director of National Intelligence and the CIA Director.[440]

While reading these notes, Mr. Biden struggled to read his handwriting, and he showed part of the handwritten passage to Zwonitzer. The two then had the following exchange:

Mr. Biden:    Do you have any idea what the hell I'm saying there? Less on the number of what? Isn't that awful?

Zwonitzer:    Something. Number, something – quality. I can't.

Mr. Biden:    **Some of this may be classified, so be careful.**

Zwonitzer:    Okay.

Mr. Biden:    **I'm not sure. It isn't marked classified, but.**[441]

Mr. Biden then continued to read nearly verbatim from portions of his notes on the 2014 Situation Room meeting.[442] Some of the portions that Mr. Biden read to Zwonitzer remains classified at the Secret level.[443]

More generally, during his dozens of hours of interviews with Zwonitzer, Mr. Biden read from notebook entries related to many classified meetings, including National Security Council meetings, CIA briefings, Department of Defense briefings, and other meetings and briefings with foreign policy officials.[444]

---

[440] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 4-22; Notebook entry 1B67-0063-65; Evidence items 1B79, 1B81.

[441] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 13-14; Notebook entry 1B67-0065.

[442] Zwonitzer recording 170424_0091 (emphasis added); 170424_0091 Tr. at 14-22; Notebook entry 1B67-0063-65.

[443] FBI Serial 676.

[444] *E.g.*, Notebook entries 1B57-0039, 1B57-0062-63, 1B67-0059-61, 1B67-0063-65.

106

Mr. Biden began the interview with a long discussion about the murder of nine worshippers at the Emanuel African Methodist Church in Charleston, South Carolina, and a discussion of his son Beau.[462] During this portion of the recording, Mr. Biden did not sound like he was reading from notes.[463]

He then turned to his "Daily" notebook for "August 2014-September 2016."[464] Mr. Biden read from an entry containing notes on a July 7, 2015 National Security Council meeting about Iraq.[465]

While reading from his notebook, Mr. Biden listed four points he made about the Iraq situation during the July 7, 2015 meeting. Mr. Biden explained to Zwonitzer that he had made similar arguments years earlier, during the 2009 debate about the troop surge in Afghanistan.[466] Mr. Biden told Zwonitzer he had sent President Obama a 40-page, handwritten memo arguing against the deployment of additional troops in Afghanistan "on the grounds that it wouldn't matter."[467] Mid-sentence during this narrative, Mr. Biden said, in a matter-of-fact tone, that he had "just found all the classified stuff downstairs."

> So this was – I, early on, in '09—**I just found all the classified stuff downstairs**—I wrote the President a handwritten 40-page

---

[462] Zwonitzer recording Carved_000556; ZWONITZER-TR_0064-78; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[463] Zwonitzer recording Carved_000556; ZWONITZER-TR_0064-78; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[464] Zwonitzer recording Carved_000556: ZWONITZER-TR_0079; FBI Serials 315, 335; Notebook 1B57; Evidence items 1B79, 1B81.

[465] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 4; ZWONITZER-TR_0079; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[466] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 5-6; ZWONITZER-TR_0079; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[467] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 5-6; ZWONITZER-TR_0079; FBI Serials 315, 335; Evidence items 1B79, 1B81.

110

memorandum arguing against deploying additional troops to Iraq—I mean, to Afghanistan—on the grounds that it wouldn't matter, that the day we left would be like the day before we arrived. And I made the same argument . . . I wrote that piece 11 or 12 years ago.[468]

As discussed in the next chapter, Mr. Biden was referring to a long, handwritten memo he faxed to President Obama from Nantucket over the Thanksgiving weekend in 2009. In the memo—which Bob Woodward later detailed in his book, *Obama's Wars*—Mr. Biden argued against engaging in full-scale counterinsurgency and nation-building in Afghanistan.[469]

As noted above, this February 2017 meeting with Zwonitzer was on the main floor of the Virginia home. "Downstairs" from where Mr. Biden and Zwonitzer sat was Mr. Biden's basement office, where he kept his personal papers.[470] The photo below shows the basement office in October 2017, several months after the February 2017 meeting with Zwonitzer:

---

[468] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 5-6; ZWONITZER-TR_0079 (emphasis added); FBI Serials 315, 335; Evidence items 1B79, 1B81.

[469] Bob Woodward, OBAMA'S WARS 309 (Simon & Schuster 2010).

[470] Biden 10/9/23 Tr. at 36-37; SCOH-000322.

111

We expect Mr. Biden also to contend that the presence of classified information in what he viewed as his diary did not change his thinking. As a member of the exclusive club of former presidents and vice presidents, Mr. Biden will claim that he knew such officials kept diaries, and he knew or expected that those diaries—like Mr. Reagan's—contained classified information.[917] He also understood that former presidents and vice presidents took their diaries home upon leaving office, without being investigated or prosecuted for it. Thus, whatever McGrail now thinks of the matter, Mr. Biden will claim that it did not occur to him to store what he thought of as his personal diaries—which he held close for eight years—at the National Archives, and he certainly did not know that by failing to do so he committed a crime.

Contemporaneous evidence from immediately after the vice presidency supports this defense. In a recorded conversation with Zwonitzer on April 26, 2017, three months after leaving office, Mr. Biden said the following:

| | |
|---|---|
| Mr. Biden: | I'm told by [a personal aide], I guess he checked with you, in order for me to get my, uh, get all those presidential notes I had for lunch, the luncheon meetings, I have to go to McGrail? |
| Assistant: | Yes, McGrail has them. We were supposed to turn it in and that is the last person who had them. |

definition of "personal records" under the Presidential Records Act because they "relate to or have an effect upon the carrying out of" the duties of the vice president, and they are not "of a purely private or nonpublic character." 44 U.S.C. § 2201(3). But Mr. Biden will likely present a compelling case that he viewed the notebooks as his personal diaries or the rough equivalent. Indeed, in a recorded conversation with Zwonitzer, while reviewing a notebook entry about a national security meeting, Mr. Biden twice referred to the passage as a "diary entry." Carved_000556. And, as discussed extensively in Chapter Ten, Mr. Reagan's diaries contained several instances of classified information, the Department of Justice described them as his "personal records," and Mr. Reagan brought them home after his presidency without repercussion.

[917] *See* Chapter Ten.

| Mr. Biden: | OK. Uh. See if you can get me McGrail on the line while I have you now. OK? And stay on okay? |
| Assistant: | Got it sir. Hold on. |
| Zwonitzer: | **This is probably something that goes to the presidential papers.** |
| Mr. Biden: | **I don't think so. It was in between. I didn't want to turn them in**. |
| Zwonitzer: | **Right so, it's the gray area.**[918] |

This exchange concerned Mr. Biden's handwritten notecards, which, like his notebooks, addressed both personal and official matters, and which also contained classified information.[919] The evidence suggests, as explained above, that McGrail decided the classified notecards should be stored at the National Archives after the administration, with Mr. Biden telling Zwonitzer he did not want to do so.[920] But when Zwonitzer suggested that the notecards might be "presidential papers"—that is, presidential records that are required by law to be stored at the National Archives—Mr. Biden disagreed. Mr. Biden explained that he did not think he was required to turn in the notecards and that he had not wanted to do so.

One interpretation of this exchange that the evidence permits is that, while Mr. Biden followed McGrail's advice to store the classified notecards in a SCIF at the Archives, he did not believe he was required to, and he thought that, at most, the notecards fell into an "in between" or "gray area." Indeed, when interviewed, McGrail

---

[918] Zwonitzer recording Carved_000599 (emphasis added); Carved_000599 Tr. at 3-4; FBI Serials 315, 335.

[919] *See* Chapter Four.

[920] *See id.*

237

# EXHIBIT 2

## Taisa Goodnature

| | |
|---|---|
| **From:** | Amy Jeffress |
| **Sent:** | Thursday, April 16, 2026 12:10 PM |
| **To:** | Winn, Peter A. (OPCL) |
| **Cc:** | Taisa Goodnature; Perkins, Paul (ODAG) |
| **Subject:** | RE: FOIA request |

Peter,

Thank you for your response. I appreciate your willingness to engage on these issues, consistent with the governing agreement.

To the extent your analysis rests on the premise that the Attorney General's appointment of a special counsel negates the requester's burden to "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred," *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004), nothing in the Court's decision in *Favish* turned on the structure of the independent counsel statute. Nor did Attorney General Garland ever suggest that the public release of the Hur Report reflected that a reasonable person would suspect impropriety in Special Counsel Hur's investigation, as you contend below. To the contrary, Attorney General Garland explained that the appointment of a special counsel "underscores for the public the Department's commitment to both independence and accountability in particularly sensitive matters, and to making decisions indisputably guided only by the facts and the law." Press Release, Office of the Attorney General, Appointment of a Special Counsel (Jan. 12, 2023), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-1. In other words, the context of a special counsel investigation here is evidence of the *absence* of government misconduct, not of its existence—and it certainly does not categorically relieve a FOIA requester of the independent obligation to make a "meaningful evidentiary showing" that "responsible officials acted negligently or otherwise improperly in the performance of their duties." *Favish*, 541 U.S. at 174-75.  You may also want to consider the implications that this theory has on other Special Counsel appointments.

Separately, we do not agree that a draft indictment of a sitting First Lady is subject to less public interest and implicates greater privacy interests than an audio recording of highly personal conversations created for purely private use between then-Vice President Biden and his biographer, as appears to be your sole argument to distinguish the D.C. Circuit's instructive opinion in *Judicial Watch, Inc. v. National Archives & Records Administration*, 876 F.3d 346 (D.C. Cir. 2017).

Finally, the Second Circuit's application of the adoption doctrine has no bearing here. That doctrine applies when the government effectively waives deliberative process privilege or attorney-client privilege by incorporating an otherwise privileged document into the working law of the agency. But those privileges do not require balancing public interest against individuals' privacy interests, as Exemption 7(C) does.

As to next steps, I have a trial beginning tomorrow and will be unable to go in and review the additional redactions until the trial concludes. Could we schedule a time during the week of April 27?

Best, Amy

1

App-360

**Amy Jeffress | Hecker Fink LLP**
Partner
1050 K Street NW | 10th Floor
Washington, DC 20001
(W) 202.742.2655 | (M) 202.309.7598
ajeffress@heckerfink.com

**From:** Winn, Peter A. (OPCL) <Peter.A.Winn@usdoj.gov>
**Sent:** Wednesday, April 15, 2026 9:40 PM
**To:** Amy Jeffress <ajeffress@heckerfink.com>
**Cc:** Taisa Goodnature <tgoodnature@heckerfink.com>; Perkins, Paul (ODAG) <Paul.Perkins@usdoj.gov>
**Subject:** FOIA request

This email was sent from outside the Firm.

Dear Amy,

Thank you for your email of March 31, and for your helpful comments on our proposed redactions to the audio files and transcript.  Based on your comments, we have expanded our redactions both to the audio files as well as the transcript, providing greater privacy protection to President Biden's family and correcting inadvertent errors on our part.

Nevertheless, we disagree with the approach to the privacy/public interest balance reflected in your email.  That approach appears to be largely based on *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017), which, in connection with the investigation by Special Counsel Ken Starr, gave the privacy interests of the Clintons greater weight than the public interest in the draft indictment containing unproven and unfiled allegations prepared by Starr's office.

Here, by contrast, we are not dealing with a non-public deliberative draft document prepared by a special counsel, or mere evidence collected in connection with his investigation, but a record created by Special Counsel Hur and explicitly relied on in his published Report, to justify his decision—accepted by the Attorney General—to decline prosecution with respect to the admittedly wrongful 2017 disclosure by then Vice-President Biden of classified information to his ghostwriter, who lacked a security clearance.  Hur declined prosecution with respect to this potential charge because, as he explained,

> Mr. Biden's memory appeared to have significant limitations at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations.  Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.  Report at 207.

If, as Hur appears to have believed was likely, Mr. Biden had simply forgotten that the information he disclosed to Zwonitzer was classified, it would constitute a complete defense to a criminal offense requiring a finding of willfulness.  The audio and transcripts thus constitute not only the principal evidence on which Hur relied to reach his conclusion that the evidence would not support a finding of willfulness beyond a reasonable doubt but, as to the 2017 wrongful disclosures, what Hur *explicitly relied on in his public report* to justify his decision to decline prosecution for lack of willfulness.

2

Hur's express and public reliance on a particular item of curated evidence we view as akin to the application of the so-called adoption doctrine, where otherwise privileged legal advice becomes disclosable when an agency decision maker explicitly relies on it as the basis of the agency decision, *compare, Brennan Center for Justice v. DOJ*, 697 F.3d 184 (2nd Cir. 2012).  This is because, as in adoption doctrine cases, the fact that as part of his Report Hur publicly and explicitly relied upon a particular item of information as the basis of his decision, increases the public interest in and need to access that item of information—essentially, without such access, the public would lack access to the complete record of the basis of the decision by the Special Counsel.

It goes without saying that at the time of Hur's investigation the subject of the investigation was the President of the United States.  Hur reported directly to the Attorney General who in turn reported to the subject of his investigation.  The potential conflict of interest inherent in this arrangement requires a greater corresponding level of transparency as reflected in the Special Counsel Regulations.  See 28 C.F.R. §600.9.  It is for this reason that the integrity of a Special Counsel's investigation constitutes a matter of paramount public interest.  *See National Archives and Records Administration v. Favish*, 541 U.S. 157, 173-174 (2004).  By contrast, under the Independent Counsel statute, 28 U.S.C. §§ 591-599, which governed Special Counsel Starr's service, he reported to a three-judge panel appointed by the Chief Justice, eliminating the potential conflict of interest, but thereby eliminating the need for heightened public scrutiny.  Because of this, when Attorney General Garland's made the decision to make the Hur Report public, he determined that the Hur Report addressed "evidence that would warrant the belief by a reasonable person that government impropriety might have occurred" (See Favish, at 174).

The question now is, with a FOIA request and Congressional inquiry in hand, whether the public's interest goes beyond the Hur Report itself to any of the evidence referenced in the Report, specifically the limited sections of audio (approximately two and a half hours) out of "Mr. Biden's dozens of hours of recorded conversations with the ghostwriter," which were  curated by Special Counsel Hur, as well as the transcriptions made of those curated audio recordings.

As noted above, Special Counsel Hur created the curated audio recordings and transcripts records not simply as a way to  "store" evidence acquired in connection with his investigation, but because Hur recognized that these materials constituted both the primary evidence of the 2017 wrongful disclosures, as well as the primary basis for his decision to decline prosecution of President Biden with respect to these wrongful disclosures—which is how Hur explicitly refers to them in his Report.  Again, we emphasize that not all evidence acquired in connection with a special counsel investigation thereby becomes publicly disclosable.  Here, however, it is Hur's express reliance on the audio recordings and transcripts as the basis of his decision that dramatically increases the public interest in them.  In other words, in the face of a potential conflict of interest, public access to these materials becomes necessary to show whether in the face of a conflict of interest, Special Counsel Hur "pulled his punches" or acted without impropriety.  For the public to make this determination, the Hur Report alone is incomplete without access to these additional materials.

Of course, as was the case with the release of the Hur Report itself, even in the context of the release of a Special Counsel Report, privacy interests of individuals do not disappear, whether they happen to be the President or other public figures.   But here, the Department continues to be bound by the requirement in 5 USC § 552(b) that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

3

App-362

The redactions we have made reflect our analysis, after consideration of your input, of the privacy interests of the President and other third parties that override the cognizable public interest in the audio and transcript. As important public figures, the privacy interests of President Biden and certain other third-party public figures were evaluated differently given their status. Accordingly, as in the case of the Hur Report itself, redactions were not made where we found no serious harm to their interests in the release of the otherwise private information about them in Biden's discussions with his ghostwriter. We also did not redact content if the information was already public, be it cited in the Hur report, discussed in Congressional testimony, or published in President Biden's memoir. We did, however, redact the names of non-public figures, who enjoyed the benefit of a more protective test.

We hope that this explanation of our decision making will be helpful to you. Please note that the Department intends to release to Congress and the FOIA requestor no earlier than Tuesday of next week. In the meantime, if you wish to review the additional redactions we have made to the transcripts and audio recordings, you will need to arrange to do so before then.

Peter

Peter A. Winn
Acting Chief Privacy & Civil Liberties Officer
United States Department of Justice

---

**From:** Amy Jeffress <ajeffress@heckerfink.com>
**Sent:** Tuesday, March 31, 2026 6:18 PM
**To:** Perkins, Paul (ODAG) <Paul.Perkins@usdoj.gov>; Winn, Peter A. (OPCL) <Peter.A.Winn@usdoj.gov>
**Cc:** Taisa Goodnature <tgoodnature@heckerfink.com>
**Subject:** [EXTERNAL] FOIA request

Paul and Peter,

Thank you for taking the time to meet with us regarding the Heritage Foundation's pending request for the audio recordings and transcripts of President Biden's private conversations with Mark Zwonitzer. I am writing to respond to some of the issues you raised in our discussion, for your consideration as you continue to review the audio recordings and transcripts.

When we met, you questioned the distinction between the Hur Report itself and the raw evidence underlying the Report in making determinations regarding public release. As explained below, even assuming that the same standards were to govern the Department's decision whether to release the Report and whether to release hours of raw audio of private conversations between President Biden and his biographer, applying those standards to these two very different categories of material calls for different results.

As you know, to disclose law-enforcement records that implicate an individual's privacy interest, the Department must balance the privacy interest against the public interest in disclosure. *Elec. Priv. Info. Ctr. v. DOJ* ("*EPIC*"), 18 F.4th 712, 718 (D.C. Cir. 2021). Disclosure of third-party law enforcement information is a rare exception, not the rule. *See Martin v. DOJ*, 488 F.3d 446, 457 (D.C. Cir. 2007).

The public interest in a Special Counsel's report to the Attorney General is far greater than any cognizable public interest in sensitive, private materials collected—but not created, nor expressly relied

4

App-363

upon—by the Special Counsel's Office. A Special Counsel's report is perhaps the best evidence of what the Special Counsel's Office "was up to" over the course of its investigation. *EPIC*, 18 F.4th at 721 (internal quotation marks omitted). By contrast, the audio recordings and transcripts at issue here are private documents that the government "happens to be storing." *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 780 (1989). Special Counsel Hur quoted directly from the portions of the Biden-Zwonitzer conversations on which he relied in reaching his determinations, referring to the conversations in multiple instances in his report. With that information already in the public domain, the notion that releasing the audio recordings and transcripts that Special Counsel Hur did *not* cite might further the public interest in understanding the Special Counsel's investigation is speculative, at best, and certainly not "likely." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004). (The reference in our conversation to *Favish* in support of disclosure in these circumstances misses the point of that decision, which is replete with references to the strength of the privacy interests Congress intended to protect by Exemption 7(C).  *See id*. at 174.)

Moreover, public interest in the undisclosed audio recordings and transcripts is not evaluated in a vacuum, but in light of the information that is already available to the public. Any legitimate public interest in these materials that may have existed is diminished by the "voluminous information already in the public domain" about Special Counsel Hur's investigation. *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017). The public release of the Hur Report counsels against—not in favor of—releasing evidence underlying that report. Further, after the report was released, Special Counsel Hur testified for hours before Congress about the report and his determinations. And the Department has now produced the full transcript and audio recording of Special Counsel Hur's interview with President Biden. Any "incremental public interest in learning how the [Special] Counsel carried out his investigation" by disclosing recordings of private conversations between President Biden and his biographer years before the investigation began is plainly insufficient to overcome President Biden's substantial privacy interests in the materials. *Id*.

And the privacy interests implicated here are acute. Heritage seeks the raw audio of intimate conversations, many of which took place in President Biden's home, which were never intended for public release. The analysis from the *Judicial Watch* decision addressed very similar privacy interests of a public figure, also in the context of a special counsel investigation, and is readily modifiable to these circumstances: "Although the existence of [Special] Counsel [Hur]'s investigation of [President Biden] is public knowledge," and the Hur Report has been publicly released, President Biden "retains a distinct privacy interest in the *contents* of the investigative files," including these recordings and transcripts. *Id*. at 349 (citation modified).

To be sure, the Department's release of the portions of the Biden-Zwonitzer transcripts that were included the Hur Report also implicated President Biden's privacy interests. But whereas the Hur Report quoted a few minutes of discussion, largely focused on President Biden's recordkeeping practices, Heritage now seeks approximately 2.5 hours of recordings, including discussions of highly sensitive topics, such as President and Dr. Biden's reactions to the death of their son, and references to private remarks of numerous other third parties, who were not targets of the investigation. *See 100Reporters LLC v. DOJ*, 316 F. Supp. 3d 124, 162 (D.D.C. 2018) (explaining that Exemption 7(C) protects the privacy interests of individuals who were not subjects of investigation). The invasion of President Biden's privacy that would result from disclosure of hours of audio recordings and transcripts of these conversations is orders of magnitude greater than from release of the Hur Report.

5

Accordingly, viewing Heritage's request in light of the Department's decision to release the Hur Report to the public only underscores that the Department correctly determined, stating in the memorandum of law in support of summary judgment in this case that releasing the materials at issue "would harm substantial privacy interests that are not outweighed by any cognizable public interest," ECF 33-1.

Please let me know if it would be helpful to discuss further.

Best, Amy

**Amy Jeffress | Hecker Fink LLP**
Partner
1050 K Street NW | 10th Floor
Washington, DC 20001
(W) 202.742.2655 | (M) 202.309.7598
ajeffress@heckerfink.com

---

*This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of the message from your computer system. Thank you.*

# EXHIBIT 3

Case 1:24-cv-00645-DLF    Document 65-5    Filed 05/29/26    Page 2 of 5
USCA Case #26-5235        Document #2180382        Filed: 06/24/2026      Page 404 of 635

E UPDATES • A DIRECT LINE TO THE ADMINISTRATION →                DOWNLOAD THE OFFICIAL WHITE HOUSE APP • REAL-TIME NEWS • LIVE UPDATES • A DIRECT LINE TO THE ADMINISTRATION



# THE WHITE HOUSE

## WASHINGTON

NEWS        GALLERY        LIVESTREAM        TRUMP ACCOUNTS        SAVE AMERICA        INVESTMENTS        CONTA

## ⬉ FACT SHEETS

### Fact Sheet: President Donald J. Trump Directs Review of Certain Presidential Actions

The White House

June 4, 2025

**INVESTIGATING EXECUTIVE ACTIONS UNDER BIDEN'S PRESIDENCY:** Today, President Donald J. Trump signed a Presidential Memorandum directing an investigation into who ran the United States while President Biden was in office.

- The Memorandum directs an investigation into whether certain individuals conspired to deceive the public about Biden's mental state and unconstitutionally exercise the authorities and responsibilities of the President.

- The Memorandum also mandates an investigation into the circumstances surrounding Biden's purported execution of the numerous executive actions during his final years in office, examining policy documents signed with an autopen, who authorized its use, and the validity of the resulting Presidential policy decisions.

**QUESTIONING WHO WIELDED THE EXECUTIVE POWER DURING THE BIDEN ADMINISTRATION:** The combined nature of Biden's documented cognitive decline and the repeated use of an autopen raises serious concerns about the legitimacy of his actions.

- Reports indicate that, for years, Biden suffered from serious cognitive decline.
  - For example, although the Department of Justice found that Biden had violated the law by willfully retaining and disclosing classified materials, it ultimately concluded that Biden was unfit to stand trial given his incompetent mental state.

- Biden's cognitive issues and apparent mental decline were reportedly even "worse" in private, with those closest to him attempting to conceal it from the public.
  - Biden's advisors severely restricted his news conferences and media appearances, scripting his conversations with lawmakers, government officials, and donors.

- Despite Biden's cognitive deficiencies, the White House issued over 1,200 Presidential documents, appointed 235 judges to the Federal bench, and issued more pardons and

commutations than any Administration in U.S. history.

- ○ Just two days before Christmas in 2024, Biden commuted the sentences of 37 of the 40 most vile and monstrous criminals on Federal death row, including several child killers and mass murderers.

- The authority to take these executive actions is constitutionally reserved for the President, yet the Biden White House used an autopen to execute the vast majority of Biden's executive actions, particularly during the second half of his Presidency.

**RESTORING PRESIDENTIAL ACCOUNTABILITY:** President Trump believes Americans deserve answers as to whether President Biden signed these documents, and if not, who signed them, and under what circumstances.

- President Trump: "And you know what, they ought to find out who was using that autopen. Because whoever that person was, he or she was like the President of the United States … I think a President should sign it, not use an autopen. And we're going to find out whether or not he knew what the hell he was doing. … So I think it's something that we should really look at because that's so important."

- President Trump: "The real question – who ran the autopen, OK? Who ran the autopen? Because the things that were signed were signed illegally, in my opinion."

- Since returning to office, President Trump has held numerous open-press signing events where the American public can witness President Trump's signature and knowledge regarding the matters in question with their own eyes.

- Even the legacy media admits that President Trump is on track to becoming the most-accessible President in modern history.

Related

Reviewing Certain Presidential Actions

Presidential Actions, Presidential Memoranda    |    June 4, 2025
Fact Sheet: President Donald J. Trump Addresses Risks from Chris Krebs and Government Censorship

Fact Sheets    |    April 9, 2025
Fact Sheet: President Donald J. Trump Rescinds Additional Harmful Biden Executive Actions

App-368

Case 1:24-cv-00645-DLF    Document 65-5    Filed 05/29/26    Page 4 of 5
USCA Case #26-5235       Document #2180382       Filed: 06/24/2026       Page 406 of 635

Fact Sheets   │   March 14, 2025

Fact Sheet: President Donald J. Trump Removes DEI From the Foreign Service

Fact Sheets   │   March 18, 2025

Fact Sheet: President Donald J. Trump Investigates Unlawful "Straw Donor" and Foreign Contributions in American Elections

Fact Sheets   │   April 24, 2025

**1**      2      3      …      81   NEXT PAGE

 

GET THE FACTS →

**ABOUT**

Administration

Contact

Internships

Stay Informed

Privacy Policy

**MEDIA**

News

Gallery

Video Library

Media Offenders

White House Wire

**INITIATIVES**

Freedom 250

App-369

Case 1:24-cv-00645-DLF    Document 65-5    Filed 05/29/26    Page 5 of 5
USCA Case #26-5235        Document #2180382        Filed: 06/24/2026    Page 407 of 635

App. 370

Investments

Working Families Tax Cuts

AI.Gov

DOGE

## SUBSCRIBE TO THE WH NEWSLETTER

Your email

SIGN UP

Click here or text 45470 to receive updates

# THE WHITE HOUSE

# EXHIBIT 4

Case 1:24-cv-00645-DLF    Document 65-6    Filed 05/29/26    Page 2 of 2
USCA Case #26-5235        Document #2180382        Filed: 06/24/2026        Page 409 of 635



← Post

New to X?

Sign up now to get you



Sign u

Sign

Creat

By signing up, you agre
Privacy Policy, includin

**Mike Howell** ✔
@MHowellTweets

...

There is a constitutional process to deal with an incapacitated POTUS and it doesn't contemplate giving someone else his autopen and authority.

It's called the 25th Amendment and the conspiracy not to invoke it in order to keep whatever they were doing going is a big problem

**Relevant peo**



**Mike Howel**
@MHowellT

President of
@ItsYourGo
@NICEnforc
@theBlaze;
Fellow.



**Oversight P**
@ItsYourGo

We fight for
Americans f
government
We do it bec
Government



⬛ **Oversight Project** ✔ @ItsYourGov · Mar 6, 2025
🚨WHOEVER CONTROLLED THE AUTOPEN CONTROLLED THE PRESIDENCY🚨

We gathered every document we could find with Biden's signature over the course of his presidency....

6:52 PM · Mar 6, 2025 · **24.3K** Views

💬 43        ↻ 338        ♡ 610        🔖 68        ⬆

💬 Read 43 replies

**What's happe**

Trending in United Sta
**#SqueezePlay**

Trending in United Sta
**James Coburn**

Trending in United Sta
**Aaron Lewis**

Trending in United Sta
**Cartoons**

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info

**Don't miss what's happening**
People on X are the first to know.

Log in

# EXHIBIT 5

USCA Case #26-5235      Document #2180382      Filed: 06/24/2026      Page 411 of 635



← Post

New to X?

Sign up now to get you



Sign

Sign

Creat

By signing up, you agre
Privacy Policy, includin

Mike Howell ✓
@MHowellTweets

theres now a generation of dem WH staffers who were planning to rely on titles that showed a proximity to a president that now cant do that

they should have to update their linkedins to things like Special Assistant to the Autopen

 Fox News ✓  @FoxNews · Aug 21, 2025
BREAKING: Former Biden aide Ian Sams told lawmakers he had only two in-person meetings with the president, Rep. Comer says



5:46 PM · Aug 21, 2025 · **2,928** Views

💬 1          ↻ 10          ♡ 43          🔖 3          ↑

Relevant peo



Mike Howel
@MHowellT
President of
@ItsYourGo
@NICEnforc
@theBlaze;
Fellow.



Fox News ✓
@FoxNews
Stay Ahead.
First. Down

What's happe

Trending in United Sta
#SqueezePlay

Trending in United Sta
$300 Billion

Trending in United Sta
James Coburn

Trending in United Sta
Aaron Lewis

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info

**Don't miss what's happening**
People on X are the first to know.

Log in

# EXHIBIT 6



**WEAPONIZATION AND CORRUPTION**

# THE AUTOPEN PRESIDENCY PART IV: COMPREHENSIVE SUMMARY OF AUTOPEN USE

🕐 OCTOBER 27, 2025

## Introduction

America experienced a constitutional crisis during the presidency of Joseph R. Biden. Ever since The Oversight Project discovered the Biden White House's prolific use of an autopen to execute core presidential documents, investigations in and out of government have uncovered key facts detailing the pervasiveness of the Biden Administration's disregard for the Constitution. But until now, there has not been a comprehensive accounting of the *scale* and *scope* of the Biden White House's autopen use.



App. 376

Case 1:24-cv-00645-DLF    Document 65-8    Filed 05/29/26    Page 3 of 13
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 414 of 635

This post presents a comprehensive analysis of the scope, scale, frequency, and timing of autopen use by the Biden White House to sign documents exercising key Presidential powers.1 Our findings are not only alarming but should serve as a roadmap for Congressional and Executive Branch investigators to identify particular uses of the autopen to focus on.

**Key Findings and Methodology**

- The Oversight Project reviewed approximately 1,597 enrolled copies of documents bearing President Biden's signature.  These documents include all enrolled copies of signed bills, pardon warrants, commutation warrants, Executive Orders and Presidential Proclamations.

- We found that 88.3% (846/958) of documents *excluding public laws* (Executive Orders, Pardons, Commutations, and Proclamations) were signed with an autopen.

- We found that 82.2% (696/846) of all autopen-signed Executive Orders, Pardons, Commutations and Proclamations, were signed while Biden was in D.C.

- The Biden White House first deployed the autopen on *day 5* of the Biden Administration to sign a proclamation.

- The Oversight Project has identified *four different* autopen signatures that were used by the Biden White House.

- President Biden appears to have hand signed all but one bill into law.  President Biden's signature varies significantly across the enrolled bills and appears to deteriorate as his cognitive abilities declined throughout his Presidency.

- Autopen use for documents increased throughout the Administration as President Biden's mental and physical acuity declined.

- The Biden White House had widespread use of the autopen while President Biden was physically in



App. 377

Case 1:24-cv-00645-DLF    Document 65-8    Filed 05/29/26    Page 4 of 13
USCA Case #26-5235        Document #2180382        Filed: 06/24/2026        Page 415 of 635

Washington, D.C. and was thus presumably available to hand sign important documents.

**The Four Autopen Signatures**

The Oversight Project has discovered at least 4 different autopen signatures in use throughout the Biden Administration. We have reproduced images of the signatures and outlined the approximate dates they were in use and what documents they were used to sign below. We identified the autopen signatures Autopen A–D based on when we identified the autopen signature in our investigation. They do not necessarily align with the date in which they were in use.



Dates in use: May 13, 2022 – December 12, 2024

Documents Signed: Pardons, Commutations, Executive Orders, Proclamations

App. 378

Case 1:24-cv-00645-DLF    Document 65-8    Filed 05/29/26    Page 5 of 13

USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 416 of 635



**AUTOPEN B**

JOSEPH R. BIDEN, JR.
**President**

Dates in use:  February 1, 2024  – January 19, 2025

Documents Signed: Pardons, Commutations, Executive
Orders, Proclamations, Public Law  118-60.



**AUTOPEN C**

Dates in use:  January 25, 2021 – May 12, 2022

Documents Signed: Proclamations



USCA Case #26-5235     Document #2180382     Filed: 06/24/2026     Page 417 of 635



**AUTOPEN D**

Dates in use: March 1, 2021 – May 14, 2021

Documents Signed: Proclamations (less than 10 total)

How the Biden White House determined which autopen signature to use in a given instance or why they decided to change signatures remains a topic for government investigators to uncover. However, we did identify the specific date where the Biden White House appears to have changed from Autopen C to Autopen A. The Biden White House used Autopen C to sign a proclamation on May 12, 2022, and used Autopen A to sign another proclamation on May 13, 2022. Prior to May 12, 2022, Autopen C was the predominant autopen signature. After May 13, 2022, Autopen A became the predominant signature. It is unclear why the Biden White House changed the President's autopen signature on this date.

**President Biden's Signatures on Bills**

The Oversight Project also pulled copies of every enrolled bill signed into law during the Biden Presidency. The video below shows President Biden's signature on every bill that became law during his presidency. Note the wide discrepancy in how these signatures write President Biden's name and how it appears that the President's signature deteriorates over time. These signatures vary so widely, that it cannot be said for certain that the same person signed every document. That is a topic for government investigators to uncover. The signature variation also makes the autopenned signatures obvious because of their uniform letter structure, spacing, and other factors.



https://itsyourgov.org/investigation/the-autopen-presidency-part-iv-comprehensive-summary-of-autopen-use/

Case 1:24-cv-00645-DLF    Document 65-8    Filed 05/29/26    Page 7 of 13

USCA Case #26-5235       Document #2180382       Filed: 06/24/2026       Page 418 of 635



**Data Analysis**

The Oversight Project has completed a comprehensive review of 1,597 presidential documents including all enrolled copies of signed bills, pardons warrants, commutation warrants, Executive Orders and Presidential Proclamations.

The following charts display signature analysis, including autopen use, by month and week throughout the Biden Presidency.

**Figure 1:  Signature Type by Month (All Documents Analyzed)**



Case 1:24-cv-00645-DLF    Document 65-8    Filed 05/29/26    Page 8 of 13

USCA Case #26-5235      Document #2180382      Filed: 06/24/2026      Page 419 of 635

**Figure 2: Signature Type by Week (All Documents Analyzed)**



Autopen Use by Week with Signature and Document Type Breakdown

Although nearly all the public laws were wet signed (638/639), documents signed with an autopen device outnumbered those with wet signatures during most weekly and monthly time periods. Autopen signatures exceeded wet signed documents in 65% of all weeks (137 out of 209) and 69% of all months (34 out of 49).

President Biden wet signed shockingly few Executive Orders, Presidential Proclamations, Pardons, and Commutations compared to those signed via autopen. Excluding public laws from the data shows that autopen signed documents exceeded handsigned documents in 84.2% of all weeks (176 out of 209) and in 98% of all months (48 out of 49).

**Figure 3: Signature Type by Month (Excluding Public Laws)**

Autopen Use by Month with Signature and Document Type Breakdown



**Figure 4: Signature Type by Week (Excluding Public Laws)**

Autopen Use by Week with Signature and Document Type Breakdown



**Signature Type by Category Over Time**

- **Executive Orders:** 59.2% (96 out of 162) were signed with autopen, with usage increasing over time, reaching 100% in 2025.

- **Presidential Proclamations:** 96.3% (718 out of 745) bore autopen signatures, with annual usage consistently above 92%.



Case 1:24-cv-00645-DLF   Document 65-8   Filed 05/29/26   Page 10 of 13
USCA Case #26-5235   Document #2180382   Filed: 06/24/2026   Page 421 of 635

- **Pardons:** 75% (18 out of 24) were signed with autopen.

- **Commutations:** 51.8% (14 out of 27) were signed with autopen.

- **Overall:** 88.3% (846/958) of executive orders, proclamations, pardons, and commutations were signed with an autopen.

<u>Executive Orders Signed with Autopen</u>



| Year | Total Signed with Autopen | Total Executive Orders | Percent Signed with Autopen |
|------|---------------------------|------------------------|------------------------------|
| 2021 | 36 | 77 | 46.7% |
| 2022 | 17 | 29 | 58.6% |
| 2023 | 16 | 24 | 66.6% |
| 2024 | 14 | 19 | 73.6% |
| 2025 | 13 | 13 | 100.0% |
| Total | 96 | 162 | 59.2% |

<u>Proclamations Signed with Autopen</u>



| Year | Total Signed with Autopen | Total Proclamations | Percent Signed with Autopen |
|------|---------------------------|---------------------|------------------------------|
| 2021 | 180 | 194 | 92.7% |
| 2022 | 176 | 179 | 98.3% |
| 2023 | 179 | 183 | 97.8% |
| 2024 | 179 | 184 | 97.2% |
| 2025 | 4 | 5 | 80.0% |
| Total | 718 | 745 | 96.3% |

<u>Pardons and Commutations Signed with Autopen</u>

| Document Type | Signed with Autopen | Total Documents | Percent Signed with Autopen |
|---------------|---------------------|-----------------|------------------------------|
| Pardons | 18 | 24 | 75% |
| Commutations | 14 | 27 | 51.8% |

**A Disturbing Pattern: Autopen Used while Biden was in Washington, D.C.**

Perhaps most concerning is the context of this autopen usage. The Oversight Project found that a significant majority of these autopen signed orders were issued on days when President Biden was physically present in



orders were signed while Biden was in D.C.



App. 384

Case 1:24-cv-00645-DLF   Document 65-8   Filed 05/29/26   Page 11 of 13
USCA Case #26-5235      Document #2180382      Filed: 06/24/2026      Page 422 of 635

- **Proclamations**: 82.5% (593/718) of autopen-signed proclamations were signed while Biden was in D.C.

- **Pardons**: 66% (12/18) of autopen-signed pardons were signed while Biden was in D.C.

- **Commutations**: 100% (14/14) of autopen-signed commutations were signed while Biden was in D.C.

- **Overall:** 82.2% (696/846) of all autopen-signed executive orders, proclamations, pardons, and commutations were signed while Biden was in D.C.

These figures demonstrate that autopen devices were not an occasional convenience but a consistent, dominant practice of the Biden administration, affecting nearly every category of presidential action. A striking 88.3% of all executive orders, proclamations, pardons, and commutations were signed using an autopen, with 82.2% occurring while Biden was in Washington, D.C.. These statistics raise serious questions about who was actually governing the country in light of President Biden's well-documented mental decline. See below for a more detailed breakdown of these figures.

Executive Orders Signed with Autopen When Biden was in D.C.

| Year | Total Signed with Autopen When Biden was in DC | Total Signed with Autopen | Percent Signed with Autopen When Biden was in D.C. |
|---|---|---|---|
| 2021 | 30 | 36 | 83.3% |
| 2022 | 15 | 17 | 88.2% |
| 2023 | 12 | 16 | 75.0% |
| 2024 | 8 | 14 | 57.1% |
| 2025 | 12 | 13 | 92.3% |
| Total | 77 | 96 | 80.2% |

Proclamations Signed with Autopen When Biden was in D.C.

| Year | Total Signed with Autopen When Biden was in D.C. | Total Signed with Autopen | Percent Signed with Autopen When Biden was in D.C. |
|---|---|---|---|
| 2021 | 158 | 180 | 87.7% |
| 2022 | 152 | 176 | 87.5% |
| 2023 | 154 | 179 | 86.0% |
| 2024 | 125 | 179 | 69.8% |
| 2025 | 4 | 4 | 100.0% |
| Total | 593 | 718 | 82.5% |

App. 385

Case 1:24-cv-00645-DLF   Document 65-8   Filed 05/29/26   Page 12 of 13
USCA Case #26-5235      Document #2180382         Filed: 06/24/2026      Page 423 of 635

## Pardons and commutations Signed with Autopen When Biden was in D.C.

| Type | Total | Signed with Autopen | Signed with Autopen When Biden Was in DC | Percent Signed with Autopen When Biden Was in D.C. |
|------|-------|---------------------|------------------------------------------|----------------------------------------------------|
| Pardons | 24 | 18 | 12 | 66% |
| Commutations | 27 | 14 | 14 | 100% |

| Year | Total Pardons | Signed with Autopen | Signed with Autopen When Biden Was in DC | Percent Signed with Autopen When Biden Was in D.C. |
|------|---------------|---------------------|------------------------------------------|----------------------------------------------------|
| 2022 | 9 | 6 | 0 | 0% |
| 2023 | 4 | 3 | 3 | 100% |
| 2024 | 4 | 2 | 2 | 100% |
| 2025 | 7 | 7 | 7 | 100% |

| Year | Total Commutations | Signed with Autopen | Signed with Autopen When Biden Was in D.C. | Percent Signed with Autopen When Biden Was in D.C. |
|------|--------------------|---------------------|-------------------------------------------|----------------------------------------------------|
| 2022 | 7 | 1 | 1 | 100% |
| 2023 | 4 | 4 | 4 | 100% |
| 2024 | 9 | 3 | 3 | 100% |
| 2025 | 7 | 6 | 6 | 100% |

## Conclusion

America during the Biden presidency experienced a constitutional crisis. We, as a nation, operated for years without a functioning president and instead ceded executive power to a politburo of unelected bureaucrats who exercised presidential power via autopen. These statistics are alarming. The time is now for the Administration and Congress to hold those who orchestrated this coup d'etat accountable.



App. 386

Case 1:24-cv-00645-DLF    Document 65-8    Filed 05/29/26    Page 13 of 13
USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 424 of 635

## HELPFUL LINKS

Press Releases

In The News

Investigations

Litigation

Our Staff

Resources

## SUPPORT THE PROJECT

Make A Donation

## CONTACT US

Press Request

Contact

© 2026 OVERSIGHT PROJECT | PRIVACY POLICY

# EXHIBIT 7



← **Post**

**New to X?**

Sign up now to get you

 **Mike Howell** ✔
@MHowellTweets

     …

**"Whoever controlled the autopen controlled the presidency."**

I tweeted this out on March 6th of this year and the autopen scandal began.

On March 22nd, the New York Times, a sudoku creating company with fake news as a side dish, wrote an article titled *"How an Autopen Conspiracy Theory About Biden Went Viral"*

It was what we in the business call a bum steer written by Ken Bensinger, a long time amplifier of the work of my Oversight Project.

No one calls it a conspiracy theory today.

But the real story began much earlier.

In the Summer of 2024, everyone around the world wondered who was actually running the White House because it was abundantly clear that it was not Biden.

Biden's malfunction at the presidential debate put an end to any reasonable argument that he was actually in charge.

Gathered around a conference room, my team tried to find the answer.

We knew it was inevitable that Biden would exit the stage.

We were exploring several ways to accelerate that.

One was our litigation threat that if the DNC waited too long to legally substitute another candidate that we would sue to prevent them from pulling a last minute switch.

The DNC admitted in leaked memos that that very litigation threat impacted their thinking. The result was a fake and fast primary that crowned the weak Kamala Harris, wounded by her undemocratic ascension out of the gate.

Another was intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur.

We won that fight and the audio was released earlier this year, and to no one's surprise, Biden malfunction in that interview was clear.

But the most important part of that summer meeting was when we were gathered around a television watching Biden stumble across the screen.

Someone asked how he was even signing documents and then there was a contemplative pause.

Autopen.

A long and intense process was then launched. We got to work gathering up every original document we could find purporting to have the President's signature.

🔵 Sign u

 Sign

Creat

By signing up, you agre
Privacy Policy, includir

**Relevant peo**

 **Mike Howel**
@MHowellT

President of
@ItsYourGo
@NICEnforc
@theBlaze;
Fellow.

**What's happe**

Technology · Trending
**Span**

Entertainment · Trend
**Wicked Witch of tl**

Trending in United Sta
**Wiener**

Trending in United Sta
**Reese Chapman**

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info



Mike Howell on X: "Whoever controlled the autopen controlled the presidency. I tweeted this out on March 6th of this year and the …

We then gathered calendars and Biden's schedule and confirmed that Biden frequently used the autopen when he was in D.C. and had a relatively light schedule.

We took a deep-dive into the legal and constitutional authority around presidential power and whether certain decisions were delegable.

Our team spent hundreds of hours on this and the results were not only jarring but abundantly clear.

Joe Biden wasn't the President, an autopen was.

President Trump has brought up the autopen perhaps more than any other topic.

He has called it the scandal of the century.

If you look at trends of google searches as a metric, the word autopen was searched more this year than over the entire history of the Internet by many degrees.

It is now part of our national language, it is a historical term for a historic scandal.

But now is the most important part, the only part that really matters.

We're getting close to accountability.

To date, the Department of Justice hasn't taken any action to back up the President's repeated directions that all autopenned documents are null, void, and of legal effect.

Despite President Trump's clear orders, the Department of Justice is still treating these documents as legal.

They have already released awful criminals with fake commutations from Federal prison during the Trump Presidency.

We broke the scandal that Biden's own DOJ objected both to the form of these commutations and the fact that while the Biden Administration claimed they are non-violent felons many are in fact murderers and gang-bangers.

They are scheduled to release more later this month.

To be sure, brave individuals like Pardon Attorney Ed Martin have urged the Department to implement President Trump's Orders, but the Department's position remains that these autopen commutations are valid.

We're trying to stop it.

For four years, this country operated completely out of order with its Constitution, which vests executive power in one man, and not one autopen directed and operated by unelected bureaucrats and special interests.

(12/12 monologue on @FinePointOAN)

**New to X?**

Sign up now to get you

 Sign

Create

By signing up, you agree
Privacy Policy, includir

**Relevant peo**



**Mike Howel**
@MHowellT
President of
@ItsYourGo
@NICEnforc
@theBlaze;
Fellow.

**What's happe**

Technology · Trending
**Span**

Entertainment · Trend
**Wicked Witch of tl**

Trending in United Sta
**Wiener**

Trending in United Sta
**Reese Chapman**

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info

Mike Howell on X: "Whoever controlled the autopen controlled the presidency. I tweeted this out on March 6th of this year and the …



Case 1:24-cv-00645-DLF    Document 65-9    Filed 05/29/26    Page 4 of 4

**FINE POINT**
WITH CHANEL RION

THE AUTOPEN SCANDAL AND WHO REALLY RAN THE BIDEN WHITE HOUSE    FINE POINT

WROTE AN

▶    0:16 / 4:56    🔇    ⚙    ⤴    ⛶

9:01 PM · Dec 15, 2025 · **97.7K** Views

💬 24          🔁 201          ♡ 624          🔖 106          ⬆

**New to X?**

Sign up now to get you

 Sign

Creat

By signing up, you agre
Privacy Policy, includin

**Relevant peo**

**Mike Howe**
@MHowellT
President o
@ItsYourGo
@NICEnforc
@theBlaze;
Fellow.

**What's happe**

Technology · Trending
**Span**

Entertainment · Trend
**Wicked Witch of th**

Trending in United Sta
**Wiener**

Trending in United Sta
**Reese Chapman**

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info

# EXHIBIT 8

Case 1:24-cv-00645-DLF     Document 65-10     Filed 05/29/26     Page 2 of 2
USCA Case #26-5235          Document #2180382          Filed: 06/24/2026          Page 430 of 635



← Post

New to X?

Sign up now to get you

  Sign (

🍎  Sign (

Creat

By signing up, you agre
Privacy Policy, includir

**Jeff Clark** ✔
@JeffClarkUS

Joe Biden — or in reality his handlers — have known that President Trump had appointed new officials to run DOJ since late January 2025, yet they did nothing to try to intervene in our case against DOJ that started in Biden autopen administration.

Now, as these pre-Biden presidency papers are poised to be released, they're trying to throw a wrench into the situation for no good reason.

This is the most untimely intervention I've ever seen in 30+ years of litigating.

It's a pure delay tactic.



**Mike Howell** ✔  @MHowellTweets · May 10
Give them to me already x.com/politico/statu…

12:43 PM · May 10, 2026 · **24.3K** Views

💬 10          ⟲ 223          ♡ 597          🔖 19          ⬆️

💬  Read 10 replies

**Relevant peo**

  **Jeff Clark** ✔
@JeffClarkU
VP Litigation
Acting OIRA
Double DOJ
expert; on G
Truth

**Mike Howe**
@MHowellT
President of
@ItsYourGo
@NICEnforc
@theBlaze;
Fellow.

**What's happe**

Technology · Trending
**Span**

Trending in United Sta
**Evan Blanco**

Sports · Trending
**Leon Slater**

Trending in United Sta
**tim minear**

Show more

Terms of Service  |  Priva
Accessibility  |  Ads info

**Don't miss what's happening**
People on X are the first to know.

Log in

# EXHIBIT 9



← **Truth Details**
No replies
•••



**Donald J. Trump** ✔ ➕
@realDonaldTrump

A Crooked Politician!!!

---



**Donald J. Trump** ✔ ➕
@realDonaldTrump · 2d

Joe Biden sues DOJ to stop release of audio recordings connected to special counsel probe: justthenews.com/government/cou

🔗 justthenews.com

Joe Biden sues DOJ to stop release of audio recordings connected to special counsel probe

The lawsuit comes ahead of the department's planned June 15 release of the materials to the U.S. House Judiciary Committee and the conservative Heritage Foundation, which requested the information under...

---

**6.29k** ReTruths  **21.8k** Likes                    May 26, 2026, 10:31 PM

USCA Case #26-5235    Document #2180382    Filed: 06/24/2026    Page 433 of 635

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<div style="border: 1px solid">

**HERITAGE FOUNDATION,**

**MIKE HOWELL,**

　　　　　　*Plaintiffs,*

　　　v.

**U.S. DEPARTMENT OF JUSTICE,**

　　　　　　*Defendant,*
　　and

**JOSEPH R. BIDEN, JR.,**

　　　　　　*Defendant-Intervenor*.

</div>

Case No. 1:24-cv-00645 (DLF)

**MEMORANDUM OF LAW OF THE DEPARTMENT OF JUSTICE IN OPPOSITION
TO JOSEPH R. BIDEN, JR.'S MOTION FOR A PRELIMINARY INJUNCTION**

App-397

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

I.    BACKGROUND ....................................................................................... 4

    a.    The Zwonitzer Materials.............................................................. 4

    b.    The Investigation of President Biden By Robert K. Hur ........................... 5

    c.    House Judiciary Committee's Oversight Hearing Regarding the Hur Report ................................................................................... 7

    d.    DOJ's Decision to Release the Zwonitzer Materials to Plaintiffs Under FOIA ............................................................................... 7

    e.    President Biden's Motions to Intervene and for a Preliminary Injunction ................................................................................. 9

II.   STATUTORY BACKGROUND ............................................................... 10

    A.    Freedom of Information Act ...................................................... 10

    B.    Privacy Act................................................................................ 11

LEGAL STANDARD.................................................................................... 11

ARGUMENT .................................................................................................. 12

I.    PRESIDENT BIDEN IS UNLIKELY TO SUCCEED ON THE MERITS. ................. 12

    A.    The Government's Decision To Disclose Information Is Committed To The Agency's Discretion By Law Unless A Statute Constrains That Discretion By Restricting Disclosure.................................................. 12

    B.    The Privacy Act's Reticulated Remedial Scheme Precludes Injunctive Relief In This APA Suit................................................................ 14

    C.    The Department's Discretionary Balancing of Interests Was Reasonable. .......... 19

        1.    President Biden's Privacy Interests Are Minimal.................................... 21

            (a)    The Zwonitzer Materials Are Largely In The Public Domain................ 22

            (b)    The Zwonitzer Materials Do Not Include Biden Family Matters. .......... 24

(c)    President Biden Has Publicly Addressed The Hur Report
and Zwonitzer Materials. ............................................... 24

(d)    President Biden's Interest In Preventing Disclosure Of His
Voice in the Audio Recordings is Insubstantial. ........................... 25

(e)    Disclosure Would Not Impose A Stigma. .................................. 26

2.    There Is a Substantial Public Interest in Disclosure of the
Zwonitzer Materials. .................................................. 28

3.    The Department's Process Complied With Law. .................................. 32

D.    There Is No Violation of the Privacy Act. ............................................. 33

II.    THERE IS NO GENUINE THREAT OF IMMINENT, IRREPARABLE
INJURY. ............................................................................. 35

III.    NEITHER THE BALANCE OF EQUITIES NOR THE PUBLIC INTEREST
FAVORS A PRELIMINARY INJUNCTION. ................................... 37

IV.    MOVANT SHOULD POST SECURITY IN CONNECTION WITH ANY
EMERGENCY RELIEF. ........................................................ 37

CONCLUSION ........................................................................... 38

ii

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ........................................................................ 12

*ACLU v. U.S. DOJ*,
  655 F.3d 1 (D.C. Cir. 2011) ........................................................................ 30, 31

*AFL-CIO v. Dep't of Lab.*,
  No. 25 Civ. 339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) ........................... 14

*AFL-CIO v. FEC*,
  177 F. Supp. 2d 48 (D.D.C. 2001), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003) .............................. 14

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab*,
  778 F. Supp. 3d 56 (D.D.C. 2025).  ................................................................. 17

*Am. Fed'n of Tchrs. v. Bessent*,
  152 F. 4th 162 (4th Cir. 2025), *limited on other grounds*, *AFSCME v. SSA*, 172 F. 4th 361
  (4th Cir. 2026) (*en banc*) .............................................................................. 18

*Angelo v. District of Columbia*,
  648 F. Supp.3d 116 (D.D.C. 2022) ................................................................. 21

*Berardi v. U.S. Dep't of the Air Force*,
  No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) ....................... 17

*Biden v. Department of Justice*,
  26-cv-1818 (May 29, 2026), Dkt. 8 ................................................................. 21

*Bierly v. U.S. DoD.*,
  No. 23-2386 (RCL), 2024 WL 4227154 (D.D.C. Sep. 18, 2024) .................... 17

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ........................................................................................ 15

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ........................................................................................ 15

*Brunson v. Hom, Civil Action*,
  No. 24-cv-3382 (RDM), 2025 U.S. Dist. LEXIS 266082 (D.D.C. Dec. 1, 2025) ................... 21

*Campbell v. U.S. DOJ*,
  164 F.3d 20 (D.C. Cir. 1998)…………………………………………………… 20

App-400

*Cell Assocs., Inc. v. NIH*,
 579 F.2d 1155 (9th Cir. 1978) ........................................................................... 17,18

*Chrysler Corp. v. Brown*,
 441 U.S. 281 (1979) ........................................................................... 11, 13

*Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*,
 840 F. Supp. 2d 226 (D.D.C. 2012) ........................................................................... 22

*Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*,
 746 F.3d 1082 (D.C. Cir. 2014) ...................................................................*passim*

*Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*
 854 F.3d 675 (D.C. Cir. 2017) ........................................................................... 22, 30

*Clarkson v. IRS*,
 678 F.2d 1368 (11th Cir. 1982) ........................................................................... 14

*Clevinger v. Advoc. Holdings, Inc.*,
 134 F.4th 1230 (D.C. Cir. 2025) ........................................................................... 36

*CNA Fin. Corp. v. Donovan*,
 830 F.2d 1132 (D.C. Cir. 1987) ........................................................................... 27

*Comm. on Oversight & Gov't Reform v. Lynch*,
 156 F. Supp. 3d 101 (D.D.C. 2016) ........................................................................... 36

*Dep't of Air Force v. Rose*,
 425 U.S. 352 (1976) ........................................................................... 18, 28

*Dew v. United States*,
 192 F.3d 366 (2d Cir. 1999) ........................................................................... 15

*Doe v. Stephens*,
 851 F.2d 1457 (D.C. Cir. 1988) ........................................................................... 17

*DSE, Inc. v. United States*,
 169 F.3d 21 (D.C. Cir. 1999) ........................................................................... 38

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
 396 F.3d 1265 (D.C. Cir. 2005) ........................................................................... 15

*Env'tl. Def. Fund, Inc. v. Costle*,
 657 F.2d 275 (D.C. Cir. 1981) ........................................................................... 21

*FAA v. Cooper*,
 566 U.S. 284 (2012) ...................................................................*passim*

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................................ 33

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ........................................................................... 21

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ........................................................................... 15

*Greentree v. U.S. Customs Serv.*,
  674 F.2d 74 (1982) ............................................................................................. 34

*Haleem v. U.S. Dep't of Def.*,
  No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024)........................... 17

*Harrison v. Fed. Bureau of Prisons*,
  248 F. Supp. 3d 172 (D.D.C. 2017) ................................................................... 17

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................................... 13

*Hinck v. United States*,
  550 U.S. 501 (2007) ........................................................................................... 18

*In re Exec. Off. of President*,
  215 F.3d 20 (D.C. Cir. 2000), ............................................................................ 17

*Jigsaw Prods., Inc. v. U.S. SEC*,
  No. 24-cv-2358 (TSC), 2026 U.S. Dist. LEXIS 60697 (D.D.C. Mar. 23, 2026)............... *passim*

*Jones v. HUD*,
  No. 11-CV-0846 (RJD) (JMA), 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ....................... 15

*Judicial Watch, Inc. v. National Archives & Records Administration.*,
  876 F.3d 346 (D.C. Cir. 2017) ........................................................................... 31

*Jurewicz v. USDA.*,
  891 F. Supp. 2d 147 (D.D.C. 2012) *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014) ....................... 20, 34

*Kimberlin v. U.S. DOJ*,
  139 F.3d 944 (D.C. Cir. 1998) ...................................................................... 25, 29

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ........................................................................................... 28

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  818 F. Supp. 3d 34 (D.D.C. 2026) ................................................................ 14, 17

v

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................................ 13

*Make The Road N.Y. v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ............................................................................ 12

*Marino v. DEA*,
   685 F.3d 1076 (D.C. Cir. 2012) .......................................................................... 22

*Martin Marietta Corp. v. Dalton*,
   974 F. Supp. 37 (D.D.C. 1997) .......................................................................... 20

*Maydak v. U.S. DOJ*,
   254 F. Supp. 2d 23 (D.D.C. 2003) ..................................................................... 34

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) *aff'd*, 20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct.
   1350 (2022) ................................................................................................. 12, 35

*Milner v. Dep't of the Navy*,
   562 U.S. 562 (2011) ............................................................................................ 10

*Mulhern v. Gates*,
   525 F. Supp. 2d 174 (D.D.C. 2007) ................................................................... 35

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................ 11

*Murphy v. Exec. Office for United States Attys.*,
   11 F. Supp. 3d 7 (D.D.C. 2014) ......................................................................... 34

*Nat'l Archives & Records Admin. v. Favish*,
   541 U.S. 157 (2004) ............................................................................................ 20

*Nation Magazine v. U.S. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) .................................................................. 25, 28, 29

*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ............................................................................. 10

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
   879 F.2d 873 (D.C. Cir. 1989) ........................................................................... 20

*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*,
   169 F.3d 16  (D.C. Cir. 1999) ............................................................................ 35

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................ 12

vi

*Occidental Petroleum Corp. v. SEC*,
  873 F.2d 325 (D.C. Cir. 1989) ............................................................................. 32

*Parks v. IRS*,
  618 F.2d 677 (10th Cir. 1980) .............................................................................. 18

*Penguin Books USA, Inc. v. Walsh*,
  929 F.2d 69 (2d Cir. 1991) ................................................................................... 35

*Playboy Enters., Inc. v. U.S. DOJ*,
  516 F. Supp. 233 (D.D.C. 1981) *mod. on other grounds*, 677 F.2d 931 (D.C. Cir. 1982). ..... 23

*Plunkett v. U.S. DOJ*,
  924 F. Supp. 2d 289 (D.D.C. 2013) ..................................................................... 34

*Poss v. Kern*,
  No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sep. 25, 2024) ...................... 17

*Powers v. Ohio*,
  499 U.S. 400 (1991) ............................................................................................. 28

*Raw Story v. U.S. DoD*,
  No. 23-2514 (LLA), 2024 U.S. Dist. LEXIS 176680 (D.D.C. Sep. 30, 2024) ........ 30

*Reporters Comm. for Freedom of the Press v. FBI*,
  3 F.4th 350 (D.C. Cir. 2021) ................................................................................ 21

*Richardson v. Bd. of Governors of the Fed. Res. Sys.*,
  288 F. Supp. 3d 231 (D.D.C. 2018) *aff'd*, No. 18-5063, 2018 U.S. App. LEXIS 24770 (D.C. Cir. Aug. 15, 2018) ............................................................................. 14

*Rimmer v. Holder*,
  700 F.3d 246 (6th Cir. 2012) ................................................................................ 15

*Stern v. FBI*,
  737 F.2d 84 (D.C. Cir. 1984) ............................................................................... 30

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................................... 17

*Sw. Airlines Co. v. Transp. Sec. Admin.*,
  650 F.3d 752 (D.C. Cir. 2011) ............................................................................. 32

*Swanson Grp. Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ............................................................................. 12

*The Nation Magazine v. Dep't of State*,
  805 F. Supp. 68 (D.D.C. 1992) ............................................................................ 36

vii

*Tripp v. U.S. DoD*,
  193 F. Supp. 2d 229 (D.D.C. 2002) ........................................................ 17

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) .............................................................................. 27

*Trump v. Thompson*,
  573 F. Supp. 3d 1 (D.D.C. 2021) ........................................................... 35

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991) .............................................................................. 10

*U.S. DOJ v. Reporters Comm. for Freedom of Press*,
  489 U.S. 749 (1989) ................................................................... 11, 20, 29

*United States v. Bolton*,
  468 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 35

*Watkins v. United States*,
  354 U.S. 178 (1957) .............................................................................. 28

*Westcott v. McHugh*,
  39 F. Supp. 3d 21 (D.D.C. 2014) ........................................................... 17

*Wilson v. Libby*,
  535 F.3d 697 (2008) .............................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................. 11, 12

*Woods v. U.S. DOJ*,
  968 F. Supp. 2d 115 (D.D.C. 2013) ....................................................... 34

*Zeng v. Mayorkas*,
  No. 21-cv-446 (DLF), 2021 U.S. Dist. LEXIS 111323 (D.D.C. Apr. 16, 2021) ...................... 35

**<u>Statutes</u>**

5 U.S.C. § 552 ....................................................................................... 10

5 U.S.C. § 552a ................................................................................. *passim*

5 U.S.C. § 553 ....................................................................................... 19

5 U.S.C. § 701 ....................................................................................... 13

5 U.S.C. § 704 ....................................................................................... 14

5 U.S.C. § 706 ................................................................................... 19, 32

viii

**Rule**

Fed. R. Civ. P. 65(c) .................................................................................................. 38

**Regulation**

28 C.F.R. § 600.8(c)..................................................................................................... 5

**Other Authorities**

Biden, Joseph R. Jr., *Promise Me, Dad: A Year of Hope, Hardship, and Purpose,* Flatiron Books
    (1st ed. Nov. 2017) ................................................................................................ 2

Comm. on the Judiciary, U.S. House of Representatives, *Hearing on the Report of Special
    Counsel Robert K. Hur* (March 12, 2024)
    https://www.congress.gov/118/chrg/CHRG-118hhrg55150/CHRG-118hhrg55150.pdf ........... 7

U.S. Dep't of Just., Appointment of Robert K. Hur as Special Counsel, Att'y Gen. Order No.
    5588-2023 (Jan. 12, 2023) https://www.justice.gov/archives/media/1268121/dl....................... 5

U.S. Dep't of Just., *Report on the Investigation Into Unauthorized Removal, Retention, &
    Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center
    and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024)
    ("Hur Report") https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-
    february-2024.pdf................................................................................................... *passim*

## <u>INTRODUCTION</u>

Former President Joe Biden seeks to block the release of redacted transcripts and recordings of his conversations with his ghostwriter, Mark Zwonitzer, which helped lead Special Counsel Robert Hur to conclude that Mr. Biden's diminished mental capacity would make a conviction for unlawfully disclosing classified information unlikely. On May 5, 2026, the Department determined that disclosure of the redacted Zwonitzer materials is required under FOIA because President Biden's reduced privacy interests are outweighed by the public interest in the materials. There is no basis for a claim to undo that careful balancing, much less a preliminary injunction.

President Biden's claims are legally infirm for several reasons. Through an orderly process that involved President Biden's lawyers at every stage, the Department made a discretionary determination that, in its judgment, President Biden's reduced privacy interests were outweighed by a significant public interest in disclosure. While FOIA's exemptions sometimes permit non-disclosure, FOIA does not require non-disclosure in a case like this, as even President Biden tacitly acknowledges. Thus, the government's decision to disclose the materials is "committed to agency discretion by law" because there are no manageable standards that can be applied to evaluate that discretionary decision, unless some other statute prohibits disclosure. Here, President Biden claims that the Privacy Act prohibits disclosure. But the Privacy Act's reticulated remedial scheme precludes granting broader injunctive relief under the APA. And regardless, his Privacy Act claim fails because the Act exempts from its coverage information that is required to be disclosed under FOIA.

President Biden's claims fare no better on the merits. He primarily complains that his privacy rights would be violated by disclosure of materials in which "President Biden and

Zwonitzer discussed a range of sensitive topics, including the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; the many other voices and events that factored into that difficult, highly personal decision; and the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family." Dkt. 51-3 ¶ 10, Biden Answer/Cross-Claims; *see also* Dkt. 51-2, Declaration of Amy Jeffress ("Jeffress Decl.") ¶ 6 ("The materials at issue . . . includ[e] family health issues") (emphasis added).

In fact, however, President Biden's "family health issues" have been redacted from the Zwonitzer materials. In 2026, Department lawyers met with and consulted President Biden's counsel and staff, and the Department agreed to redact information related to Biden family health matters. Indeed, all references to Biden family members have been redacted.

President Biden also claims that there is a privacy interest surrounding his decision "whether to run for President in 2016." Dkt. 51-3 ¶ 10. But President Biden, with assistance from Mr. Zwonitzer, published a memoir in 2017 ("*Promise Me, Dad*") with an entire chapter ("*Run, Joe, Run*") detailing his decision not to run for President. He published the names and the advice of third parties who advised him. President Biden cannot now claim that he enjoys a significant privacy interest in his already-published decision-making process regarding whether to run for the highest public office in the land.

The Zwonitzer materials, moreover, have been extensively quoted, referenced and/or relied upon in the Hur Report, congressional testimony, Biden's counsel's correspondence appended to the Hur Report, and at a Biden press conference in the White House. Indeed, President Biden acknowledges, as he must, that the Hur Report published "excerpts of President Biden's conversations with Zwonitzer, all of which focused on President Biden's notes and other records

related to official business as Vice President." Dkt. 65-1, Biden Mem. at 5 (citing Hur Report at 65, 75-77, 106, 110-11, 236-37).

While President Biden has reduced privacy interests in the Zwonitzer materials, there is a heightened public interest in disclosure.  Information about the Hur investigation into the alleged mishandling of classified material by a high-ranking public official sheds light on how the Department of Justice and its Special Counsel have performed their statutory duties. There is a heightened public interest in whether the DOJ and Special Counsel performed their statutory duties, particularly given the substantial controversy over the Special Counsel's declination decision. Indeed, President Biden, Biden's counsel, House Committees, and individual members of Congress have publicly challenged the fairness, scope and propriety of the Hur Report and Mr. Hur's handling of the Biden investigation. The public interest in the disclosure of the materials is significant.

By any measure, President Biden's motion is fundamentally unsound. President Biden offers no declaration of his own and erroneously relies upon one declaration -- the outdated Declaration of Bradley Weinsheimer, Dkt. 33-2 (Nov. 13, 2024).  *See generally* Biden Mem., Dkt. 65-1.  In 2024, the Department and Mr. Weinsheimer assessed the Zwonitzer materials differently, overvaluing the privacy interest, and undervaluing the public interest in comparison to the current approach.  But the balancing test that the Department conducts under FOIA Exemptions 6 and 7(C) is inherently discretionary, and it should surprise no one that reasonable people in different administrations might weigh the relevant factors in different ways.  Indeed, given the discretionary nature of the balancing, both views withstand judicial scrutiny. Here, the Department's balance favors transparency, a result consistent with the Freedom of Information Act.  Because movant

3

App-409

relies on nothing more than an obsolete declaration from the government to urge secrecy, he cannot meet his burden on this motion for emergency relief.

In any event, there has been no evidentiary showing of a genuine threat of imminent, irreparable harm that would warrant a preliminary injunction. President Biden faces no threat of injury from the disclosure of family-related matters nor from the disclosure of the sort of political deliberations that already formed the basis for a chapter in his memoir. More fundamentally, even if he had a claim under the Privacy Act (he does not), his relief for any proscribed disclosure would be damages, the quintessential adequate remedy at law that precludes injunctive relief.

## I. BACKGROUND

The factual background is set forth below and in the accompanying Declaration of Peter A. Winn ("Winn Decl.") (Exhibit 1), the Director of the Office of Privacy and Civil Liberties at the United States Department of Justice and the Acting Chief Privacy and Civil Liberties Officer of the Department.

### a. The Zwonitzer Materials

In 2016 and 2017, President Biden met with a writing assistant (or "ghostwriter"), Mr. Mark Zwonitzer, at the Naval Observatory and in McLean, Virginia in connection with President Biden's preparation of his memoir, *Promise Me, Dad*, which was published in 2017. Winn Decl. ¶ 5. In connection with this book-writing project, Mr. Zwonitzer had conversations with President Biden, which Mr. Zwonitzer recorded. *Id.*

The Zwonitzer materials include 117 pages of transcripts of the Biden-Zwonitzer conversations in 2016 and 2017, and approximately 2 ½ hours of audio recordings of the same conversations. Winn Decl. ¶ 6. President Biden's counsel and members of President Biden's staff

4

reviewed the redacted recordings and transcripts at the Department of Justice in March and April 2026. *Id.* ¶ 11.

In consultation with President Biden's counsel, the transcripts and recordings have been redacted. *Id.* ¶ 6. Information concerning President Biden's family's heath issues has been fully redacted. *Id.* Information concerning President Biden's family has been fully redacted. *Id.* Information concerning individuals who are not public figures has been redacted. *Id.* National security information has been redacted. *Id.* The redacted transcripts and recordings at issue are defined herein as the "Zwonitzer Materials."

**b.** __The Investigation of President Biden By Robert K. Hur__

On January 12, 2023, Attorney General Merrick B. Garland appointed Robert K. Hur as Special Counsel to investigate and prosecute any federal crimes arising from the "possible unauthorized removal and retention of classified documents or other records discovered at locations associated with President Biden. *See* Appointment of Robert K. Hur as Special Counsel, Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023).[1] The Special Counsel's Office was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden. *Id.*

At the conclusion of the investigation, Mr. Hur issued his findings and submitted a report to Attorney General Merrick Garland pursuant to Department regulations. *See* 28 C.F.R. § 600.8(c).[2] The Hur Report "conclude[d] that no criminal charges are warranted," Hur Report, at 1,

---

[1] U.S. Dep't of Just., Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023), available at https://www.justice.gov/archives/media/1268121/dl.

[2] *Report on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024) ("Hur Report")

5

and provided an extensive discussion of the investigation and the decisions reached. *See generally* Hur Report. The Department later produced a copy of the Hur Report to Congress without any additional redactions or modifications and published it on the Department's public-facing website. Winn Decl. ¶ 8.

The Zwonitzer Materials "had significant evidentiary value." Hur Report, at 334. The Hur Report extensively quoted, referenced and relied upon the Zwonitzer Materials. *See*, *e.g.*, Hur Report, at 3 ("In a recorded conversation with his ghostwriter in February 2017, about a month after he left office, Mr. Biden said, while referencing his 2009 Thanksgiving memo, that he had 'just found all the classified stuff downstairs.'"); *id.* at 64 ("Referring to his 'Foreign Policy' notebook, Mr. Biden added, '[t]hey didn't even know I have this.'"). Relying in part on the Zwonitzer Materials, the Hur Report explained the Special Counsel's assessment of President Biden's memory and likely jury appeal. *See*, *e.g.*, *id.* at 207 ("Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Mr. Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Mr. Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."). Mr. Hur declined prosecution, concluding that "Mr. Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory." *Id.* at 6.

---

https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.
*See also* Hur Report, Dkt. 6-1, 6-2.

**c.** **House Judiciary Committee's Oversight Hearing Regarding the Hur Report**

On March 12, 2024, Special Counsel Hur publicly testified before the House Judiciary Committee concerning his investigation and declination decision.[3]  At the hearing, the audio and transcripts related to Mr. Zwonitzer's conversations with President Biden were central topics of testimony and inquiries by members of Congress.  *See*, *e.g.*, *id.* at 2, 7, 15, 16, 23, 24, 30, 32, 39, 43, 54, 60, 61, 72, 87, 92, 93.

As Mr. Hur testified, "We identified evidence that the President willfully retained classified materials after the end of his Vice Presidency when he was a private citizen. This evidence included an audio-recorded conversation during which Mr. Biden told his ghostwriter that he had, 'just found all the classified stuff downstairs.'" *Id.* at 7. "We also identified other recorded conversations during which Mr. Biden read classified information aloud to his ghostwriter." *Id.* The Zwonitzer Materials played a central role in Mr. Hur's assessment of President Biden's memory and declination decision.  *See*, *e.g.*, *id.* at 8 ("We interviewed the President and asked him about his recorded statement 'I just found all the classified stuff downstairs.' He told us that he didn't remember saying that to his ghostwriter.").

**d.** **DOJ's Decision to Release the Zwonitzer Materials to Plaintiffs Under FOIA**

In March 2024, Plaintiffs filed their FOIA action seeking production of: "all records relied upon by Special Counsel Hur to write particular passages of the Report" which made findings concerning President Biden's recollection. Compl. ¶ 1, Dkt. 1; Am. Compl. ¶ 1, Dkt. 6.  Plaintiffs clarified their demands to cover the "written transcript and audio recording." Joint Status Report,

---

[3] Comm. on the Judiciary, U.S. House of Representatives, *Hearing on the Report of Special Counsel Robert K. Hur* (March 12, 2024). https://www.congress.gov/118/chrg/CHRG-118hhrg55150/CHRG-118hhrg55150.pdf.

March 6, 2026, Dkt. 47.[4]  Earlier in this litigation, the Department produced a redacted set of Biden-Zwonitzer transcripts that disclosed the Biden-Zwonitzer statements that were quoted in the Hur Report. Dkt. 33-2 (Exh. B). The Biden Administration determined to withhold the majority of the transcripts and the entire audio recording, and the Department briefed the issues accordingly. In or about February 2026, the Department reassessed its prior litigation decision and provided notice to President Biden's counsel of its preliminary view that the Zwonitzer Materials should be disclosed to Plaintiffs under FOIA. Winn Decl. ¶ 11. This notice engendered extensive consultation between Department officials and President Biden's counsel. *Id.* This consultation occurred throughout March and April 2026 (*id.*), but did not fully satisfy President Biden's counsel.  Answer/Cross-Claims, Dkt. 51-3 ¶ 63.

On or about May 5, 2026, the Department determined to release the Zwonitzer Materials. *Id.* ¶ 12.  The Department informed President Biden's counsel of this decision. Answer/Cross-Claims, Dkt. 51-3 at ¶ 64; Winn Decl. ¶ 13.  This decision was publicly memorialized on May 8, 2026, in the Joint Status Report. Dkt. 50 ("Defendant intends to disclose the written transcript and audio recordings at issue in this matter, with redactions, to Congress, pursuant to a request from the Chair of the House Judiciary Committee, as well as to Plaintiffs.").

---

[4] The dispute with Plaintiffs was originally addressed to a subset of the Zwonitzer Materials.  On Defendant's motion for summary judgment on November 13, 2024, Defendant stated, "By agreement of the parties, Plaintiffs only seek (1) the portions of audio recordings from 2016-17 of conversations between President Biden and his writing assistant, Mark Zwonitzer ("the Biden-Zwonitzer recordings") that are quoted directly in the Hur Report, and (2) the transcripts of a portion of the Biden-Zwonitzer recordings that SCO created via a court-reporter service."  Dkt. 33-1, at 4.  Plaintiffs later reversed course.

8

App-414

e. **President Biden's Motions to Intervene and for a Preliminary Injunction**

On May 12, 2026, President Biden moved to intervene in this FOIA action as a Defendant-Intervenor. Dkt. 51. The Department consented to the motion (Dkt. 50) and Plaintiffs opposed.

In seeking intervention, President Biden, through counsel, explained the privacy interests allegedly at stake with the anticipated disclosure. Dkt. 51-1, Putative Intervenor's Memorandum of Law, at 4 ("President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family"); *id.* at 16 ("These conversations include President Biden's intimate reflections on sensitive topics, including the passing of his eldest son, Beau . . ."); Dkt. 51-6, Jeffress Decl. ¶ 6 ("The materials at issue are audio recordings and transcripts of President Biden's conversations with his writing partner in 2016 and 2017. Those conversations covered a range of private and sensitive topics, including family health issues.").

On the basis of these allegations, this Court determined that President Biden had constitutional standing. Dkt. 63 at 5-7. "Such an intrusion into a person's private affairs, including personal thoughts regarding the death of a family member, 'would be highly offensive to a reasonable person.'" *Id.* at 6 (citation omitted). This Court further held that: "Biden has the right to intervene to assert his privacy interests in preventing the Department's production of the Zwonitzer materials to the plaintiffs." Dkt. 63 at 7.[5]

---

[5] While intervention in this FOIA action was permitted, this Court held that President Biden "may not bring cross-claims regarding the Department's production of such materials to the House Judiciary Committee because it is well settled in this circuit that an intervening party may join issue only on a matter that has been brought before the court by another party." Dkt. 63 at 12 (internal quotation marks omitted).

9

On May 29, 2026, President Biden moved for a preliminary injunction seeking an order enjoining "Defendant U.S. Department of Justice, including Defendant's officers, agents, servants, employees, and attorneys . . . from disclosing or causing to be disclosed the written transcript and audio recordings at issue in this matter, or any portion thereof, to Plaintiff Heritage Foundation or to Plaintiff Mike Howell absent further order of the Court." Dkt. 65-12. To support his claim for relief, President Biden relies almost exclusively on the 2024 Weinsheimer Declaration (Dkt. 65-1, at 1-6) and focuses on the supposed need to protect Biden family health information (*id.* at 3-4) -- even though Biden family health information has been fully redacted.

## II. STATUTORY BACKGROUND

### A. Freedom of Information Act

"The Freedom of Information Act (FOIA), 5 U.S.C. § 552, requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material." *Milner v. Dep't of the Navy*, 562 U.S. 562, 564 (2011). The courts have long recognized that FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (citation modified). In other words, "[a]t all times, courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)); *see also Rose*, 425 U.S. at 361 (FOIA's "basic policy [is] that disclosure, not secrecy, is the dominant objective of the Act"). "[FOIA's] basic policy of 'full agency disclosure unless information is exempted under clearly delineated statutory language,'. . . focuses on the citizens' right to be informed about 'what their government is up to [and] [o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within

10

App-416

that statutory purpose." *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989) (citations omitted).

Indeed, while FOIA *permits* non-disclosure where one of the exemptions applies, it generally does not *require* non-disclosure. As the Supreme Court has squarely held, the exemptions "demarcate[] [an] agency's obligation to disclose; [they] do[] not foreclose disclosure." *Chrysler Corp. v. Brown*, 441 U.S. 281, 291 (1979); *accord id.* ("[T]he conclusion that the exemptions impose affirmative duties on an agency to withhold information sought . . . is not supported by the language, logic, or history of the Act.").

**B.  Privacy Act**

"The Privacy Act of 1974, codified in part at 5 U.S.C. § 552a, contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 566 U.S. 284, 287 (2012).  The Privacy Act allows for recovery of "actual damages" (*id.* at 291) and, in limited circumstances, injunctive relief.  The Privacy Act is a limited waiver of sovereign immunity, and the Supreme Court has held "we refuse to enforce a waiver that is not unambiguously expressed in the statute, [and] we also construe any ambiguities in the scope of a waiver in favor of the sovereign." *Id.* at 291. The Privacy Act exempts from its coverage information that is required to be disclosed under FOIA. 5 U.S.C § 552a(b)(2).

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must establish by "clear evidence" that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable

11

App-417

harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The Supreme Court has also stressed, however, that a preliminary injunction cannot issue based on based on a mere "possibility" of harm. *Winter*, 555 U.S. at 22. Rather, as long held in this Circuit, the moving party must establish that the claimed injury is "both certain and great," "actual and not theoretical." *E.g.*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). To obtain extraordinary injunctive relief, the movant "must show an imminent future injury." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015).

## ARGUMENT

## I. PRESIDENT BIDEN IS UNLIKELY TO SUCCEED ON THE MERITS.

### A. The Government's Decision To Disclose Information Is Committed To The Agency's Discretion By Law Unless <u>A Statute Constrains That Discretion By Restricting Disclosure.</u>

Plaintiff must identify a cause of action to proceed in this Court. *See*, *e.g.*, *Make The Road New York v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020) ("While establishing jurisdiction gets" plaintiffs "through the courthouse door, . . . . [t]hey also need a cause of action to prosecute."). Here, President Biden derives the cause of action for all four counts from the APA. *See* Dkt. 51-3 ¶¶ 77-103. But no cause of action is available under the APA because, in the circumstances presented here, the agency's release of information to Plaintiffs is committed to agency discretion by law.

12

Under 5 U.S.C. § 701(a)(2), "agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993). To determine whether Congress committed an action to agency discretion by law, courts assess whether "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

The release of information pursuant to a FOIA request is generally such an action committed to agency discretion by law.  As noted in *Chrysler Corp. v. Brown*, the Supreme Court held that the FOIA exemptions generally permit—but, crucially, do not require—non-disclosure when a particular exemption is satisfied.  441 U.S. at 291-94.  Accordingly, the Court made clear that, "Congress did not limit an agency's discretion to disclose information" simply because a FOIA exemption applies, and "[i]t necessarily follows that the Act does not afford [parties] any right to enjoin agency disclosure." *Id.* at 294.

Accordingly, unless some other statute prohibits the disclosure, *see, e.g.*, *id.* at 317-18 (holding that the Trade Secrets Act can be invoked to bar disclosure of protected information), there is no meaningful standard by which to judge an agency's decision to voluntarily disclose records covered by a FOIA exemption.  For example, if an administration chooses to disclose information, even where it exempted under FOIA, for reasons of increased transparency or some other public interest —e.g., by waiving privileges over deliberative documents—the statute would supply no administrable standard by which parties aggrieved by such disclosure could challenge such disclosure as arbitrary or capricious, absent some other statute that restricted such disclosures and supplied a standard by which the disclosure could be tested.[6]

---

[6] President Biden urges this Court to follow decisions that have permitted so-called "reverse FOIA" suits seeking injunctive and other relief under the APA. Dkt. 65-1 at 18 citing *AFL-CIO v. FEC*, 177 F. Supp. 2d 48 (D.D.C. 2001), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003); *id.* at

13

App-419

**B.   The Privacy Act's Reticulated Remedial**
**Scheme Precludes Injunctive Relief In This APA Suit.**

The Privacy Act claim (Count IV) seeks relief that that statute does not provide—an injunction against the release of records.  Dkt. 51-3 ¶¶ 89-97.  The Privacy Act is a "comprehensive scheme," *Wilson v. Libby*, 535 F.3d 697, 707 (2008), that creates a right of action for injunctive relief in only limited circumstances, none of which are present here. 5 U.S.C. §§ 552a(g)(2), (3).

The Privacy Act applies solely to federal agencies and allows injunctions in only a sub-set of cases.  *Richardson v. Bd. of Governors of the Fed. Res. Sys.*, 288 F. Supp. 3d 231, 238 (D.D.C. 2018) ("injunctive relief is available under the [Privacy] Act only for a limited category of suits: suits to amend a record and suits for access to a record"), *aff'd*, No. 18-5063, 2018 U.S. App. LEXIS 24770 (D.C. Cir. Aug. 15, 2018); *Clarkson v. IRS*, 678 F.2d 1368, 1375 n.11 (11th Cir. 1982) ("The Privacy Act expressly provides for injunctive relief for only two types of agency misconduct, that is, wrongful withholding of documents under subsection (d)(1) and wrongful refusal to amend an individual's record under subsection (d)(3).").  President Biden's case does not fall within the limited category of suits authorized by the Privacy Act and he is thus unlikely to succeed on the merits.

The APA does not grant a cause of action to enforce the Privacy Act through injunctive relief because the Privacy Act "impliedly forbids th[at] relief," 5 U.S.C. § 702, and because there is "[an]other adequate remedy in a court," *id*. § 704. The APA "makes it clear that Congress did

---

26-27 citing *AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2026 WL 879518 (D.D.C. Mar. 31, 2026); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026). None of these cases appears to have squarely addressed, let alone rejected, the proposition that the decision to disclose is committed to agency discretion by law in the particular circumstances where, as here, there is no statute enforceable through the APA that restricts the disclosure and supplies judicially manageable standards to test it.

14

App-420

not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive.

This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices.  *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, No. 11-CV-0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").  And most relevant here, it is true even where the other statute restricts the remedies available.  *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005) (Roberts, J.) ("[CSRA's] remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA.").

15

App-421

Under these principles, President Biden may not challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *Cooper*, 566 U.S. at 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). But relief under the Privacy Act is carefully circumscribed.  Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), *id.* § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D).  For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful," 5 U.S.C. § 552a(g)(4)(A), and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Privacy Act allows for injunctive relief in two circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely

16

App-422

records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). But President Biden has not sought such relief. And injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Because of the Privacy Act's comprehensive remedial scheme, courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33; *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. Dep't of Def.*, No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, No. 23-2386 (RCL), 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002).[7] That result is consistent with the principle that, "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to

---

[7] Two recent cases in this district have authorized plaintiffs to sue under the APA to enjoin proposed disclosures that are barred by the Privacy Act. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 112 (D.D.C. 2026); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 778 F. Supp. 3d 56, 81 (D.D.C. 2025). Defendants respectfully submit that those decisions are incorrect and, in any event, they are not binding on this Court because "District Court decisions do not establish . . . the law of the district," *In re Exec. Off. of President*, 215 F.3d 20, 24 (D.C. Cir. 2000), and many more district court decisions go the other way.

17

injunctive relief." *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62). Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses President Biden's APA claim that is predicated on an alleged violation of the Privacy Act. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (citation modified).

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158-59. Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claim that President Biden brings here—"the detailed remedial scheme adopted by Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.*; *see also Am. Fed'n of Tchrs. v. Bessent*, 152 F. 4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *limited on other grounds*, *AFSCME v. SSA*, 172 F.4th 361 (4th Cir. 2026) (*en banc*).[8]

---

[8] By contrast, the Supreme Court has held that the Privacy Act's remedial scheme does not displace the remedial scheme in the Fair Credit Report Act precisely because those parallel substantive statutes "are merely complementary" and "can coexist harmoniously" without FCRA nullifying the Privacy Act's limitations (in the way that enjoining Privacy Act violations through the APA would). *See Dep't of Agricultural Dev. Housing v. Kirtz*, 601 U.S. 42, 63 (2024).

18

App-424

In short, Congress specified the procedural requirements for agencies to follow when issuing rules under the APA, *see* 5 U.S.C. § 553, and also separately specified the remedies that are available for APA violations, *see id.* § 706. Congress likewise specified the procedural requirements for agencies to follow when making significant changes to a "system of records" under the Privacy Act, *see id.* § 552a(e)(4), (e)(11), and likewise separately specified the remedies that are available to individuals for Privacy Act violations, *see id.* § 552a(g). Both the substantive arguments advanced and the relief requested in this suit make a mess of those choices by mixing and matching from different parts of different statutes. Congress's decision to provide narrow, targeted causes of action for damages or particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow a plaintiff to end-run that carefully constructed scheme via APA claims. This Court should respect that congressional choice.

**C. <u>The Department's Discretionary Balancing of Interests Was Reasonable.</u>**

If this Court were to reach the question of whether the Privacy Act prohibited disclosure because FOIA did not require disclosure, President Biden has not made any showing that the Department's determination was arbitrary or capricious. Rather, it was the reasonable product of a reasonable process that afforded President Biden adequate notice, opportunity to be heard, and notification of the decision.

The balance that the Department struck to release the information at issue was a well-founded, clearly reasoned decision. Assuming the disclosure decision is reviewable at all, Judge Boasberg has explained the deferential standard of review to apply in a reverse-FOIA action raising privacy issues:

> The Administrative Procedure Act sets forth the full extent of judicial authority to review executive agency action for procedural correctness. It requires courts to hold unlawful and set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. This is

19

App-425

a narrow standard of review as courts defer to the agency's expertise. An agency is required to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. The reviewing court is not to substitute its judgment for that of the agency, and thus may not supply a reasoned basis for the agency's action that the agency itself has not given. Nevertheless, a decision that is not fully explained may be upheld if the agency's path may reasonably be discerned.

*Jurewicz v. United States Dep't of Agric.*, 891 F. Supp. 2d 147, 153 (D.D.C. 2012) (citation modified), *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014).  In a "reverse" FOIA suit, the party seeking to prevent the disclosure of information the government intends to release assumes the burden of justifying the nondisclosure of the information. *Martin Marietta Corp. v. Dalton*, 974 F. Supp. 37, 40 n.4 (D.D.C. 1997).

FOIA permits "nondisclosure only where the information 'could reasonably be expected to constitute an unwarranted invasion' of [personal privacy] [and] "[t]he term 'unwarranted' requires [the court] to balance the [] privacy interest against the public interest in disclosure." *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (quoting *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762 (1989).  Given the "presumption of openness inherent in FOIA," *Campbell*, 164 F.3d at 33, both Exemptions 6 and 7(C) permit withholding only if "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). *See Jigsaw Prods., Inc. v. U.S. SEC*, No. 24-cv-2358 (TSC), 2026 U.S. Dist. LEXIS 60697, at *7 (D.D.C. Mar. 23, 2026) ("to invoke either exemption, an agency must point to a privacy interest that is substantial, meaning more than *de minimis*").

Consistent with these standards, this Court has stated this is "a standard FOIA case" in which "the Court must weigh, among other things, Biden's privacy interests in the Zwonitzer materials against (2) the public's interest in the release of those materials to the plaintiffs." *See*

20

*Biden v. Department of Justice*, 26-cv-1818 (May 29, 2026), Dkt. 8. This determination is inherently discretionary and this Court should not undo a reasoned decision made in an orderly manner. For the reasons memorialized in the accompanying Winn Declaration, the Department has reconsidered its earlier evaluation and determined that President Biden's privacy interests in the Zwonitzer Materials have been greatly reduced and his *de minimis* privacy interests in these materials after they have been redacted are outweighed by the significant public interest in disclosure.[9]

### 1. President Biden's Privacy Interests Are Minimal.

President Biden offers no personal declaration to support his privacy claims. To the contrary, through counsel, he offers "boilerplate and generic assertions" about alleged privacy interests. *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021). He does not make a focused, evidentiary showing "why actual harm would foreseeably result from release of the specific type of material at issue here." *Id.* at 371.

The absence of a declaration from President Biden -- or any sworn evidence from him -- strongly militates against a preliminary injunction. *Angelo v. District of Columbia*, 648 F. Supp.3d 116, 132 (D.D.C. 2022) ("a conclusory allegation contained in an unverified complaint is insufficient to support a motion for a preliminary (or permanent) injunction") (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *Brunson v. Hom*, Civil Action No. 24-cv-3382 (RDM), 2025 U.S. Dist. LEXIS 266082, at *8 (D.D.C. Dec. 1, 2025) ("more is

---

[9] The Winn Declaration memorializes the Department's decision. Winn Decl. ¶ 4. It was executed by a career DOJ official who personally participated in the Department's decision. *Id.* ¶¶ 6, 11, 13. The Winn Declaration is "merely explanatory" of the decision and "[] contain[s] no new rationalizations." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981). It is appropriately considered by this Court in opposition to a motion for preliminary injunction.

App-427

needed to turn conclusory allegations into evidence sufficient to support issuance of a preliminary injunction").

**(a) <u>The Zwonitzer Materials Are Largely In The Public Domain.</u>**

"It is well established that 'one can have no privacy interest in information that is already in the public domain.'" *Jigsaw Prods., Inc*, 2026 U.S. Dist. LEXIS 60697, at *8-9 (quoting *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 840 F. Supp. 2d 226, 233 (D.D.C. 2012)). *See also Marino v. DEA*, 685 F.3d 1076, 1080 (D.C. Cir. 2012) ("Under FOIA's public domain exception, an agency may not rely on an otherwise valid FOIA exemption to justify withholding information that is already in the public domain."). "[P]revious disclosures or admissions may [] diminish[] those [privacy] interests." *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 854 F.3d 675, 683 (2017).

The Department has determined (Winn Decl. ¶¶ 9, 15(a)), and the public record establishes, that the Hur Report quoted liberally from the Zwonitzer Materials. *See, e.g.*, Hur Report, at 110-11 ("I just found all the classified stuff downstairs") (citing Zwonitzer recording); *id.* at 8 ("As he told his ghostwriter during a recorded interview, the same staff who arranged to secure his classified notecards "didn't even know" he had retained possession of his classified notebooks."); *id.* at 224 ("Mr. Biden explained that when he described material in his notebooks to Zwonitzer as 'classified' he did not actually mean 'classified.'"). Indeed, one direct quote from President Biden memorialized in the Biden-Zwonitzer recordings – "I just found all the classified stuff downstairs" (Hur Report, at 110-11) – is the key evidence relied upon throughout the Hur Report. *Id.* at 3, 4, 6, 13, 108, 110-11, 113, 114, 137, 144, 149, 150-51, 155, 157, 201-02, 203, 204, 205, 206-07, 213, 218, 343.

In this FOIA action, the Department already produced a redacted set of Biden-Zwonitzer transcripts that discloses the Biden-Zwonitzer statements that were quoted in the Hur Report. Dkt. 33-2 (Exh. B). Movant alleges that his political deliberations are included in the Zwonitzer Materials (Dkt. 51-3 ¶¶ 10, 38), but these matters are detailed in his book. Winn Decl. ¶ 15(f). Nonetheless, President Biden seeks to enjoin disclosure of the entire transcript and entire audio recording, including the audio tracking the Biden-Zwonitzer statements that have already been disclosed in this action and in the Hur Report. Audio and video recordings have been ordered disclosed under similar circumstances. *Jigsaw Prods., Inc.*, 2026 U.S. Dist. LEXIS 60697, at *1 ("Because the SEC has already released a transcript of that interview and because Musk is a highly visible public figure whose image, demeanor, and voice are already well known, the SEC has not identified a substantial privacy interest that would be actually impeded by releasing the recording.").

Similarly, President Biden has already published information about his decision "whether to run for President in 2016." Dkt. 51-3 ¶ 10. President Biden published a memoir ("*Promise Me, Dad*") with an entire chapter ("*Run, Joe, Run*") detailing his decision not to run for President. Winn Decl. ¶ 15(f). President Biden alleges that his political deliberations are recounted in the Zwonitzer Materials (Dkt. 51-3 ¶¶ 10, 38), but his political deliberations are disclosed in his book (Winn Decl. ¶ 15(f)), and this undermines his claim of a privacy interest in his decision-making process about running for the highest *public office* in the land. *Playboy Enters., Inc. v. United States Dep't of Justice*, 516 F. Supp. 233, 246 n.12 (1981) ("In view of the public 'Summary of Results of the Department of Justice Task Force Investigation on Gary Rowe, Jr.' and other publicity concerning Rowe, *including his own book*, the Court finds no unwarranted invasion of

23

App-429

Rowe's personal privacy under these circumstances.") (emphasis added), *modified on other grounds*, 677 F.2d 931 (D.C. Cir. 1982).

**(b)  The Zwonitzer Materials Do Not Include Biden Family Matters.**

President Biden's main claim is that Defendant plans to disclose Biden family health matters. Dkt. 51-3 ¶ 10, Biden Answer/Cross-Claims; Dkt. 65-1, Biden Mem. at 3-4, 15; *see also* Dkt. 51-6, Jeffress Decl. ¶ 6 ("The materials at issue . . . includ[e] family health issues") (emphasis added).  This is a factual mistake.  In consultation with President Biden's counsel, the Department redacted Biden family health information (Winn Decl. ¶ 6), and more generally, redacted Biden family information.  *Id.*  Thus, his main claim is unfounded.

**(c)  President Biden Has Publicly Addressed
The Hur Report and Zwonitzer Materials.**

President Biden voluntarily addressed the Hur Report, including the Zwonitzer Materials, in a press briefing at the White House on February 8, 2024. Winn Decl. ¶ 15(d).   President Biden told Mr. Zwonitzer: "I just found all the classified stuff downstairs." Hur Report, at 110-11 (citing Zwonitzer recording). "Mr. Biden . . . said [he] did not remember [his] statement that he had "'just found all the classified stuff downstairs.'" *Id.* at 113. "Mr. Biden said he did not remember anything at all about this incident, including whether he actually found classified documents in his basement office." *Id.*  "Mr. Biden explained that when he described material in his notebooks to Zwonitzer as 'classified' he did not actually mean 'classified." *Id.* at 224.  At the press conference, President Biden addressed his "classified" remark from the Zwonitzer Materials and said: "And so what I was referring to—I said 'classified'—I should have said it was—should be private because it was a contact between the President and the Vice President as to what was going on." Winn Decl. ¶ 15(d).

Having addressed a key aspect of the Zwonitzer Materials in public, President Biden's privacy interests as to the Zwonitzer Materials is diminished. *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1092 (D.C. Cir. 2014) ("DeLay's obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation was diminished by his well-publicized announcement of that very fact."); *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) ("public disclosures effectively waive Perot's right to redaction of his name from documents on events that he has publicly discussed"); *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998) ("Thar's statement to the press undoubtedly does diminish his interest in privacy: the public already knows who he is, what he was accused of, and that he received a relatively mild sanction."); *Jigsaw Prods., Inc. v. U.S. SEC*, No. 24-cv-2358 (TSC), 2026 U.S. Dist. LEXIS 60697, at *9 (D.D.C. Mar. 23, 2026) (finding substantially diminished privacy interest in SEC interview where "Musk has publicly discussed the SEC matter on national television.").

**(d)  President Biden's Interest In Preventing Disclosure
Of His Voice in the Audio Recordings is Insubstantial.**

As determined by the Department (Winn Decl. ¶ 15(e)), any privacy interest in President Biden's voice -- as would be disclosed through the audio recordings -- would be insubstantial. As demonstrated above, Special Counsel Hur explicitly relied upon President Biden's "tone" and "sound" as memorialized in the Biden-Zwonitzer recordings to make his declination determination. Hur Report, at 110. It is matter of public record that President Biden's voice has been recorded as a public figure for decades. There is no substantial privacy interest that would be foreseeably harmed by the audio recording's release.

This conclusion is reinforced by the recent case of *Jigsaw Productions, Inc.*, *supra*. Plaintiff Jigsaw Productions, Inc., a documentary film company producing a feature on Elon Musk,

25

App-431

brought a FOIA action against the Securities and Exchange Commission ("SEC") seeking the release of a video and audio recording of Mr. Musk's interview with SEC civil investigators. *Id.* at *1. The SEC asserted Exemptions 6 and 7(C) to withhold the video of Mr. Musk's interview (*id.* at *7) and asserted that "a video and audio recording reveals details about a person's likeness, mannerisms, and voice that would not be disclosed by a paper transcript." *Id.* at *10. The Court rejected the SEC's contentions, finding that "[Mr.] Musk—as a world-famous public figure whose voice, likeness, and mannerisms are widely publicized and easily accessible on the internet, including in interviews where he answered probing questions—does not face the same harms to his privacy interests faced by an ordinary person or even a less known celebrity." *Id.* at *10-11. The Court held that "SEC has not identified any substantial privacy interest that would be foreseeably harmed by the recording's release." *Id.* at *15.

### (e) Disclosure Would Not Impose A Stigma.

President Biden claims that he faces harm from disclosure of "investigatory" files (Dkt. 65-1 at 1, 31) – specifically the Zwonitzer Materials. This is implausible.

In theory, President Biden has an "interest in avoiding the stigma of having his name associated with a criminal investigation." *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1091 (D.C. Cir. 2014). Here, however, the fact that President Biden was the subject of a criminal investigation is a matter of public record, as confirmed by the Attorney General's Order appointing Mr. Hur, the Hur Report, President Biden's February 2024 press conference, and President Biden's several motions and pleadings in this Court. President Biden has no privacy interest in avoiding the stigma of association with a criminal investigation. *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1092 (D.C.

26

Cir. 2014) ("DeLay's obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation was diminished by his well-publicized announcement of that very fact.").

In theory, President Biden has a "privacy interest in the *contents* of the investigative files." *Id.* (emphasis in original). Here, however, the Zwonitzer Materials, such as alleged references to political deliberations (Dkt. 51-3 ¶ 10), have been published in his memoir. Winn Decl. ¶¶ 15(c), (f). Because of such public disclosures, "the typical reasons for withholding law enforcement records—such as the stigma associated with law enforcement investigations—do not hold weight. The cat is out of the bag." *Jigsaw Prods., Inc.*, 2026 U.S. Dist. LEXIS 60697, at *9 (compelling disclosure of the SEC video interview of Elon Musk where the SEC has not identified any substantial privacy interest that would be foreseeably harmed by the recording's release).

President Biden makes generic allegations about the privacy interests of third parties (Dkt. 51-3 ¶ 63). On this record, however, he does not have standing to seek emergency relief to protect the privacy of unidentified third parties. Reverse-FOIA actions are designed to protect "a submitter of information" to an agency (*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1133 n.1 (1987), not a third party to a submitter. And his Privacy Act claim is brought strictly on his own behalf. *See*, *e.g.*, Dkt. 51-3 (Count IV) ¶ 73 (referencing records of "Defendant-Intervenor Joseph R. Biden, Jr."); *id.* ¶ 96 (alleging "invasion of President Biden's privacy").

Indeed, President Biden lacks constitutional standing vis-à-vis third parties. "[A] litigant seeking to assert the legal rights or interests of others must demonstrate ordinary Article III standing for itself and answer the additional 'threshold question whether [it has] standing to raise the rights of others." *Trump v. CASA, Inc.*, 606 U.S. 831, 866 (2025) (Alito, J., concurring) (quoting *Kowalski v. Tesmer*, 543 U. S. 125, 129 (2004)). And here, President Biden has made no evidentiary showing that he personally would suffer any "injury in fact" from any alleged

27

intrusion on the privacy interests of any third-party. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Nor has he made an evidentiary showing that he has "a close relationship with the person who possesses the right" *and* that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

The Department recognizes the general view that "a privacy interest also extends to third parties who may be mentioned in investigatory files, as well as to witnesses and informants who provided information during the course of an investigation." *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995). Here, however, there has been no showing that any undisclosed person referenced in the Zwonitzer Materials is a confidential informant, cooperating witness or federal agent. It strains credulity to suggest, Biden Mem., Dkt. 65-1 at 8, 23, 33, that unnamed third parties have an inviolate privacy interest in concealing that he or she was mentioned by President Biden in a writing session in 2016 and 2017, well in advance of the Hur inquiry.

## 2. There Is a Substantial Public Interest in Disclosure of the Zwonitzer Materials.

"The public is, of course, entitled to be informed concerning the workings of its government." *Watkins v. United States*, 354 U.S. 178, 200 (1957). The Department determined that President Biden's reduced privacy interests were outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials. Winn Decl. ¶¶ 14-17. This determination is consistent with applicable law and uncontested facts.

The "public interest . . . must be assessed in light of FOIA's central purpose, which is 'to open agency action to the light of public scrutiny.'" *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 894 (1995) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976). "Official information that sheds light on an agency's performance of its statutory duties falls

28

App-434

squarely within that statutory purpose." *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989).

Records pertaining to an "individual's activities does not necessarily qualify them for exemption [and] [s]uch records may still be cloaked with the public interest if the information would shed light on agency action." *Nation Magazine*, 71 F.3d at 894-95 ("appellants have identified a public interest cognizable under FOIA in disclosure of any information regarding Perot's offers of assistance that might exist in Customs' investigatory files"). Here, the limited, redacted Zwonitzer Materials are "cloaked with the public interest." *Id*.

"In view of the purpose of the FOIA, it will ordinarily be enough for the court to consider, when balancing the public interest in disclosure against the private interest in exemption, the rank of the public official involved and the seriousness of the misconduct alleged." *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998). *See Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1094 (D.C. Cir. 2014) ("That the investigation implicated a public official as prominent as the former Majority Leader of the House of Representatives further raises the stakes."). In this case, the rank of the public official involved (President of the United States) and the seriousness of the misconduct alleged (mishandling of classified information) decidedly confirm the predominant public interest in disclosure.

Information about the Hur investigation into the alleged mishandling of classified material by a high-ranking public official sheds light on how the Department of Justice and its Special Counsel have performed their statutory duties. Winn Decl. ¶ 16(a) citing *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1096 (2014). *See also United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 766 n.18 (1989) ("matters of substantive law enforcement policy [] are properly the subject of public concern."); *Citizens for Responsibility*

29

App-435

*& Ethics in Wash. v. U.S. Dep't of Just.,* 854 F.3d 675, 682 (2017) ("a 'weighty public interest' is present here: the interest in finding out 'how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct'") (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just,* 746 F.3d 1082, 1092-93 (2014)); *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) (observing in *dictum* "the public may have an interest in knowing that a government investigation itself is comprehensive, that the report of an investigation released publicly is accurate, that any disciplinary measures imposed are adequate, and that those who are accountable are dealt with in an appropriate manner."); *Raw Story v. United States DOD*, Civil Action No. 23-2514 (LLA), 2024 U.S. Dist. LEXIS 176680, at *25-26 (D.D.C. Sep. 30, 2024) ("substantial public interest" in information "about law enforcement policy . . . including how Defendants handle investigations related to the mishandling of classified information . . ."). Because the disclosure would shed light on the Department's and Special Counsel's discharge of their statutory duties, the public interest is served by disclosure. Specifically, the Zwonitzer Materials shed critical light on Mr. Hur's decision that President Biden lacked the requisite *mens rea* to secure a conviction – especially insofar as Mr. Hur himself formed his judgment based in part on these materials. The public has a strong interest in seeing the materials themselves, to determine whether the Special Counsel appropriately discharged his public duty.

The public interest is heightened here, moreover, where the former President of the United States has been the target of the investigation and there is substantial controversy over the Special Counsel's declination decision. Winn Decl. ¶¶ 16(b), (d), (e), (f). *See ACLU v. United States DOJ*, 655 F.3d 1, 12-13 (D.C. Cir. 2011) (public interest may be indicated by "widespread media attention" and the focus of "congressional hearings"). Indeed, Special Counsel Hur acknowledged that there was a strong interest in transparency as to his work. Winn Decl. ¶ 16(g) (citing Hrg. at

30

7-8).  Mr. Hur's Report, and the Zwonitzer Materials upon which it is partly predicated, have been criticized by President Biden, Biden's counsel, individual members of Congress, and House Committees including, most recently, the House Judiciary Committee. The House Judiciary Committee held a hearing on the Hur Report, with particular focus on the handling of the Zwonitzer Materials. The controversy surrounding the Hur Report and its handling of the Zwonitzer Materials is part of an ongoing national debate about the performance of the DOJ and Special Counsel, as illustrated by the House Judiciary Committee's March 23, 2026 letter.  Dkt. 51-6. The disclosure of the Zwonitzer Materials meets and surpasses every measure of public interest.

President Biden seeks to minimize the public interest in disclosure by contending the public has enough information about the Hur investigation and its handling of the Zwonitzer Materials. Dkt. 65-1, at 24-25, 35-36.  That proposition is unsound.  "The fact that the public already has some information does not mean that more will not advance the public interest." *ACLU v. United States DOJ*, 655 F.3d 1, 15 (D.C. Cir. 2011).

Movant's reliance on *Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 876 F.3d 346, 349 (2017) ("*NARA*") is also misguided. In *NARA*, the Court found that Hillary Rodham Clinton had a heightened privacy interest in an unissued, staff-proposed draft indictment containing unproven allegations. *Id.* at 349-50. *Id.* In *NARA*, the requester seeking the draft indictment offered no public interest justification other than "'general public curiosity.'"  *Id.* at 351 (citation omitted). Here, in contrast, the Zwonitzer Materials were quoted, cited, and referenced throughout the Hur Report, and served as a predicate for Mr. Hur's declination decision. Mr. Hur's judgment about President Biden's memory was informed by 117 pages of transcripts and 2 ½ hours of audio (Winn Decl. ¶ 6), and the public should be allowed to judge for themselves

31

App-437

whether these materials supported or undermined Mr. Hur's declination decision.  Ultimately, the Hur Report and its handling of the Zwonitzer Materials have been publicly criticized by President Biden, Biden's lawyers, House Committees, and the House Judiciary Committee. This is not a matter of "general public curiosity" – it is a matter of demonstrated national interest at the highest levels of our Government.

### 3. **The Department's Process Complied With the Law.**

Reverse-FOIA actions "are in the nature of informal adjudications" and "no provision of the APA contains specific procedures to govern an informal agency adjudication subject to review under § 706." *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989).  "In 'informal adjudication[s]' like these, agencies must satisfy only 'minimal procedural requirements.'" *Sw. Airlines Co. v. Transp. Sec. Admin.*, 650 F.3d 752, 757 (D.C. Cir. 2011).

Movant complains about the process that led to the Department's decision (Dkt. 51-3 ¶¶ 56-67); however, the orderly process and reasoned basis for the decision were memorialized in the Winn Declaration. *See generally* Winn Declaration. President Biden was afforded notice of the Department's preliminary decision to disclose (Winn Decl. ¶ 11); multiple meetings with Department officials to review the materials and opportunities to be heard (*id.*); confirmation of the decision (*id.* ¶¶ 12, 13); and public notice of the decision on May 8. Dkt. 50 (JSR).  Movant fails to show that informal procedural requirements were not met in this case. *Jurewicz v. United States Dep't of Agric.*, 741 F.3d 1326, 1334-35 (D.C. Cir. 2014) (finding that informal procedural requirements were met).

The Department has met all appropriate procedural standards. The Winn Declaration "memorialize[s]" the Department's determination to release the Zwonitzer Materials to Plaintiffs in this FOIA action.  Winn Decl. ¶ 4.  Mr. Winn describes the balancing of interests that animated

32

that decision.  *Id.* ¶¶ 14-17. He recounts in detail the Department's respectful consideration of the interests of President Biden, who may have relied upon the Department's former position. *Id.*  ¶¶ 11, 15(b).  Mr. Winn forthrightly acknowledged the Department's prior decision in 2024 (*id.* ¶ 11) and provided a reasoned justification for the Department's new position in 2026 based upon this administration's assessment of the minimal privacy interests at stake and the significant public interest in disclosure. *Id.* ¶¶ 14-17. The Department thus "display[ed] awareness that it *is* changing position" and demonstrated "that there are good reasons for the new [position]."  *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

In all events, given the significant public interest, the Department reasonably determined to err on the side of transparency in releasing the Zwonitzer Materials, even if a different decisionmaker may conduct differently the above balancing analysis to reach a different conclusion.  Because Congress has created a remedial scheme for individuals aggrieved by the release of protected information to obtain monetary damages under the Privacy Act, the Department's prioritization of transparency advances the public interest without foreclosing the relief that Congress intended to be available for any individuals aggrieved by the Department's release.  There is thus no basis under the APA or the Privacy Act to reject that policy choice as either contrary to law or arbitrary and capricious.

### D.  **There Is No Violation of the Privacy Act.**

President Biden alleges that the Department's proposed disclosure to Plaintiffs is barred by the Privacy Act because it is contrary to FOIA Exemptions 6 and 7(C). Dkt. 51-3, Cross-Claims ¶¶ 89-97 (Count IV). As President Biden acknowledges, however, the enumerated exceptions to the Privacy Act include disclosures required under FOIA. Dkt. 65-1 at 27 citing 5 U.S.C § 552a(b)(2). Because the Department, faced with a FOIA request, has determined that FOIA

Exemptions 6 and 7(C) are inapplicable (Winn Decl. ¶¶ 15-17), the disclosure of the Zwonitzer Materials is required under FOIA and thus fully consistent with the Privacy Act. 5 U.S.C § 552a(b)(2).

The law on this point is clear. "[S]ection (b)(2) of the Privacy Act represents a Congressional mandate that the Privacy Act not be used as a barrier to FOIA access." *Greentree v. United States Customs Serv.*, 674 F.2d 74, 79 (1982). In other words, "[t]he [Privacy Act] does not bar disclosure of documents if they are otherwise required to be disclosed under the FOIA." *Maydak v. United States DOJ*, 254 F. Supp. 2d 23, 33 n.4 (D.D.C. 2003) (citing 5 U.S.C. § 552a(b)(2)). *See also Murphy v. Exec. Office for United States Attys.*, 11 F. Supp. 3d 7, 8-9 (D.D.C. 2014) ("Plaintiff's 'reliance' on the Privacy Act . . . is misplaced . . . [because] the Act expressly exempts from its reach information that is required to be disclosed under the FOIA.") (citing 5 U.S.C. § 552a(b)(2) & *Greentree v. United States Customs Serv.*, 674 F.2d 74, 79 (D.C. Cir. 1982)); *Woods v. DOJ*, 968 F. Supp. 2d 115, 120-21 (D.D.C. 2013) (finding that "defendant properly considered plaintiff's request in light of the FOIA, [and thus] any issue arising under the Privacy Act is essentially moot"); *Plunkett v. DOJ*, 924 F. Supp. 2d 289, 306-07 (D.D.C. 2013) ("[T]he Privacy Act does not bar disclosure of documents that are otherwise required to be disclosed under the FOIA . . . and defendant properly reviewed and released responsive records under the FOIA."). Accordingly, given the Defendant's compliance with FOIA as demonstrated above, President Biden has no claim under the Privacy Act.

The fact that the Biden Administration reached an opposite conclusion has no bearing on the requirement to disclose. Winn Decl. ¶ 11. Even assuming the prior administration's determination could be sustained, this administration reasonably reached a different conclusion. Having made that decision, the information is required to be released under Exemptions 6 and

34

App-440

7(C), and the Privacy Act therefore has no role to play. *See* 5 U.S.C. 552a(b)(2). And in all events, since the Privacy Act does not even authorize *permanent* injunctive relief for any violation in these circumstances as discussed above, it cannot possibly support granting *preliminary* injunctive relief here.

## II. <u>THERE IS NO GENUINE THREAT OF IMMINENT, IRREPARABLE INJURY.</u>

"The D.C. Circuit 'has set a high standard for irreparable injury.'" *Zeng v. Mayorkas*, No. 21-cv-446 (DLF), 2021 U.S. Dist. LEXIS 111323, at *3-4 (D.D.C. Apr. 16, 2021) (citation omitted). "A party seeking preliminary injunctive relief must show an imminent threat of irreparable harm by the challenged action or inaction. The 'injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Trump v. Thompson*, 573 F. Supp. 3d 1, 26 (D.D.C. 2021) (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up), *aff'd*, 20 F.4th 10 (2021), *cert. denied*, 142 S. Ct. 1350 (2022). President Biden has not made an evidentiary showing of irreparable harm and has not met this high standard for irreparable injury.

In general, once information has become public, any damage the movant fears from disclosure has already been done. *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999). *See also United States v. Bolton*, 468 F. Supp. 3d 1, 6 (D.D.C. 2020) ("With hundreds of thousands of copies around the globe—many in newsrooms—the damage is done. There is no restoring the status quo."); *Penguin Books USA, Inc. v. Walsh*, 929 F.2d 69, 72 (2d Cir. 1991) ("publication and wide distribution of *Opening Arguments* has mooted this appeal").

Here, however, the Privacy Act creates a scheme of monetary damages for alleged improper disclosures. *Cooper*, 566 U.S. at 291; *see also Mulhern v. Gates*, 525 F. Supp. 2d 174,

35

181 (D.D.C. 2007) ("To prevail on a claim of nonconsensual disclosure for monetary damages, a plaintiff must show that '(1) the disclosed information is a record contained within a system of records; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff.'").  If President Biden is correct (which he is not) that release to a FOIA requester harms a legal right that the Privacy Act protects, that harm can be remedied through a Privacy Act claim for monetary damages as Congress intended.  And a harm that is "remediable through monetary damages" is, by definition, not irreparable. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025).  To be clear, the government does not concede that damages would be available even if the Privacy Act were violated in these circumstances.  But any restrictions on damages and injunctions imposed by the Privacy Act reflect a Congressional judgment about the appropriate "remedies available," which precludes a court in equity from deeming those remedies "inadequate" and granting broader equitable relief.  *eBay Inc. v. Mercexchange, LLC*, 547 U.S. 388, 391 (2006); *see also Cassell v. Taylor*, 243 F.2d 259, 261 (D.C. Cir. 1957) ("equity follows the law and the equitable remedy will be withheld if the local statute of limitations would bar the concurrent legal remedy").

In any event, as described above, much of the information at issue has already been made public.  The Hur Report liberally quoted from the Zwonitzer Materials.  *Comm. on Oversight & Gov't Reform v. Lynch*, 156 F. Supp. 3d 101, 114 (D.D.C. 2016) ("What harm to the interests advanced by the privilege would flow from the transfer of the specific records sought here to the Committee when the Department has already elected to release a detailed Inspector General report that quotes liberally from the same records?").

The harms that are the focus of this motion – disclosure of Biden family health matters and political deliberations – are nonexistent.  The Biden family health matters have been redacted from

36

the Zwonitzer Materials. And President Biden has already published a memoir about his decision whether to run for President in 2016. The generic and boilerplate assertions of harms to third parties are unsubstantiated. The harms underlying this motion are not supported by evidence and disclosure would pose no genuine risk of imminent, future injury.

## III.  NEITHER THE BALANCE OF EQUITIES NOR THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION.

President Biden's request for preliminary relief must be denied because he has not shown that the balance of equities tips in his favor, or that injunctive relief would serve the public interest.

The balance-of-equities and public-interest factors merge here and substantially favor Defendant. There is, as demonstrated above, a substantial public interest in disclosure of a limited, redacted set of materials that involve a public official of the highest rank, in connection with the allegation of the most serious crimes, which will shed light on the manner in which the Department and Special Counsel discharged their statutory duties. This is matter that has been and is being debated in the halls of Congress and other public fora. In this FOIA suit, which has been pending since 2024, the requested injunction would "severely jeopardize the public's interest in an orderly, fair, and efficient administration of the FOIA." *Nation Magazine v. Dep't of State*, 805 F. Supp. 68, 74 (D.D.C. 1992). In sum, President Biden's reduced privacy interests are outweighed by the public interest in disclosure, and thus, the balance-of-equities and public-interest factors tip decidedly in favor of Defendant.

## IV.  MOVANT SHOULD POST SECURITY IN CONNECTION WITH ANY EMERGENCY RELIEF.

Finally, if the Court grants any injunctive relief, the Court should also order Movant to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if

they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If any preliminary injunctive relief issues here, the Court should require President Biden to post an appropriate bond commensurate with the scope of any such emergency order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (court wields "broad discretion . . . to determine the appropriate amount of an injunction bond").

## **CONCLUSION**

The Defendant respectfully requests that the motion for a preliminary injunction be denied.

DATED: June 5, 2026    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Federal Programs Branch

*/s/ John J. Halloran, Jr.*
JOHN J. HALLORAN, JR.
D.C. Bar No. 454128
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 598-3398
Fax: (202) 616-8460
Email: John.J.Halloran.Jr@usdoj.gov

38

App-444

**<u>CERTIFICATE OF SERVICE</u>**

On June 5, 2026, I electronically submitted the foregoing document with the Clerk of Court

for the U.S. District Court for the District of Columbia, using the electronic case filing system of

the Court.

<div style="margin-left:45%">

*/s/ John J. Halloran, Jr.*
JOHN J. HALLORAN, JR.
Trial Attorney
United States Department of Justice

</div>

39

**App-445**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **HERITAGE FOUNDATION**, **MIKE HOWELL**,<br><br>*Plaintiffs,*<br><br>v.<br><br>**U.S. DEPARTMENT OF JUSTICE**,<br><br>*Defendant,*<br><br>and<br><br>**JOSEPH R. BIDEN, JR.,**<br><br>*Defendant- Intervenor.* | Case No. 1:24-cv-00645 (DLF) |

### DECLARATION OF PETER A. WINN

I, PETER A. WINN, declare the following to be true and correct:

1.  I am the Director of the Office of Privacy and Civil Liberties ("OPCL") at the United States Department of Justice ("Department" or "DOJ"), and a member of the Senior Executive Service. I have been the Acting Chief Privacy and Civil Liberties Officer ("CPCLO") of the Department since January 20, 2017. The CPCLO is responsible for ensuring the Department's compliance with the laws, regulations and established policies designed to protect the privacy of individuals, as well as ensuring that concerns about privacy and civil liberties are appropriately considered in the development and implementation of laws, regulations and policies related to the Department's mission.

2. Among my responsibilities as the CPCLO and head of OPCL is to provide authoritative legal advice and guidance to the Department's leadership and DOJ components on questions about

1

App-446

the Privacy Act of 1974, including questions regarding the lawfulness of proposed disclosures under the Privacy Act and under the Department's privacy policy.  To this end, I advise the Offices of Special Counsel on the releasability of information contained in Special Counsel reports. In this connection, at the request of Special Counsel Hur, I assisted his office in preparing his Final Report, as required by 28 C.F.R. § 600.8(c), in a form consistent with the law and DOJ policy that would permit public dissemination to the maximum extent possible.[1]

3. The statements in this declaration are based on my personal knowledge, as well as information obtained and reviewed in the course of my official duties.

4.  This declaration is respectfully submitted to set forth the relevant factual background concerning and memorialize the Department's determination to release materials related to the Biden-Zwonitzer conversations in 2016 and 2017 to Plaintiffs in this FOIA action.

**The Zwonitzer Materials**

5.  In 2016 and 2017, President Biden met with a writing assistant (or "ghostwriter"), Mr. Mark Zwonitzer, at the Naval Observatory and in McLean, Virginia in connection with President Biden's preparation of his memoir, *Promise Me, Dad*, which was published in 2017.  In connection with this book-writing project, Mr. Zwonitzer had conversations with President Biden, which were recorded by Mr. Zwonitzer.  The Department, per the Hur Report, obtained "dozens of hours of recorded conversations with the ghostwriter." *See* Hur Report, at 5. Mr. Hur then selected smaller portions of that audio and had them transcribed.

---

[1] U.S. Dep't of Just., *Report on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr. (Feb. 5, 2024) ("Hur Report")* https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf. *See also* Hur Report, Dkt. 6-1, 6-2.

2

6. These materials consist of approximately 2 ½ hours of audio recordings and 117 pages of transcripts of these recordings. As I will discuss later in this Declaration, in consultation with President Biden's counsel, and under my supervision, the transcripts and recordings later were extensively redacted. Information concerning President Biden's family and any family health issues has been fully redacted. Information concerning third parties who are not public figures has been redacted. National security information has been redacted as well as related information covered by the presidential communications privilege. The redacted transcripts and recordings at issue are defined herein as the "Zwonitzer Materials."

### The Investigation of President Biden By Robert K. Hur

7. On January 12, 2023, Attorney General Merrick B. Garland appointed Robert K. Hur as Special Counsel to investigate and prosecute federal crimes arising from the "possible unauthorized removal and retention of classified documents or other records discovered at locations associated with President Biden. *See* U.S. Dep't of Just., *Appointment of Robert K. Hur as Special Counsel*, Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023).[2] The Special Counsel's Office was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden. *Id.*

8. At the conclusion of the investigation, Mr. Hur issued his findings and submitted a report to Attorney General Garland pursuant to Department regulations. *See* 28 C.F.R. § 600.8(c). The Hur Report stated that Mr. Hur "conclude[d] that no criminal charges are warranted," Hur Report, at 1, and provided an extensive discussion of the investigation and the decisions he reached. *See generally* Hur Report. In consultation with my office, the Hur Report was prepared in a manner

---

[2] Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023), https://www.justice.gov/archives/media/1268121/dl.

3

allowing it to be produced to Congress and published on the Department's public-facing website without any redactions, consistent with the transparency provisions of the Special Counsel Regulations. 28 C.F.R. § 600.9(c).

9. The Hur Report disclosed contents of the Zwonitzer Materials when it extensively quoted, referenced and relied upon the Zwonitzer Materials. *See*, *e.g.*, Hur Report, at 3 ("In a recorded conversation with his ghostwriter in February 2017, about a month after he left office, Mr. Biden said, while referencing his 2009 Thanksgiving memo, that he had 'just found all the classified stuff downstairs.'"); *id.* at 64 ("Referring to his 'Foreign Policy' notebook, Mr. Biden added, '[t]hey didn't even know I have this.'"). Relying in part on the Zwonitzer Materials, the Hur Report explained the Special Counsel's assessment of President Biden's memory. *See*, *e.g.*, *id.* at 207 ("Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Mr. Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Mr. Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.").

**DOJ's Decision to Release the Zwonitzer Materials to Plaintiffs Under FOIA**

10. In March 2024, Plaintiffs filed their FOIA action seeking production of Zwonitzer Materials: "all records relied upon by Special Counsel Hur to write particular passages of the Report" which made findings concerning President Biden's recollection. Compl. ¶ 1, Dkt. 1; Am. Compl. ¶ 1, Dkt. 6. Plaintiffs' demands have since been clarified to cover the "written transcript and audio recording." Joint Status Report, Dkt. 47 (March 6, 2026).

11. The Biden Administration determined to withhold substantially all the transcripts and audio recordings and briefed the issues accordingly in 2024 before this Court, relying in large part

4

on the work-product doctrine and the privacy interests of President Biden.  In or about February 2026, the Department reassessed its prior decision and decided to waive the work-product doctrine in light of the public interest in the materials.  In connection with that process, it provided notice to President Biden's counsel of its preliminary view that the Zwonitzer Materials should be disclosed to Plaintiffs under FOIA.  This notice engendered extensive consultation between Department officials and President Biden's counsel.  Specifically, on March 6, 2026, Department officials met with President Biden's lead counsel, Amy Jeffress, Esq., and allowed her to spend the morning reviewing the Zwonitzer Materials.  On March 9, 2026, Ms. Jeffress returned with two of President Biden's political advisors, who over the course of the morning, reviewed the Zwonitzer Materials, and made extensive proposed redactions and comments.  These materials were retained, but they were treated as Ms. Jeffress' confidential attorney work-product and were not reviewed by the Department.  On March 20, 2026, I, and another Department official, met with Ms. Jeffress and one of her associates and discussed President Biden's concerns, and Ms. Jeffress authorized us to review her comments and proposed redactions.  After carefully reviewing Ms. Jeffress' extensive comments and additional proposed redactions, I directed that substantial additional redactions be made.  On April 20, 2026, two of Ms. Jeffress' colleagues spent the better part of one day in my office reviewing the audio files and the corresponding transcripts. Thereafter, we did not receive any additional proposed redactions or comments on the Zwonitzer Materials themselves, although email exchanges did take place with Ms. Jeffress about the Department's general approach to this matter. Based on those considerations, additional redactions were made, which are currently reflected in the Zwonitzer Materials.  To my knowledge, no party has objected to redactions based on national security considerations or the presidential communications privilege.

12. On or about May 5, 2026, the Department made a final decision to release the Zwonitzer Materials to Plaintiffs under FOIA. This decision was publicly announced on May 8, 2026, in the Joint Status Report. Dkt. 50.

13. On May 5, 2026, the Department notified President Biden's counsel of this decision. On a phone call with President Biden's counsel that I attended on behalf of the Department with Associate Deputy Attorney General Paul R. Perkins, the Department informed President Biden's counsel that the Department had made the final decision to produce the materials to the Heritage Plaintiffs and to the Committee on the Judiciary of the U.S. House of Representatives on June 15, 2026, absent a court order barring release. We further stated that, if President Biden wished to prevent disclosure, he must file a motion to intervene by May 12, 2026. We did not state that the Department's decision constituted final agency action for the purposes of the Administrative Procedure Act.

14. As discussed in greater detail below, the Department's May 2026 decision was reached after internal consultation within the Justice Department, consultation with President Biden's counsel, and the Department's weighing and balancing of several factors, including as follows.

15. The Department determined that President Biden's privacy interests in the Zwonitzer Materials were greatly reduced for a number of reasons.

(a) The Hur Report relied on the Zwonitzer Materials, including by citing to them and quoting them in connection with the decision not to bring charges. The Zwonitzer Materials were also quoted and referenced at the House Judiciary Committee's public hearing on March 12, 2024.[3]

---

[3] *See*, *e.g.*, Committee on the Judiciary, U.S. House of Representatives, 118th Cong. 2nd Sess., Hearing on the Report of Special Counsel Robert K. Hur (March 12, 2024), at 7, 8, 15, 16, 39, 43, 92, 93. https://www.congress.gov/118/chrg/CHRG-118hhrg55150/CHRG-118hhrg55150.pdf.

6

App-451

(b) As described above, the Department provided notice and opportunity to President Biden to ensure that it had appropriately addressed his privacy interests. As discussed below, the Zwonitzer Materials, as now redacted, do not include information about President Biden's family's matters, including his and his family's reactions to and opinions regarding his family's health.

(c) The unredacted remainder of Zwonitzer Materials consists of information substantially in the public domain, including in his memoir. *See* Biden, Joseph R. Jr., *Promise Me, Dad: A Year of Hope, Hardship, and Purpose,* Flatiron Books (1st ed. Nov. 2017).

(d)    President Biden voluntarily addressed the Hur Report, including the Zwonitzer Materials, in a press briefing at the White House on February 8, 2024.[4]  President Biden's counsel, acting for President Biden, also publicly quoted the Zwonitzer Materials (*see*, *e.g.*, Hur Report, Addendum, at 3 ¶ 3; *id.* at 4 ¶ 6).

(e) Any privacy interest in President Biden's voice – as would be disclosed through the Biden-Zwonitzer audio recordings – would be insubstantial.  There have already been disclosures about President Biden's "tone" and "sound" in the Zwonitzer Materials. For example, the Hur Report states:

> In the recorded conversation when Mr. Biden told Zwonitzer he had "just found all the classified stuff downstairs," *Mr. Biden's tone was remarkably casual*. His sole reference to this discovery of classified documents was this brief aside. *Mr. Biden did not sound surprised or concerned by the documents he referenced*. While reasonable jurors could draw different conclusions from Mr. Biden's *seeming nonchalance*, one conclusion is that if Mr. Biden discovered classified documents, it simply was not significant to him and was something he could have quickly forgotten.

---

[4] Administration of Joseph R. Biden, Jr., 2024, *Remarks on Department of Justice Special Counsel Robert K. Hur's Report on the President's Handling of Classified Documents From His Tenure as Vice President and Senator and an Exchange With Reporters* (February 8, 2024), https://www.govinfo.gov/content/pkg/DCPD-202400099/html/DCPD-202400099.htm.

App-452

Hur Report, at 206-07 (emphasis added). *See also id.* at 3 ("When Mr. Biden told his ghostwriter about finding 'all the classified stuff downstairs,' his tone was matter-of-fact"); *id.* at 110 ("Mid-sentence during this narrative, Mr. Biden said, in a matter-of-fact tone, that he had 'just found all the classified stuff downstairs.'").

(f) President Biden has also publicly disclosed details relating to his decision to run for President in 2016. The Zwonitzer Materials were generated as part of a book-writing project leading to President Biden's 2017 memoir, *Promise Me, Dad.* I have reviewed Chapter 11 of *Promise Me, Dad* – entitled "*Run, Joe, Run.*" That Chapter details President Biden's decision-making process and provides commentary about advice and advisors. *See* Biden, Joseph R. Jr., *Promise Me, Dad: A Year of Hope, Hardship, and Purpose,* Flatiron Books (1st ed. Nov. 2017), at 245-47 (President Obama); *id. at* 235, 241 (Bill Bradley); *id. at* 222-24, 228, 234, 238, 243, 245-46 (Mike Donilon); *id. at* 222-24, 234, 238, 241, 242, 243, 246 (Steve Ricchetti); *id. at* 224, 243 (Ted Kaufman).

(g) The Department had already determined that portions of the Zwonitzer Materials could be released on a discretionary basis because the public Hur Report quoted the transcript. When the Department exercised its discretion to waive FOIA Exemption 5, which had been initially invoked by the Department to withhold the Zwonitzer transcripts and audio without the need to engage in a segregability analysis, it then became incumbent upon the Department to determine if other portions of the materials could be released without constituting an unwarranted invasion of privacy.

16. The Department determined that President Biden's reduced privacy interests were outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials.

8

(a) Information about the Hur investigation into the alleged mishandling of classified material by a high-ranking public official sheds light on how the Department of Justice and its Special Counsel have performed their statutory duties. *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,* 746 F.3d 1082, 1096 (D.C. Cir. 2014).

(b) There is a heightened public interest in whether the DOJ and Special Counsel performed their statutory duties, particularly in a case where a sitting President of the United States was the target of the investigation and there was substantial controversy over the Special Counsel's decision not to indict, specifically relying on the Zwonitzer Materials. In addition, President Biden has challenged the fairness, scope and propriety of the Hur Report and Mr. Hur's handling of Zwonitzer Materials.

(c) There is a heightened public interest in the audio of the Zwonitzer materials, beyond the transcripts. The Department distinguished the audio here from other audio recordings withheld in the past, where in those prior cases the additional information in the audio implicated significant privacy interests, and provided no additional information of legitimate public concern. Here, the additional information in the audio recording implicates a legitimate public interest not otherwise captured in the associated transcript. Mr. Hur relied upon this additional information in making his declination decision. Hur Report, at 206-07. As noted at ¶ 15(e) above, in making his decision to decline prosecution, Mr. Hur relied on matters of "tone" that could only be evaluated by reviewing the audio.

(d) The Department also determined that a heightened public interest in the audio was evidenced by the fact that House Committees have questioned the Hur investigation. *See, e.g.,*

9

App-454

Letter of House Committees to Attorney General Merrick Garland (February 12, 2024).[5] *Id.* at 3 ("Despite clear evidence the President willfully retained and transmitted classified materials willfully, Mr. Hur recommended 'that no criminal charges are warranted in this matter.'") (citing Hur Report, at 1). House Committees also addressed the Zwonitzer Materials. *Id.* at 2 ("In response to a question regarding sharing classified information with his ghostwriter, Mark Zwonitzer—a fact documented in Mr. Hur's report—the President claimed, 'I did not share classified information, I did not share it.' This assertion appears to be false.").

(e) Individual members of Congress have addressed the Hur Report and its handling of the Zwonitzer Materials. *See*, *e.g.*, Hearing on the Report of Special Counsel Robert K. Hur, House Judiciary Committee, March 12, 2024, at 93 (Rep. Ken Buck: "So, how do you overcome that recording where he says ''I've got classified documents?'' He is 30 years in the Senate or whatever it is. He obviously knows how he has to treat classified documents. I have got classified documents in the basement. What is the defense to that, that it was a made-up recording, that it wasn't his voice, that everyone was wrong?").[6]

(f) Most recently, the House Judiciary Committee has challenged the fairness of the work of the Justice Department in connection with the Hur investigation. The Committee's March 23, 2026 letter accuses the "Biden-Garland Department of Justice" of "politicization" and the Committee's "oversight" of the Hur investigation is a valid legislative act. *See* Dkt. 51-6.

---

[5] Letter of House Committees to Attorney General Merrick Garland (February 12, 2024), https://oversight.house.gov/wp-content/uploads/2024/02/DOJ-Transcript-video-letter-02122024.FINAL_.pdf.

[6] Committee on the Judiciary, U.S. House of Representatives, 118th Cong. 2nd Sess., Hearing on the Report of Special Counsel Robert K. Hur (March 12, 2024). https://www.congress.gov/118/chrg/CHRG-118hhrg55150/CHRG-118hhrg55150.pdf.

10

App-455

(g)  The public interest in disclosure is especially strong here because, as noted by Special Counsel Hur in his testimony before the House Judiciary Committee, transparency was important in circumstances where "the Attorney General had appointed [him] to investigate the actions of the Attorney General's boss, the sitting President of the United States." Hur House Comm. Hrg. Rept. at 7-8.

17.  Against this backdrop, the Department determined that President Biden's reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials. Accordingly, FOIA Exemptions 6 and 7(C) do not apply, the redacted Zwonitzer Materials are required to be provided to the FOIA requesters, and the non-disclosure provisions of the Privacy Act therefore do not apply.  *See* 5 U.S.C. § 552a(b)(2).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of June, 2026.

*/s/ Peter A. Winn*
PETER A. WINN

App-456

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HERITAGE FOUNDATION**, &
**MIKE HOWELL**,

        *Plaintiffs,*

    v.

**U.S. DEPARTMENT OF JUSTICE**,

        *Defendant.*

**JOSEPH R. BIDEN**,

        *Defendant-Intervenor.*

Case No. 1:24-cv-00645 (DLF)

## PLAINTIFFS' OPPOSITION TO INTERVENOR'S MOTION FOR PRELIMINARY INJUNCTION
(Hearing Requested)[1]

---

[1] Plaintiffs request a live evidentiary hearing to cross-examine former President Joseph R. Biden, Jr. about the privacy interests his counsel allege.

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .......................................................................................ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 8

    I. RELEASE OF THE AUDIO RECORDINGS CORRESPONDING TO TEXT IN THE HUR REPORT WOULD NOT RESULT IN AN UNWARRANTED INVASION OF PRIVACY. ...................................................................................... 24

        A.  President Biden Has Little, If Any, Privacy Interest Here........................... 25

        B.  There Is Overwhelming Public Interest in Disclosure................................. 29

    II.  RELEASE OF THE OTHER AUDIO AND TRANSCRIPTS WOULD NOT RESULT IN AN UNWARRANTED INVASION OF PRIVACY. .................................................. 37

        A.  President Biden Has Little, If Any, Privacy Interest Here........................... 37

        B.  There Is Overwhelming Public Interest in Disclosure of the Audio and Transcripts. 40

    III. PRESIDENT BIDEN CANNOT SHOW IRREPARABLE HARM. .............................. 41

    IV. THE EQUITIES FAVOR DISCLOSURE........................................................... 42

    V.  THE COURT SHOULD ORDER A SUBSTANTIAL BOND IN THE AMOUNT OF AT LEAST $8 MILLION. ................................................................................ 44

CONCLUSION........................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) ................................................................ 25

*Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32 (D.D.C. 2020) ................................. 44

*Az. Fam. Health Part. v. HHS*, No. 18-cv-2581 (TNM), 2019 WL 130578 (Jan. 8, 2019) .... 43, 45

*Bartko v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018) ............................................................ 25

*Boyd v. Criminal Division*, 475 F.3d 381 (D.C. Cir. 2007) ........................................ 25

*Burnham v. Superior Ct. of Calif., County of Marin*, 495 U.S. 604 (1990) ..................... 4

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ............. 41

*Coalition for Human Imm. Rights v. DHS*, 780 F.Supp.3d 79 (D.D.C. 2025) ............... 42

*Coy v. Iowa*, 487 U.S. 1012 (1988) ......................................................................... 35

*CREW v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ("*CREW III*") ............. 25, 29, 31, 32, 33, 38

*CREW v. DOJ*, 854 F.3d 675 (D.C. Cir. 2017) ......................................................... 29

*CREW v. DOJ*, 978 F. Supp. 2d 1 (D.D.C. 2013) ...................................................... 29

*Ctr. For Investigative Reporting v. USCIS*, No. 18-cv-1964 (CJN), 2019 WL 6498817 (D.D.C. Dec. 3, 2019) ........................................................................................................ 25

*Dow Jones & Co. v. DOJ*, 880 F. Supp. 145 (S.D.N.Y. 1995) ......................... 29, 33, 35, 40

*Edgar v. Mite Corp.*, 457 U.S. 624 (1982) ................................................................ 45

*Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 721 (D.C. Cir. 2021) ........................ 35, 39, 40

*Friends of Animals v. U.S. Bureau of Land Mangt.*, 548 F.Supp.3d 39 (D.D.C. July 12, 2021) .. 41

*Judicial Watch v. NARA*, 876 F.3d 346 (D.C. Cir. 2017) ................................... 35, 36, 39

*Kimberlin v. DOJ*, 139 F.3d 944 (D.C. Cir. 1998) ............................................... 26, 39

*Leadership Conf. on Civil Rights v. Gonzales*, 421 F.Supp.2d 104 (D.D.C. 2006) ......... 44

*Montgomery v. Barr*, 502 F.Supp.3d 165 (D.D.C. 2020) ............................................ 42

ii

*N.Y. Times Co. v. NASA*, 920 F.2d 1002 (D.C. Cir. 1990) (en banc) ................................... 27, 28

*NARA v. Favish*, 541 U.S. 157 (2004) ................................................................................... 25

*Nat. Treasury Empl. Union v. Trump*, No. 25-5127, 2025 WL 14415633 (D.C. Cir. May 15, 2025) ................................................................................................................................. 45

*Nation Mag. Washington Bureau v. U.S. Cust. Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ............. 26, 39

*Ontario Forest Indus. Assoc. v. United States*, 444 F. Supp. 2d 1309 (C.I.T. 2006) ................... 43

*Payne Enter., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) .............................................. 43

*Pike v. DOJ*, 306 F.Supp.3d 400 (D.D.C. 2016) .......................................................................... 28

*Proj. on Gov. Oversight, Inc. v. U.S. Off. Of Special Counsel*, No. 22-cv-3381 (DLF), 2024 WL 1213324 (D.D.C. Mar. 19, 2024) ................................................................................. 41

*See, e.g.*, *Advance Am. v. FDIC*, No. 14-cv-953, 2017 WL 2672741 (D.D.C. Feb. 23, 2017) .... 42

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ........................................................................ 43

*Trump v. Slaughter*, 146 S. Ct. 18 (2025) ...................................................................................... 4

*Trump v. United States*, 603 U.S. 593, 608 (2024) ................................................................. 4, 31

*U.S. Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) ................................................................... 43

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) .......................................................................... 41

*United States v. Burden*, 934 F.3d 675(D.C. Cir. 2019) ............................................................. 35

*Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) ...................................... 44

*Wash. Post v. Dep't of State*, 685 F.2d 698 (D.C. Cir. 1982) ...................................................... 43

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................................... 41

*WP Co. LLC v. U.S. Small Bus. Admin.*, Nos. 20-1240, 20-1614 (JEB), 2020 WL 6887623 (D.D.C. Nov. 24, 2020) ............................................................................................... 43

**Other Authorities**

*Compare Ways & Means Comm.'s Request for the Former President's Tax Returns & Related Tax Info. Pursuant to 26 U.S.C. S 6103(f)(1)*, 2021 WL 3418600 (O.L.C. July 30, 2021) ........ 4

*Cong. Comm.'s Request for the President's Tax Returns Under 26 U.S.C. S 6103(f)*, 2019 WL 2563046 (O.L.C. June 13, 2019) ................................................................................ 4

Declaration of Jerry Hatchet, *Judicial Watch et al. v. DOJ*, No. 24-cv-700 (TJK) (D.D.C. filed June 21, 2024) (ECF No. 40-4)........................................................................... 31

Declaration of the Hon. Michael B. Mukasey, *Judicial Watch et al. v. DOJ*, 24-cv-700, (June 18, 2024) (ECF No. 40-3) ............................................................................................. 5

Doris Keans Goodwin, TEAM OF RIVALS: THE POLITICAL GENIUS OF ABRAHAM LINCOLN (2005) .. 26

Jake Tapper & Alex Thompason, ORIGINAL SIN:  PRESIDENT BIDEN'S DECLINE, ITS COVER-UP, AND HIS DISASTROUS CHOICE TO RUN AGAIN (May 20, 2025)........................................ 22, 23

Jill Biden, A VIEW FROM THE EAST WING (2026) ....................................................... 24

Joint Status Report, *Heritage Found. v. DOJ*, 24-cv-952-ACR (Aug. 29, 2025) (ECF No. 32).. 23

Kamala Harris, 107 DAYS 6 (2025)............................................................................ 24

Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024) .... 1, 2, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 23, 24, 25, 26, 28, 29, 30, 31, 32, 34, 35, 37, 40

*Special Comm. to Investigate Whitewater Development Corporation and Related Matters, Final Report*, 104 Cong. 2d Sess. (1996) ............................................................................ 33

**Rules**
Fed. R. Civ. P. 65(c) ............................................................................................... 45

# INTRODUCTION

Former President Joseph R. Biden cannot have his cake and eat it, too. He has intervened at the eleventh hour in a case that has been ongoing for nearly two years, only once the parties came to the precipice of settling. He claims he has a privacy interest in the source materials for a book that made him many millions of dollars and fueled his run to the White House. The former President has no issue selling the Nation's secrets and previously private personal information for massive financial profit and electoral gain, but then turns around and asks the Court to countenance denying the American People access to records going directly to covering up the constitutional crisis brought on by President Biden's use of the autopen in the wake of his apparently failing capacity to govern. Indeed, President Biden's intervention itself is part of a continued strident denial. Its goal is to continue to conceal any evidence showing: (1) Biden's lack of mental fitness for the Office of the Presidency; (2) Biden's retention of classified documents dating back to before he became President; and (3) Biden's activities during his Presidency, where he failed to personally exercise non-delegable duties in favor of the use of an autopen by undisclosed person or persons.

1.    President of the United States Joseph R. Biden was investigated by Special Counsel Robert K. Hur for disclosing highly classified information while he was Vice President—a serious felony. The Special Counsel concluded that there was sufficient information to allow the case to go to the jury because President Biden disclosed classified information to his ghostwriter Mark Zwonitzer in the process of writing the highly lucrative book, *Promise Me Dad*. Nonetheless, Special Counsel Hur declined to recommend prosecution in large part because President Biden would "likely present himself to the jury, as he did during his interview with our office, as a sympathetic, well-meaning, elderly man with a poor memory" as well as with "diminished faculties."[2] The records in issue here represent small portions of the more than 70 hours of

---

[2] Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 5–6, 248 (Feb. 5, 2024) ("Hur Report"), available at https://www.justice.gov/sco-hur.

interviews between President Biden and Zwonitzer in February and March of 2017 that Special Counsel Hur thought important enough to curate and have transcribed for use in his investigation and in drafting his eventual Report.  Special Counsel Hur "recognized that these materials constituted both the primary evidence of the 2017 wrongful disclosures, as well as the primary basis for his decision to decline prosecution of President Biden with respect to these wrongful disclosures."  Declaration of Amy Jeffress (May 29, 2026) ("Jeffress Decl.") at Ex. 2 (ECF No. 60-4) at 3.  Those recordings are the key pieces of contemporaneous evidence on this issue.  *See* Hur Report at 6–7.  Even President Biden's Department of Justice ("DOJ" or the "Department") admitted this fact.  *See* Declaration of Bradley J. Weinsheimer at ¶ 15 (Nov. 13, 2024) (ECF No. 33-2) ("Weinsheimer Decl.").  Contrary to President Biden's protestations, Plaintiffs here do not seek to rummage through "personal conservations," but rather seek to provide the American People with the corpus of supporting evidence Special Counsel Hur deemed important enough to pull and curate from the approximately 70 hours of tape at issue.  *Intervenor's Motion for a Preliminary Injunction* at 1(May 29, 2026) (ECF No. 65-1) ("Motion" or "Mot.").  Plaintiffs disclaim interest in the many, many hours of tape that Special Counsel Hur did not curate.

Every aspect of the Special Counsel's investigation was immensely controversial and covered in real time by the media.  But critically here, the President and his allies have repeatedly and vehemently disputed Special Counsel Hur's conclusions regarding the President's "poor memory" and "diminished faculties."  Hur Report. at 6, 248.  And the President vigorously denied disclosing classified information to Zwonitzer.  Thus, the American People are confronted with a question as perplexing as it is concerning.  The Special Counsel, exercising the authority of the United States, investigated the sitting President for serious felonies and came to two prominent conclusions on all available evidence.  But the President, the boss of the Attorney General who oversaw Special Counsel Hur, vehemently denied those conclusions.  Who was right?  The public has a right to see the critical underlying evidence to judge that for themselves.  That is what this underlying FOIA action was and is about.

2.      Not surprisingly, President Biden's DOJ acted as Praetorians vigorously fighting release of information in this matter at any point and seeking to impose delay.  The timeline of the delay included claiming to process the request—and then refusing to process it by rewriting it—leading to wasteful summary judgment briefing on the search that the Biden Justice Department finally mooted out.  *See* ECF No. 26.  It also included denying the existence of transcripts curated by Special Counsel Hur for months—until they were, in fact, admittedly located.  *See* JSR, ECF No. 28 at 3–9 (setting out timeline).  Eventually, the matter was fully briefed and awaited summary judgment.  *See* ECF Nos. 33–38.

3.      When President Trump returned to Office, the Department reconsidered its position and determined that faithful application of its FOIA obligations as a matter of law required disclosure of material withheld by President Biden's DOJ.  This new position was unsurprising in light of prior similar determinations regarding other Hur-related materials. Those prior disclosures adhered to a balance of public versus privacy interests and faithful application of FOIA's segregability requirement.  They were not a wholesale "dump" of materials, but in many instances, contained ***extensive redactions***—redactions which Plaintiffs here did not challenge, as they believed them to be fundamentally fair applications of FOIA.

4.      As to the transcript and audio curated by Special Counsel Hur at issue here—as detailed in the correspondence between the Department and Counsel for President Biden—the Department painstakingly evaluated its position, consulted with Counsel for President Biden, considered the submissions by Counsel for President Biden, and at the end "[b]ased on [their] comments . . . expanded [its] redactions both to the audio files as well as the transcript, providing greater privacy protection to President Biden's family and correcting inadvertent errors . . . ." Jeffress Decl. at Ex. 2 at 2.  After affording President Biden every courtesy and multiple opportunities to be heard both in writing and in person, the Department determined to produce the remaining records now at issue here.  Plaintiffs were amenable to this disposition as it paved the way for this case to be fully settled on the merits.  *See* ECF No. 59 at 13–14.

3

App-464

**5.**        Now President Biden has entered this case in his personal capacity and seeks to upturn months of painstaking negotiation with emergency litigation he delayed launching.  His central submission?  ***His*** DOJ got it right; ***Trump's*** DOJ got it wrong.  *See* Mot. at 1–3.  Why?  Because ***his*** DOJ engaged in the "straightforward application of the law that is the daily work of any independent Justice Department" (*id.* at 1) and ***his*** DOJ relied in part on "the Declaration of The Department's highest-ranking career official, who served across administrations for more than 30 years.  *Id.* at 2.  Whereas ***President Trump's*** DOJ "may well be because the decision is nakedly political" (*id.*) and "is not operating through normal channels."  *Id.* at 1.  That is wrong at least four times over.

**a.**        To start, President Biden's submission is a rancid attack on Republican Government.  Elections have consequences.  President Biden withdrew from the 2024 Election because ***his own party*** forced him out because they viewed him a hopeless candidate plagued by incapacity problems.  Then President Trump won.  One of the many consequences of an election is that the Department's position can and does change; after all, in a unitary Executive, the President Controls the ***entire*** Executive Branch.  *See, e.g.*, *Trump v. Slaughter*, 146 S. Ct. 18 (2025); *Trump v. United States*, 603 U.S. 593, 608 (2024).  Nothing is nefarious about that.  Biden's DOJ ***did it all the time***.[3]  Indeed, the contrary submission is nefarious.  If President Biden is right, the American People can ***never*** vote to change how the first DOJ interprets and applies the law (contrary to administrative law); that is the submission of a Stuart King, not a former President.  Indeed, this principle goes back even farther than the seventeenth century.  *See Burnham v. Superior Ct. of Calif., County of Marin*, 495 U.S. 604, 619 (1990) (this would be "to

---

[3]  *Compare Ways & Means Comm.'s Request for the Former President's Tax Returns & Related Tax Info. Pursuant to 26 U.S.C. S 6103(f)(1)*, 2021 WL 3418600 (O.L.C. July 30, 2021) *with Cong. Comm.'s Request for the President's Tax Returns Under 26 U.S.C. S 6103(f)*, 2019 WL 2563046 (O.L.C. June 13, 2019) (reversing position on releasing President Trump's personal tax returns); Fifth Declaration of Samuel Everett Dewey, Ex. 1 (Jun. 5, 2026) ("5th Dewey Decl."); 5th Dewey Decl. Ex. 2.  *See also* 5th Dewey Decl. Ex. 2.5 (referencing FOIA suits mooted out, in essence, by President Biden reversal of a President Trump Executive Order).

4

stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians" quoting *Hurtado v. Calif.*, 110 U.S. 516, 528–29 (1884)).

And it is equally contrary to our Republican Government to submit that there are "career" officials whose views ***must always control***. Democratic accountability is our system—not some bizarre government of Platonic expert career guardians. And, in any event, to claim that the submissions by President Biden's DOJ were somehow apolitical is rich indeed. ***Of course they were political***; President Biden's DOJ reacted to the immense pressure applied to shield him and did so with considerable success while Biden was in Office. "Career" officials (arguably just *de facto* politicals in career roles) followed their orders. Indeed, if anything, it was President Biden's DOJ that ignored faithful application of the law as concerns the Special Counsel. That is not Plaintiffs' position; it is that of former Attorney General Mukasey. *See* Declaration of the Hon. Michael B. Mukasey, *Judicial Watch et al. v. DOJ*, 24-cv-700, (June 18, 2024) (ECF No. 40-3).

**b.** President Biden's merits submission is wrong in many ways. To start, FOIA unambiguously ***requires*** the production of the records in issue here (as redacted by the Department). So, all of this much ado about nothing. Moreover, the Department's current decision that FOIA does, in fact, require disclosure of the production set now at issue is both an unremarkable correction of the Biden DOJ's contorted submissions and, in any event, is entitled to extreme deference, reversable only under arbitrary and capricious review. *A fortiori*, Biden's submission falls.

Biden and Zwonitzer have little, if any, privacy interest in the recordings ***where the underlying text was previously produced***. (The notion that a privacy interest exists in the sound of President Biden's voice, where one of the most important functions of a President is to speak on the American and world stages, was always, and remains, a complete canard). Moreover, the corresponding transcript ***was publicly quoted in the Hur Report***, and the public well knows how Biden speaks.

As to remaining materials, Biden bemoans their status as "personal conversations" (Mot. at 1) and submits they were like a "personal diary" (*id.* at 15 (quotation and citation omitted)), and

that they were "never intended to be shared with a wider audience." *Id.* at 1.  But that ignores that the records in issue are not the full 70 hours of tape, as almost all of those records are not in issue; all that is at stake is a (comparatively) small subset of records curated by Special Counsel Hur as essential to the SCO investigation and his Report.  Moreover, that production set has *already* been redacted for privacy and then *further redacted per the submission of Biden's own Counsel*.  More fundamentally, Biden's position now seeks to whitewash out the non-private, for-profit, for political/media benefit purposes of the conversations.  What is in issue are conversations with a paid ghostwriter to draft a book with an $8 million advance designed to lay the groundwork for an impending presidential run.  It does not get any less private than that.  Moreover, Biden took no steps to safeguard these supposedly private materials.  He has never cited an NDA and he allowed Zwonitzer to retain the materials unguarded.  Nor has he put forward testimony (which even if he did, Plaintiffs should be able to cross-examine) that there was an oral agreement between him and Zwonitzer to keep the materials confidential.  No doubt because this would be nonsensical.  The whole point of Biden talking to Zwonitzer was so *a book could be sold to the public*.

Conversely there is immense public interest in the audio and transcripts curated by Special Counsel Hur, as it is undisputed that they were key evidence in Special Counsel Hur's conclusions that Biden had a "poor memory" and "diminished faculties."  Hur Report at 6–7, 248.  Thus, they are key to allowing the American People to evaluate the controversy the President and his Administration have themselves stoked.  They are also critical in allowing the American People to evaluate whether the Biden-Harris Administration concealed the fact that President Biden was not mentally fit to hold Office.  The evidence of President Biden's decline is painfully apparent.  And Special Counsel Hur himself testified that the audio recordings from 2017 provide powerful comparative evidence of the state of that decline, even 3–4 years before Biden  assumed the Nation's highest Office.  Release of these records represents a minimal privacy intrusion, precisely because it would merely fill in the fine details of a controversy Biden himself started from the (very public) White House podium.  The public interests in allowing the American People to make up their own minds about whether the President shared classified information with his ghostwriter

or was mentally fit are, of course, immense. Moreover, the senior-most members of the Biden-Harris Administration have strenuously denied Special Counsel Hur's conclusions and have even attacked him for arriving at them. Thus, the records in issue go directly to whether senior-most members of the Biden-Harris Administration encountered an impaired President, but strived every day to conceal that fact, including by attacking Special Counsel Hur's conclusions, ***despite knowing them to be true.***

The compelling interests at stake here also include providing the data that would allow the American public and the history books to assess whether President Biden ***actually authorized*** non-delegable Presidential decisions while actually impaired. The current President has deemed this issue "one of the most dangerous and concerning scandals in American history." 5th Dewey Decl. Ex. 3 ("Trump Memo"). Indeed, many of President Biden's own senior staff testified to a complete lack of such documentation and authorization for use of the autopen on official documents as something cloaked by a game of three-card monte. *See* 5th Dewey Decl. Ex. 4; 5th Dewey Decl. Ex. 5. In evaluating how such an unprecedented situation should be approached, the American People deserve as much information as possible as to the timeline and depth of President Biden's cognitive decline

    **c.**    Finally, President Biden cannot satisfy the equitable factors to obtain emergency preliminary relief. To start, he cannot show the great and irreparable harm required to obtain a preliminary injunction. This is not a case about a personal diary or a family scrapbook; it is a case about recordings made to make $8 million and line up a sympathetic political and media narrative. Moreover, there is no actually direct and competent evidence that President Biden will be harmed, only third-party declarations relaying on multiple levels of hearsay that should not be credited.

Should the Court have any doubt on this point, Plaintiffs intend to call President Biden to testify at hearing to examine the actual evidence on this point. Both the Court and the American People should not have to rely on attorney declarations strewn with hearsay—they deserve to hear it from the Joe Biden's own mouth. Whatever privacy interest Biden may have in records that Special Counsel curated is minimal and certainly not of the "great" sort to obtain emergency relief

App-468

and bring to a crashing halt settlement of longstanding litigation by enjoining the Department. And on the flip side of the coin, the harm to the American People in yet more delay is exceptionally weighty. They should be able to access records relied upon by Special Counsel Hur for themselves. The American People are entitled to know now whether Special Counsel Hur or his boss's boss were right as to President Biden's mental decline, the timeline of that decline, the veracity of senior members of the Biden-Harris Administration, who claimed he was fit for purpose, and gain access to the key underlying material curated by Special Counsel Hur to test whether Biden himself actually authorized certain non-delegable decisions. There has already been too much delay.

## BACKGROUND

On February 5, 2024, DOJ released the Hur Report. The Hur Report prompted immediate reactions from the White House, Congress, and the media for several of its conclusions. First, the Hur Report is clear that despite its conclusion to decline prosecution, there is evidence that the President Biden willfully retained and disclosed classified information. Hur Report at 1, 6–7. In particular, there is clear evidence that Biden disclosed classified information as concerns the Biden-Zwonitzer transcripts. *See* Hur Report at 4, 103–08, 108. And further, Hur found that any prosecution of President Biden was unlikely to succeed in significant part because his defense would portray him to a jury as he presented to Special Counsel Hur—as "a sympathetic well-meaning elderly man with a poor memory" and "diminished faculties." Hur Report at 5, 6, 207, 207, 219, 242, 247–48. This conclusion was central to the Special Counsel's decision not to prosecute President Biden—the Special Counsel believed the President's memory was a significant factor in concluding a prosecution would not be successful. *See* Hur Report at 5, 6, 207, 219, 242, 247–48.

Special Counsel Hur maintained this position despite strident denials and withering criticism from President Biden, his Administration, its chattering-class proxies, congressional Democrats, and certain members of the media. Special Counsel Hur's own words before the House Committee on the Judiciary ("Judiciary Committee") speak volumes:

There has been a lot of attention paid to language in the report about the President's memory, so let me say a few words about that. My task was to determine whether the President retained or disclosed national defense information willfully. That means knowingly and with the intent to do something the law forbids. I could not make that determination without assessing the President's state of mind. For that reason, I had to consider the President's memory and overall mental state and how a jury likely would perceive his memory and mental state in a criminal trial. These are the types of issues that prosecutors analyze every day and because these issues were important to my ultimate decision, I had to include a discussion of them in my report to the Attorney General.

The evidence and the President himself put his memory squarely at issue. We interviewed the President and asked him about his recorded statement "*I just found* all the classified stuff downstairs." He told us that he didn't remember saying that to his ghostwriter. He also said he didn't remember finding any classified material in his home after his Vice Presidency. He didn't remember anything about how classified documents about Afghanistan made their way into his garage.

My assessment in the report about the relevance of the President's memory was necessary, accurate, and fair. Most importantly, what I wrote is what I believe the evidence shows and what I expect jurors would perceive and believe. I did not sanitize my explanation, nor did I disparage the President unfairly. I explained to the Attorney General my decision and the reasons for it. That is what I was required to do.

Third Declaration of Samuel Everett Dewey at Ex. 1 at 8 (Nov. 27, 2024) ("3d Dewey Decl.")

("Hur Hearing") (emphasis added); *see also* Hur Report at 17, 38, 50, 65, 72.

1.    The Hur Report is clear that despite its conclusion to decline prosecution, there is evidence that the President willfully retained and disclosed classified information. *See*, *e.g.* Hur Report at 1 ("Our investigation uncovered evidence that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen."); *id*. at 6–7 ("FBI agents recovered from unlocked drawers in the office and basement den of Mr. Biden's Delaware home a set of notebooks he used as vice president. Evidence shows that he knew the notebooks contained classified information."). Under immense criticism from the President himself on down, Special Counsel Hur stood by his conclusion in his testimony before the Judiciary Committee that if the President was charged, there was sufficient evidence to send the case to the jury:

**Mr. HUR.**  As I said in the report, some reasonable jurors may have reached the inferences that the government would present in its case-in-chief.

**Mr. KILEY.**  So, a reasonable juror could have voted to convict, based on the facts that you—

**Mr. HUR.**  Correct.

Hur Hearing at 68.

2.        The Hur Report was unequivocal that President Biden shared classified information with Zwonitzer.  *See* Hur Report at 103 (subheading that reads "Mr. Biden disclosed classified information in his notebooks to Zwonitzer.").  In some instances, "Mr. Biden read his notes from classified meetings to Zwonitzer word-for-word."  Hur Report at 103.  The Hur Report details multiple instances where this occurred:

- President Biden read portions of a notebook "aloud and nearly verbatim to Zwonitzer, including portions containing classified information that remains classified up to the Secret level" about a summer 2015 Situation Room meeting "relating to a foreign country and a foreign terrorist organization."  Hur Report at 104.

- In an April 24, 2017 interview with Zwonitzer, President Biden read from another notebook entry containing notes he took during a November 2014 National Security Council meeting in the Situation Room.  In the interview with Zwonitzer, President Biden "read aloud from notes summarizing a range of issues relating to a foreign terrorist organization, including specific activities of the U.S. military and views expressed by the intelligence community, including the Director of National Intelligence and the CIA Director."  President Biden also had problems reading his handwriting of his notes and asked Zwonitzer for help deciphering his handwriting.  In that exchange, Biden cautioned "some of this may be classified, so be careful."  The Hur Report wrote further, "[s]ome of the portions that Mr. Biden read to Zwonitzer remains classified at the Secret level."  Hur Report at 105–06.

- "More generally, during his dozens of hours of interviews with Zwonitzer, Mr. Biden read from notebook entries related to many classified meetings, including National Security Council meetings, CIA briefings, Department of Defense briefings, and other meetings and briefings with foreign policy officials."  Hur Report at 106.

- On February 16, 2017, President Biden told Zwonitzer that he "***just found*** the classified stuff downstairs" in reference to classified documents relating to American military and foreign policy downstairs.  Hur Report at 108 (emphasis added). This phraseology strongly suggests someone diligently searching for something who is happy he found it. And this phraseology also suggests knowledge by Biden that it is classified information he had retained, then searched, and eventually found—presumably all so he could share it with his paid agent Zwonitzer.  These points would almost certainly be confirmed by the audio.

10

Special Counsel Hur was clear that although he recommended against prosecution, the "best case for charges would rely on Mr. Biden's possession" of classified materials in his residence in February 2017, "when he was a private citizen and when he told his ghostwriter he had *just found* classified material." Hur Report at 4 (emphasis added). Importantly, again, Special Counsel Hur's declination was not because there was insufficient evidence to send the case to the jury (*see* Hur Hearing at 68); rather Special Counsel Hur determined that an ultimate lack of evidence demonstrating willful intent by President Biden, mitigating circumstances, and probable defenses would likely undermine any potential prosecution.

**3.** Key to Special Counsel Hur's recommendation against prosecution was his analysis of how the case would be viewed by a jury. Central to Hur's analyses and conclusions was that for jurors, "Mr. Biden's apparent lapses and failures in February and April 2017 will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in our interview of him." Hur Report at 248. In his prosecutorial judgment, the Special Counsel felt those diminished faculties would cause a jury to see the President as "a sympathetic well-meaning elderly man with a poor memory." Hur Report at 6. The Report is replete with similar references:

- "Mr. Biden's memory was significantly limited both during his recorded interviews with the ghostwriter [Zwonitzer] in 2017, and in his interview with our office in 2023." Hur Report at 5.

- "Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries." Hur Report at 207.

- "In his interview with our office, Mr. Biden's memory was worse. He did not remember when he was vice president, forgetting on the first day of the interview when his term ended ('if it was 2013—when did I stop being Vice President?'), and forgetting on the second day of the interview when his term began ('in 2009, am I still Vice President?'). He did not remember, even within several years, when his son Beau died. And his memory appeared hazy when describing the Afghanistan debate that was once so important to him." Hur Report at 208.

- "We also believe some of the same evidence that supports reasonable doubt for the classified Afghanistan documents also supports reasonable doubt for the notebooks, including Mr. Biden's cooperation with the investigation, his diminished faculties in advancing age, and his sympathetic demeanor." Hur Report at 242.

- "For these jurors, Mr. Biden's apparent lapses and failures in February and April 2017 will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in our interview of him." Hur Report at 247–248.

4.      The Special Counsel repeatedly explained to the Judiciary Committee that all available demeanor evidence informed his conclusions about President Biden's memory and faculties:

> **Mr. HUR.** The totality of the time that I spent with the President during his voluntary interview was something that I certainly considered in framing my assessment and articulating it in the report. That includes not only the words in the cold record of the transcript of the interview, but also the experience of being there in the room with him and frankly considering how he would present to a jury in a criminal trial if charges were brought.
> **Chair JORDAN.** I guess I'm asking specifically. I know you cite in the report the dates that he couldn't remember when he was Vice President, when he began, when his term ended. You cite that in your report. Is there anything else specifically that stands out from that interview with the President?
> **Mr. HUR.** A number of things stand out. Again, I'm aware that the transcript has now been made available. I do provide certain examples in my report of significant personally painful experiences about which the President was unable to recall certain information. I also took into account the President's overall demeanor in interacting with me during the five-plus hour voluntary interview. So, it was a wealth of details about being there in the moment with the President, including his inability to recall certain things. I'll also say, as reflected in the transcript, the fact that he was prompted on numerous occasions by the members of the White House Counsel's Office.

Hur Report at 65. That necessarily includes the recordings at issue here: "It was based on a number of different sources . . . including various recordings, some of them from the 2016–2017 timeframe, some from our interview with the President in October 2023." *Id*. at 50; *see also* Hur Report at 5 ("Mr. Biden's memory was significantly limited, both during his recorded interviews with the ghostwriter in 2017, and in his interview with our office in 2023."); *id.* at 207 ("Mr. Biden's memory also appeared to have significant limitations-both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his

12

App-473

recorded interview with our office.  Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.").

5.      Special Counsel Hur further testified he also relied upon President Biden's and Zwonitzer's conversations from February and April of 2017 (at issue here) as a critical *comparative* reference point for assessing President Biden's "diminished faculties and faulty memory."  Hur Report at 248:

> **Ms. HAGEMAN.**  OK.  You did not compare President Biden's current memory or condition with his memory or condition when he was in the Senate or when he left the Vice Presidency and took the classified documents subject to your investigation, is that right?
> **Mr. HUR.**  Actually, I believe that's not correct, Congresswoman.  One of the things that's in the report is an assessment of the President's memory, based on recordings from the 2016–2017 timeframe, recordings of conversations between Mr. Biden and his ghostwriter, and comparing that with the President's memory that he exhibited during our interview of him in October 2023.  So, there was a comparison there.

Hur Hearing at 72; *see also* Hur Report at 208 **(*"In his interview with our office, Mr. Biden's memory was worse" than in the Biden-Zwonitzer audio* (emphasis added)).**

6.      The Hur Report makes clear that the recordings were developed solely for commercial and media/political purposes.  The Hur Report discusses the process by which proposals were developed and pitched as the start of the project:  "Mr. Biden used this proposal to shop his book to potential publishers, and this bidding process resulted in a book contract netting Mr. Biden an advance of $8 million."  Hur Report at 141.  This is a considerable sum of money and was itself the subject of considerable political attention during the House Judiciary Committee's Hearing with Special Counsel Hur:

> **Chair JORDAN.**  Eight million dollar[s].  Joe Biden had $8 million reasons to break the rules.  Took classified information and shared it with the guy who was writing the book.  That is why he knew the rules, but he broke them, for $8 million in a book advance.  You know what?  Wasn't just the money.  Joe Biden—here is—this is page 231, very next page.  In your report, "Joe Biden viewed his notebooks as an irreplaceable contemporaneous record of the most important moments [o]f his Vice Presidency."  He had written this all down for the book, for the $8 million.  The next thing you say in your report is, quote, "Such a record would buttress his legacy as a world leader."  You know what this is?  It wasn't just the money.  It wasn't just $8 million.  It was also his ego.  Pride and money are

why he knowingly violated the rules.  The oldest motives in the book:  Pride and money.  You agree with that, Mr. Hur?  You wrote about it in your report.

**Mr. HUR.**  That language does appear in the report, and we did identify evidence supporting those assessments.

3d Dewey Decl. at Ex. 1 at 24.

7.    The White House disputed some of the Hur Report's conclusions even before its public release on February 7, 2024.  Both the White House Counsel and the President's private counsel jointly wrote to Special Counsel Hur on February 5, 2024, to ensure "a final report that is both accurate and consistent with Department of Justice policy and practice."  Hur Report at 384.  The White House requested Special Counsel Hur "revisit [his] descriptions of President Biden's memory and revise them so that they are stated in a manner that is within the bounds of your expertise and remit."  Hur Report at 385.  The White House took umbrage that Special Counsel Hur "refer[red] to President Biden's memory on at least nine occasions—a number that is itself gratuitous."  Hur Report at 386.  The letter also took issue with the Report's use of the phrase "totally irresponsible" to describe President Biden's document storage practices.  Hur Report at 385.  The letter added, "this kind of criticism of an uncharged party violates 'long-standing Department practice and protocol'. . . .  Using President Biden's own words does not make the criticism compliant with Department practice."  Hur Report at 385–86 (citation omitted).  Special Counsel Hur provided no substantive response to the White House Counsel but attached the White House Counsel's Letter to his Report along with an explanation of minor typographical and factual corrections.  *See* Hur Report at 1–2.

8.    Unable to move the Special Counsel off his evaluation of the evidence, both the White House Counsel and the President's private counsel went over Special Counsel Hur's head and subsequently wrote Attorney General Garland on February 7, 2024, objecting "to the multiple denigrating statements about President Biden's memory[.]"  3d Dewey Decl. at Ex. 3 at 2.  The White House Counsel argued "[t]he Special Counsel can certainly and properly note that the President lacked memory of a specific fact or series of events.  But his Report goes further to include allegations that the President has a failing memory in a general sense, an allegation that

14

App-475

has no law enforcement purpose." *Id.* at 2. DOJ responded on February 8, 2024, writing "the Department concludes that the report as submitted to the Attorney General, and its release, are consistent with legal requirements and ***Department policy***." 3d Dewey Decl. at Ex. 4 at 2 (emphasis added).

9.      Following the Hur Report's public release on February 8, 2024, the Administration, from top to bottom, vigorously attacked Special Counsel Hur's characterizations and conclusions. On February 8, 2024, the then-President himself strenuously denied Special Counsel Hur's conclusion as to his mental state, insisting to reporters that "[m]y memory is fine." *See* 3d Dewey Decl. at Ex. 5 at 3; *see also* 3d Dewey Decl. at Ex. 6 (collecting similar articles). The President also vehemently denied sharing classified information with Zwonitzer:

> **Q:** Mr. President, why did you share classified information with your ghostwriter?
> **THE PRESIDENT:** I did not share classified information. I did not share it.
> **Q:** With your ghostwriter?
> **THE PRESIDENT:** With my ghostwriter, I did not. Guarantee you, I did not.
> What the—

3d Dewey Decl. at Ex. 5 at 5–6.

Vice President Kamala Harris dismissed the Report's conclusions as to the President's memory as "inaccurate and inappropriate" and "clearly, politically motivated, gratuitous." *See* 3d Dewey Decl. at Ex. 7 at 2; *see also* 3d Dewey Decl. at Ex. 8 (collecting similar articles). Spokesman for the White House Counsel's Office, Ian Sams, told reporters the Report "left [one] to wonder why this Report spends time making gratuitous and inappropriate criticisms of the President." 3d Dewey Decl. at Ex. 9 at 6; *see also* 3d Dewey Decl. at Ex. 10 (collecting media coverage). White House Press Secretary Karine Jean-Pierre said those portions of the Report speaking to the President's memory "don't [] live[] in reality." 3d Dewey Decl. at Ex. 9 at 29; *see also* 3d Dewey Decl. at Ex. 10.

10.      Attorney General Garland, in contrast, deferred to Special Counsel Hur's analyses and conclusions. *See* 3d Dewey Decl. at Ex. 11 at 2. In his testimony before the House Judiciary

15

App-476

Committee on June 5, 2024, Attorney General Garland repeatedly deferred to the Hur Report when questioned about the Special Counsel's conclusions. *See, e.g.*, 3d Dewey Decl. at Ex. 12 at *13.

11. White House proxies mirrored the Administration's response—with added energy. Senator John Fetterman called the Report "a smear and cheap shots and just taking things out of context, or even just inventing." 3d Dewey Decl. at Ex. 13 at 2. Representative Dan Goldman said, "what I did understand from talking to folks at the White House is . . . part of the frustration with Special Counsel Hur, a Republican appointee, cherry-picking very few remarks from a five-hour interview[.]" 3d Dewey Decl. at Ex. 14 at 2. Former General Counsel for the Federal Bureau of Investigation, Andrew Weissmann, bemoaned the Report as "a redux of what we saw with respect to James Comey at the FBI with respect to Hillary Clinton, in terms of really not adhering to what I think are the highest ideals of the Department of Justice." 3d Dewey Decl. at Ex. 15 at 3.

On social media, former Attorney General Eric Holder wrote: "Special Counsel Hur report on Biden classified documents issues contains way too many gratuitous remarks and is flatly inconsistent with long standing DOJ traditions. Had this report been subject to a normal DOJ review these remarks would undoubtedly have been excised." 3d Dewey Decl. at Ex. 16. Jim Messina, a former Deputy Chief of Staff for President Barack Obama, wrote: "Let's be clear— the special counsel isn't a dummy and we should be very careful not to take the bait after Comey pulled this in 2016. Hur, a lifelong Republican and creature of DC, didn't have a case against Biden, but he knew exactly how his swipes could hurt Biden politically." 3d Dewey Decl. at Ex. 17.

12. Despite facing a very public pressure campaign from the President himself on down, during his March 12, 2024 House Judiciary Committee Hearing, Special Counsel Hur confirmed his assessments in his opening statement and maintained throughout questioning that he had sufficient evidence to present the case to a jury but believed that Mr. Biden would prove a sympathetic defendant. *See* Hur Hearing at 7, 8, 17, 68. Special Counsel Hur also testified that President's Biden's statement that he did not disclosure classified information to Zwonitzer was

16

App-477

"inconsistent with the findings based on the evidence in my report."  3d Dewey Decl. at Ex. 5 at 30.

Nevertheless, Democratic members of the Judiciary Committee repeatedly denigrated the Special Counsel's investigation and Special Counsel Hur personally.  *See, e.g.*, *id.* at 37 ("you used your report to trash and smear President Biden because he said in response to questions over a five-hour interview that he didn't recall how he got the documents.  You knew that this would play into the Republicans' narrative that the President is unfit for office because he is senile . . . You knew that this is what was going to happen, didn't you?"); *id.* at 40 ("You could have written your report with comments about his specific recollection as to documents, a set of documents, or a set of documents, but you chose a general, pejorative reference to the President.  You understood when you made that decision, didn't you, Mr. Hur, that you would ignite a political firestorm with that language, didn't you?").

These attacks continued.  Minority Members of the House Judiciary Committee mirrored the White House's position in congressional contempt proceedings.  Despite Special Counsel Hur's clear repeated statements to the contrary, the Minority begins from the position that "[t]he Hur Report exonerates President Biden of any prosecutable charges[,]" and "President Biden's age was not a material aspect of Hur's decision to decline prosecution[.]"  3d Dewey Decl. at Ex. 25 at 32.  Further, in the Minority's view, Special Counsel Hur's conclusions as to President Biden's memory are "superfluous dicta," "wildly inappropriate," and "unsupported by the actual record[,]" as "[t]he transcript shows that President Biden was in clear command of his cognitive functions[.]" *Id.* at 34.

**13.**    The controversy surrounding the audio recording was heightened by the reality that President Biden's physical and mental fitness was not only central to Special Counsel Hur's investigation and conclusions, but was also one of the central questions in the 2024 Presidential Election prior to President Biden dropping out of the race.  In one poll, seventy-nine percent of voters consider the phrase "too old to be president" to describe President Biden very or somewhat well.  *See* 3d Dewey Decl. at Ex. 30 at 12.  An April 2024 poll by Pew Research Center found

sixty-two percent of voters were not too or not at all confident that President Biden has the mental fitness needed to be President. *See* 3d Dewey Decl. at Ex. 31 at 14. A June 2024 poll by CBS News found sixty-five percent of voters thought President Biden does not have mental and cognitive health to serve as President. *See* 3d Dewey Decl. at Ex. 32 at 3.

14. In early June, the *Wall Street Journal* released a long form article entitled "Behind Closed Doors, Biden Shows Signs of Slipping" that was "based on interviews with more than 45 people over several months." 3d Dewey Decl. at Ex. 33 at 2. *The Wall Street Journal*'s story prompted a stern rebuke from the White House with Spokesman Andrew Bates telling *Axios* "it's a little surprising that The Wall Street Journal thought it was breaking news when congressional Republicans told them the same false claims they've spouted on Fox News for years, but it's also telling that the only individuals willing to smear the President in this story are political opponents afraid to use their names[.]" 3d Dewey Decl. at Ex. 34 at 2. Moreover, the White House apparently strong armed at least one prominent congressional Democrat into calling *The Wall Street Journal* back and sitting for a second interview because it was displeased with what he had to say. 3d Dewey Decl. at Ex. 33 at 3.

15. Allies of the President were quick to note that the absence of their statements in *The Wall Street Journal's* piece. On X.com, Senator Patty Murray wrote: "I made clear to the @wsj regarding the January meeting on Ukraine that the President was absolutely engaged & ran that meeting in a way that brought everyone together. I'm not quoted—I wonder why." 3d Dewey Decl. at Ex. 35. Representative Nancy Pelosi wrote: "Many of us spent time with @wsj to share on the record our first-hand experiences with @POTUS, where we see his wisdom, experience, strength, and strategic thinking. Instead, the Journal ignored testimony by Democrats, focused on attacks by Republicans and printed a hit piece." 3d Dewey Decl. at Ex. 36. *The Hill* reported that Biden campaign manager Julie Chavez Rodriguez "brushed back the premise of the Journal story" and said of the President, "he is, you know, just one of the strongest leaders that I've been able to engage and to be able to work with and to advise." 3d Dewey Decl. at Ex. 37 at 3. White House communications director Ben LaBolt described the story as a "[c]omplete and utter editorial fail

18

App-479

by the @wsj." 3d Dewey Decl. at Ex. 38. *MSNBC*'s Joe Scarborough said of the President, "[i]f you want to talk about international affairs, if you want to talk about how to get bipartisan legislation, Joe Biden is light-years ahead of all of them." 3d Dewey Decl. at Ex. 37 at 1. In short, the Biden's "memory" and "faculties" was an issue in the Hur Investigation, and it remains an issue that the White House had deliberately placed firmly before the electorate in the 2024 Election.

16. President Biden's June 27, 2024 debate performance brought his competency for Office profoundly into question and weighs substantially in the ongoing debates between the Special Counsel on the one hand, and the Biden-Harris Administration on the other. It also raises the question of whether senior Biden-Harris Administration officials covered for President Biden, in part, by attacking Special Counsel Hur's conclusions. *See, e.g.*, 3d Dewey Decl. at Ex. 41.

17. Following the debate, President Biden's public appearances and press accounts suggested that he was suffering from steady progressive mental and physical decline that appeared to be accelerating. Several articles chronicled (albeit contested by the White House and its allies) the apparent decline based on public reporting and interviews with insiders. *See, e.g.*, 3d Dewey Decl. at Ex. 42; 3d Dewey Decl. at Ex. 43. Several notable instances stand out in this and subsequent reporting. Some in the media demanded Special Counsel Hur was vindicated in his assessment of President Biden. Fox News host Kayleigh McEnany wrote "Biden is worse than anyone knew. Robert Hur must have been truly shocked. Now the country is." 5th Dewey Decl. Ex. 6.

- **June 13–15, 2024 G7 Summit.** Accounts reflect that foreign leaders and officials: repeatedly raised major concerns with President Biden's conduct; may have acted to "shield" him from press scrutiny during his off-moments; and even that one "senior European official" said he could not "imagine" placing President Biden in a room with Russian President Vladimir Putin. *See* 3d Dewey Decl. at Ex. 42; 3d Dewey Decl. at Ex. 43.

- **July 11, 2024 NATO Press Conference.** President Biden introduced Ukrainian President Volodymyr Zelensky as President Putin at a preceding event causing "loud gasps in the audience." 3d Dewey Decl. at Ex. 44. During the press conference, President Biden

<div align="center">19</div>

<div align="center">App-480</div>

referred to Vice President Harris as Vice President Trump and misstated a key jobs number. *See* 3d Dewey Decl. at Ex. 45. The video is striking. *See* 3d Dewey Decl. at Ex. 46.

- **July 16, 2024 Las Vegas Speech.** President Biden flubbed a "basic feature" of his plan to fight rent increases. *See* 3d Dewey Decl. at Ex. 47.

- **September 21, 2024 Press Conference with the Indian Prime Minister.** "Biden was supposed to introduce Prime Minister Narendra Modi in Wilmington, Delaware. He instead became confused and appeared to think he was waiting for a question from reporters. An announcer then introduces Modi following an uncomfortable pause." 3d Dewey Decl. at Ex. 48. The video of the event is alarming.

18. On July 21, 2024, President Biden dropped out of the 2024 presidential race. All available contemporaneous reporting indicates that President Biden was pressured to drop out by his own party precisely because of widespread concerns and public perceptions regarding his mental and physical fitness for Office. There is even reporting by a Pulitzer Prize-winning journalist that President Biden dropped out only under threat of removal via Section 4 of the 25th Amendment. 3d Dewey Decl. at Ex. 49. The press coverage of these events was extraordinary even by modern standards.

Subsequent to President Biden dropping out of the 2024 Presidential race, numerous articles, and President Biden's few public appearances, have all provided substantial evidence that Special Counsel Hur had the better of his dispute with the Biden-Harris Administration over whether President Biden in fact had "diminished faculties and [a] faulty memory." This also raises the related question of whether senior Administration officials covered up the President's decline. Despite this fact, the seniormost Administration officials continued to vigorously defend President Biden's fitness for Office. For example, it remained an issue in the 2024 General Election and Vice President Harris was repeatedly questioned on whether President Biden was fit for Office and continued to insist that President Biden has the "intelligence, the commitment and the judgment and disposition" Americans expect from their President. 3d Dewey Decl. at Ex. 50; *see also* 3d Dewey Decl. at Ex. 51.

19. Post Biden-Harris Administration analysis of the Biden White House's autopen use raised serious questions regarding both whether President Biden lacked the capacity to perform

20

App-481

the functions of his Office and the senior-most members of the Biden-Harris Administration performed non-delegable presidential functions without his authorization. The Oversight Project's analysis found widespread evidence of the Biden White House deploying an autopen to affix President Biden's signature while he was present in Washington D.C., often when his schedule revealed a late start and an early lid. For example, of the 51 warrants issued by the Biden White House awarding pardons or clemency to thousands of federal inmates, over half—32 in total—were signed with an autopen. *See* 5th Dewey Decl. Ex. 8. Twenty six of the 32 autopenned clemency warrants were autopenned while President Biden was physically present in Washington, D.C. and presumably available to affix his signature to these documents executing powers belonging solely to the President. In addition, The Oversight Project identified at least eight days where President Biden hand signed a bill into law, but issued an executive order via autopen. *See* 5th Dewey Decl. Ex. 8

President Trump has deemed this issue "one of the most dangerous and concerning scandals in American history." 5th Dewey Decl. Ex. 3. The considered judgement of the current President is remarkably damming. Indeed, President Biden's many own senior staff testified to a complete lack of such documentation and authorization for use of the autopen on official documents, cloaked by a game of three-card monte. They also testified that Biden was totally isolated by his closest advisors that to an appalling lack of discipline in documenting putative decisions. *See* 5th Dewey Decl. Ex. 4; 5th Dewey Decl. Ex. 5.

President Biden's attempt to defend his use of the autopen resulted in stunning contradiction. On one hand, President Biden reportedly said to *The New York Times* "I made every decision" and that he "orally granted all the pardons and commutations issued at the end of his term." *See* 5th Dewey Decl. Ex. 11. But on the other hand, for the ***same article***, President Biden emphatically stated he ***did not*** personally approve the individual names of people that received clemency via his autopen. Instead, he made broad approvals by "category" of people to award clemency to and White House staff, in consultation with the Bureau of Prisons, would select the individuals that received the clemency awards. *Id.* ("Mr. Biden did not individually approve each

21

App-482

name for the categorical pardons that applied to large numbers of people, he and aides confirmed. Rather, after extensive discussion of different possible criteria, he signed off on the standards he wanted to be used to determine which convicts would qualify for a reduction in sentence. Even after Mr. Biden made that decision, one former aide said, the Bureau of Prisons kept providing additional information about specific inmates, resulting in small changes to the list. Rather than ask Mr. Biden to keep signing revised versions, his staff waited and then ran the final version through the autopen, which they saw as a routine procedure, the aide said."); *see also* 5th Dewey Decl. Ex. 12.

20.     Interest in President Biden's cognitive decline did not noticeably wane with his departure from the White House.  On May 16, 2025, Axios published audio recordings of President Biden's October 2023 interviews with Special Counsel Hur.  *See* 5th Dewey Decl. Ex. 13.  The press reaction was immediate, widespread, and damming.

21.     Mr. Thompson and Jake Tapper, moderator of the June 27, 2024 debate, released *Original Sin:  President Biden's Decline, Its Cover-up, and His Disastrous Choice to Run Again* on May 20, 2025.  *See* Jake Tapper & Alex Thompason, ORIGINAL SIN:  PRESIDENT BIDEN'S DECLINE, ITS COVER-UP, AND HIS DISASTROUS CHOICE TO RUN AGAIN (May 20, 2025).  *Original Sin* summarizes President Biden's debate performance; "A president's ability to communicate is a vital part of the job.  Beyond that failure, Biden had projected such weakness it raised questions about his ability to even serve as president." *Id.* at 195 (emphasis added).  Per *Original Sin*, Biden's deteriorated condition was apparent to close advisors early in his term.  In 2023, President Biden's limited public events—chiefly occurring between 10:00 a.m. and 4:00 p.m.—led one aide to conclude, "[h]e just had to win, and then he could disappear for four years—he'd only have to show proof of life every once in a while." *Id.* at 85.  Another senior official "conceded that a quick fifteen-minute interview [in October 2022] would've been impossible for the president to pull off just one year later." *Id.* at 55.  Concerns about President Biden's age were not limited to close staff.  George Clooney told Messrs. Tapper and Thompson that Biden did not appear to recognize him at a June 13, 2024 fundraiser. *Id.* at 174.

22

App-483

*Original Sin* suggests that President Biden's withdrawal from the 2024 Presidential Race was the result of sustained pressure by **Democratic** Leadership.  Tapper and Thompson recount a July 13, 2024 meeting between then-Senate Majority Leader Schumer and President Biden. Schumer made it clear that President Biden's support was ebbing in the Senate and that President Biden's pollsters were concealing dire polling numbers. *Original Sin* at 272–73.  President Biden responded to the release of *Original Sin* with defiance.  When asked for a response, "'You can see that I'm mentally incompetent, I can't walk—and I can beat the hell out of both of them,' Biden said with a smirk while speaking with reporters."  5th Dewey Decl. Ex. 14.

22.    On July 7, 2025, DOJ released additional material from Special Counsel Hur's interviews with President Biden's ghostwriter Mark Zwontizer.  *See* Joint Status Report, *Heritage Found. v. DOJ*, 24-cv-952-ACR (Aug. 29, 2025) (ECF No. 32).  The released material reflected a Department by that point faithfully adhering to balancing the compelling public interest with the miniscule (if any) privacy interest retained by President Biden rather than the initial, nearly entirely redacted release.  *See* 5th Dewey Decl. Exs. 15 & 16.

The release also revealed that the Biden DOJ redacted information going directly to President Biden's motives and credibility.  *See id.* For example, the release laid bare a pecuniary motive for President Biden to leak classified information to Zwonitzer in return for *at least* $8 million.  Again, all that information goes to evaluating who was correct, Special Counsel Hur or his boss's boss, Joe Biden.

23.    When the Hur Report came out, then-Vice President Harris vigorously defended President Biden's mental capacity and savaged Special Counsel Hur, saying that as a former prosecutor she found Hur's comments on President Biden's mental capacity "gratuitous, inaccurate, and inappropriate."  *See* 5th Dewey Decl. Ex. 17.  She added, "The way that the president's demeanor in that report was characterized could not be more wrong on the facts and clearly politically motivated, gratuitous.  And so I will say when it comes to the role and responsibility of a prosecutor in a situation like that, we should expect that there would be a higher level of integrity than what we saw."  *Id*.  But incredibly, in her September 2025 political memoir,

*107 Days*, Vice President Harris noted how the Hur Report "fueled" "doubts about Biden's age and capacity" and she admitted, "[t]he report had detailed concerning lapses.  I knew very well that when he was tired, his age showed, and I also knew that depositions could be grueling."  *See*, Kamala Harris, 107 DAYS 6 (2025).

24.    Dr. Jill Biden recently released her memoir, *A View from the East Wing*, on June 2, 2026.  While promoting the book on CBS News Sunday Morning, Dr. Biden said of the debate, "I was frightened, because I had never seen Joe like that before or since.  Never, I don't know what happened.  As I watched it, I thought, 'oh, my god, he's having a stroke.'"  5th Dewey Decl. Ex. 18.  Amazingly, Jill Biden's double down on the notion that President Biden had no cognitive issues and was fit for purpose and Special Counsel Hur was wrong.  *See, e.g.*, Jill Biden, A VIEW FROM THE EAST WING 161, 211, 245 (2026).

25.    President Biden announced on June 2, 2026 that yet another memoir will be released in September 2026.  *See* 5th Dewey Decl. Ex. 19.  President Biden announced his new memoir at the debut talk for Jill Biden's memoir in New York shortly after the former President interrupted the talk in a highly awkward fashion to ask his wife "who do you love most in the whole world?"  5th Dewey Decl. Ex. 20.

## I.    RELEASE OF THE AUDIO RECORDINGS CORRESPONDING TO TEXT IN THE HUR REPORT WOULD NOT RESULT IN AN UNWARRANTED INVASION OF PRIVACY.

President Biden's merits argument seeks to elide the fact that for some of the audio files in issue here the corresponding text **has already been made public**.  *See, e.g.*, Mot. at 17 (indirectly acknowledging this point).  President Biden has zero privacy interests in the audio recording corresponding to **exact quotations from transcripts in the Hur Report**, and the American people have an overwhelming public interest in judging for themselves Special Counsel Hur's determinations that:  (1)  there was a case for Biden to have to answer to in part because he disclosed classified information to Zwonitzer (*see* Hur Report at 4, 103–08, 108); and (2) not to prosecute the President because of his "diminished faculties and faulty memory."  Hur Report at

248. The American People also have an overwhelming interest in understanding whether other senior members of the Biden Administration publicly defended President Biden's competence while knowing behind the scenes that his was in mental decline and not fit for Office. President Biden has no good answer to that reality.[4]

### A.      President Biden Has Little, If Any, Privacy Interest Here.

1.      President Biden insists that disclosing the recording would result in an unwarranted invasion of President Biden's privacy interests. *See Mot.* at 15–16. But the principal problem with that argument is that the corresponding transcript has already been released; ***it was quoted in the Hur Report***. Broad citation to the putative privacy interests in 70 hours of tape simply is not apposite as to the six or so minutes at issue here. Indeed, President Biden ***himself*** effectively choose to release the quoted material because the Executive is unitary and President Biden's Administration touted that he did not exert executive privilege over the Hur Report. Given that disclosure, it is hard to see what additional privacy interests withholding the audio recording would protect. It is not simply the President's involvement in the investigation that is public; he has voluntarily released the content of the audio in question. *Cf. CREW III*, 746 F.3d at 1090 (noting separate privacy interest in "content"). Moreover, the President did so for political reasons; privacy interests cannot operate as both sword and shield. That release vitiates any privacy interest

---

[4] Analysis under Exemption 7(C) occurs in three phases in which there is some shift in the usual burdens.

First, *the Government* must demonstrate that a privacy interest protected by a privacy exemption is "present." *NARA v. Favish*, 541 U.S. 157, 172 (2004); *see also ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).

Second, the "FOIA requester must (1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest." *Boyd v. Criminal Division*, 475 F.3d 381, 386–87 (D.C. Cir. 2007) (internal quotation marks and citations omitted). Here, the burden is on the *requester*. *See, e.g.*, *Ctr. For Investigative Reporting v. USCIS*, No. 18-cv-1964 (CJN), 2019 WL 6498817, at *3 (D.D.C. Dec. 3, 2019).

Third, in the final analysis here, the *Government* bears the burden to show the privacy interests outweigh the public interests in the final balancing analysis. *Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018); *see CREW v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) ("*CREW III*").

here.  *See, e.g.*, *CREW III*, 746 F.3d at 1092; *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998); *Nation Mag. Washington Bureau v. U.S. Cust. Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995).  A public figure has little if any privacy interest in that context.  *Cf., e.g.*, *CREW III*, 746 F.3d at 1092; *Nation Mag.*, 71 F.3d 885 at 894, n.9.  And this was no mere public speaker. This was the  President of the United States speaking not as an "uncharged individual" but as "the President of the United States, clothed with immense power."  Doris Keans Goodwin, *TEAM OF RIVALS: THE POLITICAL GENIUS OF ABRAHAM LINCOLN* 687 (2005).  He was Special Counsel Hur's boss's boss.  He had absolute and unreviewable constitutional power to fire or control Special Counsel Hur at any time. President Biden stated Special Counsel Hur was wrong not as some "individual" from a stoop in S.W. D.C., but from the White House podium in the West Wing, with the Seal of the President of the United States before him, the flags of his Office and the Nation behind, him and surrounded by the full might and pomp of his power.

2.     Moreover, President Biden's argument omits the elephant in the room.   The recordings in issue really are not all that private even in ***his*** own DOJ's telling.  Rather, they are the product of a commercial book deal.  And that deal netted President Biden "an ***advance*** of $8 million."  Hur Report. at 141 (emphasis added).  In other words, he may have made even more than the $8 million figure based on actual book sales and royalties.   In fact, Biden and Zwonitzer may have shopped around Biden's ***actual diary entries*** in an effort to obtain the maximum advance.  *See* 5th Dewey Decl. at Ex. 15 at 91:11–92:23.  Moreover, Zwonitzer testified that the supposedly "private" topic of the book was selected precisely to appeal to "what the American public [would] be interested in."  *Id.* at 59:6–7.

Zwonitzer also testified that President Biden was "very upfront with me and with other folks" about financial goals such as paying of his house, paying for kids college loans and funds, and ensuring Jill would be provided for if "anything happened" to Biden.  *See id.* at 89:19–90:6. Zwonitzer also testified that Biden did not want to make money by lobbying or making speeches because "want[ed] to make sure [he was] . . . in a position where . . . [he] c[ould] still run for

president if . . . [he] decide[d]to do that.  So he was careful about the way he made money." *Id.* at 91: 2–5.

Finally, Zwonitzer never alluded to any sort of NDA, including an oral agreement to keep the audio private, or requirement to destroy or return the material to Biden.  In fact, he testified he routinely retains audio and transcripts from closed projects and does not have any policy regarding retention, return, or destruction.  *Id.* at 22:12–21.  The closest Zwonitzer came was stating in carefully parsed language:

> ZWONITZER: But, you know, these audio recordings, *to me*, are they are personal and they are private, and they were never *meant* to be heard by anybody but him and me.  And nobody had ever heard them before, and nobody ever would have heard them before but for this.  Until and unless he wanted to. But no, the—you know, *to me*, they were personal and private.

5th Dewey Decl. at Ex. 15 at 68:2–8 (emphases added).  The implication is clear—there were zero privacy protections actually in place.  And the "sensitive" "personally painful" topics of the Book—including "Beau's illness and eventual passing" (Mot. at 3–4) *were selected precisely because they would sell to the tune of $8 million dollars.*

3.     President Biden cannot bring himself to directly defend the Biden DOJ's fanciful theory that President Biden has a distinct privacy interest in the manner in which he answered the Special Counsel's questions—*i.e.*, the "pauses, hesitations, mannerisms, and intonations" (despite having plenty of unused pages to do so).  ECF No. 33-1 at 16.  Instead, President Biden rather simply "adopts and incorporates) many pages of DOJ briefing from the Biden era to do so, which puts this Court in an awkward position of having to respond to argument that is not on all fours and is no longer the Department's position.  In any event, as to the merits of that submission, the *en banc* D.C. Circuit has made clear that "when the government asserts that only the non-lexical aspect is exempt from disclosure, the court must consider whether the information that would be *newly revealed* by that disclosure is or is not exempt."  *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc) (emphasis added); *see also id.* ("The information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words

27

themselves."). Put differently, the only privacy interest President Biden can legitimately assert here is the interest in President Biden voices against the backdrop that significant portions of transcript were already released. And here, releasing the recording would reveal little new private information about either President Biden's "pauses, hesitations, mannerisms, and intonations." ECF No. 33-1 at 16. The public is already quite familiar with how President Biden speaks. But the audio here would provide significant value—by either supporting or undercutting Special Counsel Hur's non-charging decisions—to the public debate.

In arguing otherwise, the President Biden's DOJ relied heavily on *NASA*, but that case is not remotely on point. There, the Court declined to order the disclosure of a recording that revealed sensitive voice communications of NASA astronauts on board the *Challenger* in the final moments before the space shuttle exploded when a transcript of those communications was already public. *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 633 (D.D.C. 1991). President Biden's DOJ asserted that "[i]f released to the public, these private conversations—and all the 'intimate details' they contain—would likely be broadcast to the world and become universally available on the Internet. ECF No. 33-1 35 (quoting *N.Y. Times*, 782 F. Supp. at 632). (And recall even President Biden has tacitly admitted that the conversations at issue were pointedly not "intimate."). It goes without saying that revealing a recording of the panicked communications of private individuals moments before their death is not remotely comparable to interviews conducted for a lucrative commercial and political purpose that were so significant to Special Counsel Hur's non-charging decision ***that he quoted them in the Hur Report***. The same is true of *Pike v. DOJ*, 306 F.Supp.3d 400 (D.D.C. 2016). Withholding a recording where the "voice inflection" would reveal the identity of an undercover source is not remotely comparable. *Pike*, 306 F.Supp.3d 400 at 412.

    **4.**    Biden has little if any privacy interest that extends beyond the transcript and in any event the point is when the his own DOJ already (as applicable here) revealed the ***substance*** of his communications and his manner of speaking would inform the public of his demeanor during the interview to help the American people ascertain whether and how the Government is administering substantive law enforcement policy.

And the privacy interests in issue in this case are not remotely comparable to the interests at stake in *NASA*. Instead, they are far more comparable to the privacy interests at stake in *Dow Jones & Co. v. DOJ*, 880 F. Supp. 145, 152–53 (S.D.N.Y. 1995), where then-Judge Sotomayor ordered the release of Vince Foster's suicide note and rejected the Government's reliance on *NASA* on the ground that "the Foster family's privacy interest in the Note is weaker than the deceased Challenger astronauts' families' interest in the audiotape, and because the public interest in disclosure of the Note is stronger than it was in the audiotape." *Id.* at 153.

## B.    There Is Overwhelming Public Interest in Disclosure.

On the other side of the scale, the public interest in the recording is overwhelming.

1.    President Biden does not dispute that there is a compelling public interest in assessing his DOJ's exercise of prosecutorial discretion. *See* Def. Mot. at 19 (quoting *CREW III*, 746 F.3d at 1092). Of course he cannot. The D.C. Circuit has "repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy." *CREW III*, 746 F.3d at 1093. As the D.C. Circuit has explained, relevant to that interest (in the context of a specific criminal investigation) is "the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches." *Id.*; *accord id.* at 1093–94 (collecting authorities); *CREW v. DOJ*, 854 F.3d 675, 682 (D.C. Cir. 2017) ("*CREW IV*") (same).[5] That interest may be amplified by "[w]idespread media attention, an ongoing public policy discussion, and the public profile of the subject of the investigation[.]" *CREW II*, 978 F.Supp.2d at 13. And here, the recording is critical in two respects to assessing Special Counsel Hur's decision not to recommend prosecuting the President for alleged crimes.

a.    As the Special Counsel explained in both the Hur Report and his testimony to Congress, his decision not to recommend prosecution was based in part on his conclusion that "at

---

[5] Necessarily, that interest is applicable even to a specific case, especially a high-profile one. *See, e.g.*, *CREW III*, 746 F.3d at 1094; *CREW IV*, 854 F.3d at 679; *CREW v. DOJ*, 978 F. Supp. 2d 1, 13 (D.D.C. 2013) ("*CREW II*").

29

trial, Mr. Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory." Hur Report at 6. It would therefore "be difficult to convince a jury that they should convict him—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness." *Id*. Of course, President Biden, senior Member of the Biden Harris-Administration, and their political allies have all vigorously attacked this conclusion.

The audio in issue here is a critical piece of evidence supporting that finding. First, the Biden-Zwonitzer recording serves as direct evidence that seven years ago "Biden's memory also appeared to have significant limitations . . . as evidenced by their recorded conversations." Special Counsel Hur specifically recounted that, "Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries." Hur Report at 207. But second, and more critically, Special Counsel Hur testified he also relied upon President Biden's and Zwonitzer's conversations from February and April of 2017 (at issue here) as a critical comparative reference point for assessing President Biden's diminished faculties and faulty memory. *See* Hur Hearing at 72; Hur Report at 248.

The public has an overwhelming interest in the recording so that it can assess the Special Counsel's conclusions for itself and resolve the controversy between the Special Counsel on the one hand and the President and the rest of the Biden-Harris Administration on the other.

**b.** The Hur Report is clear that despite its conclusion to recommend declining prosecution, there is evidence that the President willfully retained and disclosed classified information. In particular, the Hur Report was unequivocal that President Biden shared classified information with Zwonitzer. *See* Hur Report at 103–106, 108. Indeed, Hur testified ***there was a case to answer***. *See supra* at 9–10. President Biden stridently denied providing classified information to Zwonitzer and Special Counsel Hur stood by his conclusion in his Congressional testimony. Again, the American People are allowed to judge this dispute themselves.

<center>30</center>

<center>App-491</center>

c.      While the two foregoing interests are more than sufficient, their power is increased by the fact that in at least one key instance, the Special Counsel was not entirely sure what President Biden said. *See* Weinsheimer Decl. at ¶ 19 bullet 4; Hur Report at 104 n.431. Production of the recordings would both allow the American People to judge the matter for themselves and would allow experts to explore audio enhancement to provide clarity on this issue. *See* Declaration of Jerry Hatchet at ¶ 6, *Judicial Watch et al. v. DOJ*, No. 24-cv-700 (TJK) (D.D.C. filed June 21, 2024) (ECF No. 40-4).

2.      President Biden also entirely ignores another separate and salient interest. Did the Biden-Harris Administration cover up the fact that President Biden was unfit for Office? To be sure, the D.C. Circuit has held that "the only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *CREW III*, 746 F.3d at 1093 (citations omitted). And the public interest does not extend to what an official was up to in terms of their private putative criminal misconduct. *Id.*

But those cases were carefully cabined and must be distorted beyond all recognition to support the Biden DOJ's proposition that the only permissible public interest is "an explanation of how release of the audio recordings and transcripts would inform the public about the activities of Special Counsel Hur, not about the conduct or characteristics of President Biden or Mr. Zwonitzer." ECF No. 33-1. at 12. No one disputes that the President's fitness for Office is plainly implicated by the Special Counsel's investigation itself. (That is the entire point of the disagreement between the Biden-Harris Administration and Special Counsel Hur regarding the President's "diminished faculties and faulty memory." Hur Report at 248). The President *is* the Executive Branch. He is the living breathing embodiment of a unitary Executive, "the only person who alone composes a branch of government." *See, e.g.*, *Trump*, 603 U.S. at 610 (internal citation and quotation omitted)). Thus, the President's fitness for office is a sufficient FOIA interest because, by definition, it "she[d][s] light on . . . [The Executive Branch's] performance of its statutory duties." *CREW III*, 746 F.3d at 1093 (first alternation in original; citation omitted).

31

Whether the man always accompanied by the nuclear football is fit for Office cannot be any more fundamental to the people's right to know "'what their government is up to.'" *CREW III*, 746 F.3d at 1093 (citations omitted). Moreover, that interest is not confined to the President *quo* the President. If Special Counsel Hur is correct and President Biden showed clear evidence of impairment outside of carefully scripted public appearances seven years ago, and that impairment continued, Vice President Harris and other senior Administration officials would have undoubtedly encountered President Biden's "diminished faculties and faulty memory" (Hur Report at 248) *every day from January 20, 2021 to present*. Indeed, the senior-most Executive Branch officials are charged by Section 4 of the Twenty-Fifth Amendment to ensure the President is fit for duty.[6]

Again, the public has a powerful interest in assessing the Special Counsel's conclusions *because those conclusions are sharply contested*. Did Vice President Harris and other senior Administration officials cover for President Biden when they viciously attacked Special Counsel Hur for his conclusion—relying specifically on the audio at issue here—that the President had a "poor memory" and "diminished faculties"? Hur Report at 2, 248. Or were they right and Special Counsel Hur wrong? *To this day*, senior Biden Administration officials deny any sort of impairment. Incredibly, President Biden *admits that this controversy is on-going* by citing, in detail, the compelling evidence of Biden's decline and the fact that the Biden-Harris Administration covered it up. *See* Mot. at 9–10. He then has the gall to submit that somehow the fact that Plaintiffs have "engaged in repeated public attacks focused on the diary-writer's mental competency" supports finding a privacy interest. *Id.* at 33. FOIA is antithetical to this paternalistic

---

[6] A contrary position would lead to absurd results. There would be no public interest in whether the President was virtually completely incapacitated, and his closest associates covered it up. 5th Dewey Decl. Ex. 21. (recounting Edith Wilson's usurpation of President Woodrow Wilson's power and dysfunction of the Presidency after his stroke; efforts by President Grover Clevland's Administration to strong arm press to cover up his cancer surgery; use of even the FBI to suppress reporting that President Franklin D. Roosevelt was dying as he ran for re-election in 1944; and President John F. Kennedy's potential cognitive impairment due to habitual use of potent pharmaceuticals). That cannot be right.

view that some information must be taken for granted and President Biden's side of the story cannot be challenged.[7] The American People are entitled to decide for themselves who is right by listening to the recordings. That interest is quintessentially about what the American People's "'government is up to.'" *CREW III*, 746 F.3d at 1093 (citations omitted).

      **3.**      President Biden's contrary arguments are unavailing. President Biden does not dispute that Special Counsel Hur relied upon the recordings here. But it insists that the recordings are not all that important because "[t]he Department already has released the portions of the transcripts of President Biden and Zwonitzer's conversations that Special Counsel Hur cited in his report" (Mot. at 17), made public the "345 page report" (*id.*), and "the Department has released additional materials related to the Special Counsel's investigation" (*id.* at 24) and thus there is already "'voluminous information' about the Special Counsel investigation already in the public domain." *Id.* at 6 (internal citation omitted). Thus, the recordings' value is " tenuous at best" *Id.* Hardly.

---

[7] To be sure, the best evidence rule does not apply strictly in FOIA, but its principle does. Justice Sotomayor's opinion in *Dow Jones*, is instructive. There, the content of Vince Foster's "suicide" note had been made available, but the note itself had not. *Dow Jones*, 880 F. Supp. at 152. Justice Sotomayor found:

> The public has a substantial interest in viewing the Note. . . . [T]he public not only has an interest in the contents of the Note but also in viewing a photocopy of the actual document. According to statements made at the Press Conference, the Note was torn up by someone, and some of the pieces are missing. Stip. Facts ¶ 54. The missing pieces, the "look" of the handwriting, and the significance to be drawn therefrom, are, as plaintiffs note, matters of public concern. DOJ itself has implicitly recognized the public interest by making a photocopy of the Note available for viewing.

*Id.* at 152. To be sure, there was some measure of controversy over the authenticity of the note, given that it was torn up and reconstructed (although it was generally agreed all text was present), and the circumstances under which the White House handled it. *See Special Comm. to Investigate Whitewater Development Corporation and Related Matters, Final Report* at 84–85, 104 Cong. 2d Sess. (1996). But there is controversy here over how to read nuances in testimony. And the audio may shed some light on that. Of course, there may be little the public can pull from audio intonation, pauses, etc., but so too the appearance of a note or the "look" of Vince Foster's handwriting. The American people are entitled to review the evidence on a such a controversial matter and judge it for themselves.

**a.**    Special Counsel Hur repeatedly testified that President Biden's "diminished faculties and faulty memory" was an important component of his decision not to charge the President because a jury would see him as "a sympathetic well-meaning elderly man with a poor memory." Hur Report at 248, 6; *see supra* pp. 10–11. Special Counsel Hur also repeated testified that President Biden disclosed classified information to Zwonitzer. *See supra* pp. 11–12. Those findings are immensely controversial, and the American people have the right to judge them for themselves. The recordings—by revealing the pauses, hesitations, mannerisms, and intonations that are not obvious from a cold transcript—will shed light on whether the Special Counsel (or his detractors) got it right.

Again, it is the height of hubris for President Biden to claim the matter is effectively explained and settled because the Hur Report is public when the Biden White House *itself* (and through its numerous proxies and political allies) have vigorously attacked that "determination" as to the President's "diminished faculties and faulty memory" since before the Hur Report was made public. *See supra* pp. 8–12. President Biden himself felt so strongly about both matters that he disputed those findings from the podium the day the Hur Report was released. *See supra* pp. 2, 14. The precise reason the American People cannot rest on Special Counsel Hur's word as to what is on the recording is that President Biden has stated in dramatic fashion that Special Counsel Hur is wrong. How can resolving that controversy, which is emphatically about Special Counsel Hur's Report and the functioning of the Government, *possibly* not be of overwhelmingly public interest when the Biden White House and its allies fanned—and incredibly *still fan*—the controversy at every turn? It cannot.

On the issue of "diminished faculties and faulty memory," the audio recordings cannot possibly be cumulative. Special Counsel Hur's contested conclusion was based on demeanor evidence. *See supra* pp. 10-12. It is the very type of evidence that even President Biden's preferred narrator *admits* is captured by audio recordings. *See* Weinsheimer Decl. at ¶¶ 16–17, 23. And as Special Counsel Hur explained in his testimony, a cold transcript is no substitute for live audio. That is particularly so because the critical point was how, in Special Counsel Hur's prosecutorial

34

App-495

judgment, the President's "diminished faculties and faulty memory" (Hur Report at 248) would cause a jury to see the President as "a sympathetic well-meaning elderly man with a poor memory." *Id.* at 6.

Even President Biden's DOJ stated that the *only* contemporaneous evidence of demeanor are the audio recordings. 3d Dewey Decl. at Ex. 2 at 3:2–4. Special Counsel Hur himself testified he relied upon the recordings for demeanor evidence. *See supra* pp. 10-12. The Government does not dispute these facts—it cannot—and that concession is fatal. *See Elec. Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 721 (D.C. Cir. 2021) ("*EPIC*") (rejecting similar argument that disclosure was cumulative as to Special Counsel Robert Mueller's Report because the relevant records went to an issue on which information had not been released); *see also Dow Jones*, 880 F.Supp. at 152–53 (ordering disclosure of Vince Foster's suicide note despite prior release of transcript of that note and rejecting DOJ's analogy to *NASA* because "the public not only has an interest in the contents of the Note but also in viewing a photocopy of the actual document. According to statements made at the Press Conference, the Note was torn up by someone, and some of the pieces are missing. . . . The missing pieces, the 'look' of the handwriting, and the significance to be drawn therefrom, are, as plaintiffs note, matters of public concern. DOJ itself has implicitly recognized the public interest by making a photocopy of the Note available for viewing.").[8]

As to the question of whether classified information was disclosed to Zwonitzer, tone matters. A cold transcript is no substitute for live testimony when evaluating a witness's demeanor and credibility. *See, e.g.*, *Coy v. Iowa*, 487 U.S. 1012, 1015–20 (1988); *United States v. Burden*, 934 F.3d 675, 685 (D.C. Cir. 2019). The public is entitled to any significant piece of evidence and many members of the public may well find the audio significant to *their* view of the matter (pro-

---

[8] President Biden's reliance on his DOJ's extensive analogy to *Judicial Watch v. NARA*, 876 F.3d 346 (D.C. Cir. 2017), is flawed. There, the record sought did not even concern a decision of the Independent Counsel; it was an internal draft. *Id.* at 350. Judicial Watch only asserted a general interest in the "operations" of the Independent Counsel's Office, and accordingly an internal draft was held cumulative of the voluminous information already disclosed. That is a world removed from a *key finding* by Special Counsel Hur that remains the subject of immense controversy and on which the key piece of evidence has not been released.

35

or con-Biden). President Biden has pointedly **no**t provided sworn testimony that **nothing** in the audio provides important demeanor evidence that would confirm or refute Special Counsel Hur's conclusions or President Biden's disputation thereof; to the contrary he simply pronounced that Special Hur was—and is—wrong as a matter of *ipse dixit*.

Again, at the end of the day, the public's need to evaluate the audio recordings to decide for themselves whether President Biden disclosed classified information to Zwonitzer is not cumulative precisely because Biden himself denied doing so, contrary to Hur's conclusions.

**b.**    President Biden next appears to insist that the Special Counsel may have **other reasons** for declining to prosecute the President resting on his DOJ's prior briefing and the nebulous categorization that "no charges" were filed. Mot. at 1. But President Biden nowhere denies that one of the Special Counsel's **primary** reasons for declining to prosecute the President was his determination that a jury would likely view him as a well-meaning, elderly man with a poor memory who likely did not have the requisite mental state of willfulness when he opted to retain classified documents. Moreover, the recordings are one of the key pieces of evidence that the Special Counsel expressly relied on in refusing to recommend charging **the sitting President of the United States** with a serious federal crime. *Cf. Judicial Watch*, 876 F.3d at 349–50 (little public interest in disclosure of "staff proposed" draft indictment never acted upon).

**c.**    Finally, President Biden asserts that all of the foregoing interests are attenuated because Biden is no longer in Office. *See* Mot. at 24. But that gets President Biden nowhere. The notion that the "facts militating against disclosure are even stronger now that President Biden has returned to life as a private citizen" (ECF No. 51 at 13) completely ignores an immutable fact. President Biden **chose** to run for President, **chose** to take the oath, and **chose** to serve as the President. That choice—which President Biden coveted and which was a major motive for the book—carries with it the consequence that retirement does not somehow restore a cloak of privacy.

Moreover, while President Biden is out of Office, his decisions in Office live on and may well have impact on future elections like the upcoming 2026 Midterm elections. Indeed, many in the Biden-Harris Administration remain in the public sphere. Whether President Biden or Special

36

App-497

Counsel Hur are correct could well play in those electoral contests.  One may think that is why President Biden has adopted a litigation strategy of injecting maximum delay here.  More broadly, whether the Biden-Harris Administration covered up the existence of an impaired President is still very much an electoral topic and will undoubtedly play in the upcoming elections.  After all, the sitting President has forcefully asserted that the Nation is still suffering from immense damage from decisions potentially made by the senior-most Members of the Biden-Harris Administration without his knowledge of an incapacitated President that should have been removed under the Twenty-Fifth Amendment.

## II.    RELEASE OF THE OTHER AUDIO AND TRANSCRIPTS WOULD NOT RESULT IN AN UNWARRANTED INVASION OF PRIVACY.

President Biden has a vastly diminished privacy interest in the transcripts because not only the fact of the Special Counsel's investigation, but many of its details—including relative to the transcripts—are also already public.[9]  Conversely, the American people have an overwhelming public interest in access to the set of materials curated by Special Counsel Hur constituting a specific body of evidence undergirding his investigation and Report, so as to judge for themselves if Special Counsel Hur was correct as whether:  (1) there was a case for President Biden to answer, in part because he disclosed classified information to Zwonitzer, *see* Hur Report at 4, 103–08, 108); or instead (2) a basis, on the flip side, not to recommend prosecuting the President because of his "diminished faculties and faulty memory," Hur Report at 248; and (3) President Biden was actually impaired in Office and the Biden-Harris Administration covered that fact up.

### A.    President Biden Has Little, If Any, Privacy Interest Here.

**1.**    To start President Biden blithely ignores what is ***actually in issue***.  This is not about the full 70-hour set of recordings, but the few hours of recordings that Special Counsel Hur curated because they were so important to his investigation and decision making that he had them

---

[9]  That this Court found sufficient privacy interests for the purposes of standing to intervene has no relevance here.  Contra Mot. at 32–33.  That was a proceeding evaluated at the level of whether President Biden had ***pleaded*** he had the privacy interests asserted and Plaintiffs did not contest that such points were properly pleaded.  That analysis is entirely different than that in issue here.

transcribed.  Moreover, this is not about simply dumping conservations that are "deeply sensitive and personal in nature" without any redactions.  Mot. at 32  The record reflects not only did the Department make redactions for privacy to that curated subset of materials, but they made even more redactions in response to objections and requests from President Biden.  *See* Jeffress Decl. at Ex. 2 at 2. ("Thank you for your email of March 31, and for your helpful comments on our proposed redactions to the audio files and transcript.  Based on your comments, we have expanded our redactions both to the audio files as well as the transcript, providing greater privacy protection to President Biden's family and correcting inadvertent errors on our part.").  And even by ***President Biden's*** telling, the materials in question are not actually private—President Biden's "intimate reflections on his decision making . . . as a public servant" are quintessentially public.  Mot at 33.  Why the President takes official action is always a public matter.  Privileges over that information do not sound in privacy and President Biden pointedly has not asserted Executive Privilege here.

Contrary to President Biden's attempts to smear the Department as partisan, the proof is in the pudding.  Other Hur-related disclosures clearly demonstrate that the Department has been faithful in applying FOIA.  Review of the Zwonitzer-Hur transcripts shows a great number of redactions for privacy that remain.  Nothing was "dumped".  *See* 5th Dewey Decl. Exs. 15 & 16.[10]

2.    President Biden continues his parade of willful blindness in that he also completely ignores as  noted above that the recordings were made entirely for monetary, media and political purposes.

3.    President Biden asserts he maintains a "tremendous" (Mot. at 15) privacy interest, even though the whole world knows he was subject to an investigation because "while Special Counsel Hur's final report has become public, President Biden retains a 'distinct privacy interest in the contents of the investigative files.'"  Mot. at 16 (quoting *CREW III*, 746 F.3d at 1092).  That is correct but does little work for the Biden here.  The operative facts are also known to the entire

---

[10]   Plaintiffs have no objection to this Court conducting *in camera* review of the proposed production set ***now***, given the tight timeframe necessitated by President Biden's litigation choices.

world. After all, that is the entire point of the dispute between Special Counsel Hur, President Biden, and his Administration. All that remains is evaluating the specifics of the transcripts to determine whether Special Counsel Hur or the President is correct. In one sense, that revelation is "an array of new information;" in another, it is carefully targeted details about already public content necessary to resolve a raging dispute between the former-President and the man appointed by the President's handpicked Attorney General to investigate the President for major felonies. In those circumstances both President Biden has a vastly diminished privacy interest. *See, e.g.*, *CREW III*, 746 F.3d at 1092; *Kimberlin*, 139 F.3d at 949; *Nation Mag.*, 71 F.3d 885 at 896.

4.    Further, as President Biden *himself* acknowledges, his privacy interests are diminished by his decades of service as a Senator, Vice President, and then President. *See* Mot. at 16.

5.    President Biden's assertion that the privacy interest is far stronger based on reliance on *Judicial Watch*, 876 F.3d at 346, and *EPIC*, 18 F.4th at 712, is wrong. *See* Jeffress Decl. at Ex. 2 at 4–6. In *Judicial Watch*, the D.C. Circuit allowed the Government to withhold a draft indictment accusing Hillary Clinton of various crimes because the contents of the draft indictment—"*a staff-proposed formal government accusation of criminal conduct*"—were never adopted by the Independent Counsel let alone released to the public. 876 F.3d at 349–350 (emphasis added). In that circumstance, publicizing the decades-old draft indictment would have obviously impaired Mrs. Clinton's privacy interests by "produc[ing] the unwarranted result of placing Mrs. Clinton in the position of having to defend her conduct in the public forum outside of the procedural protections normally afforded the accused in a criminal proceeding." *Id.* at 350. Here, by contrast, the public is already aware of the alleged crimes that spawned the investigation of President Biden as well as much the content of that investigation.

In *EPIC*, the D.C. Circuit allowed the Government to withhold "the names and personally identifiable information of individuals investigated but not charged by the Special Counsel" (18 F.4th at 716) with making "false statements" (*id.* at 720) because disclosure of the records at issue would have revealed "additional facts about individuals that are not disclosed or even intimated

elsewhere in the report." *Id.* at 720. That is not remotely the case here. The public is well aware of both of what President Biden and was investigated for and the details of that investigation.

> ### B.    There Is Overwhelming Public Interest in Disclosure of the Audio and Transcripts.

The public interests in disclosure are both clear and precise. Firs*t*, was Special Counsel Hur correct when he found that President Biden disclosed classified information to Zwonitzer? Or President Biden when he denied doing so? By the Biden's DOJ's own admission, the transcripts go directly to that question. *See* Weinsheimer Decl. at ¶¶ 14–15. Allowing the American People to judge such disputes for themselves goes to the very essence of FOIA. Second, was Special Counsel Hur correct when he found President Biden had "diminished faculties and faulty memory" or was President Biden correct in his strident denials. Hur Report at 248. Third, did the Biden-Harris Administration cover up the fact that President Biden was unfit for Office?

President Biden' only new retort is rehashing and repacking his assertion that the information is cumulative. *See* Mot. at 6, 17, 24. But again, whether information is cumulative does not turn on the relative volume of information, but whether the information in question has been released. *See, e.g.*, *EPIC*, 18 F.4th at 721 (rejecting similar argument that disclosure was cumulative as to Special Counsel Robert Mueller's Report because the relevant records went to an issue on which information had not been released); *Dow Jones*, 880 F. Supp. at 152–53. Here, the issue is whether Special Counsel Hur—or the President—was correct. And by President Biden's DOJ's own admission, the best evidence to assess that proposition is the audio and transcripts. Resolution of those issues goes directly to whether the senior-most members of the Biden-Harris Administration covered for a cognitively impaired President. Thus, the audio and transcripts cannot be cumulative, and it is rich in the extreme for the President Biden to argue otherwise when *he* stoked the controversy.

To be sure, no one knows what the public will draw from the additional audio transcripts in determining whether President Biden or Special Counsel Hur is correct, but that does not render Plaintiffs' submission speculative. Some may find the transcripts informative; some not so.

Anyone who has tried a white-collar case to a jury knows the confounding nature of nuanced words and proof. But that is okay precisely because FOIA presupposes many known unknowns. What matters here is that there is a great and open question, and it is admitted by the Government that the transcript at issue is highly relative evidence to allowing the American People to judge the matter for themselves. That direct link distinguishes President Biden's authority, which turned on the relevance of the records **at all** being speculative. *Cf., e.g.*, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 178–79 (1991) (FOIA interest speculative because it is unknown if any public interest would in fact be developed by the intended derivative use of records); *Proj. on Gov. Oversight, Inc. v. U.S. Off. Of Special Counsel*, No. 22-cv-3381 (DLF), 2024 WL 1213324, at *5 (D.D.C. Mar. 19, 2024) (finding interest in whether senior Trump Administration officials were investigated differently was speculative where there was no evidence of special treatment).

## III.    PRESIDENT BIDEN CANNOT SHOW IRREPARABLE HARM.

To establish irreparable harm, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The burden of showing such irreparable harm sits squarely on **President Biden**. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction"); *Friends of Animals v. U.S. Bureau of Land Mangt.*, 548 F.Supp.3d 39, 69 (D.D.C. July 12, 2021) (denying preliminary injunction because "at best this brings the question of irreparable harm into equipoise, and FOA, not the BLM, bears the burden of proof" and noting that Plaintiff declined to present live testimony).

One would expect a submission that begins and ends with the supposed devastating harm from disclosure would be accompanied by direct testimony from President Biden. Not so. *See* Mot. at 1 (*ipse dixit*); *id.* at 2 (citing to Biden DOJ's arguments); *id.* at 3 (*ipse dixit*); *id.* at 4 (misrepresenting Weinsheimer's as stating the recordings were for Zwonitzer's "personal use" (*id.*) when Weinsheimer wrote only "use" (Weinsheimer Decl. at ¶ 10); Mot. at 4

41

(mischaracterizing quoted portion of paragraph 13 of the Weinsheimer Declaration); *id.* at 15 (opinion and hearsay from Weinsheimer); *id.* at 16 (*ipse dixit*); *id.* at 23 (*ipse dixit*); *id.* at 32 (*ipse dixit*); *id.* at 33 (*ipse dixit*); *id.* (Weinsheimer's opinion); *id.* at 35 (*ipse dixit*).

Mere words are not at all **proof** of "great" or "certain" injury from actual instruction on privacy. Competent evidence is required to discharge Biden's burden of showing the materials in question are actually that private. Moreover, the lower evidentiary standard applicable in the preliminary injunction posture cannot save Biden.

"While a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," and courts often rely on affidavits "for the limited purpose of determining whether to award a preliminary injunction," stretching these exceptions to hearsay-within-hearsay strikes the Court as a step too far. *Coalition for Human Imm. Rights v. DHS*, 780 F.Supp.3d 79, 91–92 (D.D.C. 2025) (citation omitted). Court routinely reject hearsay-within-hearsay. *See, e.g.*, *Advance Am. v. FDIC*, No. 14-cv-953, 2017 WL 2672741, at *8 (D.D.C. Feb. 23, 2017). So too material without attribution. *See, e.g.*, *Coalition for Human Imm. Rights*, 780 Supp.3d at 92; *Advance Am.*, 2017 WL 2672741, at *8. And at least one Court has strongly implied that an attorney's declaration "filled with hearsay statements" from the client is inadequate where the client has a history of confabulation. *Montgomery v. Barr*, 502 F.Supp.3d 165, 175–76 (D.D.C. 2020). That logic applies perforce here; Biden is a serial confabulator; and the attorney declarations here rely on hearsay accounts of vague unspecified opinion and uncited other sources.

Given the complete lack of evidence that President Biden's privacy interests actually face concrete, "great" and "certain" harm, the Motion should be denied. At a minimum, Plaintiffs should be entitled to test vague assertions of opinion via hearsay and hearsay without attribution via cross examination of President Biden in open Court.

## IV.    THE EQUITIES FAVOR DISCLOSURE.

1.    There is a strong public interest in disclosure in any FOIA case because "[D]isclosure, not secrecy, is the dominant objective" of FOIA (*U.S. Dep't of Air Force v. Rose*,

425 U.S. 352, 360–61 (1976)) and "There is a national interest in transparency of government operations." *Az. Fam. Health Part. v. HHS*, No. 18-cv-2581 (TNM), 2019 WL 130578, at *3 (Jan. 8, 2019). Moreover, FOIA mandates not only production of records, but the ***prompt*** production of records. *See, e.g.*, *Judicial Watch v. DHS*, 895 F.3d 770, 774 (D.C. Cir. 2018) ("federal agencies, 'upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records ***promptly available***.'" (quoting 5 U.S.C. § 552(a)(3)(A) (emphasis added)); *Payne Enter., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("stale information is of little value"). "Congress reasoned that prompt adjudication of FOIA cases (a) foster the important goal of creating an informed citizenry; (b) involve remedies of a 'transitory' nature, *i.e.*, that delay could render an information request 'of no value at all;'" *Ontario Forest Indus. Assoc. v. United States*, 444 F. Supp. 2d 1309, 1319 (C.I.T. 2006) (quoting H. Rep. No. 98-985, at 5–6 (1984)). That is why FOIA statutorily eliminates normal barriers to equitable relief. *See, e.g.*, *Soucie v. David*, 448 F.2d 1067, 1076 (D.C. Cir. 1971) ("Congress clearly has the power to eliminate ordinary discretionary barriers to injunctive relief, and we believe that Congress intended to do so here."); *accord Wash. Post v. Dep't of State*, 685 F.2d 698, 704 (D.C. Cir. 1982), *vacated as moot*, 464 U.S. 979 (1983) (mem.).

2.    Moving on, the Department has acted lawfully (*contra* Mot. at 35) and thus, "[i]n a reverse-FOIA case such as this one, the Court will defer to an agency'' own determination that disclosure is in its interest." *Az. Fam. Health*, 2019 WL 130758, at *3.

3.    As to Heritage and the Public's broader interests, the public interest is severely harmed when delay "would  deprive the public of information critical to an ongoing national debate of considerable importance, as well as basic details surrounding an unprecedented [action by the Federal Government]." *WP Co. LLC v. U.S. Small Bus. Admin.*, Nos. 20-1240, 20-1614 (JEB), 2020 WL 6887623, at *5 (D.D.C. Nov. 24, 2020); *accord id.* at *4 (collecting cases); *Az. Fam. Health*, 2019 WL 130578, at *3. Biden's claim that Plaintiffs "have identified no time-sensitive need for President Biden's private conversations from 2016 and 2017" is dead wrong. Mot. at 35. The information is obviously relevant simply as to whether non-delegable Presidential

43

App-504

actions were actually authorized or auto-penned in the President's name by the senior-most Members of the Biden-Harris Administration. Whether a pardon or a veto is valid is no small matter. Moreover, whether President Biden did, in fact, leak classified information, whether President Biden was in fact impaired, and whether senior Members of the Biden-Harris Administration covered up Biden's apparent cognitive decline is and will continue to be a salient issues in the upcoming 2026 Election. Indeed, the timing of President Biden's decision to resort to litigation at the last possible second and interject delay is pregnant with critical political implications: The goal is to delay any disclosure until *after* the fast approaching Midterm Elections. It is also nonsensical to claim that there has been delay in litigation that steadily worked to settle the case well prior to the Midterm elections. *Cf.* Mot at 36.

Courts have routinely found a clear public interest in disclosure in such circumstances. *See, e.g., Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32, 38 (D.D.C. 2020) ("Plaintiff seeks the requested information to inform the public about ICE's response to the COVID-19 pandemic and the impact of that response on the thousands of immigrant detainees who are presently in ICE custody. A delay in the release of the requested information would cause irreparable harm."); *Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) (granting preliminary injunction holding U.S. Secret Service visitor logs for visits to the Vice President and his senior staff were agency records and must be produced due to the public interest in them prior to the 2006 mid-term elections); *Leadership Conf. on Civil Rights v. Gonzales*, 421 F.Supp.2d 104, 110 (D.D.C. 2006) ("plaintiff and the public likely will suffer significant harm if the Court grants a stay. The upcoming 2006 federal elections and congressional hearings regarding the re-authorization of provisions of the Voting Rights Act make plaintiffs' information requests time sensitive").

## V.    THE COURT SHOULD ORDER A SUBSTANTIAL BOND IN THE AMOUNT OF AT LEAST $8 MILLION.

Plaintiff seeks to vindicate a fundamental public right to government information. By contrast, Biden made *$8 million or even more* and garnered extensive earned and unearned media

44

to advance his political agenda by sitting down with a ghostwriter to profit from his vice presidency and his time in the Senate.  A substantial bond should accordingly be set to safeguard the combined interests of the Plaintiffs and the American People to gain access to their own information as currently held by the Department. Joe Biden's profits are plainly a conservative estimate of how much he profited from **selective disclosure** of classified information to Zwonitzer his ghostwriter. It does not even account for his political gain.  Plaintiffs submit that they are entitled to see the Court require Intervenor to post at least an $8 million bond.  If President Biden's actions brought in that much money, the information sought here is worth at least that much to a waiting public in the midst of a heated Midterm election season.

Intervenor's request to impose no bond or a nominal bond under Fed. R. Civ. P. 65(c) is legally unsupported and contrary to the purposes of Rule 65(c).  Just recently the D.C. Circuit admonished judges in this District for routinely requiring nominal bond.  *See, e.g.*, *Nat. Treasury Empl. Union v. Trump*, No. 25-5127, 2025 WL 1441563, at *3 (D.C. Cir. May 15, 2025) ("injunction bonds are generally required.  Fed. R. Civ. P. 65(c) ('The court may issue a preliminary injunction . . . **only if** the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.' (emphasis added))"); *see also Edgar v. Mite Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) (an injunction bond "is the moving party's warranty that the law will uphold the issuance of the injunction").  Biden claims that the Department is not harmed by a delay in release of the documents.  *See* Mot at 37.  This ignores that the **real irreparable harm here** is to the American People and Plaintiffs and that the Court defers to the Department's view that its interest is in disclosure.  *See, e.g.*, Az. *Fam. Health*, 2019 WL 130578, at *3.

Under Rule 65(c), the bond must serve as a meaningful guarantee that Intervenor will not be permitted to inflict irreparable harm on the public's right to know without consequence. The Court should deny the request for a nominal bond and instead require at least an $8 million bond.

**CONCLUSION**

President Biden's Motion should be denied.

45

Dated:  June 5, 2026

Respectfully submitted,

/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
(No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

JEFFREY BOSSERT CLARK
(No. 455315)
THE OVERSIGHT PROJECT
211 N. Union Street
Alexandria, VA 22314
202-279-1396
Email:  Jeff@itsyourgov.org

KYLE BROSNAN
(No. 90021475)
THE OVERSIGHT PROJECT
211 North Union Street
Alexandria, VA 22314
845-674-5589
Email:  Kyle@ItsYourGov.org

ERIC NEAL CORNETT
(No. 1660201)
THE OVERSIGHT PROJECT
211 North Union Street
Alexandria, VA 22314
845-674-5589
Email:  Neal@ItsYourGov.org

*Counsel for Plaintiffs*

46

App-507

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION,

MIKE HOWELL,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE,                No. 24-cv-645 (DLF)

*Defendant*,

and

JOSEPH R. BIDEN, JR.,

*Defendant-Intervenor*.

**<u>REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION BY JOSEPH R. BIDEN, JR.</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

    I.      President Biden Is Likely to Succeed on the Merits of His Cross-Claims
           Challenging the Department's Proposed Disclosure to the Heritage Plaintiffs .................. 1

          A.      The Department's Conduct Is Judicially Reviewable ............................................. 1

          B.      The Disclosure Decision Is Arbitrary, Capricious, and an
                 Abuse of Discretion ............................................................................................... 3

          C.      Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act .................. 16

    II.     President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction ............. 21

    III.    The Balance of Equities and the Public Interest Weigh Strongly in Favor of
           Preliminary Injunctive Relief .................................................................................. 24

    IV.    The Court Should Waive the Bond Requirement or Set a Nominal Bond Amount ......... 24

CONCLUSION ................................................................................................................. 25

i

## TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner*,
　　387 U.S. 136 (1967) ................................................................ 17, 19

*AFL-CIO v. Dep't of Lab.*,
　　778 F. Supp. 3d 56 (D.D.C. 2025) ............................ 16, 19, 20, 21, 23

*AFL-CIO v. Dep't of Lab.*,
　　No. 25 Civ. 339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) .......... 17, 19

*AFL-CIO v. Dep't of Lab.*,
　　No. 25 Civ. 339, 2025 WL 1783899 (D.D.C. June 27, 2025) .............. 22

*AFL-CIO v. FEC*,
　　177 F. Supp. 2d 48 (D.D.C. 2001) ................................................. 2

*Ahmed v. Noem*,
　　No. 25 Civ. 1351, 2025 WL 2299447 (D.D.C. Aug. 8, 2025) ............. 18

*All. for Retired Ams. v. Bessent*,
　　770 F. Supp. 3d 79 (D.D.C. 2025) ................................................. 19

*Am. First Legal Found. v. FBI*,
　　No. 23 Civ. 2172, 2024 WL 4607496 (D.D.C. Oct. 29, 2024) ............ 15

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
　　641 F.3d 504 (D.C. Cir. 2011) ................................................. 11, 23

*Ashland Oil, Inc. v. FTC*,
　　548 F.2d 977 (D.C. Cir. 1976) ....................................................... 4

*AT&T Info. Sys., Inc. v. GSA*,
　　810 F.2d 1233 (D.C. Cir. 1987) ..................................................... 2

*Bass v. Fed. Motor Carrier Safety Admin.*,
　　817 F. Supp. 3d 1 (D.D.C. 2025) .................................................. 20

*Black Rock City LLC v. Haaland,*
　　No. 19 Civ. 3729, 2022 WL 834070 (D.D.C. Mar. 21, 2022) .............. 5

*Bowen v. Am. Hosp. Ass'n*,
  476 U.S. 610 (1986)...........................................................................................4

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988).........................................................................................17

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986).........................................................................................17

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)...........................................................................................5

*Campbell Sixty-Six Express, Inc. v. Interstate Com. Comm'n*,
  603 F.2d 1012 (D.C. Cir. 1979)..........................................................................6

*Campbell v. U.S. Dep't of Just.*,
  164 F.3d 20 (D.C. Cir. 1998)..............................................................................2

*CASA, Inc. v. Trump*,
  793 F. Supp. 3d 687 (D. Md. 2025)..................................................................25

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979)............................................................................................2

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014).......................................................... 2, 12, 13, 14

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  846 F.3d 1235 (D.C. Cir. 2017)........................................................................17

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  854 F.3d 675 (D.C. Cir. 2017).................................................................... 12, 13

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)............................................................................................2

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004)..........................................................................15

*Cohen v. United States*,
  650 F.3d 717 (D.C. Cir. 2011)..........................................................................16

*Council on Am.-Islamic Rels. v. Gaubatz*,
  667 F. Supp. 2d 67 (D.D.C. 2009)....................................................................22

iii

*Ctr. for Taxpayer Rts. v. IRS*,
    815 F. Supp. 3d 1 (D.D.C. 2025) .............................................................. 18, 22

*Davis v. U.S. Dep't of Just.*,
    968 F.2d 1276 (D.C. Cir. 1992) ...................................................................... 11

*\*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
    601 U.S. 42 (2024) .......................................................................................... 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................... 3, 4, 5, 24

*\*Doe v. Chao*,
    540 U.S. 614 (2004) ........................................................................................ 20

*Doe v. Noem*,
    781 F. Supp. 3d 1055 (E.D. Cal. 2025) .......................................................... 18

*\*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988) ...................................................................... 20

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ........................................................................................ 23

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    396 F.3d 1265 (D.C. Cir. 2005) ........................................................................ 6

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Just.*,
    18 F.4th 712 (D.C. Cir. 2021) ............................................................... 8, 12, 13

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .......................................................................................... 5

*End Citizens United PAC v. FEC*,
    69 F.4th 916 (D.C. Cir. 2023) ....................................................................... 5, 6

*Env't Def. Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) .......................................................................... 5

*\*FAA v. Cooper*,
    566 U.S. 284 (2012) .................................................................................. 20, 22

*Friends of Animals v. Ross*,
    396 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................... 4

iv

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) ............................................................................ 17

*Heckler v. Chaney*,
470 U.S. 821 (1985) .............................................................................................. 2

*Hodes v. U.S. Dep't of the Treasury*,
342 F. Supp. 3d 166 (D.D.C. 2018) ...................................................................... 4

*Jibril v. Mayorkas*,
101 F.4th 857 (D.C. Cir. 2024) ........................................................................... 15

*Jigsaw Productions, Inc. v. SEC*,
No. 24 Civ. 2358, 2026 WL 797411 (D.D.C. Mar. 23, 2026) .................................. 11, 14

*Judulang v. Holder*,
565 U.S. 42 (2011) ................................................................................................ 3

*Kimberlin v. U.S. Dep't of Just.*,
139 F.3d 944 (D.C. Cir. 1998) ................................................................... 12, 13, 14

*Kowal v. U.S. Dep't of Just.*,
107 F.4th 1018 (D.C. Cir. 2024) ............................................................... 11, 12

*\*League of United Latin Am. Citizens v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ...................................................................... 20

*Lopez v. U.S. Dep't of Just.*,
No. 03 Civ. 5192, 2004 WL 626726 (D.C. Cir. Mar. 29, 2004) ................................ 11, 12

*Marino v. DEA*,
685 F.3d 1076 (D.C. Cir. 2012) ................................................................ 12, 13

*Michigan v. EPA*,
576 U.S. 743 (2015) .............................................................................................. 9

*Mori v. Dep't of the Navy*,
917 F. Supp. 2d 60 (D.D.C. 2013) .................................................................... 5, 6

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................ 9

*N.Y. Times Co. v. NASA*,
920 F.2d 1002 (D.C. Cir. 1990) ......................................................................... 23

*Nation Mag. v. Dep't of State*,
    805 F. Supp. 68 (D.D.C. 1992) ................................................................... 24

*Nation Mag. v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) ................................................................. 8, 13

*Pike v. U.S. Dep't of Just.*,
    306 F. Supp. 3d 400 (D.D.C. 2016) ................................................. 11, 23, 24

*\*Pilon v. U.S. Dep't of Just.*,
    73 F.3d 1111 (D.C. Cir. 1996) ................................................................... 18

*Playboy Enters., Inc. v. U.S. Dep't of Just.*,
    516 F. Supp. 233 (D.D.C. 1981) ................................................................ 13

*\*Poss v. Kern*,
    No. 23 Civ. 2199, 2024 WL 4286088 (D.D.C. Sept. 25, 2024) ................. 18, 19

*Radack v. U.S. Dep't of Just.*,
    402 F. Supp. 2d 99 (D.D.C. 2005) ............................................................ 18, 19

*Redding v. Ahuja*,
    No. 21 Civ. 2449, 2023 WL 6065129 (D.D.C. Sept. 18, 2023) .................... 9, 21

*\*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .................................................................................. 4, 24

*Sunoco Pipeline, L.P. v. U.S. Dep't of Transp.*,
    No. 21 Civ. 1760, 2023 WL 11195824 (D.D.C. Sept. 29, 2023) .................... 4

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ................................................................. 20

*\*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) .................................................................................. 2

*\*V.I. Hous. Fin. Auth. v. Fed. Emergency Mgmt. Agency*,
    151 F.4th 409 (D.C. Cir. 2025) ................................................................. 17

*Waterkeeper All., Inc. v. Wheeler*,
    330 F.R.D. 1 (D.D.C. 2018) .................................................................. 22, 25

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) ..................................................................................... 2

vi

*Williams & Connolly, LLP v. DHS*,
No. 24 Civ. 2322, 2026 WL 72065 (D.D.C. Jan. 9, 2026) ............................................... 15

**STATUTES**

5 U.S.C. § 552 ............................................................................................................... 9

5 U.S.C. § 552a ............................................................................................. 17, 18, 21

5 U.S.C. § 701 ................................................................................................................ 2

**FEDERAL RULES**

Fed. R. Civ. P. 56 ...................................................................................................... 15

Fed. R. Civ. P. 65 ...................................................................................................... 25

**OTHER AUTHORITIES**

Ian Schwartz, *Trump Mocks Biden's Stage Behavior By Aimlessly Walking Around,
Asks 'Where The Hell Am I?,'* RealClearPolitics (Sept. 29, 2023),
https://www.realclearpolitics.com/video/2023/09/29/trump_mocks_
bidens_stage_behavior_by_aimlessly_walking_around_asks_where_
the_hell_am_i.html ................................................................................................ 10

*Inside the Justice Department Where the President Calls the Shots*,
Wall St. J. (Oct. 8, 2025), https://www.wsj.com/politics/policy/trump-
doj-inside-political-enemies-17f13f72 ................................................................. 10

*Trump Attacks Biden with AI-Generated Post and Pushes 'Autopen' Claims Again*,
Forbes (May 7, 2026), https://www.forbes.com/sites/siladityaray/2026/05/07/
trump-attacks-biden-with-ai-generated-post-and-pushes-autopen-claims-again/ ............. 10

U.S. Dep't of Just., Off. of Priv. & C.L., *Overview of the Privacy Act:
2020 Edition* (2020), https://www.justice.gov/Overview_2020/dl?inline ....................... 20

App-515

**INTRODUCTION**

The Department of Justice has provided a full record of the reasons the Court should grant President Biden's motion and enjoin the disclosure of the Zwonitzer materials to the Heritage Plaintiffs. In extensive briefing and declarations submitted in 2024, the Department explained why these materials—transcripts and audio recordings of private conversations collected in the course of a criminal investigation, for the sole purpose of that investigation—should be withheld under the FOIA exemptions that protect privacy and law enforcement interests in such evidence. Reversing course on this decision, for purely political purposes, is the definition of arbitrary and capricious action. The Department offers no valid justification for its change in position. And while the Department may wish to pretend that this decision was made by a career official for non-partisan reasons, the Heritage Foundation's strident opposition, citing the manufactured "autopen" controversy and other entirely irrelevant matters, loudly proclaims otherwise. This Court should enjoin the Department's politically motivated conduct on the grounds that it is arbitrary and capricious, an abuse of discretion, and contrary to law.

**ARGUMENT**

I.    **President Biden Is Likely to Succeed on the Merits of His Cross-Claims Challenging the Department's Proposed Disclosure to the Heritage Plaintiffs**

A.    **The Department's Conduct Is Judicially Reviewable**

The Court should reject the Department's extraordinary assertion that no court may review its decision to disclose President Biden's private information in this Freedom of Information Act ("FOIA") action, *see* ECF No. 68 ("DOJ Opp.") at 12-13—a position that runs counter to decades of precedents reviewing agency action under FOIA, the Privacy Act, and the Administrative Procedure Act ("APA"). The Department contends that "unless some other statute prohibits the disclosure," "there is no meaningful standard by which to judge an agency's decision to voluntarily

disclose records covered by a FOIA exemption." DOJ Opp. at 13. But that assertion is irrelevant; the Department's position in this action is that it is required to disclose the materials because "FOIA Exemptions 6 and 7(C) are inapplicable." *Id.* at 33-34; *see also id.* at 34-35; ECF No. 68-1 ("Winn Declaration" or "Winn Decl.") ¶ 17. Accordingly, FOIA and the Privacy Act supply the requisite "meaningful standard[s]" here. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (action is committed to agency discretion by law only where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion").

The APA's exception to judicial review for matters "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is "very narrow," applicable only in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citation modified). The Supreme Court has "long applied a strong presumption favoring judicial review," reading § 701(a)(2) "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018).

This Court's resolution of President Biden's cross-claims will turn on well-established, judicially manageable standards: whether the Department's new position that FOIA's exemptions do not permit the Department to withhold President Biden's private conversations was reasonable and reasonably explained, drawing on familiar standards from reverse-FOIA and other APA actions, *see* ECF No. 65-1 ("Mot.") at 19-26, and whether the proposed disclosure would violate the Privacy Act, *see id.* at 26-32. How the Department assessed—and then reassessed—the FOIA exemptions is plainly reviewable, and it would run contrary to decades of Supreme Court and D.C. Circuit precedent to conclude otherwise.[1] Moreover, even under the Department's preferred

---

[1] *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 293-94, 317-18 (1979) (authorizing reverse-FOIA suits); *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989) (explaining that, in considering FOIA's exemptions, "a court must balance the public

formulation, President Biden has identified "some other statute [that] prohibits the disclosure," DOJ Opp. at 13, because he asserts an APA claim based on the Department's prospective Privacy Act violation. *See* Mot. at 26-32; *infra* Section I.C. The Court should reject the Department's effort to evade judicial review.

## B. The Disclosure Decision Is Arbitrary, Capricious, and an Abuse of Discretion

Confronted with the reality that its challenged disclosure decision does not satisfy the basic requirements of the APA, *see* Mot. at 19-26, the Department scrambles to paper over its failures. The Department does not even muster an argument that it provided a reasoned, contemporaneous explanation for its decision. Instead, it attempts to start from scratch and defend its decision through post hoc rationalizations. That approach is squarely foreclosed by precedent and confirms that President Biden is likely to succeed on the merits of his claims. In any event, the Department's post hoc rationalizations do not withstand scrutiny.

### 1. The Department's Unexplained Decision Is a "Textbook" APA Violation

It is a bedrock principle of administrative law that "[a]n agency must defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 2 (2020). The requirement of reasoned, contemporaneous explanation for agency action "is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). And it applies with equal force to so-called "reverse-FOIA" claims as to any other claims arising

---

interest in disclosure against the interest Congress intended the Exemption to protect"); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1095-96 (D.C. Cir. 2014) ("*CREW I*") (reviewing agency's application of Exemption 7(C) balancing test); *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 33-34 (D.C. Cir. 1998) (reviewing agency's privacy-public interest balance under Exemption 7(C)); *see also AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (*per curiam*) (reviewing agency's failure to provide contemporaneous explanation of its decision to disclose information that may be exempt); *AFL-CIO v. FEC*, 177 F. Supp. 2d 48, 63 (D.D.C. 2001) (finding "the FEC's refusal to apply Exemption 7(C) to bar release of the names and other identifying information of third-party individuals referred to in its investigative files [to be] arbitrary, capricious and contrary to law"), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003).

under the APA.  *See, e.g.*, *Sunoco Pipeline, L.P. v. U.S. Dep't of Transp.*, No. 21 Civ. 1760, 2023 WL 11195824, at *5 (D.D.C. Sept. 29, 2023).[2]

As this Court has explained, "[n]o principle of administrative law is more firmly established than that a court must review discretionary actions in terms of the rationale on which the agency acted, rather than 'accept . . . counsel's post hoc rationalizations.'" *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 10 (D.D.C. 2019) (quoting *Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 981 (D.C. Cir. 1976)).  This requirement is no mere formality.  Rather, the APA's procedural requirements "serve[] important values of administrative law," such as "promot[ing] 'agency accountability.'" *Regents*, 591 U.S. at 22-23 (quoting *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986)).  The APA's requirement of reasoned, contemporaneous explanation also serves to prevent "both litigants and courts" from being "forc[ed] . . . to chase a moving target." *Id.* at 23.  "Permitting [the Department] to invoke belated justifications"—particularly in the context of emergency briefing necessitated by the Department's own arbitrary decision to disclose the materials at issue on June 15, 2026, after maintaining its prior, well-reasoned position for almost two years, *see* Mot. at 5-7—would "upset 'the orderly functioning of the process of review,'" *Regents*, 591 U.S. at 23 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

Remarkably, the Department does not contend that it provided *any* contemporaneous explanation for its decision to release materials that it previously determined were exempt from

---

[2] In the context of a FOIA claim, as opposed to review of agency action under the APA, an agency "can meet [its] burden through affidavits or declarations that describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Hodes v. U.S. Dep't of the Treasury*, 342 F. Supp. 3d 166, 171 (D.D.C. 2018) (internal quotation marks and citation omitted).  For this reason, the Department properly submitted the declaration of Bradley Weinsheimer in support of its motion for summary judgment on the Heritage Plaintiffs' FOIA claims. *See* ECF No. 33-2 ("Weinsheimer Declaration" or "Weinsheimer Decl.").

disclosure under FOIA Exemptions 5, 6, and 7(C). *See* Mot. at 20-26. And the Department does not acknowledge—much less attempt to defend—the correspondence of Acting Chief Privacy and Civil Liberties Officer Peter Winn with President Biden's counsel in March and April 2026 regarding the Department's disclosure decision. *See* ECF No. 65-4; Mot. at 21-24 (arguing that Winn's flawed analysis cannot withstand arbitrary-and-capricious review). By abandoning any reliance on Department officials' contemporaneous communications, the Department is left with "[a]n agency action that lacks explanation" altogether, which is "a textbook example of arbitrary and capricious action." *Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60, 64 (D.D.C. 2013); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Instead, the Department relies solely on a June 5, 2026, declaration from Winn. *See* Winn Decl. But well-settled precedent precludes the Court from "accept[ing] agency counsel's post hoc rationalizations for agency action." *Black Rock City LLC v. Haaland*, No. 19 Civ. 3729, 2022 WL 834070, at *7 (D.D.C. Mar. 21, 2022) (brackets omitted) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The D.C. Circuit "has made clear that the 'limited exception' permitting an agency to supplement its initial explanation 'may not be employed to offer post-hoc rationalizations where no rationalization exists.'" *End Citizens United PAC v. FEC*, 69 F.4th 916, 922 (D.C. Cir. 2023) (citation omitted). That Winn "personally participated in the Department's decision," DOJ Opp. at 21 n.9, does not alter the analysis: The relevant prohibition is "on *post hoc* rationalizations, not advocate rationalizations, because the problem is the timing, not the speaker." *End Citizens United PAC*, 69 F.4th at 922 (quoting *Regents*, 591 U.S. at 23).

The Department maintains in a footnote that the Court may consider Winn's declaration because it "is 'merely explanatory' of the decision and 'contains no new rationalizations,'" but this characterization does not withstand scrutiny. DOJ Opp. at 21 n.9 (brackets omitted) (quoting *Env't*

5

App-520

*Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981)).  One indication that the Winn

Declaration does not merely "supplement" any "initial explanation," *End Citizens United PAC*, 69

F.4th at 922 (citation omitted), is that the Department repeatedly cites it as the sole source for its

assertions regarding the rationale for its disclosure decision, *see, e.g.*, DOJ Opp. at 33-34 (citing

Winn Decl. ¶¶ 15-17); *id.* at 28 (citing Winn Decl. ¶¶ 14-17); *id.* at 25 (citing Winn Decl. ¶ 15(e)).

In sum, the Department's reliance on the Winn Declaration is a paradigmatic attempt to

offer a post hoc rationalization as a "substitute for a clear explanation by the agency of the reasons

for decision." *Campbell Sixty-Six Express, Inc. v. Interstate Com. Comm'n*, 603 F.2d 1012, 1014

(D.C. Cir. 1979); *accord El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health

& Hum. Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005).  The Court should decline to credit these

rationalizations and hold that the Department has failed to provide any contemporaneous

explanation for its decision—"a textbook example of arbitrary and capricious action," *Mori*, 917

F. Supp. 2d at 64.

### 2. Even if the Court Were to Consider the Department's Impermissible Post Hoc Rationalizations, They Do Not Justify the Department's New Position

Even if the Department's post hoc rationalizations were appropriate for this Court to

consider, they fail on their merits.  As explained below, both the Department and the Heritage

Plaintiffs misconstrue the underlying facts and circumstances, the applicable law, and the relevant

evidentiary standards.  They also misstate President Biden's arguments in several material ways.

**(a) The Department mischaracterizes President Biden's arguments about the nature

of the unredacted materials.**  The motion and supporting declarations explained that the

Department's proposed redactions—as conveyed to President Biden's counsel and staff during in-

person meetings in March and April 2026—are insufficient to protect the privacy interests of

President Biden and third parties.  Mot. at 8; ECF No. 51-2 ("Jeffress Decl.") ¶¶ 4, 14, 21.  The

6

App-521

Department contends otherwise, asserting that the final, redacted versions of the transcripts and recordings exclude all information concerning "President Biden's family's health issues," "President Biden's family," and "individuals who are not public figures," as well as "[n]ational security information." DOJ Opp. at 5. While neither President Biden nor his counsel have access to the Department's final redactions, the Department's characterization is inconsistent with counsel's understanding based on prior reviews. Jeffress Decl. ¶¶ 14, 17, 21. Because the Court has ordered the Department to "provide the Court with a copy of the Zwonitzer materials--as the defendant intends to release them to the plaintiffs--for an *in camera* review," it will be able to assess for itself whether the Department has redacted all information that could constitute "sensitive, personal information about the intervenor and his family." Min. Order (June 8, 2026). And that consideration should not be limited to family health matters.

The Department's assertion that "President Biden's main claim is that Defendant plans to disclose Biden family health matters" gets President Biden's arguments totally wrong. DOJ Opp. at 24 (citing ECF No. 51-3 ¶ 10; Mot. at 3-4, 15; and ECF No. 51-6 ¶ 6). President Biden's previous filings in this case describe the "conversations" and "materials" as a whole, and they make clear that the conversations included—but hardly were limited to—family health issues. *See* Mot. at 4-5. As the motion explained, "President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that [his son] Beau's illness and eventual passing took on President Biden and his tight-knit family; the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; and the many other voices and events that factored into that difficult, highly personal decision." Mot. at 4 (citing Weinsheimer Decl. ¶¶ 13, 16). And the motion emphasized the connection between these family matters and President Biden's political deliberations: "Pressing decisions that President Biden faced about his political

7

App-522

future were inextricably intertwined with Beau." Mot. at 3 (citing Weinsheimer Decl. ¶ 12).

Even if President Biden's personal and political lives could be teased apart, the fact that these conversations included intimate discussion of President Biden's family life illustrates their private nature, *see* Weinsheimer Decl. ¶ 22, and the conversations are all the more private now, given their inclusion in a law enforcement investigative file, *see Elec. Privacy Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 719 (D.C. Cir. 2021) ("*EPIC*"). Regardless of whether the Department agrees to carve out specific references to family members and their voices on the recordings, President Biden's personal reflections on political and other matters—communicated in his own home without any intention that the conversations would be disseminated—are independently private. *See infra* Section I.B.2(c). And contrary to the Heritage Plaintiffs' assertion that President "Biden took no steps to safeguard these supposedly private materials," ECF No. 69 ("Heritage Opp.") at 6, the materials were produced pursuant to an agreement with the Special Counsel's Office that they "w[ould] be accessed, reviewed, and used . . . only for purposes of advancing [Special Counsel Hur's] investigation," Mot. at 28 (quoting ECF No. 51-4).

Lastly, the Department's arguments about third-party standing misconstrue both President Biden's cross-claims and the case law. *See* DOJ Opp. at 27-28. President Biden asserts APA claims on his own behalf, not on behalf of third parties, but his motion appropriately describes the materials—which contain references to other individuals—as implicating the privacy interests of himself and others. *See, e.g.*, Mot. at 8, 23, 32-33. The D.C. Circuit has recognized that privacy interests extend to all "third parties who may be mentioned in investigatory files," *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995), notwithstanding the Department's selective focus on confidential informants, cooperating witnesses, and federal agents, *see* DOJ Opp. at 28. In any event, the Department's failure to adequately consider any privacy interests—whether of

President Biden or of third parties—renders its disclosure decision arbitrary and capricious. *See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

**(b)** <u>**The Department's submission confirms that there are no new facts or circumstances that would tilt the balance toward disclosure.**</u> Rather than engage substantively with the merits of its prior position and the controlling law on which it was based, the Department attempts to brush aside the sworn declaration of its then-highest-ranking career official as "outdated" and "obsolete." DOJ Opp. at 3-4. But it fails to identify any changed factual or legal circumstances that would affect the validity of that analysis. The assertion in the Winn Declaration that President Biden's privacy interests somehow have been "reduced" defies credulity. Winn Decl. ¶ 15. All but two of the factual circumstances that Winn cites in support of that conclusion were equally true when the Department briefed its cross-motion for summary judgment. *See id.* ¶ 15(a), (c)-(f). With respect to the remaining two circumstances—the Department's consultation with President Biden's counsel and its recent waiver of work-product protection—neither has any bearing on the Department's prior, well-founded conclusion that disclosure of the materials at issue "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C); *see* Winn Decl. ¶ 15(b), (g).

Moreover, as the motion explained, "intervening events" have only "strengthened and reinforced [the Department's] earlier position." *See* Mot. at 24-25 (discussing President Biden's transition to life as a private citizen and the disclosure of substantial additional material related to Special Counsel Hur's investigation). The Department does not respond to these points, and it has therefore conceded them. *See Redding v. Ahuja*, No. 21 Civ. 2449, 2023 WL 6065129, at *5

(D.D.C. Sept. 18, 2023), *aff'd*, No. 23-5225, 2024 WL 1432729 (D.C. Cir. Apr. 1, 2024).

The Department does not identify any new facts or legal developments that would justify a change in position since the parties completed summary judgment briefing in this action. Indeed, though the Department casts its decision as a routine reweighing of factors, *see* DOJ Opp. at 3, Heritage Plaintiffs accurately attribute this shift to Department officials' unprecedented lack of independence under President Trump.[3]  *See, e.g.*, Heritage Opp. at 4 ("One of the many consequences of an election is that the Department's position can and does change; after all, in a unitary Executive, the President Controls the ***entire*** Executive Branch."); *see also* Josh Dawsey et al., *Inside the Justice Department Where the President Calls the Shots*, Wall St. J. (Oct. 8, 2025), https://www.wsj.com/politics/policy/trump-doj-inside-political-enemies-17f13f72.

To be sure, a new Presidential administration is entitled to advance policy priorities that differ from those of the previous administration. But a change in administration does not give the Department of Justice license to make decisions motivated by the sitting President's well-documented animosity toward his predecessor,[4] rather than governing law, and then attempt to reverse-engineer a justification for those decisions in the context of litigation.

**(c) The Department misapplies FOIA's "public domain" doctrine.**  The Department cannot seriously dispute that individual privacy interests are at their apex in the sensitive, private

---

[3] By contrast, the Department's innuendo that its prior position was driven by President Biden's preferences is wholly unsupported. *See* DOJ Opp. at 8. Far from leveraging the power of the Presidency to end the Special Counsel investigation, President Biden fully cooperated, including by entering into the Agreement. *See* Mot. at 4-5.

[4] *See, e.g.*, Ian Schwartz, *Trump Mocks Biden's Stage Behavior By Aimlessly Walking Around, Asks 'Where The Hell Am I?,'* RealClearPolitics (Sept. 29, 2023), https://www.realclearpolitics.com/video/2023/09/29/trump_mocks_bidens_stage_behavior_by_a imlessly_walking_around_asks_where_the_hell_am_i.html; Siladitya Ray, *Trump Attacks Biden with AI-Generated Post and Pushes 'Autopen' Claims Again*, Forbes (May 7, 2026), https://www.forbes.com/sites/siladityaray/2026/05/07/trump-attacks-biden-with-ai-generated-post-and-pushes-autopen-claims-again/.

10

conversations that a person has at home.  *See, e.g.*, Mot. at 15-16, 32-33.  Instead, the Department

relies heavily on FOIA's public-domain doctrine, *see* DOJ Opp. at 22-24, which precludes

withholding under FOIA where the requestor has "show[n] that there is a permanent public record

of the *exact* portions" of the requested materials that "'he wishes' to obtain."  *Lopez v. U.S. Dep't*

*of Just.*, No. 03 Civ. 5192, 2004 WL 626726, at *1 (D.C. Cir. Mar. 29, 2004) (per curiam)

(emphasis added) (quoting *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1280 (D.C. Cir. 1992));

*accord Kowal v. U.S. Dep't of Just.*, 107 F.4th 1018, 1030 (D.C. Cir. 2024).  This reliance is

misplaced.

The public-domain doctrine does not apply to any of the material at issue here.  The

Department's observation "that the Hur Report quoted liberally from the Zwonitzer Materials"

does not support disclosure under the public-domain doctrine of materials that the Report did *not*

quote.  DOJ Opp. at 22; *see* Weinsheimer Decl. Ex. B.  The remaining portions of the transcripts,

by definition, are not "the exact record" that is publicly available.  *Kowal*, 107 F.4th at 1030

(citation modified); *see also, e.g.*, *Lopez*, 2004 WL 626726, at *1 (that the government "officially

acknowledged the information contained [in the record]" does not bring the material within the

public-domain doctrine).  Indeed, the government here intends to release material for which there

is no "exact record," *Kowal*, 107 F.4th at 1030 (citation modified), at a level of detail that goes far

beyond what exists in the public domain.  *Cf. Pike v. U.S. Dep't of Just.*, 306 F. Supp. 3d 400, 411

(D.D.C. 2016) (Jackson, J.) ("[I]t is clear beyond cavil that, 'as a simple factual matter, publication

of part of a document does not put the rest into the public domain.'" (quoting *Ancient Coin*

*Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 510 (D.C. Cir. 2011))).  This scenario is

distinct from that in either *Jigsaw Productions, Inc. v. SEC*, No. 24 Civ. 2358, 2026 WL 797411,

at *1 (D.D.C. Mar. 23, 2026), in which the government sought only to withhold the recordings

11

associated with an already-public transcript, or in *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice*, 854 F.3d 675, 682 (D.C. Cir. 2017) ("*CREW II*"), and *Marino v. DEA*, 685 F.3d 1076, 1080 (D.C. Cir. 2012), in which the government refused to confirm the identities of individuals in law enforcement records where those identities were already known.

The same logic applies to the Department's contention that President Biden waived any privacy interest in his political deliberations by addressing his decision to run for President in a chapter of his memoir, *Promise Me, Dad*. *See* DOJ Opp. at 23-24; *see also* Heritage Opp. at 37-40. As the D.C. Circuit has held, a "summary" of a conversation "is not the same as the conversation itself." *Kowal*, 107 F.4th at 1030. Likewise, a published chapter that reflects considered judgment about which information President Biden chose to make public is not the same as the underlying, private conversations that informed that work. The Department and Heritage Plaintiffs do not contend, nor could they, that the requested materials and the memoir chapter are an exact match. *Cf. Lopez*, 2004 WL 626726, at *1. For the same reasons, President Biden did not waive his privacy interests in the evidence underlying the Hur Report by addressing the Report during a press conference. *See EPIC*, 18 F.4th at 719; *Kimberlin v. U.S. Dep't of Just.*, 139 F.3d 944, 949 (D.C. Cir. 1998); *CREW I*, 746 F.3d at 1092.

**(d) <u>President Biden has an ongoing interest in the non-disclosure of evidence from a criminal investigative file.</u>** Both the Department and the Heritage Plaintiffs contend that President Biden's privacy interests are "diminished" because certain aspects of Special Counsel Hur's investigation and President Biden's political deliberations are known to the public. *See* DOJ Opp. at 22-27; Heritage Opp. at 37-40. When assessing the privacy interests of an individual who is already known to have been investigated, the relevant inquiry is whether the material to be disclosed "could reveal new information about [the] person's conduct, going beyond the facts in

App-527

the public record" or "could expose the individual to . . . reputational and stigmatizing harms." *EPIC*, 18 F.4th at 719 (quoting *CREW II*, 854 F.3d at 682); *accord Kimberlin*, 139 F.3d at 949. Accordingly, the Department may not rely on public knowledge of the fact of the investigation as a basis to disclose the non-public "*contents* of the investigative files"—a disclosure that implicates substantially greater privacy interests. *EPIC*, 18 F.4th at 719 (quoting *CREW I*, 746 F.3d at 1092). The Department's cited cases, including *Playboy Enterprises, Inc. v. U.S. Department of Justice*, 516 F. Supp. 233, 246 & n.12 (D.D.C. 1981), *Nation Magazine*, 71 F.3d at 896, and *Marino*, 685 F.3d at 1080, are inapposite.

The materials at issue here undoubtedly "contain . . . new facts," "new information or descriptions of conduct that have not been made public elsewhere," and could result in "additional reputational or stigmatizing harm" far beyond that which President Biden has already suffered as an uncharged individual. *EPIC*, 18 F.4th at 720; *see supra* Section I.B.2(c). President Biden therefore "retain[s] a significant privacy interest in the contents" at issue. *EPIC*, 18 F.4th at 720. To argue otherwise, the Department relies on cases that either support withholding or bear little on the facts at hand. *See* DOJ Opp. at 22-28. It cites *Kimberlin v. U.S. Department of Justice*, 139 F.3d 944 (D.C. Cir. 1998), for example, for the proposition that President Biden's public statement about Special Counsel Hur's investigation diminishes President Biden's privacy interests in the Zwonitzer materials. DOJ Opp. at 25. But in *Kimberlin*, the D.C. Circuit held that the Department properly withheld the contents of an investigative file even after the subject of the investigation publicly confirmed the investigation's existence. 139 F.3d at 949. Although the fact of the investigation was publicly known, as it is here, the Court explained that the person investigated retained a sufficient privacy interest "in avoiding disclosure of the details of the investigation," such that even an "official confirmation" of the investigation or disclosure of *any* "additional

13

details" beyond those already known "could reasonably be expected to constitute an unwarranted invasion of . . . personal privacy." *Id.*; *accord CREW I*, 746 F.3d at 1091-92.

The Department's reliance on *Jigsaw* is similarly unavailing. *See, e.g.*, DOJ Opp. at 22-23, 25-27. In *Jigsaw*, the court held that the SEC had not satisfied its burden to justify withholding the video recording of Elon Musk's interview with SEC staff under Exemption 7(C), where the SEC had already released the transcript of the interview. *See Jigsaw*, 2026 WL 797411, at *1, *3-5. *Jigsaw* is readily distinguishable, including because the materials here—unlike the recording of the Musk interview—"were created by individuals acting in a private capacity," and their subject matter was "unusually sensitive." Weinsheimer Decl. ¶ 22. In addition, the Department's own submissions in this action detail the likely harm to President Biden from disclosure, which the SEC failed to do in *Jigsaw*. *Compare* Decl. of Mark Tallarico, *Jigsaw Prods., Inc.*, No. 24 Civ. 2358 (D.D.C. May 9, 2025), ECF No. 18-3, ¶¶ 13, 16, 18-19; *with* Weinsheimer Decl. ¶¶ 21-24, 34-35. The SEC submitted only the "generic" statement "that the recording of Musk contain[ed] images of his facial expressions and body language, as well as audio of his voice[]," *Jigsaw*, 2026 WL 797411, at *5 (citation modified). Notably, the Department has released the audio recording of President Biden's interview with Hur, which is analogous to the material that an independent agency (the SEC) tried to protect in *Jigsaw*.

**(e) <u>Both the Department's and the Heritage Plaintiffs' evidentiary arguments are unavailing.</u>** The evidentiary arguments raised in the oppositions are distractions, at best, and President Biden has readily satisfied his burden based on the existing record. Accordingly, there is no basis for the Heritage Plaintiffs' request to cross-examine President Biden.

Grasping at straws, the Department contends that President Biden's claims are unlikely to succeed on the merits because President Biden did not submit a personal declaration detailing the

14

harms to his privacy that would result from disclosure of the relevant materials. DOJ Opp. at 21; *see also id.* at 3. The Department cites no authority for the proposition that the Court may not consider injury to an individual's privacy interests without a declaration from that individual. To the contrary, the Department routinely withholds records under FOIA Exemptions 6 and 7(C)— and courts routinely affirm such withholdings—without relying on declarations from the parties whose privacy interests are implicated. *See, e.g.*, *Williams & Connolly, LLP v. DHS*, No. 24 Civ. 2322, 2026 WL 72065, at *11-13 (D.D.C. Jan. 9, 2026); *Am. First Legal Found. v. FBI*, No. 23 Civ. 2172, 2024 WL 4607496, at *10, *15 (D.D.C. Oct. 29, 2024), *aff'd*, No. 24-5258, 2025 WL 1188974 (D.C. Cir. Apr. 22, 2025); *cf.* Weinsheimer Decl. Moreover, President Biden's counsel has relevant personal knowledge, including knowledge of the Department's proposed redactions based on personal review, and was therefore an appropriate declarant. *Cf.* Fed. R. Civ. P. 56(c)(4).

To the extent there is any factual dispute with respect to the nature of the materials that the Department intends to disclose, the Department has not provided President Biden or his counsel with a copy, *see* Jeffress Decl. ¶ 8, and the appropriate mechanism for the Court to resolve such a dispute is to review the materials *in camera*—as the Court plans to do. *See* Min. Order (June 8, 2026); *Jibril v. Mayorkas*, 101 F.4th 857, 866 (D.C. Cir. 2024) ("[I]n cases in which sensitive materials may be in issue, the court has inherent authority to review such material *ex parte*, *in camera*." (citation modified)), *cert. denied*, 145 S. Ct. 550 (2024).

For similar reasons, the Heritage Plaintiffs' request to cross-examine President Biden at an evidentiary hearing is wholly unfounded. *See* Heritage Opp. at 6-7; ECF No. 71. Neither the Department nor the Heritage Plaintiffs have raised any "genuine issue[] of material fact," *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004), and "[t]he practice in this jurisdiction is to decide preliminary injunction motions without live testimony where possible," L.R. 65.1(d). The facts in

15

this case are straightforward and undisputed, and the materials themselves, along with the declarations of counsel addressing the Department's proposed redactions and its planned release on June 15, 2026, readily establish that President Biden faces imminent, irreparable harm. The remaining issues are legal in nature and can be decided by the Court without documentary or testimonial evidence.

## C. Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act

President Biden is also likely to succeed on his APA claim challenging the Department's planned disclosure as a violation of the Privacy Act. As explained below, injunctive relief is available under the APA because the Privacy Act does not provide an "adequate remedy." As for the merits of the Privacy Act violation, the Department's arguments regarding the § 552a(b)(2) exception are unconvincing, and the Department has conceded and forfeited virtually all other arguments regarding the elements of an unlawful-disclosure violation. *See* Mot. at 26-32.

### 1. President Biden Can Assert a Claim Under the APA for Injunctive Relief to Prevent the Department's Planned Violation of the Privacy Act

Contrary to the Department's assertions, *see* DOJ Opp. at 14-19, President Biden can challenge the Department's planned Privacy Act violation by seeking injunctive relief under the APA. *See* Mot. at 26-27. President Biden does not dispute that the Privacy Act itself does not provide for injunctive relief in connection with its unlawful-disclosure provision. *See* Mot. at 26; DOJ Opp. at 14. That is precisely the point. Because the Privacy Act does *not* include a cause of action for injunctive relief to prevent the Department's unlawful disclosure of the materials at issue, "the APA's 'generic cause of action in favor of persons aggrieved by agency action' can step into the breach and permit the Court to enjoin [the Department's] action." *AFL-CIO v. Dep't of Lab.* ("*AFL-CIO I*"), 778 F. Supp. 3d 56, 80 (D.D.C. 2025) (quoting *Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (en banc)). The Department's contrary position that "the

16

Privacy Act already provides an adequate alternative remedy," DOJ Opp. at 16, strains longstanding APA precedent and ignores the persuasive logic of several recent cases in this district.

Section 704's adequate-remedy "exception" to APA review is aimed at "avoid[ing] . . . duplication" of "existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Against "the strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986); *see Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967), courts assess whether an alternative scheme precludes APA review "by looking for 'clear and convincing evidence of legislative intent to create a special, alternative remedy,'" *V.I. Hous. Fin. Auth. v. Fed. Emergency Mgmt. Agency*, 151 F.4th 409, 418 (D.C. Cir. 2025) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017)). Several considerations guide that inquiry, including whether the alternative statute provides at least the "same genre" of relief, whether APA review and review under the alternative remedy are incompatible in major respects, and whether the alternative remedy contains its own independent cause of action or alternative review procedure. *Id.* "An alternative remedy" is not "adequate . . . if the remedy offers only 'doubtful and limited relief.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *Bowen*, 487 U.S. at 901).

To start, the Privacy Act does not provide an adequate remedy because it does not offer relief in the "same genre" as the injunctive relief President Biden seeks with respect to his APA claim. Critically, the Privacy Act does not "create," nor "expressly precludes," a "cause of action for relief from imminent, unlawful disclosure of records." *AFL-CIO v. Dep't of Lab.* ("*AFL-CIO II*"), No. 25 Civ. 339, 2026 WL 879518, at *19 (D.D.C. Mar. 31, 2026). Rather, the Privacy Act provides for monetary damages in connection with an unlawful-disclosure claim. *See* 5 U.S.C. § 552a(g)(1)(D), (g)(4); *Radack v. U.S. Dep't of Just.*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005). But

17

those "retrospective damages remedies . . . are inadequate to address" the imminent and unlawful disclosure of protected records. *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 44 (D.D.C. 2025) (citation omitted). This Court has recognized as much, explicitly distinguishing the scenario in which the Privacy Act provides for "*only* monetary damages with no form of equitable relief" (like here) from that in which the statute provides non-identical but nonetheless adequate relief. *Poss v. Kern*, No. 23 Civ. 2199, 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (emphasis in original) (citing *Radack*, 402 F. Supp. 2d at 104). Because President Biden seeks under the APA relief that the Privacy Act does not provide or expressly preclude, his APA claim is not barred by Section 704. *See Ahmed v. Noem*, No. 25 Civ. 1351, 2025 WL 2299447, at *15 (D.D.C. Aug. 8, 2025) (no "alternate remedy" where plaintiff's "ability to seek relief under the Privacy Act is 'nonexistent'" (quoting *Doe v. Noem*, 781 F. Supp. 3d 1055, 1065-66 (E.D. Cal. 2025))).

For much the same reason, APA review of the Department's planned unlawful disclosure of President Biden's private materials is fully compatible with the Privacy Act's scheme. If anything, APA review of an agency's imminent violations *vindicates* the Privacy Act's animating purpose by protecting individuals' privacy before harmful disclosures occur. *See Pilon v. U.S. Dep't of Just.*, 73 F.3d 1111, 1119 (D.C. Cir. 1996) (in enacting Privacy Act, Congress "inten[ded] to protect the individual privacy of the subjects of protected records"). The Department asserts that permitting APA review of imminent, unlawful agency disclosures of protected information would "nullify[] the Privacy Act's limitations," but it cites to no authority and provides no explanation as to how such nullification would occur. DOJ Opp. at 18 n.8.

Despite the Department's insistence otherwise, there is no indication that Congress intended the Privacy Act to provide a comprehensive scheme that displaces APA review entirely. *See* DOJ Opp. at 16-19. While the Privacy Act does set forth its own causes of action, *see* 5 U.S.C.

§ 552a(g), courts in this district have concluded that "the Privacy Act is not the kind of comprehensive and 'exclusive' remedial statute that impliedly displaces related remedies under other statutes." *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 105 (D.D.C. 2025); *see also, e.g.*, *AFL-CIO II*, 2026 WL 879518, at *19 (finding "nothing in the Privacy Act's text or the structure of its remedial scheme that evinces fairly discernable congressional intent to displace the APA's 'basic presumption of judicial review.'" (quoting *Abbott Lab'ys*, 387 U.S. at 140)). Confirming these courts' appraisal, the Supreme Court recently held that the Privacy Act is "complementary" with a similar remedy under a different statute, the Fair Credit Reporting Act. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024).

The Department has assembled a string cite of cases supposedly supporting the proposition that a plaintiff cannot bring an APA claim to obtain relief for a Privacy Act violation. DOJ Opp. at 17.[5] But the Department fails to appreciate that every one of those cases "dealt with a different situation entirely, one where plaintiffs sought injunctive relief under the APA despite its availability under the Privacy Act." *AFL-CIO I*, 778 F. Supp. 3d at 81 (citations omitted); *see also Radack*, 402 F. Supp. 2d at 104 (distinguishing between APA claims seeking relief identical to that which can be sought under the Privacy Act and those seeking distinct relief). They did not seek to prevent imminent unlawful disclosures, as President Biden does here—a harm for which the Privacy Act provides no remedy.

It speaks volumes that the Department does not even attempt to address the reasoning of cases that have reached the opposite conclusion, including two recent cases in this district—cited in the motion—that "have authorized plaintiffs to sue under the APA to enjoin proposed

---

[5] This string cite includes this Court's decision in *Poss v. Kern*, 2024 WL 4286088, which—as explained above—supports President Biden's position that relief under the Privacy Act is inadequate and does not preclude APA review of threatened disclosures, *see id.* at *6.

19

disclosures that are barred by the Privacy Act."[6]  DOJ Opp. at 17 n.7 (citing *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 112 (D.D.C. 2026), and *AFL-CIO I*, 778 F. Supp. 3d at 81).  For instance, the Department does not address the fact that the Supreme Court has acknowledged and left open the possibility that the APA provides a cause of action in these very circumstances.  *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) ("The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA]." (citation omitted)); *FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012) ("The [Privacy] Act deters violations of its substantive provisions in other ways—for instance, . . . possibly by allowing for injunctive relief under the [APA]." (citation omitted) (citing *Chao*, 540 U.S. at 619 n.1)).  And the Department ignores the fact that the D.C. Circuit has previously granted declaratory relief for a violation of the Privacy Act,[7] and was prepared to grant injunctive relief had the need for such relief not been obviated by the opinion itself.  *Doe*, 851 F.2d at 1465-67.  Indeed, the Department's own declarant has explained that "[c]ourts have differed as to whether plaintiffs are entitled to additional remedies beyond those available under the Privacy Act."  U.S. Dep't of Just., Off. of Priv. & C.L., *Overview of the Privacy Act: 2020 Edition* 295 (2020) (preface signed by Peter A. Winn),

---

[6] Nor does the Department grapple with a recent case denying APA review in light of the fact that the Privacy Act "offers *exactly* the injunctive relief that [the plaintiff] s[ought]," while distinguishing the case from instances where plaintiffs seek different relief than the Privacy Act can provide.  *See Bass v. Fed. Motor Carrier Safety Admin.*, 817 F. Supp. 3d 1, 132 (D.D.C. 2025), *appeal dismissed*, No. 26-5010, 2026 WL 969853 (D.C. Cir. Mar. 23, 2026).

[7] The Department indirectly references *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988), only once in its opposition, for the undisputed proposition that the Privacy Act itself does not include a cause of action that could provide the injunctive relief President Biden seeks here.  *See* DOJ Opp. at 17 (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (citing *Doe*, 851 F.2d at 1463)); *see* Mot. at 26.

20

https://www.justice.gov/Overview_2020/dl?inline.

In sum, the Department's arguments that President Biden cannot seek to enjoin the Department from violating the Privacy Act under the APA are unavailing. Under established APA precedent and a growing line of cases in this district, the APA can "step into the breach" when a federal agency threatens an unlawful disclosure. *AFL-CIO I*, 778 F. Supp. 3d at 80.

### 2. The Proposed Disclosure Does Not Fall Within the Privacy Act's Exception for Disclosures Required Under FOIA, and the Department Has Conceded and Forfeited All Other Privacy Act Arguments

On the merits of the Privacy Act cross-claim, the Department's only argument is that the Privacy Act does not bar the Department's planned disclosure because the "disclosure . . . is required under FOIA" and falls under the Privacy Act's exception for mandatory productions pursuant to a FOIA request. DOJ Opp. at 34; 5 U.S.C. § 552a(b)(2). That argument is incorrect because the materials are indeed exempt under Exemptions 6 and 7(C), and the Privacy Act's FOIA exception is therefore inapplicable. *See* Mot. at 13-18, 27.

The Department says almost nothing about the elements of a Privacy Act unlawful-disclosure violation or President Biden's discussion of those elements. *Compare* DOJ Opp. at 33-35, *with* Mot. at 27-32. The Department has thereby conceded and forfeited any arguments that it did not address. *See Redding*, 2023 WL 6065129, at *5. Thus, the Department has conceded and forfeited at least the following arguments: that the materials at issue are "record[s]" that "pertain[]" to" and are "about" President Biden; that the materials are "contained in a system of records"; that the Department's proposed action involves a "disclos[ure]" to "any person" without President Biden's "written consent"; and that the Privacy Act's "routine use" exception, codified in 5 U.S.C. § 552a(b)(3), does not apply to this disclosure. *See* Mot. at 29-32.

## II. President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction

The Department contends that because the Privacy Act provides for monetary damages,

21

App-536

any harm from disclosure would be "by definition, not irreparable." DOJ Opp. at 36. This argument fundamentally misconstrues the nature of privacy injuries and the availability of equitable relief to prevent privacy violations before they occur.

If the materials are disclosed, the harm to President Biden's privacy interests will be severe, immediate, and—importantly—irreparable. This Court has already recognized that disclosure will "'result in a substantial change in the status quo with respect to [President Biden's] [privacy] interests, such that the task of reestablishing the status quo' would be impossible." ECF No. 63 at 8 (quoting *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 7 (D.D.C. 2018)). Neither the Department nor the Heritage Plaintiffs addresses that conclusion, but it follows from common sense: No judicial remedy could restore President Biden's lost privacy, and no amount of damages could compensate for the permanent intrusion. *AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2025 WL 1783899, at *12 (D.D.C. June 27, 2025) ("[D]isclosure necessitates a preliminary injunction when there is an imminent risk that information privately disclosed . . . will either be impermissibly used or publicly disclosed."); *cf.* DOJ Opp. at 35 ("In general, once information has become public, any damage the movant fears from disclosure has already been done.").

The Department contends that if President Biden is correct on the law, any harm can be remedied through an after-the-fact Privacy Act lawsuit for monetary damages. DOJ Opp. at 36. But the Privacy Act's damages remedy does not define or supplant the universe of equitable remedies available. As the Department recognizes, damages available under the Privacy Act are limited only "to proven *pecuniary* or *economic* harm." DOJ Opp. at 16 (emphases added) (quoting *Cooper*, 566 U.S. at 299). By definition, such damages cannot compensate for the non-economic, irreversible loss of privacy that occurs upon public disclosure. *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 44; *cf. Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C.

22

2009) (disclosure of private information is irreparable precisely because it "destroy[s]" "the very rights [the movant] seeks to protect"); *see also* Mot. at 34. Indeed, it would be entirely inconsistent with the Privacy Act's broad protective purpose to find by "clear and convincing evidence" that Congress intended for victims of certain imminent Privacy Act violations to have no equitable remedy at all. *See AFL-CIO I*, 778 F. Supp. 3d at 81; *supra* Section I.C.1. By providing for retrospective, pecuniary damages under the Privacy Act and, separately, authorizing injunctive relief under the APA to stop privacy violations before they take place, Congress ensured that "the long tradition of equity practice" remained available to prevent irreparable losses of privacy. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

The need for injunctive relief is particularly acute here. President Biden seeks to prevent an imminent, actual, great, and irreparable harm to his privacy. Mot. at 32-34. The raw, unedited transcripts of President Biden's private conversations capture candid, off-the-record statements, personal reflections, and private information about President Biden and third parties—material deliberately omitted from his memoir and now embedded in a law enforcement file. *See supra* Section I.B.2; *cf. Pike*, 306 F. Supp. 3d at 411 ("[I]t is clear beyond cavil that, 'as a simple factual matter, publication of part of a document does not put the rest into the public domain.'" (quoting *Ancient Coin Collectors Guild*, 641 F.3d at 510)).[8] The recordings are more sensitive still. *See N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc) ("The information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves."). President Biden's tone, emotional state, and other deeply personal characteristics cannot be redacted and were never made public through his memoir or any

---

[8] Contrary to the Heritage Plaintiffs' insistence, it does not require the personal testimony of the former President to establish that the materials at issue implicate his privacy interests. *See supra* Section I.B.2(e); Mot. at 3-4, 32-33.

other medium.  The Heritage Plaintiffs seek the recordings for exactly that reason—because they reveal "pauses, hesitations, mannerisms, and intonations" that a "cold transcript" cannot.  Heritage Opp. at 34.  That these "non-lexical" private moments are of interest to the Heritage Plaintiffs does not diminish President Biden's privacy interest.  *Pike*, 306 F. Supp. 3d at 412.  To the contrary, it confirms that once those private moments are disclosed, they cannot be made private again— precisely the kind of irreversible injury that satisfies the standard for irreparable harm.

## III.    The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief

The remaining injunction factors weigh strongly in favor of preliminary relief.  While the Department contends that an injunction would "severely jeopardize the public's interest in an orderly, fair, and efficient administration of the FOIA," DOJ Opp. at 37 (quoting *Nation Mag. v. Dep't of State*, 805 F. Supp. 68, 74 (D.D.C. 1992)), unexplained and unsupported reversals of agency determinations based on "belated justifications" serve only to "upset 'the orderly functioning of the process of review,'" *Regents*, 591 U.S. at 23 (quoting *Chenery*, 318 U.S. at 94), and certainly do not promote the orderly, fair, or efficient administration of FOIA, the Privacy Act, or the APA.  In addition, any residual public interest in these materials from 2016 and 2017 is *de minimis*, and it only grows weaker over time.  *See* Mot. at 16-17; *supra* Section I.B.2(b).  On the other side of the balance, President Biden's interest in maintaining the privacy of his intimate reflections on his decision-making both as a public servant and as a husband, father, and grandfather, including his descriptions of conversations with multiple third parties on these subjects, remains at its apex.  *See* Mot. at 32-33.  The balance of equities and the public interest thus weigh decidedly in favor of granting a preliminary injunction.  *See* Mot. at 34-36.

## IV.    The Court Should Waive the Bond Requirement or Set a Nominal Bond Amount

Here, the party to be enjoined—the Department—does not argue that it will suffer costs or

App-539

damages if an injunction is wrongly granted.[9]  *See* DOJ Opp. at 37-38.  Because "an improperly imposed injunction would not impose a substantial hardship on the government," a bond set at $0 or a nominal amount is appropriate.  *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025).

**CONCLUSION**

For the foregoing reasons, President Biden respectfully requests that the Court grant the motion for preliminary injunction and waive the security bond requirement.[10]

Dated: June 9, 2026

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
H. Atticus Ballesteros (D.C. Bar No. 90043198)*
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883
ajeffress@heckerfink.com

*Counsel for Defendant-Intervenor*
*Joseph R. Biden, Jr.*

*Admitted pro hac vice

---

[9] The Heritage Plaintiffs focus on supposed revenue generated by President Biden's memoir, *see* Heritage Opp. at 44-45, but they do not explain how that figure properly represents the costs and damages the Department will sustain if it is found to be wrongfully enjoined, *see* Fed. R. Civ. P. 65(c).  Nor do they identify any measurable costs or damages to their interests.

[10] In the event the Court denies President Biden's preliminary injunction motion, President Biden respectfully requests that the Court stay the effect of its decision for a brief period to allow President Biden to consider seeking appellate review, consistent with its prior ruling that disclosure of the materials "'would result in a substantial change in the status quo with respect to [President Biden's privacy] interests, such that the task of reestablishing the status quo' would be impossible."  ECF No. 63 at 8 (quoting *Waterkeeper All., Inc.*, 330 F.R.D. at 7).

25

App-540

                    BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


    HERITAGE FOUNDATION, et al.,        .
                                        .
                Plaintiffs,             .  Case Number 24-cv-645
                                        .
         vs.                            .
                                        .
    U.S. DEPARTMENT OF JUSTICE,         .
                                        .
                Defendant,              .
                                        .
         and                            .  Washington, D.C.
                                        .  June 11, 2026
    JOSEPH R. BIDEN, JR.,               .  2:02 p.m.
                                        .
                Defendant-Intervenor. .
    - - - - - - - - - - - - - - - - -

                        TRANSCRIPT OF MOTION HEARING
                  BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                        UNITED STATES DISTRICT JUDGE

    APPEARANCES:

    For the Plaintiffs:          SAMUEL DEWEY, ESQ.
                                 Chambers of Samuel Everett Dewey, LLC
                                 2200 12th Court North
                                 Apartment 609
                                 Arlington, VA 22201

                                 JEFFREY CLARK, ESQ.
                                 KYLE BROSNAN, ESQ.
                                 Oversight Project
                                 211 North Union Street
                                 Alexandria, VA 22314

    For the Defendant:           JOHN HALLORAN, ESQ.
                                 ELIZABETH SHAPIRO, ESQ.
                                 U.S. Department of Justice
                                 1100 L Street Northwest
                                 Washington, D.C. 20005


                        -- continued --


App-541

APPEARANCES (CONTINUED):

For Defendant-Intervenor:    AMY JEFFRESS, ESQ.
                             TAISA GOODNATURE, ESQ.
                             KAITLIN KONKEL, ESQ.
                             JARED HIRSCHFIELD, ESQ.
                             Hecker Fink LLP
                             1050 K Street Northwest
                             Tenth Floor
                             Washington, D.C. 20001


Official Court Reporter:    SARA A. WICK, RPR, CRR
                            333 Constitution Avenue Northwest
                            Room 4704-B
                            Washington, D.C. 20001
                            202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

App-542

P R O C E E D I N G S

(Call to order of the court.)

(All participants present telephonically.)

COURTROOM DEPUTY:  We are on the record with Civil Case 24-645, Heritage Foundation, et al., versus U.S. Department of Justice.

Counsel, starting with the plaintiff, please identify yourself.

MR. DEWEY:  Samuel Dewey for the plaintiffs.  With me are Jeffrey Clark and Kyle Brosnan.

THE COURT:  Who do we have here from the department?

MR. HALLORAN:  Good afternoon, Your Honor.  May it please the Court.  My name is John Halloran.  I appear today for the defendant, and appearing with me today is Elizabeth J. Shapiro.

THE COURT:  All right.  And for former President Biden?

MS. JEFFRESS:  Yes.  Thank you.  Amy Jeffress, along with Kaitlin Konkel, Taisa Goodnature, and Jared Hirschfield.

THE COURT:  All right, everyone.  Good afternoon.  Thank you for being available on such short notice.

Before the Court is former President Biden's motion to enjoin preliminarily the Department of Justice's planned release of certain materials from Special Counsel Robert Hur's investigation to the plaintiff in the FOIA action.  Those

App-543

materials are redacted audiotapes and transcripts of recordings made by biographer Mark Zwonitzer, who was working on former President Biden's memoir in 2016 and 2017.

The parties should know that I have reviewed the tapes and transcripts in camera.  I have a number of questions for each side.  I will also give each side a short amount of time to make any additional points we don't cover.

And at the outset, I do want to thank you all for your very helpful briefing that you did on short notice.  Former President Biden's motion raised some really difficult, challenging legal issues, and I appreciate the thoroughness with which you all have addressed them in your expedited briefing.

I am going to start with Ms. Jeffress, as it is the former president's motion.  But first, Mr. Halloran, I would like to just ask you, can you help me understand, what is the importance of the June 15th date of release?  Why the urgency?

MR. HALLORAN:  The date has been the process of a long negotiation, Your Honor.  This case has been pending since 2024.  There has been a decision made that the process needs to conclude, and the date that was selected on May 5 was June 15.

THE COURT:  All right.  Well, as I said, the motion raises some hard issues, and I'm just -- I would appreciate more time to resolve this issue.  The briefs weren't ripe until the 9th, and it's difficult to rule on all these issues in less than a week.

So I would ask the department to consider whether it might defer release for an additional week.

MR. HALLORAN:  We consent to that --

THE COURT:  You don't have to -- I mean, if you can answer that now, great, but if not, it's something that I would ask you to consider.

MR. HALLORAN:  We consent to one week, Your Honor.

THE COURT:  Oh, you do?  One week from Monday?  Can we do one week from Monday, or are you consenting to one week from today?

MR. HALLORAN:  How about next Friday?

THE COURT:  Next Friday?  That is -- that's the 19th?  Is that what you're saying?

MR. HALLORAN:  Yes, Your Honor.

THE COURT:  Okay.  All right.  I would appreciate that.

All right.  So let me -- most of my questions, Ms. Jeffress, are for the department, but let me ask you a few to start.

If the Court were to conclude that the Privacy Act claim is not viable under the APA, do you agree that the department's decision whether to invoke certain FOIA exceptions is committed -- exemptions is committed to the department's discretion?

MS. JEFFRESS:  No, Your Honor, we don't.  We believe

that these two claims are related but separate from one another. So without the Privacy Act challenge, we would challenge the department's decision to release these materials under FOIA as an abuse of discretion, and we would challenge that under the APA.

THE COURT:  All right.  But the Court would need to assess that under the abuse of discretion standard?

MS. JEFFRESS:  Yes, we do agree with that.

THE COURT:  Okay.  So, you know, as I see it, there's not any mandatory language in the statute or the implementing regulations that suggests that the department must invoke every exemption that could possibly apply.

Do you agree with that?

MS. JEFFRESS:  We do agree with that.

THE COURT:  All right.  Correct me if I'm wrong, but this seems to be the only reverse FOIA action outside the trade secret context.

Do you agree with that?

MS. GOODNATURE:  Your Honor, this is Taisa Goodnature on behalf of President Biden.

The *Jurewicz* case did involve a Trade Secrets Act claim, but it also involved a FOIA (d)(6) claim for an invasion of privacy, which the Court assessed under the arbitrary and capricious and abuse of discretion standard.  That case is cited on page 25 of our opening brief.

THE COURT: Okay. All right. Thank you for that.

The Trade Secrets Act has very precise language that FOIA doesn't have. And many of those decisions seem to turn on the specific language of the act. Other statutory provisions, like Section 6103 which generally prohibits IRS disclosure of personal tax information, have limits on what DOJ or an agency can disclose, as does Federal Rule 60.

But doesn't all this together suggest that there really needs to be an external statute apart from FOIA that limits the department's discretion to disclose?

MS. GOODNATURE: Your Honor, it doesn't. It's true that there are other statutes that do prevent releasing materials pursuant to FOIA. We would note that this would be a very different case if the government had taken the position that the FOIA exemptions apply but if the government nevertheless planned to release the information in an exercise of discretion.

Because the government here has taken the position very clearly that it is required to release the information pursuant to FOIA -- pursuant to a FOIA request and that Exemption 6 and 7C do not apply, that's a legal determination by the department that is reviewable by the Court under the arbitrary and capricious and abuse of discretion standard.

THE COURT: Okay. So if there were no FOIA request here at all and the department just simply decided it wanted to

release this material on its own volition, would that decision be subject to APA review, or would that be --

MS. GOODNATURE:  Our position is that it would, Your Honor.  Of course, that's a very different case than what's presented here, but yes, that would still be a final decision of the department that -- from which legal consequences would flow and that the Court would review under the arbitrary and capricious standard.

The distinction here is that there would be -- if the department took that discretionary -- made that discretionary decision, then the applicability of the FOIA exemptions wouldn't be embedded into the APA analysis in the way it is here.

THE COURT:  All right.  How do you address the fact that in the Privacy Act, Congress has both monetary damages for the disclosure or other misuse of personal records, and then they attach limited injunctive relief for the amendment and removal of personal records?

Isn't the presence of these narrow remedies evidence that Congress intended to authorize certain injunctive relief but not this type of injunctive relief?

MS. GOODNATURE:  No, Your Honor, it is not, and as courts in this district have recently held in both *AFL-CIO* and in *League of United Latin American Citizens,* both of which arose in the context of unusual or irregular disclosure decisions by this administration, which it now gets to the facts of this

case.

The APA does not provide the sort of reticulated -- or the sort of comprehensive scheme that would preclude the availability of injunctive relief under the APA here, nor would the availability of monetary damages in the event of a Privacy Act violation fully alleviate the harm to President Biden from that release.

THE COURT:  Okay.  So you are -- these are the Judge Bates and Kollar-Kotelly cases that you're citing?

MS. GOODNATURE:  Correct, Your Honor.

THE COURT:  Okay.  You've also argued that the department's decision to release the materials is not reasoned because the Court can't consider the post hoc rationalization given in the Winn declaration.

But courts do that all the time in assessing, you know -- in FOIA summary judgment cases.  And it's routine for the Court to give good faith and deference to the declaration provided by the government in support of its decision to not disclose documentation.  And that typically arises in the case of litigation, and it's after-the-fact explanation of why the department made the decision it did.

So why is this situation any different, given how the department handles FOIA cases across the board?  It seems like it's always dependent on a declaration -- the Court is always assessing the strength of the government's position based on a

declaration that's filed during the course of litigation.  It's not like an actual administrative records case.

MS. GOODNATURE:  Your Honor, that is true in a traditional FOIA case in which the government has already made -- or by the time the Court is reviewing cross-motions for summary judgment, the Court has already made a final response to a FOIA request and then can explain that decision in an after-the-fact declaration by the Court.

However, in a reverse FOIA case, the APA standards apply, and the agency is bound to explain its decisionmaking when it makes its decision to the party whose privacy interests have been raised by the request, and the agency is required to explain how it has assessed those interests and why it has made the decision that it has made.

Again, the *Jurewicz* case that we cite on page 25 of our brief is instructive here and walks through the ways the agency considered comments from the submitter of the information and then provided a final response, which the submitters were then challenging in their so-called reverse FOIA case, which is really an APA case.

And that case shows how the process is supposed to proceed in these contexts where the agency not only has decided -- it has made its final decision in response to a FOIA claim, but also has made a decision in response to objections to that release from the individual or entity whose privacy interests

are at stake.

THE COURT:  All right.  So you're saying when the department decides it is going to disclose records pursuant to a FOIA request -- in this case, notice was provided to the former president, and you're saying that the administrative record should include that back and forth, along with a reasoned decision in --

MS. GOODNATURE:  Well --

THE COURT:  -- the Department of Justice's internal files that reflects how they weighed it?  What exactly are you --

MS. GOODNATURE:  Correct, Your Honor.  The way for this case to be decided on summary judgment is for the Court to -- or for the government, excuse me, to submit the administrative record reflecting its contemporaneous decisionmaking, as well as the final decision that the government needed to have provided to President Biden explaining the basis for his decision -- excuse me, for the department's decision, which is then the basis of the APA claim, rather than providing no explanation at the time and then providing a set of shifting justifications in the course of this litigation.

THE COURT:  All right.  I may have some further questions for you, and I will certainly give you a chance to reply after I hear from the government.  But let me turn to Mr. Halloran now.

Mr. Halloran, I want to start with the issue of whether the department's disclosure decision is reviewable under the APA.

You give two reasons that it's not reviewable. First, you say the decision to invoke certain FOIA exemptions is committed to agency discretion by law, and you point to the Privacy Act remedial scheme to argue that the relief the former president seeks is not available under the APA.

You also argue in the event that disclosure decision is reviewable under the APA, that that decision should be assessed as to whether it's arbitrary and capricious or abuse of discretion or otherwise not in accordance with law.

Courts are certainly divided on the Privacy Act APA issue. And so far as the Court -- other than the one case that was mentioned. I'm forgetting the name of it. Is it Jacardi? *Jurewicz v. Department of Agriculture case*. All the rest are in the trade secrets context.

Do you agree with that, Mr. Halloran?

MR. HALLORAN: My understanding, Your Honor, is that most, if not all, of these cases are Trade Secrets Act cases, 18 U.S.C. 1905 cases, like *Chrysler* was.

THE COURT: All right. But if the Court should find the Privacy Act can be enforced through the APA in this context because there is no other adequate remedy, does your *Heckler* argument fall?

MR. HALLORAN: Your Honor, I don't believe so. I

think our position on this is really very simple:  That the Privacy Act has a comprehensive, reticulated scheme where Congress has dictated that there are two forms of injunctive relief remedies, to allow access and to amend access to a record.  And it would be nullification of Congress's policy if a private right of action were to be permitted under these circumstances.

THE COURT:  Well, what's your position with respect to Judge Bates's decision in *American Federation of Labor* and Judge Kollar-Kotelly's position in *League of United Latin American Citizens*?  In your view, are those just wrongly decided?

MR. HALLORAN:  Your Honor, we don't believe that they squarely address the question of agency action committed to agency discretion.  We don't believe that they squarely address the issue that we've raised in our papers.

And I think that Judge Bates's decision, in particular, will note that he is interstitially making law here, which I think is a nullification of a congressional policy.

THE COURT:  All right.  But what about those two decisions you think distinguishes them from this case?

MR. HALLORAN:  Your Honor, we view a coordinate district court decision as being not binding on this court, and we feel that this court should squarely address the idea that this action here has been -- is committed to agency discretion by law under 5 U.S.C. 701(a)(2).

THE COURT:  Right.  No, I understand it's not binding on me.  I'm just trying to understand what you think about the cases distinguishes it from my case if I were to find the reasoning in those cases, which I haven't determined, persuasive?

MR. HALLORAN:  I believe the inherent problem with these cases, Your Honor, is that they do not squarely address the issue we're raising today.  That's how I would distinguish them.

THE COURT:  Meaning what specifically?  In this particular context, this reverse FOIA context?  Or the government didn't make the same arguments it's making now?

MR. HALLORAN:  Well, let's turn to the reverse FOIA context for a second.  Because *Chrysler* is very clear that FOIA is a purely disclosure statute, and it affords no private right of action to enjoin agency disclosure.  So there is no private right of action under FOIA.

With respect to the Privacy Act, Congress has limited specific monetary remedies in the instance of willful misconduct and two specific forms of injunctive relief, which are different from what is being presented to the Court today.  President Biden is presenting an omnibus claim for injunctive relief that is not specifically authorized by the Privacy Act.

THE COURT:  All right.  Well, what do you make of -- to what extent -- how should the Court read *Bowen v.*

*Massachusetts* here in which the Supreme Court's word on other adequate remedies under the APA was that monetary relief in that case, in the claims court under the Tucker Act, was not necessarily adequate when the plaintiff sought injunctive relief under the APA?

MR. HALLORAN: Well, here, it's a congressional determination as to what is an adequate remedy. Here, Congress has identified a comprehensive scheme, as the Supreme Court said in *SAA versus Lupert* (phonetic). It has identified in a reticulated manner specific remedies for specific forms of harm. And that is why it is deemed to be an adequate remedy. And even as the formal relief that is sought in this case is not provided under the Privacy Act, that is a judgment of Congress.

THE COURT: Well, Bates cited the D.C. Circuit's decision in *Doe v. Stephens* where it seemed the Court assumed, without analysis, that the plaintiffs could seek declaratory relief under the APA for violation of the veterans' records statute as amended by the Privacy Act.

Why was -- I assume you think that assumption was incorrect, and if so, why?

MR. HALLORAN: Your Honor, I would need to review that case in particular.

THE COURT: Well, what about the language from Justice Alito's majority opinion in *FAA v. Cooper,* which notes that the Privacy Act deters violations of its substantive provisions in

App-555

other ways, for instance by possibly allowing for injunctive relief under the APA?

MR. HALLORAN:  I think he used the word "possibly" there, Your Honor.

THE COURT:  He did.

MR. HALLORAN:  Your Honor, there is one case I would refer this Court's attention to.  It's *Richardson versus Board of Governors of the Federal Reserve System*, 288 F.Supp.3d 231, D.D.C. 2018, which was affirmed in a memorandum by the D.C. Circuit, where the Court ruled that injunctive relief is available under the Privacy Act only for a limited category of suits:  Suits to amend the record and suits for access to a record.

So I feel like -- I believe, Your Honor, that that case should also be considered.

THE COURT:  All right.  I will take a close look. You've cited my opinion in *Poss v. Kern* where I held that a plaintiff could not use the APA to seek the removal of records under the Privacy Act because such relief would be duplicative. But the reasoning there was that the Privacy Act explicitly provides for the correction and removal of personnel records -- personal records.

So it was a different situation than we have here.  It doesn't necessarily mean that the Court would rule the same in this case, given the situation here, because the relief that

Biden is seeking is not necessarily provided for as it was in *Poss*.

If the Court does find the decision subject to APA review because the Privacy Act provides a discretion-containing wall, why would the disclosures here not violate the Privacy Act that has a blanket bar on disclosure of records like this without the parties' consent?

MR. HALLORAN:  The remedy for wrongful disclosure in the event it's willful is monetary damages, Your Honor.

THE COURT:  But if I find that the action can be brought under the APA, the APA provides for injunctive relief. So let's say that I do say they can proceed under the APA.

Why can't they get injunctive relief through the APA based on the mandatory language -- the bar on disclosure in the Privacy Act?

MR. HALLORAN:  Your Honor, you're assuming that the records are covered by the Privacy Act, and we can't make that assumption ourselves.  I think that we move then into the sphere of the traditional balancing test as to whether the alleged privacy interests that have been invoked by President Biden are -- decidedly outweigh the significant public interest in disclosure of the Zwonitzer materials in this case.

THE COURT:  All right.  And so you're getting there because the blanket bar in the Privacy Act is subject to the exception that the blanket ban doesn't apply when disclosure of

the record would be required under Section 552 and that section's FOIA?

MR. HALLORAN:  Your Honor, our basic position is that this is a matter that has been committed to agency discretion.

THE COURT:  No, I understand.  I'm just saying -- and I haven't decided.  But if I were to disagree on that and we're in the world where there's mandatory language in the Privacy Act and the Court is looking at the remedy under the APA, does this exception, disclosure of the record would be required under Section 552, which is FOIA, is that where the Court lands?  The Court has to basically do an assessment under FOIA at that point?

MR. HALLORAN:  Well, I think you hit the nail on the head.  I think that (b)(2) of the Privacy Act allows and authorizes disclosure and protects the decisionmaker, the FOIA decisionmaker from potential liability where FOIA requires production.

Here, the department has demonstrated and determined its judgment that the information should be disclosed.  So we believe that the exemption for FOIA production in the Privacy Act would provide immunity to the FOIA decisionmaker here.

THE COURT:  All right.  Well, the declaration of Peter Winn, along with my review of the actual transcript and tape, it is clear that the strength of the former president's privacy interests, as well as the strength of the public's interest,

seems to me to vary throughout the tapes.  Winn states that there is a significant public interest in the conclusions of Hur's report and the reasoning behind Hur's decision not to prosecute Biden.  But that interest seems to turn on the portions of the audio and the transcript that concerns classified material.  It's hard to see the public interest in the other nearly two hours of uncensored audio.

MR. HALLORAN:  The relevance of the totality of the audio and the totality of the transcripts is basically a curated subset that was reviewed by Special Counsel Hur.  He made his judgment based upon the totality of those materials that there was a question concerning memory, and that supported his declination decision, specifically in reliance upon the Zwonitzer materials.

THE COURT:  And you take that position with respect to the parts of the discussion that's completely unrelated to classified materials and it touches on relationships with third parties?

Just one example, why does the public interest in Hur's --

MR. HALLORAN:  Your Honor --

THE COURT:  Yes?

MR. HALLORAN:  If we're going to get into the contents of the redacted material, I think we --

THE COURT:  I'm not going to get into specifics, nothing beyond what you all put in your briefs, which I don't

think were redacted.  Did you file redacted briefs?

MR. HALLORAN:  We did not.

THE COURT:  So I'm just -- in general -- I'm not going to talk about any specific comment, but for example -- I think you alluded to this in your briefs -- discussion about campaign decisions and aides and the like, how is that necessary -- why is that necessary for the public to have a sense of Hur's investigation and conclusion?

MR. HALLORAN:  I understand your point, Your Honor. Our view is that it's the totality of the information that was considered by Mr. Hur, and his recollection of past events in different contexts tends to support a good memory, which would undermine the declination decision.  On the other hand, there are other instances where there are questions about memory that would support the declination decision.

THE COURT:  I can understand that, but it's just -- it's difficult, if the Court gets there -- and I'm not saying I am.  But if the Court were to get to this stage, it's difficult to see why, in order to assess the former president's competency and manner of speaking from personal portions of the audio that don't reflect any confusion or lack of memory, why there's a high enough public interest in those portions of the tape and the audio that would exceed his own privacy interests with respect to those portions?

MR. HALLORAN:  Your Honor, ultimately, it's a

balancing test.  And in terms of the privacy interests, the political deliberations, for instance, have been the subject of a chapter of the memoir.  So to the extent that there's a public interest in assessing his recollection on the totality of the evidence before Mr. Hur, there's relevance there.  On the other hand, I understand your point.

THE COURT:  So in terms of assessing the department's decision, it did switch itself on the applicability of the exemptions.  And you agree that if the Court reaches the stage, that the Court should be reviewing the department's decision under an abuse of discretion standard?

MR. HALLORAN:  If the hurdles under the reverse FOIA case fall and also the Privacy Act are surmounted here, we believe that the appropriate determination is to assess the department's exercise of discretion in making a judgment call, in making a balanced decision.

And I believe that --

THE COURT:  But that's an abuse of discretion standard, is it not, that the Court is assessing it?

MR. HALLORAN:  Generally, yes, Your Honor.

THE COURT:  All right.  And if I get there, to what extent should the Court take into account the fact that the department routinely -- in cases that come across my docket and many other judges on this case, routinely assert 7C in FOIA cases to protect civilians, witnesses, law enforcement officers,

and even defendants before conviction.

And your position here, as I see it, would it not give you carte blanche to disclose any portion of an investigative case file that you decided you wanted to disclose; the department could?

MR. HALLORAN:  Your Honor, that's not this case.  We have a very discrete set of materials.  They've been redacted.  They are limited.  They have been generally referenced and quoted and referred to in public fora.

We have a limiting principle here, which is we have a balance decision with respect to a former sitting president of the United States, a very singular circumstance, and that balancing is a purely discretionary matter.

THE COURT:  But what is the limiting principle there?

MR. HALLORAN:  I think the limiting principle is: What did Robert Hur rely upon specifically in making his declination decision?

THE COURT:  All right.  But prosecutors all the time decline cases.  So if the public wants to know why an AUSA declined a case, does the public have a right to have an investigative file turned over to assess whether the government did its job?

MR. HALLORAN:  The answer to that, Your Honor, is yes. *Citizens -- CREW versus DOJ,* D.C. Circuit 2014, this very issue was presented to the Court, and the D.C. Circuit overruled the

district court decision withholding on 7C grounds things like FBI 302s and investigatory materials.

And here's the public interest --

THE COURT:  Wait, wait.  Sorry to interrupt.  But that was the government withholding, right, not producing?

MR. HALLORAN:  But it was remanded by the D.C. Circuit in that case, Your Honor, and this was what the D.C. Circuit said.

THE COURT:  Okay.  Go ahead.  Sorry to interrupt.

MR. HALLORAN:  "Disclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion, whether the government had the evidence but nevertheless pulled its punches."

That's the issue:  Does the information that is subject to disclosure bear upon and shed light upon agency action?  That is the public interest.

THE COURT:  And so the outcome in that case was the case file was basically opened in full, or was it remanded for the district court to parse through it again?

MR. HALLORAN:  Well, that's what happened, Your Honor. In that case, the DOJ took the position that there was very little public interest, and there was a heightened privacy interest, and the D.C. Circuit disagreed with that conclusion and remanded the case for further proceedings.

THE COURT:  But again, the D.C. Circuit didn't say the entire file needs to be disclosed, did it?

MR. HALLORAN:  Absolutely not, Your Honor; absolutely not.

THE COURT:  Okay.  So I think -- and I am going to ask, because I don't have, I don't think -- correct me if I'm wrong, but I don't think the record reflects exactly what parts of the transcript and tape have been released to date in other litigation.

Am I correct about that?

MR. HALLORAN:  Your Honor, if I could clarify.  There was a Weinsheimer declaration that was put in the record earlier in this case.  We cite it in the papers.  It was Exhibit P.  And Exhibit P is the transcript of -- the Zwonitzer transcript of the conversations with President Biden.

And the determination was made by the Justice Department to release, as a part of that transcript, those excerpts that were actually quoted in the Hur report.

So that's --

THE COURT:  So it's only what's quoted in the Hur report?

MR. HALLORAN:  That is what has been produced in this action, yes, Your Honor.

THE COURT:  Okay.  So, Mr. Halloran, in the *CREW* case you cited -- I mean, I can appreciate that there can be a public

App-564

interest in whether the government did its job well or acted illegally, and here, there is certainly a public interest in the special counsel's investigation of this matter.  So I completely understand that there's a strong public interest in parts of the transcript and tape.  But the question is the extent of -- what part of the interest outweighs the former president's privacy interests.

And so it sounds like your position is, basically, because Hur reviewed the entire tapes/transcript, the public has an interest that is so great that it overrides the former president's interest in any portion of that transcript.

Is that fair?

MR. HALLORAN:  Your Honor, I'm not prepared to comment about that position, Your Honor, but I do appreciate your point, and if possible, if this Court were to invite further consideration of that issue, I'm confident that we would be able to match up specific portions of the Hur report to different sections that have been released, which do deal with the question of memory.

THE COURT:  All right.  Well, I had understood the Winn declaration and your briefing to assert categorically that the entire transcript, the entire tape needed -- minus you do have some redactions.  I do want to acknowledge that there are redactions that have been done.

But I thought that that was -- that process was complete

and what I had before me now was only those portions of the tape and transcript that you felt the public interest was so great that it outweighed the former president's privacy interests.

But you're saying not necessarily true?

MR. HALLORAN:  Your Honor, our position is that the entire Zwonitzer material, minus the redactions, should be disclosed.

THE COURT:  All right.  So again, that portion that should be disclosed now is so important to the public interest that it outweighs all of the former president's privacy interests?

MR. HALLORAN:  We believe that the balancing that was struck by the department supports that position, Your Honor.

THE COURT:  All right.  Are there any other points, Mr. Halloran, you want to make?

I understand the department has several levels of argument.  So I'm not -- I don't mean to telegraph that I've decided any of these issues.  I think they are very difficult and issues of first impression.

But is there anything that we haven't discussed that you would like to raise before I ask Mr. Dewey if he has anything to add to what you've said?

MR. HALLORAN:  Nothing further, Your Honor.  Thank you for your consideration.

THE COURT:  Of course.

Mr. Dewey?

MR. DEWEY:  Yes, Your Honor.

THE COURT:  Any points you would like to make on the areas that I've covered with Mr. Halloran or the plaintiff's attorneys?

MR. DEWEY:  Certainly, Your Honor.  I would like to start with the questions Your Honor was asking about the prior materials from the materials that are in dispute.

And I would direct Your Honor to paragraphs 5 and 6 of the Winn declaration.  And those paragraphs explain, Your Honor, that there were dozens of hours of recordings between former President Biden and Mr. Zwonitzer and that the approximately two-and-a-half hours and 117 pages of transcripts were those materials that Special Counsel Hur called out from that broader universe and determined were a curated set that were important to and underlie his decision.

So I just wanted to clarify, Your Honor, that this is not the entire universe of what is colloquially referred to as the "Zwonitzer tape."  It is that curated set.  And as Your Honor may recall, that is the set where there was an issue with the search in 2024 in locating those specific transcripts that the special counsel had made.

Now, unless Your Honor has any questions on the materials that are in dispute, I can turn to Your Honor's questions on the --

App-567

THE COURT: Well, let me follow up with one question on that. Yes, I did understand that that was a curated set of the tape. But as I understood it, it was a curated set that was developed because it's surrounded by mention of classified material.

Is that fair?

MR. DEWEY: Your Honor, that is not in the record, and my understanding from the record -- and again, it's 5 and 6 of the Winn declaration -- is that it was curated for general evidentiary significance. And I don't think Your Honor can conclude on the present record that that was confined to the issue of disclosure of classified information, given the centrality to Special Counsel Hur's declination decision that President Biden's mental state and hypothetical presentation to a hypothetical jury played.

THE COURT: Before we move on, let me ask, Mr. Halloran, do you have anything to add to this discussion regarding how the tape was curated?

MR. HALLORAN: My understanding, Your Honor, is that there were 70 hours of tape, 7-0, and Mr. Hur and his staff went through the recordings, made a judgment about what might be relevant to his investigation, and then pulled out of the 70 hours the two or two-and-a-half hours that we have today, and then asked a court reporter to transcribe those, and we have 117 pages as a result of that.

THE COURT:  I -- sorry to interrupt.  Go ahead.

MR. HALLORAN:  I'm sorry, Your Honor.  All of which reflect the deliberative process as to what he thought was relevant.

THE COURT:  All right.  Well, I don't want to give any examples, because these matters are sealed.  But there are certainly some aspects that it's hard to see the relevance as to those parts being a part of the smaller set.

Okay.  Mr. Dewey, go on.

MR. DEWEY:  Your Honor, if I can be helpful on that, the Hur report itself states that the recordings have significant evidentiary value as to -- and that's at Hur report 334.

And, Your Honor, the other way the tapes -- this portion of the tapes has been described, which is at paragraph 15 of the Weinsheimer declaration is, quote, potentially relevant to SCO's evaluation of whether to recommend criminal charges, closed quote.

And given the declination decision was, in our submission, primarily premised on President Biden's mental state, my submission to Your Honor is I don't think Your Honor can necessarily conclude from this record that it was only those portions that weren't classified information that were excerpted.

Unless Your Honor has a question --

App-569

THE COURT:  No, you can move on.  Thank you.

MR. DEWEY:  Your Honor asked why the broader set of tapes would be relevant, and, Your Honor, in our mind, that goes directly to the centrality that President Biden's mental state played to Special Counsel Hur's declination.

And the fact that -- I'm going to quote here, and this is laid out at page 30 of our brief, Your Honor.  The Hur report cited to these tapes as evidence that, quote, Biden's memory also appeared to have significant limitations, as evidenced by the recorded conversations.

And I will continue to quote, Your Honor.  This is page 30 of our brief, Hur report at 207.  Quote, Mr. Biden's recorded conversations with Zwonitzer from 2017 are also often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.

And I would also note, Your Honor, that both the Hur report at 248 and, more particularly, in Special Counsel Hur's congressional testimony at page 72 of the hearing transcript, Special Counsel Hur set out that these tapes provided a comparative evidence of President Biden's cognitive decline and presentation to a potential jury, Your Honor.

So as to the why the portions of the tape that Your Honor asked about that may not speak specifically to a classified document issue were relevant is because of the centrality that this curated set played to those two determinations by Special

Counsel Hur that I just discussed.

And if I can go on, Your Honor, on that point, to the extent it would be helpful, I do think that the discussion with Special Counsel Hur -- and we actually quote the relevant portion at page 13 of our brief, Your Honor.  The comparative discussion is particularly relevant, because it wasn't just the way the conversation presented.  It was comparative.

And I would note, Your Honor, that while the American people now have Special Counsel -- the audio of Special Counsel Hur's interview with President Biden, they do not have these imperative materials.

If I can move on, Your Honor, to Your Honor's question about what is the relevant public interest and how this case is unique, we would submit there are actually two interests involved, Your Honor.

The first is the one that you and Mr. Halloran were discussing that's reflected in -- true, in evaluating the special counsel's work, but there is a second interest in evaluating both whether or not President Biden was fit for office and in evaluating whether or not those in his administration, many of whom are still involved in politics, many of whom were allies of his administration in politics who are up for election in the mid-terms, covered up President Biden's cognitive decline.

And moving into distinguishing this case, Your Honor, I

think what is the key distinguishing factor is, Special Counsel Hur made his conclusions that there was a case to answer for releasing classified information and that he was declining because of President Biden's mental state and memory difficulties.

President Biden -- this is the sitting president of the United States, quote, with immense power -- attacks Special Counsel Hur from the White House.  His allies did.  His media group did.  His congressional allies did.  So you have what is, in effect, a dispute between the sitting president of the United States, who is Special Counsel Hur's boss's boss, and Hur.

And I think Your Honor, in our submission, it's that unique dispute, President Biden himself putting these facts in issue, distinguishes this case from any number of routine FOIA cases that Your Honor sees on that point.

And again, Your Honor, it's not just in our submission the review of Special Counsel Hur and whether he was right to decline in evaluating who was right in concluding there was a case to answer, him or his boss's boss, but there is also that separate interest in when the vice president attacked Special Counsel Hur to defend him but then in her memoir suggests well, there may have actually been an issue.  You have the question of the public interest in was there a coverup of President Biden's cognitive state.

And in our respectful submission, that is particularly

compelling because it doesn't just get into the efficient operation of government, bearing in mind again that the president is the Executive Branch, the Executive Branch is indivisible, it also implicates a broader question of the vice president, in my example, Your Honor, is duty bound under the 25th Amendment to ensure the chief executive is competent. And if she should cover up evidence of a cognitive decline, surely, there is a separate and powerful public interest.

And we would admit that we can't give you a case that considers this, because we've never seen this. The situation is sui generis, as the current president has said, Your Honor. As to authority, as to getting into a public controversy, I think certainly as to the audio that corresponds with the already released transcript, Your Honor has our submission, and I think the recent *Jigsaw* case speaks to that issue.

But as to the broader issue, I think Justice Sotomayor's analysis in the Vincent Foster suicide case is persuasive, because that again dealt with a fairly unique case with extensive controversy, political pugilists having it out, and her conclusion that although the specifics of the note were not public, they needed to be made public because of that overwhelming interest.

And unless Your Honor has any questions on my public interest submissions, I would like to make several submissions on the privacy interests.

THE COURT:  Okay.  You may briefly.

MR. DEWEY:  Your Honor, in our view, the privacy interests here are extraordinarily attenuated because, one, the materials have been redacted to protect for the privacy; two, they were extensively disclosed, as my friend discussed; but then three, Your Honor, we would point out these materials were developed specifically to sell a book.  The very sensitive topics my friend invoked in her briefing were picked because they would sell.  They would have a media appeal, and they would advance a still vibrant political career.

And we discussed those excerpts of Zwonitzer's testimony to Special Counsel Hur, and I would direct Your Honor to page 26 and 27 of our briefing where it is clear that these entire recordings were all about profit.  They were all about media advancement.  And we would submit that that severely undercuts, if not extinguishes, the relevant privacy interests, Your Honor.

And we would also note, in the same testimony, Your Honor, there were no steps taken to protect this information.  It was retained.  There was no NDA.  There was no oral agreement.  There was nothing you would ordinarily see that would be undertaken.  It is as if you speak to a reporter without specifying it's off the record.  There was nothing done to protect it.

And then finally, Your Honor --

THE COURT:  Sorry to interrupt, but weren't these

materials deleted by Zwonitzer?

MR. DEWEY:  The materials were deleted by Zwonitzer after the fact because he felt he should keep them private, Your Honor, and was concerned about their release.  But that doesn't go to the nature of the commercial arrangement and the fact that President Biden, when this was done, took no steps to protect it through normal commercial measures.

You might expect my friend to point to an NDA.  You might expect my friend to point to an oral NDA.  You might expect my friend to point to a "Zwonitzer actually violated the contract by not returning source materials."  Those are standard in these types of sensitive negotiations, Your Honor.  None were undertaken.

And again, the entire purpose -- and I want to focus particularly on this point, Your Honor.  Zwonitzer testified that the private topics of the book were selected to appeal to, quote, what the American public would be interested in.

In other words, the death of Beau Biden, to take one of my friend's example, was selected because it would sell, and that's why it was discussed --

THE COURT:  So, Mr. Dewey, I haven't read the book, but I would presume this is the case with many such projects; that whatever is said to the writer doesn't necessarily make it into the book and that the individual whose biography it is has a lot of say as to what actually goes into the book and that a

App-575

lot is provided for context and background that never sees the light of day.

So I don't know that everything that is said in private about creating a book necessarily makes it public in the same sense that those general subject areas end up being in the book.

MR. DEWEY:  Your Honor, I think certainly over the course of book-writing, that might be true.  But again, Your Honor, that would only go to the level of the privacy interest and doesn't extinguish the commercial need or political motive.

And if I can, Your Honor --

THE COURT:  I understand; I understand that point.

MR. DEWEY:  To the second point, Your Honor, perhaps that is true in other books, but we don't see any sort of contractual provisions or testimony from President Biden or Zwonitzer that there were any such protections.  We have never seen a contract that said President Biden had absolute control, although one might presume it because he did review the book.  That is in the record.  But we've never seen anything to protect these tapes to ensure that they were never made public.

THE COURT:  Wasn't there a preexisting friendship relationship between the former president and Zwonitzer?

MR. DEWEY:  Your Honor, that's true, but I don't think that would go to that point.  It's no different than if I speak to my close friend who is a reporter without an explicit understanding that it's off the record.  It's on the record.

And if I speak to a colleague of mine about a private issue and I want to keep it private and have a legal question, I engage them to act as my counsel.

If I need a doctor who is a friend, I still engage them to act medically so I'm protected by HIPAA.

My point is, not only do you have the predominant commercial purpose, but you also have the failure to protect the materials.

Now, I know my friend is likely to say there were subsequent actions, but those all related to a blanket invocation of executive privilege, Your Honor. They did not relate to any contemporaneous protection that would reflect the nature of these materials.

And that takes me to my last point. And I take it Your Honor may be against me on this, but there is no competent evidence of these privacy interests, given we are dealing with a redacted set.

And, Your Honor, I -- at page 41 and 42 of our papers, we've gone through my friend's submissions, and they rely upon ipsa dixit or hearsay with an unspecified declarant.

Now, we would submit, for the reasons we said in our papers, that is just not sufficient. In particular, we point the Court to, I believe it was, Judge McFadden's position in *Montgomery versus Barr,* pointing out that where you have attorney declarations with hearsay and you have a client with a

history of confabulation -- and we all remember why President Biden had to drop out in 1988; so certainly, he has that history -- that the Court should view an attorney declaration with skepticism.

So I would -- I agree with my friend, Mr. Halloran, that there is a failure of proof here.

And if I may, Your Honor, unless Your Honor has any specific questions on that privacy interest, I would like to take a brief step back and address harm and the equities.

THE COURT:  All right.  Very briefly.

MR. DEWEY:  Certainly, Your Honor.

I would just say, we would reiterate that for the same reason and the same lack of proof, there is an issue showing the harm from its specific curated subset is grave and certain.

And I did want to point out from a timing perspective, Your Honor, we do think, given that second public interest and were members of Congress who were running for reelection who attacked Special Counsel Hur and covering for President Biden's decline or more broadly the issue of was President Biden's decline covered up, that does continue to have relevancy.  We see the current president speak about it.  We see disputes about that. It is going to be relevant to the mid-terms.  So there is not only an historical public interest in our submission, but a forward-looking interest, which in our view goes to both the harm and the equities.

Unless the Court has any questions, I will end my submissions there.

THE COURT:  Thank you, Mr. Dewey.

Ms. Jeffress or Ms. Goodnature, would you like to respond to anything Mr. Halloran or Mr. Dewey has stated?

MS. JEFFRESS:  This is Amy Jeffress for President Biden.  We do have a few responses to the Court's questions and counsel's representations.

Starting with the privacy interests here, the Court has reviewed this material, and I think it speaks for itself.  And so I won't belabor the point.  But these were private conversations.  They were President Biden's reflections on his career and conversations in the privacy of his own home with a trusted ghost writer whom he knew and had a relationship with, as the Court has observed.

And so these conversations were private.  They were never intended for public release.  And as the Court pointed out, it was up to President Biden and Mr. Zwonitzer to choose what portions of these conversations they included in the book, and they did so.

These conversations were also just not -- they're very natural conversations.  President Biden is flipping through notes.  You can hear that on the audio.  They're not intended for public release.  They're highly private.  And the harm to him in producing them to the Heritage Foundation would be

irreparable and would not be the type of harm that could be subject to financial compensation. It's privacy harms that we don't think are quantifiable in that way.

So the -- to put them in context as well, Your Honor, to go back to the point that the Court and Mr. Halloran made about Brad Weinsheimer's declaration, Brad Weinsheimer's declaration did attach a highly redacted version of these transcripts that Special Hur's team had curated. But the quotes that Rob Hur relied on in his conclusions were unredacted, and they were unredacted in the context of those interviews.

So that's the material that Brad Weinsheimer and his team back in 2024 went through and determined which of these statements could be released and should be released consistent with the public interest and which statements were subject to redactions for all of the proper FOIA exemptions, including Exemption 7C, which as the government's briefing in 2024 made clear were at its apex in the context of an investigation of an individual and evidence collected in the course of that investigation that was supposedly -- that was supposed to be used only in connection with that investigation and not subject to public release.

The only relevant public interest in the FOIA balancing analysis, too, to be clear is the extent to which the disclosure of the information sought would shed light on the agency's performance of its statutory duties and the function of

government.  And so much of what Mr. Dewey just offered as rationale for the release of these materials really does not apply in this case and is not relevant.  We would just add that.

And one more point, and then I'll just conclude, to go back to one of the Court's concerns.  With respect to Mr. Hur's observations about President Biden's memory and his demeanor, these tapes were not necessarily the best evidence of that.

So these tapes were, again, recordings of President Biden interacting with Mr. Zwonitzer.  The audio is really taken out of context when you're not in the room to see who is flipping pages, who is walking in and out of the room, and what the overall climate is.

So I think it was of fairly minimal value to Rob Hur in assessing the president's demeanor, especially compared to Rob Hur's own interview of President Biden in 2022.

And so that is a much more relevant piece of information for purposes of Rob Hur's conclusions about President Biden's -- the impression that a jury would get from President Biden, had he chosen to prosecute President Biden.  These recordings were made in 2016 and 2017, and taking them out of context does not really reveal very much at all about Rob Hur's conclusions in that regard.

The substance of those conversations that were relevant to Rob Hur's prosecution decision are relevant, and those are the material that Brad Weinsheimer and his team already released

back in 2024.

And then finally, Your Honor, just to go back to one of the points that the Court made, which is that a ruling against President Biden here could have devastating consequences for anyone subject to a criminal investigation, because if this section is unreviewable, as the Department of Justice claims, the Department of Justice can collect investigation using all of its sensitive law enforcement authority and -- collect evidence in courses of investigation by using all of this authority and then decide whether or not they can prosecute an individual or try to put a case in front of a grand jury and lose that case, but then decide to release the evidence to the Heritage Foundation in response to a FOIA request.  And that should not be the case, Your Honor.

Your Honor, you were asking earlier about whether there are cases that are sort of on point here, and there really aren't very many.  We've been unable to find cases that are analogous because the department has, throughout history, taken great pains to protect evidence that it collects in the course of criminal investigations and does protect that evidence invoking Exemption 7C, which Congress passed for this purpose.

And so we feel that the harm to President Biden would be irreparable, that the department's decision here and this change in position that was made for what we believe are purely partisan purposes is an abuse of discretion.

At points, the department's -- or Heritage Foundation's arguments and, to some extent even, the Department of Justice's arguments seem to be that President Biden has lost his privacy rights because he was the former president and a public figure who was investigated.  And we don't believe that that's the law.  We don't believe that that's ever been the law.  And we don't believe that that should be the law.

And so we would ask that the Court uphold the law and protect all individuals who might be subject to criminal investigation, including former President Biden, against this type of abuse of power.

THE COURT:  All right.  Thank you, Counsel.

Mr. Halloran, on the delayed release of these documents, do I have a commitment from you that you will not release these documents to Heritage?

I understand there's a related case before another judge -- well, not that I determined related, but a similar case before another judge dealing with Congress.

What I'm asking is, your commitment to withhold the release of these documents will extend until Friday, June 19, at 5:00 p.m. to give me time to issue my ruling?

MR. HALLORAN:  Yes, Your Honor.  And I would like to confirm that that commitment pertains only to this FOIA case.

THE COURT:  Understood; understood.

All right.  Anything else, Counsel?

App-583

MR. DEWEY: Yes, Your Honor. This is Mr. Dewey speaking.

I take it from the timing Your Honor is against it, but I would -- just for clarity of the record, we would respectfully request a ruling on our submission that we cross-examine former President Biden.

THE COURT: I'm going to deny that request. I think that I can determine based on the transcripts and tapes. I don't think there's a factual dispute that needs to be resolved for me to decide the issues before me and the motion for preliminary injunction. I think that the tapes themselves and the audio give me adequate factual record on which to rule.

MR. DEWEY: Thank you, Your Honor.

THE COURT: All right. Thank you, Counsel.

(Proceedings adjourned at 3:11 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.




/s/ Sara A. Wick                    June 15, 2026
SIGNATURE OF COURT REPORTER         DATE

App-585

APPEAL,STAYED,TYPE I−FOIA

**U.S. District Court**
**District of Columbia (Washington, DC)**
**CIVIL DOCKET FOR CASE #: 1:24−cv−00645−DLF**

HERITAGE FOUNDATION et al v. U.S. DEPARTMENT OF JUSTICE
Assigned to: Judge Dabney L. Friedrich
Cause: 05:552 Freedom of Information Act

Date Filed: 03/06/2024
Jury Demand: None
Nature of Suit: 895 Freedom of Information Act
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**HERITAGE FOUNDATION**                     represented by     **Daniel D. Mauler**
HERITAGE ACTION FOR AMERICA
214 Massachusetts Avenue NE
Washington, DC 20002
202−617−6975
Email: dan.mauler@heritage.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Bossert Clark**
OVERSIGHT PROJECT
211 N. Union Street
Alexandria, VA 22314
202−279−1396
Email: jeff@itsyourgov.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Neal Cornett**
THE OVERSIGHT PROJECT
211 North Union Street
Alexandria, VA 22314
606−275−0978
Email: neal@itsyourgov.org
*ATTORNEY TO BE NOTICED*

**Kyle Brosnan**
THE OVERSIGHT PROJECT
211 North Union Street
Alexandria, VA 22314
845−674−5589
Email: Kyle@ItsYourGov.org
*ATTORNEY TO BE NOTICED*

**Max Taylor Matheu**
2525 N George Mason Dr
Arlington, VA 20007
727−249−5254
Email: maxmatheu@outlook.com
*TERMINATED: 09/02/2025*
*ATTORNEY TO BE NOTICED*

**Samuel Everett Dewey**
CHAMBERS OF SAMUEL EVERETT DEWEY, LLC
2200 12th Court North
Apt. 609
Arlington, VA 22201
(703) 261−4194
Email: samueledewey@sedchambers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MIKE HOWELL**                                    represented by    **Daniel D. Mauler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Bossert Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Neal Cornett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Brosnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max Taylor Matheu**
(See above for address)
*TERMINATED: 09/02/2025*
*ATTORNEY TO BE NOTICED*

**Samuel Everett Dewey**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**                    represented by    **Cameron Drew Silverberg**
DOJ−CIV
1100 L Street NW
Washington, DC 20005
202−353−9265
Email: cameron.d.silverberg@usdoj.gov
*TERMINATED: 05/02/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Shapiro**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 514−5302
Fax: (202) 616−8470
Email: Elizabeth.Shapiro@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J Halloran , Jr**
DOJ−Civ
Civil Division, Federal Programs Branch
1100 L Street, NW
Ste 12514
Washington, DC 20005
202−598−3398
Email: john.j.halloran.jr@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

App-587

**Joshua Charles Abbuhl**
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
202−987−5228
Email: jabbuhl@elias.law
*TERMINATED: 04/07/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert W. Meyer**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202−305−0872
Email: robert.w.meyer@usdoj.gov
*TERMINATED: 02/09/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**JOSEPH R. BIDEN, JR.**                represented by   **Amy Jeffress**
HECKER FINK LLP
1050 K St NW
Suite 1040
Washington, DC 20001
202−742−2655
Email: ajeffress@heckerfink.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**H. Atticus Ballesteros**
HECKER FINK LLP
1050 K St NW
Suite 1040
Washington, DC 20001
929−458−6482
Email: aballesteros@heckerfink.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared M. Hirschfield**
HECKER FINK LLP
1050 K Street NW
Ste 10th Floor
Washington, DC 20001
646−791−9328
Email: jhirschfield@heckerfink.com
*TERMINATED: 06/12/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaitlin Brooke Konkel**
HECKER FINK LLP
1050 K St NW
Suite 1040
Washington, DC 20001
332−251−0482
Email: kkonkel@heckerfink.com
*ATTORNEY TO BE NOTICED*

**Taisa M. Goodnature**

App-588

HECKER FINK LLP
1050 K Street NW
Ste 10th Floor
Washington, DC 20001
929−294−2548
Email: tgoodnature@heckerfink.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2024 | 1 | COMPLAINT against U.S. DEPARTMENT OF JUSTICE ( Filing fee $ 405 receipt number ADCDC−10737838) filed by HERITAGE FOUNDATION, MIKE HOWELL. (Attachments: # 1 Civil Cover Sheet, # 2 Summons AG, # 3 Summons DOJ, # 4 Summons USAO, # 5 Exhibit 1 Part 1, # 6 Exhibit 1 Part 2, # 7 Exhibit 2, # 8 Exhibit 3, # 9 Exhibit 4, # 10 Exhibit 5, # 11 Exhibit 6, # 12 Exhibit 7, # 13 Exhibit 8, # 14 Exhibit 9, # 15 Exhibit 10, # 16 Exhibit 11, # 17 Exhibit 12)(Dewey, Samuel) (Entered: 03/06/2024) |
| 03/07/2024 | | Case Assigned to Judge Dabney L. Friedrich. (zed) (Entered: 03/07/2024) |
| 03/07/2024 | 2 | SUMMONS (3) Issued Electronically as to U.S. DEPARTMENT OF JUSTICE, U.S. Attorney and U.S. Attorney General. (Attachment: # 1 Notice and Consent)(zed) (Entered: 03/07/2024) |
| 03/07/2024 | 3 | STANDARD ORDER for Civil Cases. See text for details. Signed by Judge Dabney L. Friedrich on March 7, 2024. (lcdlf2) (Entered: 03/07/2024) |
| 03/12/2024 | 4 | NOTICE of Appearance by Eric Neal Cornett on behalf of All Plaintiffs (Cornett, Eric) (Main Document 4 replaced on 3/13/2024) (mg). (Entered: 03/12/2024) |
| 03/12/2024 | 5 | NOTICE of Appearance by Kyle Brosnan on behalf of All Plaintiffs (Brosnan, Kyle) (Main Document 5 replaced on 3/13/2024) (mg). (Entered: 03/12/2024) |
| 03/13/2024 | 6 | AMENDED COMPLAINT against U.S. DEPARTMENT OF JUSTICE filed by HERITAGE FOUNDATION, MIKE HOWELL. (Attachments: # 1 Exhibit 1 Part 1, # 2 Exhibit 1 Part 2, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit Redline)(Dewey, Samuel) (Entered: 03/13/2024) |
| 04/08/2024 | 7 | ANSWER to 6 Amended Complaint, by U.S. DEPARTMENT OF JUSTICE.(Abbuhl, Joshua) (Entered: 04/08/2024) |
| 04/09/2024 | 8 | MOTION Status Conference by HERITAGE FOUNDATION, MIKE HOWELL. (Dewey, Samuel) (Entered: 04/09/2024) |
| 04/09/2024 | 9 | DECLARATION *of Samuel Everett Dewey* by HERITAGE FOUNDATION, MIKE HOWELL re 8 MOTION Status Conference . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Dewey, Samuel) (Entered: 04/09/2024) |
| 04/12/2024 | | MINUTE ORDER requiring the parties to MEET AND CONFER and file a Meet and Confer report proposing a schedule for further proceedings. The report should address the status of the plaintiffs' FOIA request, including the anticipated number of documents responsive to the request and the anticipated date(s) for release of the requested documents. The parties shall also discuss the plaintiffs' request for expedited processing. The parties shall file the Meet and Confer report on or before May 12, 2024. The Court does not believe that its involvement in these discussions is warranted before the meet and confer occurs. As such, the plaintiffs' 8 Motion for Status Conference is DENIED. So Ordered by Judge Dabney L. Friedrich on April 12, 2024. (lcdlf2) (Entered: 04/12/2024) |
| 05/07/2024 | 10 | NOTICE of Appearance by Max Taylor Matheu on behalf of All Plaintiffs (Matheu, Max) (Main Document 10 replaced on 5/7/2024) (mg). (Entered: 05/07/2024) |
| 05/08/2024 | 11 | NOTICE OF SUBSTITUTION OF COUNSEL by Cameron Drew Silverberg on behalf of U.S. DEPARTMENT OF JUSTICE Substituting for attorney Joshua C. |

| | | Abbuhl (Silverberg, Cameron) (Entered: 05/08/2024) |
|---|---|---|
| 05/12/2024 | 12 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Silverberg, Cameron) (Entered: 05/12/2024) |
| 05/24/2024 | | NOTICE of Hearing: Status Conference set for 6/10/2024 at 2:00 PM in Courtroom 14− In Person before Judge Dabney L. Friedrich. (zjch, ) (Entered: 05/24/2024) |
| 06/10/2024 | | Minute Entry for Status Conference held on 6/10/2024 before Judge Dabney L. Friedrich: Motions due by 6/24/2024. Responses due by 7/8/2024. Replies due by 7/15/2024. Status Report due by 6/14/2024. Court Reporter Sara Wick. (zjch, ) (Entered: 06/10/2024) |
| 06/10/2024 | | MINUTE ORDER. As discussed during today's status hearing, the defendant shall file its motion for summary judgment on the adequacy of the search on or before June 24, 2024; the plaintiffs' opposition shall be filed on or before July 8, 2024; and any reply shall be filed on or before July 15, 2024. On or before June 16, 2024, the parties shall meet and confer and file a joint status report informing the Court of their positions on the briefing schedule for the remaining issues in this case. Also, to the extent possible, the parties shall confer and inform the Court whether the scope of search can be narrowed with respect to the 70 hours of audio recordings. So Ordered by Judge Dabney L. Friedrich on June 10, 2024. (lcdlf2) (Entered: 06/10/2024) |
| 06/10/2024 | 13 | NOTICE *of Letter* by HERITAGE FOUNDATION, MIKE HOWELL (Dewey, Samuel) (Entered: 06/10/2024) |
| 06/16/2024 | 14 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Silverberg, Cameron) (Entered: 06/16/2024) |
| 06/16/2024 | 15 | DECLARATION *Max Taylor Matheu* by HERITAGE FOUNDATION, MIKE HOWELL re 14 Status Report. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Matheu, Max) (Entered: 06/16/2024) |
| 06/17/2024 | | NOTICE of Hearing: Status Conference set for 6/18/2024 at 2:15 PM in Courtroom 14− In Person before Judge Dabney L. Friedrich. (zjch, ) (Entered: 06/17/2024) |
| 06/17/2024 | | MINUTE ORDER. In preparation for tomorrow's status hearing at 2:15 PM in Courtroom 14, the parties shall be prepared to discuss the rate of production and the extent to which the rate of production of audio tapes can be compared to that of pages of documents. So Ordered by Judge Dabney L. Friedrich on June 17, 2024. (lcdlf2) (Entered: 06/17/2024) |
| 06/18/2024 | 16 | NOTICE of Appearance by Daniel D. Mauler on behalf of All Plaintiffs (Mauler, Daniel) (Entered: 06/18/2024) |
| 06/18/2024 | 17 | RESPONSE TO ORDER OF THE COURT re Order, filed by HERITAGE FOUNDATION, MIKE HOWELL. (Attachments: # 1 Exhibit Weinsheimer Decl. Part 1 (24−cv−700), # 2 Exhibit Weinsheimer Decl. Part 2 (24−cv−700), # 3 Exhibit Weinsheimer Decl. Part 3 (24−cv−700))(Dewey, Samuel) (Entered: 06/18/2024) |
| 06/18/2024 | 18 | NOTICE of Appearance by Joshua Charles Abbuhl on behalf of U.S. DEPARTMENT OF JUSTICE (Abbuhl, Joshua) (Entered: 06/18/2024) |
| 06/18/2024 | | Minute Entry for proceedings held before Judge Dabney L. Friedrich: Status Conference held on 6/18/2024. (Court Reporter Sara Wick.) (zjch, ) (Entered: 06/18/2024) |
| 06/18/2024 | | MINUTE ORDER. As discussed during today's status hearing, the Court's June 10, 2024 minute order is MODIFIED, and the defendant's motion for summary judgment on the adequacy of the search is now due on or before June 27, 2024. On or before June 21, 2024, the parties shall file a joint status report that discusses (1) the possibility of further narrowing the scope of the plaintiffs' search and (2) the revision of the briefing schedule. So Ordered by Judge Dabney L. Friedrich on June 18, 2024. (lcdlf2) (Entered: 06/18/2024) |
| 06/21/2024 | 19 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Silverberg, Cameron) (Entered: 06/21/2024) |

| 06/22/2024 | | MINUTE ORDER. Upon consideration of the parties' 19 Joint Status Report, the briefing schedule is MODIFIED as follows: on or before July 1, 2024, the defendant shall file its motion for summary judgment; on or before July 9, 2024, the plaintiffs shall file any opposition; and on or before July 17, 2024, the defendant shall file any reply. On or before June 25, 2024, the parties shall file a joint status report updating the Court on their progress regarding the scope of the plaintiffs' request. So Ordered by Judge Dabney L. Friedrich on June 22, 2024. (lcdlf2) (Entered: 06/22/2024) |
|---|---|---|
| 06/25/2024 | 20 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Silverberg, Cameron) (Entered: 06/25/2024) |
| 07/01/2024 | 21 | MOTION for Partial Summary Judgment by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Bobak Talebian, # 3 Declaration of Bradley Weinsheimer, # 4 Proposed Order)(Silverberg, Cameron) (Entered: 07/01/2024) |
| 07/09/2024 | 22 | RESPONSE re 21 MOTION for Partial Summary Judgment filed by HERITAGE FOUNDATION, MIKE HOWELL. (Attachments: # 1 Statement of Facts)(Dewey, Samuel) (Entered: 07/09/2024) |
| 07/09/2024 | 23 | DECLARATION *of Max Matheu* by HERITAGE FOUNDATION, MIKE HOWELL re 22 Response to motion. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5)(Cornett, Eric) (Entered: 07/09/2024) |
| 07/09/2024 | 24 | Cross MOTION for Partial Summary Judgment by HERITAGE FOUNDATION, MIKE HOWELL. (See docket entry 22 to view document). (mg) (Entered: 07/10/2024) |
| 07/17/2024 | 25 | REPLY to opposition to motion re 24 MOTION for Partial Summary Judgment filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Response to Statement of Undisputed Material Facts, # 2 Supplemental Declaration of Bobak Talebian)(Silverberg, Cameron) (Entered: 07/17/2024) |
| 07/22/2024 | | NOTICE of Hearing:Status Conference set for 7/23/2024 at 9:00 AM in Telephonic/VTC before Judge Dabney L. Friedrich. (zjch, ) (Entered: 07/22/2024) |
| 07/22/2024 | 26 | NOTICE *Regarding Search* by U.S. DEPARTMENT OF JUSTICE (Silverberg, Cameron) (Entered: 07/22/2024) |
| 07/23/2024 | | MINUTE ORDER. In light of the defendant's 26 Notice Regarding Search, the parties shall file a joint status report stating their respective positions on the remaining issues in the case after they meet and confer. So Ordered by Judge Dabney L. Friedrich on July 23, 2024. (lcdlf2) (Entered: 07/23/2024) |
| 08/23/2024 | 27 | NOTICE *of Supplemental Search Declaration* by U.S. DEPARTMENT OF JUSTICE (Silverberg, Cameron) (Entered: 08/23/2024) |
| 08/28/2024 | 28 | Joint STATUS REPORT by HERITAGE FOUNDATION, MIKE HOWELL. (Attachments: # 1 Declaration of Samuel Everett Dewey, # 2 Exhibit Dewey Decl. Ex. 1, # 3 Exhibit Dewey Decl. Ex. 2, # 4 Exhibit Dewey Decl. Ex. 3, # 5 Exhibit Dewey Decl. Ex. 4)(Dewey, Samuel) (Entered: 08/28/2024) |
| 09/06/2024 | | MINUTE ORDER. Upon consideration of the parties' 28 Joint Status Report, the Court denies the plaintiff's request for bifurcated briefing on DOJ's withholdings related to audio files and transcripts of the Biden−Zwonitzer interviews. Although a significant public interest in the records remains, the urgency in resolving this dispute has diminished since President Biden withdrew from the presidential race. Moreover, bifurcated proceedings would lead to inefficiencies for the parties and the Court because DOJs withholdings for the audio files and transcripts raise common factual and legal issues, see Joint Status Report at 14, making multiple rounds of briefing largely repetitious and cumulative. Finally, any anticipated appeal by the government, see Joint Status Report at 15, would delay any release of records until well after the presidential election. For these reasons, the plaintiff's request for a bifurcated briefing schedule is denied. Accordingly, DOJ shall conclude processing of the remaining records in this case on or <u>before October 16, 2024</u>. On or <u>before October 16, 2024</u>, the parties shall file a joint status report proposing a schedule for briefing on the cross−motions for summary judgment. So Ordered by Judge Dabney L. Friedrich on September 6, 2024. (lcdlf2) (Entered: 09/06/2024) |

| 09/23/2024 | 29 | TRANSCRIPT OF PROCEEDINGS before Judge Dabney L. Friedrich held on 06/10/2024. Page Numbers: 1−35. Date of Issuance: 09/23/2024. Court Reporter: Sara Wick, telephone number 202−354−3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/14/2024. Redacted Transcript Deadline set for 10/24/2024. Release of Transcript Restriction set for 12/22/2024.(Wick, Sara) (Entered: 09/23/2024) |
|---|---|---|
| 09/23/2024 | 30 | TRANSCRIPT OF PROCEEDINGS before Judge Dabney L. Friedrich held on 06/18/2024. Page Numbers: 1−54. Date of Issuance: 09/23/2024. Court Reporter: Sara Wick, telephone number 202−354−3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/14/2024. Redacted Transcript Deadline set for 10/24/2024. Release of Transcript Restriction set for 12/22/2024.(Wick, Sara) (Entered: 09/23/2024) |
| 10/15/2024 | 31 | MOTION for Extension of Time to *Complete Processing and to file Joint Status Report* by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Text of Proposed Order)(Abbuhl, Joshua) (Entered: 10/15/2024) |
| 10/15/2024 | | MINUTE ORDER denying the government's 31 Motion for Extension of Time to Complete Processing and to File Joint Status Report. In its August 28, 2024 Joint Status Report, the government represented to the Court that it would expedite processing the remaining 117 pages of Biden−Zwonitzer transcripts and provide a final response to Plaintiffs by October 16, 2024. Joint Status Report, Dkt. 28, at 15. Based on those representations, the Court (1) rejected the plaintiffs' request that the Court order the government to process and release the records by September 18, 2024 and (2) rejected the plaintiff's request for bifurcated briefing on the two document sets at issue. See Minute Order of September 6, 2024. Given the great latitude the Court has already afforded the government, it will not entertain a motion for a two−week extension of time filed less than 24 hours before the Court−ordered deadline. Accordingly, the government's 31 Motion is DENIED. So Ordered by Judge Dabney L. Friedrich on October 15, 2024. (lcdlf2) (Entered: 10/15/2024) |
| 10/16/2024 | 32 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Abbuhl, Joshua) (Entered: 10/16/2024) |
| 10/17/2024 | | MINUTE ORDER. Upon consideration of the parties' 32 Joint Status Report, the defendant shall file its motion for summary judgment on the withholdings issue on or before November 13, 2024; the plaintiffs shall file their opposition and cross−motion |

| | | for summary judgment on or before November 27, 2024; the defendant shall file its opposition and reply on or before December 12, 2024; and the plaintiffs shall file their reply on or before December 23, 2024. So Ordered by Judge Dabney L. Friedrich on October 17, 2024. (lcdlf2) (Entered: 10/17/2024) |
|---|---|---|
| 10/17/2024 | | Set/Reset Deadlines: Cross Motions due by 11/27/2024. Response to Cross Motions due by 12/12/2024. Reply to Cross Motions due by 12/23/2024. Summary Judgment motions due by 11/13/2024. Response to Motion for Summary Judgment due by 11/27/2024. Reply to Motion for Summary Judgment due by 12/12/2024. (zjch, ) (Entered: 10/29/2024) |
| 11/13/2024 | 33 | MOTION for Summary Judgment by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Statement of Facts, # 4 Text of Proposed Order)(Silverberg, Cameron) (Entered: 11/13/2024) |
| 11/27/2024 | 34 | Partial MOTION for Partial Summary Judgment by HERITAGE FOUNDATION, MIKE HOWELL. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Dewey, Samuel) (Entered: 11/27/2024) |
| 11/27/2024 | 35 | RESPONSE re 33 MOTION for Summary Judgment filed by HERITAGE FOUNDATION, MIKE HOWELL. (Dewey, Samuel) (Entered: 11/27/2024) |
| 11/27/2024 | 36 | DECLARATION by HERITAGE FOUNDATION, MIKE HOWELL re 34 Partial MOTION for Partial Summary Judgment . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 47, # 47 Exhibit 49, # 48 Exhibit 50, # 49 Exhibit 51)(Dewey, Samuel) (Entered: 11/28/2024) |
| 12/12/2024 | 37 | REPLY to opposition to motion re 33 Motion for Summary Judgment filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Statement of Facts)(Silverberg, Cameron) (Entered: 12/12/2024) |
| 12/23/2024 | 38 | REPLY to opposition to motion re 34 Motion for Partial Summary Judgment filed by HERITAGE FOUNDATION, MIKE HOWELL. (Dewey, Samuel) (Entered: 12/23/2024) |
| 01/30/2025 | | MINUTE ORDER. In light of the defendant's 26 Notice Regarding Search and the parties' 28 Joint Status Report, the plaintiff's 21 Motion for Partial Summary Judgment and the defendant's 24 Cross−Motion for Partial Summary Judgment are denied as moot. So Ordered by Judge Dabney L. Friedrich on January 30, 2025. (lcdlf2) (Entered: 01/30/2025) |
| 04/07/2025 | 39 | NOTICE OF WITHDRAWAL OF APPEARANCE as to U.S. DEPARTMENT OF JUSTICE. Attorney Joshua Charles Abbuhl terminated. (Abbuhl, Joshua) (Entered: 04/07/2025) |
| 05/02/2025 | 40 | NOTICE OF SUBSTITUTION OF COUNSEL by Robert W. Meyer on behalf of U.S. DEPARTMENT OF JUSTICE Substituting for attorney Cameron Silverberg (Meyer, Robert) (Entered: 05/02/2025) |
| 09/02/2025 | 41 | NOTICE OF WITHDRAWAL OF APPEARANCE as to HERITAGE FOUNDATION, MIKE HOWELL. Attorney Max Taylor Matheu terminated. (Matheu, Max) (Entered: 09/02/2025) |
| 09/23/2025 | | MINUTE ORDER. In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24−cv−700, the parties shall file, on or before September 26, 2025, a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records. So Ordered by Judge Dabney L. Friedrich on September 23, 2025. (lcdlf2) (Entered: 09/23/2025) |

| 09/26/2025 | 42 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Meyer, Robert) (Entered: 09/26/2025) |
|---|---|---|
| 09/27/2025 | | MINUTE ORDER. Upon consideration of the parties' 42 Joint Status Report, this case is STAYED to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues. If the parties are unable to settle this case, they shall inform the Court, no later than October 15, 2025, so that the Court can schedule a hearing, if necessary, and promptly resolve all remaining legal issues. So Ordered by Judge Dabney L. Friedrich on September 27, 2025. (lcdlf2) (Entered: 09/27/2025) |
| 12/08/2025 | 43 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Meyer, Robert) (Entered: 12/08/2025) |
| 12/08/2025 | | MINUTE ORDER. Upon consideration of the parties' 43 Joint Status Report, it is ordered that the parties shall, on or before January 8, 2026, file another joint status report as to whether they have been able to settle the case or narrow the issues in dispute. So Ordered by Judge Dabney L. Friedrich on December 8, 2025. (lcdlf2) (Entered: 12/08/2025) |
| 12/09/2025 | | Set/Reset Deadlines: Joint Status Report due by 1/8/2026. (smc) (Entered: 12/09/2025) |
| 01/08/2026 | 44 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Meyer, Robert) (Entered: 01/08/2026) |
| 01/09/2026 | | MINUTE ORDER. Upon consideration of the parties' 44 Joint Status Report, it is ORDERED that the parties shall, on or before February 6, 2026, file another joint status report. So Ordered by Judge Dabney L. Friedrich on January 9, 2026. (lcdlf2) (Entered: 01/09/2026) |
| 02/06/2026 | 45 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Meyer, Robert) (Entered: 02/06/2026) |
| 02/06/2026 | | MINUTE ORDER. Upon consideration of the parties' 45 Joint Status Report, it is ORDERED that the parties shall, on or before March 6, 2026, file another joint status report. So Ordered by Judge Dabney L. Friedrich on February 6, 2026. (lcdlf2) (Entered: 02/06/2026) |
| 02/09/2026 | 46 | NOTICE OF SUBSTITUTION OF COUNSEL by John J Halloran, Jr on behalf of All Defendants Substituting for attorney Robert W. Meyer (Halloran, John) (Entered: 02/09/2026) |
| 03/06/2026 | 47 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Halloran, John) (Entered: 03/06/2026) |
| 03/06/2026 | | MINUTE ORDER. Upon consideration of the parties' 47 Joint Status Report, it is ORDERED that the parties shall, on or before April 8, 2026, file another joint status report. So Ordered by Judge Dabney L. Friedrich on March 6, 2026. (lcdlf2) (Entered: 03/06/2026) |
| 04/08/2026 | 48 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Halloran, John) (Entered: 04/08/2026) |
| 04/08/2026 | | MINUTE ORDER. Upon consideration of the parties' 48 Joint Status Report, it is ORDERED that the parties shall, on or before May 8, 2026, file another joint status report. So Ordered by Judge Dabney L. Friedrich on April 8, 2026. (lcdlf2) (Entered: 04/08/2026) |
| 05/08/2026 | 49 | NOTICE of Appearance by Jeffrey Bossert Clark on behalf of All Plaintiffs (Clark, Jeffrey) (Entered: 05/08/2026) |
| 05/08/2026 | 50 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Halloran, John) (Entered: 05/08/2026) |
| 05/12/2026 | 51 | MOTION to Intervene by JOSEPH R. BIDEN, JR.. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Amy Jeffress, # 3 Answer to Amended Complaint & Cross−Claims, # 4 Exhibit A − White House Counsel's Office Agreement, # 5 Exhibit B − Email re: Production Pursuant to Agreement, # 6 Exhibit C − Request from House Committee on the Judiciary, # 7 Text of Proposed Order)(Jeffress, Amy) (Entered: |

| | | 05/12/2026) |
|---|---|---|
| 05/12/2026 | 52 | SEALED DOCUMENT filed by JOSEPH R. BIDEN, JR. re 51 MOTION to Intervene (This document is SEALED and only available to authorized persons.)(Jeffress, Amy) (Entered: 05/12/2026) |
| 05/12/2026 | 53 | NOTICE of Appearance by Amy Jeffress on behalf of JOSEPH R. BIDEN, JR. (Jeffress, Amy) (Entered: 05/12/2026) |
| 05/12/2026 | 54 | NOTICE of Appearance by Kaitlin Brooke Konkel on behalf of JOSEPH R. BIDEN, JR. (Konkel, Kaitlin) (Entered: 05/12/2026) |
| 05/13/2026 | | MINUTE ORDER. Upon consideration of Joseph R. Biden's 51 Motion to Intervene, it is ORDERED that the plaintiffs shall file their opposition on or before May 15, 2026. The Department of Justice, which does not oppose this motion per the putative intervenor's filing, need not file a response. So Ordered by Judge Dabney L. Friedrich on May 13, 2025. (lcdlf2) Modified to edit due date on 5/13/2026 (zsmc). (Entered: 05/13/2026) |
| 05/13/2026 | 55 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Taisa M. Goodnature, Filing fee $ 100, receipt number ADCDC−12420610. Fee Status: Fee Paid. by JOSEPH R. BIDEN, JR.. (Attachments: # 1 Declaration of Taisa M. Goodnature, # 2 Certificate of Good Standing (DC), # 3 Text of Proposed Order)(Jeffress, Amy) (Entered: 05/13/2026) |
| 05/13/2026 | 56 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jared M. Hirschfield, Filing fee $ 100, receipt number ADCDC−12420613. Fee Status: Fee Paid. by JOSEPH R. BIDEN, JR.. (Attachments: # 1 Declaration of Jared M. Hirschfield, # 2 Certificate of Good Standing (NY), # 3 Text of Proposed Order)(Jeffress, Amy) (Entered: 05/13/2026) |
| 05/14/2026 | | MINUTE ORDER granting the putative intervenor's 55 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So Ordered by Judge Dabney L. Friedrich on May 14, 2026. (lcdlf2) (Entered: 05/14/2026) |
| 05/14/2026 | | MINUTE ORDER granting the putative intervenor's 56 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So Ordered by Judge Dabney L. Friedrich on May 14, 2026. (lcdlf2) (Entered: 05/14/2026) |
| 05/14/2026 | 57 | NOTICE of Appearance by Taisa M. Goodnature on behalf of JOSEPH R. BIDEN, JR. (Goodnature, Taisa) (Entered: 05/14/2026) |
| 05/14/2026 | 58 | NOTICE of Appearance by Jared M. Hirschfield on behalf of JOSEPH R. BIDEN, JR. (Hirschfield, Jared) (Entered: 05/14/2026) |
| 05/16/2026 | 59 | Memorandum in opposition to re 51 MOTION to Intervene filed by HERITAGE FOUNDATION, MIKE HOWELL. (Dewey, Samuel) (Entered: 05/16/2026) |
| 05/16/2026 | 60 | DECLARATION *of Samuel Everett Dewey (3rd)* by HERITAGE FOUNDATION, MIKE HOWELL re 59 Memorandum in Opposition. (Attachments: # 1 Exhibit 1)(Dewey, Samuel) (Entered: 05/16/2026) |
| 05/16/2026 | 61 | MOTION for Evidentiary Hearing by HERITAGE FOUNDATION, MIKE HOWELL. (See Docket Entry 59 to view document). (znmw) (Entered: 05/18/2026) |
| 05/21/2026 | 62 | ORDER granting in part and denying in part the intervenor's 51 Motion to Intervene and denying the plaintiffs' 61 Request for Evidentiary Hearing. See text for details. Signed by Judge Dabney L. Friedrich on May 21, 2026. (lcdlf2) (Entered: 05/21/2026) |
| 05/21/2026 | 63 | MEMORANDUM OPINION regarding the intervenor's 51 Motion to Intervene and the plaintiffs' 61 Request for Evidentiary Hearing. See text for details. Signed by Judge Dabney L. Friedrich on May 21, 2026. (lcdlf2) (Entered: 05/21/2026) |
| 05/28/2026 | | MINUTE ORDER. In his Complaint in *Biden v. Department of Justice*, 26−cv−1818, the intervenor notes that he "intends to file [a] preliminary injunction motion" in this case and that he is "conferring with the Department and the Heritage Plaintiffs regarding a proposed briefing schedule," 26−cv−1818, Dkt. 1, at 21, n.2, and his |

| | | |
|---|---|---|
| | | motion to intervene in this case further noted that he is "prepared to participate in renewed summary judgment briefing on an expedited basis," Dkt. 51, at 16. In light of the Department's June 15, 2026 disclosure date, it is ORDERED that, on or before 9:00 a.m. on May 29, 2026, the parties shall file a proposed briefing schedule for any forthcoming motions for emergency relief. So Ordered by Judge Dabney L. Friedrich on May 28, 2026. (lcdlf2) (Entered: 05/28/2026) |
| 05/29/2026 | 64 | NOTICE *Regarding Proposed Briefing Schedule (Joint)* by JOSEPH R. BIDEN, JR. re Order,,, (Jeffress, Amy) (Entered: 05/29/2026) |
| 05/29/2026 | | MINUTE ORDER. Upon consideration of the parties' 64 Notice, it is ORDERED that the defendant−intervenor's preliminary injunction motion shall be filed today, May 29, 2026. Any oppositions to the defendant−intervenor's motion shall be filed on or before June 5, 2026, and any reply in support of defendant−intervenor's motion shall be filed on or before June 9, 2026. So Ordered by Judge Dabney L. Friedrich on May 29, 2026. (lcdlf2) (Entered: 05/29/2026) |
| 05/29/2026 | 65 | MOTION for Preliminary Injunction by JOSEPH R. BIDEN, JR.. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Amy Jeffress (Supplemental), # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Text of Proposed Order)(Jeffress, Amy) (Entered: 05/29/2026) |
| 06/01/2026 | 66 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− H. Atticus Ballesteros, Filing fee $ 100, receipt number ADCDC−12455769. Fee Status: Fee Paid. by JOSEPH R. BIDEN, JR.. (Attachments: # 1 Declaration of H. Atticus Ballesteros, # 2 Certificate of Good Standing (DC), # 3 Text of Proposed Order)(Jeffress, Amy) (Entered: 06/01/2026) |
| 06/02/2026 | | MINUTE ORDER granting the intervenor's 66 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So Ordered by Judge Dabney L. Friedrich on June 2, 2026. (lcdlf2) (Entered: 06/02/2026) |
| 06/03/2026 | 67 | NOTICE of Appearance by H. Atticus Ballesteros on behalf of JOSEPH R. BIDEN, JR. (Ballesteros, H.) (Entered: 06/03/2026) |
| 06/05/2026 | 68 | Memorandum in opposition to re 65 MOTION for Preliminary Injunction filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Declaration)(Halloran, John) (Entered: 06/05/2026) |
| 06/05/2026 | 69 | Memorandum in opposition re 65 MOTION for Preliminary Injunction filed by HERITAGE FOUNDATION, MIKE HOWELL. (Dewey, Samuel) Modified event on 6/8/2026 (znmw). (Entered: 06/05/2026) |
| 06/05/2026 | 70 | DECLARATION *of Samuel Everett Dewey (Fifth)* by HERITAGE FOUNDATION, MIKE HOWELL re 69 Response to motion. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 2.5, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21)(Dewey, Samuel) (Entered: 06/05/2026) |
| 06/08/2026 | | MINUTE ORDER. Upon review of the briefs on the intervenor's 65 Motion for a Preliminary Injunction, it is apparent that the parties and the intervenor dispute whether the Zwonitzer materials, as redacted by the defendant, contain sensitive, personal information about the intervenor and his family. *Compare* Mem. Intervenor's Mot. for Prelim. Injunction 8, Dkt. 65−1 (defendant's redactions "are wholly inadequate to protect the privacy interests of President Biden and of third parties"), *with* Def.'s Opp'n 5, Dkt. 68 ("Information concerning President Biden's family's heath [*sic*] issues has been fully redacted. Information concerning President Biden's family has been fully redacted. Information concerning individuals who are not public figures has been redacted." (citations omitted)); Winn Decl. ¶¶ 6, 11, Dkt. 68−1 (similar). Accordingly, on or before noon on June 9, 2026, the defendant shall provide the Court with a copy of the Zwonitzer materials——as the defendant intends to release them to the plaintiffs——for an *in camera* review. So Ordered by Judge Dabney L. Friedrich on June 8, 2026. (lcdlf2) (Entered: 06/08/2026) |

| 06/08/2026 | 71 | NOTICE *Pursuant to Local Civil Rule 65.1(d)* by HERITAGE FOUNDATION, MIKE HOWELL re 65 Motion for Preliminary Injunction, (Dewey, Samuel) (Entered: 06/08/2026) |
|---|---|---|
| 06/09/2026 | 72 | NOTICE *Submission of the Zwonitzer Materials to the Court for In Camera Review* by U.S. DEPARTMENT OF JUSTICE re Order,,,, (Halloran, John) (Entered: 06/09/2026) |
| 06/09/2026 | 73 | REPLY to opposition to motion re 65 Motion for Preliminary Injunction, filed by JOSEPH R. BIDEN, JR.. (Jeffress, Amy) (Entered: 06/09/2026) |
| 06/10/2026 | 74 | NOTICE of Appearance by Elizabeth J. Shapiro on behalf of All Defendants (Shapiro, Elizabeth) (Entered: 06/10/2026) |
| 06/10/2026 | 75 | NOTICE *DELIVERY OF ZWONITZER MATERIALS [AMENDED]* by U.S. DEPARTMENT OF JUSTICE re Order,,,, (Halloran, John) (Entered: 06/10/2026) |
| 06/11/2026 | | MINUTE ORDER. A telephonic hearing on the intervenor's 65 Motion for a Preliminary Injunction is scheduled for June 11, 2026, at 2:00 p.m. The hearing will be accessible in Courtroom 24A. So Ordered by Judge Friedrich on June 11, 2026. (lcdlf2) (Entered: 06/11/2026) |
| 06/11/2026 | | MINUTE ORDER: The court will provide access for the public to telephonically attend the hearing scheduled for June 11, 2026, at 2:00 PM. The hearing can be accessed by dialing the Toll−Free Number: 833−990−9400 (Meeting ID: 117076001). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. The public is advised that in the event of technical issues, the public line will be terminated and will not be restored. Given that Court will be actively in session, listeners should not contact chambers should that occur. So Ordered by Judge Dabney L. Friedrich on June 11, 2026. (zdrf) (Entered: 06/11/2026) |
| 06/11/2026 | | Minute Entry for telephonic Motion Hearing proceedings held on 6/11/2026 before Judge Dabney L. Friedrich. Arguments heard and taken under advisement. Defendant agreed to delay the release of materials at issue on this matter until Friday, June 19, 2026 at 5 PM. (Court Reporter Sara Wick) (zdrf) (Entered: 06/11/2026) |
| 06/12/2026 | 76 | NOTICE OF WITHDRAWAL OF APPEARANCE as to JOSEPH R. BIDEN, JR.. Attorney Jared M. Hirschfield terminated. (Hirschfield, Jared) Modified event on 6/12/2026 (mg). (Entered: 06/12/2026) |
| 06/19/2026 | | MINUTE ORDER. The Court will issue shortly an Order denying the defendant−intervenor's 65 Motion for a Preliminary Injunction. During the June 11, 2026 Motions Hearing, the Department agreed to withhold production of the Zwonitzer materials to the plaintiffs until 5:00 p.m. on June 19, 2026. *See* June 11, 2026 Hr'g Tr. 43:19−23. Accordingly, it is ORDERED that any motion for an injunction pending appeal, *see* Fed. R. Civ. P. 62(d), shall be filed **no later than 2:00 p.m. today**; the plaintiffs shall file any response **no later than 3:30 p.m. today**. So Ordered by Judge Dabney L. Friedrich on June 19, 2026. (lcdlf1) (Entered: 06/19/2026) |
| 06/19/2026 | 77 | ORDER denying the defendant−intervenor's 65 Motion for a Preliminary Injunction. See text for details. Signed by Judge Dabney L. Friedrich on June 19, 2026. (lcdlf1) (Entered: 06/19/2026) |
| 06/19/2026 | 78 | MEMORANDUM OPINION regarding the defendant−intervenor's 65 Motion for a Preliminary Injunction. See text for details. Signed by Judge Dabney L. Friedrich on June 19, 2026. (lcdlf1) (Entered: 06/19/2026) |
| 06/19/2026 | 79 | Emergency MOTION for Injunction *Pending Appeal* by JOSEPH R. BIDEN, JR.. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Jeffress, Amy) (Entered: 06/19/2026) |

| 06/19/2026 | 80 | SUPPLEMENTAL MEMORANDUM to re 79 Emergency MOTION for Injunction *Pending Appeal* filed by JOSEPH R. BIDEN, JR.. (Jeffress, Amy) (Entered: 06/19/2026) |
|---|---|---|
| 06/19/2026 | 81 | Memorandum in opposition to re 79 Emergency MOTION for Injunction *Pending Appeal* filed by U.S. DEPARTMENT OF JUSTICE. (Halloran, John) (Entered: 06/19/2026) |
| 06/19/2026 | 82 | RESPONSE re 79 Emergency MOTION for Injunction *Pending Appeal* filed by HERITAGE FOUNDATION, MIKE HOWELL. (Dewey, Samuel) (Entered: 06/19/2026) |
| 06/19/2026 | | MINUTE ORDER granting in part the defendant−intervenor's 79 Emergency Motion for an Injunction Pending Appeal. It is ORDERED that the defendant is temporarily ENJOINED from disclosing to the plaintiffs the contested Zwonitzer materials for a period of three weeks to permit the Court of Appeals for the D.C. Circuit an orderly period to consider whether to grant an injunction pending appeal. So Ordered by Judge Dabney L. Friedrich on June 19, 2026. (lcdlf1) (Entered: 06/19/2026) |
| 06/19/2026 | 83 | MEMORANDUM OPINION regarding the defendant−intervenor's 79 Emergency Motion for an Injunction Pending Appeal. See text for details. Signed by Judge Dabney L. Friedrich on June 19, 2026. (lcdlf1) (Entered: 06/19/2026) |
| 06/22/2026 | 84 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 77 Order on Motion for Preliminary Injunction, 78 Memorandum & Opinion by JOSEPH R. BIDEN, JR.. Filing fee $ 605, receipt number ADCDC−12501780. Fee Status: Fee Paid. (Jeffress, Amy) (Entered: 06/22/2026) |
| 06/23/2026 | 85 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 84 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 06/23/2026) |