No. 26-5235

In the United States Court of Appeals for the District of Columbia Circuit

———————

HERITAGE FOUNDATION & MIKE HOWELL,
*Plaintiff- Appellants,*

*v.*

DEPARTEMENT OF JUSTICE.
*Defendant-Appellant.*

V.

JOSEPH R. BIDEN

*Defendant
Intervenor-Appellee*

———————

On Appeal from the United States District
Court for the District of Columbia

———————

**PLAINTIFFS OPPOSITION TO APPELLEE'S MOTION FOR
INJUNCTION PENDING APPEAL**

———————

JEFFREY BOSSERT CLARK

The Oversight Project
211 N. Union St
Alexandria, VA 22314
Email:  jeff@itsyourgov.org

SAMUEL EVERETT DEWEY
    *Counsel of Record*
Chambers of Samuel Everett Dewey LLC
2200 12th Court North Apt. 609
Arlington VA 22201
(703) 261-4194
Email:  Samueledewey@sedchambers.com

## CERTIFICATION

Plaintiffs certify as follows:

The Heritage Foundation has no parent entity and no entity has a greater than 10 percent ownership interest in Heritage Foundation.   The Heritage Foundation is a 501(c)(3) nonprofit organization. Plaintiff Mike Howell is the President of The Oversight Project, a 501(c)(4) nonprofit organization dedicated to preserving American freedom by ensuring government is and remains responsible, accountable, and transparent.

Pursuant to D.C. Circuit Rule 29, Plaintiffs hereby submits this certificate.

**A. Parties and Amici**.

The parties who appear before the Court are:   (1) Plaintiff Heritage Foundation; (2) Plaintiff Mike Howell; (3) Defendant the Department of Justice; and (4) Defendant-Intervenor President Joseph R. Biden.

**B. Rulings Under Review.**

The ruling under review is an opinion and order denying a preliminary injunction. The opinion and order are attached to

i

Defendants-Appellants' motion.

## C. Related Cases.

This case is related to Biden v. DOJ, No. 26-cv-1818 (D.D.C.)

# TABLE OF CONTENTS

CERTIFICATION..................................................................................i

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES .............................................................iv

INTRODUCTION.............................................................................iv

BACKGROUND ..................................................................................6

ARGUMENT ....................................................................................10

   I.  PRESIDENT BIDEN IS UNLIKELY TO SUCCEED ON THE MERITS..................................................................................10

      A. The Privacy Act Does Not Require *De Novo* Legal Review on a Reverse FOIA Claim....................................................10

      B. FOIA Requires Disclosure. .....................................................11

      C. The Department's Disclosure Decision Is Not Arbitrary, Capricious, or an Abuse of Discretion. .....................................17

   II. ....PRESIDENT BIDEN CANNOT SHOW IRREPARABLE HARM SUFFICIENT TO WARRANT AN INJUNCTION PENDING APPEAL...............................................................................18

   III. ................THE EQUITIES AND PUBLIC INTEREST SUPPORT DENYING AN INJUNCTION PENDING APPEAL....................20

   IV. .....................BIDEN'S INTERVENTION WAS UNTIMELY AND UNDERMINES HIS CLAIMED URGENCY. ..............................24

CONCLUSION ................................................................................28

CERTIFICATE OF COMPLIANCE ...........................................29

CERTIFICATE OF SERVICE...................................................30

## TABLE OF AUTHORITIES

**Cases:**

*Amador Cty. v. Dep't of Interior*, 772 F.3d 901 (D.C. Cir. 2014). ..... 27, 28

*Az. Fam. Health Part. v. HHS*, No. 18-cv-2581 (TNM), 2019 WL 130578, (Jan. 8, 2019) .................................................................................... 22, 23

*Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230 (D.C. Cir. 2025) ..... 21

*CREW v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ......................... 14, 15, 16

*CREW v. DOJ*, 854 F.3d 675 (D.C. Cir. 2017) ........................................ 11

*Department of Commerce v. N.Y.*, 588 U.S. 752 (2019) .......................... 19

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ........ 18

*DOD v. FLRA*, 510 U.S. 487 (1994) ....................................................... 11

*Dow Jones & Co. v. DOJ*, 880 F.Supp. 145 (S.D.N.Y. 1995) ................. 15

*FDA v. Wages & White Lion Investments*, LLC, 604 U.S. 542 (2025) .... 18

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) ................................. 10

*In re Brewer*, 863 F.3d 861 (D.C. Cir. 2017) ......................................... 27

*Jigsaw Productions, Inc. v. SEC*, __F.Supp.3d __, No. 24-cv-2358 (TSC), 2026 WL 797411 (D.D.C. Mar. 23, 2026) ............................................ 15

*Judicial Watch v. DHS*, 895 F.3d 770 (D.C. Cir. 2018) ........................ 22

*Kimberlin v. DOJ*, 139 F.3d 944 (D.C. Cir. 1998) ................................. 14

*Kowal v. DOJ*, 107 F.4th 1018 (D.C. Cir. 2024) .................................... 14

*Leadership Conf. on Civil Rights v. Gonzales*, 421 F.Supp.2d 104
(D.D.C. 2006)........................................................................................24

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ................11

*N.Y. Times Co. v. NASA*, 920 F.2d 1002 (D.C. Cir. 1990) (en banc) ......15

*Nation Mag. Washington Bureau v. U.S. Cust. Serv.*, 71 F.3d 885 (D.C.
Cir. 1995)..............................................................................................14

*Payne Enter., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988)........22

*Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965 (D.C. Cir. Sept.
10, 2025) ................................................................................................9

*See, e.g.*, *Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32 (D.D.C. 2020)
................................................................................................................24

*Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168 (2025)
................................................................................................................11

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................10

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ...................................22

*Stewart v. Rubin*, 124 F.3d 1390 (D.C. Cir. 1997) (Table) ....................28

*Trump v. United States*, 603 U.S. 593 (2024) ........................................16

*Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir. 1984) .....................10

*U.S. Dep't of Air Force v. Rose*, 425 U.S. 352 (1976)..............................22

*Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) ...24

*Wash. Post v. Dep't of State*, 685 F.2d 698 (D.C. Cir. 1982) ...................22

*West Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059 (D.C. Cir. 2023) .10

*WMATA v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) .........9, 19

*WP Co. LLC v. U.S. Small Bus. Admin.*, Nos. 20-1240, 20-1614 (JEB), 2020 WL 6887623 (D.D.C. Nov. 24, 2020)............................................23

**Statutes**

5 U.S.C. § 552(a)(4)(B)............................................................................12

5 U.S.C. § 552a(g)(1)...............................................................................20

**Other Authorities**

Doris Keans Goodwin, TEAM OF RIVALS:  THE POLITICAL GENIUS OF ABRAHAM LINCOLN 687 (2005)................................................................ 4

Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr. at 5–6, 248 (Feb. 5, 2024)*..........................3, 4, 13, 14, 15, 16, 17, 20, 25

**Rules**

Fed. R. Civ. P. 52(a)(2) ...........................................................................10

Fed. R. Civ. P. 52(a)(6) ...........................................................................10

## INTRODUCTION

Former President Joseph R. Biden ("Biden") asks this Court to indefinitely suppress audio recordings and transcripts of conversations he voluntarily made—while being paid an $8 million advance for his memoir and laying the groundwork for a potential 2016 or 2020 presidential campaign.

The recordings at issue here were curated by Special Counsel Robert Hur ("Hur") as part of his investigation into Biden for disclosing highly classified information while he was Vice President—a serious felony. Hur concluded that there was sufficient information to allow the case to go to the jury because Biden disclosed classified information to his ghostwriter Mark Zwonitzer ("Zwonitzer") in the process of writing the highly lucrative book, *Promise Me Dad*.[1] Nonetheless, Hur declined to recommend prosecution in large part because Biden would "likely present himself to the jury, as he did during his interview with our office, as a sympathetic, well-meaning, elderly man with a poor memory" and

---

[1] *See* App. at 470–71.

1

with "diminished faculties."[2]  The records at issue here represent small portions of the more than 70 hours of interviews from the spring of 2016 to the Summer of 2017 between Biden and Zwonitzer that Hur thought important enough to curate and transcribe for use in his investigation and in drafting his eventual Report.  The curated set of Zwonitzer materials "constituted both the primary evidence of the 2017 wrongful disclosures, as well as the primary basis for his decision to decline prosecution of President Biden with respect to these wrongful disclosures."  Op. at 17–18 (cleaned up).  Those recordings are the key pieces of contemporaneous evidence on this issue.  *See* Hur Report at 6–7.  Even ***Biden's*** Department of Justice admitted this fact.  *See* App. at 67.

Biden seeks to suppress these materials on the facially absurd theory that he retains a cognizable privacy interest in his own voice while discussing his public career and that the American People cannot judge

---

[2]  Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 5–6, 248 (Feb. 5, 2024) ("Hur Report"), *available a*t https://www.justice.gov/sco-hur.

for themselves whether Hur was right, even though it was Biden who released the Hur Report and, as the sitting President of the United States "clothed in immense power,"[3] viciously denied and attacked Hur's conclusions.  (His Administration and his political allies followed suit).[4]

The District Court, after conducting an *in camera* review of the DOJ-redacted materials, denied his preliminary injunction motion. Biden did not respond by promptly seeking emergency relief; he waited the majority of a week, then filed this motion 16 days before the District Court's temporary injunction expires.  The motion should be denied.

Biden's framing is theatrical.  He portrays the Zwonitzer recordings as the intimate private diaries of an unsuspecting private citizen swept up in a law enforcement investigation against his will.  ***That is __not this__ case.***  In 2016 and 2017, Biden invited his paid ghostwriter into his home and spoke at length—with full knowledge he was being recorded—about his political career, foreign policy views, decision to run for President, and the events of his Vice Presidential tenure.  Those conversations were

---

[3]  Doris Keans Goodwin, TEAM OF RIVALS:  THE POLITICAL GENIUS OF ABRAHAM LINCOLN 687 (2005).

[4]  *See* App. at 469–85.

inputs into an $8 million book deal and the opening perturbations of what became a successful run culminating in him taking the Presidential Oath of Office on the Capitol steps in January 2021. They were selected precisely because they would sell and were produced for public consumption, not to be kept within a careful cocoon of privacy akin to a family scrapbook.

Contrary to Biden's wild protestations,[5] the Department—after a line-by-line segregability analysis and redaction process—removed all genuinely sensitive material and determined that disclosure is required. The District Court carefully reviewed the tapes and transcripts *in camera* prior to argument and found that what remains after redaction largely concerns foreign policy and Biden's 2016 decision not to run for President—material squarely within FOIA's public interest mandate. Op. at 16 ("[H]aving reviewed the Zwonitzer materials *in camera*, the Court finds that Biden's privacy arguments largely overlook the Department's recent redactions and reasoning.").

---

[5] *See, e.g.*, Mot. at 3 (suggesting material at issues "cover[ed] sensitive topics such as family health issues").

Furthermore, Hur explicitly relied on these materials in his *publicly released* report to explain his non-prosecution decision. That reliance dramatically amplifies the public interest in the underlying materials. The public is entitled to evaluate the propriety of Hur's discretion and the controversy the President and his Administration themselves stoked: Who was right—Hur or his boss's boss? The public interests in allowing the American People to make up their own minds about whether the President shared classified information with his ghostwriter or was mentally fit are immense. But Biden largely ignores this point. *See* Mot. at 15–16.

The materials in issue are also critical for allowing the American People to evaluate whether the Biden-Harris Administration concealed the fact that Biden was not mentally fit for Office. The evidence of Biden's decline is painfully apparent. And Hur testified that the audio recordings from 2017 provide powerful comparative evidence of the state of that decline, even 3–4 years before Biden assumed the Nation's highest office.[6] Moreover, the senior-most members of the Biden-Harris Administration have strenuously denied Hur's conclusions and even

---

[6] *See* App. at 474.

attacked him for them.  Thus, the records in issue go directly to whether senior Biden-Harris Administration officials encountered an impaired President, but strived every day to conceal that fact, including by attacking Hur's conclusions *despite knowledge of their veracity*.

The compelling interests at stake also include providing data that would allow the American public and the history books to assess whether Biden *actually authorized* non-delegable presidential decisions while impaired.  In evaluating how such an unprecedented situation should be approached, the American People deserve as much information as possible to illumine the timeline and depth of Biden's cognitive decline.

Biden fails to make the clear showing required for a preliminary injunction on any of the four factors.  The motion should be denied and the materials should finally be released—ending this multi-year litigation and honoring FOIAs mandate of *prompt* public transparency.

## BACKGROUND

Regrettably, it is necessary to clarify the record as to precisely what is involved in the Zwonitzer materials in issue.  The prior withholding decision was made by Associate Deputy Attorney General Bradley Weinsheimer, reflecting the prior Administration's policy judgment that

6

disclosure "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  App. 010–011.  That decision was made as to the Zwonitzer materials *as a whole* because the records were ***categorically*** withheld under the work product doctrine.  *See* App. at 449–50.  Under the prior DOJ's view, a segregability analysis was thus not required.  *Id.* at 453.  The current Department, through career official Peter Winn (Acting Chief Privacy & Civil Liberties Officer), reached a different judgment regarding the Zwonitzer materials after a materially changed landscape and "on about February 2026, the Department reassessed its prior decision and decided to waive the work-product doctrine in light of the public interest in the materials."  App. at 450.  That waiver required a segregability analysis that had not been previously undertaken.  App 453.[7]  The Weinsheimer Declaration spoke to the Zwonitzer materials *as a whole* and *without* the "substantial redactions" made by the current Department.  Op. at 16.  Thus, Weinsheimer's declaration is obsolete and defunct.

---

[7]    The Department did this in contemporaneous, documented communications that the District Court reviewed and credited.  *See* App-021–022.

7

**STANDARD OF REVIEW**

"An injunction pending appeal is an 'exceptional remedy,' and the party seeking one on appeal from the denial of a preliminary injunction faces the 'difficult task' of showing that the district court likely abused its discretion in denying preliminary relief." *Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965, at *3 (D.C. Cir. Sept. 10, 2025) (cleaned up). The movant must demonstrate: (1) likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) that an injunction will not substantially harm other interested parties; and (4) that an injunction serves the public interest. *See WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public, ***and*** when denial of the order would inflict irreparable injury on the movant." *Id.* at 844 (emphasis added). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir.

8

2011) (cleaned up). Biden bears the burdens of production and persuasion.

This Court reviews the District Court's factual findings—including those resting on *in camera* review of the Zwonitzer materials—for clear error. *See* Fed. R. Civ. P. 52(a)(2); *id.* at 52(a)(6). By contrast, the District Court's legal conclusions are reviewed *de novo* and overall preliminary injunction denial decisions are reviewed for abuse of discretion. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

The denial of a preliminary injunction may also be affirmed on any ground apparent in the record. *See, e.g., Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1150 (D.C. Cir. 1984).[8] Here, the District Court's denial rests on at least three independent and sufficient grounds: (1) Biden's failure to demonstrate likelihood of success on the merits; (2) his failure to demonstrate irreparable harm of sufficient magnitude to compensate for his weak merits under the sliding-scale framework; and (3) the balance of equities and public interest strongly favoring release. Any one of these

---

[8] Intervention issues are subject to alternate-ground-for-affirmance analysis. *See West Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1071 (D.C. Cir. 2023).

grounds, standing alone, supports affirmance. The untimeliness of Biden's intervention provides a fourth independent basis.

## ARGUMENT

### I. PRESIDENT BIDEN IS UNLIKELY TO SUCCEED ON THE MERITS.

#### A. The Privacy Act Does Not Require *De Novo* Legal Review on a Reverse FOIA Claim.

Biden's argument that a reverse FOIA–APA Privacy Act claim is a pure legal issue requiring *de novo* review misreads the applicable framework. He relies on *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and *DOD v. FLRA*, 510 U.S. 487 (1994), for the proposition that courts must independently assess whether exemptions apply. But in the reverse FOIA APA context, the application of Exemptions 6 and 7(C) is not a purely legal determination—it requires fact-intensive balancing of specific privacy and public interests in particular documents. *See, e.g.*, *CREW v. DOJ*, 854 F.3d 675, 682–83 (D.C. Cir. 2017) ("*CREW IV*") (fact-specific nature of balancing renders it insusceptible). *Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 179–83 (2025), correctly holds that when an agency makes "fact-dependent, context-specific, and policy-laden choices," courts should

"afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. The Department's balancing of privacy and public interests with respect to these specific redacted recordings is precisely such a choice.[9]

### B.    FOIA Requires Disclosure.

**1.**    President Biden has little if any privacy interest here.

**a.**    The Zwonitzer materials are not the private musings of a private man. They are the documented output of a commercial and political enterprise. Biden received an $8 million advance for the book that emerged from these sessions with Zwonitzer. *See* App. at 487 (collecting citations). He invited Zwonitzer into his home for the express purpose of creating a publishable narrative of his political life. Zwonitzer recorded their conversations with Biden's knowledge. The conversations were tools of commercial self-promotion and political positioning, not private confidences intended to remain forever sealed from public eyes.

---

[9]    In an apparent effort at misdirection, Biden appears to confuse the normal deferential review provided by an APA claim, with review under a FOIA request, where **by statute** "the court shall determine the matter de novo." 5 U.S.C. § 552(a)(4)(B).

Indeed, the very topics of conversation were selected for commercial appeal. *Id.*

The political dimension is equally significant. Biden met with Zwonitzer during the precise period he was evaluating whether to challenge Hillary Clinton for the 2016 Democratic presidential nomination. His discussions with Zwonitzer about that decision—which the District Court confirmed remain in the materials after redaction— were not private deliberations; they were the kind of frank political calculations that the voting public has every legitimate interest in delving into on someone who later became President of the United States.

Moreover, the record reveals no efforts by Biden to keep the materials confidential. There was no written or oral nondisclosure agreement. Nor was there any agreement on disposing of or keeping the audio. *See* App. at 488 (collecting citations). And President Biden has pointedly failed to provide any record evidence on these points or about his alleged residual privacy interest.

**b.**    The release of the Hur Report and related materials further undermines Biden's privacy interests. Indeed, Biden ***himself*** effectively chose to release much of this material. Biden's Administration touted

12

that he did not exert Executive Privilege over the Hur Report. But this was done for political reasons. Privacy interests cannot operate as both sword and shield. That release vitiates any privacy interest here. *See, e.g., CREW v. DOJ*, 746 F.3d 1082, 1092 (D.C. Cir. 2014) ("*CREW III*"); *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998); *Nation Mag. Washington Bureau v. U.S. Cust. Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995). A public figure has little if any privacy interest in that context. *Cf., e.g., CREW III*, 746 F.3d at 1092; *Nation Mag.*, 71 F.3d 885 at 894, n.9.

Thus, Biden misses the mark in his submission that disclosure of a summary does not diminish the privacy interest in the underlying conversation, citing *Kowal v. DOJ*, 107 F.4th 1018 (D.C. Cir. 2024). Kowal is a public domain case, and Plaintiffs merely submit that context matters, and the context here undermines the privacy interest. The public is entitled to evaluate Hur's characterizations of Biden's "tone" and "sound" against the actual recordings, not merely take Hur's word for them. Indeed, at least some of the audio corresponds to material ***quoted verbatim in the Hur Report***.

**c.**     As to the audio itself, to be sure, this Court has recognized a separate privacy interest in information that would be "newly revealed"

13

by the non-lexical. *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc). But there is little to no such privacy interest here where the public is already quite familiar with how Biden speaks. It goes without saying that revealing a recording of the panicked communications of private individuals moments before death is not remotely comparable to interviews conducted for a lucrative commercial and political purpose that were so significant to Hur's non-charging decision **that he quoted or cited to them in the Hur Report**. *See, e.g.*, *Dow Jones & Co. v. DOJ*, 880 F.Supp. 145, 152–53 (S.D.N.Y. 1995) (Sotomayor, J.) (distinguishing *NASA*); *see also*, *Jigsaw Productions, Inc. v. SEC*, __F.Supp.3d __, No. 24-cv-2358 (TSC), 2026 WL 797411 (D.D.C. Mar. 23, 2026).

**2**.    The D.C. Circuit has repeatedly recognized that the public interest under Exemption 7(C) extends to records revealing "whether the government had the evidence but nevertheless pulled its punches." *CREW III*, 746 F.3d at 1093. Hur explicitly relied on the Zwonitzer materials as primary evidence for concluding Biden shared classified information, characterizing Biden's mental state, and deciding not to prosecute. That evaluation looked not only to the cold record, but as the

District Court correctly recognized, "tone." Op. at 18. The public has an overwhelming interest in accessing the evidentiary basis of Hur's conclusion so it can determine whether Hur or Biden (his ultimate boss) was correct.

3.    Moreover, there is an undoubted public interest in assessing whether Biden was fit for Office. The President *is* the Executive Branch. *See Trump v. United States*, 603 U.S. 593, 610 (2024) (citations omitted). Whether the man always accompanied by the nuclear football is fit for Office cannot be any more fundamental to the people's right to know "'what their government is up to.'" *CREW III*, 746 F.3d at 1093 (citations omitted). Moreover, that interest is not confined to the President *quo* the President. Indeed, the senior-most Executive Branch officials are charged by Section 4 of the 25th Amendment to ensure the President is fit for duty. If Hur is correct and Biden showed clear evidence of impairment outside of carefully scripted public appearances seven years ago, and that impairment continued, Vice President Harris and other senior Administration officials would have undoubtedly encountered Biden's "diminished faculties and faulty memory" (Hur Report at 248) *every day from January 20, 2021 to present*.

15

Again, the public has a powerful interest in assessing Hur's conclusions *because those conclusions are sharply contested*. Did Vice President Harris and other senior Administration officials cover for the President when they viciously attacked Hur for his conclusion— relying specifically on the audio at issue here—that Biden had a "poor memory" and "diminished faculties"? Hur Report at 2, 248. Or were they right and Hur wrong? *To this day*, senior Biden Administration officials deny any sort of impairment.

4.    On the merits of balancing the public versus privacy interests, the District Court's *in camera* review is decisive. After reviewing the full, unredacted materials, the Court found that what remains after redaction "largely contain[s] Biden's discussion of foreign policy—including his references to what may have been classified material in his possession— and his decision not to run for President in 2016" and "contain[s] no mention of highly sensitive topics like illness or death, nor do they mention any non-public persons, including members of Biden's family." Op. at 16. Conversely, the District Court credited the Department's explanations of the important public interest served by disclosure. *Id.* at 16–18, 23. The District Court's conclusion was neither clearly erroneous

16

nor an abuse of discretion. Moreover, the District Court was careful to note that the "unique" nature of this case and the facts it found cabined the scope of its ruling—foreclosing Biden's parade of horribles in the form of Administrations exposing sensitive private information in routine cases. *See id.* at 22–24; *contra* Mot. at 12–13.

### C.    The Department's Disclosure Decision Is Not Arbitrary, Capricious, or an Abuse of Discretion.

The record of the Department's decision-making process is robust. The Winn Declaration and Winn's April 15, 2026 email to Biden's counsel—found by the District Court to be a contemporaneous explanation of the Department's reasoning, not a *post hoc* rationalization—articulate numerous reasons for the change. *See* App. 451–53. The District Court correctly found that the Department displayed awareness that it was changing position and offered good reasons for the new policy. *See FDA v. Wages & White Lion Investments*, LLC, 604 U.S. 542, 570 (2025). Biden's reliance on *DHS v. Regents of the University of California*, 591 U.S. 1, 24 (2020), is misplaced because the

17

Winn email predates the final disclosure decision; it is contemporaneous explanation, not a litigation-stage rationalization.

Biden's allegation of political motivation does not hunt.  A court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons.  *See Department of Commerce v. N.Y.*, 588 U.S. 752, 781 (2019).  Biden offered no specific evidence of bad faith; he offered only circumstantial inferences from the change of administration and the fact that Heritage is a political critic of Biden.  But of course, administrations change position all the time; that is the point of elections.  That is insufficient as a matter of law even before taking account here of the impact on the complexion of this case that Congress *also* wants this information released.

## II.   PRESIDENT BIDEN CANNOT SHOW IRREPARABLE HARM SUFFICIENT TO WARRANT AN INJUNCTION PENDING APPEAL.

1.     The District Court found that disclosure posed only *some* risk of irreparable harm to Biden's privacy interests and the harm was insufficient to compensate for Biden's weak merits showing under the D.C. Circuit's sliding-scale framework.  *See Holiday Tours*, 559 F.2d at 844.

*First*, the harm Biden identifies is substantially mitigated by the redactions already applied.  The District Court's *in camera* review found that the redacted materials contain no references to family members, family health issues, non-public persons, national security information, or material covered by the presidential communications privilege.  *See* Op. at 16.

*Second*, the extensive material already in the public domain substantially undercuts the claimed harm.  The 345-page Hur Report, Hur's Congressional testimony, the transcript of Hur's interview of Biden, and Hur's interview of Zwonitzer are all publicly available.  The specific passages Hur quoted from the Zwonitzer transcripts are already part of the public record.  *Promise Me, Dad*, contains overlapping material.  Each prior disclosure diminishes the marginal harm from the incremental disclosure of the redacted recordings.

*Third*, the Privacy Act provides a private right of action for actual damages for intentional and willful disclosures in violation of the Act.  *See* 5 U.S.C. § 552a(g)(1).  The District Court correctly recognized that the availability of this *post hoc* remedy cuts against irreparable harm.  *See Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir.

2025). Whatever harm Biden suffers from disclosure is not beyond remedy.

*Finally*, Biden's two-year delay in intervening fatally undermines his urgency. Irreparable harm, to justify emergency injunctive relief, must be not only severe but imminent and not self-inflicted. A party who intervened only when disclosure was days away has manufactured the very emergency he now tries to stand on. Biden cannot be allowed to wield the procedural facts and circumstances of this case as both sword and shield.

2. While the District Court reached the correct result, it was overly solicitous of Biden's privacy interests. Biden presented no actual testimony as to how or why the redacted set of materials (*i.e.*, not the materials as a whole as characterized by Weinsheimer) would threaten his privacy interest. The best he could muster was some patent attorney hearsay and *ipse dixit*. *See* App. at 502–03 (collecting citations). More is required.

## III. THE EQUITIES AND PUBLIC INTEREST SUPPORT DENYING AN INJUNCTION PENDING APPEAL.

1. To start, there is a strong public interest in disclosure in any FOIA case. "[D]isclosure, not secrecy, is the dominant objective" of FOIA,

*U.S. Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976), and "[t]here is a national interest in transparency of government operations," *Az. Fam. Health Part. v. HHS*, No. 18-cv-2581 (TNM), 2019 WL 130578, at *3 (Jan. 8, 2019).

2.     Plaintiffs have a statutory right under FOIA to ***timely*** access to these records—a right the Department has now confirmed after more than two years of litigation. *See, e.g.*, *Judicial Watch v. DHS*, 895 F.3d 770, 774 (D.C. Cir. 2018) ("federal agencies, 'upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records ***promptly available***.'" (quoting 5 U.S.C. § 552(a)(3)(A) (emphasis added)); *Payne Enter., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("stale information is of little value"). That is why FOIA statutorily eliminates normal barriers to equitable relief. *See, e.g.*, *Soucie v. David*, 448 F.2d 1067, 1076 (D.C. Cir. 1971); *accord Wash. Post v. Dep't of State*, 685 F.2d 698, 704 (D.C. Cir. 1982), *vacated as moot*, 464 U.S. 979 (1983) (mem.).

Each additional week of suppression is a concrete injury to Plaintiffs' statutory rights; and to the public's interest in evaluating

Hur's work and whether senior Administration officials covered up Biden's decline.  We have waited long enough.

3. Moreover, the public interest is severely harmed when delay "would  deprive the public of information critical to an ongoing national debate of considerable importance, as well as basic details surrounding an unprecedented [action by the Federal Government]." *WP Co. LLC v. U.S. Small Bus. Admin.*, Nos. 20-1240, 20-1614 (JEB), 2020 WL 6887623, at *5 (D.D.C. Nov. 24, 2020); *accord id.* at *4 (collecting cases); *Az. Fam. Health*, 2019 WL 130578, at *3.  The information in issue here is clearly urgently needed for ongoing national debate simply as to whether non-delegable Presidential actions were actually authorized by the President, or auto-penned in the President's name by the senior-most officials of the Biden-Harris Administration.  Whether a pardon or a veto is valid is no small matter.  Moreover, whether Biden did, in fact, leak classified information, whether Biden was in fact impaired, and whether senior officials of the Biden-Harris Administration covered up Biden's apparent cognitive decline are and will continue to be salient issues in the upcoming midterm elections.  Indeed, the timing of Biden's decision to resort to litigation at

the last possible second and inject delay is pregnant with critical political implications:  the goal seems to be to delay any disclosure until *after* the rapidly approaching midterm elections are over.

Courts have routinely found a clear public interest in *prompt* disclosure in such circumstances.  *See, e.g., Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32, 38 (D.D.C. 2020) ("Plaintiff seeks the requested information to inform the public about ICE's response to the COVID-19 pandemic and the impact of that response on the thousands of immigrant detainees who are presently in ICE custody.  A delay in the release of the requested information would cause irreparable harm."); *Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) (granting preliminary injunction holding U.S. Secret Service visitor logs for visits to the Vice President and his senior staff were agency records and must be produced due to the public interest in them prior to the 2006 mid-term elections); *Leadership Conf. on Civil Rights v. Gonzales*, 421 F.Supp.2d 104, 110 (D.D.C. 2006) ("plaintiff and the public likely will suffer significant harm if the Court grants a stay.  The upcoming 2006 federal elections and congressional hearings regarding the re-authorization of

23

provisions of the Voting Rights Act make plaintiffs' information requests time sensitive").

On the other hand, the harm to Biden from prompt disclosure is *de minimis*. He faces disclosure of discussions of foreign policy and his 2016 electoral decision—subjects he has addressed publicly in a memoir and whose contours the Hur Report has already made part of the national public record. The District Court's *in camera* review confirmed there is no sensitive personal content remaining after redaction. The balance of equities is not even close.

## IV. BIDEN'S INTERVENTION WAS UNTIMELY AND UNDERMINES HIS CLAIMED URGENCY.

1.    Heritage and Mike Howell filed this FOIA action in March 2024. The parties cross-moved for summary judgment in November and December 2024. The case was stayed in September 2025. Biden did not seek to intervene until May 2026—more than two years after suit was filed, and only after the Department announced its intent to disclose. The District Court granted limited intervention to allow Biden to assert his

personal privacy interests, but denied his bid to expand the scope of the case.

Biden's delay is direct evidence militating against his claimed urgency. At the very latest, he should have intervened when President Trump took the presidential oath of office for the second time on January 20, 2025. And there is simply no excuse for Biden's attorneys to not try to intervene as discussions were unfolding behind the scenes and the risk of a new DOJ disclosure decision became a likely outcome. Biden's decision to wait until the eve of disclosure confirms that his motivation is not the protection of genuine privacy interests, but the suppression of politically inconvenient materials. We suggest his strategic delay was sought to maximize the chances that the materials Plaintiffs seek are suppressed until after the impending Midterm Elections. Whatever the motive, however, Biden's inexcusable delay provides an independent ground to deny the extraordinary relief he seeks.

2.    Under governing law, the timeliness of intervention is measured not from when adverse action is finally taken, but from when it became clear that the proposed intervenor's interests would no longer be protected by the existing parties. *See In re Brewer*, 863 F.3d 861, 872

25

(D.C. Cir. 2017).  The D.C. Circuit "measure[s] elapsed time from when the 'potential inadequacy of representation [comes] into existence.'" *Amador Cty. v. Dep't of Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014). Under that standard, Biden's intervention was untimely by months, if not more than a year.

The divergence of interests began no later than January 20, 2025, when President Trump took office having publicly criticized Biden-era secrecy around the Hur investigation.  On May 19, 2025, the Department waived Biden's executive privilege assertion and released more than five hours of audio from Biden's Hur interview—necessarily reversing many of the same litigating positions the Biden DOJ had advanced in this very case.  On July 7, 2025, the Department lifted a further tranche of redactions from the Zwonitzer–Hur interview transcripts.  On September 26, 2025, the Department filed a joint status report in this case confirming it was "reviewing the withholdings"—meaning it was reconsidering, not defending, the Biden Administration's position.  By February 25, 2026, Biden's own counsel had been personally informed the Department planned to release the materials with limited redactions and that the Department had waived work product protections.  *See* App.

26

at 235–36, 449–50.  Indeed, in a separate action, Biden argues that the "Department knew" *in March of 2026* "that the planned disclosure in the FOIA Action . . . *was likely to invite legal challenge*."  *Biden v. DOJ*, No. 26-cv-1818 (D.D.C.) ECF No. 22 at 26 (emphasis added).  Yet Biden did not move to intervene until May 12, 2026—many months after the divergence became apparent, and only after the Department had already made its final decision.  That is the paradigmatic definition of an untimely intervention under D.C. Circuit precedent.

3.     Biden's delay also caused severe prejudice to the existing parties. The case was stayed in September 2025 specifically to allow the parties "to settle this case or narrow the remaining legal issues."  The parties did exactly that, cooperating *over seven months* to reach agreement on redactions and a production schedule.  Biden's last-minute intervention seeks to upend those seven months of productive work and reset the case to its pre-September 2025 posture.  Courts in this Circuit have held that disruption of a settled or near-settled matter constitutes substantial prejudice sufficient to deny intervention.  *See Stewart v. Rubin*, 124 F.3d 1390 (D.C. Cir. 1997) (Table); *Amador Cty.*, 772 F.3d at 905–06.  This Court should hold that Biden's untimeliness and the

27

resulting prejudice provide an independent basis for denying the injunction pending appeal. The District Court's preliminary injunction analysis was spot on but was overly solicitous of President Biden's bid to intervene, which should have been denied.

## CONCLUSION

The motion for an injunction pending appeal should be denied.

Respectfully submitted,

Dated:  June 30, 2026

Respectfully submitted,

   /s/ Samuel Everett Dewey

SAMUEL EVERETT DEWEY
Chambers of Samuel Everett Dewey
LLC
2200 12th Court North Apt. 609
Arlington VA  22201
(703) 261-4194
Email:
samueledewey@sedchambers.com


JEFFREY BOSSERT CLARK

The Oversight Project
211 N. Union St
Alexandria, VA 22314
Email:  jeff@itsyourgov.org

28

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the portions of the brief exempted by Fed. R. App. P. 32(f), this document contains 5,163 words.

2.    This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook typeface.

*/s/ Samuel Everett Dewey*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on this 30th day of June 2026, I filed the foregoing motion using this Court's Appellate CM/ECF system, which effected service on all parties.

*/s/ Samuel Everett Dewey*