**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　v.<br><br>DEPARTMENT OF JUSTICE,<br><br>　　　　　*Defendant*,<br><br>JOSEPH R. BIDEN, JR.,<br><br>　　　　　*Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

**<u>ORDER</u>**

For the reasons stated in the accompanying memorandum opinion, it is

**ORDERED** that the defendant-intervenor Joseph R. Biden, Jr.'s Motion for a Preliminary

Injunction, Dkt. 65, is **DENIED**.

**SO ORDERED.**

June 19, 2026

_____
DABNEY L. FRIEDRICH
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF JUSTICE, <br><br> *Defendant*, <br><br> JOSEPH R. BIDEN, JR., <br><br> *Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

**<u>MEMORANDUM OPINION</u>**

The Heritage Foundation and Mike Howell (plaintiffs) bring this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *et seq*., for certain records from Special Counsel Robert K. Hur's investigation of former President Joseph R. Biden, Jr.  The Department of Justice (Department) initially withheld requested transcripts and audio recordings under several FOIA exemptions.  *See* Dkt. 33.  Recently, the Department reversed course and represented that it intends to disclose those materials, with redactions, to the plaintiffs and the House Judiciary Committee on June 15, 2026.[1]  Dkt. 50.  Biden intervened to defend the withholdings.  *See* Dkts. 51, 63.  Before the Court is Biden's Motion for a Preliminary Injunction, which asks the Court to preliminarily enjoin the Department from disclosing the materials to the plaintiffs.  Dkt. 65.  For the reasons that follow, the Court will deny the motion.

---

[1] The Department initially informed the parties that it intended to disclose these materials to the plaintiffs on June 15, 2026.  Dkt. 50.  It later agreed to delay release of these materials to the plaintiffs until June 19, 2026, at 5:00 p.m.  *See* June 11, 2026 Hr'g Tr. 43:19–23.

## I.    BACKGROUND

In January 2023, Attorney General Merrick Garland appointed Robert K. Hur as a Special Counsel to investigate and prosecute federal crimes arising from the "possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private residence of President Joseph R. Biden, Jr."  Appointment of Robert K. Hur as Special Counsel, Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023).  Hur issued his findings, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph. R. Biden, Jr.* (Report), in February 2024.  *See* Hur Report, Dkt. 6-1.  Among other things, the Report mentioned Biden's "diminished faculties and faulty memory," as exhibited in his interview with the Special Counsel's Office and his 2016 and 2017 recorded interviews with Mark Zwonitzer, a biographer who assisted with Biden's since published book, *Promise Me, Dad*.  *Id.* at 248; *see id.* at 3–5, 244–48.  Hur ultimately declined to prosecute Biden "for his retention of" certain classified documents because, among other things, "the evidence [was] not sufficient to convict" and because "[i]t would be difficult to convince a jury that they should convict [Biden]—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness."  *Id.* at 6.

In March 2024, the Heritage Foundation and its employee, Mike Howell, filed this FOIA action against the Department seeking "all records relied upon by Special Counsel Hur to write particular passages of the Report."  Compl. ¶ 1, Dkt. 1; *see* Am. Compl. ¶ 1 (same), Dkt. 6.  As relevant here, those passages included lines in which the Report referred to Biden's recorded conversations with Zwonitzer as "painfully slow, with Mr. Biden struggling to remember events

2

and straining at times to read and relay his own notebook entries." Am. Compl. ¶ 9 (Passage 4). After narrowing the issues, Dkt. 28, and processing relevant materials, Dkt. 32, the Department withheld the Zwonitzer audio tapes and the majority of the written transcripts, invoking FOIA Exemptions 1, 3, 5, 6, and 7(C), Decl. of Bradley Weinsheimer ¶ 4, Dkt. 33-2. In November 2024, the Department moved for summary judgment, Def.'s Mot. Summ. J., Dkt. 33, and the plaintiffs cross-moved for summary judgment, Pls.' Mot. Summ. J., Dkt. 34. The Court stayed proceedings in September 2025 to allow the parties to engage in additional discussions or to settle or narrow the case, *see* September 27, 2025 Minute Order, after the Department represented that it would review its withholdings, Dkt. 42.

The Department no longer seeks to withhold the Zwonitzer materials. In a May 8, 2026 filing, the Department reported that it "intends to disclose the written transcript and audio recordings at issue in this matter, with redactions, to Congress, pursuant to a request from the Chair of the House Judiciary Committee, as well as to Plaintiffs." Joint Status Report 1, Dkt. 50. The Department further stated that, if Biden intervened by May 12, 2026, it would hold off disclosing the material until June 15, 2026. *Id.* Biden timely moved to intervene. Intervenor Mot., Dkt. 51. The Court granted in part and denied in part the motion, allowing Biden to assert his privacy interests as to the plaintiffs' FOIA request for disclosure of the written transcripts and audio recordings. Intervention Mem. Op. 11, Dkt. 63.

On May 29, 2026, Biden moved for a preliminary injunction barring the Department from "disclosing or causing to be disclosed the written transcript and audio recordings at issue in this matter, or any portion thereof, to" the plaintiffs. Mot., Dkt. 65. He argues that the Department's decision to disclose the Zwonitzer materials violates the Administrative Procedure Act (APA), 5

U.S.C. § 551, *et seq.*, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Mem. Mot. 2, Dkt. 65-1.

## II.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)).  To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation modified).  The movant "bear[s] the burdens of production and persuasion."  *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits

Biden is unlikely to show that the Department's decision to disclose the Zwonitzer materials, as currently redacted, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

#### 1.    *APA Reviewability as to the Privacy Act*

As a threshold matter, Biden can challenge the agency's disclosure decision through a "reverse-FOIA" suit under the APA.  *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1134 n.1 (D.C. Cir. 1987) ("'Reverse-FOIA' actions are now a common species of FOIA litigation."); *Taylor Energy Co. LLC v. U.S. Dep't of the Interior*, 734 F. Supp. 2d 112, 118–19 (D.D.C. 2010).  "Section 10(a) of the APA provides that 'a person suffering legal wrong because of agency action,

4

or adversely affected or aggrieved by agency action . . . , is entitled to judicial review thereof.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 (1979) (modifications in original) (quoting 5 U.S.C. § 702).  Release of the Zwonitzer materials would leave Biden "adversely affected or aggrieved" by the Department's decision.  *See* Intervention Mem. Op. 6.  Accordingly, "review of [the Department's] decision to disclose [Biden's personal records] is available under the APA." *Chrysler*, 441 U.S. at 317.

The Department's decision is not "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *contra* DOJ Opp'n 12, Dkt. 68.  The Privacy Act provides a "meaningful standard against which to judge the agency's exercise of discretion" in reaching its voluntary disclosure decision.  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  The Act commands that "[n]o agency shall disclose any [covered] record . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless an enumerated exception applies.  5 U.S.C. § 552a(b).

The Privacy Act is enforceable through the APA in this voluntary disclosure context because there is no other adequate remedy.  The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The Supreme Court has explained that "[a] restrictive interpretation of § 704 would unquestionably . . . 'run counter to § 10 and § 12 of the Administrative Procedure Act.  Their purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes.'"  *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)).  Accordingly, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."  *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967).  In *Bowen v. Massachusetts*, 487 U.S. 879 (1988), for example, the

Supreme Court concluded that the Tucker Act's channeling of certain monetary claims to the Claims Court did not preclude injunctive relief under the APA. *Id.* at 904, 908. Among other things, the Court was "not willing to assume, categorically, that a naked money judgment against the United States," which was the only form of relief that the Claims Court could offer, "will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Id.* at 905; *see Cohen v. United States*, 650 F.3d 717, 734 (D.C. Cir. 2011) (en banc) (similar).

Here, the Privacy Act's remedies provision speaks only of monetary damages for intentional and willful disclosures, 5 U.S.C. § 552a(g)(4)(A), and injunctive relief for the amendment and disclosure of personal records improperly withheld, *id.* § 552a(g)(2)–(3). Those provisions do not offer the declaratory and injunctive relief against the disclosure of records that Biden seeks here, nor do they explicitly forbid such relief. The Court thus concludes that the Act's enumerated remedies are "not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." *Bowen*, 487 U.S. at 904. The Act's silence as to other remedies does not furnish the sort of "clear and convincing evidence of a contrary legislative intent" necessary to overcome the general presumption of judicial review under the APA. *Abbott Lab'ys*, 387 U.S. at 141. Nor does "[t]he structure of this Act indicate[] that Congress intended only . . . [the enumerated remedies] to ensure that the statutory objectives would be realized." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984).

That said, "[t]his Court is mindful that the availability of injunctive relief under the APA in circumstances similar to those presented here is an unsettled question with which other courts are actively wrestling." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 111 (D.D.C. 2026); *see Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175–76 (4th

Cir. 2025) (reserving on the issue and noting that "it appears that no court of appeals has opined directly on the question"). The Supreme Court's three-paragraph opinion staying a Privacy Act–based preliminary injunction, *see SSA v. Am. Fed'n of State, Cnty., & Mun. Employees*, 145 S. Ct. 1626 (2025), offers no meaningful guidance on the § 704 issue given the many potential grounds for issuing such a stay, particularly in light of the Supreme Court's dicta suggesting that the Privacy Act may be enforceable under the APA, *see FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012); *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004). As such, the Court agrees with the persuasive opinions of other judges of this Court in concluding that the APA authorizes judicial review of agency decisions to disclose records protected by the Privacy Act. *See AFL-CIO v. Dep't of Labor*, 25-cv-339, 2026 WL 879518, at *19–20 (D.D.C. Mar. 31, 2026); *League of United Latin Am. Citizens*, 818 F. Supp. 3d at 112.

### 2.    *APA Reviewability as to FOIA Alone*

Unlike the Privacy Act, FOIA contains no meaningful standard against which to assess an agency's decision to disclose certain sensitive materials. The Department's decision whether to invoke a particular FOIA exemption is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see* DOJ Opp'n 12–13; *Sunoco Pipeline, L.P. v. U.S. Dep't of Transp.*, 21-cv-1760, 2023 WL 11195824, at *2 (D.D.C. Sept. 29, 2023) ("[I]n order to state a claim that an agency acted unlawfully in disclosing information, a plaintiff must demonstrate that some other law, not FOIA, required the agency to withhold the information." (citation modified)); *contra* Mem. Mot. 19 (arguing that the Department's decision to disclose the Zwonitzer materials "is arbitrary and capricious and an abuse of discretion" under FOIA alone).

The plain text of FOIA does not require the government to invoke every applicable exemption; it merely clarifies that an agency's obligation to "make available to the public

information" within FOIA's ambit, 5 U.S.C. § 552(a), "does not apply to matters that are" subject to one of the nine enumerated exemptions, *id.* § 552(b). As the Supreme Court noted in *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 (1979), which blessed "reverse-FOIA" cases, "Congress did not limit an agency's discretion to disclose information when it enacted the FOIA," and, as such, FOIA did "not afford [the party opposing release] any right to enjoin agency disclosure" because an exemption might apply. *Id.* at 294. The Court explained that "Congress did not design the FOIA exemptions to be mandatory bars to disclosure," *id.* at 293, and rejected the challenger's argument that "the exemptions impose affirmative duties on an agency to withhold information sought" as "not supported by the language, logic, or history of the Act.," *id.* at 291. The *Chrysler* challenger thus had to rely on the external constraints on disclosure under the Trade Secrets Act, 18 U.S.C. § 1905. *See id.* at 318.

*Chrysler*'s logic holds. Because the Department is under no "affirmative dut[y] . . . to withhold information sought" under FOIA's exemptions, *id.* at 291, its determination that they do not apply here would be "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), absent the Privacy Act's (or another statute's) external constraints on disclosure.[2] This point is ultimately

---

[2] Two "reverse-FOIA" decisions—one from this Court and another from the D.C. Circuit—have engaged in APA review of agencies' decision to forgo withholdings under applicable exemptions. *See AFL-CIO v. FEC*, 177 F. Supp. 2d 48, 63 (D.D.C. 2001), *aff'd on other grounds*, 333 F.3d 168 (D.C. Cir. 2003); *Jurewicz v. United States, Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014). But those decisions assumed that the agency's decisions were subject to APA review. Neither decision discusses *Chrysler*, *Heckler*, or § 701(a)(2). Nor does it appear that the government pressed a committed-to-discretion argument against review in *Jurewicz v. United States*. *See* Br. of Appellee, *Jurewicz v. United States, Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (Nos. 10-1683 & 11-707). The briefing in *AFL-CIO v. FEC*, which is not docketed on CM/ECF due to age, was not available at the time of this decision.

"That the court has taken jurisdiction in the past does not affect the analysis because jurisdictional issues that were assumed but never expressly decided in prior opinions do not thereby become precedents." *Am. Portland Cement All. v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996); *Claybrook v.*

academic because, as discussed below, the legality of disclosure under the Privacy Act here turns on whether the Department abused its discretion in determining that the FOIA exemptions did not apply.

### 3.    *Privacy Act Exceptions*

Because Biden can press his Privacy Act claim through the APA, the question is whether the Department's decision to disclose the Zwonitzer materials is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The parties do not dispute that the Privacy Act applies to the Zwonitzer materials, which are "information about an individual that is maintained by an agency." *Id.* § 552a(a)(4); *see* Mem. Mot. 29–32; *see generally* DOJ Opp'n; Heritage Opp'n, Dkt. 68. Accordingly, the Privacy Act prohibits disclosure of the Zwonitzer materials "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless an enumerated exception applies. 5 U.S.C. § 552a(b). The relevant exception here applies when "disclosure of the record would be . . . required under section 552 of this title." *Id.* § 552a(b)(2). Section 552 is FOIA, which "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material." *Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011).

The legality of the Department's decision thus turns on whether FOIA "require[s]" disclosure of the Zwonitzer materials. 5 U.S.C. § 552a(b)(2). The Department's initial answer to that question was no because "[t]he withheld audio recordings and portions of the transcripts are

---

*Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) ("[T]he courts lack jurisdiction to review agency decisions 'committed to agency discretion by law.'" (quoting 5 U.S.C. § 701(a)(2)); *see United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("[T]his Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*."); *see also Waters v. Churchill*, 511 U.S. 661, 678 (1994) (past decisions "cannot be read as foreclosing an argument that they never dealt with").

protected by FOIA's Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." Def.'s Mem. Mot. Summ. J. 1, Dkt. 33-1.[3] But, after receiving a request from the House Judiciary Committee and redacting additional portions of the materials, the Department decided that "the redacted Zwonitizer [*sic*] Materials are required to be provided to the FOIA requesters." Decl. of Peter A. Winn (Winn Decl.) ¶ 17, Dkt. 68-1. The Department found that "Biden's reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials." *Id.*.

Biden argues that the agency's new position is "arbitrary and capricious and an abuse of discretion, in violation of the APA," Mem. Mot. 12, (1) because the Department's decision was explained only by *post hoc* rationalizations, Reply 4–5, Dkt. 73; (2) because Exemptions 6 and 7(C) mean that disclosure is not required under FOIA and is thus barred by the Privacy Act, Mem. Mot. 27; and (3) because the Department's decision was politically motivated, Mem. Mot. 9; Reply 10.

First, the Department's decision-making process is supported by more than *post hoc* rationalizations. *Contra* Reply 3–6. "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation modified). But "[t]he significance of agency affidavits in a FOIA case cannot be underestimated." *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987). In its only "reverse-FOIA" case to deal with the issue, the

---

[3] The Department also asserted that "the written transcripts are also subject to Exemption 5, as disclosure of the redacted material would reveal attorney work product." Def.'s Mem. Mot. Summ. J. 2. Biden does not appear to contest the Department's recent decision to waive its work-product privilege.

D.C. Circuit held that an agency's disclosure decision could not be supported by a litigation affidavit alone. *See AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987). In that case, the agency had informed the challenger that it would release its sensitive business data in a letter that "contained no explanation or reason." *Id.* at 1235. The D.C. Circuit reasoned that the agency's affidavit could not supplement the record because the agency had "provided no rationalization at the agency level for its refusal to withhold the [sensitive] data and [was] therefore precluded from initially offering one on judicial review." *Id.* at 1236.

Here, the Department offers the declaration of Peter Winn, which describes the redaction negotiations and decision-making process leading up to the Department's final decision to disclose the Zwonitzer materials. *See* Winn Decl. ¶¶ 11–14. That affidavit alone does not an administrative record make. *See AT&T*, 810 F.3d at 1236. But Winn also explained the Department's grounds for disclosure in an April 15, 2026 email to Biden's lawyers leading up to its final May 5, 2026 decision. *See* Suppl. Decl. of Amy Jeffress, Ex. 2 (Winn-Jeffress Emails), at 2–4, Dkt. 65-4. Winn's email explained that Hur's "public[]" and "explicit[]" reliance on the Zwonitzer materials "increases the public interest in and need to access that item of information—essentially, without such access, the public would lack access to the complete record of the basis of the decision by the Special Counsel." *Id.* at 3; *see id.* ("Hur's express reliance on the audio recordings and transcripts as the basis of his decision that [*sic*] dramatically increases the public interest in them. In other words, in the face of a potential conflict of interest, public access to these materials becomes necessary to show whether in the face of a conflict of interest, Special Counsel Hur 'pulled his punches' or acted without impropriety."). Winn also elaborated that the Department had considered that the "privacy interests of individuals do not disappear, whether they happen to be the President or other public figures," but nevertheless the Department determined that it was

11

required to produce segregable audio after making redactions. *Id.* at 3–4. He stated that the Department's redactions "reflect [its] analysis, after consideration of [Biden's] input, of the privacy interests of the President and other third parties that override the cognizable public interest in the audio and transcript" and then explains why the Department declined to redact certain information about "third-party public figures" as opposed to "non-public figures." *Id.* at 4.

The Court considers Winn's April 15, 2026 email to be a contemporaneous explanation of the Department's rationale for its disclosure decision. Winn's declaration is consistent with the justification advanced in that email, and the Department may thus "supplement the administrative record to provide such additional explanations of the reasons for the agency decision as may prove necessary." *AT&T*, 810 F.3d at 1236 (citation modified); *see id.* ("[T]he record may be supplemented to provide, for example, background information or evidence of whether all relevant factors were examined by an agency, [but] we have made clear that the new material should be merely explanatory of the original record and should contain no new rationalizations." (citation modified)). Although Winn's declaration contains more detail about, for example, congressional inquiries than his contemporaneous email, "there is nothing improper in receiving declarations that merely illuminate reasons obscured but implicit in the administrative record." *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (citation modified). Accordingly, the Court will consider Winn's declaration and his April 15, 2026 email as part of the administrative record.[4]

---

[4] The Court notes that Winn's April 15, 2026 email appears to be one in a series of back-and-forth written communications and meetings with Biden's lawyer about the disclosure decision and additional redactions. *See* Winn-Jeffress Emails 4 (March 31, 2026 email from Biden's counsel thanking Department lawyers for "taking the time to meet with us regarding the Heritage Foundation's pending request for the audio recordings and transcripts of President Biden's private conversations with Mark Zwonitzer"). Should this challenge proceed to summary judgment, it seems likely that the record of the Department's decision-making process will expand.

Second, on the record before this Court, the Department's disclosure decision does not appear to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Department determined that "reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials" such that Exemptions 6 and 7(C) do not apply.  Winn Decl. ¶ 17.  Exemption 7(C) protects "records or information compiled for law enforcement purposes," the production of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7).  "Courts have construed this exemption to cover documents in which the privacy interest at stake outweighs the public's interest in disclosure."  *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996).  Exemption 6 similarly protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), but there is "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)."  *Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

The Department exercised discretion in weighing the factors that underlie Exemptions 6 and 7(C).  "[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential abuse of discretion standard.  Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179–80 (2025).  When an agency makes "fact-dependent, context-specific, and policy-laden choices," such as weighing the incommensurable value of personal privacy against the public's interest, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of

reasonableness." *Id.* at 182–83.  "Agencies are [also] free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  "When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.  But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy."  *Id.* (citation modified).  "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Id.* at 222 (citation modified).

As an initial matter, the change in position here was obvious: the Department once withheld these documents from the plaintiffs under FOIA; now it seeks to release them.  "Once a change in agency position is identified, the doctrine poses a second question: Did the agency display awareness that it *is* changing position and offer good reasons for the new policy?"  *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 570 (2025) (modification in original).  The answer to this question is yes.  The Department acknowledged that "[i]n or about February 2026, the Department reassessed its prior decision," "provided notice to President Biden's counsel of its preliminary view that the Zwonitzer Materials should be disclosed," and engaged in "extensive consultation" before reaching its final decision.  Winn Decl. ¶ 11; *see* Winn-Jeffress Emails 4; Decl. of Amy Jeffress ¶ 13, Dkt. 51-2 ("Perkins informed me that the Department had reversed its position on withholding and intended to release 117 pages of transcript and the corresponding audio recordings.").  The Department also identified reasons for its new position: Biden's privacy interests had waned after extensive redactions and were "outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials."  Winn Decl. ¶ 17.  The rationality

of the Department's decision, then, turns on traditional APA review of the agency's weighing of those values.[5]

The Department's disclosure decision was reasonable under the deferential APA standard. Start with Biden's privacy interests. In negotiations with Biden's lawyer, the Department made redactions where it determined that "the privacy interests of the President and other third parties . . . over[o]de the cognizable public interest in the audio and transcript." Winn-Jeffress Emails 4. Winn explained that "[a]s important public figures, the privacy interests of President Biden and certain other third-party public figures were evaluated differently given their status." *Id.* "Accordingly, as in the case of the Hur Report itself, redactions were not made where [the Department] found no serious harm to their interests in the release of the otherwise private information about them in Biden's discussions with his ghostwriter." *Id.* The Department "also did not redact content if the information was already public, be it cited in the Hur report, discussed in Congressional testimony, or published in President Biden's memoir." *Id.* The result is that "[i]nformation concerning President Biden's family and any family health issues has been fully redacted. Information concerning third parties who are not public figures has been redacted. National security information has been redacted as well as related information covered by the presidential communications privilege." Winn Decl. ¶ 6.

Bidens says that his "privacy interests are tremendous" because, among other things, "portions of the audio recordings remaining at issue took place in the context of broader

---

[5] Another facet of the change-in-position doctrine is that "an agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars*, 579 U.S. at 221–22 (citation modified). But Biden does not argue that the agency's earlier position to withhold the Zwonitzer materials engendered serious reliance interests. *See generally* Mem. Mot.

conversations between President Biden and his writing assistant that involved highly personal topics, including the illness and death of [his] son." Mem. Mot. 15 (citation modified). He also emphasizes the Department's earlier stance that "[h]ow Mr. Biden's voice sounded throughout those conversations . . . implicates substantial privacy rights." *Id.* (citation modified). The Court agrees that "government officials do not surrender all rights to personal privacy when they accept a public appointment." *Bast v. DOJ*, 665 F.2d 1251, 1254–55 (D.C. Cir. 1981); *see* Winn-Jeffress Emails 3 (acknowledging the same). But having reviewed the Zwonitzer materials *in camera*, the Court finds that Biden's privacy arguments largely overlook the Department's recent redactions and reasoning.

After the latest round of redactions, the Zwonitzer materials contain no mention of highly sensitive topics like illness or death, nor do they mention any non-public persons, including members of Biden's family. *Accord* Winn Decl. ¶ 6. The Court's *in camera* review of the materials—including a copy without the redactions applied—shows that the Department made substantial redactions to the audio and transcripts since its earlier stance in opposition to release. The remaining materials largely contain Biden's discussion of foreign policy—including his references to what may have been classified material in his possession—and his decision not to run for President in 2016.

Biden insists that, even if the Department "teased apart" his "personal and political lives," "the fact that these conversations included intimate discussion of [his] family life illustrates their private nature." Reply 8. But, as noted, Biden and Zwonitzer covered a number of topics, not all of which were personal in nature. *See* Winn-Jeffress Emails 3–4 (Winn citing the agency's segregability obligation under 5 U.S.C. § 552(b)); *Rudometkin v. United States*, 140 F.4th 480, 495 (D.C. Cir. 2025) ("Even if an exemption covers an entire agency record, the agency still must

release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." (citation modified)).  And while Biden's discussion of certain topics and other public figures could be considered sensitive, the Department reasoned that Biden's privacy interests are diminished by the Report's descriptions and the publication of his memoir, which contains some similar material, *see* Winn Decl. ¶ 15(c)–(d); Winn-Jeffress Emails 4—albeit without the same detail or exact language. Moreover, although Biden's privacy interest in the sound of his own voice is legitimate, *see N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1009 (D.C. Cir. 1990) (en banc), the Department explained that his privacy was already diminished by Hur's references to the "tone" and "sound" of certain of his statements in the tapes, *see* Winn Decl. ¶ 15(e); Winn-Jeffress Emails 2 (noting Hur's finding that "Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries"); *id.* at 4 (explaining that the Department "did not redact content if the information was already public," such as being "cited in the Hur report").  In all, the Department offered a rational explanation for its conclusion that Biden's "privacy interests in the Zwonitzer Materials were greatly reduced."  Winn Decl. ¶ 15.

Turning next to the Department's articulation of "the significant public interest in the disclosure of the redacted Zwonitzer Materials," *id.* ¶ 16, the Department explained that Congress and the public have an interest in Hur's investigation and declination decision, *see* Winn-Jeffress Emails 3; *id.* (noting congressional inquiry); *id.* ("Hur's express reliance on the audio recordings and transcripts as the basis of his decision . . . dramatically increases the public interest in them."); Winn Decl. ¶ 16(d)–(g).  The curated set of Zwonitzer materials "constituted both the primary evidence of the 2017 wrongful disclosures, as well as the primary basis for his decision to decline

prosecution of President Biden with respect to these wrongful disclosures." Winn-Jeffress Emails 3. The Department explained that "the integrity of a Special Counsel's investigation constitutes a matter of paramount public interest" and that Attorney General Merrick Garland's decision to release the Report turned on his determination "that the Hur Report addressed 'evidence that would warrant the belief by a reasonable person that government impropriety might have occurred.'" Winn-Jeffress Emails 3. Moreover, the Department elaborated that Biden had heightened the public's interest by "challeng[ing] the fairness, scope and propriety of the Hur Report and Mr. Hur's handling of Zwonitzer Materials." Winn Decl. ¶ 16(b).

As to the public interest in the audio—rather than the transcripts alone—the Department explained that Hur "relied on matters of 'tone' that could only be evaluated by reviewing the audio." *Id.* ¶ 16(c); *see also* Winn-Jeffress Emails 2 (noting Hur's finding that "Biden's memory appeared to have significant limitations at the time he spoke to Zwonitzer in 2017" because "Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow" and concluding that "[t]he audio and transcripts thus constitute not only the principal evidence on which Hur relied to reach his conclusion that the evidence would not support a finding of willfulness beyond a reasonable doubt but, as to the 2017 wrongful disclosures, what Hur *explicitly relied on in his public report* to justify his decision to decline prosecution for lack of willfulness" (emphasis in original)).

Biden's arguments about the public's interest are unavailing. He says that "any light that might be shed on the Special Counsel's investigation by the public disclosure of these materials is *de minimis*," Mem. Mot. 16, particularly in light of the Department's release of specific portions of the transcripts of the Zwonitzer interviews that Hur quoted in his report, *id.* at 17, and the Department's release of audio recordings of Biden's interview with Hur, *id.* at 6. But the D.C.

Circuit has "repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy." *CREW v. DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014); *see id.* (collecting cases). That public interest extends to records that would "likely reveal much about . . . the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches," *id.* (citation modified), which aligns with the Department's assessment of the public's interest in the Special Counsel's investigation and decision not to prosecute Biden, *see* Winn-Jeffress Emails 3 ("[I]n the face of a potential conflict of interest, public access to these materials becomes necessary to show whether in the face of a conflict of interest, Special Counsel Hur 'pulled his punches' or acted without impropriety."); Winn Decl. ¶ 16(a) ("Information about the Hur investigation into the alleged mishandling of classified material by a high-ranking public official sheds light on how the Department of Justice and its Special Counsel have performed their statutory duties.").

Biden also quibbles with the Department's reading of two cases in an email exchange with his lawyer leading up to the release decision. *See* Mem. Mot. 21–23. He says that the Department's "legal . . . errors . . . further evidence that the Department's position is arbitrary, capricious, and an abuse of discretion." *Id.* at 21. Biden is correct that "citation to a clearly distinguishable precedent is not enough" to support an agency's decision. *Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972, 976 (D.C. Cir. 1998). But the Department's reading of these cases is neither "clearly" wrong nor pivotal to its weighing of the factors that Congress intended it to consider under FOIA Exemptions 6 and 7(C).

First, Biden takes issue with Winn's citation to *National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004), in explaining the public's heightened interest in the Special Counsel's Office as opposed to the Supreme Court's analysis of the public interest in

death scene photographs that the Office of the Independent Counsel had collected in its investigation into former President William J. Clinton.  The Supreme Court in that case concluded that the descendant's family's privacy interest in preventing photographs of their family member's apparent suicide outweighed the public interest because "where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure."  *Id.* at 174.  But contrary to Biden's description that Winn "suggest[ed] that *Favish* demands disclosure," Mem. Mot. 21, Winn's email simply cites *Favish* in explaining that there is a heightened public interest in the functions of the Special Counsel, *see* Winn-Jeffress Emails 3 ("Hur reported directly to the Attorney General who in turn reported to the subject of his investigation.  The potential conflict of interest inherent in this arrangement requires a greater corresponding level of transparency as reflected in the Special Counsel Regulations. . . . It is for this reason that the integrity of a Special Counsel's investigation constitutes a matter of paramount public interest.").  Winn's subsequent "*see*" citation to *Favish* does not suggest that this finding of public interest required him to conclude falsely that *Favish* mandated disclosure here.

To the extent that Biden contests whether *Favish*'s "evidentiary requirements" regarding allegations of government impropriety are met here, *see* Mem. Mot. 22, he ignores the D.C. Circuit's more recent and binding pronouncement that the public interest in law enforcement records under Exemption 7(C) extends to public records that "would likely reveal much about . . . the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches," *CREW*, 746 F.3d at 1093, which Winn echoed in his email, *see* Winn-Jeffress Emails 3 ("[P]ublic access to these materials becomes necessary to

show whether in the face of a conflict of interest, Special Counsel Hur 'pulled his punches' or acted without impropriety.").

Next, Biden objects to Winn's "*compare*" citation to *Brennan Center for Justice v. U.S. Department of Justice*, 697 F.3d 184 (2d Cir. 2012).  *See* Mem. Mot. 23.  But Winn's explanation does not hinge on the details of that case—he merely analogizes the prior public release of the Hur Report to public domain waiver doctrine.  *See* Winn-Jeffress Email 3.

In sum, the Department's reading of the caselaw in its email to Biden's counsel does not render its bottom-line balancing of Biden's privacy and the public's interest arbitrary and capricious.

Finally, Biden's general allegations of political motivation do not vitiate the Department's reasonable weighing of personal privacy and the public interest.  Biden argues that "a change in administration does not give the Department of Justice license to make decisions motivated by the sitting President's well-documented animosity toward his predecessor."  Reply 10.  He also says that a "striking alignment between Administration officials and the Heritage Plaintiffs in their targeting of President Biden . . . bears directly on the purposes of the proposed disclosure under the Privacy Act and the Department's reasons for its new position under the APA."  Mem. Mot. 9; *see id.* at 9–10 (collecting statements by Trump, the Trump White House, Heritage, Heritage's lawyer, and Howell about Biden).

But "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."  *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019).  "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'"  *Id.* (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)).  The Supreme Court has "recognized a narrow exception to the

21

general rule against inquiring into the mental processes of administrative decisionmakers. On a strong showing of bad faith or improper behavior, such an inquiry may be warranted and may justify extra-record discovery." *Id.* at 781 (citation modified). Biden notes this doctrine in a footnote, *see* Mem. Mot. 31 n.7, but he neither offers any specific argument for looking beyond the agency's stated justification here nor advances the "strong showing of bad faith" necessary to do so, a standard that has "proven virtually impossible for plaintiffs to meet," *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 516 F. Supp. 2d 43, 54 n.4 (D.D.C. 2007).

In all, Biden is not likely to succeed on the merits of his cross-claims against the Department because he has not made a clear showing that the Department abused its discretion in "determin[ing] that President Biden's reduced privacy interests are outweighed by the significant public interest in the disclosure of the redacted Zwonitzer Materials" and concluding that "FOIA Exemptions 6 and 7(C) do not apply[] and the redacted Zwonitizer [*sic*] Materials are required to be provided to the FOIA requesters." Winn Decl. ¶ 17. Because the Department's determination that it was required to produce the Zwonitzer materials under FOIA was not "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A), its decision is "in accordance with," *id.*, the Privacy Act's exception for "disclosure of the record[s] . . . required under [FOIA]," *id.* § 552a(b)(2).

\*     \*     \*

The Court emphasizes that its evaluation of Biden's likelihood of success on the merits in this case is unique in several ways.

First, this case involves an unusually strong public interest in the release of law enforcement materials to outweigh the privacy interests protected by FOIA's exemptions. In

22

particular, (1) while serving in the position of Special Counsel, (2) Hur prepared a report detailing evidence that the then-sitting President had, among other things, disclosed classified information to his biographer, and (3) Hur report explicitly relied on the Zwonitzer materials in deciding not to prosecute Biden because of his mental state.  Attorney General Garland, in turn, (4) released Hur's report to the public, leading to (5) immense lay and congressional interest in the Special Counsel's Office, Hur's findings about Biden's mental state, and Hur's ultimate decision not to prosecute the sitting President.

These unparalleled circumstances account for the high degree of public interest in materials that were gathered during the course of a law enforcement investigation that resulted in no criminal charges.  As the Department itself acknowledged, "not all evidence acquired in connection with a special counsel investigation thereby becomes publicly disclosable" because of public interest in the Special Counsel.  Winn-Jeffress Emails 3.  Indeed, the Department described this case as "a very singular circumstance" involving "a very discrete set of materials" that have "been redacted" and "generally referenced and quoted and referred to in public fora" and concern "a former sitting [P]resident of the United States."  June 11, 2026 Hr'g Tr. 22:7–13.  In short, this case presents a confluence of significant public disclosures of prosecutorial decision-making, explicit reliance on particular records, and the statements of a high-profile public figure to support the Department's decision—all considered under the Court's highly deferential abuse-of-discretion review under the APA.

Second, the privacy interests in this case—though substantial—are mitigated by the Department's extensive redactions, as reviewed by the Court *in camera*.  As now redacted, the Zwonitzer materials contain no information about Biden's family or other private persons.  And while public figures maintain certain privacy rights, the Department did not abuse its discretion in

23

finding that nothing in the remaining Zwonitzer materials is sensitive enough to outweigh the public's unusually strong interest.

Finally, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation modified) (emphasis in original).  On this preliminary record, Biden simply has not carried that burden as to his likelihood of success on the merits.

## B.    Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.  The D.C. Circuit "has set a high standard for irreparable injury.  First, the injury must be both certain and great; it must be actual and not theoretical. . . . Second, the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation modified).  There is no question of imminent injury to Biden here given the Department's looming disclosure deadline.  Biden says that "the harm caused by the disclosure of [his] private conversations will be irreparable" because "[n]o judicial remedy could un-ring the bell or fairly compensate President Biden for the perpetual intrusion on his and his family's privacy."  Mem. Mot. 34.  The Court agrees that—on these facts involving the frank words of a public figure in his home—disclosure of the Zwonitzer materials risks irreparable harm to Biden's privacy interests and his reputation.  *See Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature.").

24

The severity of Biden's irreparable injury is less clear. *See Holland v. Florida*, 560 U.S. 631, 649–50 (2010) ("We have said that courts of equity must be governed by rules and precedents no less than the courts of law. But we have also made clear that often the exercise of a court's equity powers . . . must be made on a case-by-case basis." (citation modified)). Biden offers little in the way of specific details about the types of harm he foresees, especially in light of related information already in the public domain like the Hur Report and Biden's deposition with the Special Counsel. And courts are generally reluctant to find general harms to personal reputations to be irreparable. *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 103 (D.D.C. 2014) (If "any harm to his personal reputation . . . constituted irreparable harm, not compensable through monetary damages, defamation plaintiffs would regularly obtain preliminary injunctions against their defamers rather than seek monetary damages."); *Sampson v. Murray,* 415 U.S. 61, 91–92 (1974) ("Assuming . . . that respondent had . . . supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case."). Moreover, not all of Biden's potential harm here is irreparable because the Privacy Act provides a private right of action for "actual damages" and attorney fees against the United States in the case of a violation. *See* 5 U.S.C. § 552a(g)(1); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citation modified)).

Accordingly, the Court finds that—absent a preliminary injunction—Biden is likely to suffer irreparable injuries from the Department's disclosure of the Zwonitzer materials to the plaintiffs. But, to the extent that the D.C. Circuit's "sliding scale approach remains good law

25

after . . . *Winter v. Natural Resources Defense Council, Inc.*," *Clevinger*, 134 F.4th at 1235, his showing of such harms is not so "strong" that it "could make up for a weaker showing" on the likelihood-of-success prong, *Sherley*, 644 F.3d at 392.

###### C.    Balance of the Equities & Public Interest

Finally, the Court "must carefully balance the equities by weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024). Biden has not identified any public harm that would arise absent an injunction in this case. And, as with the Department's FOIA balancing discussed above, the harm to Biden's diminished privacy interest is outweighed by the public's interest in the Zwonitzer materials and FOIA's "policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (citation modified).

### CONCLUSION

For the foregoing reasons, the defendant-intervenor Joseph R. Biden, Jr.'s Motion for a Preliminary Injunction, Dkt. 65, is denied. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

June 19, 2026

26